**No. 2014-1303**

# In the
# United States Court of Appeals
## for the Federal Circuit

VIIV HEALTHCARE CO., VIIV HEALTHCARE UK LTD.,

*Plaintiffs-Cross-Appellants,*

v.

LUPIN LTD., LUPIN PHARMACEUTICALS, INC.,
TEVA PHARMACEUTICALS USA, INC.,

*Defendants-Appellants.*

_____

Appeal from the United States District Court for the District of Delaware,
No. 1:11-cv-00576-RGA.
Honorable **Richard G. Andrews**, Judge Presiding.

## PRINCIPAL BRIEF OF APPELLANTS/PETITIONERS
## LUPIN LTD. and LUPIN PHARMACEUTICALS, INC.

WILLIAM A. RAKOCZY
PAUL J. MOLINO
DEANNE M. MAZZOCHI
RACHEL PERNIC WALDRON
PATRICK C. KILGORE
RAKOCZY MOLINO MAZZOCHI SIWIK LLP
6 West Hubbard Street, Suite 500
Chicago, IL 60654
(312) 527-2157

*Counsel for Defendants-Appellants*
*Lupin Ltd. and Lupin Pharmaceuticals, Inc.*

Dated: June 6, 2014

 COUNSEL PRESS · (866) 703-9373         PRINTED ON RECYCLED PAPER 

## <u>CERTIFICATE OF INTEREST FOR</u>
## <u>LUPIN LTD. AND LUPIN PHARMACEUTICALS, INC</u>.

Pursuant to Federal Circuit Rules 27(a)(7) and 47.4, counsel for Defendants-Appellants Lupin Ltd. and Lupin Pharmaceuticals, Inc. certifies the following:

1.    The full name of every party represented by me is:

Lupin Ltd. and Lupin Pharmaceuticals, Inc.

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

Not Applicable.

3.    All parent corporations and any publically-held companies that own 10% or more of the stock of any party represented by me are:

Lupin Pharmaceuticals, Inc. is a wholly-owned subsidiary of Lupin Ltd.

4.    The names of all law firms and the partners or associates that have appeared for the parties now represented by us in the trial court or are expected to appear in this Court are:

William A. Rakoczy
Paul J. Molino
Deanne M. Mazzochi
Rachel Pernic Waldron
Tara M. Raghavan
Yixin H. Tang
Harven DeShield
John J. McGuirk
Patrick C. Kilgore
Neil A. Benchell*
Matthew T. Lord*
RAKOCZY MOLINO MAZZOCHI SIWIK LLP
6 West Hubbard Street, Suite 500
Chicago, Illinois  60654

*No longer affiliated with the firm.

John C. Phillips, Jr.
Megan C. Haney
PHILLIPS, GOLDMAN & SPENCE, P.A.
1200 North Broom Street
Wilmington, Delaware 19806


Dated:  June 6, 2014            RAKOCZY MOLINO MAZZOCHI SIWIK LLP


                                /s/Deanne M. Mazzochi
                                Deanne M. Mazzochi
                                William A. Rakoczy
                                Paul J. Molino
                                Rachel Pernic Waldron
                                Patrick C. Kilgore
                                6 West Hubbard Street, Suite 500
                                Chicago, Illinois 60654
                                (312) 527-2157

                                *Attorneys for Defendants-Appellants*
                                *Lupin Limited and Lupin Pharmaceuticals, Inc.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... vii

LIST OF ABBREVIATIONS ....................................................................xi

I.     STATEMENT OF RELATED CASES ...................................1

II.    JURISDICTIONAL STATEMENT ......................................1

III.   STATEMENT OF ISSUES ...................................................2

IV.    STATEMENT OF THE CASE ..............................................4

      A.     The Proceedings Below-District of Delaware........................4

      B.     Statement of Facts. ...............................................................5

            1.     Preliminary Statement................................................5

            2.     HIV.............................................................................6

            3.     The NRTI drug class. .................................................7

                  a.     NRTI combinations. .......................................7

                  b.     3TC vs. ddC. ..................................................9

                  c.     ABC. ...............................................................9

            4.     Other drug classes. ..................................................10

            5.     Drugs in human trials pre-March 1995....................10

            6.     Motivation to pursue NRTI combinations. ...............11

                  a.     Triple combinations......................................11

                  b.     Triple combinations-starting points................13

                  c.     Larder 1993....................................................17

            7.     Cross-resistance. ......................................................18

            8.     Alleged "failures." ...................................................19

9.  Trizivir's performance. ............................................................20

10.  The '191 patent-overview. .................................................21

11.  The '191 patent's specification. ..............................................22

V.  SUMMARY OF THE ARGUMENT .................................................23

VI.  ARGUMENT..........................................................................................25

A.  The asserted claims satisfy § 103 obviousness. ...................................25

1.  The district court imposed overly rigid motivation-to-combine requirements. .............................................................25

a.  Lupin only had to prove a reason to combine. ...............26

b.  ABC was known to inhibit HIV replication. ...................27

c.  The district court erred by diminishing the motivation absent extraordinarily high clinical efficacy guarantees. ........................................................27

i.  Conclusive efficacy proof is not required to establish motivation............................................29

ii.  It is legal error to deride the prior art for inadequacies the '191 patent fails to resolve. ......31

d.  A perfect understanding of why combinations work is not required for a motivation to pursue them. ...................................................................33

e.  Reliance on unknown "potential" toxicity was both legally and factually improper.......................................34

f.  KSR rejected the premise a printed publication must express the motivation to combine. .....................35

g.  The number of options in Larder 1993 does not preclude a motivation to pursue the AZT/3TC/ABC combination. ..........................................37

iv

|  | h. | Cross-resistance could not discourage ABC's use in AZT/3TC combinations..............................................41 |

2. The district court misapplied the obvious-to-try analysis.........45

3. ViiV's secondary considerations evidence was legally irrelevant. ...............................................................47

    a. No commercial success. ......................................47

    b. No failure of others or unmet needs. ..............................48

        i. No nexus.............................................................48

        ii. Other legal errors....................................................49

    c. No unexpected results.....................................................51

4. The district court incorrectly weighed the *Graham* factors under this Court's drug-combination precedent. .....................53

    a. *Graham* factors 1 and 2. ....................................54

    b. *Graham* factor 3..............................................55

    c. *Graham* factor 4..............................................55

    d. Balancing the *Graham* factors........................................56

B. The '191 patent is invalid under 35 U.S.C. § 112...............................60

1. Patents to hypotheses or research proposals are non-enabled. ...............................................................61

2. The district court's multiple findings the art was unpredictable..........................................................62

3. The district court's enablement and nonobviousness judgments cannot be reconciled..............................................63

C. The district court's construction of the '191 patent claims was overbroad.............................................................66

VII. CONCLUSION...............................................................66

VIII.  STATEMENT PURSUANT TO FEDERAL RULE OF APPELLATE
       PROCEDURE 28(i) ..................................................................................... 66

# TABLE OF AUTHORITIES

## Federal Cases

*AK Steel Corp. v. Sollac & Ugine*,
  344 F.3d 1234 (Fed. Cir. 2003) .................................................................. 60, 61

*Alcon Research, Ltd. v. Apotex, Inc.*,
  687 F.3d 1362 (Fed. Cir. 2012) .......................................................... 32, 36, 43

*Allergan Inc. v. Sandoz Inc.*,
  726 F.3d 1286 (Fed. Cir. 2013) ..................................................... 28, 34, 56, 57

*Alza Corp. v. Andrx Pharm., LLC*,
  603 F.3d 935 (Fed. Cir. 2010) ......................................................................63

*Alza Corp. v. Mylan Labs., Inc.*,
  464 F.3d 1286 (Fed. Cir. 2006) .................................................................. 33, 36

*Bayer Healthcare Pharm., Inc. v. Watson Pharm. Inc.*,
  713 F.3d 1369 (Fed. Cir. 2013) ........................................................ 40, 49, 53

*Bayer Schering Pharma AG v. Barr Labs., Inc.*,
  575 F.3d 1341 (Fed. Cir. 2009) .......................................................................56

*Bristol-Myers Squibb Co. v. Teva Pharm. USA, Inc.*,
  923 F. Supp. 2d 602 (D. Del. 2013) .................................................................29

*Galderma Labs., L.P. v. Tolmar, Inc.*,
  737 F.3d 731 (Fed. Cir. 2013) ................................................................ *passim*

*Genentech Inc. v. Novo Nordisk A/S*,
  108 F.3d 1361 (Fed. Cir. 1997) .......................................................................64

*Graham v. John Deere Co.*,
  381 U.S. 1 (1996)...................................................................................... 30, 31

*Great Atl. & Pac. Tea Co. v. Supermarket Equip. Corp.*,
  340 U.S. 147 (1950)........................................................................................26

*Hoffmann-La Roche Inc. v. Apotex, Inc.*,
  --- F.3d ---, 2014 WL 1394948 (Fed. Cir. Apr. 11, 2014)............... 29, 42, 46, 59

*In re '318 Patent Infringement Litig.*,
    583 F.3d 1317 (Fed. Cir. 2009) ............................................................ 60, 63, 65

*In re Borkowski*,
    422 F.2d 904 (C.C.P.A. 1970) ................................................................51

*In re Brana*,
    51 F.3d 1560 (Fed. Cir. 1995) ....................................................... 63, 64

*In re Cortright*,
    165 F.3d 1353 (Fed. Cir. 1999) ............................................................65

*In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*,
    676 F.3d 1063 (Fed. Cir. 2012) ............................................................49

*In re Enhanced Sec. Research, LLC*,
    739 F.3d 1347 (Fed. Cir. 2014) ............................................................37

*In re Fisher*,
    421 F.3d 1365 (Fed. Cir. 2005) ............................................................64

*In re Fulton*,
    391 F.3d 1195 (Fed. Cir. 2004) ............................................................40

*In re Harris*,
    409 F.3d 1339 (Fed. Cir. 2005) ............................................................52

*In re Huang*,
    100 F.3d 135 (Fed. Cir. 1996) ..............................................................52

*In re Kahn*,
    441 F.3d 977 (Fed. Cir. 2006) ..............................................................43

*In re Kubin*,
    561 F.3d 1351 (Fed. Cir. 2009) ............................................................46

*In re Mod*,
    408 F.2d 1055 (C.C.P.A. 1969) ............................................................53

*In re Novak*,
    306 F.2d 924 (C.C.P.A. 1962) ..............................................................61

*In re Omeprazole Patent Litig.*,
483 F.3d 1364 (Fed. Cir. 2007) ........................................................48

*KSR Int'l Co. v. Teleflex Inc.*,
550 U.S. 398 (2007).................................................... *passim*

*McNeil-PPC, Inc. v. L. Perrigo Co.*,
337 F.3d 1362 (Fed. Cir. 2003) ................................ 28, 57

*Merck & Co. v Biocraft Labs., Inc.*,
874 F.2d 804 (Fed. Cir. 1989) ........................ 27, 38, 45, 52

*Merck & Co. v. Teva Pharm. USA, Inc.*,
395 F.3d 1364 (Fed. Cir. 2005) ........................................31

*Mintz v. Dietz & Watson, Inc.*,
679 F.3d 1372 (Fed. Cir. 2012) ........................................49

*Muniauction, Inc. v. Thomson Corp.*,
532 F.3d 1318 (Fed. Cir. 2008) ................................ 33, 48

*Novo Nordisk A/S v. Caraco Pharm. Labs., Ltd.*,
719 F.3d 1346 (Fed. Cir. 2013) .............................. *passim*

*Pfizer, Inc. v. Apotex, Inc.*,
480 F.3d 1348 (Fed. Cir. 2007) .............................. *passim*

*PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*,
491 F.3d 1342 (Fed. Cir. 2007) ................................ 29, 59

*Pozen Inc. v. Par Pharm., Inc.*,
696 F.3d 1151 (Fed. Cir. 2012) ........................................58

*Purdue Pharma Prods. L.P. v. Par Pharm. Inc.*,
377 Fed. App'x 978 (Fed. Cir. 2010) ................................40

*Rasmusson v. SmithKline Beecham Corp.*,
413 F.3d 1318 (Fed. Cir. 2005) .............................. *passim*

*Richardson-Vicks, Inc. v. Upjohn Co.*,
122 F.3d 1476 (Fed. Cir. 1997) ................................ 53, 57

ix

*Sanofi-Aventis Deutschland GMBH v. Glenmark Pharm. Inc.*,
   --- F.3d ---, 2014 WL 1552167 (Fed. Cir. Apr. 21, 2014) .................................59

*Santarus, Inc. v. Par Pharm. Inc.*,
   694 F.3d 1344 (Fed. Cir. 2012) ...........................................................49

*Scott v. Finney*,
   34 F.3d 1058 (Fed. Cir. 1994) ............................................................61

*Simmons Fastener Corp. v. Ill. Tool Works Inc.*,
   739 F.2d 1573 (Fed. Cir. 2013) ..........................................................47

*Tokai Corp. v. Easton Enters. Inc.*,
   632 F.3d 1358 (Fed. Cir. 2013) ..........................................................47

*Tyco Healthcare Grp. LP v. Mut. Pharm. Co.*,
   642 F.3d 1370 (Fed. Cir. 2011) ..........................................................30

## Federal Statutes

28 U.S.C. § 1295(a)(1) .......................................................................1

28 U.S.C. § 1331 .............................................................................1

28 U.S.C. § 1338(a) .........................................................................1

35 U.S.C. § 103 ......................................................................... 5, 24, 25

35 U.S.C. § 112 ........................................................................... 25, 60

## Federal Rules

Fed. R. App. P. 28(i) ................................................................. *passim*

Fed. R. Evid. 106 ..........................................................................37

x

## LIST OF ABBREVIATIONS

| Abbreviation | Reference |
|---|---|
| '191 patent | U.S. Patent No. 6,417,191 |
| A | Adenosine |
| Abacavir, ABC, or 1592U89 | (1S, 4R)-cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-yl]-2-cyclopentene-1-methanol |
| ANDA | Abbreviated New Drug Application |
| ABC/3TC | Treatment of HIV infection by simultaneous administration of ABC and 3TC |
| ABC/ddC | Treatment of HIV infection by simultaneous administration of ABC and ddC |
| AIDS | Acquired Immunodeficiency Syndrome |
| AZT | Zidovudine |
| AZT/3TC | Treatment of HIV infection by simultaneous administration of AZT and 3TC |
| C | Cytidine |
| d4T | Stavudine |
| ddC | Zalcitibine |
| ddI | Didanosine |
| DNA | Deoxyribonucleic Acid |
| FDA | U.S. Food and Drug Administration |
| FTC | Emtricitabine |
| G | Guanosine |
| HIV | Human Immunodeficiency Virus |
| Lamivudine or 3TC | (2R, cis)-4-amino-1-(2-hydroxymethyl-1,3-oxathiolan-5-yl)-(1H)-pyrimidin-2-one |
| Larder 1993 | Patent Cooperation Treaty Publication No. WO 93/23021 (A4245-78) |
| M184V | A mutation at codon 184 in RT, in which valine replaces methionine |

| **Abbreviation** | **Reference** |
|:---:|:---:|
| Monotherapy | Treatment with a single agent |
| NNRTI(s) | Non-Nucleoside Reverse Transcriptase Inhibitor(s) |
| NRTI(s) | Nucleoside Reverse Transcriptase Inhibitor(s) |
| PI(s) | Protease Inhibitor(s) |
| Rideout | Rideout, D. & Chou, T., Synergism, Antagonism and Potentiation in Chemotherapy: An Overview, Synergism and Antagonism in Chemotherapy (1991) |
| RNA | Ribonucleic Acid |
| RT | Reverse Transcriptase |
| T | Thymidine |
| Trizivir | Reference-listed drug comprising abacavir sulfate, lamivudine, and zidovudine |

## I.     STATEMENT OF RELATED CASES

Counsel for Defendants-Appellants Lupin Limited and Lupin Pharmaceuticals, Inc. ("Lupin") state no other appeal from the civil actions below was previously before this or another appellate court.

*ViiV Healthcare UK Ltd. v. Lupin Ltd.*, No. 14-cv-00369 (D. Del., filed Mar. 21, 2014) may be directly affected by the decision in this appeal.

## II.     JURISDICTIONAL STATEMENT

This appeal arises from ViiV's lawsuits brought in the District of Delaware against Teva (No. 11-cv-00688) and Lupin (No. 11-cv-00576) (later consolidated) alleging '191 patent infringement.  The district court had subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

This Court has jurisdiction from the district court's final judgment entered January 27, 2014 (signed January 24, 2014) under 28 U.S.C. §1295(a)(1).  (A1-2, A148).  Lupin timely filed its Notice of Appeal on February 21, 2014.  ViiV filed its Notice of Cross-Appeal on February 24, 2014.

III.    **STATEMENT OF ISSUES**

1.    Whether the district court's obviousness analysis erred by:

- requiring advance-predictability of extended, superior, human clinical success;

- deeming combinations of less-potent drugs "failures" discouraging combinations with more potent drugs;

- raising issues the '191 patent nowhere addresses, let alone resolves; and

- compelling express motivation statements to exist in a publication, not the skilled artisan's general knowledge.

2.    Whether the district court's obvious-to-try analysis erred by finding 28 drugs available for use in combination was not a finite set, further limited when considering the art as a whole;

3.    Whether the district court erred in finding the asserted claims of the '191 patent non-obvious, when its secondary considerations analysis:

- erroneously assumed nexus;

- relied on the marketed Trizivir product despite its exclusion from the asserted claims' scope;

- applied the wrong legal test for failure of others/long felt need; and

- adopted "unexpected results" not commensurate in scope with the claims or distinguishable from the closest prior art.

4. Whether the district court erred in balancing the four *Graham* factors when considering the AZT/3TC/ABC triple combination's obviousness given it found a trend in the art towards combination therapy; AZT/3TC was a successful NRTI combination; doctors already used triple NRTI combinations; and the art recognized ABC was a potent drug in clinical trials with less toxicity and synergistic effects in AZT combinations.

5. Whether the district court erred in finding enablement of the '191 patent when: (i) the specification lacks experimental proof of credible utility; and (ii) it was not shown that a skilled artisan would accept the asserted utility "without question."

6. Whether the district court's claim construction declining to limit the claims to results achieving "synergy" was error, particularly given the importance the district court placed on the combination achieving certain test outcomes in its obviousness and § 112 analysis.

## IV.    STATEMENT OF THE CASE

Lupin incorporates Statement of the Case § II ("The Patent-in-Suit") of Teva's Opening Brief.  Fed. R. App. P. 28(i).  Lupin focuses below on triple-combination issues.

### A.    The Proceedings Below-District of Delaware.

ViiV's lawsuit against Lupin concerns ANDA No. 202-912, involving a generic version of the triple-combination drug Trizivir.  (A7).

In November 2012, the district court construed various claim terms. Notwithstanding the importance of ViiV's "synergy" representations to the PTO, which the PTO relied upon to issue the claims, the district court declined to limit the claim scope to only synergistic combinations.  (A83, A85-94).

In June 2013, the district court held a trial on invalidity and Lupin's noninfringement of ViiV's asserted claims 4, 26, 27, 29, 30, 34, 36, 38, 39, and 47 of the '191 patent.  (A1-2).  The district court agreed Lupin's ANDA product was non-infringing because Lupin's product contains abacavir sulfate, not the claimed abacavir (a non-salt compound).  (A8-21).  On invalidity, the district court entered judgment the asserted claims are not invalid under 35 U.S.C. §§ 103 or 112.  (A1).

## B.    Statement of Facts.

The critical date for the '191 patent is March 30, 1995.  (A23).  The asserted claims involve dual- and triple-combinations of drugs previously-known to combat HIV:  abacavir ("ABC"); lamivudine ("3TC"); and zidovudine ("AZT").[1]

Claim 47 involves a triple-combination tablet/capsule.  (A10).  The remaining claims involve methods to treat or prevent "symptoms or effects of an HIV infection" using a double (26, 27, 29, 30) or triple (4, 34, 36, 38, 39) combination.  (A16, A19).

The district court held the claims encompass methods "designed to halt viral replication."  (A18; *id.* (combinations "inhibit[] replication of the HIV virus")).

### 1.    Preliminary Statement.

The district court found the facts required to find obviousness under 35 U.S.C. § 103 when applying the correct legal standards.

Lupin showed one of ordinary skill could assemble a triple combination to halt HIV replication with a reasonable expectation of success.  The district court went astray by requiring that the prior art guarantee the triple combination could produce long-term clinical efficacy that would keep patients from dying, without toxicity, potency problems, or cross-resistance (A69)—outcomes the '191 patent

---

[1]  The asserted claims contain certain drug formulation and/or ratio elements; ViiV agreed obviousness turned on whether one of ordinary skill would have found it obvious to combine the drugs at issue.  (A1709-13).

itself never resolves. The district court's over-amplification of these issues infected the district court's obvious-to-try and secondary considerations analyses. Compounding the errors, the district court assumed ViiV's Trizivir established secondary considerations, despite the asserted claims' failure to cover it. Such errors further tainted the district court's balancing of the *Graham* factors.

The district court's obviousness analysis is irreconcilable with its (1) refusal to construe the claims as limited to combinations exhibiting unexpected/superior synergy; (2) determination ViiV showed infringement of the "treating symptoms or effects of an HIV infection" claim element because the drugs inhibit HIV replication; and (3) conclusion that the '191 patent was enabled via one *in vitro* HIV replication test combined with the skilled artisan's knowledge.

## 2. HIV.

HIV is a virus that rapidly proliferates in the human body. (A25). HIV levels in the body are measured as viral load. (A250). Long-term excessive HIV viral loads eventually overwhelm the body's immune system. (A23-24). When a person's immune system is exhausted, their CD4 (t-cell) counts fall too low, rendering the body vulnerable to other infections (*e.g.*, pneumonia) or cancers that independently harm the body. (*Id.*; A277-79). HIV drug therapy interferes with the HIV replication process to suppress viral loads. (A24-25).

### 3.     The NRTI drug class.

The Nucleoside Reverse Transcriptase enzyme facilitates the assembly of new HIV DNA and RNA with nucleoside bases, abbreviated T, A, C and G.  (A24-25).

The first drug with a demonstrable ability to reduce patients' viral loads—however briefly and with adverse side effects at the initial doses given—was the Nucleoside Reverse Transcriptase Inhibitor ("NRTI") AZT.  (A25).  NRTI drugs are "T," "A," "C," or "G" analogs with key structural differences designed to fool the enzyme such that the drug, once incorporated into a growing HIV chain, terminates that chain's growth.  (A24-25).

FDA approved the first generation NRTIs in the 1980s–early 1990s (AZT, ddC, ddI, d4T).  (A28).  Next-generation NRTIs were designed for greater potency and/or less toxicity.  3TC (C analog) was more potent compared to ddC (C analog).  (A31; A690-91, A712-13).  ABC (G analog), was designed to have better potency and fewer side effects compared to carbovir (G analog).  (A31-32).

### a.     NRTI combinations.

Many researchers and clinicians adopted a strategy of using NRTIs in combination.  FDA approved an AZT/ddC combination; physicians also routinely used an AZT/ddI combination off-label.  (A26, A33; A672-73, A1512).

7

By June 1993, the clinical literature recognized most AIDS patients were being treated with drug combinations.  (A26).

A November 1993 published patent application, WO 93/23021 ("Larder 1993"), noted after AZT achieved widespread use, it was "observed that in certain instances following prolonged treatment, the virus may develop [] resistance to [AZT] and therefore a loss of sensitivity to the drug."  (A4247).  Larder 1993 taught its preferred strategy for overcoming this problem—using AZT and 3TC (or the latter's analog, FTC) together as combination therapy:

> An especially preferred embodiment… comprises… lamivudine [3TC] or FTC together with zidovudine [AZT].  The use in combination of the two types of HIV-RT inhibitor results in a very significant effect in reducing or preventing the development and maintenance by HIV populations of resistance to zidovudine.

(A4251).

The district court found that by early 1995, the art "strongly suggest[ed] that the field had been moving toward combination therapy."  (A27).  Double-blind clinical trials with AZT/3TC (Larder 1993's "especially preferred" combination) showed the combination outperformed AZT monotherapy.  (A4251; A4128-29; A26-27).  The parties' experts uniformly agreed the AZT/3TC clinical data provided the "most sustained immune system benefit… of any combination yet tested" (A834-35; *see also* A847-48, A1530-31, A1540), producing a tenfold viral

load reduction for a period of over a year.  (A4128-29; A4116-17; A847-48).  The

district court further found:

> [t]he AZT and 3TC combination was a momentous development in the field.  Results from the corresponding trials were described as a "breath of fresh air," and the combination was said to offer "the most potent and longest lasting effect of any antiretroviral strategy yet tested in clinical trials."  AZT and 3TC effectively delayed the emergence of resistant strains of HIV, even though neither drug did so individually.

(A31 (citations omitted)).

The district court ultimately concluded that "the evidence is clear and convincing that combination therapy was generally thought to offer better treatment opportunities by March 1995."  (A27).

### b.    3TC vs. ddC.

The above-referenced AZT/3TC studies included a comparator arm to AZT monotherapy **and** the existing FDA-approved combination of AZT and less-potent ddC.  (A4131).  ViiV's expert agreed that one of ordinary skill would understand from these studies that 3TC was clearly better than ddC in targeting the "C" bases in the replicating DNA.  (A4128-31; A1534-36).  This gave the skilled artisan a reason to focus on 3TC combinations.

### c.    ABC.

Another next-generation NRTI, ABC, saw its first clinical data published at an October 1994 ICAAC conference; as the district court found, a publication

9

reciting the major points of the conference specifically highlighted ABC. (A32). The district court found the literature reported ABC "had lower toxicity than AZT"; had "*in vitro* synergistic activity with AZT, ddI, and ddC"; was an "attractive candidate for clinical evaluation"; and was "'an important candidate for further development as an anti-HIV drug for combination therapy,' due to its 'cross-resistance profile and the relatively slow emergence of resistance.'" (A33). The district court found ABC "would have been a ripe candidate for researching new combination therapies." (*Id.*)

### 4.    Other drug classes.

One under-development drug class targeted the Nucleoside Transcriptase enzyme with non-nucleoside drug structures ("NNRTIs"). (A29 n.9). Another, "PIs," targeted the protease enzyme, which performs a viral replication "cleavage" step necessary for producing mature viral strands. (*Id.*) While 5 and 8 drugs in these classes, respectively, were in clinical trials by the critical date, none were FDA-approved for either mono- or combination therapy. (A29).

### 5.    Drugs in human trials pre-March 1995.

By March 1995, there were 28 NRTIs, NNRTIs, PIs, etc. that had been used against HIV in human clinical trials. (A29). These NRTIs included existing FDA-approved drugs and several less-potent drugs. (A1500-05, A1515-18). The

10

remaining few were next-generation NRTIs:  3TC; FTC (a "C" analog); and ABC. (A31-33; A712-13, A1518-19).

### 6.    Motivation to pursue NRTI combinations.

The district court recognized the AZT/3TC combination "consisted of two NRTIs and was the first HIV therapy to offer lasting clinical benefits," and that "it would follow that persons skilled in the art would attempt to build on the success garnered from combinations in the NRTI class." (A28).  While the district court identified the other drug classes as options, it recognized that prior efforts to combine an NRTI with another drug class (*e.g.*, AZT plus interferon, AZT plus the NNRTI nevirapine) produced no clinical benefit by the critical date.  (A35).

While, as Teva discusses, certain patients would not or could not take AZT, the art continued to vigorously pursue AZT/3TC, including in further combinations.

### a.    Triple combinations.

Even before the published AZT/3TC clinical results, late 1994 articles recognized that some early combination clinical trial results (AZT/ddC vs. AZT alone), while not statistically significant, "may, in fact, have ***encouraged clinicians to prescribe combinations earlier in the course of disease***, because the trend… showed that combinations should be used earlier rather than later." (A4008 (emphasis added); A1508-09).  One researcher insisted "it is better to hit

11

as hard as you can as early as you can" (A4008), a.k.a., the "hit-hard hit-early" principle. (A1507; *see also* A851, A924). Another researcher similarly explained, "[m]y inclination would be to use combinations right away. We are all waiting for better drugs to become available, and if such drugs were available there is little doubt that we would want to use our most effective therapies initially." (A4008).

While the district court noted these early clinical trials left some doubt about combinations (A26-27, A34), the results with AZT and the next-generation, more potent 3TC caused Dr. Raymond Schinazi, who played a sizable role in new drug development (A1539), to publish in March 1995 (pre-critical date) that "[s]cientists are finally waking up and smelling the data," and realizing NRTIs "*are not* all the same." (A1539-40 (emphasis added); A4280). ViiV's expert agreed. (A1542).

Dr. Schinazi emphasized there should be a paradigm shift, analogizing HIV to tuberculosis, where single-agent therapy had failed for years, but combination therapy was successful when initiated early. (A1539-40; *see also* A829-30, A851, A876-79). While Dr. Schinazi discussed differences in NRTI toxicities as well (A4280), his fundamental emphasis was to use potent combinations, early, to keep the disease under control. (A1539-40; *see also* studies showing combinations could prevent resistance in the first instance at A672-85, A4169-72; A4156-66).

The district court correctly found that the "general consensus was that combination therapy should be started earlier rather than later in treatment."

12

(A34).  There was "hope that potent combinations would delay the emergence of a resistant virus."  (A41).

### b.     Triple combinations-starting points.

In terms of *which* drugs to combine, the art gave clear guidance; it was not a metaphorical dart board where any and every parameter required blind variation.

The district court correctly found "persons skilled in the art would attempt to build on the success garnered from combinations in the NRTI class."  (A28).  The biggest success was the AZT/3TC combination, published in January-February 1995.  (A27-28).  February 1995 then saw the publication of an abstract building on that success, which discussed clinical trials with the triple NRTI combination AZT/3TC/ddI.  (A3729).

The district court was unsure this combination would "inspire imitation" since clinical trial *results* were not yet published.  (A54).  But skilled artisans would understand physicians started prescribing this triple combination (AZT/3TC plus the commercially-available ddI) (A53), *despite* the absence of published clinical trial results.  (A54).  Indeed, the district court recognized that with otherwise-dying patients, physicians were willing to pursue *any* option absent experimental evidence saying ***not*** to pursue that path.  (A47-48).  The AZT/3TC/ddI combination shows pursuit of triple NRTI combinations based upon AZT/3TC already existed in the art.

13

The district court also expressly found that the art perceived ABC was a "ripe candidate for researching new combination therapies." (A33). That alone is reason enough to include it in a triple NRTI combination with AZT/3TC.

ABC represented an opportunity to improve upon the existing triple combination for further independent reasons. It was understood that patient compliance in taking medications was a significant concern. (A25; A488-89, A1538). With ddI, there were known toxicities including pancreatitis (A52), and its doses required pills so big they were like horse pills. (A1538). ABC was structurally similar to ddI (A54; A944), and was designed to have better potency; less toxicity; and better oral bioavailability. (A53-54; A518-20; A4372-73; A860-61; *see also* A32 (comparing ABC toxicity to carbovir analog)).

There were a limited number of NRTI alternatives to the FDA-approved ddI. The next-generation NRTIs were two: FTC (a 3TC analog) and ABC (a ddI analog that produced the same *in vivo* product as another ddI analog, carbovir, but without its toxicity problems). (A53-54; A496-97, A944, A1517-25; A4372-73).

The district court acknowledged multiple experts testified that when combining NRTIs, one of ordinary skill would have known to pursue combinations where each NRTI did not target the same DNA base, to avoid drugs competing for the same site on the DNA chain. (A36-37). ViiV's expert conceded one of ordinary skill would "avoid[] the use of [nucleoside] analogs based on the same

14

DNA building block. For example, avoiding two thymidine analogs used in conjunction." (A1401). With AZT a T analog, and 3TC a C analog, the only other bases available to target in a triple combination were A or G. (A982, A1517).

While the district court accepted that "it has been established that one might *avoid* combining drugs that work on the same base" (A39 (emphasis added)), the district court nevertheless criticized the premise a skilled artisan would affirmatively craft an NRTI combination with drugs that each targeted different bases. (A36-39, A48, A53-54, A59).

*First*, this is a distinction without a difference for triple combinations. With only four possible bases to target, a triple combination must target three of the four bases to avoid combining drugs that work on the same base.

*Second*, the district court never suggested the different-base approach was scientifically unsound, or Defendants' witnesses lacked credibility. Rather, the district court repeatedly complained the rationale was not formally published. (A37 (criticizing that there was no "single reference to support the premise that combining analogs of different bases was known to provide a more potent combination"), A39, A48 ("[N]o references in the prior art support the position that drug researchers understood this phenomenon."), A54, A59 ("[W]ere such a relationship established in the field, it would have been reported in some study.")).

15

Yet, ViiV itself presented, via its expert, Dr. Ho, information from a paper by Rideout, PTX 425. (A1543). On cross-examination, Dr. Ho conceded that Rideout—published prior to March 1995—expressly taught that the synergism observed between AZT and ddI might be explained by the drugs being "incorporated into different sites… on the same DNA strand formed by the HIV reverse transcriptase. ***In this way, neither drug competes for the incorporation of the other***." (A1543-44 (emphasis added)). The rationale an NRTI combination achieved synergy because the drugs did not have to compete with each other at a DNA incorporation site ***was*** in the published literature.

Thus, with the understanding that a combination should not simultaneously target the same bases, and that AZT/3TC target "T" and "C," one of ordinary skill is left with one of two options: target "A" or "G." (A982, A1517). The only NRTIs still in human trials targeting "A" or "G" were ddI and ABC. (A690, A982, A1513-18). Two is a finite, limited number of options. The skilled artisan could further narrow the list to ABC since ddI was already used and ABC is structurally similar to ddI. (A54, A944).

Thus, by whatever pathway one of ordinary skill contemplated a triple NRTI combination based on AZT/3TC, all include incorporating ABC.

### c.     Larder 1993.

Larder 1993 independently suggested triple NRTI combinations, and expressly taught its disclosed dual combinations could be further used with other therapeutic agents, including a third NRTI drug:

> ***Examples of such further therapeutic agents include*** agents that are effective for the treatment of HIV infections or associated conditions, ***such as 2',3'-dideoxynucleosides***, e.g. 2',3'-dideoxycytidine [***ddC***], 2',3'- dideoxyadenosine [***ddA***] and 2',3'-dideoxyinosine [***ddI***], ***carbovir***, 2',3'-didehydrothymidine, acyclic nucleosides …, protease inhibitors…, oxathiolan nucleoside analogues…, interferons…, renal excretion inhibitors…, nucleoside transport inhibitors…, as well as immunomodulators….

(A4253 (emphasis added); A51).

The district court, taking Larder 1993 in isolation, stated that the "variety of compounds in the 'other therapeutic agents' category, spann[ed] multiple classes," and "would leave a person skilled in the art with virtually no guidance as to which path to choose." (A51-52).  That ignores that by March 1995, efforts to combine NRTIs with ***other*** drug classes had not shown any comparable clinical benefits.  (A35 (interferon, nevirapine)).[2]  Considering Larder 1993 by the critical date, with the AZT/3TC/ddI combination known, the art had picked a path:  all-NRTI combinations.  (A4245-53; A3729).

---

[2]     The first reported success involving AZT and a PI was post-critical date. (A1359-60).

The district court acknowledged that "one extractable combination from the instructions is AZT, 3TC, and carbovir." (A52). The district court accepted that ABC and carbovir generated the same active metabolite *in vivo* and that ABC resolved carbovir's known toxicity problems. (A32). The leap from carbovir to ABC is well within the ordinary creativity of the skilled artisan. (A927-28, A1409).

### 7. Cross-resistance.

The district court presumed cross-resistance concerns "would be a discouraging factor" in developing combinations because they "retained the potential to undermine even the most potent combinations." (A44).

The district court noted 3TC and ABC "both select for the M184V mutation." (A45). That concern is moot in the context of the triple combination. Such a mutation prompts re-sensitization to AZT to make it work better, which the district court characterized as the "best" explanation for why the AZT/3TC combination worked so well. (A40-41, A49-50).

The district court noted ABC could select for the L74V and K65R mutations, which produced 3TC resistance. (A46). But the L74V mutation is another re-sensitizing mutation for AZT. (A951-52). This cannot discourage the ABC triple combination when ddI, which likewise selects for these two mutations, *was* incorporated in the AZT/3TC combination. (A46; A1190). Nor did cross-

18

resistance *in vitro* produce clinically relevant cross-resistance in real-world patients. (A4110; A595, A1388). What resistance reportedly emerged with ABC was slow and low-level. (A33; A520-21). The district court thus acknowledged cross-resistance "would not always conclusively rule out research on a particular combination," and given the desperate situation, doctors "might not be inclined to rule out any particular combination absent experimental evidence indicating that it should not be pursued." (A47-48).

### 8.    Alleged "failures."

The district court repeatedly discussed prior art combination "failures." (A33, A36-38, A40-41, A50, A55-56). What the district court deemed "failures" were scenarios where antiviral agents "would initially reduce a patient's viral load," which then "would return to baseline levels after six months of treatment." (A69 ("[A]lmost all therapies failed to provide *sustained* results." (emphasis added)), A55 ("no certainty" that combination therapy benefits "would be sustainable in the face of a vexing disease")). The district court recognized the drug or combination *would* work effectively for a period of time by interfering with HIV replication; its efficacy just tapered off over the long term.

Yet, the district court never suggested the asserted claims' scope excludes treatments that only work for days, weeks or less than 6 months in humans (A106-08), and the court refused to find the asserted claims require synergy. (A90, A94).

It found the method claim elements satisfied by any aim to stop HIV replication for infringement purposes. (A18-19). The district court never attempted to reconcile its "failure" analysis with the claim scope, *e.g.*, as part of the nexus analysis. Likewise, in its enablement analysis, the district court did not obligate the '191 patent specification to proffer the proof of clinical efficacy that a skilled artisan allegedly would have required to expect comparable clinical success for the triple combination. (A73-76).

### 9.    Trizivir's performance.

The district court's obviousness analysis heavily relied on Trizivir's clinical efficacy and sales. (A63-68, A70-71).

However, the district court recognized that ViiV was *unable* to show Trizivir was superior to AZT/3TC combinations in the prior art. (A56-57, A62-63). ViiV proffered no evidence AZT/3TC/ABC outperformed AZT/3TC/ddI either *in vitro* or in the clinic. (A1263-64, A1276-77, A1488-89).

Moreover, it was undisputed that the active ingredient in Trizivir is abacavir sulfate. (A286-87). This is the very ingredient the district court found fell outside the asserted claims' scope in its analysis of the Lupin ANDA product. (A8-21; A447). Thus, nothing about Trizivir's performance (clinically or commercially) is attributable to the particular asserted claims here.

### 10.    The '191 patent-overview.

The '191 patent touts as the invention not merely a triple combination, but a *synergistic* one.  (A101).  Yet, the '191 patent offers no new clinical data; toxicity data; human data; rationales for combination; or anything not already taught in the prior art about drug combinations, save for one *in vitro* test result that showed the triple combination reduced HIV replication better than the drugs individually or another two-drug combination.  (A100).

The district court found "many combinations had been shown to be synergistic *in vitro*… and ViiV repeatedly criticized those results as not sufficient to conclude that combination therapy would provide clinical results."  (A63).  The district court affirmatively concluded "showing of synergy *in vitro*, without correlative *in vivo* success, is not enough."  (*Id.*)

During prosecution of the '191 patent, the PTO Examiner repeatedly rejected the claims as obvious.  (A1892-93, A1901-04, A1913, A1917-21, A1925-29; A1541-42).   What convinced the Examiner to issue the claims was a Declaration from a named inventor (St. Clair) insisting that (1) a skilled artisan would have expected all NRTIs to have an antagonistic or at best additive effect since they targeted the same enzyme, precluding a motivation to prepare a triple combination; and (2) *in vitro* synergy test data was indicative of unexpected results.  (A1931-33; A1541-42).

21

*First*, the inventor's PTO representations all NRTIs were the same were wrong.  Pre-critical date literature expressly taught the NRTIs *should not* be treated as interchangeable.  (A1539-40, A1542).  *Second*, the district court specifically found that the "fact that the claimed combinations show synergism *in vitro* is not enough to prove unexpected results."  (A63).  The claims should never have issued in the first instance.

### 11.    The '191 patent's specification.

The district court devoted pages to the potential uncertainties and other factors a skilled artisan faced seeking to develop an anti-HIV combination, ranging from long-term clinical drug efficacy, antagonism, toxicity, cross-resistance, and the like.  (A30-48).  Yet the '191 patent resolved none of these concerns.  ViiV's own expert confirmed one of ordinary skill, with the '191 Patent in-hand, *would not* reasonably expect the triple combination to work, and *would* be required to initiate a complete research program, including with human clinical trials.  (A1482-87 ("Q.  Even if we assume that we have… the three-drug combination in the '191 patent, and that you've obtained favorable *in vitro* results, in your opinion, the person of ordinary skill in the art still would not have been able to predict whether that combination would work in the clinic; right? A. Yes.  The results are unpredictable.")).

The district court allowed ViiV to have it both ways. In the obviousness analysis, the skilled artisan's knowledge was insufficient to make even a reasonable prediction a triple combination would work (A50-53); yet, in the enablement analysis, an *in vitro* assay result "in combination with the knowledge of a POSA, [wa]s sufficient to establish a 'credible' utility for the '191 patent" notwithstanding the admitted lack of safety, efficacy, toxicity and cross-resistance data in the '191 patent specification itself. (A76).

## V.    SUMMARY OF THE ARGUMENT

The district court recognized that by March 1995, the art trended towards combination therapy. (A27). There were only 28 drugs that were FDA-approved or in clinical trials. (A28-29). Early combinations with first-generation drugs showed a hint of promise but not long-sustained clinical efficacy. (A34). But one—AZT combined with a highly potent next-generation drug 3TC—offered "the most potent and longest lasting effect of any antiretroviral strategy yet tested in clinical trials." (A31; A4128). As the district court rightly found, one of ordinary skill in the art "would attempt to build on the success garnered from combinations in the NRTI class." (A28).

By March 1995, the art actually did combine AZT/3TC plus the NRTI ddI in the clinic to make a triple combination. (A45). ABC was a next-generation NRTI structurally similar to ddI, and also in human clinical trials. (A32, A54). ABC was

23

"declared 'an important candidate for further development as an anti-HIV drug for combination therapy,' due to a lack of cross-resistance with AZT, its synergy with… AZT." (A45).

The district court found that in the relevant period, "[d]rug researchers and physicians acted in the midst of a public health crisis… [t]he situation was desperate, and with doctors scrambling for solutions, they might not be inclined to rule out any particular combination absent experimental evidence indicating that it should not be pursued." (A47-48).

Despite this, the district court erroneously concluded a skilled artisan lacked sufficient motivation to add ABC to the lauded AZT/3TC combination with a reasonable expectation of success, and further concluded it would not have been obvious to try. The district court's reasoning on these points hinged upon issues that are legally irrelevant to the obviousness analysis. Setting those aside compels finding obviousness under 35 U.S.C. § 103.

Moreover, the '191 patent resolves none of the issues the district court identified as undermining the predictability of the claimed triple combination. The patent offers no new theory or rationale of combination therapy; no evidence of clinical success (let alone sustained success); no evidence of cross-resistance's absence; and identifies no different benefits the AZT/3TC/ABC combination further achieves. The only new data the specification proffers versus the prior art

24

is *in vitro* testing the district court found *would not* correlate to clinical outcome. (A63). ViiV's expert conceded one of ordinary skill would not believe the triple combination would work after reading the specification. (A1484-90).

Thus, particularly if the district court's obviousness analysis is accepted, the '191 patent lacks credible "how to use" utility under 35 U.S.C. § 112.

## VI.    ARGUMENT

Lupin incorporates Argument § II ("The Claims Require 'Synergistic' Combinations") and Argument § III(C)(5) ("No Secondary Considerations Support Non-Obviousness") of Teva's Opening Brief. Fed. R. App. P. 28(i).

This Court reviews legal conclusions de novo and factual findings for clear error. *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1358 (Fed. Cir. 2007). Under 35 U.S.C. § 103, obviousness is a legal conclusion based on underlying facts. *Galderma Labs., L.P. v. Tolmar, Inc.*, 737 F.3d 731, 736 (Fed. Cir. 2013).

### A.    The asserted claims satisfy § 103 obviousness.

The district court's non-obviousness judgment should be reversed for any number of independent reasons based on legal and/or clear factual errors.

#### 1.    The district court imposed overly rigid motivation-to-combine requirements.

Despite finding a clear trend in the art towards combination therapy; that AZT/3TC was the best dual-combination to date; that ABC was a "ripe" candidate to use in combinations; and that the art had already used the AZT/3TC/ddI triple

25

NRTI combination, the district court refused to find a sufficient motivation to include ABC in a triple NRTI combination.  That was both legal and factual error.

### a.    Lupin only had to prove a reason to combine.

For patent claims directed to combinations of old elements, the analysis of whether prior art rationales for the combination existed must be "expansive and flexible," not "rigid."  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 415 (2007).  Patented combinations uniting "old elements with no change in their respective functions" are undesirable because this "obviously withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful men."  *Id.* at 415-16 (quoting *Great Atl. & Pac. Tea Co. v. Supermarket Equip. Corp.*, 340 U.S. 147, 152 (1950)).

Pre-critical date, AZT, 3TC, and ABC were each known to inhibit HIV replication.  (A31-32, A101, A820).  The AZT/3TC combination successfully was used in HIV therapy.  (A28).  The art subsequently taught a triple NRTI combination: AZT/3TC/ddI.  (A45).  ABC was a next-generation NRTI; structurally similar to ddI; and targeted a third DNA base like ddI.  (A54; Section (IV)(B)(3)(c), above).  ABC was in human clinical trials (A32); easier for patients to take (A1538); less toxic than ddI (A53); and intended for combination therapy uses (A33).  These clearly were reasons to use ABC in a triple combination with AZT/3TC.  (A836-38).

### b.    ABC was known to inhibit HIV replication.

The combination "of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." *KSR*, 550 U.S. at 415; *see also Galderma*, 737 F.3d at 737-38; *Novo Nordisk A/S v. Caraco Pharm. Labs., Ltd.*, 719 F.3d 1346, 1360 (Fed. Cir. 2013).

The AZT/3TC combination was known and generated longer-term anti-HIV efficacy versus monotherapy and other combinations (*e.g.*, AZT/ddC).  (A27). ABC's function was to inhibit HIV replication, including in anti-HIV combinations.  (A33, A49, A46; A649-50; A4336).  ABC was predicted to be synergistic with AZT.  (A33).  The AZT/3TC/ddI combination was being prescribed to combat HIV.  (A53-54; A3729).  ABC was known to be an improvement over ddI (A864; A4373), and target another base like ddI (A982). This renders it reasonable for the skilled artisan to expect AZT/3TC/ABC would inhibit HIV replication.  (A487, A538-42, A618-21, A835-38, A857-59, A866-79, A958-59, A982).

### c.    The district court erred by diminishing the motivation absent extraordinarily high clinical efficacy guarantees.

A motivation to combine drugs exists when the prior art generally suggests combining drug classes.  *See Merck & Co. v Biocraft Labs., Inc.*, 874 F.2d 804, 808-09 (Fed. Cir. 1989) (patent disclosing 1200+ amiloride combinations,

including with other diuretic drugs, and identifying hydrochlorothiazide as such a diuretic drug, rendered claims obvious); *McNeil-PPC, Inc. v. L. Perrigo Co.*, 337 F.3d 1362, 1370-71 (Fed. Cir. 2003) (motivation to combine simethicone and anti-diarrheal drug existed despite non-commercialization of prior simethicone/anti-diarrhea drug combinations); *Allergan Inc. v. Sandoz Inc.*, 726 F.3d 1286, 1291-92 (Fed. Cir. 2013) (motivation to combine when one reference taught two drugs and their individual clinical indications, and another taught combining two drugs from each class).

AZT, 3TC, and ABC were each designed to inhibit HIV replication (A31-32; A101; A820); used previously in combination (AZT/3TC); or recommended for use in combination (ABC). (A31, A33). For infringement, the district court found the treating/preventing "symptoms or effects" claim language could be satisfied by *any* combination "aimed at halting replication of HIV." (A17-18).

Yet, the district court presumed if the skilled artisan's knowledge was not perfect, it became the enemy of the good. Despite finding ABC "ripe" to pursue in combinations and that AZT/3TC was the best clinical combination to date (A31, A33), the district court was concerned that: no "definitive conclusions" could be drawn from prior studies (A35); certain prior "promising" combinations were not fully "effective" (A34); combination principles were not "thoroughly established" (A42-43); absent empirical testing, clinical outcomes could not be known (A39);

28

newer NRTIs "retained the potential for unexpected toxicity" (A53); combination rationales were not formally presented in a prior art publication (A37-38); and there was "no certainty that [a combination's] benefits would be sustainable in the face of a vexing disease" (A55), because many combinations worked for a while, then their efficacy tapered off. (A69). Requiring satisfaction of these issues imposed an overly-rigid motivation analysis that erred as a matter of law.

### i. Conclusive efficacy proof is not required to establish motivation.

The district court asserted "the failure of others to develop a safe and effective drug often supports the nonobviousness of a drug that finally achieves success." (A55). *First*, its cited case, *Bristol-Myers Squibb Co. v. Teva Pharmaceuticals USA, Inc.*, 923 F. Supp. 2d 602, 680 (D. Del. 2013), is distinguishable because the decision and its cited cases concerned the *structural* obviousness of *novel* drug compounds. Here, the drugs involved were not novel; they were known useful anti-HIV agents. (A31-32; A101; A820).

*Second*, the district court asserted there was "no certainty" clinical benefits would be sustainable long-term. (A55). But "[c]onclusive proof of efficacy is not necessary to show obviousness. All that is required is a reasonable expectation of success." *Hoffmann-La Roche Inc. v. Apotex, Inc.*, --- F.3d ---, 2014 WL 1394948, at *5 (Fed. Cir. Apr. 11, 2014) (citing *PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1363-64 (Fed. Cir. 2007)); *accord Pfizer*, 480 F.3d at 1364.

*Third*, the district court assumed that clinical success reported with AZT/3TC could not "erase[] the extensive history of failures in the art." (A55-56). Setting aside that what the district court deemed "failures" were methods producing some anti-HIV effect (*see* Section (IV)(B)(8), above), a demonstrated success supersedes any supposed prior art failures. *Graham v. John Deere Co.*, 381 U.S. 1, 36 (1996) (after Livingstone taught a problem's solution, "unsuccessful attempts to reach a solution… made before that time became wholly irrelevant").

Thus, even if AZT/3TC was the only success story, it remains reasonable for a skilled artisan to expect pursuing that successful path would work. The district court found one of ordinary skill *would* build a combination around AZT/3TC. (A28). Thus, the non-AZT/3TC "failures" the district court identified (none of which involved ABC) are irrelevant to the expectations of success for AZT/3TC-based triple combinations.

*Fourth*, the '191 patent claims "are not tied to product efficacy" over a 6-months or longer period, "so the absence of any particularized discussion of efficacy in the [prior art] is immaterial" given the prior art showing general efficacy for the same use. *Tyco Healthcare Grp. LP v. Mut. Pharm. Co.*, 642 F.3d 1370, 1374 (Fed. Cir. 2011).

Thus, the district court erred as a matter of law when it relied on heightened standards of clinical efficacy to conclude non-obviousness.   (A34-35, A41-42, A46, A54, A69-70).

> ### ii.    It is legal error to deride the prior art for inadequacies the '191 patent fails to resolve.

Neither the '191 patent nor its prosecution history resolves the alleged deficiencies the district court identified—including overcoming cross-resistance risks.  (A101-06; *see* Section (IV)(B)(7), above).  Courts have long looked askance at patentees raising prior art "problems" nowhere solved in a patent's specification or argued to the PTO.  *Graham*, 383 U.S. at 25 (noting validity theory was not hinted at in specification or raised before PTO, and that if this "were so vital an element… it is strange that all mention of it was omitted").

In *Merck & Co. v. Teva Pharmaceuticals USA, Inc.*, the patentee argued a skilled artisan would not reasonably expect a claimed alendronate weekly-dosing method to work because the dose the prior art proposed potentially was toxic.  395 F.3d 1364, 1373 (Fed. Cir. 2005).  The district court agreed; this court reversed. While the prior art "may have invited skepticism based on concerns for dose-related GI problems, ***the claimed invention add[ed] nothing beyond the teachings of those articles.***  Thus, the district court clearly erred in finding any difference between the claimed invention and the articles on this point."  *Id.* at 1374 (emphasis added).

The same standard applies to human testing. The *Alcon Research, Ltd. v. Apotex, Inc.* patentee argued the prior art teachings inadequately demonstrated a proposed drug formulation would work in humans without toxicity. 687 F.3d 1362, 1369 (Fed. Cir. 2012). While it was "true that [the prior art] does not expressly disclose that [the drug] would be safe for use in human eyes, neither does the… patent. The patent is not based on testing in humans; instead it reports only *in vitro* tests." *Id.* "[J]ust as a skilled artisan would be able to practice the invention claimed… despite its lack of explicit instruction that [the drug] is safe for human ophthalmic use, the artisan would have a reasonable expectation of success for adapting [the prior art] for the same use in a human eye." *Id.*

Here, ViiV's expert conceded the '191 patent did not: include testing in humans; give assurances of clinical efficacy; provide toxicity data; resolve cross-resistance concerns; or otherwise establish a mechanism of action allowing the skilled artisan to predict, much less actually implement, the triple combination. (A1407, A1482-87). The only triple combination data provided is *in vitro* data the district court found would not predict real-world clinical efficacy. (A63). Nor did ViiV raise such arguments before the PTO, instead arguing no motivation to combine NRTIs since they had the same target and mechanism of action. (A92-93). But by the critical date, the prior art had rejected this premise. (A4280).

Consequently, the factors the district court relied on to undermine motivation were legally irrelevant—they involve problems the '191 patent fails to resolve. Conversely, if the district court's heightened motivation standards apply, then the '191 patent is not enabled. *See Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1327 & n.3 (Fed. Cir. 2008) (patentee arguing a prior art method element was beyond the ability of the skilled person, when its own patent "is itself silent regarding how to actually implement the methods claimed… might suggest that the claims present an enablement issue, rather than support a conclusion of nonobviousness").

### d.    A perfect understanding of why combinations work is not required for a motivation to pursue them.

Again demanding of the art a guarantee instead of a reasonable expectation of success, the district court expressed concern principles for achieving a successful combination were not "thoroughly established." (A42-43).

Even "imperfect" correlations can support a reasonable expectation of success. *Alza Corp. v. Mylan Labs., Inc.*, 464 F.3d 1286, 1295 (Fed. Cir. 2006). Physicians prescribed a triple AZT/3TC/ddI combination despite the absence of a perfectly-established clinical trial correlation. (A45, A53-54; A866-79).

The district court suggested without clinical results, the AZT/3TC/ddI combination could not inspire imitation. (A53-54). But doctors had already prescribed this combination—in children—without awaiting clinical trial results.

33

(A851-53; A3729).    The district court acknowledged doctors would try any combination, absent data instructing the drugs should not be combined.    (A47-48). ViiV's expert admitted there was nothing in the literature that taught any danger of an AZT/3TC/ABC combination or that such a combination would not work. (A1545).    Here, ABC was a known improvement over ddI (A864; A4373); its mechanism of action was known (A4372); ABC and ddI were structurally similar (A54); and targeted different DNA bases if in an AZT/3TC combination.    (A982). That supports a reasonable expectation, particularly since the district court found one of ordinary skill would be enabled to achieve the triple combination without clinical trial data in the '191 patent.    (A73-74); *see Pfizer*, 480 F.3d at 1364 (salt influence on humans was unpredictable, but  a skilled artisan could learn this by known and routine ways (*e.g.*, empirical testing and clinical evaluations), satisfying the reasonable expectation of success standard).

### e.    Reliance on unknown "potential" toxicity was both legally and factually improper.

The district court asserted since new NRTI therapies "retained the potential for unexpected toxicity," this increased the "unpredictability in the field, which undercuts the argument that any particular combination would be obvious."  (A53).

Relying on generalized toxicity risks applicable to all drugs not being fully known reflects reversible error; that a "science carries with it a degree of unpredictability" is insufficient to avoid obviousness. *Allergan*, 726 F.3d at 1292.

If the district court intended to imply ABC possessed heightened toxicity risks, that contradicts its own findings. The district court recognized the literature taught ABC was expected to be *less* toxic compared to ddI (A53); refused to impute toxicities associated with carbovir to ABC precisely because ABC was designed to avoid them (A31-32, A53); and found ABC's advancement to human clinical trials confirmed the art would not expect adverse toxicities from ABC. (A32).

Thus, unknown "potential" toxicity risks cannot diminish the existing motivation to pursue the AZT/3TC/ABC combination.

### f. *KSR* rejected the premise a printed publication must express the motivation to combine.

The district court acknowledged that: skilled artisans were "aware of the nature of NRTIs as analogs of a particular DNA base"; "experts were aware of combinations producing synergy"; *and* skilled artisans were motivated to craft NRTI combinations using drugs targeting different DNA bases to ensure they were not competing with each other *in vivo*. (A59, 39). But, the district court repeatedly discounted this evidence because the motivation was not "reported in some study, publication, or textbook in the prior art" so as to prove that the strategy was "known" and "established" to the level that it would inspire "imitation" (A37-39, A54, A59), specifically stating that "*were such a relationship established in the*

35

*field, it would have been reported in some study, publication, or textbook in the prior art*." (A59 (emphasis added)). This was legally and clearly erroneous.

Motivation is not restricted to statements in printed references; a court must "look to interrelated teachings of multiple patents; the effects of demands known to the design community or present in the marketplace; and the background knowledge possessed by a person having ordinary skill in the art" to determine "whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue." *KSR*, 550 U.S. at 418; *Alcon*, 687 F.3d at 1368-69 (motivation "may be found in any number of sources, including common knowledge, the prior art as a whole, or the nature of the problem itself"); *Alza*, 464 F.3d at 1290-91 (motivation "may be implicit from the prior art as a whole, rather than expressly stated in the references").

Independently, the district court's assumption the published literature lacked such teachings was clearly erroneous. ViiV's expert, Dr. Ho, admitted the concept was disclosed in a prior art paper on synergy and antagonism ("Rideout") that his direct testimony referenced. (A1543-44).

Independently, if the district court's statement "no reference *in the record* show[ed] that such a sophisticated understanding… existed" (A37 (emphasis added)), was merely concerned Rideout was not formally in evidence, that was legal error since (1) Dr. Ho conceded the accuracy of the relevant portion of

36

Rideout; and (2) ViiV never raised an FRE 106 objection—nor could it, as Dr. Ho testified he relied on Rideout in forming his opinions and also purported to rebut an aspect of predictability "based on [Rideout]." (A1543-44, A1448-49). *See* Fed. R. Evid. 106; *In re Enhanced Sec. Research, LLC*, 739 F.3d 1347, 1356 (Fed. Cir. 2014) (factfinder may consider "selected portions of prior art references so long as the missing portions are not necessary to fully understand the submitted portions").

Thus, the district court erred both legally and factually in discounting the independent motivation of the skilled artisan to target different DNA bases when designing NRTI combinations because the rationale ostensibly was unexpressed in a printed reference.

> **g.    The number of options in Larder 1993 does not preclude a motivation to pursue the AZT/3TC/ABC combination.**

As Section (IV)(B)(6)(c) above explains, Larder 1993 disclosed the "especially preferred" combination of AZT/3TC could be combined with another agent, specifying 2',3'-dideoxynucleosides (of which ABC is one), and further exemplifying ddI and carbovir. (A4251-53). There is no dispute ABC is a structural analog of both ddI and carbovir. (A53-54; A944, A1522). The district court found ABC and carbovir metabolized to the same nucleoside *in vivo*. (A31-32). ABC possessed structural modifications to avoid carbovir's toxicity issues, which is why it advanced to human clinical trials. (A53; A1526-28).

37

AZT/3TC/ddI was used before the critical date (A45-46); the district court also recognized a skilled artisan could envision the AZT/3TC/carbovir combination. (A51-52). The district court opined, however, that Larder 1993 could not render any combination (including AZT/3TC/ABC) obvious due to its "laundry list of drug classes and compounds." (A51). The district court also opined Larder 1993 would not lead a researcher to the AZT/3TC/carbovir combination "to the exclusion of any other." (A52). Both conclusions reflect legal error.

*First*, where prior art lists even "a multitude of effective combinations," that "does not render any particular formulation less obvious… [t]his is especially true [where] the claimed composition is used for the identical purpose taught by the prior art." *Biocraft*, 874 F.2d at 807. In *Biocraft*, the prior art reference disclosed over 1200 combinations, and neither active pharmaceutical ingredient was highlighted as a preferred embodiment in the prior art. Nevertheless, the species combination selected was deemed obvious. *Id.* at 808-09. Here, AZT/3TC was Larder's "especially preferred" initial combination; the other agents description included the NRTI drug class encompassing ABC; and ddI and carbovir were exemplified.

*Second*, the district court stated a skilled artisan would not exclude other drugs classes from consideration based on Larder 1993, but even accepting this

*arguendo*, only 28 drugs—including ABC—had been used in human clinical trials. (A28-29).  In *Pfizer*, the besylate salt was one of 53 potential salts, used only 0.25% of the time.  480 F.3d at 1363.  Nevertheless, it was still "logical" and obvious for a skilled artisan to pursue this salt.  *Id.*  Similarly here, it would have been logical and obvious to pursue ABC with AZT/3TC from Larder 1993.

*Third*, the district court's conclusion that Larder presented too many options conflicts with its factual findings.  The district court acknowledged all four FDA-approved anti-HIV medications were NRTIs; AZT/3TC was the first HIV therapy to offer lasting clinical benefits; and one prior art reference lauded NRTIs because "[i]n the last year, there have been more clinical successes with (NRTIs) than with any other class of compounds." (A28-29; A4280).  The district court found "it would follow that persons skilled in the art would attempt to build on the success garnered from combinations in the NRTI class" and "good reasons existed to explore the NRTI category for combination research."  (A28).  The district court concluded combination clinical trials outside the NRTI combinations were reported failures (A35 (interferon, nevirapine)), but did not apply its findings to limit the scope of "other agents" one would be motivated to pursue under Larder 1993.

*Fourth*, the district court's complaint that the AZT/3TC/carbovir combination was not defined as the best to the exclusion of any other is immaterial; a "finding that the prior art as a whole suggests the desirability of a

39

particular combination need not be supported by a finding that the prior art suggests that the combination claimed… is the preferred, or most desirable, combination." *Bayer Healthcare Pharm., Inc. v. Watson Pharm. Inc.*, 713 F.3d 1369, 1376 (Fed. Cir. 2013) (quoting *In re Fulton*, 391 F.3d 1195, 1200 (Fed. Cir. 2004)). In *Bayer*, the prior art indicated a preference for one dosing regimen, but that did not mean that the *rationale* for the dosing regimen could not be applied to similarly improve other preparations. *Id.* at 1377. Here, the rationales behind a triple combination and for improving toxicity via ABC could be extrapolated from AZT/3TC/carbovir to generate AZT/3TC/ABC with expectations of improvement. (A857-59, A866-79).

*Fifth*, considering Larder 1993 in the context of the art as a whole limits the scope of options. In *Purdue Pharma Prods. L.P. v. Par Pharm. Inc.*, the patentee argued a "person of skill in the art would not have selected tramadol out of the myriad other possible active ingredients for use in a once-daily formulation." 377 Fed. App'x 978, 982 (Fed. Cir. 2010). But the Oshlack reference listed "tramadol as one of fourteen different opioid analgesics to use in a controlled-release formulation that provide effective blood levels for twenty-four hours. As such, Oshlack itself renders the selection of tramadol obvious regardless whether or not the patent lists tramadol as a preferred embodiment." *Id.*

Viewing Larder 1993 in the context of the art, the only triple combination in use by March 1995 was the NRTI combination AZT/3TC/ddI.  Only one other NRTI that targeted a different DNA base if combined with AZT/3TC was in clinical use:  ABC.  (A928, A1528, A690).  ABC was clearly preferable to other analogs (*e.g.*, carbovir) based on its improved toxicity profile for humans.  (A31-33, A53).

The district court, viewing Larder 1993 in isolation, thus erred in concluding the "variety of compounds in the 'other therapeutic agents' category, span[ed] multiple classes," and "would leave a person skilled in the art with virtually no guidance as to which path to choose."  (A51-52).  Considering Larder 1993 by the critical date, with the AZT/3TC clinical results and the AZT/3TC/ddI combination known, the pathway blazed was one using all-NRTI combinations, where each drug targeted different DNA bases.  (A28; A487, A1543-44).

> **h.   Cross-resistance could not discourage ABC's use in AZT/3TC combinations.**

Despite finding a skilled artisan would pursue any combination absent data saying avoid it (A47-48), the district court concluded that cross-resistance weighed against combinations.  The district court's cross-resistance analysis rests on legal and factual errors, particularly when applied to the triple combination.

*First*, as noted above, the '191 patent does not resolve cross-resistance problems. (A101-06; A1495-96). Basing skepticism of combinations on cross-resistance is wrong as a matter of law. (*See* Section (VI)(A)(1)(c), above).

*Second*, even if cross-resistance mattered, the district court erroneously framed the teaching away inquiry as being "the significance of cross-resistance's potential to undermine therapeutic value in choosing compounds to combine." (A43-44). The correct analysis was whether the art as a whole taught the AZT/3TC/ABC triple combination would not work to inhibit HIV replication. The district court's belief cross-resistance would be one "discouraging factor" or "reason" to look in another direction (A44, A48, A54), cannot trump the other reasons to combine (*e.g.*, hit-hard, hit-early, DNA base combinations), because the mere existence of competing theories cannot, by itself, teach away. *Hoffmann-La Roche*, 2014 WL 1394948, at *5.

*Third*, the district court assumed the *only* reason why one of ordinary skill would pursue a combination was to exploit cross-resistance profiles. (A41, A43-44, A48). That is simply not consistent with the district court's other findings of a trend in the art towards combinations (A27); the real-world pressures from dying patients (A69); and that physicians would combine drugs absent an express reason to avoid them (A47-48), as well as independent rationales found in the art, e.g., "hit hard, hit early," and the desire to target different DNA bases within an NRTI

42

combination (which the district court erroneously discounted, *see* Sections (IV)(6)(a)-(b), above). New patients, naïve to treatment, lack cross-resistant strains. (A570-71).

Granted, internally ViiV tested the cross-resistance profiles of combinations and used that to guide their research. (A1029-30). The '191 patent lacks ViiV's internal cross-resistance data. (A99-106; A1494). Even so, a prior art motivation "need not be the same motivation that the patentee had." *Alcon*, 687 F.3d at 1368; *see also KSR*, 550 U.S. at 420 (it is error to look "only to the problem the patentee was trying to solve"); *In re Kahn*, 441 F.3d 977, 990 (Fed. Cir. 2006) ("[T]he skilled artisan need not be motivated to combine [the prior art] for the same reason contemplated by [the inventor].").

*Fourth*, cross-resistance concerns arising from the dual-combination are inapplicable to the triple-combination. The district court acknowledged ABC was an important candidate for further development in combination therapy "due to its 'cross-resistance profile and the relatively slow emergence of resistance.'" (A33; A45). The district court further found that ABC would select for the M184V mutation (A45); M184V provides a *benefit* of re-sensitizing HIV to attack by AZT. (A40). AZT and ABC were tested *in vitro* and found to be not only compatible, but synergistic in attacking HIV. (A1528; A4372). The district court observed ABC and ddI both prompt the L74V and M184V mutations, though not completely

43

identically.   (A46, A54).   But this is beneficial in the context of the triple combination because it was known L74V independently re-sensitizes HIV to attack by AZT.  (A951-52; A4419-20 (L74V mutation suppresses AZT resistance)).

*Fifth*, even if cross-resistance was a concern with ABC, the district court's findings that the AZT/3TC/ddI triple combination was in clinical trials (A45, A54); doctors were prescribing that combination (A53); and ABC has a similar cross-resistance profile as ddI (A54), undermines the premise cross-resistance risks affirmatively dissuaded those of ordinary skill from an AZT/3TC/ABC combination.

———————————

In sum, nothing relevant under this Court's caselaw, supported by the district court's factual findings, crosses the threshold of showing "that the side effects," whether toxicity, cross-resistance, diminishment of effect after 6 months, etc., "would be serious enough to dissuade the development" of the triple AZT/3TC/ABC combination.  *Galderma*, 737 F.3d at 738-39; *see also Novo Nordisk*, 719 F.3d at 1355-56.  The skilled artisan had ample reason to incorporate ABC into the best-working combination, and expect the combination would inhibit HIV replication.  (A835-38, A857-59, A866-79, A958-59, A982).

### 2.      The district court misapplied the obvious-to-try analysis.

The Supreme Court's obvious-to-try analysis explains that "[w]hen there is a design need… and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp.  If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense."  *KSR*, 550 U.S. at 421.

There plainly was a desire for HIV combinations; the art was trending toward combinations to treat dying patients.  (A47-48, A69).

A finite number of options were available.  AZT/3TC had produced the best clinical results to date, and only 28 drugs advanced to human clinical trials.  (A27-29).  The list of options narrows further still if only NRTIs are considered.  (A28).  There are even fewer options—including ABC—when one considers the prior art teachings that NRTI combinations should not use drugs targeting the same base.  (A690, A928, A1528).  Thus, the district court's finding that the "[u]niverse of potential anti-HIV drugs for combination" weighed against obviousness (A27-28), was clearly erroneous.  *See also Biocraft*, 874 F.2d at 807 (over 1200 combinations); *Pfizer*, 480 F.3d at 1363 (53 salt options).

The solutions were predictable.  (A835-38, A857-59, A866-79, A958-59).  By March 1995, Larder 1993 taught adding another agent to the AZT/3TC combination; the AZT/3TC/ddI triple NRTI combination was in use in clinical

trials and by doctors; ABC was a next-generation NRTI structurally similar to ddI and expected to be used in combination. (A4253; A33, A45, A54). A skilled artisan would have a reasonable expectation that the triple combination would be effective to "inhibit replication of HIV." (A17-18; *see also* Section (VI)(A)(1), above).

The district court (A28) cited *In re Kubin*, 561 F.3d 1351 (Fed. Cir. 2009). *Kubin* distinguished between throwing "metaphorical darts at a board filled with combinatorial prior art possibilities" and having a finite number of solutions. *Id.* at 1359. In *Kubin*, a skilled artisan with the prior art in-hand would have had to resort to various biotechnology processes to arrive at the claimed invention, but since those processes were conventional and routine, they satisfied the obvious-to-try standard. *Id.* at 1356. Here, the district court concluded (in its enablement analysis) that one of ordinary skill—who would have lacked everything but an *in vitro* test result in the '191 patent—would have been able to fully implement the '191 patent claims as a matter of routine. (A73-74). If that is accepted, the skilled artisan possessed those same tools to implement the triple combination. *See also Hoffmann-La Roche*, 2014 WL 1394948, at *5 (once-monthly 150 mg ibandronate dose was obvious-to-try when the dose could be extrapolated from 1 of 2 daily doses, or 1 of 4 monthly doses); *Novo Nordisk*, 719 F.3d at 1354-56 (combination of particular secretagogue and insulin sensitizers obvious-to-try when the art

46

disclosed 15 secretagogues; multiple insulin sensitizers; and combination therapy using both was common).

Thus, the triple combination was also obvious to try.

### 3.     ViiV's secondary considerations evidence was legally irrelevant.

"A nexus between the merits of the claimed invention and evidence of secondary considerations is required in order for the evidence to be given substantial weight in an obviousness decision." *Simmons Fastener Corp. v. Ill. Tool Works Inc.*, 739 F.2d 1573, 1575 (Fed. Cir. 2013).

The district court's non-infringement analysis, and the lack of claim elements directed to toxicity, cross-resistance, long-term sustained clinical efficacy and the like, preclude a viable nexus.  Value originating from prior art features likewise precludes nexus.  *Tokai Corp. v. Easton Enters. Inc.*, 632 F.3d 1358, 1369-70 (Fed. Cir. 2013).

The district court's secondary considerations analysis rests on reversible legal errors as to both nexus and the legal tests for long felt need/failure of others.

### a.     No commercial success.

The district court erred by giving weight to Trizivir's purported commercial success.

*First*, commercial success is attributable to the patented invention where "the marketed product embodies the claimed features, and is coextensive with

47

them." *Muniauction*, 532 F.3d at 1327-28. A product using abacavir **sulfate** does not embody the claimed features, because the claims asserted are limited to abacavir, which is the free base. *(*A9). Trizivir only uses abacavir sulfate. (A1469-70).

*Second*, the district court never differentiated between success from the prior art features and benefits (AZT/3TC, AZT/3TC/ddI, ABC's known anti-HIV effect) and incremental effects resulting from the particular claimed triple combination.

With no established nexus between Trizivir's performance or sales and claims limited to abacavir (A447, A1308), which is the free base, the district court erred by determining Trizivir's success supports non-obviousness.

### b.    No failure of others or unmet needs.

### i.    No nexus.

Since the district court did not restrict the claims to non-toxic, non-cross-resistant combinations that are clinically safe and effective to provide sustained anti-HIV therapy, it cannot rely on such factors to find "failure of others and unmet need." (*Compare* A23-54 (particularly A34), *with* A55-56, A69; *see also* Sections (IV)(B)(6)-(8), above). Nor did the district court explain why cross-resistance profiles would not be inherent features of the prior art molecules themselves. *See In re Omeprazole Patent Litig.*, 483 F.3d 1364, 1373 (Fed. Cir. 2007) (process involving separating layer in drug could not distinguish the prior art when it was an

48

inherent result of prior art compositions); *Santarus, Inc. v. Par Pharm. Inc.*, 694 F.3d 1344, 1354 (Fed. Cir. 2012) (pharmacokinetic drug performance was inherent in the prior art). Thus, the district committed legal error by presuming a nexus between alleged failure of others/long felt need and the claims. *See, e.g.*, *Bayer*, 713 F.3d at 1377 (declining to find secondary considerations based on an unclaimed element).

### ii.    Other legal errors.

The district court also applied the wrong legal tests for failure of others/long felt need.

"Failure of others" requires identifying the problem the patent purports to solve, to "turn back the clock and place the claims in the context that led to [the] invention." *Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1378 (Fed. Cir. 2012). Long-felt need "is closely related to the failure of others." *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1082 (Fed. Cir. 2012).

The '191 patent generally asserts drug resistance means "new therapies are needed." (A101). But the district court found the art was already rapidly pursuing new therapies. (A29). AZT/3TC worked; the '191 patent leaves unmentioned the new AZT/3TC/ddI combination physicians adopted. (A99-106; A1543). Thus, others did try and *succeeded* in identifying further AZT/3TC combinations.

49

The '191 patent contains no data showing the triple combination actually solved any problem, *e.g.*, sustained clinical effectiveness for six months or more against HIV (A55-56); improved efficacy in comparison to AZT/3TC (*id.*); avoiding toxicity associated with other triple combinations (*id.*); resolving any cross-resistance concerns (*id.*); or satisfying needs left unfilled by the AZT/3TC or AZT/3TC/ddI combinations. (A99-106; A1407, A1482-87; Section (IV)(B)(3)(b), above). The '191 patent put the skilled artisan in no meaningfully better predictive position as compared to the state of the art pre-'191 patent.

The '191 patent does assert, relying on a 1982 publication, that "drugs with the same site of action are frequently antagonistic or additive." (A101). The '191 patent points to the AZT/3TC results as consequently "surprising," and asserts its own *in vitro* test results were surprising "since all three drugs act upon the same molecule." (*Id.*) However, if this line of thinking represents a problem or need requiring resolution, it was resolved before the '191 patent by (a) the AZT/3TC results; and (b) others in the art, such as Dr. Schinazi, who taught NRTIs should not be deemed the same, but recognized as having different effects on the target enzyme. (A4280; *see* Section (IV)(B)(5)(a), above).

To the extent the '191 patent makes general assertions that its claimed combinations **will provide** synergistic effects, more complete viral suppression, limit the emergence of drug-resistant HIV strains, or allow better management of

50

drug-related toxicities, it is using prophetic language and recounting the already-expected outcomes from applying the "hit-hard hit-early" doctrine. (A4008; A851, A1507). If the skilled artisan would accept this prophetic language from the '191 patent as solving any problem or need, that same acceptance applies to expect success from the existing prior art teachings. (A851); *see also In re Borkowski*, 422 F.2d 904, 908 (C.C.P.A. 1970) (prophetic examples are sufficient if the "invention is otherwise disclosed in such a manner that one skilled in the art will be able to practice it without an undue amount of experimentation").

In terms of actual failures directed to the claimed combination by others, there are none; ViiV's expert conceded the prior art nowhere teaches anyone tried and failed to combine ABC with AZT/3TC. (A1545).

Thus, because there was no problem, expectation, or need resolved by the '191 patent (and/or which was not already noted and resolved by the prior art); and there was no prior failure of an AZT/ABC combination used clinically, the district court's clinical efficacy-related analyses, on which it heavily relied to find non-obviousness, reflects reversible error. (A54-56; *see* Section (VI)(A)(1)(c), above).

### c.    No unexpected results.

The district court also erred in finding unexpected results for the triple combination.

The district court did not require a showing that the triple combination was unexpectedly superior compared to the prior art, stating "the Court does not view that as necessary." (A56). But that is the legal test: when "unexpected results are used as evidence of nonobviousness, the results must be shown to be unexpected compared with the closest prior art." *Pfizer*, 480 F.3d at 1370-71.

To be "unexpected," the results also must differ "in kind and not merely in degree." *In re Harris*, 409 F.3d 1339, 1344 (Fed. Cir. 2005); *In re Huang*, 100 F.3d 135, 139 (Fed. Cir. 1996). Mere percentages of comparative improvements are insufficient. *Galderma*, 737 F.3d at 739 (percent efficacy increases are differences in degree); *id.* at 748 (Newman, J., dissenting) (differences in degree reflect "a continuation of a trend previously described in the prior art"; differences in kind "violate[] that trend"). Not even synergistic improvements are presumptively unexpected. *See Biocraft*, 874 F.2d at 808-09 ("medically synergistic" result "convinced the examiner, but it should not have," because it was "normal" to see improvements when combining two compounds).

Here, it was "normal" to expect an AZT/3TC drug combination would generate some sustained clinical efficacy benefits; and given that doctors were already prescribing an AZT/3TC/ddI combination, it would be expected that incorporating ABC into an AZT/3TC combination would allow the combination to continue to inhibit HIV replication. (A857-65).

52

While the district court made no finding the magnitude of any alleged performance increases were unexpected, even superior results from a combination do not justify a patent if the skilled person had a motivation to prepare the combination anyway. *Richardson-Vicks, Inc. v. Upjohn Co.*, 122 F.3d 1476, 1484 (Fed. Cir. 1997) (unexpected synergy was conceded, but combination was nevertheless obvious); *Pfizer*, 480 F.3d at 1372; *In re Mod*, 408 F.2d 1055, 1056-57 (C.C.P.A. 1969); *see also Bayer*, 713 F.3d at 1377 (unexpected results evidence may be "legally insufficient" to show nonobviousness).

Since the district court made no findings AZT/3TC/ABC's performance differed in kind from the prior art AZT/3TC or AZT/3TC/ddI combinations, any unexpected results finding represents reversible error.

<hr />

The district court's secondary considerations analysis was replete with legal and factual errors that, discussed below, must be reversed because they influenced the ultimate obviousness analysis.

### 4.    The district court incorrectly weighed the *Graham* factors under this Court's drug-combination precedent.

The district court's ultimate finding on nonobviousness should be reversed, because the *relevant* facts the district court found compel a finding of obviousness.

### a.    *Graham* factors 1 and 2.

The level of ordinary skill in the art was high, and physicians were used to dealing with and rapidly incorporating new information into treating patients. (A23; A475).  The scope and content of the prior art showed that:

- AZT, 3TC, and ABC were known anti-HIV drugs (A31-32; A101; A820);

- the art was trending towards combination therapy (A27);

- the AZT/3TC combination had shown the best clinical results by the relevant priority date (A31);

- one of ordinary skill was motivated to build on the AZT/3TC combination, and pursue NRTI combinations in particular (A28, A31);

- the triple AZT/3TC/ddI NRTI combination was being pursued in clinical trials and prescribed by doctors (A45-46, A53);

- ABC was a ddI structural analog, which, like ddI targeted a different NRTI base than AZT/3TC; had known improvements relative to ddI (A53-54); and was "ripe" for use in combination (A32-33);

- Larder 1993 taught combining AZT/3TC with other NRTIs (A4253);

- Cross-resistance mutations associated with ABC re-sensitized AZT, which would be expected to generate a clinical benefit in a combination with AZT (A45-46, A54);

54

- The DNA base theory of combinations was within the scope and content of the prior art (*see* Section (IV)(B)(6)(b), above); and

- Physicians would pursue combinations unless data showed the combination would not work.  (A47-48).

Given the above, the skilled artisan would have had a reason to combine AZT/3TC/ABC and reasonably expect the combination would combat HIV.

### b.    *Graham* factor 3.

The differences between the prior art AZT/3TC/ddI triple combination and the AZT/3TC/ABC triple combination are small, since ABC is a structural analog of ddI and, like ddI, targets a different DNA base.  (A32-33, A53-54).  Likewise, the differences between the Larder 1993 triple regimens are either nonexistent or small, because ABC is a subset of the NRTI class, and recognized improved version of Larder 1993's triple combination including carbovir.  (A51, A53).

### c.    *Graham* factor 4.

Trizivir cannot underlie secondary considerations because the asserted claims do not cover it, given that Trizivir contains abacavir sulfate.  (*See* Section (VI)(A)(3)(a), above).  The district court never found the triple combination outperformed AZT/3TC clinically (A56); the *in vitro* synergy data was not an unexpected result.  (A63).  ViiV never showed AZT/3TC/ABC outperformed AZT/3TC/ddI, the closest prior art.  (A54-56).  As for the triple combination using

protease inhibitors ViiV presented to the district court—not shown to be prior art—ViiV could only show comparable, not superior, clinical performance.  (A55).

### d.    Balancing the *Graham* factors.

The asserted claims reflect the mere "combination of familiar elements according to known methods"—previously-known anti-HIV drugs used to inhibit HIV replication—a "predictable result[]."  *KSR*, 550 U.S. at 416; *see also Novo Nordisk*, 719 F.3d at 1354-56; *Allergan*, 726 F.3d at 1291-92; *Bayer Schering Pharma AG v. Barr Labs., Inc.*, 575 F.3d 1341, 1350 (Fed. Cir. 2009).  The factors the district court deemed unpredictable represent unclaimed elements that the '191 patent does not itself resolve, and thus are irrelevant to the analysis.  (*See* Section (VI)(A)(1)(c)(ii), above).

The asserted claims are obvious considering this Court's combination-drug precedent.  For example:

In *Biocraft*, the claimed combination of amiloride and hydrochlorothiazide was obvious because the "objective of co-administration [was] to reduce the amount of potassium ions eliminated, without reducing the amount of sodium ions eliminated"; amiloride was a known "'potassium conserving' [diuretic]"; and hydrochlorothiazide was known to "induce[] both sodium and potassium excretion."  874 F.2d at 805.  With no "unexpectedly good" properties associated with the combination, it was obvious.  *Id.* at 808-09.

56

In *Richardson-Vicks*, the claims combined ibuprofen and pseudoephedrine, "two well-known ingredients." 122 F.3d at 1477. The difference between prior art single-combined products and the claimed invention was "the former used a different analgesic," aspirin. *Id.* at 1481-82. The ibuprofen/pseudoephedrine combination produced superior synergistic effects, *id.*, but that was insufficient to overcome the clear suggestion for combining these drugs in the prior art, rendering the claims obvious. *Id.* at 1482-83.

*McNeil-PPC* involved a combination of an antidiarrheal compound, loperamide, and known anti-gas compound simethicone. 337 F.3d at 1364-65. The prior art taught combining anti-diarrheal drugs (though not loperamide specifically) with simethicone. *Id.* at 1369-70. While none of the prior art anti-diarrheal/simethicone combinations were commercialized, there was nevertheless a sufficient teaching to combine members of the two drug classes that rendered the combination obvious, since the patentee failed to show unexpected or synergistic effects. *Id.* at 1370-71.

Combination claims were obvious in *Allergan*, when they combined the "well-known alpha2-agonist [brimonidine] and the well-known beta-blocker [timolol]" to treat glaucoma, and the prior art had previously taught combining timolol with an alpha2-agonist to treat glaucoma. 726 F.3d at 1289, 1293.

In *Novo Nordisk*, claims to combining a known insulin sensitizer (metformin) with a known insulin meglitinide-type-secretagogue (repaglinide) were obvious where prior sensitizer/sulfonylurea-type-secretagogue combinations were known; prior combinations were "well known in the art to produce beneficial and even synergistic results"; and repaglinide was known to have a similar mechanism of action to sulfonylureas. 719 F.3d at 1355.

Similarly here, the prior art taught triple NRTI combinations against HIV. Clinical trials were underway with—and physicians were independently prescribing—the combination consisting of the lauded AZT/3TC combination plus a third NRTI, ddI. (A45-46, A53). ABC, a ddI analog, which would likewise target a different DNA base (A53-54); was synergistic with AZT (A32-33); and had known toxicity advantages compared to its predecessors (A52-54). The district court never found AZT/3TC/ABC outperformed AZT/3TC/ddI, or even the AZT/3TC combination itself to any meaningful degree, let alone as a difference in kind. (A56; A271, A1277, A1489).

By contrast, the naproxen/sumatriptan claims in *Pozen Inc. v. Par Pharmaceutical, Inc.* contained comparative-performance elements; the prior art only recommended sumatriptan for sequential administration; and the existing prior art four-drug combination would have required removing naproxen if including sumatriptan. 696 F.3d 1151, 1165, 1157-58, 1163 (Fed. Cir. 2012).

Here, the claims require no comparative clinical outcome (A106-08); the district court expressly found ABC was intended for use in combination therapy (A33); and incorporating ABC into a triple AZT/3TC regimen would not require simultaneously excluding AZT or 3TC.  (A28; A836-38).

In *Sanofi-Aventis Deutschland GMBH v. Glenmark Pharmaceuticals Inc., USA*, the jury verdict was supported by evidence that "combination therapy was not favored"; "the longer-lasting effectiveness of the [] combination" were not "provided by, or predicted or suggested by, the prior art"; and skilled artisans held a "widespread belief that double-ring inhibitors would not fit the pocket structure of the ACE." --- F.3d ---, 2014 WL 1552167, at *3-4, *6 (Fed. Cir. Apr. 21, 2014). Here, the district court found the art was trending towards combinations (A27); no comparative improvements were shown to result from AZT/3TC/ABC versus AZT/3TC/ddI (A56; A1277); and one of ordinary skill expected ABC to act like other NRTIs and inhibit the RT enzyme.  (A31-32).

Further, for the reasons set forth in Section (IV)(A), above, because the number of identified combinations was finite; and there are no relevant secondary considerations factors weighing in favor of non-obviousness, one of ordinary skill in the art also would have found the claimed combination obvious to try.  *See KSR*, 550 U.S. at 421; *Hoffmann-La Roche*, 2014 WL 139496, at *6; *PharmaStem*, 491 F.3d at 1363 (inventors "significantly advanced the state of the science of

59

hematopoietic transplantations by eliminating any doubt as to the presence of stem cells in cord blood," but was still noninventive because the inventors "merely used routine research methods to prove what was already believed to be the case"); *Galderma*, 737 F.3d at 737-38 (when the prior art offers a range of options to try, they are presumptively obvious absent clear teaching away or outweighed by other secondary considerations).

---

Thus, when the *Graham* factors and relevant factual findings are properly balanced, the asserted claims would have been obvious to one of ordinary skill by the March 1995 critical date.

### B.    The '191 patent is invalid under 35 U.S.C. § 112.

The '191 patent, particularly given the district court's obviousness analysis, is invalid under 35 U.S.C. § 112 for non-compliance with the "how-to-use" prong of the enablement analysis.  *See Rasmusson v. SmithKline Beecham Corp.*, 413 F.3d 1318, 1322-23 (Fed. Cir. 2005); *In re '318 Patent Infringement Litig.*, 583 F.3d 1317 (Fed. Cir. 2009) (hereinafter, "*Janssen*").  Whether the subject matter of a patent claim satisfies the enablement requirement is a question of law, reviewed de novo, based on underlying facts, reviewed for clear error.  *Id* at 1323; *AK Steel Corp. v. Sollac & Ugine*, 344 F.3d 1234, 1238-39 (Fed. Cir. 2003).

60

### 1. Patents to hypotheses or research proposals are non-enabled.

An enabling specification represents the "*quid pro quo*" of the patent monopoly bargain. *AK Steel*, 344 F.3d at 1244. To enable skilled artisans to accomplish what is claimed, complex inventions may require "more scrupulous testing under circumstances approaching actual use conditions when the problem includes many uncertainties." *Scott v. Finney*, 34 F.3d 1058, 1063 (Fed. Cir. 1994). By contrast, "when the problem to be solved does not present myriad variables," little or no testing may demonstrate "the soundness of the principles of operation of the invention." *Id.*

For drug products and their uses, whether a specification satisfies "how-to-use" enablement standards turns on what the ordinarily skilled artisan would accept given the specification's teachings. "[W]here there is '*no indication that one skilled in [the] art would accept without question* statements [as to the effects of the claimed drug products] and no evidence has been presented to demonstrate that the claimed products do have those effects,' an applicant has failed to demonstrate sufficient utility and therefore cannot establish enablement." *Rasmusson*, 413 F.3d at 1323 (emphasis added) (quoting *In re Novak*, 306 F.2d 924, 928 (C.C.P.A. 1962)).

61

### 2. The district court's multiple findings the art was unpredictable.

The district court's obviousness analysis repeatedly insisted a skilled artisan would consider combination therapy to be highly complex (A42); "confusing" (A46); and unpredictable. (A34, A36). The district court further found that *in vitro* test results in the '191 patent specification were not predictive of the clinical efficacy required to have even a reasonable expectation of success. (A49, A54). Cross-resistance profiles were discouraging. (A44, A49-50). Until one performed the clinical testing, efficacy outcomes were unknown. (A34, A47).

The '191 patent lacks cross-resistance data; toxicity data; clinical efficacy data; or any information that would give the skilled artisan comfort the claimed dual- or triple-combination products could actually be used to therapeutic effect in humans. (A101-06). ViiV's own expert conceded a skilled artisan could not use the specification and expect the claimed combinations would work given the paucity of data given in the specification, and that significant new experimental work was required before such person could believe the claimed combinations would work. (A1407, A1482-87).

Thus, given ViiV's admissions and the district court's ultimate conclusion of non-obviousness, the skilled artisan simply cannot "accept without question" ViiV's utility assertions in the '191 patent.

### 3.    The district court's enablement and nonobviousness judgments cannot be reconciled.

When the art is unpredictable, the threshold credible utility showing requires "a greater measure of proof, and for good reason," because otherwise applicants could game the system by prematurely patenting "inventions" that were "little more than respectable guesses as to the likelihood of their success." *Rasmusson*, 413 F.3d at 1325; *accord Janssen*, 583 F.3d at 1327 (specification was a mere hypothesis or research proposal given lack of adequate test data and unpredictability of the art).

The district court dismissed Lupin's enablement defense by pointing out the triple-combination was later capable of achieving a useful and commercially successful result; data meeting FDA standards of safety and efficacy is not required of a specification; and skilled artisans would expect to engage in further experimentation. (A75-76). That sidesteps the *relevant* question: whether one of ordinary skill would accept the asserted utility of the dual- or triple-combinations "without question" given the specification and state of the art in March 1995. *Rasmusson*, 413 F.3d at 1323; *Alza Corp. v. Andrx Pharm., LLC*, 603 F.3d 935, 940 (Fed. Cir. 2010) (enablement determined as of date of filing).

The district court cited *In re Brana*, 51 F.3d 1560, 1568 (Fed. Cir. 1995). The claims in *Brana* were compound claims, not method-of-treatment claims. *Id.* at 1562. *Brana* also accepted the *in vitro* and *in vivo* tests at issue were suitable

predictive models for efficacy in the context of that particular art.  *Id.* at 1567-68.

Here, the district court found the disclosed *in vitro* data would not predictably

correlate to clinical efficacy outcomes.  (A63).

The district court's fallback position—that *in vitro* data plus the general

knowledge of one of ordinary skill could fill the enablement gap (A76)—also fails.

A specification need not disclose what is well known in the art, but that is "not a

substitute for a basic enabling disclosure."  *Genentech Inc. v. Novo Nordisk A/S*,

108 F.3d 1361, 1366 (Fed. Cir. 1997); *see also In re Fisher*, 421 F.3d 1365, 1372

(Fed. Cir. 2005) (utilities requiring further research to reasonably confirm a "real

world" use are not substantial utilities).  Moreover, since all the '191 patent does is

parrot existing theories regarding drug combinations (A101; *see* Section

(VI)(A)(3)(b)(ii), above), such reasoning was already available to a skilled artisan,

and equally available to evaluate the existing prior art combinations.

The facts found by the district court are comparable to those demonstrating

non-enablement as a matter of law in *Rasmusson* and *Janssen*.

In *Rasmusson*, the PTO determined that by the priority date, the skilled

artisan would not believe finasteride would effectively treat prostate cancer.  413

F.3d at 1323-24.  Consequently, "Rasmusson needed to provide experimental proof

that his invention could be effective in treating cancer."  *Id.* at 1324.  His earlier

applications lacking such data were deemed non-enabled.  *Id.*  Similarly here, the

district court found the art too unpredictable for one of ordinary skill to reasonably expect the triple combination would work and be clinically effective (A39) without data the '191 patent likewise lacks.  (A1482-83).

*Janssen* recognized typically patents "claiming new methods of treatment are supported by test results."   583 F.3d at 1324.   *Janssen* acknowledged the testing need not equate to FDA safety and efficacy testing, provided a reasonable correlation existed between efficacy and the test data provided.  *Id.* at 1325.   But here, the district court further found *in vitro* data of the type disclosed in the '191 patent *would not* correlate to clinical efficacy.   (A63).   The district court even rejected the truth of the '191 patent's efficacy assertions based on two-drug combination disclosures with, *e.g.*, AZT+ddC.   (A41).   Thus, the asserted utility represents little more than a hypothesis or research proposal.   *See Rasmusson*, 413 F.3d at 1323; *Janssen*, 583 F.3d at 1324, 1327.

Thus, particularly if the district court's obviousness analysis is upheld, the district court's enablement judgment must be reversed.   *See In re Cortright*, 165 F.3d 1353, 1360 (Fed. Cir. 1999) (specification that stated, it was "believed" or "surmise[d]" that invention worked a certain way did not enable claims despite specification's human clinical data because the statements "reflect no actual observations" and would not be accepted by one of ordinary skill).

## C.     The district court's construction of the '191 patent claims was overbroad.

The district court's decision that the claims should be construed broadly is at odds with the foundational premises of its obviousness analysis as set forth above. Lupin adopts Teva's brief at Argument § II ("The Claims Require 'Synergistic' Combinations") regarding the district court's error in construing the claims as not limited to combinations possessing synergy.  Fed. R. App. P. 28(i).

## VII.   CONCLUSION

For the above reasons, Lupin respectfully requests this Court reverse the district court's invalidity judgment, and declare the asserted claims invalid.

## VIII.  STATEMENT PURSUANT TO FEDERAL RULE OF APPELLATE PROCEDURE 28(i)

Lupin joins the following sections of Teva's brief:

- Statement of the Case § II ("The Patent-in-Suit");

- Argument § II ("The Claims Require 'Synergistic' Combinations"); and

- Argument § III(C)(5) ("No Secondary Considerations Support Non-Obviousness").

Dated: June 6, 2014

 /s/ Deanne M. Mazzochi
Deanne M. Mazzochi
William A. Rakoczy
Paul J. Molino
Rachel Pernic Waldron

Patrick C. Kilgore

RAKOCZY MOLINO MAZZOCHI SIWIK LLP
6 West Hubbard Street, Suite 500
Chicago, IL 60654
Telephone:  312-527-2157
Email:  wrakoczy@rmmslegal.com
Email:  paul@rmmslegal.com
Email:  dmazzochi@rmmslegal.com
Email:  rpernicwaldron@rmmslegal.com
Email:  pkilgore@rmmslegal.com

*Attorneys for Defendants-Appellants*
*Lupin Limited and Lupin Pharmaceuticals, Inc.*

# ADDENDUM

# ADDENDUM

## TABLE OF CONTENTS

**Page**

Judgment, filed Jan. 24, 2014 ............................................................ A1-2

Memorandum Supporting Judgment, filed Jan. 24, 2014................................... A3-5

Trial Opinion, filed Dec. 17, 2013.................................................... A6-79

Claim Construction Opinion, filed Nov. 16, 2012......................................... A83-97

United States Patent No. 6,417,191 B1, dated Jul. 9, 2002 ......................... A98-110

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| VIIV HEALTHCARE UK LTD. AND VIIV HEALTHCARE CO., | : | |
| | : | |
| Plaintiffs, | : | |
| v. | : | C.A. 11-576-RGA (CONSOLIDATED) |
| | : | |
| LUPIN LTD. AND LUPIN PHARMACEUTICALS, INC., | : | |
| TEVA PHARMACEUTICALS, INC., | : | |
| | : | |
| Defendants. | : | |

## JUDGMENT

For the reasons stated in the Court's December 17, 2013 Trial Opinion (D.I. 257), IT IS HEREBY ORDERED AND ADJUDGED ON THIS 24th day of January, 2014, that:

1. ViiV Healthcare UK Ltd. and ViiV Healthcare Co. have standing and are proper plaintiffs in these consolidated cases.

2. Claims 4, 26, 27, 29, 30, 34, 36, 38, 39, and 47 of U.S. Patent No. 6,417,191 Patent ("the '191 patent") are not invalid for obviousness under 35 U.S.C. § 103 or for lack of utility under 35 U.S.C. § 112, nor are claims 4, 26, 27, 29, 34, 36, 38, or 47 invalid for lack of enablement under 35 U.S.C. § 112.

3. Teva[1] infringes claims 26, 27, 29, and 30 of the '191 patent. Teva's filing of ANDA No. 079-246 was an act of infringement of those claims, and Teva's commercial manufacture, use, sale, offer for sale, or importation of its ANDA product would infringe, induce infringement, and/or contribute to infringement of those claims. Pursuant to 35 U.S.C. § 271(e)(4)(A), the effective date of any approval by the FDA of Teva's ANDA No. 079-246 shall be a date which is not earlier than the expiration of the '191 patent, including any

---

[1] Teva Pharmaceuticals USA, Inc.

1

exclusivities or patent term extensions.

    4.  Lupin[2] does not infringe claims 4, 26, 27, 29, 30, 34, 36, 38, 39, or 47 of the '191 patent, either literally or under the doctrine of equivalents, and Lupin's commercial manufacture, use, sale, offer for sale or importation of its ANDA No. 202-912 product would not infringe, induce infringement, and/or contribute to infringement of those claims, either literally or under the doctrine of equivalents.

    5.  The only pending motion (D.I. 187 at 5) is denied.

    6.  The deadline for filing any motion/petition for attorney fees and costs, together with any bill of costs, is hereby stayed until 30 days after: (a) the issuance of any mandate from any appeal taken in this matter; or (b) the date after which the deadline for filing a notice of appeal in this matter has expired, whichever is later.


                                        UNITED STATES DISTRICT JUDGE

---

[2] Lupin Ltd. and Lupin Pharmaceuticals, Inc.

2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| VIIV HEALTHCARE UK LTD. AND VIIV HEALTHCARE CO., | : | |
| | : | |
| Plaintiffs, | : | |
| v. | : | C.A. 11-576-RGA (CONSOLIDATED) |
| | : | |
| LUPIN LTD. AND LUPIN PHARMACEUTICALS, INC., TEVA PHARMACEUTICALS, INC., | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM

The Court issued an opinion on December 17, 2013. (D.I. 257). The Court requested the parties agree to a form of final judgment. The parties were unable to do so. This Memorandum is to explain its resolution of the issues the parties disputed in their letters. (D.I. 262, 265, 267, 268).

**ViiV v. Lupin:** 1. This is an ANDA case. Plaintiffs have not waived any right to a jury trial, as this case only concerned issues to which Plaintiffs had no right to a jury trial. 2. I am only going to enter judgment on claims that were actually tried. Lupin wants judgments of non-infringement on four claims that were included in the pretrial order; it does not want judgments of validity on them, however. (D.I. 267-1 at ¶¶3 & 5). The Court always encourages the parties to streamline the trial. While it would be better to do the streamlining before the pretrial conference, fine-tuning between the pretrial conference and the trial still serves a useful purpose, which the Court does not want to discourage. Both parties understood the four claims were no longer asserted. As a practical matter, the Court does not understand the point of the dispute,

1

since it is not arguable that the Plaintiff can assert those four claims (or any other claims in the patent) against Lupin either in this case or some other case involving the ANDA products.  3. The Court does not understand Lupin's position in regard to the third disputed issue.  Lupin won on infringement.  Lupin lost on invalidity.  The judgment's language ought to, and does, reflect that.

**ViiV v. Teva**:  1. Teva stipulated to infringement under the Court's claim construction. The case between ViiV and Teva only concerned validity of the patent's asserted claims.  Teva cannot back out of its stipulation simply because it would like to pursue an argument that Lupin successfully pursued on Lupin's facts (which may or may not be Teva's facts).[1]  The Court did not change anything in its earlier claim construction.  To the extent it offered further claim construction in the ViiV v. Lupin dispute, it was done in the context of an issue being litigated between ViiV and Lupin, and not between ViiV and Teva.  2. Teva also questions the Court's commercial success analysis.  Assuming for the sake of argument that ViiV's two products are not the commercial embodiments of the asserted claims, such a finding would result in the conclusion that ViiV had not shown commercial success, as opposed to the Court's finding in the Opinion: "The Court finds that the commercial success of Epzicom and Trizivir is indicia of nonobviousness, although not as strong of an indication as would exist in the absence of the patent rights that Burroughs Wellcome held." (D.I. 257 at 63).  In my opinion, even if Teva were right, I would still conclude that the totality of the analysis would lead to the conclusion that the Defendants had not shown by clear and convincing evidence that the inventions were obvious.

---

[1]  The facts relating to Teva's proposed product were not at issue in the trial, and thus the Court cannot opine on them.

2

**A00004**

The Court will thus enter ViiV's proposed form of judgment, slightly modified.

Richard G. Andrews

United States District Judge

1/24/14

3

**A00005**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

VIIV HEALTHCARE UK LTD. AND VIIV        :
HEALTHCARE CO.,                         :
                                        :
              Plaintiffs,               :
        v.                              :       C.A. 11-576-RGA (CONSOLIDATED)
                                        :
LUPIN LTD. AND LUPIN                    :
PHARMACEUTICALS, INC.,                  :
TEVA PHARMACEUTICALS, INC.,             :
                                        :
              Defendants.               :

## TRIAL OPINION

Brian E. Farnan, Esq., Wilmington, Delaware; F. Christopher Mizzo, Esq., Washington, D.C.; Gregg F. LoCascio, Esq., Washington, D.C.; Charles A. Fernandez, Esq., Washington, D.C.; Tiffany P. Cunningham, Esq., Chicago Illinois; Craig T. Murray, Esq., Washington, D.C.; Attorneys for Plaintiffs ViiV Healthcare UK Limited and ViiV Healthcare Co.

John C. Phillips, Jr., Esq., Wilmington, Delaware; Deanne M. Mazzochi, Esq., Chicago, Illinois.; Paul J. Molino, Esq., Chicago, Illinois; Neil A. Benchell, Esq., Chicago, Illinois; Rachel P. Waldron, Chicago, Illinois; Matthew T. Lord, Esq., Chicago, Illinois; Attorneys for Defendants Lupin Ltd. and Lupin Pharmaceuticals, Inc.

Richard L. Horwitz, Esq., Wilmington, Delaware; Ira J. Levy, Esq., New York, New York; Annemarie Hassett, Esq., New York, New York; Gregory T. Sandidge, Esq., New York, New York; Attorneys for Defendant Teva Pharmaceuticals USA, Inc.

December 17 2013
Wilmington, Delaware

1

A00006

ANDREWS, UNITED STATES DISTRICT JUDGE:

Plaintiffs ViiV Healthcare UK Ltd. and ViiV Healthcare Co. (collectively "ViiV") assert

U.S. Patent No. 6,417,191 ("the `191 Patent") against Defendants Teva Pharmaceuticals, Inc.

("Teva"), Lupin Ltd., and Lupin Pharmaceuticals, Inc. (collectively "Lupin").  The `191 Patent

(JX 1) is titled "Synergistic Combinations of Zidovudine, 1592U89 and 3TC." [1](D.I.178, Ex. 1 ¶

7).  The patent issued on July 9, 2002, and expires on March 28, 2016.  (*Id.* ¶¶ 7, 9).  The named

inventors are David Walter Barry and Martha Heider St. Clair.  *Id.* ¶ 8.  The patent claims recite

formulations and methods of treating HIV infection, using (a) the "triple combination" of

abacavir, zidovudine, and 3TC; or (b) the "double combination" of abacavir and 3TC.  (JX 1

cols. 12-16).

ViiV holds NDA No. 21-205 for Trizivir, an oral tablet dosage form, which the FDA

approved in November 2000 as an HIV drug.  (D.I. 178, Ex. 1 ¶¶ 13-15).  Trizivir contains the

"triple combination" of abacavir, 3TC, and AZT.  ViiV also holds NDA No. 21-652 for an oral

tablet dosage form for Epzicom, which the FDA approved in August 2004 as an HIV drug.  (*Id.*

¶ 20).  Epzicom contains the "double combination" of abacavir and 3TC.  The FDA's Orange

Book lists ViiV's `191 Patent in connection with both products.  (*Id.* ¶¶ 16, 23).  ViiV's case

against Teva and Lupin arises out the Defendants' ANDA filings with the FDA.  Teva seeks

FDA approval to market a generic version of Epzicom, while Lupin seeks FDA approval for a

generic version of Trizivir.  (*Id.* ¶ 17).

Defendants assert that the `191 Patent is invalid as obvious.  Lupin individually asserts

that the `191 Patent is invalid due to lack of enablement and utility, and also asserts that its

proposed generic product does not infringe the `191 Patent.  The Court held a four and a half day

---

[1] Zidovudine is also referred to as "AZT."  "1592U89" is also referred to as "abacavir" or "ABC."  "3TC" is also referred to as "lamivudine."  The terms are used interchangeably throughout the opinion.

2

bench trial on June 24, 25, 26, 27, and 28.[2]  Defendants failed to prove any of their invalidity

defenses by clear and convincing evidence, while ViiV failed to prove that Lupin's generic drug

product infringes the asserted claims of the `191 Patent.

## I.    INFRINGEMENT

ViiV asserts that Lupin's generic product would infringe claims 4, 26, 27, 29, 30, 34, 36,

38, 39, and 47 of the `191 Patent.  Claim 47 is a formulation claim, while the remaining claims

recite methods of treatment.  All claims encompass abacavir and 3TC, while certain claims add

AZT as the third drug in the combination.  There is no dispute that Lupin's ANDA product will

contain AZT and 3TC.  The infringement dispute hinges on the abacavir limitation, and whether

Lupin's ANDA product's use of abacavir sulfate puts the product outside the scope of the

asserted claims.  Lupin argues that it does not infringe any of the claims because (1) the asserted

claims do not encompass the sulfate form of abacavir; (2) the method claims are only directed to

treating the "opportunistic conditions" associated with HIV rather than the HIV infection itself;

and (3) there is no evidence that Lupin would induce and contribute to the infringement of the

method claims.  ViiV disagrees, arguing that (1) abacavir is contained by the abacavir sulfate in

Lupin's generic product; (2) the method claims are aimed at the treatment of the underlying HIV

infection; and (3) Lupin clearly intends to infringe the method claims by inducing and

contributing to use by clinicians and patients of the claimed combinations.

### (A)  FINDINGS OF FACT

1.  Independent claim 45 recites the chemical compounds of AZT, 3TC, and pure
    abacavir, also referred to as abacavir free base.  `191 Patent, claim 45.

2.  Claim 46 depends from claim 45, reciting the formulation of claim 45 in a unit
    dosage form.  `191 Patent, claim 46.

---

[2] (Transcripts available at D.I. 192, 193, 194, 195, and 196).

3

3. Claim 47 depends from claim 46, reciting the formulation of claim 46 in the form of a tablet capsule. `191 Patent, claim 47.

4. Claim 47 is asserted against Lupin.

5. Lupin's proposed ANDA product contains abacavir sulfate, also referred to as the salt form of abacavir, 3TC, and AZT. (*See, e.g.*, PTX 135 at 1; PTX 136 at 15; PTX 137 at 44).

6. Abacavir sulfate is formed via a chemical reaction between abacavir free base and sulfuric acid. (Tr. at 215-17, 228, Dr. Langer).

7. Abacavir sulfate has different molecular bonds and a different molecular weight from free base abacavir. (Tr. at 215-17, 228, Dr. Langer).

8. Abacavir sulfate is a distinct chemical compound from free base abacavir. (Tr. at 254-56, Dr. Arnold).

9. The `191 Patent does not define claim 47 to encompass abacavir sulfate, and thus Lupin's generic product does not literally infringe claim 47.

10. There is no evidence that abacavir sulfate and free base abacavir are functional equivalents, as abacavir sulfate has superior stability and handling properties. (Tr. at 220, Dr. Langer; Tr. at 254-55, Dr. Arnold).

11. Claims 4, 26, 27, 29, 30, 34, 36, 38, and 39 of the `191 Patent encompass treatment of the underlying HIV infection rather than merely treatment of the opportunistic infections associated with AIDS. `191 Col. 1:09-20.

12. Claim 4 does not encompass any "physiologically functional derivative" of abacavir, and thus Lupin's generic product does not literally infringe that claim. *See* `191 Patent, claim 1-4.

13. Claims 26, 27, 29, 30, 34, 36, 38, and 39 do not encompass the salt form of abacavir, and thus Lupin's generic product does not literally infringe those claims. *See* `191 Patent, claims 26, 27, 29, 30, 34, 36, 38, and 39.

14. Lupin's generic product does not infringe claims 4, 26, 27, 29, 30, 34, 36, 38, and 39 under the doctrine of equivalents.

(B) LEGAL DISCUSSION AND CONCLUSIONS OF LAW

   (i) *Literal infringement of claim 47*

4

ViiV first argues that Lupin's generic product will directly infringe claim 47 of the `191

Patent, which is a formulation claim. ViiV has the burden to prove infringement by a

preponderance of the evidence. *Golden Blount, Inc. v. Robert H. Peterson Co.*, 438 F.3d 1354,

1363 (Fed. Cir. 2006). Claim 47 depends from claim 46, which depends from claim 45. Those

three claims follow:

> 45. A pharmaceutical formulation comprising (1S, 4R)-cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-yl]-2-cyclopentene-1-methanol, zidovudine, and (2R, cis)-4-amino-1-(2-hydroxymethyl-1,3-oxathiolan-5-yl)-(1H)-pyrimidin-2-one in a ratio of 1 to 20:1 to 20:1 to 10 by weight, in association with one or more pharmaceutically acceptable carriers therefor.
>
> 46. A formulation according to claim 45 in a unit dosage form.
>
> 47. A formulation according to claim 46 in the form of a tablet capsule.

ViiV asserts that independent claim 45 recites abacavir, AZT, and 3TC, and Lupin's generic

tablet capsule product will infringe dependent claim 47, which claims a tablet capsule unit

dosage form. In support, ViiV points to Lupin's ANDA, which states that Lupin's generic drug

product will contain abacavir, AZT, and 3TC as the active ingredients. In response, Lupin

argues that claim 47 is limited to the chemical formulation of "abacavir free base," *i.e.*, pure

abacavir. Lupin argues that its generic product does not contain "abacavir free base," but rather

uses "abacavir sulfate," or a salt form of abacavir. According to Lupin, the salt form of abacavir

has a chemical structure that differs from pure abacavir, and the salt form's chemical structure is

not encompassed by claim 47. ViiV replies that this is a distinction without a difference, as

abacavir sulfate invariably contains abacavir.

ViiV is correct when it says that Lupin's ANDA, in certain places, explicitly states that

abacavir, AZT, and 3TC are the ingredients of the generic product. (*See, e.g.*, PTX 152 at

LUPIN(TRIZ) 012340; *id.* at 012373). Lupin's 30(b)(6) witnesses also stated as much: "Our

5

product is abacavir, lamivudine and zidovudine tablets."[3]  (Tr. at 150-151, Mr. Dahibate).  Dr. Langer, ViiV's expert on infringement, further testified that "abacavir is in abacavir sulfate…Lupin's ANDA says that."  (Tr. at 189).  Lupin's ANDA further states that "each film-coated tablet contains the active ingredients 300 mg of abacavir as abacavir sulfate."  (PTX 154 at LUPIN(TRIZ) 000102).  Dr. Arnold, Lupin's expert, acknowledged that Lupin's product "eventually provides abacavir.  That is the active ingredient.  Otherwise, the product wouldn't work."  (Tr. 280).

These statements in isolation would suggest that Lupin's proposed generic drug contains the identical chemical compound recited in independent claim 45 and is thus encompassed by asserted dependent claim 47.  The sum total of the evidence, however, shows otherwise.  Lupin's ANDA product will use abacavir in a salt form, i.e., abacavir sulfate, not abacavir in its free base or pure form.  Each ANDA section proffered by ViiV identifies the active ingredient as "abacavir sulfate."  (*See, e.g.*, PTX 135 at 1; PTX 136 at 15; PTX 137 at 44).  The proposed ANDA labeling expressly defines the active ingredient as the sulfate or salt form.  (PTX 152 at 12355).  Although ViiV argues that abacavir is "in" abacavir sulfate, the sulfate form comes into being only after a reaction between abacavir free base and sulfuric acid in isopropyl alcohol, and the resulting salt product has a changed molecular weight and forms new molecular bonds.  (Tr. at 215-17, 228, Dr. Langer).  As the salt form is only produced after a chemical reaction, it is chemically distinct from abacavir free base or pure abacavir.  (Tr. at 254-56, Dr. Arnold).  It thus does not contain abacavir free base as recited in claim 45.  As to the 30(b)(6) testimony, Mr. Dahibate also testified to the cover letter for the ANDA, which recites abacavir sulfate, lamivudine, and zidovudine tablets.  (Tr. at 152-53).  There is no question that Lupin's proposed

---

[3] *See also* tr. at 164, Mr. Raghavan ("Yes. [Lupin's generic product] provides lamivudine, zidovudine and abacavir.")).

6

tablet must use the sulfate form of abacavir, and not abacavir free base, if it is to be consistent with the ANDA submitted to the FDA. (*See* PTX 152 at 5) (generic drug contains "300 mg of abacavir as abacavir sulfate"). A 30(b)(6) witness's testimony does not alter the directions provided in the ANDA document, and any generic product must be consistent with the content of the relevant ANDA.

ViiV argues that Lupin's planned use of abacavir sulfate in combination with AZT and 3TC nevertheless infringes claim 47, as the tablet capsule eventually provides abacavir when it is administered to a patient. ViiV relies on *Merck & Co., Inc. v. Teva Pharmaceuticals USA, Inc.*, 347 F.3d 1367, 1371 (Fed. Cir. 2003) to argue that even if the sulfate form is chemically distinct from abacavir free-base, claim 45 would be understood by a person skilled in the art as encompassing the salt form. In *Merck & Co.*, the Federal Circuit upheld the district court's finding that the salt form of an acid drug compound infringed the sole claim of the patent, which was a method claim, even though that claim recited only the acid form and not the salt form. *Id.* at 1372. The Federal Circuit stated the following:

> The evidence of all the qualified witnesses was that persons in this field would understand that the acid is the active agent and that the acid is administered when it is in the form of the salt. There was no evidence that the claimed method of treatment is not achieved by the acid salt. The record shows that Teva and Zenith, as well as Merck, label their products with the "free acid equivalent."

*Id.* at 1371. The chemical distinction between an acid and a salt was thus discounted, as pharmacologists skilled in the art would have understood the claimed method of treatment to encompass the salt. *Id.* at 1371-72. ViiV argues that similarly, the Court should conclude that the sulfate of abacavir falls within the scope of abacavir in the free base form. In support, ViiV points to the specification's statement that "therapeutic use" included "salts of [abacavir]," and that "all salts, whether or not derived from a physically acceptable acid or base, are within the

7

scope of the present invention." `191 Col. 3:25-27. ViiV also directs attention to dependent

claim 35, which states the following: "a method according to claim 32, wherein the [abacavir] is

the succinate salt," suggesting that the abacavir chemical is intended to include the salt form.

Lupin argues that *Merck & Co.* is not on point. First, Lupin notes that the claim at issue

in that case recited methods of treatment, whereas claim 47 is a chemical formulation claim.

Lupin argues that because it was a method claim in *Merck & Co.*, rather than a formulation

claim, the district court was able to apply a special lexicography to define the acid compound as

including salts, as the district court relied on the "biology" section of that patent's specification

that was more relevant to the method of treatment, while ignoring the "chemical" section. *Merck

& Co. v. Teva Pharms. USA, Inc.*, 228 F. Supp. 2d 480, 489 (D. Del. 2002). Lupin argues that

the district court noted that this was only proper because a method claim was at issue, and the

district court would not have done so if the claim "were still a composition claim," since, in that

context, the chemistry section "would be highly instructive." *Id.* The Federal Circuit's

affirmation of the district court's opinion was similarly dependent on the claim's form as a

method claim. *See Merck & Co.*, 347 F.3d at 1372. Further, Lupin argues that construing the

only claim of the patent at issue in *Merck & Co.* as excluding the salt form would have rendered

salt form embodiments described in the specification completely excluded from the patent.

Here, in contrast, there are unasserted claims specifically directed at "physiological functional

derivatives," meaning that the salt embodiments described in the `191 Patent would not be

excluded by Lupin's construction, and also suggesting that when the inventors intended to claim

derivatives, they did so explicitly, and thus the derivatives should not be read as encompassed by

the method claims.

The Court agrees with Lupin that the present facts are distinguishable from *Merck & Co.*

8

*Merck & Co.* dealt with a method claim that recited a "method of treatment" that "consists of administering to a patient in need thereof an effective amount of [the drug compound]." *Id.* at 1370. The Federal Circuit relied on the fact that "[t]he evidence of all the qualified witnesses was that persons in this field would understand that the acid is the active agent and that the acid is administered when it is in the form of the salt." *Id.* at 1371. The claim in that case encompassed therapeutic treatments, and there were multiple statements in the specification suggesting that the method of treatment included the salt form. Claim 47 is not a method claim reciting the administration of a drug to a patient for a certain therapy. It is solely a formulation claim, unconcerned with the ultimate effects of the drug compound in the body. Further, there are unasserted claims of the `191 Patent explicitly reciting "physiological functional derivatives" of the drugs, which would include the salt form. Thus, the patentee differentiated between the pure (or free base) form of abacavir and the salt form in the claims themselves, undermining the argument that the salt form is intrinsically encompassed by the free base or pure form. The Court's ruling does not exclude salt forms altogether from the scope of the patent, as there are unasserted claims that encompass derivatives. If salts and derivatives of abacavir were intended to be encompassed by the chemical compound as recited, then there would have been no need for the patentee to claim derivatives and salts of abacavir separately.

As to ViiV's claim differentiation argument, ViiV correctly states that claim 35 narrows the "1S-methanol" [abacavir] element of claim 32 to "the succinate salt." As Lupin notes, however, the inventors were inconsistent in their use of dependent claims. Claim 32 claims in part "1S-Methanol" [abacavir]. It does not claim a physiologically functional derivative thereof. Claim 35 depends from claim 32, and narrows the claim to where the "1S-Methanol" [abacavir] is the "succinate salt," implying that the "succinate salt" is claimed by "1S-methanol" [abacavir].

9

**A00014**

Claim 48 recites the "1S-methanol" [abacavir] element with "or a physiologically functional derivative thereof." Then, dependent claim 49 narrows claim 48 to where the "physiologically functional derivative of '1S-Methanol' [Abacavir]" is the "succinate salt." In one case, the succinate salt is a limitation on "1S-methanol" [abacavir] and the other time it is a limitation on the derivative of "1S-methanol" [abacavir]. The patentee excludes the "1S-methanol" limitation, instead only reciting the "derivative" limitation narrowed to the "succinate salt." The "succinate salt" claims are inconsistent. The patentee cannot benefit from inconsistent claims drafting.[4]

For these reasons, the Lupin generic ANDA product does not literally infringe claim 47 of the '191 Patent.

### (ii) Infringement of claim 47 under doctrine of equivalents

ViiV next argues that Lupin's generic ANDA product infringes under the doctrine of equivalents. The primary inquiry in applying the doctrine of equivalents is whether "the differences between the claimed invention and the accused device are . . . 'insubstantial.'" *nCUBE Corp. v. SeaChange Int'l, Inc.*, 313 F. Supp. 2d 361, 376 (D. Del. 2004), *aff'd*, 436 F.3d 1317 (Fed. Cir. 2006). A salt form of a drug has properties distinct from the pure or free base form, as the entire purpose behind using the salt form is the form's superior stability and handling properties. (Tr. at 220, Dr. Langer; Tr. at 254-55, Dr. Arnold). This suggests that the salt and the free base forms are not equivalent, and no evidence was provided otherwise. Further, as discussed, there are unasserted claims that explicitly recite "physiologically functional derivatives" of abacavir. ViiV chose not to assert those claims against Lupin, instead asserting a claim that does not contain that limitation. It would be improper to recapture scope

---

[4] As Lupin notes, (D.I. 210 at 12), the claims drafting belies that any particular care went into it. For example, claim 40 is a duplicate of claim 35.

10

Case: 14-1303     Document: 40     Page: 98     Filed: 06/06/2014

Case 1:11-cv-00576-RGA   Document 257   Filed 12/17/13   Page 11 of 74 PageID #: 11883

that is absent in the asserted claim, yet present in unasserted claims, under the doctrine of equivalents. *See Abbott Laboratories v. Sandoz, Inc.*, 566 F.3d 1282, 1297 (Fed. Cir. 2009).

(iii) <em>Literal infringement of method claims 4, 26, 27, 29, 30, 34, 36, 38, and 39</em>

ViiV also asserts method claims 4, 26, 27, 29, 30, 34, 36, 38, and 39 of the `191 Patent, all reciting methods "for the treatment or prevention of the symptoms or effects of an HIV infection in an infected animal which comprises treating said animal with a therapeutically effective amount of" a combination of abacavir, 3TC, and optionally AZT. ViiV asserts theories of indirect infringement, arguing that Lupin's ANDA shows it would induce and/or contribute to acts of direct infringement of the method claims by doctors and patients.

To induce infringement, the defendant must intend to cause the acts that constitute the direct infringement, *DSU Medical Corp. v. JMS Co.*, 471 F.3d 1293, 1305 (Fed. Cir. 2006), and must know that the induced acts constitute infringement. *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2068-71 (2011). To be held liable for contributory infringement, ViiV must show that Lupin will sell its generic product knowing that it will be used in an infringing manner. *Netgear, Inc. v. Ruckus Wireless, Inc.*, 852 F. Supp. 2d 470, 476 (D. Del. 2012). Claims 34, 35, 38, and 39 are nearly identical to claims 26, 27, 29, and 30, except that claims 26, 27, 29, and 30 recite methods of treatment using a combination "comprising" ABC and 3TC, thus permitting (but not requiring) AZT. Those claims are recited below:

| Double combination claims (26, 27, 29, 30) | Triple Combination Claim (34, 36, 38, 39) |
|---|---|
| **20.** A method for the treatment or prevention of the symptoms or effects of an HIV infection in an infected animal which comprises treating said animal with a therapeutically effective amount of a | **32.** A method for the treatment or prevention of the symptoms or effects of an HIV infection in an infected animal which comprises treating said animal with a therapeutically effective amount of a |

11

| | |
|---|---|
| combination comprising [abacavir] and [3TC]. | combination comprising [abacavir], zidovudine, and [3TC] |
| **26.** A method according to claim **20** wherein each [abacavir] and [3TC] is present in an amount from 5 to 1000 mg per unit dosage form. | **34.** A method according to claim **32** wherein each [abacavir], zidovudine, and [3TC] is present in an amount from 5 to 1000 mg per unit dosage form. |
| **27.** A method according to claim **20** wherein the combination is administered simultaneously. | **36.** A method according to claim **32** wherein the combination is administered simultaneously. |
| **29.** A method according to claim **20** wherein the combination is administered as a single combined formulation. | **38.** A method according to claim **32** wherein the combination is administered as a single combined formulation. |
| **30.** A method according to claim **20** in which said animal is a human. | **39.** A method according to claim **32** in which said animal is a human. |

All of the asserted method claims (or the independent claims from which they derive) recite the following limitation: "the treatment or prevention of the symptoms or effects of an HIV infection." The parties dispute whether treatment or prevention of the HIV infection itself falls within the scope of "symptoms or effects." Lupin argues that the plain meaning of "symptoms or effects" of HIV is limited to opportunistic infections or conditions and not to the HIV infection itself. Because its generic drug product is intended to treat HIV infection, not the symptoms or effects of an infection, Lupin argues it does not indirectly infringe the claims. ViiV disagrees, arguing that Lupin's generic product is aimed at halting replication of HIV, which is an effect of infection, and it therefore infringes that limitation. The Court construed the "symptoms or effects" term according to its plain and ordinary meaning, but did not specify what this plain and ordinary meaning was, or whether that meaning excluded treatment of the HIV infection itself. (D.I. 126 at 2, 3).

12

Lupin argues that construing "symptoms or effects" to include the HIV infection itself would simply remove the term from the claim in the following manner:

> **32.** A method for the treatment or prevention ~~of the symptoms or effects~~ of an HIV infection in an infected animal. . . .

The Court does not agree. The `191 Patent is aimed at treatments designed to halt viral replication. (Tr. at 81-82, Dr. Blick). The first paragraph of substance in the specification states, "The present invention relates to therapeutic combinations of [the drug compounds] which have anti-HIV activity. The present invention is also concerned with pharmaceutical compositions containing said combinations and their use in the treatment of HIV infections including infections with HIV mutants bearing resistance to nucleoside and/or non-nucleoside inhibitors." `191 Col. 1:09-20. The specification makes clear that the combinations are designed to treat an HIV infection by inhibiting replication of the HIV virus. There is nothing wrong with construing the "symptoms or effects" claim language to encompass such treatment, especially when those terms are read in light of the specification. "Symptoms" and "effects" are not equivalent. While "symptoms" might be understood to have the restrictive scope argued by Lupin, "effects" is a broader term. One "effect" of an HIV infection is the nonstop viral replication resulting in a spread of infection throughout the cells of the body. There is no dispute that Lupin's ANDA product is intended to halt such progression of the disease. (*See* PTX 152 at LUPIN(TRIZ) 12337). It is thus a method for the treatment of the effects of an HIV infection.

The claim language also concerns the "prevention" of symptoms of an HIV infection. One way to prevent the opportunistic conditions (which Lupin argues is what is meant by "symptoms or effects of an HIV infection") associated with AIDS is to treat the underlying infection. Finally, although it is true that "[a] claim construction that gives meaning to all terms of the claim is preferred over one that does not do so," *Merck & Co. v. Teva Pharms. USA, Inc.,*

13

**A00018**

395 F.3d 1364, 1372 (Fed. Cir. 2005), that is a mere preference. It would be better to allow for some redundancy than to adopt a construction that is inconsistent with the invention. Thus, Lupin's generic ANDA product meets the "method for the treatment or prevention of the symptoms or effects of an HIV infection" limitation.

The Court will next consider claim 4 separately from the other method claims. Claim 4 depends from claim 2, which depends from claim 1. Those three claims follow:

> 1. A method for the treatment or prevention of the symptoms or effects of an HIV infection in an infected animal which comprises treating said animal with a therapeutically effective amount of a combination comprising [abacavir] or a physiologically functional derivative thereof, [AZT] or a physiologically functional derivative thereof, and [3TC] or a physiologically functional derivative thereof.

> 2. A method according to claim 1 wherein [abacavir] or a physiologically functional derivative thereof, [AZT] or a physiologically function derivative thereof, and [3TC] or a physiologically functional derivative thereof are present in a ratio of 1 to 20:1 to 20:1 to 10 by weight.

> 4. A method according to claim 2 wherein [abacavir], [AZT] and [3TC] are present in a ratio of 1 to 3:1 to 3:1 to 2 by weight.

The parties dispute whether the "physiologically functional derivative thereof" limitation of claims 1 and 2 is encompassed or excluded by asserted claim 4.[5] ViiV argues that dependent claim 4 encompasses that limitation, and thus that Lupin's generic product infringes the claim. Lupin disagrees, arguing that claim 4 has been narrowed to exclude the "physiologically functional derivative" limitation. Dependent claim 2 contains "physiologically functional derivative thereof" limitations for all drug compounds, but asserted dependent claim 4 does not. This would suggest that claim 4 does not encompass derivatives. Claim 13, which is also dependent from claim 1, and like claim 4, adds additional weight ratio limitations, follows:

> 13. A method according to claim 1 wherein [abacavir] or a physiologically functional derivative thereof, [AZT] or a physiologically functional derivative

---

[5] The Court construed "physiologically functional derivative thereof" as including "[a]ny physiologically acceptable salt[.]" (D.I. 126, p. 3). This means that abacavir sulfate would fall within the scope of the term.

thereof, and [3TC] or a physiologically functional derivative thereof are present in
a ratio of 1 to 10:1 to 10:1 to 5 by weight.

Claim 13 explicitly recites the derivative limitation, while asserted claim 4 does not. It would

follow that claim 4 does not encompass the derivative limitation. The only conclusion that can

be drawn from comparing asserted claim 4 with claims 2 and 13 is that claim 4 has been

narrowed to exclude salt derivatives of abacavir, which would exclude Lupin's accused generic

product. Lupin's generic product does not literally infringe claim 4.

As to the bulk of the method claims, ViiV argues that the reasons for finding non-

infringement of formulation claim 47 do not extend to finding non-infringement of method

claims 26, 27, 29, 30, 34, 36, 38, and 39. ViiV argues that the method claims are concerned with

treatment, and the generic product ultimately treats the patient with abacavir. This gives rise to

another discussion of *Merck & Co.*, 347 F.3d at 1367. On the surface, it would appear that

because the asserted claims at issue are method claims, the situation becomes analogous to

*Merck & Co.* This does make *Merck & Co.* a closer fit than it was with formulation claim 47.

There are, however, still key differences between the singular method claim of *Merck & Co.* and

the asserted method claims of the `191 Patent. In *Merck & Co.*, there was only a single asserted

claim and the specification suggested that the salt form was understood as falling within the

scope of that claim. *Id.* at 1371-72. Here, by contrast, there are unasserted claims that

manifestly recite derivatives of abacavir that would include the salt forms. It would not seem

true to the patentee's intentions of claim drafting for the Court to redefine and broaden the

asserted claims as implicitly encompassing scope, where the patentee felt it necessary to

explicitly claim that scope elsewhere. This is the most important distinction with *Merck & Co.*,

as in that case, there was only a single method claim at issue, and construing that claim to

include the salt form would not vitiate limitations in unasserted claims. Further, in *Merck & Co.*,

15

**A00020**

there was evidence that the lexicography of the patent defined the acid form of the drug as

encompassing the salt form. *Id.* at 1372. Here, there is no suggestion in the patent that the

chemical formula for pure or free base abacavir was specially defined to include the salt form.

The inventors' explicit recitation of separate "physiologically functional derivative thereof"

limitations in unasserted claims suggests they understood them to be different. Finally, Dr.

Arnold persuasively explained how the salt form is chemically distinct from the pure or free base

form of abacavir, and that the salt form offers superior functionality, and thus the Court cannot

find that persons skilled in the art would have understood the pure or free base form of abacavir

to be the same thing as, or to encompass, the salt form. (Tr. at 254-57). For these reasons, the

instant case is distinguishable from *Merck & Co.*, and Lupin's generic product does not literally

infringe the asserted method claims of the `191 Patent.

> (iv) *Infringement of method claims 4, 26, 27, 29, 30, 34, 36, 38, and 39 under the doctrine of equivalents*

For similar reasons as to why the generic product does not infringe the formulation claim

under the doctrine of equivalents, Lupin's generic product does not infringe the method claims

under the doctrine of equivalents. Where the patentee explicitly claims certain subject matter in

unasserted claims, that subject matter should not be transported into the asserted claims via the

doctrine of equivalents. This, however, is what ViiV seeks here, as many unasserted claims

contain the "physiologically functional derivative thereof" limitations, which would encompass

the salt form of abacavir, yet the asserted claims do not. For this reason, Lupin's generic product

does not infringe the method claims of the `191 Patent under the doctrine of equivalents.

## II.    OBVIOUSNESS

To determine obviousness, the Court must decide whether the subject matter of the

claimed invention would have been obvious at the time the invention was made to a person of

16

ordinary skill in the art to which the subject matter of the invention pertains.  35 U.S.C. § 103(a).

"Obviousness is a question of law with several underlying factual inquiries: (1) the scope and

content of the prior art; (2) the differences between the prior art and the claims at issue; (3) the

level of ordinary skill in the field of the invention; and (4) objective considerations such as

commercial success, long felt but unsolved need, and the failure of others." *Transocean*

*Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1347 (Fed. Cir.

2012).  Defendants have the burden of proving the obviousness of the claims by clear and

convincing evidence.  *Id.*

Defendants argue that the claimed combinations, abacavir and 3TC, and abacavir, 3TC,

and AZT, were obvious in light of the prior art.  Where a skilled artisan merely pursues known

options from a finite number of identified, predictable solutions, the resulting invention is

obvious under § 103.  *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent*

*Litig.*, 676 F.3d 1063, 1070 (Fed. Cir. 2012).  "Where, however, a defendant urges an

obviousness finding by 'merely throw[ing] metaphorical darts at a board' in hopes of arriving at

a successful result, but 'the prior art gave either no indication of which parameters were critical

or no direction as to which of many possible choices is likely to be successful,' courts should

reject 'hindsight claims of obviousness.'"  *Id.* at 1070-71.

Teva asserts that the combination of abacavir and 3TC was obvious both because (i) a

person skilled in the art ("POSA") would have been motivated to combine complementary and

potent NRTIs to hit HIV early and hard, with a reasonable expectation that such a combination

would suppress HIV reproduction and delay or prevent the development of resistant strains of the

virus, and (ii) a POSA would have been particularly motivated to replace AZT in the AZT/3TC

combination with abacavir, as abacavir was an NRTI, yet it avoided the toxicity problems

17

**A00022**

associated with AZT while still complementing 3TC. Lupin argues that a POSA would have

been motivated to build upon the success of AZT/3TC by adding a third potent and low toxicity

drug to the therapeutic regimen. ViiV disagrees, arguing that combination therapy was

unpredictable, the sizeable universe of potentially useful drugs was inconsistent with an

obviousness finding, problems of cross-resistance overrode considerations of potency and would

have discouraged a POSA from combining abacavir and 3TC, and it made no sense to alter

AZT/3TC by substituting abacavir for AZT, as AZT/3TC was the only known combination that

worked.

   (A)  FINDINGS OF FACT

     *(i)  Level of ordinary skill in the art.*

   The parties agreed that their definitions of a person skilled in the art are essentially the

same. (Tr. at 1583). A person skilled in the art would have a medical degree or a PhD in

virology or a related field in the biological sciences with experience in retroviral therapies. (Tr.

at 79, Dr. Langer; Tr. at 309, Dr. Zingman).

     *(ii)  Scope and content of the prior art.*

      (a)  Background

   The application leading to the `191 Patent was filed on March 28, 1996, and claims

priority from two Great Britain applications filed on March 30, 1995, and claims inventions

conceived in mid-1994. (JX 1, p.30). Human Immunodeficiency Virus ("HIV") was first

reported in 1983, and was discovered to be the cause of Acquired Immune Deficiency Syndrome

("AIDS") in 1994. (Tr. at 1219-21, Dr. Ho). As a virus, HIV does its damage through

replication. HIV (1) fuses and enters a cell; (2) converts viral RNA to DNA by reverse

transcription; (3) integrates the new DNA into the host cell's nucleus; (4) uses the new DNA to

create copies of viral RNA and enzymes; (5) packages the new RNA and enzymes into virions; (6) buds from the cell; (7) cleaving, or cutting, the enzymes into their final form. (Tr. at 987-88, Dr. Larder; Tr. at 1278-79, Dr. Ho). AIDS, which is the final stage of HIV infection, is diagnosed where immune cells (CD4 T cells) fall below a certain level, and the patient is vulnerable to deadly opportunistic infections. (Tr. at 84, Dr. Blick). The AIDS epidemic was a public health crisis in the 1980s and 1990s, having left approximately 300,000 Americans dead. (PTX 258).

In 1995, the state of the art in HIV treatment was one of both failure and advancement, with drug researchers and doctors eager to identify effective therapies to halt the progression of the disease. (Tr. at 313-15, Dr. Zingman; Tr. at 1218-21, Dr. Ho). Nucleoside reverse transcriptase inhibitors ("NRTIs") were the first type of drugs developed for the treatment of HIV. (Tr. at 317, Dr. Zingman; Tr. at 1233-34, Dr. Ho). In order to incorporate itself into the nucleus of a host cell and induce replication, HIV must build a complete DNA chain from its RNA after entering the host cell. (Tr. at 1234-35, Dr. Ho). This is known as the reverse transcription process, and is mediated by an enzyme called reverse transcriptase.[6] (Tr. at 317, Dr. Zingman; Tr. at 1234, Dr. Ho). The DNA chain is made from four protein building blocks, which are known as deoxycytidine, deoxyguanine, deoxythymidine, and deoxyadenosine. (Tr. at 476, Dr. Parniak). They are generally referred to as the C, G, T, and A building blocks or bases. (Tr. at 476, Dr. Parniak).[7] NRTIs function as analogs of these building blocks. (Tr. at 477, Dr. Parniak). An NRTI will trick the reverse transcriptase enzyme into incorporating the drug into a growing viral chain. (Tr. at 1234, Dr. Ho). The NRTI then prevents further blocks from being

---

[6] It is "reverse" transcription because generally, DNA produces RNA, not vice versa.
[7] Each building block only binds with its pair: T binds with A, and C binds with G. (Tr. at 478, Dr. Parniak).

19

attached to the chain, thus acting as a "chain terminator" and halting replication. (Tr. at 482, Dr. Parniak).

AZT, the first FDA-approved anti-HIV drug, is an NRTI analog to the "T" DNA building block. (Tr. at 136, Dr. Blick; Tr. at 1220, Dr. Ho). AZT was known to be effective at decreasing mortality as a monotherapy, but for only a relatively short period of time. (Tr. at 327, Dr. Zingman). AZT also had the drawback of producing severe side effects due to its toxicity, causing patient compliance difficulties. (Tr. at 328, Dr. Zingman). Toxicity occurred because NRTIs may disrupt normal human DNA processes in a similar manner as to how they disrupt viral DNA. (Tr. at 328, Dr. Zingman). Other NRTIs were developed and used in treatment, but no drug provided sustained effectiveness when prescribed as monotherapy. (TTX 153; Tr. at 313-15, Dr. Zingman; Tr. at 1218-21, 1236-37, Dr. Ho). HIV replicates itself at a rapid pace, creating over one billion copies daily. (Tr. at 320, Dr. Zingman). The replication process is error-prone, allowing for millions of mutated variants created daily in an infected person. (PTX 353 at 126). HIV's ability to mutate rapidly causes the virus to become resistant to monotherapy in a matter of months. (Tr. at 982-83, 993, Dr. Larder; Tr. at 1237, Dr. Ho; Tr. at 445-46, Dr. Zingman; Tr. at 816, Dr. Arnold). Persons skilled in the art sought to solve the problem of treatment failure due to resistance. (Tr. at 991-93, 995-97, 1023-24, Dr. Larder; Tr. at 816, Dr. Arnold).

### (b) Was combination therapy established as a treatment strategy as of March 1995?

The `191 Patent sought to solve the problem of viral resistance to monotherapy via NRTI combination therapy. `191 Col. 1:16-21. The claims of the patent recite two-drug and three-drug combinations, those combinations being abacavir and 3TC, and abacavir, 3TC, and AZT. *See* `191 Patent, claims 1-51. The effective filing date is March 30, 1995. The degree to which

20

combination therapy was accepted in the field of anti-HIV drug treatment as of March 1995 is

relevant to the obviousness of the `191 Patent. *Novo Nordisk A/S v. Caraco Pharm.

Laboratories, Ltd.*, 719 F.3d 1346, 1351 (Fed. Cir. 2013). Defendants argue that by March 1995,

combination therapy had clearly begun to demonstrate its superiority to monotherapy. ViiV

disagrees, arguing that there was still pervasive uncertainty in the field, and combination therapy

was far from established.

The Court generally agrees with Defendants that combination therapy was emerging as

superior to monotherapy in the field of HIV treatment, with the caveat that the field was still in

the midst of considerable uncertainty. As early as June 1993, over a year and a half before the

effective filing date, the *Journal of Commerce* reported on the Ninth International Conference on

AIDS in Berlin. (TTX 153). The publication stated that "most AIDS cases now are treated with

a combination of drugs because researchers believe this might be a better technique." (*Id.*). The

failures of monotherapy were recognized: "The most critical point . . . is that no currently

available monotherapy (use of one drug) will provide as long-lasting benefit as we would all

desire." (*Id.*). The Hammer article from *Journal of Acquired Immune Deficiency Syndromes*

reported that a "majority of panelists," *i.e.*, clinicians, would "recommend initial combination

antiretroviral therapy" for a variety of patient types.[8] The Caliendo reference from *AIDS

Commentary* also described the failure of AZT monotherapy (referring to its benefits as

"transient") and the suspected superiority of combination therapy. (LTX 1490 at 516). The

FDA had approved the ddC and AZT combination, and doctors independently prescribed AZT

plus ddI. (LTX 1318; TTX 17; Tr. at 315; Tr. at 1361-62, Dr. Ho).

---

[8] These patient types were "treatment-naïve patients who are symptomatic and for treatment-naïve persons who are asymptomatic with less than 200 $CD4^+$ cells/mm.$^3$ They would recommend combination therapy for patients who have had previous antiretroviral therapy and who are stable with <300 $CD4^+$ cells/mm$^3$ or who are progressing." (PTX 344 at S37).

All of these references strongly suggest that the field had been moving toward combination therapy prior to the effective filing date of the `191 Patent. This could be derived even without taking into account the results of the 3TC and AZT trials, presented at the 2nd National Conference on Human Retroviruses and Related Infections, held January 29 to February 2, 1995 in Washington D.C. (TTX 71). *AIDS Weekly* reported these results: "The combination of lamivudine (3TC) and zidovudine (AZT) has the most potent and longest lasting effect of any retroviral strategy yet tested in clinical trials, according to the result of four Phase II trials conducted in Europe and in North America." (*Id.*). This reference explicitly supports the premise that certain types of combination therapy were recognized as the best available treatment.

In arguing that combination therapy was not established, ViiV does cite a trial stating that monotherapy had "the best benefit for patients," but that trial came before the 3TC/AZT announcement and only touched upon the AZT and ddI combination. (PTX 440 at PB0261). It further is a single study of a single combination, which does not alter the fact that combination therapy was generally being pursued in the field. ViiV also cites the *The Medical Letter* in opposition, as that reference does state that monotherapy was the recognized preferential treatment, but even that reference suggested the suspected superiority of combinational therapy over monotherapy: "Concurrent use of two or more drugs may prove to be more effective than monotherapy." (PTX 251 at 87, 88, 90 n.1). Thus, the evidence is clear and convincing that combination therapy was generally thought to offer better treatment opportunities by March 1995.

(c) Universe of potential anti-HIV drugs for combination.

22

The size of the universe of potential drugs that a person skilled in the art would encounter when seeking an effective combination is relevant to the obviousness analysis. *See In re Kubin*, 561 F.3d 1351, 1361 (Fed. Cir. 2009). The more potentialities, the less likely that a particular combination is obvious. *Id.* Where options are fewer, indicia of obviousness increases. *Id.* Defendants argue that a person skilled in the art would look toward a small group of promising NRTIs for potential combinations, as NRTIs were the most effective and best understood class of drugs. ViiV disagrees, arguing that the universe was much larger than Defendants state, and that it certainly included drugs in classes other than NRTIs.

The Court finds that this factor weighs slightly against a finding of obviousness. It is true that good reasons existed to explore the NRTI category for combination research. As of the filing date, all four FDA-approved anti-HIV medications (AZT, ddI, ddC, and d4T) were NRTIs. (Tr. at 317-18, 321-24, Dr. Zingman; Tr. at 486, Dr. Parniak). The AZT and 3TC combination consisted of two NRTIs and was the first HIV therapy to offer lasting clinical benefits. (TTX 17, TTX 71; Tr. at 1381-82, 1391 Dr. Ho). Although evidence suggested that a particular mutational relationship between those two drugs gave rise to the combination's benefits (*see id.*), it would follow that persons skilled in the art would attempt to build on the success garnered from combinations in the NRTI class. At least one reference did show a special focus on NRTIs, with one researcher stating, "In the last year, there have been more clinical successes with [NRTIs] than with any other class of compounds." (TTX 224 at 45). "A powerful platform for drug discovery, in particular [NRTIs], may well set the stage for modifying the predestined pathogenesis of HIV-1." (*Id.* at 46).

All of this being said, however, the Court agrees with ViiV that a person of ordinary skill in the art would not completely limit herself to NRTIs in considering drug combinations. ViiV

23

**A00028**

rightly points out that, as of the time of filing, at least 28 drugs were in human clinical trials.

(TTX 24; PTX 358; PTX 466; TTX 196; PTX 280; PTX 255; PTX 396; PTX 362; PTX 254;

PTX 399; PTX 418; PTX 334; PTX 449; PTX 462; PTX 269; Tr. at 1231, Dr. Ho). Of these 28

drugs, thirteen were not NRTIs: eight were protease inhibitors ("PIs") and five were non-

nucleoside reverse transcriptase inhibitors ("NNRTIs").[9] (Tr. at 1231-36). NNRTIs were

thought to have the potential for less toxicity compared with the other drug classes, making them

desirable research targets, especially considering the NRTI toxicity issue. (Tr. at 606, Dr.

Parniak; PTX 491 at 103-04). PIs were identified as a "potent new class of drugs[.]" (PTX 251

at 88). Defendants argue, and Dr. Parniak testified, that problems with bioavailability and

manufacturing would have discouraged research with PIs, but it was reported that, despite these

difficulties, "there [was] still merit in pursuing the protease inhibitors[.]" (TTX 224 at 46). Dr.

Parniak admitted that PIs were available for experimentation, and that he would consider

combining NNRTIs and PIs. (Tr. at 604, 428). [10]   Defendants' other experts made similar

admissions. (Tr. at 428-29, Dr. Zingman; Tr. at 821-22, Dr. Arnold). Thus, the experts

essentially agree that a person skilled in the art would not limit herself to NRTIs. As Lupin

stated in its brief, "[s]cientists were eager for new drugs." (D.I. 202, p. 7). It makes sense for

drug developers to pursue combinations in both the known and the less known classes, especially

in what were still perilously uncertain days for HIV patients. Further, a patent application of one

---

[9] NNRTIs, like NRTIs, focus on disrupting the reverse transcriptase step of HIV replication. Unlike NRTIs, NNRTIs do not mimic nucleosides and interfere with the growing DNA chain. They instead bind directly to the reverse transcriptase enzyme. (Tr. at 1233-35, Dr. Ho). PIs inhibit the "cleavage" step of viral replication by interfering with the protease enzyme. (Tr. at 1235-36, Dr. Ho).
[10] The fact that eight PIs were in clinical testing further undermines Dr. Parniak's position that the difficulty of manufacturing PIs would discourage clinical research for that class.

of ViiV's experts, Dr. Larder, specifically teaches that NRTIs could be combined with NNRTIs and PIs.[11] (*See* TTX 204). PIs and NNRTIs were on the table for combination therapy.

(d) Predictability of combination therapy?

The next inquiry into the scope of the prior art is the predictability of combination therapy. Defendants further argue that persons skilled in the art were armed with specific rationales that would lead them to the claimed combinations. Specifically, the AZT and 3TC combination's success would steer drug researchers to incrementally improve upon that combination to achieve predictable results. Teva argues that the AZT and 3TC combination would lead a person skilled in the art to combine abacavir and 3TC, as abacavir and 3TC would offer similar potency to the AZT/3TC combination, but with less toxicity. Lupin argues that the AZT/3TC combination would lead a person skilled in the art to improve the potency of that combination by adding abacavir. ViiV disagrees, arguing that the field was generally unpredictable, AZT and 3TC was the only known effective combination, but that effectiveness was due to a unique mutational interplay between the drugs. ViiV further argues that issues of cross-resistance would discourage combining abacavir and 3TC.

AZT, the first anti-HIV drug sanctioned by the FDA, had been approved for monotherapy since 1987. (Tr. at 1220, Dr. Ho). AZT was a potent inhibitor of HIV, but it produced toxic side effects severe enough to cause some patients to refuse it. (Tr. at 327-28, Dr. Zingman; TTX 56 at 736-37; TTX 78; TTX 202). Moreover, despite AZT's initial potency, the benefits of AZT monotherapy were short-lived. (*Id.*; Tr. at 1220, Dr. Ho). After a few months, the therapeutic benefit was lost due to the rapid emergence of a drug-resistant virus, resulting in treatment failure and patient death. (Tr. at 1220, 1237, Dr. Ho; PTX 128). Researchers looked to

---

[11] This supports Dr. Ho's testimony the PIs and NNRTIs began to show "safety and pharmokinetics data," and "efficacy results" before March 1995. Tr. at 1290.

25

alternatives for AZT in order to skirt the drug's resistance and toxicity issues.[12] 3TC's potency

was similar to AZT's, yet it was much less toxic. (Tr. at 335, 345-47, 374, Dr. Zingman; TTX

56; TTX 224).[13] Like AZT, however, 3TC's initial therapeutic effectiveness as a monotherapy

quickly waned. (Tr. at 423-24, Dr. Zingman). 3TC gave rise to resistance and was not effective

as a monotherapy. (Tr. at 423, Dr. Zingman; Tr. at 1220, Dr. Ho). Three other NRTIs, ddI, ddC,

and d4T, all failed as monotherapies due to the emergence of resistance in the virus. (Tr. at

1220, Dr. Ho).

All parties agree that the AZT and 3TC combination was a momentous development in

the field. Results from the corresponding trials were described as a "breath of fresh air," and the

combination was said to offer "the most potent and longest lasting effect of any antiretroviral

strategy yet tested in clinical trials." (TTX 71 at 2; Tr. at 339, Dr. Zingman). AZT and 3TC

effectively delayed the emergence of resistant strains of HIV, even though neither drug did so

individually. (*Id.*; TTX 224; TTX 300; Tr. at 337-39). The efficacy of the 3TC and AZT

combination was thought to depend upon a mutation in the M184 reverse transcriptase gene that

made the virus resistant to 3TC, but overrode mutations conferring AZT resistance, thus

resensitizing previously AZT-resistant HIV to the antiviral effects of AZT. (TTX 71 at 3).[14]

Defendants argue that good reasons existed to focus on abacavir as a low toxic and potent

candidate for combination therapy. ViiV disagrees, arguing that there was no reason to focus on

abacavir among the myriad of available compounds. Abacavir is an analog of another then

experimental anti-HIV drug known as carbovir. Both drugs metabolize to the same antiviral

---

[12] "Drug resistance and bone marrow toxicity point to a need for new chemotherapeutic agents with high antiviral potency and low myelotoxicity for use as alternatives to, or in combination with, AZT." (TTX 78 at 437).
[13] 3TC was also much less toxic than ddC, another FDA-approved NRTI, despite the structural similarities between those two drugs. (TTX 224 at 45).
[14] "Researchers 'speculate' that 3TC may increase AZT's effectiveness by delaying viral resistance to the drug." (TTX 17 at 12).

form in the body, carbovir triphosphate, albeit via different routes. (TTX 265, Abstract I84; Tr. at 515, 586, Dr. Parniak; Tr. at 1373-74, Dr. Ho). Both are "G" analogs. (*Id.*). Carbovir was reported to be a potent inhibitor of HIV and to have synergistic *in vitro* activity with AZT (a "T" analog) and ddC (a "C" analog). (PTX 438 at 967; TTX 93 at 2-3; TTX 228 at 90-92). Carbovir was discussed in the prior art as a potential alternative to AZT. (Tr. at 558-61, 586, Dr. Parniak; TTX 78 at 437). ViiV argues that carbovir's poor oral bioavailability and reported toxicity in dogs caused drug developers to abandon it, and they likewise would have looked away from carbovir's analog, abacavir. It is true that carbovir had poor bioavailability, and in one reference, was reported to cause toxicity in dogs. (PTX 438 at 967; Tr. at 515-17, 599, Dr. Parniak; TTX 93; TTX 228). However, this did not apply to abacavir, because abacavir was known to offer sufficient oral bioavailability and to be non-toxic in laboratory animals. (TTX 265 at I6, I86, I88; Tr. at 352-53, Dr. Zingman; Tr. at 1375-76). Dr. Ho testified that carbovir's toxicity report would be a "red flag" to researchers investigating abacavir, but he also admitted that a researcher would understand that toxicity issues would be resolved were a drug in phase 1 trials. (Tr. at 1294, 1377-78). As of October 1994, abacavir was in Phase I human clinical trials. (TTX 196; TTX 116 at § 8). Carbovir's toxicity would not have been imputed to abacavir.

ViiV argues that a person skilled in the art had no reason to focus on abacavir in particular. ViiV points out that the first abacavir data was not published until October 1994 at the "ICAAC" conference, and that abacavir was only described in five out of more than a thousand abstracts presented at that conference. (Tr. at 442-43, Dr. Zingman; TTX 265). One publication reciting the major points of the conference, however, specifically highlighted "Wellcome's 1592UB9," *i.e.*, abacavir. (TTX 196). This suggests that abacavir stood out among the topics covered at the conference. ViiV also argues that abacavir's potency was in

27

**A00032**

doubt, as one study showed that abacavir was 50 to 100 times less potent than AZT. (TTX 265 at I82). The weight of the scientific literature, however, shows that abacavir was comparably potent to AZT. (TTX 78; TTX 265 at I82; TTX 258 at 2:65-68, Tr. at 511-17, 559-61, 581, Dr. Parniak). Abacavir also had lower toxicity than AZT, was synergistic with other compounds, and penetrated the central nervous system, which is a desirable feature for an anti-HIV medication. (*Id.*). Abacavir was reported to have *in vitro* synergistic activity with AZT, ddI, and ddC. (TTX 265 at I6). Abacavir was reported to be "an attractive candidate for clinical evaluation." (TTX 265 at I6, I88). It was also "an important candidate for further development as an anti-HIV drug for combination therapy," due to its "cross-resistance profile and the relatively slow emergence of resistance." (TTX 265 at I82). Thus, the evidence shows that abacavir would have been a ripe candidate for researching new combination therapies.

Defendants argue that because the AZT and 3TC combination was the best known combination, and abacavir was known as a particularly strong candidate for future combinations, the claimed combinations bringing those drugs together were obvious. ViiV argues that the fact that all combinations other than AZT and 3TC had failed showed the extreme unpredictability of the field. Defendants point to other allegedly successful combinations to show that it was not an unpredictable field. Defendants rely on the `191 Patent's specification to show that AZT was known to combine well with other compounds. The specification states, "The combination of [AZT] with either ddC or ddI has shown promising results in HIV infected patients[.]" `191 Col. 1:66-67. ViiV points out that the studies relied on in the specification for this statement were outdated by March 30, 1995, and that it was understood that those combinations were in fact not

28

effective. Defendants counter that admissions in the specification regarding the prior art are binding on the patentee.[15]

The Court accepts the statement that AZT plus ddI or ddC were regarded as "promising." That is not the same thing as saying they were effective. Defendants themselves, however, cite references that contain statements indicating that those combinations were not effective long-term. It would not make sense for the Court to allow Defendants to rely on those references where they support the obviousness case, but to pretend that certain statements unfavorable to the obviousness analysis do not exist. *AIDS Weekly* from February 1995, a Teva exhibit that Defendants rely on to show the success of AZT and 3TC, also discusses the AZT/ddC Phase II trial. (TTX 71 at 5). That trial showed that therapeutic benefits of AZT/ddC were not sustained at 24 weeks. (*Id.*). The Hammer reference, which is both a ViiV and Lupin exhibit, is relied on by Defendants to show the general acceptance of combination therapy and to support the theory that potency was understood to lessen the problem of resistance. (LTX 1324; PTX 344; D.I. 205 at 15). That reference also explains that no combination therapy, including AZT/ddC and AZT/ddI, had been shown "beneficial in delaying *clinical* disease progression or in improving survival." (*Id.* at S28) (italics in original). As to whether Hammer supports Defendants' position that potency was understood to be the most important factor, Dr. Hammer did state, "Perhaps it is better to hit as hard as you can as early as you can," and the general consensus was that combination therapy should be started earlier rather than later in treatment. (*Id.* at S36). There is nothing in Hammer, however, that suggests that combination therapy was predictably effective.

---

[15] The cases that hold that an admission in the specification is binding on the patentee typically involve a situation where the patentee attempts to deny the existence of something in the prior art. *See, e.g., PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1362 (Fed. Cir. 2007), a case where expert testimony was given that stem cells had not yet been proven to exist in umbilical cord blood by the asserted patent's filing date, despite the statement in the specification that stem cells were concentrated in cord blood at a much higher level than in adult blood. *Id.* at 1361-62. In contrast, the `191 Patent's specification only states that AZT plus ddC or ddI garnered "promising results," which is far from a definite statement as to the ultimate effectiveness of those combinations.

29

It in fact suggests strongly otherwise, as there was not even any proof of "clear-cut clinical

benefits" of combination therapy. (*Id.* at S36). Doctors "could not recommend one combination

over another based on current data." (*Id.* at S34). Defendants' own physician expert admitted

that he regarded antiretroviral therapy to be "quite confusing" in 1995. (Tr. at 762, Dr.

Laurence).

Defendants also rely on results from the "Thompson" study that indicated that AZT plus

ddC or ddI afforded greater survival benefit than did starting on AZT and then switching to ddC

or ddI. (*Id.*). According to Defendants, these results, juxtaposed with what was known about

AZT/3TC, suggest the obviousness of the claimed combinations. Defendants, however, admit

that no definitive conclusions could be drawn from this study, as it was a retrospective (or "look-

back") study rather than a prospective study, and that prospective studies were much better.[16]

(Tr. at 747, 48). Later prospective studies showed that AZT and ddI provided no better results

than monotherapy, or, in the case of AZT and ddC, produced worse results. (Tr. at 1246, Dr.

Ho; PTX 420; PTX 440 at Abstract PB0261; Tr. at 633, Dr. Parniak; PTX 268 at PB0266; PTX

344).[17] It was also known that AZT combined with ddC showed signs of increased incidence of

serious toxicity in patients in advanced stages of the disease. (PTX 432 at 4253; Tr. at 1246-47,

Dr. Ho). Other combinations, including AZT and interferon, and AZT and nevirapine, did not

display good results. (PTX 315 at 059B; PTX 344 at 0012152-53).

The AZT and 3TC combination was the only therapy known to provide prolonged viral

load reduction and increase in CD4 count as of the priority date. (TTX at 17; TTX at 71; TTX

224). No other combination was recognized as providing sustained therapeutic effects. As one

---

[16] Dr. Ho elaborated on the weaknesses of retrospective studies. (Tr. at 1242-43).
[17] Defendants argue that AZT/ddI combination was superior to monotherapy. The weight of the evidence, however, is against that proposition.

reference stated, that combination was a "breath of fresh air" to the field, *i.e.*, it provided

something sorely lacking. (TTX at 71). The high degree of failure suggests that combination

therapy could not be considered a predictable field.

Defendants argue that the claimed combinations are obvious in part because each of

abacavir, 3TC, and AZT is an analog to a different DNA building block (the C, G, and T bases,

respectively). These blocks are essential to the reverse transcription process and thus HIV's

ability to replicate. Because each drug would inhibit replication at different sites of the growing

viral DNA chain, they would not compete with one another to effectuate their anti-HIV activity.

Defendants argue that the combination of differing analogs was understood to provide

synergistic (or at least additive) effects. Defendants argue that persons skilled in the art knew of

the beneficial nature of combining NRTIs operating on different sites of the DNA chain, and

would thus be motivated to combine the claimed combinations with a reasonable expectation of

success. ViiV disagrees, arguing that Defendants provide no evidence that persons skilled in the

art were aware of the beneficial nature of the specific drug interactions at play.

In support of this position, Defendants rely on the testimony of their experts. Dr.

Zingman testified, "By March of 1995, we already had pretty good evidence that it would be

helpful to have complementary nucleoside reverse transcriptase inhibitors, and that would be one

way to put them together as a combination." (Tr. at 326). "[W]e started to get information about

potential antagonism between the cytosine analogs, so we started to get information that it wasn't

a good idea to use two T drugs, for example[.]" (Tr. at 334). He testified as to an expectation

for success: "[T]he potential to join abacavir and 3TC because one was a G analog and one was

a C analog and that you'd expect they would work well together." (Tr. at 376). Dr. Zingman

continued that "combination therapy targeting different DNA bases was already established as a

31

treatment option for people with HIV infection." (Tr. at 379). Dr. Parniak echoed Dr.

Zingman's opinion, testifying in great detail as to how the strands of DNA are made in the

reverse transcription process, and how the component drugs work to terminate the DNA chain,

and explaining the expected benefit derived from combinations where the analogs do not

compete for the same site on the DNA chain. (Tr. at 477, 482-86, 516).

Aside from expert testimony, however, Defendants do not provide a single reference to

support the premise that combining analogs of different bases was known to provide a more

potent combination. It is true that certain combinations having different bases (at least AZT and

3TC) were reported as offering significant clinical benefits. Defendants, however, do not cite a

single reference or publication reporting that the therapeutic benefits of combination therapy

could be explained by the drugs affecting different bases of the DNA chain. Nor did

Defendants' experts rely on any references in support. Dr. Zingman testified that "we had pretty

good evidence" that combining NRTIs with complementary bases was known to be effective, yet

he never actually identified that evidence. Likewise, Dr. Parniak testified that it was known that

certain combinations having two NRTIs with different bases provided additive to synergistic

inhibition of HIV replication, but he never provided any studies or publications suggesting this

was the case. In fact, his deposition testimony was that he could not identify any references that

taught to combine compounds with different bases.[18] There is no reference in the record

showing that such a sophisticated understanding of combination therapy existed as of March

1995.

---

[18] "Q. And but my question focused on whether there was a general statement in the literature before March 30,
1995 that taught to combine combinations of compounds of different bases and said that they would lead to additive
to synergistic effects? Can you identify any such references for me?

A. Off the top of my head, no, I cannot. I would have to conduct an extensive literature review."

Tr. at 612-13.

Lupin cites Schinazi 1995 for the field's supposed recognition that NRTIs with the same

mechanism of action should not be combined, but that reference in no way refers to the benefits

of combining NRTIs with different analog bases. It is instead concerned with the discovery that

structurally similar NRTIs may differ significantly in regard to levels of toxicity.[19]  Lupin also

cites *AIDS Weekly 1995* for the proposition that researchers realized that if the success of the

3TC and AZT combination was "due to specific interactions, it may lead to rational strategies for

combination therapy instead of random choices from a wide array of drugs." (TTX 71 at 2).

This article, however, specified the M184V mutation selected by 3TC and the consequential

resensitization of the virus to AZT as the reason for the 3TC and AZT combination's success.

(*Id.* at 3).  Thus, the specific interactions from which scientists might learn rational strategies for

combination involved mutational interplay, not interactions derived from differing DNA bases.

If the benefit of offering combinations with different DNA bases were truly known in the art

prior to the filing date, one would imagine some reference, somewhere, would have said so, and

been presented during the trial.

ViiV also rightly points out that researchers did combine NRTIs targeting the same

nucleoside bases, including 3TC and ddC, up until shortly before the filing date, and some NRTI

combinations with analogs of different bases failed to show any benefit over monotherapy or

even displayed antagonistic qualities. (TTX 71 at 4, 5; Tr. at 920, Ms. St. Clair; PTX at 178).

These failures provide further reason to doubt that combining analogs of different bases was a

known method of increasing potency, although it is Defendants' failure to provide any references

---

[19] "We are realizing that nucleosides are the only approved antiretroviral drugs and that they are not all the same. For example, although structurally related to ddC, 3TC does not cause peripheral neuropathy even at high doses, thus destroying the fallacy that there is no 'non-toxic nucleoside' for retroviral therapy." (TTX 224 at 5).

33

**A00038**

in support that is the most important factor in reaching the conclusion that the Defendants have not proved that it was a known method.

Defendants cite testimony from Dr. Ho in an attempt to show that he agreed with their position that combining analogs with different DNA bases was an established treatment strategy as of the filing date. The Court does not agree with this interpretation of the testimony. Although Dr. Ho testified that one might avoid using the same nucleoside analog based on the same building block, he also testified that combining different analogs was just a theory. (Tr. at 1252). "In terms of what might work, in my opinion this is unpredictable, what may turn out to be synergistic, antagonistic, or additive. Until one does the experiment, it's not --- the outcome is not known." (*Id.*). At best, it has been established that one might avoid combining drugs that work on the same base, but there is no proof that a person skilled in the art had any expectation that combining drugs of different bases would offer additive or synergistic potency.

(e) Teaching away and cross-resistance

The parties debate the significance of cross-resistance. ViiV argues that the art taught away from using abacavir in a combination with 3TC because those two drugs share overlapping cross-resistance profiles. ViiV also argues it would make no sense to remove AZT from the AZT and 3TC combination, because that combination was understood to work due to specific mutational interplays. Defendants disagree, arguing that cross-resistance was not a factor where highly potent combinations were concerned, and that in any event the cross-resistance between abacavir and 3TC was not significant. As to the particular combinations, Teva argues that it would be obvious to remove AZT from the AZT/3TC combination and replace it with abacavir, as abacavir offered similar potency to AZT with lower toxicity. For its part, Lupin argues that it

34

would be obvious to combine 3TC, abacavir, and a low dose of AZT, as persons skilled in the art

knew this would provide an extremely potent therapy with an acceptable degree of toxicity.

There is no dispute that drug resistance was the reason behind the failure of NRTI

monotherapy. (*See, e.g.*, PTX 128). "The development and clinical use of selective inhibitors to

treat human immunodeficiency virus (HIV) infection have been marred by the ability of the virus

to become drug resistant []." (*Id.*). HIV's ability to replicate up to one billion times per day,

combined with its propensity to err in the transcription process, allow for millions of viral

variants or mutations each day. (Tr. at 789, 803, 816, Dr. Arnold; Tr. at 1219-20, Dr. Ho). In

other words, NRTI monotherapy selected for HIV mutations that resulted in resistance to the

drug. (Tr. at 368-69, Dr. Zingman; Tr. at 490-91, Dr. Parniak). Monotherapy provided

temporary benefits until the resistant variants emerged, causing the therapy to lose effectiveness.

(PTX 128). This occurred with all NRTI monotherapies, including AZT and 3TC individually,

without regard to their individual potency. (Tr. at 789, 803, 816, Dr. Arnold).

The hope in the field was that combination therapy would succeed where monotherapy

failed. At the time of filing, there was only one combination known to provide sustained

therapeutic benefits for HIV-infected persons: AZT and 3TC. The success of this combination

was a breakthrough in the art, coming a few months prior to March 1995. (TTX 17; TTX 71).

Although the pharmaceutical and viral interactions were not entirely understood,[20] the prevailing

thought behind the combination's success was 3TC's selection of the M184V mutation, which

appeared to restore the effectiveness of AZT in an AZT-resistant person. (Tr. at 796, 823, Dr.

Arnold; Tr. at 1004, Dr. Ho; Tr. at 1003-04, Dr. Larder; TTX 71). In other words, it was

---

[20] "Researchers speculate that 3TC may increase AZT's effectiveness by delaying viral resistance to the drug." (TTX 17 at 12).

35

suspected that the mutations selected for by 3TC and AZT interacted with one another to make a

previously resistant infection treatable. This is what allowed the combination to provide

sustained therapy where other treatments failed.

Defendants point out that the mutational interplay was unproven, but it was by far the

best explanation given for the combination's success in the prior art.[21] As the AZT and 3TC

combination was a turning point in the field of HIV therapy, it would seem a POSA seeking to

mimic its success would invariably put stock into the only known explanation for that success.

The explanation hinged on the resistance profiles of the individual compounds of the

combination, which would make cross-resistance highly significant. That is not to say that

Defendants are incorrect when they assert that potency was a fundamental principle of

compound selection.[22] There was the hope that potent combinations would delay the emergence

of a resistant virus. The fact that potency was essential to therapy, however, is not inconsistent

with a strong desire to avoid cross-resistant combinations, as drug resistance might undermine

potency altogether. (Tr. at 1018-19, Dr. Larder). Defendants also cite TTX 108. It shows that

when using certain potent combinations *in vitro*, "no resistant variants emerged." (TTX 108 at

195S). Defendants thus argue that it was known that potency could trump resistance. There is

no evidence, however, that those combinations had overlapping cross-resistance profiles, and

they thus do not speak to the issue. Further, it was later known that the combinations of AZT/ddI

and AZT/ddC, which showed very strong potency *in vitro*, did nothing to delay resistance

clinically. (LTX at 1490 at 518-19). Defendants argue that research was conducted on

---

[21] Teva notes that TTX 71 stated that "the efficacy of 3TC apparently goes beyond its ability to prolong the efficacy of AZT," but that exhibit clearly singles out the mutational interplay as the main suspected reason behind the combination's success.

[22] It seems obvious even to a layperson that a more potent drug is superior to a less potent drug for treatment of a disease, all else being equal.

36

combinations that included both ddI and 3TC, drugs with known overlapping cross-resistance profiles. (LTX 1518 at 953-54). This research was conducted prior to the announcement of the AZT and 3TC trials, which everyone agrees was a monumental occurrence in the field, and the Court sees it as a strongly indicating the importance of accounting for cross-resistance.

Defendants also rely on the testimony of Dr. Laurence, who stated, "You want to target it early on in infection with the most potent combination you have, so that you don't have to worry about resistance or cross-resistance . . . [h]it it hard and hit it early." (Tr. at 672-73, 678). There was, however, little evidence that hitting the infection hard and early with combination therapy made cross-resistance a non-issue. Defendants point to the Hammer reference for the proposition that "the overriding goal of researchers by March 1995 was . . . to hit HIV 'hard' and 'early.'" Although clinicians in the reference discuss the need to use maximum dosages, and tentatively suggest that combination therapy might best be used right away, rather than in later stages of infection, the tone and tenor of the article does not inspire confidence. (*See* PTX 344 at S36). To the contrary, the reference highlights the uncertainty in combination therapy, stating, "many issues complicate[d] the evaluation of combination therapy for HIV." (*Id.* at S25). A "clear-cut clinical benefit" demonstrating combination therapy's superiority to monotherapy had yet to be proven.[23] (*Id.* at S36). Clinicians did not understand why some studies showed promise, while other studies disappointed.[24] One lingering question was "[w]hat will the impact of combination therapy be on the emergence of resistance and cross-resistance?" (*Id.* at S25). The Hammer reference thus does not suggest that any principles of combination therapy had

---

[23] This reference was circulated prior to the publication of the AZT/3TC combination results.
[24] "Salvage studies, such as ACTG 116B/117, have seemed promising in terms of continuing the antiviral effect by switching therapy. Yet the results of ACTG 155 were disappointing. Why did the salvage studies work and ACTG 155 not work?" (*Id.*).

37

been thoroughly established, and in no way suggests that potency resolved issues of cross-resistance.

ViiV also cites three references teaching that cross-resistance was to be avoided in selecting compounds for combination. (TTX 225 at 172; PTX 365; PTX 434). Defendants dispute the interpretation of these references as containing statements teaching against combining drugs with overlapping profiles of cross-resistance. (*See id.*). Defendants argue that TTX 225 emphasizes toxicity concerns, not cross-resistance, as it states, "if synergistic toxicity is not a problem, then these should be combined with drugs that impact acute infection." (TTX 225 at 172). That same paragraph, however, flatly stated that "drugs should not be cross-resistant." (*Id.*; Tr. at 1009, Dr. Larder). It thus clearly teaches against combining cross-resistant drugs.

Defendants also argue that the second reference, PTX 365, stresses potency and selectivity, and lists cross-resistance toward the end of its teachings, thus suggesting that factor is less important. That reference lists various factors as important when combining drugs, including "the stage of HIV replication at which the agent works," "the pharmokinetic profile," "penetration into the central nervous system," and "the likely toxicity profile" before noting that "[a]nother increasingly important issue is the potential for inducing resistance and the likelihood of cross-reactive resistance with other agents." (PTX 365 at 202). The order factors are listed, however, is not determinative of their value. Further, the recognition that choosing drugs for combination is a complicated endeavor that requires the weighing of many factors does not suggest that cross-resistance is a minor factor. There is no dispute that clinicians sought to obtain the best balance of high potency and low toxicity. The question is the significance of cross-resistance's potential to undermine therapeutic value in choosing compounds to combine. This reference's acknowledgment that cross-resistance is an "increasingly important issue"

38

speaks for itself. Finally, the third reference, PTX 434, states that knowledge of 3TC's selection

for the M184V mutation would "permit effective patient monitoring for the development of

resistance to these drugs and to design rational drug combinations." (PTX 434 at 880). As

Defendants point out, PTX 434 discusses the importance of maximizing antiviral effects while

minimizing toxicity. (*Id.*) It also straightforwardly pairs the rationality of combining drugs with

knowledge of resistance. (*Id.*). Even the most potent combination, AZT and 3TC, which were

not cross-resistant, still rapidly selected for the M184V mutation. (PTX 363 at LB33; Tr. at

1003, 1018-19, Dr. Larder).

The weight of the prior art most strongly suggests that concerns of cross-resistance would

be a discouraging factor, even for combinations displaying significant potency and limited

toxicity. HIV's ability to mutate quickly gave rise to the difficulties in identifying an effective

treatment. It was recognized that "the enormous potential of HIV-1 for the development of drug

resistance cannot be denied." (TTX 224 at 45). Drug resistance was the root cause of the failure

of both monotherapy and combination therapies prior to the AZT and 3TC combination, and the

best understanding of why that combination worked was attributed to how it selected for

mutations, *i.e.*, its resistance profile. (Dr. Larder, Tr. at 1018-19, 1029). Drugs with issues of

cross-resistance retained the potential to undermine even the most potent combinations. Thus,

resistance profiles would be a critically important factor in forming combinations,

notwithstanding the fact that toxicity and potency were also vitally important.

Cross-resistance might discourage a person skilled in the art from pursuing a particular

combination, but would it discourage the specific combination of 3TC and abacavir? Defendants

argue that it would not, as the cross-resistance between those two drugs was minimal, and there

were strong countervailing reasons to combine those drugs. ViiV argues that the cross-resistance

39

between 3TC and abacavir was known and significant, and persons skilled in the art would have accordingly avoided that combination.

3TC and abacavir both select for the M184V mutation, a mutation that can cause resistance to HIV.[25] (Tr. at 1016-18, Dr. Larder). Abacavir's selection of the M184V mutation caused increases of resistance at levels between two and five-fold. (TTX 265 at I82; Tr. at 552-54, Dr. Parniak). Defendants argue that resistance at those levels is not significant, while ViiV argues that it would be discouraging. Dr. Parniak testified that two-fold resistance was not significant, and five-fold resistance was "borderline at best." (Tr. at 553-54). Defendants point out that this is consistent with a 1998 article by Dr. Larder that defined "resistance" as greater than five-fold, and "high-level resistance" as greater than ten-fold. (LTX 1341; Tr. at 1348). In 1993, Dr. Larder also described five-fold resistance as low resistance. (PTX 128 at 5653, 5655). Despite abacavir's cross-resistance with ddI and ddC in the range of a three-to-six fold increase, abacavir was declared "an important candidate for further development as an anti-HIV drug for combination therapy," due to a lack of cross-resistance with AZT, its synergy with ddI, ddC, and AZT, and the slow emergence of resistance. (TTX 265 at I82; Tr. at 358-60, Dr. Zingman; Tr. at 444-45, 551-55, Dr. Parniak). AZT, ddI, and 3TC were combined and evaluated as having "superior activity" *in vitro*. (LTX 1484 at 268; Tr. at 701, Dr. Laurence; Tr. at 809-10, 833, Dr. Arnold). They were also combined and used in clinical trials that suggested therapeutic intervention at an earlier stage of HIV infection. (LTX 1484 at 265, 268; Tr. at 702-04, Dr.

---

[25] Although the M184V mutation causes a degree of resistance to both 3TC and abacavir, it ironically reverses resistance to AZT.

Laurence). This was despite the fact that ddI and 3TC have cross-resistance to some of the same mutations as abacavir and 3TC.[26] (LTX at 1484 at 265, 268; Tr. at 1041, Dr. Larder).

In response, ViiV first notes that abacavir did not only select for the M184V mutation, it also selected for secondary L74V and K65R mutations, which also conferred resistance to 3TC. (TTX 265 at I82; Tr. at 1016-17, Dr. Larder). Defendants' own expert, Dr. Zingman, described the resistance conferred by these latter two mutations as "significant." (Tr. at 360). Dr. Laurence, another expert of Defendants, testified that abacavir and 3TC would have appeared to be cross-resistant on their face, and that combination therapy was confusing in general. (Tr. at 763-64). Although the Tisdale reference (TTX 265 at I82) described the emergence of the M184V mutation to abacavir as slow, both Drs. Larder and Arnold testified that the four passages required for abacavir to select the M184V mutation was quick. (Tr. at 1015-16; Tr. at 820). There is a reference suggesting that levels of resistance between two and six were not insignificant, as resistance at similar levels affected the clinical use of ddI.[27] (Tr. at 1269-70, 1275-76, Dr. Ho). Dr. Ho testified that although it is true that researchers did pursue the ddI and 3TC cross-resistant combination, only 3TC and abacavir had completely overlapping resistance profiles. (Tr. at 1297-98, 1365-66, Dr. Ho).

Abacavir was declared an important candidate for combination therapy due to its general cross-resistance profile and its synergy with other NRTIs in the Tisdale abstract. It thus was a good candidate for combination therapy generally. The cross-resistance profile, however, also

---

[26] Dr. Arnold referred to the St. Clair abstract in his testimony on this subject, which was outside the scope of his expert report, and thus cannot be considered here.

[27] PTX 696 notes that ddI was shown to confer resistance in patients who received long-term therapy, while also noting that "[i]t has been difficult to detect more than a 2 to 8 fold difference in [ddI] susceptibility…which is in contrast to the high-level [AZT] resistance (e.g., 100-fold changes from the baseline seen after prolonged [AZT] therapy[.]" (PTX 696 at S144; Tr. at 1269-70). "The clinical significance of the detection of [ddI] resistance in vitro remain[ed] unclear." (Id.).

41

gave reasons to look in directions other than combining abacavir with 3TC. Although a fold

increase of between two and five was not considered extremely high, it would at a minimum

factor into the consideration, especially in conjunction with the knowledge that other drugs (ddI

in particular) displaying resistance between two-fold and eight-fold resulted in treatment failure.

As to the Dr. Larder publications relied on by Defendants, one was published in 1998 and thus is

not relevant here, as it is fair to believe that much was learned about M184V cross-resistance

three years after AZT/3TC and the claimed combinations entered the public sphere. The other

publication, from 1993, characterized ddC's five-fold resistance as "partial resistance," and

resistance at levels of less than five-fold resistance as "low-level." [28]   (PTX 128 at 5653, 5655).

The countervailing evidence, however, that the overall cross-resistance profile was expected to

be capable of interfering with anti-HIV therapy is persuasive, especially the testimony of

Defendants' own witnesses, Dr. Zingman and Dr. Laurence.

      The existence of research into the ddI and 3TC cross-resistant combinations tends to

show that cross-resistance would not always conclusively rule out research on a particular

combination. That being said, Defendants did not counter the evidence showing that the degree

of cross-resistance between 3TC and abacavir was more extensive than between ddI and 3TC. It

is also important to view all of the testimony in light of the treatment situation during the early to

mid-90s. Drug researchers and physicians acted in the midst of a public health crisis, and they

did not have a strong understanding as to what would work and why. The situation was

desperate, and with doctors scrambling for solutions, they might not be inclined to rule out any

---

[28] ViiV argues that Defendants' failure to cross-examine Dr. Larder on his own publications that allegedly undermine his testimony justifies an inference that Dr. Larder's answers would have explained away any inconsistencies. I do not find that any choice not to ask a witness a question justifies an inference that the unasked question would have been answered unfavorably to the party who did not ask the question. Defendants, however, do not appear to use the reference to specifically impeach Dr. Larder's testimony, for had they, they would have violated Fed. R. Evid. 613(b) for failing to give him the chance to explain or deny the statement. They instead use it as one prior art publication supporting their position that the resistance conferred by abacavir was not significant.

particular combination absent experimental evidence indicating that it should not be pursued.
The fact that in certain instances researchers pursued potential solutions in the face of teachings
suggesting that the solution might not work is not surprising in this context. That does not
change the fact that those teachings existed, and would have been informative for those seeking
to combine drug compounds. The cross-resistance between abacavir and 3TC is a significant
difference with the prior art AZT and 3TC combination. In the end, the cross-resistance profiles
of abacavir and 3TC provided a reason for researchers to look in another direction than a
combination of those drugs.

      *(iii) The claimed combinations in comparison with the prior art.*

The Court will next address the specific claimed combinations and the differences and
similarities between those combinations and the prior art.

      (a) The double combination: abacavir and 3TC.

Teva argues that, because abacavir showed synergy in combination with ddC, 3TC was a
logical replacement for ddC, as ddC and 3TC had identical mechanisms of action, yet 3TC had a
superior therapeutic window and toxicity profile. Teva argues that persons skilled in the art
would have known that replacing ddC with 3TC would have led to predictable therapeutic
benefits, because both ddC and 3TC are "C" analogs, and thus work on a different base than
abacavir. It has already been shown, however, that no references in the prior art support the
position that drug researchers understood this phenomenon. There is thus no justification for the
premise that drug researchers would expect another "C" analog to combine well with abacavir.
Further undermining Teva's position is the fact that, to reach this conclusion, Teva chiefly relies
on Dr. Parniak's discussion of Du 1992 (TTX 78), Daluge 1994 (TTX 265), Coates 1992 (TTX
56), and Hart 1992 (TTX 124). (Tr. at 581-82, 587; D.I. 205 at p. 10). This combination,

43

**A00048**

however, was not disclosed in his expert report as one of the specific combinations that he relied

upon to form the foundation of his obviousness opinion. In his report, Dr. Parniak defined the

following two groups of references as each separately supporting his obviousness opinion: (1)

AIDS Alert 1995 (TTX 17), Du 1992 (TTX 78), and Daluge 1994 (TTX 265) and (2) New AIDS

Therapy 1992 (TTX 196) and Hart 1992 (TTX 124). (*See* D.I. 211, Exh. A, *Dr. Parniak's Expert

Report* at ¶ 353). The Court was clear that witnesses were to testify only to combinations

specifically identified in their expert reports as supporting their opinions.[29] Dr. Parniak thus was

not permitted to mix and match between his identified groups as he did in his testimony, where

he relied on Hart 1992 (from the second group) in combination with Daluge 1994 and Du 1992

(from the first group). Further, he explicitly relied on Coates 1992 (TTX 56) in forming his

opinion, which does not appear in either of the two groups. (Tr. at 636). For this reason, Dr.

Parniak's testimony on this point will not be considered by the Court.[30]

    Teva also argues that a person skilled in the art would seek to improve upon the

AZT/3TC combination by removing AZT and replacing it with abacavir. It is true that abacavir

and 3TC were "second generation NRTIs," less toxic than AZT, a first generation NRTI. (TTX

265 at IG, I82; TTX 56). It is also true that abacavir and 3TC were understood to be potent

inhibitors of HIV, and both had been shown to have synergy with other NRTIs. (TTX 196; TTX

202). Despite all of this, to remove AZT from the AZT/3TC combination and replace it with

abacavir would be inconsistent with the best understanding of why that combination worked.

Although the pharmaceutical and viral interactions were not entirely understood, the prevailing

thought behind the combination's success was 3TC's selection of the M184V mutation, which

---

[29] "If I find something in [the expert report] saying, here are 27 references. It's some combination of these that
makes it obvious. Well, if that's what the report says, that's not good enough." (D.I. 188, p. 46 ll. 11-15).
[30] Dr. Parniak's testimony on this point was thus in violation of Fed. R. Civ. P. 26. ViiV timely objected. (*See* Tr. at
569-592) The Court now grants ViiV's motion to strike (D.I. 211) this testimony.

A00049

appeared to restore the effectiveness of AZT in an AZT-resistant person. (Tr. at 796, 823, Dr.

Arnold; Tr. at 1004, Dr. Ho; Tr. at 1003-04, Dr. Larder; TTX 71). Removing AZT would be

contrary to the understanding of why that combination worked, and no good reason was given

why a person skilled in the art would abandon that advantageous property. (Tr. at 1003, Dr.

Larder; Tr. at 1251, Dr. Ho). Teva argues that this was just a theory, but the evidence shows that

it was the best available explanation for why AZT/3TC worked where all other combinations

failed.[31] Teva also points out that resensitization did not entirely explain the efficacy of the

combination, but resensitization indisputably was understood to be the most significant factor. It

is not disputed that 3TC and abacavir did not have a similar mutational interplay, and would not

be expected to restore sensitivity to a resistant virus. There also is the issue of cross-resistance,

which the Court already noted was a deterrent to combining abacavir and 3TC. For these

reasons, the AZT/3TC prior art would not provide motivation for a person skilled in the art to

remove AZT from the combination, and to replace it with abacavir to form the double

combination.

(b) The triple combination: abacavir, 3TC, and AZT.

Lupin argues that the prior art logically led drug researchers to pursue the triple

combination of abacavir, 3TC, and AZT. Lupin points out that abacavir and 3TC selected for the

same mutations, and thus both would resensitize an AZT-resistant virus to AZT, making them

ideal to pair with AZT. (Tr. at 764; TTX 265 at 182). Lupin further asserts that abacavir was

known to show *in vitro* synergy with AZT. (LTX 1324 at S36; TTX 265 at 16, 182; Tr. at 802,

---

[31] Although the references indicate that scientific certainty had not been arrived regarding why the combination worked, there are multiple references explicitly tying the mutational interplay to AZT/3TC's success. Contrasted with Defendants' theory that differing analog bases would offer predictable potency and synergy, which has no supportive publications, the mutational interplay explanation is on solid ground. All of this suggests that the mutational interplay would inform persons skilled in the art when designing combinations after AZT/3TC's publicized success.

45

Dr. Arnold; Tr. at 1379-81, Dr. Ho). Lupin also relies heavily on a patent application of Dr. Larder, one of ViiV's experts. That application suggested combining AZT with two additional compounds, each from one of the following categories: (1) a "mutation-inducing HIV-RT inhibitor," to gain the benefit of resensitization, and (2) "other therapeutic agents." (TTX 204 at 1-2, 7; Tr. at 1379-81). 3TC is listed in the first category as one possible "mutation-inducing HIV-RT inhibitor," and carbovir is listed in the second category as one of the "other therapeutic agents." (Tr. at 778, Dr. Laurence; TTX 204 at 7). According to Lupin, the application thus specifically discloses AZT, 3TC, and carbovir. As abacavir was a carbovir analog understood to have superior bioavailability and toxicity profiles, Lupin argues a person skilled in the art would accordingly replace carbovir with abacavir in the three drug combination suggested by the Larder application, making the claimed combination obvious.

ViiV, however, rightly points out that a complete reading of the Larder application gives rise to a large number of potential combinations having many different potential benefits and challenges. While 3TC is one potential "mutation-inducing HIV-RT inhibitor" to be combined with AZT, there are also eight other drugs listed in that "inhibitor" category. (TTX 204 at 4-5). One is the NRTI known as FCT, and the seven others are NNRTIs. (TTX 204 at 2, 4-5; Tr. at 801-02, Dr. Arnold; Tr. at 750-53, Dr. Laurence).[32] The NNRTIs induce a different resensitizing mutation than 3TC (at "position 181" rather than "position 184"). (TTX 204 at 19). The application next contains the vague suggestion to add "other therapeutic agents" to "AZT and/or the mutation-inducing HIV-RT inhibitor." The "other therapeutic agents" category is exemplified by (but not limited to) a laundry list of drug classes and compounds, including protease inhibitors, interferons, and the NRTIs of ddI, 3TC (appearing again) and carbovir. (*Id.*

---

[32] The NNRTIs induced a different mutation than 3TC did (M181V rather than M184V) to resensitize the virus to AZT. (*Id.*). Thus, their use, unlike 3TC's use, with abacavir would not result in duplicative resensitization.

46

at 7). The variety of compounds in the "other therapeutic agents" category, spanning multiple

classes, would leave a person skilled in the art with virtually no guidance as to which path to

choose.

Although one extractable combination from the instructions is AZT, 3TC, and carbovir,

there is nothing in the application that would lead a drug researcher to that specific combination

to the exclusion of any other. Even combining teachings in the application with the knowledge

that AZT/3TC had been proven to be the best combination, it does not follow that carbovir

should be added as the third drug where those two drugs are used. It would make little sense to

pluck carbovir out from the list of "other therapeutic agents" where 3TC was used as the

mutation inducing inhibitor, as there were a litany of options on the list that did not share cross-

resistant profiles with 3TC. In contrast, carbovir would be more predictably combined where

one of the NNRTIs was used as the mutation inducing inhibitor, as overlapping resistance

profiles would be avoided. The Larder application is thus not as strong a suggestion in the

direction of the claimed triple combination as proffered by Lupin.

ViiV further argues that the concerns of toxicity would have taught away from the triple

combination. Specifically, carbovir and AZT had been shown to display "synergistic toxicity,"

and thus a person skilled in the art would not seek to combine abacavir (the carbovir analog)

with AZT. (PTX 451 at 146; TTX 225 at 172). NRTIs were generally expected to be toxic, as

they may interfere with normal DNA processes in a similar manner as to how they inhibit the

viral reverse transcription. (Tr. at 1290-91, Dr. Ho; TTX 224 at 33). Toxicity could not

necessarily be predicted based on *in vitro* study or even *in vivo* animal experimentation, as ddI

did not show serious toxicity when studied *in vitro* or in dogs, yet when given to humans, serious

side effects emerged, including potentially lethal pancreatitis. (PTX 365 at 3949). Certain

47

combinations also resulted in highly toxic outcomes. For example, the combination of AZT and ddC caused "considerably more adverse reactions" due to toxicity than AZT or ddI monotherapies. (PTX 268 at PB0266; Tr. at 634, Dr. Parniak). That combination was also reported to cause "increased incidence of serious toxicity in patients with advanced disease." (PTX 432 at 4253; Tr. at 1246-47, Dr. Ho). Dr. Zingman agreed that "it was a difficult decision to know whether or not to give [patients] two toxic drugs or only one…" (Tr. at 421-22). The experts agreed that synergistic toxicity was to be avoided. (Tr. at 709, Dr. Laurence; Tr. at 1294-95, Dr. Ho; Tr. at 581, Dr. Parniak).

All of this suggests that new types of NRTI therapies retained the potential for unexpected toxicity. That potential increased the unpredictability in the field, which undercuts the argument that any particular combination would be obvious. And it is true that AZT and carbovir produced synergistic toxicity. (PTX 451 at 146; TTX 225 at 172). As discussed above, however, abacavir was successfully designed to avoid the toxicity problems of carbovir, and was understood to be a less toxic compound. (TTX 265 at I84). Further, unlike carbovir, abacavir had been progressed to clinical trials, which would increase the confidence that abacavir was safer than carbovir. (Tr. at 1374-77, Dr. Ho). Thus, concerns of abacavir's toxicity would not be the same as they were for carbovir, and the Court does not believe that carbovir's toxic synergy with AZT would be imputed to abacavir.

Lupin also argues that a person skilled in the art would be motivated to improve upon the existing AZT/3TC/ddI combination by replacing ddI with abacavir. Lupin points out that prior to March 1995, doctors had already prescribed the triple combination of AZT, 3TC, and ddI. (Tr. at 1364, Dr. Ho). Lupin posits that abacavir was a solid candidate to replace ddI in the combination, as abacavir was known to be less toxic than the very toxic ddI, yet offered greater

48

**A00053**

potency. (Tr. at 334, 362-63, Dr. Zingman; Tr. at 715, Dr. Laurence). Abacavir was structurally

similar to ddI, and both selected for the M184V and L74V mutations. (Tr. at 795, Dr. Arnold;

Tr. at 1041, Dr. Larder; TTX 265 at 182). Lupin heavily relies on the fact that abacavir targets

the same DNA base as ddI. As discussed already, the differing analog base strategy was not

shown to be established in the prior art. Thus it would not provide a motivation to make the

triple combination. Lupin further does not point to any success garnered from the AZT/3TC/ddI

combination that would inspire imitation. Only two abstracts discuss this combination. (LTX

1484 at 265, 268). One is a description of ongoing clinical trials that does not disclose any

results. (*Id.* at 265). The second is an *in vitro* study of AZT/ddI/3TC, describing it as "the most

consistent triple drug combination," but the study does not state which other combinations were

less consistent. (*Id.* at 268). A single *in vitro* study claiming some degree of undefined success

is not persuasive evidence of obviousness. And, as discussed, the complete cross-resistance

between abacavir and 3TC provided some degree of discouragement for their combination.

### (iv) Secondary considerations

The Court will consider any secondary considerations indicative of nonobviousness. "A

court is required to consider secondary considerations, or objective indicia of nonobviousness,

before reaching an obviousness determination, as a 'check against hindsight bias.'" *INVISTA N.*

*Am. S.a.r.l. v. M & G USA Corp.*, 2013 WL 3196817, *7 (D. Del. June 25, 2013). ViiV argues

the secondary considerations of failures of others, long felt but unresolved needs and unexpected

clinical efficacy, industry praise, skepticism, unexpected synergism, and commercial success as

indicia of nonobviousness.

> (a) Failures of others, unmet but long felt needs, and unexpected clinical
> efficacy

49

ViiV asserts that both the claimed combinations satisfied long felt, but unresolved needs in the marketplace for anti-HIV medicine. Defendants disagree, arguing that ViiV failed to show that the claimed combinations were superior to AZT/3TC.

Dr. Ho testified that studies showed that the abacavir/3TC combination outperformed AZT/3TC in children, and this would be surprising, because AZT/3TC was known as the gold standard of HIV treatment in March 1995. (PTX 113; PTX 122 at 738; Tr. at 1303-04, Dr. Ho). The fact that the abacavir/3TC would eliminate the resensitization benefit of AZT/3TC, yet still offered clinical efficacy, would be surprising. Dr. Ho also testified that abacavir/3TC/AZT outperformed AZT/3TC even with the M184V mutation present, and this would be surprising. (Tr. at 1307-08, Dr. Ho; PTX 257). The triple combination was also non-inferior (or comparable) to AZT/3TC plus a protease inhibitor in two separate studies. (Tr. at 1307-08, Dr. Ho; PTX 390; PTX 477). ViiV argues this would be surprising in light of the overlapping resistance profiles of abacavir and 3TC.

"In the pharmaceutical industry, the failure of others to develop a safe and effective drug often supports the nonobviousness of a drug that finally achieves success." *Bristol-Myers Squibb Co. v. Teva Pharmaceuticals USA, Inc.*, 923 F. Supp. 2d 602, 680 (D. Del. 2013) (citation omitted). The long-felt and unmet need inquiry is judged at the time of the filing date of the patent. *Id.* at 683. It is clear that the art of HIV treatment was littered with failures as of March 30, 1995. Only a single combination, AZT/3TC, had shown any sustained effectiveness against the virus. Despite this promising showing, that combination was still in an experimental stage, not yet FDA approved, and there was no certainty that its benefits would be sustainable in the face of a vexing disease. The question is whether the announcement of AZT/3TC's impressive clinical results a few months prior to the filing date erases the extensive history of failures in the

50

**A00055**

art. The Court does not believe that it does. Monumental efforts were being put forth in the

early to mid-90s to solve the HIV public health crisis. When put to the test, nearly all of those

efforts were proven to be failures. Those failures are indicia of nonobviousness in comparison

with the success of the claimed combinations.

As to the actual evidence of success proffered by ViiV, it is sufficient to show that the

claimed combinations are safe and effective agents at providing sustained anti-HIV therapy.[33]

The success of the double combination is particularly surprising, as that combination lacked the

AZT/3TC resensitization dynamic. The success of the triple combination is also surprising, as

that combination added a third potentially toxic drug to the existing AZT/3TC combination,

while having an overlapping cross-resistance profile with 3TC. Defendants argue that ViiV has

not shown that the claimed combinations were superior to AZT/3TC, but the Court does not view

that as necessary, considering that at the time of filing, the country was still in the midst of a

public health crisis, and the need for more than a single effective therapy was apparent. For

these reasons, the success of the claimed combinations in the midst of many failures is indicia of

nonobviousness.

(b) Industry Praise

ViiV argues that the claimed combinations received industry praise, a factor which may

support nonobviousness. ViiV points to the testimony of Dr. Blick, who stated that the claimed

combinations gained praise for their efficacy and durability. (Tr. at 104-09). ViiV points out

that they have been prescribed often, and that Trizivir was chosen to launch a highly active

antiretroviral therapy ("HAART") in China. (Tr. at 1143-45, Dr. Grabowski; Tr. at 1308-09,

---

[33] Defendants argue that the studies cited by ViiV should be discounted, as they only show effectiveness for treatment in children, but do not explain why that effectiveness would not be correlated with effective treatment generally.

51

1311-12, Dr. Ho). ViiV also asserts that the single combined formulation of abacavir/3TC is currently a "preferred" regimen, in four out of six guidelines. (PTX 467; 633; PTX 637; PTX 636). Similarly, ViiV asserts that the triple combination was recommended as an alternative regimen for many years by two guidelines, and was the only triple combination to be so recommended. (PTX 487; PTX 515; PTX 532).

None of this is sufficient to create indicia of nonobviousness. ViiV has not provided any evidence of praise from other drug researchers or competitors. The testimony of Dr. Blick is unsupported by any evidence, and the fact that a drug compound is recommended by treatment guidelines or is prescribed often is more appropriately considered in the context of commercial success. All of this falls well short of showing true industry praise. *See Bayer Healthcare Pharmaceuticals, Inc. v. Watson Pharmaceuticals, Inc.*, 713 F.3d 1369, 1377 (Fed. Cir. 2013) (holding journal citations referencing efficacy studies not sufficient to show industry praise).

(c) Skepticism

ViiV argues that it has provided evidence of skepticism of others that the claimed inventions would work. ViiV points to two supposed instances of skepticism. The first is a February 1995 communication by Dr. Tisdale, a colleague of the inventors, who warned that abacavir and 3TC "clearly show some cross-resistance" and "stress[ed] that the cros[s]-resistance profile is a problem with this combination." (PTX 12 at 0745208). The second is a 2002 study, where the authors stated that, prior to the study, they were concerned that the combination might not be effective due to abacavir and 3TC's selection for the M184V mutation. (PTX 122 at 738-39).

Defendants argue that the Tisdale statement is irrelevant, as it was an untestified to hearsay statement that was not published. The Court agrees that it is not relevant, but not for

52

precisely these reasons. The Court is not aware of any cases where skepticism was recognized as indicia of nonobviousness when that skepticism was made by personnel internal to the company responsible for the invention. Skepticism should only be recognized as indicia of nonobviousness if it is displayed by those outside the company, as it seems conducive to the inventive process for coworkers to play the devil's advocate, that is, to probe for weaknesses and test the merits of ongoing research. Such internal dialogue has no probative value. Further, skepticism expressed in a private communication is likely less considered and less self-scrutinized than statements of skepticism intended to be published to the scientific community. For these reasons, Dr. Tisdale's statement is not indicia of nonobviousness.

As to the 2002 study, Defendants argue it is irrelevant for being published subsequent to the filing date. The Federal Circuit has stated, however, that evidence responding to attacks on validity may be obtained after the filing date of the patent. *Knoll Pharm. Co., Inc. v. Teva Pharmaceuticals USA, Inc.*, 367 F.3d 1381, 1385 (Fed. Cir. 2004). "Relevant secondary considerations often are not manifest even until well after the issuance of a patent." *Genetics Inst., LLC v. Novartis Vaccines & Diagnostics, Inc.*, 655 F.3d 1291, 1307 (Fed. Cir. 2011). This would seem to be especially true in the context of a skepticism inquiry, as it is often in the inventor's interest to maintain the secrecy of her invention as long as possible, and knowledge of the invention might only enter the public sphere (and thus become ripe for skepticism) due to an event naturally occurring after the filing date, such as the application's publication. The Court agrees with ViiV that the statement, that the risk of cross-resistance was still a concern so many years after the filing date, is relevant skepticism indicating nonobviousness. It is, however, only a single statement, and therefore is an insignificant factor in the final weighing of the evidence.

(d) Unexpected synergism

53

(i) Was synergism expected?

Defendants argue that the synergism of the claimed combinations was to be expected, as abacavir, 3TC, and AZT all operate as analogs of different DNA bases, and all of the clearly synergistic combinations in the prior art also involved NRTIs of different analog bases. As discussed *supra*, however, the only evidence that synergism was positively understood to result from these types of combinations is unsupported expert testimony. It is beyond doubt that experts were aware of the nature of NRTIs as analogs of a particular DNA base, and it is also true that experts were aware of combinations producing synergy. There is no evidence, however, that the field put two and two together to deduce that synergism was actually caused by (or even correlated with) combinations assembled from different analogs. There is little doubt that, were such a relationship established in the field, it would have been reported in some study, publication, or textbook in the prior art.

The only support Defendants can point to is Dr. Ho's testimony that drug researchers would avoid using nucleoside analogs based on the same DNA building block. Knowing it is best to avoid combining drugs based on the same block out of an apparent desire to avoid antagonism is not equivalent to reasonably predicting that combining drugs based on different blocks will result in synergism. For these reasons, Defendants do not show that "POSAs understood that complementary NRTIs exhibited synergistic effects[.]" (D.I. 205 at 28).

(ii) Synergy evidence

The next question is whether ViiV factually proved the synergistic effects of the claimed double and triple combinations. The parties dispute the trustworthiness of the data relied upon by ViiV's synergism expert, Dr. Greco, for his opinion that synergy was shown for both combinations. Dr. Greco received the data from Mr. Hazen, the Glaxo employee who conducted

54

**A00059**

the experiments. (Tr. at 1098-99, Dr. Greco). Mr. Hazen admitted that the data sets were

affected by control problems. (Tr. at 1072-72). Nevertheless, Dr. Greco relied on the data for

his model, finding the drug combinations synergistic. (Tr. at 1088-90, 1107-08, 1108-09; PTX

567; PTX 569; PTX 576; PTX 579).

Defendants argue that problems with the controls of Mr. Hazen's experiment make

Professor Greco's opinion unreliable. The problem involved the wells of uninfected and

untreated human cells. (Tr. at 1072-74, Mr. Hazen). As the control group, the uninfected cells

were intended to provide the theoretical upper bound for the measurement of living human cells

in comparison with the infected cells. (Tr. at 1452, Prof. Makuch). The results of the test,

however, showed that wells of infected cells plus AZT actually had a higher number of living

cells than the control group, counterintuitively suggesting that HIV infection increased rather

than decreased human cell production. (Tr. at 1452-53, Prof. Makuch). Professor Makuch,

Defendants' expert, testified that it was much more difficult to measure the effect of the drugs

absent the control group for comparison. (Tr. at 1454-55). He also noted that certain wells

containing lesser dosages of the drug resulted in greater suppression of replication than wells

with greater dosages, when the opposite would be expected. (Tr. at 1454).

ViiV argues that issues with the control group do not necessarily imply issues with the

infected cells. Dr. Greco testified that he was able to rely on the infected cells treated with drugs

at high concentrations in place of the control because they characterized the "upper asymptote

very, very well." (Tr. at 1102-03). Mr. Hazen found the data was reliable because the infected

cells were treated differently than the uninfected cells, and the calculations from the infected

cells produced a smooth, S-shaped curve. (Tr. at 1058-60).

55

Professor Makuch explained that Dr. Greco's attempt to salvage the validity of the experiment was problematic because ignoring the control group violated the original design of the experiment, which included the control group to provide a baseline for data comparison. (Tr. at 1455). He also explained that problems with the control group put the values of all wells in the experiment in doubt. (Tr. at 1455-56). Professor Makuch opined that the proper way to remedy the problem was to replicate the experiment to provide a check on the data obtained, rather than to ignore the control group. (Tr. at 1456). Professor Makuch also testified that wells at columns five through nine were concerning. (Tr. at 1457). Those columns represented serial dilutions of the drug with other variables constant, yet had a flat dose response, *i.e.*, the values did not vary despite differences in drug potency. (Tr. at 1457). He further noted that even if Hazen's experiment had been conducted perfectly, it was only a single experiment, and further experimentation should have been performed to assess validity and account for variability. (Tr. at 1457).

The Court credits Prof. Makuch's testimony. The control group was there for a reason, and simply ignoring it is not consistent with the original intent of the experiment. Further, anomalies in the control group not only required the removal of the baseline, but also place a degree of doubt into the data accumulated from the infected wells, even if they were "treated differently" than the uninfected cells. That doubt is enlarged by counterintuitive findings that certain wells with lesser drug concentration showed greater viral replication than wells with greater drug concentration. One of these problems in isolation might not necessarily undermine Dr. Greco's conclusions relying on the Hazen data, but in combination they are troubling enough so that I cannot conclude his opinion is based on reliable data. I therefore do not credit it.

56

The Hazen data is not the only source of alleged synergy proffered by ViiV. ViiV also provided testimony from Martha St. Clair, one of the `191 Patent's inventors. Defendants argue that this evidence is also not reliable. Ms. St. Clair testified that she generated results showing synergy, relying on her lab notebooks. (Tr. at 918-920, 934-35, 959; PTX 12; PTX 13). She also admitted that she did not include one set of data indicating antagonism, as that set involved a very high concentration of 3TC, and drugs at high levels sometimes do not behave in an appropriate fashion. (Tr. at 961-63). Defendants argue that Ms. St. Clair's exclusion of results indicating antagonism proves she cherry-picked from data sets. The Court does not agree that Ms. St. Clair's exclusion of a single data set showing antagonism from the totality of her results renders those results untrustworthy. If Defendants put forth evidence that the claimed combinations were in fact antagonistic, rather than "not synergistic," the exclusion of those results might put the St. Clair data into serious question. There does not seem to be a genuine dispute, however, that the drug combinations are not antagonistic.[34] It is thus reasonable to conclude that the data excluded by Ms. St. Clair was in fact not reflective of the actual drug activity. The only other criticism Defendants have of the St. Clair data is that two points of data were slightly misplotted. (Tr. at 956-61, Ms. St. Clair). Ms. St. Clair, however, testified that even with accurate plotting of those two points, the data still showed synergy, and that testimony was not discredited. Ms. St. Clair also testified as to the synergy of the two drug combination disclosed in the Daluge 1997 article that she co-authored, but that article only contains an isobologram, without the underlying data points, so it is less persuasive evidence. (PTX 296; Tr. at 936-39). Nevertheless, the St. Clair data is thus sufficient for a showing of the *in vitro* synergy of the claimed combinations.

---

[34] If Lupin and Teva actually believed the claimed combinations resulted in antagonism, they would likely not seek to bring generic forms of those drugs to market.

A00062

Defendants do point to some evidence suggesting that the claimed combinations did not show synergy. Mr. Hazen authored a report to his supervisors, which was forwarded to the FDA, suggesting that the ABC and 3TC combination was additive rather than synergistic. (TTX 61 at 0046905; Tr. at 1079, Mr. Hazen). Dr. Tisdale also stated that ABC and 3TC was an additive combination in an internal communication to Ms. St. Clair, while allowing that abacavir, 3TC, and AZT showed some synergy. (PTX 12 at 745208; Tr. at 968-70, Ms. St. Clair). Defendants, however, point to no actual data supporting any argument that the combinations were merely additive. Absent such a showing, the Court will rely on Ms. St. Clair's testimony and her lab notebooks as accurate.

That being said, the only evidence proffered by ViiV related to *in vitro* synergy. The fact that the claimed combinations show synergism *in vitro* is not enough to prove unexpected results. In fact, many combinations had been shown to be synergistic *in vitro*, as explained throughout the opinion (*E.g., supra*, pg. 26, 27), and ViiV repeatedly criticized those results as not sufficient to conclude that combination therapy would provide clinical results. A showing of synergy *in vitro*, without correlative *in vivo* success, is not enough. Although ViiV has shown unexpected clinical efficacy as explained above, the evidence of synergism *in vitro* is not evidence of unexpected results.

(e) Commercial success

The parties dispute whether Epzicom and Trizivir, the commercial embodiments of the '191 Patent, have been proven to be commercial successes. "Commercial success is relevant because the law presumes an idea would successfully have been brought to market sooner, in response to market forces, had the idea been obvious to persons skilled in the art." *Merck & Co., Inc. v. Teva Pharmaceuticals USA, Inc.*, 395 F.3d 1364, 1376 (Fed. Cir. 2005). "Thus, the law

58

deems evidence of (1) commercial success, and (2) some causal relation or 'nexus' between an

invention and commercial success of a product embodying that invention, probative of whether

an invention was non-obvious." *Id.*

The Court must first define the relevant market. ViiV argues that the relevant market is

limited to drug products in the NRTI class. Defendants argue that the relevant market is all

classes of anti-HIV drugs. Dr. Grabowski, ViiV's expert, testified that the market is limited to

NRTIs, rather than the anti-HIV drug market as a whole, because that is consistent with how the

drugs are prescribed for treatment. (Tr. at 1146). Specifically, Epzicom and Trizivir are

prescribed as the "backbone" of HAART therapy, and are then combined with another drug from

a different class, either a PI or an NNRTI. (Tr. at 1146-47). According to Dr. Grabowski, drugs

from other classes complement NRTIs and do not take sales away from NRTIs; and the focus for

the commercial success analysis should thus center on the market for the NRTI "backbone" of

HAART therapy. (Tr. at 1146-47). Mr. McSorley, Defendants' expert on obviousness,

disagreed, pointing out that ViiV's internal documents defined the market as including products

in other drug classes, including PIs. (Tr. at 1420; LTX 1224). Defendants further argue that

because patients can take more than one NRTI at a time, and also because NRTIs themselves can

be complementary to each other, it makes no sense to define the NRTI market as separate from

other drug classes. (D.I. 221 at 30).

The Court agrees with ViiV that the relevant market for Epzicom and Trizivir is the

NRTI market. Dr. Grabowski's testimony as to how Epzicom's and Trizivir's use in treatment

drives sales and determines the market is persuasive. There are two general components of

HAART therapy: (1) an NRTI "backbone" matched with (2) a drug of another class.[35]  It would

---

[35] ViiV's evidence of what HAART therapy consists of is unchallenged by Defendants. Defendants further do not
put forth evidence that a different type of HIV therapy drives the market.

make no sense for a doctor to consider prescribing a PI or an NNRTI for the "backbone" of

HAART therapy, as the "backbone" itself must be comprised of NRTIs. The realities of

treatment thus dictate that PIs and NNRTIs generally do not compete with NRTIs for sales.

While ViiV's internal "launchplan" showed an intention for the commercial embodiments to

compete with all anti-HIV drug classes, Mr. McSorley's contention that ViiV's launchplan

determines the market is not persuasive. ViiV's internal aspirations for market dominance are

not evidence of how the drugs are prescribed in practice, and are thus less probative when

determining the relevant market.

Defendants further argue that it illogical to say that because NRTIs are complementary to

other classes of drugs, they are in a different market from those drugs, where the evidence shows

that NRTIs themselves can be complementary to each other. It is true that NRTIs in one sense

may be described as complementary to one another, *i.e.*, the much discussed AZT and 3TC

combination. They complement one another, however, in performing the same anti-HIV

function, *i.e.*, acting as chain terminating nucleosides. The other anti-HIV drug classes attack

viral replication in a fundamentally distinct way. For example, a PI disrupts replication by

selectively inhibiting the protease enzyme, which interferes with the virus's cleaving process.

The mechanism is completely different, and this explains why doctors prescribe NRTIs and PIs

together as "complementary" drugs, and would not consider one as a substitute for another, even

if NRTIs can also be labeled as "complementary" to each other in a different sense. The market

for Epzicom and Trizivir is the NRTI market.

The next question is whether Epzicom and Trizivir garnered a substantial quantity of the

NRTI market. Over 2.5 million prescriptions have been filled for both drugs since their

introduction to the market. (PTX 77; Tr. at 1145). The two drugs were rapidly accepted in the

60

market place, with Epzicom garnering over 200,000 prescriptions in its first year, and Trizivir

garnering almost 400,000 prescriptions by year three on the market. (Tr. at 1143-44). Dollar

sales of Epzicom and Trizivir are over $3 billion each, with the cumulative profitability of both

drugs over $1.6 and $1.56 billion, respectively. (PTX 76; PTX 78; PTX 83). To argue that they

are not commercial successes, Defendants point to the fact that other NRTI products such as

Truvada and Combivir have outperformed Epzicom and Trizivir. The fact that a commercial

embodiment is not the most popular product on the market, however, does not dictate that the

embodiment is not a commercial success. Although Trizivir and Epzicom did not capture the

greatest share of the market, they are solidly in the top half of NRTIs through their sales history.

(PTX 76; PTX 78; PTX 83). Epzicom has consistently outperformed the majority of other

NRTIs on the market, and Trizivir did as well during the peak years of its life-cycle. Their

market shares are sufficient to find them reasonably successful compared with the competition.

 ViiV must not only show that Trizivir and Epzicom are successful drugs, but that there is

a close nexus between that success and the claims of the `191 Patent. *Transocean*, 699 F.3d at

1350. If the success was due to factors other than the benefits intrinsic to the invention, such as

marketing or, relevant here, the existence of blocking patents, the nexus may not exist. *See Teva*,

395 F.3d at 1364. There is little dispute that Trizivir and Epzicom are the commercial

embodiments of the `191 Patent's claims.[36] Trizivir and Epzicom were "tier two formularies" 76

and 77 percent of the time, meaning that they are designated "preferred drugs" by insurers.[37]

The designations supports the finding that the products are successful due to their therapeutic

qualities. (Tr. at 1162, Dr. Grabowski).

---

[36] Lupin says there was no testimony that Trizivir contains abacavir free base. (D.I. 221, p. 17). Dr. Ho did testify that Trizivir was "covered by the asserted claims of the `191 patent." (Tr. 1324).

[37] Tier 1 drugs are generally reserved for generic drugs. (Tr. at 1160, Dr. Grabowski). Third tier drugs are non-preferred and have higher co-pays than preferred drugs. (Tr. at 1160, Dr. Grabowski).

Key to the nexus question is whether the commercial success was due to the beneficial characteristics of the invention, or can be attributed to the existence of blocking patents.[38] Defendants main argument is that the existence of "blocking patents," owned or controlled by the same patentee, prevented competitors from developing the invention earlier in response to "market forces," citing *Teva*, 395 F.3d at 1376-77. The claimed combinations were developed by Burroughs Wellcome, who also invented AZT and abacavir individually and held patents for those two drugs. (Tr. at 1165, Dr. Grabowski). The rights to commercialize 3TC were licensed to Glaxo from a company known as Biochemical Pharma. (Tr. at 1414-15, Mr. McSorely). Glaxo entered into a letter of intent with Burroughs Wellcome, licensing some of the 3TC patent rights in March 1994. (Tr. at 1414-15, Mr. McSorely).

Mr. McSorley's opinion that the patents effectively halted any other company from pursuing the claimed combinations relied on the fact that "other researchers would not have been able to conduct such research to begin with because of the patents[.]" (Tr. at 1418). It is true that Burroughs Wellcome had the right to exclude others from working on all three drug compounds as of the effective filing date. Burroughs Wellcome only had the right of exclusivity for a short period of time, however. The rights to market 3TC were gained in March 1994, and Martha St. Clair performed her tests showing the synergism of the double and triple combinations in June 1994. This is not a situation where a patentee was able to "block" others from attempting to make the claimed inventions for many years- they were formulated a matter of months into Burroughs Wellcome's exclusivity period. It is also not disputed that researchers frequently shared compounds with other companies in the HIV field to help create new HIV therapies. (Tr. at 881-83, Ms. St. Clair; Tr. at 1164-66, Dr. Grabowski; Tr. at 1198, Dr. Hausman). Although

---

[38] There is no evidence that marketing or promotion drove the sales of either drug. (Tr. at 1162-64, Dr. Grabowski).

A00067

Burroughs Wellcome had exclusive rights to use all three compounds as of the effective filing date, it had only obtained the right to 3TC a relatively short time prior. Thus, the inference that the commercial success was due to "blocking patents" is lessened.

Thus, this is not a situation where the commercial success of the drugs can be completely attributed to blocking patents. The Court finds that the commercial success of Epzicom and Trizivir is indicia of nonobviousness, although not as strong of an indication as would exist in the absence of the patent rights that Burroughs Wellcome held.

 (B) LEGAL DISCUSSION AND CONCLUSIONS OF LAW

Section 103 bars patentability unless "the improvement is more than the predictable use of prior art elements according to their established functions." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 401 (2007). A patent claim is obvious "if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art." 35 U.S.C. § 103(a). To prove a case of obviousness, Defendants must show that a person skilled in the art would be motivated to combine the claimed combinations with a reasonable expectation of success. *Allergan, Inc. v. Sandoz Inc.*, 726 F.3d 1286, 1291 (Fed. Cir. 2013). Evidence of obviousness, especially when that evidence is proffered in support of an "obvious-to-try" theory, is insufficient unless it indicates that the possible options skilled artisans would have encountered were "finite," "small," or "easily traversed," and that skilled artisans would have had a reason to select the route that produced the claimed invention. *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1072 (Fed. Cir. 2012). Obviousness must be proven by clear and convincing evidence. *Id.* at 1078.

63

**A00068**

Defendants did not meet their burden. There was very little about anti-HIV therapy that could be described as predictable as of March 1995, and the history of failure in the field offered persons skilled in the art little reason to expect that any particular combination would work. Concerns of toxicity, potency, cross-resistance profiles, HIV's ability to mutate swiftly, a large universe of potential compounds and drug classes, and rapidly dying patients in the midst of a public health crisis made assembling an effective drug combination extremely challenging. In the months preceding the filing of the `191 Patent, the state of the art was extremely fluid. News of disheartening setbacks were followed by important advances in what was a fast moving field. Monotherapy options had been exhausted, and although the field generally accepted the premise that combination therapy was the future of HIV treatment, no clear cut clinical benefit had been shown prior to the reports of AZT/3TC's success in December 1994. These results were exciting precisely because of the pervasive failure encountered in the field, as years of testing antiviral agents either alone or in combination showed that while the drugs would initially reduce a patient's viral load, it would return to baseline levels after six months of treatment. The promise of AZT/3TC in no way erased the reality that combining anti-HIV drugs was a highly uncertain endeavor, and there was little expectation that any particular combination would work.

Defendants argue that AZT/3TC provided a reference point that made the claimed combinations of the `191 Patent obvious, but as Defendants point out, the molecular mechanisms underlying why the AZT/3TC combination was successful were not entirely understood. This observation cuts against finding the claimed combinations obvious, as the less understanding that exists in a field, the less the likelihood that any particular new therapy in that field is obvious. A finding of obviousness seems incompatible in a field where (1) almost all therapies failed to provide sustained results and (2) the sole success story was not completely understood. The

64

reality that combination therapy was still quite confusing for persons skilled in the art is

confirmed by the words of the February 1995 issue of *AIDS Weekly*, which stated that AZT/3TC

"*may* lead to rational strategies for combination therapy *instead* of random choices from a wide

array of drugs." (TTX 71 at 2) (italics added).  Researchers felt their efforts in combination

therapy were beset by "random choices from a wide array of drugs." The hope was that "rational

strategies" were forthcoming, but the field was not quite there yet.  This was the state of the art

less than six weeks prior to the effective filing date of the `191 Patent, and months after Martha

St. Clair did her first testing and compiled results of the claimed combinations.

     The state of the art as described in the *Aids Weekly* report is inconsistent with the law

underlying Defendants' "obvious to try" theory.  The "obvious to try" standard follows:

> When there is a design need and there are a finite number of identified, predictable
> solutions, a person of ordinary skill has good reason to pursue the known options
> within his or her technical grasp. If this leads to the anticipated success, it is likely
> the product not of innovation but of ordinary skill and common sense.

*KSR*, 550 U.S. at 421.  Where researchers have to resort to a wide array of options and are

required to select drugs randomly, it cannot be said that "a finite number of identified,

predictable solutions" existed. Defendants' "differing DNA bases" theory cannot serve to

narrow the options or to make the efficacy of the claimed combinations predictable, as it was not

supported in the art.  Abacavir's status as a strong candidate for combination therapy does not

convert the combination selection process into a reasonably predictable endeavor.  Further, the

argument that the AZT/3TC combination made the double combination obvious is contradicted

by the then-existing best explanation for the AZT/3TC combination's success, *i.e.*, the special

mutational interplay resensitizing the virus to AZT.  As to the claimed triple combination, while

it retained the special AZT/3TC dynamic, no three-drug NRTI combination had shown sustained

clinical efficacy as of the filing date.  In that sense, the abacavir, 3TC, and AZT was a first of its

kind combination. The inherent risk of toxicity associated with adding a third NRTI to
AZT/3TC lowered the expectation that the three drug combination would be successful, even
considering the fact that abacavir and 3TC were second generation NRTIs associated with less
toxicity than first generation NRTIs. The overlapping drug profiles of abacavir and 3TC also
taught away from their combination. The secondary considerations also suggest that
nonobviousness of the claimed combinations. Both Epzicom and Trizivir must be regarded as
commercial successes, and both succeeded in providing clinically effective treatment in a field
where many others had failed, despite monumental efforts to succeed. All of these
considerations results in the conclusion that the Defendants have not proved the obviousness of
the claimed inventions by clear and convincing evidence.

    *Novo Nordisk A/S v. Caraco Pharm. Laboratories, Ltd.*, 719 F.3d 1346 (Fed. Cir. 2013),
cited by Defendants, is not persuasive otherwise. In *Novo Nordisk*, the Federal Circuit upheld
the district court's finding that a two-drug combination treatment for Type II diabetes was
obvious. *Id.* at 1351. The combined drugs were metformin, a well-known and successful drug
used to improve insulin sensitivity, and repaglinide, a new sulfonylurea-class insulin
secretagogue that worked to stimulate insulin release from pancreatic beta cells. *Id.* at 1349. It
was not disputed that it was well-known in the art that two drugs having different mechanisms
for attacking diabetes were more effective than one, and drugs were often tested in combination
therapy after demonstrating effectiveness in monotherapy. *Id.* at 1351. Combinations of insulin
sensitizers and insulin secretagogues were common at the time, and the patentee's failure to
prove that the synergy shown was unexpected doomed the claims as obvious. *Id.* at 1349, 1355.

    There are some superficial similarities between *Novo Nordisk* and the case at hand. Both
involve combination therapies and a failure to show unexpected synergistic effects. The

**A00071**

commonality ends there. In *Novo Nordisk*, the patentee's showing of synergistic effects was not surprising, as the district court found that the combined drug classes had been used together for more than 30 years. *Novo Nordisk A/S v. Caraco Pharm. Laboratories, Ltd.*, 775 F. Supp. 2d 985, 1003 (E.D. Mich. 2011). The drug classes had a well-known history of being used together for beneficial results. *See Novo Nordisk*, 719 F.3d at 1355. That history went a long way to make combining metformin and repaglinide a predictable endeavor. *See id.* The first effective HIV combination therapy, in contrast, was only announced a few months before the '191 Patent's filing date. The degree of understanding in the field of the *Novo Nordisk* combination was literally a generation ahead of the understanding in the anti-HIV field. Further, although ViiV did not establish unexpected synergy, ViiV did show unexpected clinical efficacy, and any sustained clinical efficacy was seen as a breakthrough as of March 1995. Another significant difference is that the drugs in *Novo Nordisk* were known to be generally effective individually for diabetes treatment, whereas the NRTIs of the claimed combinations all failed to treat HIV infection as monotherapy. It takes less of a leap of faith to conclude that drugs that provide effective treatment individually would work well in tandem, especially where they have different mechanisms of action, as the drugs of *Novo Nordisk* do. It takes a much larger leap to predict that monotherapy failures will turn the corner to effectiveness when used together. Finally, there is no indication that the field of diabetes treatment was littered with the challenges facing persons skilled in the art seeking to treat HIV, and there apparently were no other secondary considerations suggesting nonobviousness in *Novo Nordisk*. For these reasons, *Novo Nordisk* does not compel the Court to find the claimed combinations obvious.

Defendants have not proven the obviousness of any of the claims of the '191 Patent by clear and convincing evidence.

67

## III.    ENABLEMENT

A patent's specification must enable the claimed invention. *In re Cortright*, 165 F.3d 1353, 1356 (Fed. Cir. 1999).  For a patent claim to be enabled, "The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same . . . ."  35 U.S.C. § 112.  Furthermore, "[t]he scope of enablement . . . is that which is disclosed in the specification plus the scope of what would be known to one of ordinary skill in the art without undue experimentation." *Nat'l Recovery Technologies, Inc. v. Magnetic Separation Sys., Inc.*, 166 F.3d 1190, 1196 (Fed. Cir. 1999).

Defendant Lupin argues that the method claims are invalid as they encompass inoperable embodiments.  Specifically, Lupin contends that as the full scope of the method claim recites "an infected animal" and as the specification only enables the method claims for humans the claims cannot be enabled.[39]   (D.I. 202 at 33-34).  ViiV responds that the claims are in fact limited to "infected animals" which "is much narrower than 'all animals'" and thus the claims "do not include any inoperative embodiments."  (D.I. 212 at 57).

(A) FINDINGS OF FACT

The only animals that are able to contract HIV are humans and "potentially chimpanzees."  (Tr. 731).

(B) LEGAL DISCUSSION AND CONCLUSIONS OF LAW

Whether a patent claim is enabled is a question of law based upon the underlying facts of the case. *Wyeth & Cordis Corp. v. Abbott Labs.*, 720 F.3d 1380, 1384 (Fed. Cir. 2013).  Here,

---

[39] Lupin does not contest dependent claims 30 and 39 of the `191 Patent on these grounds as the claims are limited to treating humans. (D.I. 202 at 33).

68

the burden of proof must be carried by the Defendants, and must be proven by clear and

convincing evidence. *Cephalon, Inc. v. Watson Pharm., Inc.*, 707 F.3d 1330, 1336 (Fed. Cir.

2013). "Claims are not enabled when, at the effective filing date of the patent, one of ordinary

skill in the art could not practice their full scope without undue experimentation." *Id.*

Here, the patent explicitly refers to an infected animal, not simply an animal. `161 Col.

12: 32-35.[40] Thus, while Lupin's arguments may have had some appeal if the patent claims did

not limit the term animal, here the patent claims explicitly limit themselves to animals that are

infected. Lupin claims that the `161 patent's specification defines the term "infected animal" to

include "any mammal and humans." (D.I. 221 at 32). The Court disagrees. The Court finds that

the while the patent discusses that, "The components of the combination which may be referred

to as active ingredients may be administered for therapy to an animal e.g. a mammal including a

human in a conventional manner," `161 Col. 5: 4-7, this section does not act to define the term

"infected animal" only that the components can be administered to an animal. Therefore, as

Lupin's contentions rely upon the assumption that the patent must enable the treatment of at least

all mammals, not simply infected animals, Lupin has failed to bring forth sufficient evidence to

prove that the `161 Patent is not sufficiently enabled for a POSA to utilize the patent without

undue experimentation.

## IV.    UTILITY

Patents may only be issued for inventions that are "useful to some extent and in certain

applications . . . ." *Stiftung v. Renishaw PLC*, 945 F.2d 1173, 1180 (Fed. Cir. 1991). However,

"[a]n invention need not be the best or the only way to accomplish a certain result, and it need

---

[40] Claim 1 of the `161 patent, which is representative, states in part "A method for the treatment or prevention of the symptoms or effects of an HIV infection in an infected animal which comprises treating said animal with a therapeutically effective amount of a combination comprising . . . ." `161 Col. 12: 32-35.

69

only be useful to some extent and in certain applications. . . . The fact that an invention has only

limited utility and is only operable in certain applications is not grounds for finding lack of

utility." *Id.* (internal brackets, citations, and quotation marks omitted).

Here, Lupin argues that because the patentee "provide[d] no human or animal data

regarding the three-drug combination's safety, efficacy, toxicity, etc.," the patent specification

discloses no "credible utility." (D.I. 202 at 31-32). In turn, the Plaintiff argues that "credible

utility" was disclosed as "a POSA would believe that the claimed combinations would have

'therapeutic utility'" considering that the `191 Patent describes the claimed combinations and

"the `191 Patent includes *in vitro* data on the ability of abacavir, 3TC, and AZT alone and in

combination to inhibit HIV replication at 'trough' drug concentrations determined from human

clinical studies." (D.I. 212 at 53-54).

For a Court to find that a patent claim is not useful, "the claimed device must be totally

incapable of achieving a useful result." *Brooktree Corp. v. Advanced Micro Devices, Inc.*, 977

F.2d 1555, 1571 (Fed. Cir. 1992). This is ultimately a question of fact. *Id.* While the parties

discuss *in vitro* versus *in vivo* studies, "Testing for the full safety and effectiveness . . . is more

properly left to the Food and Drug Administration (FDA). Title 35 does not demand that such

human testing occur within the confines of Patent and Trademark Office . . . proceedings." *Scott

v. Finney*, 34 F.3d 1058, 1063 (Fed. Cir. 1994).

Utility is proven where there is evidence of the patent claim's commercial success.

*Raytheon Co. v. Roper Corp.*, 724 F.2d 951, 959 (Fed. Cir. 1983); *see also Temco Elec. Motor

Co. v. Apco Mfg. Co.*, 275 U.S. 319, 328 (1928) (finding that commercial success demonstrated

that the patent claim was useful). As in *Raytheon*, the Court's finding *supra* that the "inventions

set forth in the claims . . . have on their merits been met with commercial success," 724 F.2d

70

951, 959 (Fed. Cir. 1983), further supports the Court's finding that the `191 patent is not invalid for lack of utility.

Additionally, "Usefulness in patent law, and in particular in the context of pharmaceutical inventions, necessarily includes the expectation of further research and development. The stage at which an invention in this field becomes useful is well before it is ready to be administered to humans." *In re Brana*, 51 F.3d 1560, 1568 (Fed. Cir. 1995). Here, the `191 Patent specification itself includes *in vitro* data on the ability of abacavir, 3TC, and AZT to inhibit HIV replication. `161 Col. 11:65 - 12:25. As was discussed by Martha St. Clair, the assays were conducted in MT-4 cells, which allowed for a robust assay. (Tr. at 901). The presence of this assay in the patent, in combination with the knowledge of a POSA, is sufficient to establish a "credible" utility for the `191 Patent. Lupin's argument that because the patent did not include *in vivo* test results the patent lacked utility, is unpersuasive and runs counter to the Federal Circuit's holding in *In re Brana*.

The Court finds that Lupin has not shown by clear and convincing evidence that any of the claims of the `191 Patent are invalid due to a failure to show utility.

V.    STANDING

Standing in a patent infringement suit is governed by Federal Circuit case law. *Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1337 (Fed. Cir. 2007). Whether a party has standing is based upon "whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." *Id.* at 1339 (quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975)). The Federal Circuit has determined that there are three types of plaintiffs that may be encountered when determining whether there is standing: "those that can sue in their own name; those that can sue as long as the patent owner is

71

joined in the suit; and those that cannot even participate as a party to an infringement suit." *Id.*

"When a party holds all rights or all substantial rights, it alone has standing to sue for

infringement . . . ," and would thus fall under the first category. *Id.* at 1340. "Parties that hold

the exclusionary rights are often identified as exclusive licensees, because the grant of an

exclusive license to make, use, or sell the patented invention carries with it the right to prevent

others from practicing the invention. However, these exclusionary rights 'must be enforced

through or in the name of the owner of the patent,' and the patentee who transferred these

exclusionary interests is usually joined to satisfy prudential standing concerns." *Id.* (footnote

omitted). Finally, "[t]he third category of plaintiffs includes those that hold less than all

substantial rights to the patent and lack exclusionary rights under the patent statutes to meet the

injury in fact requirement." *Id.*

Here, the Defendants contend that while ViiV UK "was the sole owner of the '191 Patent

at the time suit was filed and has standing to sue on that basis," ViiV Co. "lacks standing and

must be dismissed . . . ." (D.I. 208 at 9). Specifically, the Defendants argue that the Cost

Sharing Agreement ("the Agreement") between ViiV Co. and ViiV UK is not sufficient to grant

ViiV Co. an exclusive license. The Plaintiffs rebut by arguing that the aforementioned

agreement is sufficient to create an exclusive license. The Court agrees.

The Court finds that the Agreement between ViiV Co. and ViiV UK granted ViiV Co. an

exclusive license. Here the Agreement is subject to Pennsylvania law. (D.I. 206-1 at 63). In

Pennsylvania,

> [t]he law of contracts requires contractual terms that are clear and unambiguous to
> be given effect without reference to matters outside the contract. Further, a contract
> must be construed as a whole and the parties' intentions must be ascertained from
> the entire instrument; effect must be given to each part of a contract. A contract is
> deemed "ambiguous if it is reasonably susceptible of different constructions and
> capable of being understood in more than one sense. Therefore, a contract will be

deemed unambiguous if reasonable persons could not differ as to the contract's interpretation.

*Purdy v. Purdy*, 715 A.2d 473, 475 (Pa. Super. Ct. 1998) (internal citations and quotation marks omitted).

Two sections of the agreement are relevant to the determination of whether there is an exclusive license: (1) "Rights of Parties in ViiV Cost Shared Intangibles" and (2) "Definitions." First, the section entitled "Rights of Parties in ViiV Cost Shared Intangibles" states in part:

> Each Party or its designated Affiliates shall be entitled to exclusive ownership including the exclusive right to exploit within their respective geographic markets of all items of ViiV Cost Shared Intangibles developed pursuant to this Agreement, regardless of which Party owns legal title to the ViiV Cost Shared Intangibles. The geographic market of ViiV Co and its Affiliates shall be the United States, and that of ViiV Ltd and its Affiliates shall be the rest of the world.

(D.I. 206-1 at 59). Second, the Definition section of the same Agreement, states in part:

> "ViiV Cost Shared Intangibles" shall mean any patents, patent applications, new drug applications, product license applications, inventions, formulae, specifications, protocols, processes, designs, patterns, trade secrets, know-how, . . . that relate to ViiV Cost Shared Products (a) that are generated, developed, or first reduced to practice by or on behalf of, either or both of the Parties or their Affiliates pursuant to this Agreement, or (b) that relate to ViiV Cost Shared Products and are acquired by transfer by, or on behalf of, either or both of the Parties, but only if such acquisition results in substantial direct benefits to both Parties.

(D.I. 206-1 at 55 (emphasis removed)). The Court finds that it is clear from the four corners of the Agreement that the `161 patent is a "ViiV Cost Shared Intangible" and thus is subject to the "Rights of Parties" clause of the Agreement. The `161 patent meets part (b) of the definition of "ViiV Cost Shared Intangibles." First, the patent was "acquired by transfer by, or on behalf of, either of the parties."[41] And second, the acquisition resulted in "substantial direct benefits to both Parties" as required by the Agreement. While the Defendants claim that there has not been a showing that both ViiV UK and ViiV Co. received a substantial direct benefit, the Court

---

[41] The `161 patent was acquired in April 2011, after the Agreement was signed. (D.I. 208 at 12).

disagrees. Epzicom and Trizivir, the commercial embodiments of the `191 Patent, have a cumulative profitability of over 1.5 billion and 1.56 billion dollars respectively. (*See* the Court's findings *supra*). Furthermore, as ViiV Co. is a wholly-owned subsidiary of ViiV UK, (D.I. 206-1 at 47-48), its profits provide substantial direct benefits to ViiV UK. These two facts alone are sufficient to find that there is a "substantial direct benefit" to both ViiV UK and ViiV Co.[42]

For all these reasons, the Court finds that ViiV Co. has standing.

## VI.    CONCLUSION

The Plaintiffs have failed to prove that Lupin's generic product infringes the `191 Patent. The Defendants have not proven by clear and convincing evidence that any of the asserted claims of the `161 Patent are invalid.

The Plaintiffs should submit an agreed upon form of final judgment within two weeks.

---

[42] The Court finds that even if the contract was ambiguous as written, Mr. William Collier's unrebutted declaration that ViiV UK owned the `191 patent and that ViiV Co. was the exclusive licensee, provides an alternative basis for ViiV Co. to have standing in this case. (D.I. 222-3 at 5, 6).

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| VIIV HEALTHCARE UK LTD. AND VIIV HEALTHCARE CO., | : | |
| | : | |
| | : | |
| Plaintiffs, | : | |
| v. | : | C.A. 11-576-RGA |
| | : | |
| LUPIN LTD. AND LUPIN PHARMACEUTICALS, INC., | : | |
| | : | |
| | : | |
| Defendants. | : | |
| | : | |
| VIIV HEALTHCARE UK LTD. AND VIIV HEALTHCARE CO., | : | |
| | : | |
| | : | |
| Plaintiffs, | : | |
| v. | : | C.A. 11-688-RGA |
| | : | |
| TEVA PHARMACEUTICALS USA, INC., | : | |
| | : | |
| Defendant. | : | |

Brian E. Farnan, Esq., Wilmington, Delaware; F. Christopher Mizzo, Esq. (argued), Washington, D.C.; Tiffany P. Cunningham, Esq. (argued), Chicago Illinois; Attorneys for Plaintiffs Viiv Healthcare UK Limited and and Viiv Pharmaceutical.

John C. Phillips, Jr., Esq., Wilmington, Delaware; Paul J. Molino, Esq. (argued), Chicago, Illinois; Deanne M. Mazzochi, Esq. (argued), Chicago, Illinois; Attorneys for Defendants Lupin Ltd. and Lupin Pharmaceuticals, Inc.

David E. Moore, Esq., Wilmington, Delaware; Ira J. Levy, Esq. (argued), New York, New York; Eric H. Yecies, Esq. (argued), New York, New York; Attorneys for Defendant Teva Pharmaceuticals USA, Inc.

November 16, 2012
Wilmington, Delaware

1

**ANDREWS, UNITED STATES DISTRICT JUDGE:**

This is a claim construction opinion. Plaintiffs Viiv Healthcare UK Ltd. and Viiv

Healthcare Co. assert U.S. Patent No. 6,417,191 ("'191 Patent") against Defendants Lupin Ltd.,

Lupin Pharmaceuticals, Inc., and Teva Pharmaceuticals, USA, Inc.[1]  The '191 Patent relates to

therapeutic combinations of anti-HIV drug compounds.

### I.    Agreed Upon Term

The parties have agreed to the construction of the term "simultaneously" as follows:

| Undisputed Claim Term | Agreed Upon Construction |
|---|---|
| "simultaneously"<br><br>(claims 8, 21, 27, 36) | at the same time, either in the same or separate pharmaceutical formulations |

### II.   Disputed Terms

This brings the Court to the disputed terms. The disputed terms "animal,"

"physiologically functional derivative," and "symptoms or effects of an HIV infection" are

construed as follows:

| Disputed Claim Term | Court's Construction |
|---|---|
| "animal" (claims 1, 11, 20, 24, 30, 32, 39) | Plain and ordinary meaning. |

---

[1] Viiv filed suit against the Lupin entities and Teva separately. The claim construction briefing and hearing were conducted jointly for purposes of efficiency.

A00084

| "physiologically functional derivative" (claims 1, 2, 13, 15, 48, 51) | Any physiologically acceptable salt, ether, ester, salt of such ester of 1592U89, zidovudine or 3TC; or solvates of any thereof and their physiologically functional derivatives; or any other compound which upon administration to the recipient, is capable of providing (directly or indirectly) such a compound or an antivirally active metabolite or residue thereof. |
|---|---|
| "symptoms or effects of an HIV infection" (claims 1, 20, 32) | Plain and ordinary meaning. |

The remaining terms present more complicated issues of claim construction and merit written explanation.

A. "Synergism"

| Disputed Claim Term/Phrase from Patent-in-Suit | ViiV's Proposed Construction | Lupin's Proposed Construction | Teva's Proposed Construction |
|---|---|---|---|
| "(1S, 4R)-cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-y1]-2-cyclopentene-1-methanol or a physiologically functional derivative thereof and (2R, cis)-4-amino-1-(2-hydroxymethyl-1,3-oxathiolan-5-yl)-(1H)-pyrimidin-2-one or a physiologically functional derivative thereof"

(claim 48) | Plain and ordinary meaning. If the Court wishes to further construe the term, its plain and ordinary meaning is a combination of (1S, 4R)-cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-y1]-2-cyclopentene-1-methanol or a physiologically functional derivative and (2R, cis)-4-amino-1-(2-hydroxymethyl-1,3-oxathiolan-5-yl)-(1H)-pyrimidin-2-one or physiologically functional derivative. | [Lupin takes no position on this term.] | Synergistic combination of (1S, 4R)- cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-yl]- 2-cyclopentene-1-methanol or a physiologically functional derivative thereof and (2R, cis)-4-amino-1-(2-hydroxymethyl-1,3-oxathiolan-5-yl)-(1H)-pyrimidin-2-one or a physiologically functional derivative thereof |

3

A00085

| Disputed Claim Term/Phrase from Patent-in-Suit | ViiV's Proposed Construction | Lupin's Proposed Construction | Teva's Proposed Construction |
|---|---|---|---|
| "combination" (claims 1, 8, 10, 20, 21, 23, 27, 29, 32, 36, 38) | Plain and ordinary meaning. If the Court wishes to further construe the term, its plain and ordinary meaning is combination. | Synergistic combination. | Synergistic combination |

| Disputed Claim Term/Phrase from Patent-in-Suit | ViiV's Proposed Construction | Lupin's Proposed Construction | Teva's Proposed Construction |
|---|---|---|---|
| "pharmaceutical formulation" /"formulation" (claims 10, 16, 23, 29, 38, 48, 51) | Plain and ordinary meaning. If the Court wishes to further construe the term, its plain and ordinary meaning is a combination of one or more active ingredients with one or more pharmaceutically acceptable carriers or excipients and optionally other therapeutic agents. | Synergistic pharmaceutical formulation / Synergistic formulation. | Teva does not seek construction of this claim term and therefore does not proffer a construction. |

| Disputed Claim Term/Phrase from Patent-in-Suit | ViiV's Proposed Construction | Lupin's Proposed Construction | Teva's Proposed Construction |
|---|---|---|---|
| "combination" (claims 1, 8, 10, 20, 21, 23, 27, 29, 32, 36, 38) | Plain and ordinary meaning. If the Court wishes to further construe the term, its plain and ordinary meaning is combination. | Synergistic combination. | Synergistic combination |

| Disputed Claim Term/Phrase from Patent-in-Suit | ViiV's Proposed Construction | Lupin's Proposed Construction | Teva's Proposed Construction |
|---|---|---|---|
| "pharmaceutical formulation" /"formulation" (claims 10, 16, 23, 29, | Plain and ordinary meaning. If the Court wishes to further construe the term, its | Synergistic pharmaceutical formulation / Synergistic | Teva does not seek construction of this claim term and therefore does not |

A00086

| 38, 48, 51) | plain and ordinary meaning is a combination of one or more active ingredients with one or more pharmaceutically acceptable carriers or excipients and optionally other therapeutic agents. | formulation. | proffer a construction. |
|---|---|---|---|
| **Disputed Claim Term/Phrase from Patent-in-Suit** | **ViiV's Proposed Construction** | **Lupin's Proposed Construction** | **Teva's Proposed Construction** |
| "therapeutically effective amount" (claims 1, 20, 32) | Plain and ordinary meaning. If the Court wishes to further construe the term, its plain and ordinary meaning is an amount that will treat or prevent symptoms or effects of an HIV infection in an infected animal. | Amount sufficient to cause a synergistic response. | Teva does not seek construction of this claim term and therefore does not proffer a construction. |

The construction of all of these terms hinges upon the same dispute: whether the "synergism" achieved by the drug combination functions to limit the '191 Patent's claims. Synergism is not mentioned within any of the claims. Defendants, however, argue that the specification and prosecution history demonstrate that synergism is an essential element of the claimed drug combination. They argue that the patentee disavowed non-synergistic combinations and the claims should be construed accordingly. Viiv argues that the synergistic activity is not an element of the drug combination itself, but is an unexpected effect or result of

5

the drug combination's administration, which was emphasized in order to overcome repeated

rejections for obviousness.

Claim terms should generally be given their ordinary and customary meaning. *ICU Med., Inc. v. Alaris Med. Sys., Inc.*, 558 F.3d 1368, 1374 (Fed. Cir. 2009). That meaning is determined by how a person of ordinary skill in the art in question would understand the terms at the time of the invention. *Id.* In determining this meaning, the claims must be read in view of the specification, of which they are a part. *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1340 (Fed. Cir. 2001). "Where the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question." *Id.* at 1341. "The patentee may demonstrate intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." *Id.* "Mere criticism of a particular embodiment encompassed in the plain meaning of a claim term is not sufficient to rise to the level of clear disavowal. . . . It is likewise not enough that [all of the embodiments] contain a particular limitation." *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1366 (Fed. Cir. 2012). Any disclaimer must be clear and unmistakable. *Id.* at 1366-67.

Defendants begin their disavowal argument with reliance on the specification. Defendants point to the title of the '191 Patent itself, which emphasizes the synergistic aspect of the invention: "Synergistic Combinations of Zidovudine, 1592U89, and 3TC." Defendants then refer to description that explains the synergistic anti-viral activity achieved by the invention:

6

**A00088**

> Unexpectedly, it has now been found that by combining 1592U89, zidovudine and 3TC a
> synergistic anti-HIV effect is achieved.  The result is surprising since all three drugs act
> upon the same molecule, HIV Reverse Transcript use.  It is a feature of this invention that
> the use of this drug combinations [sic] will provide synergistic antiviral effects, more
> complete viral suppression over a longer period, limit the emergence of drug resistant
> HIV mutants and allow better management of drug-related [toxicity].

Patent '191, ll. 2:08-15.  Defendants particularly emphasize the language describing "synergistic

antiviral effects" as a "feature of the invention."  Defendants argue that this statement speaks to

the scope of the invention itself as requiring synergism and the claims should be limited

accordingly.

Defendants next cite another passage from the specification: "If there is sequential

administration, the delay in administering the second and third active ingredients should not be

such as to lose the benefit of a synergistic therapeutic effect of the combination of the active

ingredients."  *Id.* at 3:62-65.  Defendants argue that these directions explicitly mandate a

particular method of administration to ensure that the synergistic drug activity is not lost.

Defendants also point to the description of specific drug ratios aimed at ensuring synergism.[2]

According to Defendants, these are additional pieces of evidence that synergism is an essential

part of the invention and that non-synergistic drug combinations have been disclaimed by the

patentee.

The Court does not find that the specification evinces "manifest statements of exclusion

or restriction" giving rise to clear and unmistakable disclaimer.  Disclaimer of claim scope most

---

[2] The ratios are explained as follows:

> The synergistic effects of the combination of 1592U89, zidovudine and 3TC (or, alternatively to 3TC,
> FTC), or a physiologically functional derivative of any thereof are seen over a ratio, for example, of 1 to
> 20:1 to 20:1 to 10 (by weight), preferably 1 to 10:1 to 10:1 to 5 (by weight), particularly 1 to 3:1 to 3:1 to 2
> (by weight)[.]  Conveniently each compound will be employed in the combination in an amount at which it
> exhibits antiviral activity when used alone.

*Id.* at 4:17-25.

7

typically occurs through a patentee's differentiation of prior art. Here, at no point does the patentee criticize a prior art for lacking synergism and then distinguish the drug combination for its synergistic aspect. To the contrary, the patentee differentiates her invention by emphasizing the novelty of combining the drugs in the first place.[3] Further, when the specification explains what the "present invention" consists of, it describes the drug combination.[4] Synergism or synergistic effects are only discussed insofar as they constitute unexpected results. The description of "synergistic anti-viral effects" as a "feature of the invention" does not give rise to disavowal of non-synergism. The discussion just preceding this description makes clear that this synergism feature came along "unexpectedly" and that the "result [was] surprising."[5] This confirms the nature of synergism as an incident of the claimed drug combination, but not as a component or property of the combination itself.[6]

Despite Defendants' arguments, the specification's detailing of preferred drug combination ratios for the delivery of synergy is not persuasive evidence of disclaimer.

---

[3] The specification describes the prior art in relation to the present invention as follows:

> To date the treatment of HIV infection has relied to a large extent upon monotherapy with nucleoside reverse transcriptase inhibitors such as zidovudine, didanosine (ddl), zalcitabine (ddC) and stavudine (D4T). However, these drugs eventually become less effective due either to the emergence of HIV resistant mutants [or] because of toxicity. Thus, new therapies are needed.
>
> The combination of zidovudine with either ddC or ddl has shown promising results in HIV infected patients[.]

*Id.* at 1:59-67.

[4] For example, the specification states, "[T]he present invention provides a combination comprising 1592U89 or a physiologically functional derivative thereof, zidovudine or a physiologically functional derivative thereof and 3TC (or, alternatively to 3TC, FTC) or a physiologically functional derivative thereof." *Id.* at 2:18-23.

[5] "Unexpectedly, it has now been found that by combining 1592U89, zidovudine and 3TC a synergistic anti-HIV effect is achieved. This result is surprising since all three drugs act upon the same molecule, HIV Reverse Transcript use." *Id.* at 2:7-9.

[6] It makes sense for the patentee to have emphasized these unexpected results, as the '191 Patent's application was repeatedly rejected for obviousness. (D.I. 67, Exhs. 37-41).

8

Dependent claims 2-4 claim these same ratios. These claims are dependent to claim 1, which does not mention any ratio. The rule of claim differentiation suggests that claim 1 should be read more broadly than its dependent claims 2-4 and is thus not limited to the described ratios. It therefore follows that the effects of these ratios are not limiting on the independent claim. Finally, the specification's advice that the combination "should" be taken within a certain time period is not strong enough language to justify finding a "clear and unmistakable" disclaimer. Moreover, even in this context, synergism is described as an effect of the combination rather than a property of the combination itself. In addition, the claims describe numerous distinct methods of administration, and they are not limited to sequential administration, thus undermining the argument that the statements should limit every claim. For all these reasons, the Court holds that specification disclaimer does not render "synergism" as a limit on claim scope.

Defendants also argue for prosecution disclaimer. "[A] patentee may limit the meaning of a claim term by making a clear and unmistakable disavowal of scope during prosecution." *Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1374 (Fed. Cir. 2008). This may occur where an applicant clearly characterizes an invention in order to overcome rejections based on prior art. *Id.* Prosecution disclaimer is not found where the file history is ambiguous. *Id.* at 1375.

Defendants argue that the patentee's responses to the PTO Examiner's rejections disclaimed non-synergistic drug combinations. The '191 Patent application was rejected numerous times for obviousness. (D.I. 67, Exhs. 37-41). The rejections were predicated on the rationale that "[i]t is generally considered prima facie obvious to combine two compounds each of which is taught by the prior art to be useful for the same purpose, in order to form a composition which is to be used for the very same purpose." (*See, e.g.*, D.I. 67, Exh. 41 at 2-3).

9

**A00091**

In response to these rejections, the patentee emphasized the originality of combining the drug

compounds and the unexpected results of the combination.  The patentee stated the following

within a November 19, 1998 response:

> Nothing in the references suggests that HIV infections can be successfully treated with
> [the triple drug combination].  Figure 1 of the instant specification demonstrated that no
> measurable HIV-1 mediated cytopathic effect remained upon treatment of HIV-1 infected
> MT4 cells with all three compounds.  Furthermore, these compounds were found to be
> synergistic[.]

(D.I. 67, Exh. 26 at 2).  Despite this response, the application was again rejected for obviousness.

Within the next response, dated September 14, 1999, the patentee again attempted to change the

examiner's mind, referencing proof of the drug combination's synergistic effects:

> The Examiner contends that Applicants fail to illustrate the presence of unexpected
> benefits.  On the contrary, the specification at page 2 states the combinations of the
> present invention are synergistic and data provided in Figure 1 indicates the excellent
> anti-HIV effect of the combinations of the present invention.

(D.I. 67, Exh. 2 at 2).  The patentee further explained why the synergism of the combination was

to be unexpected and that it rendered the drug combination non-obvious and patentable:

> [D]rugs having the same mode of action would be expected to be antagonistic.
> The drugs of the instant application are all inhibitors of HIV reverse transcriptase
> and therefore, would be expected to be antagonistic or at best additive.  This is not
> the case, as illustrated in the specification and in the Daluge article.  In summary,
> the demonstration of synergy between [the combined drugs] is an unexpected
> effect.

(*Id.* at 3).  Despite the patentee's insistence, the Examiner again rejected the application as

obvious.  Only after the patentee filed a March 14, 2001 response with the affidavit of Inventor

Martha Heider St. Clair attached was the Examiner persuaded.  This response again insisted that

"the combination is synergistic."  (D.I. 67, Exh. 42 at 2).  It also explained that this result was

surprising and unexpected, as "[i]t would not be obvious to one skilled in the art to combine

10

three drugs that have the same viral mechanism of action to achieve a synergistic effect." (*Id.*).

The attached St. Clair affidavit stated the following:

> 8.     The results of this experiment indicate that the triple combination of zidovudine, 3TC and 1592U89 was synergistic in suppression of viral replication in lymphocytes *in vitro*.
>
> 9.     The synergistic effects of zidovudine, 3TC and 1592U89 was unexpected because zidovudine, 3TC and 1592U89 are all nucleoside reverse transcriptase inhibitors, and therefore, act upon the same viral target in cells. Because of the same mechanism of action of zidovudine, 3TC and 1592U89 it would not be obvious to one skilled in the art that combining these three agents would result in the synergistic effect described above.

(D.I. 67, Exh. 3 at ¶¶ 8-9). In response to this filing, the Examiner finally allowed the

application, agreeing that "it would not be obvious for the skilled artisan to employ the claimed

compounds concomitantly and expect the therapeutic effect herein claimed." (D.I. 67, Exh. 30 at

2). The Examiner specifically cited paragraphs eight and nine of the St. Clair affidavit as support

for overcoming the rejections for obviousness. (*Id.*).

Defendants argue that this file history makes clear that the applicants only intended to

claim synergistic combinations of the drug compounds and disavowed all non-synergistic

combinations. Classic prosecution disclaimer occurs when an applicant escapes rejection for

anticipation through narrowing statements to the examiner differentiating the application from

the prior art. The claimant then attempts to "recapture" the disclaimed scope by submitting a

final patent application with claims covering the scope of the prior art that was previously

distinguished. This is not what occurred here. The '191 application was never rejected as

anticipated by prior art, as the Examiner agreed that nothing in the prior art disclosed the

combined use of the drug compounds.[7]  It was thus not necessary for the patentee to narrow

---

[7] "That the prior art failed to employ one, or another prior art antiviral compound concomitantly in the prior art medicament composition fails to reduce the prior art's obviation power." (D.I. 67, Exh. 38 at 2).

11

A00093

claim scope in order to defeat the Examiner's rejections. Instead, the patentee was required to prove that it would not be obvious to administer a combination of drugs known to be individually effective against the HIV virus for that same effective purpose. The patentee eventually proved the nonobvious nature of the invention by successfully arguing that the combined use of the drug compounds would not be expected to be as effective as proven. This was because the drug compounds have the same "mode of action" in fighting the HIV virus, and typically drugs with the same mode of action have antagonistic rather than synergistic therapeutic effects. These arguments were accepted by the Examiner. They should not be considered clear and unmistakable disclaimer, because they did not require the claims to be narrowed, distinguished, or amended. Had the patentee proved the existence of synergistic effects (and thus non-obviousness) via responses that altered the chemical or physical characteristics of the drug combination itself, those responses would arguably limit the scope of the claims, as the invention itself would have been re-characterized. Instead, the properties of the drug combination never needed to be altered or narrowed in order to prove the existence of synergism, as synergism was maintained as an intended result from the beginning of the application process. Statements during prosecution that purely concern the intended results of the administration of drug compounds do not limit the patent's claims. *See Bristol-Myers Squibb Co. v. Ben Venue Laboratories, Inc.*, 246 F.3d 1368, 1375 (Fed. Cir. 2001). For these reasons, Defendants have failed to show clear and unmistakable disclaimer of non-synergistic combinations.

The Court thus adopts the plain and ordinary meaning for each term in this group.

12

### 2.   "A single combined formulation"

The Court next construes "a single combined formulation." The parties' proposed

constructions are as follow:

| Disputed Claim Term/Phrase | Viiv's Proposed Construction | Lupin's Proposed Construction | Teva's Proposed Construction |
|---|---|---|---|
| "a single combined formulation"  (claims 10, 23, 29, 38) | Plain and ordinary meaning. If the Court wishes to further construe the term, its plain and ordinary meaning is one formulation. | A dosage form wherein the 1592U89, zidovudine and 3TC are mixed together in the same admixture. (Claims 10 and 23).  A dosage form wherein the 1592U89 and 3TC are mixed together in the same admixture. (Claims 29 and 38). | No position, as none of the claims asserted against Teva contain this term. |

"A single combined formulation" is used within claims 10, 23, 29, and 38 of the '191

Patent. The claim construction dispute hinges on whether the word "combined" within this

phrase requires the drug compounds to be mixed together within the same admixture. Viiv

argues that "combined" only requires that the individual drug compounds be contained within

one formulation and places no restrictions on how the drugs are physically composed within that

formulation. "A single combined formulation" is thus arguably due its plain and ordinary

meaning. In the alternative, Viiv offers "one formulation." Lupin argues that Viiv's

construction fails to give "combined" any meaning. Lupin points to claim 6, which claims a

"unit dosage form." According to Lupin, a "unit dosage form" already claims Viiv's

13

construction, i.e., a single formulation of the drug compounds with no restriction on how the drugs are physically composed within the formulation. Lupin argues that the presence of the word "combined" within the phrase "single combined formulation" necessarily makes the scope of that phrase narrower than "unit dosage form." Lupin concludes that "combined" can only be construed faithfully with the specification if it requires the drug compounds to be uniformly mixed in the same admixture.

I do not agree with Lupin. It is not the case that the word "combined" within "a single combined formulation" makes that phrase narrower than "unit dosage form." The specification states, "The formulations may be presented in unit-dose or multi-dose sealed containers, for example, ampoules and vials[.]" '191 Patent, ll. 7:27-29. This indicates that a single formulation is not equivalent to a "unit-dosage form," as a single formulation may encompass both "unit-dose" and "multi-dose" containers. The fact that a "single formulation" is not equivalent to a "unit dosage form" defeats the inference that a "single combined formulation" must be more narrowly construed than "unit dosage form." This undermines Lupin's argument that "combined" necessarily gives rise to the admixture limitation. Further consideration of the claims reveals that "combined" simply requires that the drug compounds are contained within a single pharmaceutical formulation, regardless of admixture. Claim 1 broadly covers the administration of the claimed combination and places no limits on the methods of administration. This means that drugs that can be administered at the same or separate times, whether in separate formulations (one compound per formulation) or combined formulations (at least two compounds combined in the same formulation). Various dependent claims then narrow the scope of the "methods" of "administ[ration]" of the claimed "combination." Dependent claim 21 refers to methods "wherein the combination is administered simultaneously," dependent claim 22

14

refers to methods "wherein the combination is administered sequentially," and dependent claim 23 refers to methods with a "single combined formulation." Claim 21's use of "simultaneously" would cover the scenario where the drug combination is taken all at once, but not necessarily in the same pill. Claim 22's use of "sequentially" would cover the scenario where pills are given over a period of time as opposed to all at once. Finally, claim 23's use of "single combined formulation" would cover the scenario where all the drugs are administered within a single pill. Thus, it is not accurate to say that "combined" restricts the claim to require admixing, when its most naturally reading in comparison with the other claims merely requires that the drugs are administered in one formulation. For these reasons, the Court adopts Viiv's proposal and construes "a single combined formulation" according to its plain and ordinary meaning.

15

**A00097**



# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office

April 30, 2012

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM
THE RECORDS OF THIS OFFICE OF:

U.S. PATENT: 6,417,191
ISSUE DATE: July 09, 2002

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

P. R. GRANT
Certifying Officer

JX 1

Civil Action No.:
11-576-RGA

ViiV_EZTZ_0778207



US006417191B1

(12) **United States Patent**
Barry et al.

(10) Patent No.: **US 6,417,191 B1**
(45) Date of Patent: ***Jul. 9, 2002**

| | | |
|---|---|---|
| WO | 97/49410 | 12/1997 |
| WO | 97/49411 | 12/1997 |

OTHER PUBLICATIONS

Daluge, S.M. et al., "1592U89, a Novel Carbocyclic Nucleoside Analog with Potent, Selective Anti–Human Immunodeficiency Virus Activity," vol. 41, No. 5, pp. 1082–1093, 1997.

Staszewski, S. et al., "Preliminary Long–Term Open–Label Data From Patients Using Abacavir (1592) Containing Antiretroviral Treatment Regimens," 5th Conference on Retroviruses and Opportunistic Infections, Feb. 1–5, 1998, #658.

Tisdale, M., et al., "Rapid In–Vitro Selection of Human Immunodeficiency Virus Type 1 Resistant to 3'Thiacytidine Inhibitors Due to a Mutation in the YMDD Region of Reverse Transcriptase", *Proc Natl Acad Sci USA*, vol. 90 (12). 1993, pp. 5653–5656.

Mathez D., et al., "Infectious Amplification of Wild–Type Human Immunodeficiency Virus From Patients' Lymphocytes and Modulation by Reverse Transcriptase Inhibitors In–Vitro", *Antimicrob Agents Chemother*, vol. 37 (10). 1993, pp. 2206–2211.

"New AIDS therapies at ICAAC;Triple therapy Fusion toxins Wellcomes's 1592U89 Protease inhibitor prodrugs", *Scrip World Pharmaceutical News*, No. 1969, Oct. 25, 1994.

Tisdale, M., et al., "Anti–HIV activity of (1S,4R)–4[2–amino–6–(cyclopropylamino)–9H–purin–9–yl]–2–cyclopentene–1–methanol(159U89)", *Program Abstr Intersci Conf Antimicrob Agents Chemother*, Oct. 4–7, 1994, P92.

Daluge, SM, et al., "1592U89 succinate —a novel carbocyclic nucleoside analogue with potent, selective anti–HIV activity", *Program Abstr Intersci Conf Antimicrob Agents Chemother*, Oct. 4–7, 1994, P7.

Hoong et al J org cham, vol. 57, pp. 5563–65, 1992.*
Scrip word Pham Neus, #1969, Oct. 25, 1994.*

* cited by examiner

*Primary Examiner*—Russell Travers
(74) *Attorney, Agent, or Firm*—Karen L. Prus

(54) SYNERGISTIC COMBINATIONS OF ZIDOVUDINE, 1592U89 AND 3TC

(75) Inventors: **David Walter Barry**, Chapel Hill; **Martha Helder St. Clair**, Rougemont, both of NC (US)

(73) Assignee: **GlaxoSmithKline**, Research Triangle Park, NC (US)

(*) Notice: This patent issued on a continued prosecution application filed under 37 CFR 1.53(d), and is subject to the twenty year patent term provisions of 35 U.S.C. 154(a)(2).

Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **08/930,225**

(22) PCT Filed: **Mar. 28, 1996**

(86) PCT No.: **PCT/EP96/01352**
§ 371 (c)(1),
(2), (4) Date: **Sep. 30, 1997**

(87) PCT Pub. No.: **WO96/30025**
PCT Pub. Date: **Oct. 3, 1996**

(30) **Foreign Application Priority Data**

Mar. 30, 1995  (GB) .............................................. 9506489
Mar. 30, 1995  (GB) .............................................. 9506490

(51) Int. Cl.7 ...................... A61K 31/505; A61K 31/70; A61K 31/52

(52) U.S. Cl. ......................... 514/274; 514/50; 514/261

(58) Field of Search .......................... 514/50, 274, 261

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 4,724,232 A | * | 2/1988 | Rideout et al. ............... | 514/50 |
| 5,047,407 A | | 9/1991 | Belleau et al. ............... | 514/274 |
| 5,122,517 A | | 6/1992 | Vince et al. ............... | 514/50 |
| 5,234,913 A | | 8/1993 | Furman et al. ............... | 574/49 |
| 5,539,116 A | | 7/1996 | Liotta et al. ............... | 544/317 |
| 5,627,186 A | | 5/1997 | Cameron et al. ............... | 574/274 |
| 5,723,490 A | | 3/1998 | Tung ............... | 514/478 |
| 5,756,478 A | | 5/1998 | Cheng et al. ............... | 514/4/5 |
| 5,859,021 A | | 1/1999 | Cameron ............... | 514/274 |
| 6,180,639 B1 | | 1/2001 | Coates ............... | 514/274 |

FOREIGN PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| EP | A0 513 917 | | 11/1992 | |
| WO | WO 91/17159 | * | 11/1991 | ........ A61K/31/505 |
| WO | A92 15309 | | 9/1992 | |
| WO | A93 23021 | | 11/1993 | |
| WO | 96/06844 | | 3/1996 | |

(57) **ABSTRACT**

The present invention relates to therapeutic combinations of (1S,4R)-cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-yl]-2-cyclopentene-1-methanol (1592U89), 3'-azido-3'-deoxythymidine (zidovudine) and (2R,cis)-4-amino-1-[2-hydroxymethyl-1,3-oxathiolan-5-yl]-(1H)-pyrimidin-2-one (3TC) (or, alternatively to 3TC, (2R,cis)-4-amino-5-fluoro-1-(2-hydroxymethyl-1,3-oxathiolan-5-yl)-(1H)-pyrimidin-2-one (FTC)) which have anti-HIV activity. The present invention is also concerned with pharmaceutical compositions containing said combinations and their use in the treatment of HIV infections including infections with HIV mutants bearing resistance to nucleoside and/or non-nucleoside inhibitors.

**51 Claims, 1 Drawing Sheet**

Copy provided by USPTO from the PIRS Image Database on 04/17/2012

ViiV_EZTZ_0778208

U.S. Patent                Jul. 9, 2002          US 6,417,191 B1



**10 x TCID50 HIV 3B**
**Zidovudine, 3TC, and 1592U89 Added at Trough Plasma Levels**

| Point | Combination used |
|-------|------------------|
| 1 | zidovudine |
| 2 | 3TC |
| 3 | zidovudine and 3TC |
| 4 | zidovudine and 3TC and 1592U89 |

*Fig. 1*

Copy provided by USPTO from the PIRS Image Database on 04/17/2012

ViiV_EZTZ_0778209

A00100

US 6,417,191 B1

1

## SYNERGISTIC COMBINATIONS OF ZIDOVUDINE, 1592U89 AND 3TC

This application is filed pursuant to 35 U.S.C. §371 as a United States National Phase Application of International Application No. PCT/EP96/01352 filed Mar. 28, 1996 which claims priority from GB9506490.3 filed Mar. 30, 1995 and GB9506489.5 filed Mar. 30, 1995.

The present invention relates to therapeutic combinations of (1S,4R)-cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-yl]-2-cyclopentene-1-methanol (1592U89), 3′-azido-3′-deoxythymidine (zidovudine) and (2R,cis)-4-amino-1-(2-hydroxymethyl-1,3-oxathiolan-5-yl)-(1H)-pyrimidin-2-one (3TC) (or, alternatively to 3TC, (2R,cis)-4-amino-5-fluoro-1-(2-hydroxymethyl-1,3-oxathiolan-5-yl)-(1H)-pyrimidin-2-one (FTC)) which have anti-HIV activity. The present invention is also concerned with pharmaceutical composi-tions containing said combinations and their use in the treatment of HIV infections including infections with HIV mutants bearing resistance to nucleoside and/or non-nucleoside inhibitors.

Zidovudine is now well established as an important and useful chemotherapeutic agent for the treatment and/or prophylaxis of HIV-infections including related clinical con-ditions such as AIDS, AIDS-related complex (ARC), AIDS dementia complex (ADC) and also for the treatment of patients who have an asymptomatic HIV infection or who are anti-HIV antibody-positive. Treatment with zidovudine prolongs the disease-free interval in asymptomatic patients infected with HIV and delays death in symptomatic patients.

Following the widespread clinical use of zidovudine in the treatment of such infections and conditions. It has been observed that in certain instances following prolonged treatment, the virus may develop a certain level of resistance to zidovudine and therefore a loss of sensitivity to the drug.

The therapeutic agent 1592U89 (European Specification EPO434450) is a promising anti-HIV chemotherapeutic candidate (International Conference on Antiviral Research Apr. 23rd 1995) showing potent activity against HIV, low cytotoxicity and excellent penetration into the brain, which is important for the treatment of AIDS and HIV linked central nervous system conditions such as ADC.

Nucleoside analogues containing an oxathiolane residue in place of the sugar residue, for example, nucleosides described in European Patent Specification No. 382526 particularly 4-amino-1-(2-hydroxymethyl-1,3-oxathiolan-5-yl)-(1H)-pyrimidin-2-one(BCH-189) have been found to have anti-HIV activity. BCH-189 is a racemic mixture and although the enantiomers are equipotent against HIV the (−)-enantiomer has considerably lower cytotoxicity than the (+)-enantiomer. The (−)-enantiomer has the chemical name (2R,cis)-4amino-1-(2-hydroxymethyl-1,3-oxathiolan-5-yl)-(1H)-pyrimidin-2-one, now known as 3TC or lamivudine.

An alternative oxathiolane nucleoside analogue is described in International Specification Number WO92/ 14743 (2R,cis)-4-amino-5-fluoro-1-(2-hydroxymethyl-1,3 oxathiolan-5-yl)-(1H)-pyrimidine-2-one, commonly referred to as FTC or 524W91.

To date the treatment of HIV infection has relied to a large extent upon monotherapy with nucleoside reverse transcriptase inhibitors such as zidovudine, didanosine (ddI), zalcitabine (ddC) and stavudine (D4T). However, these drugs eventually become less effective due either to the emergence of HIV resistant mutantsor becauseof toxicity. Thus, new therapies are needed.

The combination of zidovudine with either ddC or ddI has shown promising results in HIV infected patients (New

2

Eng. J. Med. 1992, 329(9) 581–587, and Program Abstract 1993 9R International Conference on AIDS, abstract US-B25–1). The combination of zidovudine and 3TC has also been studied and widely reported. However, it should be noted that these results are surprising because drugs with the same site of action are frequently antagonistic or additive (Rev Infect Dis 1982, 4, 255–260). Unexpectedly, it has now been found that by combining 1592U89, zidovudine and 3TC a synergistic anti-HIV effect is achieved. The result is surprising since all three drugs act upon the same molecule, HIV Reverse Transcript use. It is a feature of this invention that the use of this drug combinations will provide syner-gistic antiviral effects, more complete viral suppression, viral suppression over a longer period, limit the emergence of drug resistant HIV mutants and allow better management of drug-rel ated toxicitie dt

As an alternative to 3TC the compound FTC may be used.

Thus, a cording to one aspect, the present invention provides a combination comprising 1592U89 or a physi-ologically functional derivative thereof, zidovudine or a physiologically functional derivative thereof and 3TC (or, alternatively to 3TC, FTC) or a physiologically functional derivative thereof.

It will be appreciated that zidovudine may exist in the keto or enol tautomeric form and the use of either tautomeric form is within the scope of this invention. 3TC and 1592U89 will normally be provided substantially free of the corre-sponding enantiomer, that is to say no more than about 5% w/w of the corresponding enantiomer, preferably no more than about 2% w/w, in particular less than 1% w/w will be present.

As used herein, the term "physiologically functional derivative" includes any physiologically acceptable salt, ether, ester, salt of such ester of 1592U89, zidovudine or 3TC; or solvates of any thereof and their physiologically functional derivatives; or any other compound which upon administration to the recipient, is capable of providing (directly or indirectly) such a compound or an antivirally active metabolite or residue thereof.

Preferred esters in accordance with the invention are independently selected from the following group: (1) car-boxylic acid esters in which the non-carbonyl moiety of the carboxylic acid portion of the ester grouping is selected from straight or branched chain alkyl (for example, methyl, n-propyl, t-butyl, or n-butyl), cycloalkyl, alkoxyalkyl (for example, methoxymethyl), aralkyl (for example, benzyl), aryloxyalkyl (for example, phenoxymethyl), aryl (for example, phenyl optionally substituted by, for example, halogen, $C_{1-4}$ alkyl, or $C_{1-4}$ alkoxy), or amino; (2) sulpho-nate esters, such as alkyl- or aralkylsulphonyl (for example, methanesulphonyl); (3) amino acid esters (for example, L-valyl or L-isoleucyl), and (4) phosphonate esters In such esters, unless otherwise specified, any alkyl moiety present advantageously contains from 1 to 18 carbon atoms, par-ticularly from 1 to 6 carbon atoms, more particularly from 1 to 4 carbon atoms. Any cycloalkyl moiety present in such esters advantageously contains from 3 to 6 carbon atoms. Any aryl moiety present in such esters advantageously comprises a phenyl group. Any reference to any of the above compounds also includes a reference to a physiologically acceptable salt thereof.

Particularly preferred esters are the mono-, di-, and tri-phosphate esters of zidovudine, 3TC (which may be optionally blocked) or FTC or any other compound which upon administration to a human subject is capable of pro-viding (directly or indirectly) said mono-, di, or triphosphate ester.

Copy provided by USPTO from the PIRS Image Database on 04/17/2012

US 6,417,191 B1

3

A preferred derivative of 1592U89 is the tri-phosphate ester of (−) carbovir.

Examples of physiologically acceptable salts of 1592U89, zidovudine or 3TC and their physiologically acceptable derivatives include salts derived from an appropriate base, such as an alkali metal (for example, sodium), an alkaline earth (for example, magnesium), ammonium and $NX_4^+$ (wherein X is $C_{1-4}$ alkyl). Physiologically acceptable salts of an hydrogen atom or an amino group include salts of organic carboxylic acids such as acetic, lactic, tartaric, malic, isethionic, lactobionic and succinic acids, organic sulphonic acids, such as methanesulphonic, ethanesulphonic, benzenesulphonic and p-toluenesulphonic acids and inorganic acids, such as hydrochloric, sulphuric, phosphoric and sulphamic acids. Physiologically acceptable salts of a compound of an hydroxy group include the anion of said compound in combination with a suitable cation such as $Na^+$, $NH_4^+$ and $NX_4^+$ (wherein X is a $C_{1-4}$ alkyl group).

For therapeutic use, salts of 1592U89, zidovudine and 3TC will be physiologically acceptable, i.e. they will be salts derived from a physiologically acceptable acid or base. However, salts of acids or bases which are not physiologically acceptable may also find use, for example, in the preparation or purification of a physiologically acceptable compound. All salts, whether or not derived form a physiologically acceptable acid or base, are within the scope of the present invention.

A preferred salt of 1592U89 is the succinate salt.

Combinations of 1592U89 or a physiologically functional derivative thereof, zidovudine or a physiologically functional derivative thereof and 3TC or a physiologically functional derivative thereof may hereinafter be referred to as combinations according to the invention.

The present invention further provides combinations according to the invention for use in therapy, particularly in the treatment and/or prophylaxis of an HIV infection including infections with HIV mutants bearing resistance to nucleoside inhibitors, particularly zidovudine, 3TC, FTC, ddI, ddC or D4T or combinations thereof and non-nucleoside inhibitors such as Nevirapine (BI-RG-587), Loviride (α-APA) and Delavuridine (BHAP). Furthermore, the combinations according to the invention are especially useful for the treatment of AIDS and related clinical conditions such as AIDS related complex (ARC), progressive generalised lymphadenopathy (PGL), Kaposi's sarcoma, thrombocytopenic purpura, AIDS-related neurological conditions such as AIDS dementia complex, multiple sclerosis or tropical paraparesis, and also anti-HIV antibody-positive and HIV-positive conditions, including such conditions in asymptomatic patients.

According to another aspect, the present invention provides a method for the treatment or prevention of the symptoms or effects of an HIV infection in an infected animal, for example, a mammal including a human, which comprises treating said animal with a therapeutically effective amount of a combination of 1592U89, zidovudine and 3TC for, alternatively to 3TC, FTC) or a physiologically functional derivative of any thereof.

It will be appreciated that the compounds of the combination may be administered simultaneously, either in the same or different pharmaceutical formulation or sequentially. If there is sequential administration, the delay in administering the second and third active ingredient should not be such as to lose the benefit of a synergistic therapeutic effect of the combination of the active ingredients. It will also be understood that 1592U89, zidovudine and 3TC (or, alternatively to 3TC, FTC), or the physiologically functional

4

derivatives of any thereof, whether presented simultaneously or sequentially, may be administered individually or in multiples or in any combination thereof. 1592U89, zidovudine and 3TC (or, alternatively to 3TC, FTC), are preferably administered simultaneously or sequentially in separate pharmaceutical formulations, most preferably simultaneously.

The present invention also provides the use of 1592U89 in the manufacture of a medicament for administration simultaneously or sequentially with zidovudine and 3TC (or, alternatively to 3TC, FTC), respectively for the treatment and/or prophylaxis of HIV infections and associated clinical conditions hereinbefore described. It will be appreciated that 1592U89, zidovudine or 3TC (or, alternatively to 3TC, FTC), or any combination thereof may be used in the manufacture of the above medicament.

The synergistic effects of the combination of 1592U89, zidovudine and 3TC (or, alternatively to 3TC, FTC), or a physiologically functional derivative of any thereof are seen over a ratio, for example, of 1 to 20:1 to 20:1 to 10 (by weight), preferably 1 to 10:1 to 10:1 to 5 (by weight), particularly 1 to 3:1 to 3:1 to 2 (by weight) Conveniently each compound will be employed in the combination in an amount at which it exhibits antiviral activity when used alone.

The amount of a combination of 1592U89, zidovudine and 3TC (or, alternatively to 3TC, FTC), required to be effective as an anti-HIV agent will, of course, vary and is ultimately at the discretion of the medical practitioner. The factors to be considered include the route of administration and nature of the formulation, the animal's body weight, age and general condition and the nature and severity of the disease to be treated.

In general a suitable dose of 1592U89 for administration to a human for treatment of an HIV infection will be in the range of 0.1 to 100 mg per kilogram body weight of the recipient per day, preferably in the range of 0.5 to 50 mg per kilogram body weight per day and most preferably in the range 7 to 30 mg per kilogram body weight per day.

In general a suitable dose of zidovudine will be in the range of 3 to 120 mg per kilogram body weight of the recipient per day, preferably in the range of 6 to 90 mg per kilogram body weight per day and most preferably in the range 10 to 30 mg per kilogram body weight per day.

For 3TC a suitable daily dose will be in the range of from about 0.1 to about 120 mg per kilogram body weight of the recipient per day, preferably in the range of 0.5 to 75 mg per kilogram body weight per day, most preferably in the range of 1 to 40 mg per kilogram body weight per day, such as 5 to 10 mg per kilogram body weight per day.

For FTC a suitable daily dose will be in the range of from about 0.1 to about 120 mg per kilogram body weight of the recipient per day, preferably in the range of 0.5 to 75 mg per kilogram body weight per day, most preferably in the range of 1 to 40 mg per kilogram body weight per day, such as 5 to 10 mg per kilogram body weight per day.

Unless otherwise indicated all weights of active ingredients are calculated in terms of the drug per se. In the case of a physiologically functional derivative of 1592U89, zidovudine, 3TC (or, alternatively to 3TC, FTC), (or, alternatively to 3TC, FTC), or a solvate of any thereof the figures would be increased proportionately. The desired dose is preferably presented as two, three, four, five, six or more sub-doses administered at appropriate intervals throughout the day. These sub-doses may be administered in unit dosage forms, for example, containing from 1 to 1500 mg, preferably from 5 to 1000 mg, most preferably from 10 to 700 mg

Copy provided by USPTO from the PIRS Image Database on 04/17/2012

ViiV_EZTZ_0778211

A00102

US 6,417,191 B1

5

of active ingredient per unit dosage form. Alternatively, if the condition of the recipient so requires, the dose may be administered as a continuous infusion.

The components of the combination which may be referred to as active ingredients may be administered for therapy to an animal e.g. a mammal including a human in a conventional manner.

While it is possible for the active ingredients of the combination to be administered as the raw chemical it is preferable to present them as a pharmaceutical formulation. Pharmaceutical formulations according to the present invention comprise a combination according to the invention together with one or more pharmaceutically acceptable carriers or excipients and optionally other therapeutic agents. The carrier(s) must be acceptable in the sense of being compatible with the other ingredients of the formula and not deleterious to the recipient thereof. When the individual components of the combination are administered separately they are generally each presented as a pharmaceutical formulation. The references hereinafter to formulations refer unless otherwise stated to formulations containing either the combination or a component thereof.

A combination of 1592U89, zidovudine and 3TC (or, alternatively to 3TC, FTC), or a physiologically functional derivative of any thereof may conveniently be presented as a pharmaceutical formulation in a unitary dosage form. A convenient unitary dosage formulation contains the active ingredients in amounts of from 50 mg to 3 g each, for example, 100 mg to 2 g.

It is also possible to combine any two of the active ingredients in a unitary dosage form for simultaneous or sequential administration with the thirdactive ingredient, for example, a typical unitary dosage may contain 50 mg to 3 g each of zidovudine and 3TC, preferably 100 mg to 2 g each of zidovudine and 3TC or 50 mg to 3 g each of zidovudine and 1592U8983, preferably 100 mg to 2 g each of zidovudine and 1592U8983.

As a further feature of the present invention presented is a unitary dosage form comprising at least two active ingredients selected from zidovudine, 1592U89 and 3TC (or, alternatively to 3TC, FTC) or physiologically functional derivatives of any thereof and a pharmaceutically acceptable carrier therefore.

It will be appreciated that the administration of two active compounds selected from 1592U89 and 3TC (or, alternatively to 3TC, FTC), is an essential part of the invention, preferably as a prelude to the remaining third active ingredient being administered. The combinations of 1592U89 and zidovudine, 1592UB9 and 3TC, and 1592U89 and FTC are prefered, in particular the combination of 1592U89 and zidovudine.

In addition we have found that when the compounds described above are combined a synergistic effect is also found.

As yet a further feature of the present invention presented is a combination comprising two compounds selected from zidovudine, 1592U89 and 3TC (or, alternatively to 3TC, FTC) provided that the two compounds are not zidovudine and 3TC. Preferably the combination is administered simultaneously or sequentially with the third remaining compound.

More commonly these days pharmaceutical formulations are prescribed to the patient in "patient packs" containing the whole course of treatment in a single package, usually a blister pack. Patient packs have an advantage over traditional prescriptions, where a pharmacists divides a patients supply of a pharmaceutical from a bulk supply, in that the

6

patient always has access to the package insert contained in the patient pack, normally missing in traditional prescriptions. The inclusion of a package insert has been shown to improve patient compliance with the physicians instructions.

It will be understood that the administration of the combination of the invention by means of a single patient pack, or patients packs of each formulation, within a package insert diverting the patient to the correct use of the invention is a desirable additional feature of this invention.

According to a further aspect of the invention provided is a patient pack comprising of at least one active ingredient 1592U89, zidovudine, 3TC or FTC of the combination of the invention and an information insert containing directions on the use of the combination of the invention.

According to another aspect the invention provides a triple pack comprising in association for separate administration 1592U89 or a physiologically functional derivative thereof, zidovudine or a physiologically functional derivative thereof and 3TC or a physiologically functional derivative thereof.

Formulations include those suitable for oral, rectal, nasal, topical (including transdermal, buccal and sublingual), vaginal or parenteral (including subcutaneous, intramuscular, intravenous and intradermal) administration. The formulations may conveniently be presented in unit dosage form and may be prepared by any methods well known in the art of pharmacy. Such methods represent a further feature of the present invention and include the step of bringing into association the active ingredients with the carrier which constitutes one or more accessory ingredients. In general, the formulations are prepared by uniformly and intimately bringing into association the active ingredients with liquid carriers or finely divided solid carriers or both, and then if necessary shaping the product.

Formulations of the present invention suitable for oral administration may be presented as discrete units such as capsules, caplets, cachets or tablets each containing a predetermined amount of the active ingredients; as a powder or granules; as a solution or a suspension in an aqueous or non-aqueous liquid; or as an oil-in-water liquid emulsion or a water-in-oil liquid emulsion. The active ingredient may also be presented as a bolus, electuary or paste.

A tablet may be made by compression or molding, optionally with one or more accessory ingredients. Compressed tablets may be prepared by compressing in a suitable machine the active ingredients in a free-flowing form such as a powder or granules, optionally mixed with a binder (e.g. povidone, gelatin, hydroxypropylmethyl cellulose), lubricant, inert diluent, preservative, disintegrant (e.g. sodium starch glycollate, cross-linked povidone, cross-linked sodium carboxymethyl cellulose) surface-active or dispersing agent. Molded tablets may be made by molding a mixture of the powdered compound moistened with an inert liauid diluent in a suitable machine. The tablets may optionally be coated or scored and may be formulated so as to provide slow or controlled release of the active ingredients therein using, for example, hydroxypropylmethyl cellulose in varying proportions to provide the desired release profile. Tablets may optionally be provided with an enteric coating, to provide release in parts of the gut other than the stomach.

Formulations suitable for topical administration in the mouth include lozenges comprising the active ingredients in a flavored base, usually sucrose and acacia or tragacanth; pastilles comprising the active ingredient in an inert basis such as gelatin and glycerin, or sucrose and acacia; and mouthwashes comprising the active ingredient in a suitable

Copy provided by USPTO from the PIRS Image Database on 04/17/2012

ViiV_EZTZ_0778212

US 6,417,191 B1

7

liquid carrier. Formulations for rectal administration may be presented as a suppository with a suitable base comprising, for example, cocoa butter or a salicylate.

Topical administration may also be by means of a trans-dermal iontophoretic device.

Formulations suitable for vaginal administration may be presented as pessaries, tampons, creams, gels, pastes, foams or spray formulations containing in addition to the active ingredient such carriers as are known in the art to be appropriate.

Pharmaceutical formulations suitable for rectal adminis-tration wherein the carrier is a solid are most preferably presented as unit dose suppositories. Suitable carriers include cocoa butter and other materials commonly used in the art. The suppositories may be conveniently formed by admixture of the active combination with the softened or melted carrier(s) followed by chilling and shaping in moulds.

Formulations suitable for parenteral administration include aqueous and nonaqueous isotonic sterile injection solutions which may contain anti-oxidants, buffers, bacteri-ostats and solutes which render the formulation isotonic with the blood of the intended recipient; and aqueous and non-aqueous sterile suspensions which may include suspending agents and thickening agents; and liposomes or other micro-particulate systems which are designed to target the com-pound to blood components or one or more organs. The formulations may be presented in unit-dose or multi-dose sealed containers, for example, ampoules and vials, and may be stored in a freeze-dried (lyophilized) condition requiring only the addition of the sterile liquid carrier, for example water for injection, immediately prior to use. Extempora-neous injection solutions and suspensions may be prepared from sterile powders, granules and tablets of the kind previously described.

Preferred unit dosage formulations are those containing a daily dose or daily subdose of the active ingredients, as hereinbefore recited, or an appropriate fraction thereof.

It should be understood that in addition to the ingredients particularly mentioned above the formulations of this inven-tion may include other agents conventional in the art having regard to the type of formulation in question, for example, those suitable for oral administration may include such further agents as sweeteners, thickeners and flavoring agents.

The compounds of the combination of the present inven-tion may be obtained in a conventional manner. Zidovudine can be prepared, for example, as described in U.S. Pat. No. 4,724,232, incorporated herein by reference. Zidovudine can also be obtained from Aldrich Chemical Co., Milwaukee, Wis. 53233, USA.

1592U89 may be prepared by the method described in European Specification EP0434450 or PCT application PCT/GB/4500225, which are incorporated herein by refer-ence.

Methods for the preparation of 3TC are described in International Patent Application No. WO91/17159, incorpo-rated herein by reference.

Methods for the preparation of FTC are described in International Patent Application No. WO92/14743 incorpo-rated herein by reference.

The following examples are intended for illustration only and are not intended to limit the scope of the invention in any way. "Active ingredient" denotes 1592U89, zidovudine, 3TC (or, alternatively to 3TC, FTC), or multiples thereof or a physiologically functional derivative of any of the afore-mentioned compounds.

8

EXAMPLE 1

Tablet Formulation

The following formulations A, B and C are prepared by wet granulation of the ingredients with a solution of povidone, followed by addition of magnesium stearate and compression.

|  | mg/tablet |
| --- | --- |
| **Formulation A** | |
| Active Ingredient | 250 |
| Lactose B.P. | 210 |
| Povidone B.P. | 15 |
| Sodium Starch Glycollate | 20 |
| Magnesium Stearate | 5 |
|  | 500 |
| **Formulation B** | |
| Active Ingredient | 250 |
| Lactose B.P. | 150 |
| Avicel PH 101 | 60 |
| Povidone B.P. | 15 |
| Sodium Starch Glycollate | 20 |
| Magnesium Stearate | 5 |
|  | 500 |
| **Formulation C** | |
| Active Ingredient | 250 |
| Lactose B.P. | 200 |
| Starch | 50 |
| Povidone | 5 |
| Magnesium Stearate | 4 |
|  | 359 |

The following formulations, D and E, are prepared by direct compression of the admixed ingredients. The lactose in formulation E is of the direct compression type (Dairy Crest—"Zeparox").

|  | mg/tablet |
| --- | --- |
| **Formulation D** | |
| Active Ingredient | 250 |
| Pregelatinized Starch NF15 | 150 |
|  | 400 |
| **Formulation E** | |
| Active Ingredient | 250 |
| Lactose B.P. | 150 |
| Avicel | 100 |
|  | 500 |

Formulation F (Controlled Release Formulation)

The formulation is prepared by wet granulation of the ingredients with a solution of povidone followed by the addition of magnesium stearate and compression.

Copy provided by USPTO from the PIRS Image Database on 04/17/2012

ViiV_EZTZ_0778213

A00104

US 6,417,191 B1

**9**                                                    **10**

| | mg/tablet |
|---|---|
| Active Ingredient | 500 |
| Hydroxypropylmethylcellulose (Methocel K4M Premium) | 112 |
| Lactose B.P. | 53 |
| Povidone B.P. | 28 |
| Magnesium Stearate | 7 |
| | 700 |

Drug release takes place over a period of about 6–8 hours and is complete after 12 hours.

### EXAMPLE 2

Capsule Formulations

Formulation A

A capsule formulation is prepared by admixing the ingredients of formulation D in Example 1 above and filling into a two-part hard gelatin capsule. Formulation B (infra) is prepared in a similar manner.

| | mg/capsule |
|---|---|
| Formulation B | |
| Active Ingredient | 250 |
| Lactose B.P. | 143 |
| Sodium Starch Glycollate | 25 |
| Magnesium Stearate | 2 |
| | 420 |
| Formulation C | |
| Active Ingredient | 250 |
| Macrogel 4000 B.P. | 350 |
| | 600 |

Capsules of formulation C are prepared by melting the Macrogel 4000 B.P., dispersing the active ingredient in the melt and filling the melt into a two-part hard gelatin capsule.

| Formulation D | mg/capsule |
|---|---|
| Active Ingredient | 250 |
| Lecithin | 100 |
| Arachis Oil | 100 |
| | 450 |

Capsules of formulation D are prepared by dispersing the active ingredient in the lecithin and arachis oil and filling the dispersion into soft, elastic gelatin capsules.

Formulation E (Controlled Release Capsule)

The following controlled release capsule formulation is prepared by extruding ingredients a, b, and c using an extruder, followed by spheronization of the extrudate and drying. The dried pellets are then coated with release-controlling membrane (d) and filled into a two-piece, hard gelatin capsule.

| | mg/capsule |
|---|---|
| (a) Active Ingredient | 250 |
| (b) Microcrystalline Cellulose | 125 |
| (c) Lactose B.P. | 125 |
| (d) Ethyl Cellulose | 13 |
| | 513 |

### EXAMPLE 3

Injectable Formulation

| Formulation A | mg |
|---|---|
| Active Ingredient | 200 |
| Hydrochloric Acid Solution 0.1 M or Sodium Hydroxide Solution 0.1 M q.s. to pH | 4.0 to 7.0 |
| Sterile water q.s. to | 10 ml |

The active ingredient is dissolved in most of the water (35°–40° C.) and the pH adjusted to between 4.0 and 7.0 with the hydrochloric acid or the sodium hydroxide as appropriate. The batch is then made up to volume with the water and filtered through a sterile micropore filter into a sterile 10 ml amber glass vial (type 1) and sealed with sterile closures and overseals.

| Formulation B | |
|---|---|
| Active Ingredient | 125 mg |
| Sterile, Pyrogen-free, pH 7 Phosphate Buffer, q.s. to | 25 ml |

### EXAMPLE 4

Intramuscular Injection

| Active Ingredient | 200 mg |
|---|---|
| Benzyl Alcohol | 0.10 g |
| Glycofurol 75 | 1.45 g |
| Water for injection q.s. to | 3.00 ml |

The active ingredient is dissolved in the glycofurol. The benzyl alcohol is then added and dissolved, and water added to 3 ml. The mixture is then filtered through a sterile micropore filter and sealed in sterile 3 ml amber glass vials (type 1).

### EXAMPLE 5

| Syrup | |
|---|---|
| Active Ingredient | 250 mg |
| Sorbitol Solution | 1.50 g |
| Glycerol | 2.00 g |
| Sodium Benzoate | 0.005 g |
| Flavor, Peach 17.42.3169 | 0.0125 ml |
| Purified Water q.s. to | 5.00 ml |

Copy provided by USPTO from the PIRS Image Database on 04/17/2012

ViiV_EZTZ_0778214

**A00105**

US 6,417,191 B1

11

The active ingredient is dissolved in a mixture of the glycerol and most of the purified water. An aqueous solution of the sodium benzoate is then added to the solution, followed by addition of the sorbital solution and finally the flavor. The volume is made up with purified water and mixed well.

### EXAMPLE 6

Suppository

| | mg/capsule suppository |
| --- | --- |
| Active Ingredient | 250 |
| Hard Fat, B.P. (Witepsol H15 - Dynamit Nobel) | 1770 |
| | 2020 |

One-fifth of the Witepsol H15 is melted in a steam-jacketed pan at 45° C. maximum. The active ingredient is sifted through a 200 μM sieve and added to the molten base with mixing, using a Silverson fitted with a cutting head, until a smooth dispersion is achieved. Maintaining the mixture at 45° C., the remaining Witepsol H15 is added to the suspension and stirred to ensure a homogenous mix. The entire suspension is passed through a 250 μm stainless steel screen and, with continuous stirring, is allowed to cool to 40° C. At a temperature of 38° C. to 40° C., 2.02 g of the mixture is filled into suitable, 2 ml plastic molds. The suppositories are allowed to cool to room temperature.

### EXAMPLE 7

Pessaries

| | mg/pessary |
| --- | --- |
| Active Ingredient | 250 |
| Anhydrate Dextrose | 380 |
| Potato Starch | 363 |
| Magnesium Stearate | 7 |
| | 1000 |

The above ingredients are mixed directly and pessaries prepared by direct compression of the resulting mixture.

Biological Test Results

Peak and Trough Plasma Levels

The peak and trough values in micromolar concentrations used in this study came from clinically determined peak and trough plasma levels. These values were meant to reflect actual peak and trough plasma levels achieved in patients when using therapeutic doses of each drug as a single agent

| Drug | Peak Level (uM) | Trough Level (uM) |
| --- | --- | --- |
| zidovudine | 5 | 0.4 |
| 3TC | 9 | 0.7 |
| 1592U89 | 3.5 | 0.1 |
| FTC | 10 | 0.5 |

Antiviral Activity Alone or in Combination

Anti-HIV assay. The human T-cell lymphotropic virus type 1-transformed cell line MT4 was grown and infected

12

with HIV-1 strain 3B or strain MN (Advanced Biotechnologies Inc., Columbia, Md.) at 10 times the amount necessary to cause a 50% reduction of MT4 cell growth (10×TCID$_{50}$, 2×10$^4$ plaque forming units/cell), unless otherwise indicated. Mock-infected cells were also prepared. Following 1 hour incubation, the cells were pipetted onto 96well dishes at 1×10$^4$ cells/well. The wells contained various concentrations of zidovudine, and peak or trough plasma levels of 3TC (or, alternatively to 3TC, FTC), and 1592U8983 as indicated in table 1. The infected T-lymphoblastoid cells were incubated for 5 days to allow for HIV-1 mediated growth inhibition. Plates were then treated with 28 μl of 5% Nonidet P-40 (Sigma) in phosphate-buffered saline (PBS) and 60 μl samples were transferred to filter-bottomed, 96-well plates (Idexx Corp.). Plates were placed in an automated assay instrument (Idexx Screen Machine) which added propidium iodide to each well, performed a series of washes, and determined the resulting fluorescence (E). Fluorescence has been shown to correlate directly with cell number, allowing for the quantitation of HIV-1 mediated cytopathic effect (CPE). Uninfected cells were determined to have 0% CPE and infected untreated cells were determined to have 100% CPE. Percent inhibition of HIV-1 induced CPE and IC$_{95}$s (95% inhibitory concentration) were determined.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 shows graphically the results of the combination of zidovudine, 3TC and 1592U89 against zidovudine and 3TC alone and in combination.

What is claimed is:

1. A method for the treatment or prevention of the symptoms or effects of an HIV infection in an infected animal which comprises treating said animal with a therapeutically effective amount of a combination comprising (1S, 4R)-cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-yl]-2-cyclopentene-1-methanol or a physiologically functional derivative thereof, zidovudine or a physiologically functional derivative thereof, and (2R, cis)-4-amino-1-(2-hydroxymethyl-1,3-oxathiolan-5-yl)-(1H)-pyrimidin-2-one or a physiologically functional derivative thereof.

2. A method according to claim 1 wherein (1S, 4R)-cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-yl]-2-cyclopentene-1-methanol or a physiologically functional derivative thereof, zidovudine or a physiologically function derivative thereof, and (2R,cis)-4-amino-1-(2-hydroxymethyl-1,3-oxathiolan-5-yl)-(1H)-pyrimidin-2-one or a physiologically functional derivative thereof are present in a ratio of 1 to 20:1 to 20:1 to 22 by weight.

3. A method according to claim 2 wherein (1S, 4R)-cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-yl]-2-cyclopentene-1-methanol, zidovudine, and (2R, cis)-4-amino-1-(2-hydroxymethyl-1,3-oxathiolan-5-yl)-(1H)-pyrimidin-2-one are present in a ratio of 1 to 10:1 to 10:1 to 5 by weight.

4. A method according to claim 2 wherein (1S, 4R)-cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-yl]-2-cyclopentene-1-methanol, zidovudine, and (2R, cis)-4-amino-1-(2-hydroxymethyl-1,3-oxathiolan-5-yl)-(1H)-pyrimidin-2-one are present in a ratio of 1 to 3:1 to 3:1 to 2 by weight.

5. A method according to claim 2 wherein each (1S, 4R)-cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-yl]-2-cyclopentene-1-methanol, zidovudine and (2R, cis)-4-amino-1-(2-hydroxymethyl-1,3-oxathiolan-5-yl)-(1H)-pyrimidin-2-one is present in an amount from 1 to 1500 mg per unit dosage form.

Copy provided by USPTO from the PIRS Image Database on 04/17/2012

ViiV_EZTZ_0778215

A00106

US 6,417,191 B1

13

**6.** A method according to claim **2** wherein each (1S, 4R)-cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-yl]-2-cyclopentene-1-methanol, zidovudine, and (2R, cis)-4-amino-1-(2-hydroxymethyl-1,3-oxathiolan-5-yl)-(1H)-pyrimidin-2-one is present in an amount from 5 to 1000 mg per unit dosage form.

**7.** A method according to claim **2** wherein the (1S, 4R)-cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-yl]-2-cyclopentene-1-methanol is the succinate salt.

**8.** A method according to claim **2** wherein the combination is administered simultaneously.

**9.** A method according to claim **2** wherein the combination is administered sequentially.

**10.** A method according to claim **2** wherein the combination is administered as a single combined formulation.

**11.** A method according to claim **2** in which said animal is a human.

**12.** A method according to claim **1** wherein the physiologically functional derivative of (1S, 4R)-cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-yl]-2-cyclopentene-1-methanol is the succinate salt.

**13.** A method according to claim **1** wherein (1S, 4R)-cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-yl]-3-2-cyclopentene-1-methanol or a physiologically functional derivative thereof, zidovudine, and a physiologically function derivative thereof, and (2R,cis)-4-amino-1-(2-hydroxymethyl-1,3-oxathiolan-5-yl)-(1H)-pyrimidin-2-one or a physiologically functional derivative thereof are present in a ratio of 1 to 10:1 to 10:1 to 5 by weight.

**14.** A method according to claim **1** wherein each (1S, 4R)-cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-yl]-2-cyclopentene-1-methanol or a physiologically functional derivative thereof, zidovudine or a physiologically function derivative thereof, and (2R,cis)-4-amino-1-(2-hydroxymethyl-1,3-oxathiolan-5-yl)-(1H)-pyrimidin-2-one or a physiologically functional derivative thereof is present in an amount from 1 to 1500 mg per unit dosage form.

**15.** A method according to claim **1** wherein each (1S, 4R)-cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-yl]-2-cyclopentene-1-methanol or a physiologically functional derivative thereof, zidovudine or a physiologically function derivative thereof, and (2R,cis)-4-amino-1-(2-hydroxymethyl-1,3-oxathiolan-5-yl)-(1H)-pyrimidin-2-one or a physiologically functional derivative thereof is present in an amount from 5 to 1000 mg per unit dosage form.

**16.** A pharmaceutical formulation comprising (1S, 4R)-cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-yl]-2-cyclopentene-1-methanol or a physiologically functional derivative thereof, zidovudine or a physiologically functional derivative thereof, and (2R,cis)-4-amino-1-(2-hydroxymethyl-1,3-oxathiolan-5-yl)-(1H)-pyrimidin-2-one or a physiologically functional derivative thereof in association with one or more pharmaceutically acceptable carriers therefor.

**17.** A formulation according to claim **16** in unit dosage.

**18.** A formulation according to claim **17** in the form of a tablet or capsule.

**19.** A pharmaceutical formulation according to claim **16** wherein the physiologically functional derivative of (1S, 4R)-cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-yl]-2-cyclopentene-1-methanol is the succinate salt.

**20.** A method for the treatment or prevention of the symptoms or effects of an HIV infection in an infected animal which comprises treating said animal with a therapeutically effective amount of a combination comprising (1S, 4R)-cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-yl]-2-cyclopentene-1-methanol and (2R,cis)-4-amino-1-(2-hydroxymethyl-1,3-oxathiolan-5-yl)-(1H)-pyrimidin-2-one.

14

**21.** A method according to claim **1** wherein the combination is administered simultaneously.

**22.** A method according to claim **1** wherein the combination is administered sequentially.

**23.** A method according to claim **1** wherein the combination is administered as a single combined formulation.

**24.** A method according to claim **1** in which said animal is a human.

**25.** A method according to claim **20** wherein each (1S, 4R)-cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-yl]-2-cyclopentene-1-methanol and (2R, cis)-4-amino-1-(2-hydroxymethyl-1,3-oxathiolan-5-yl)-(1H)-pyrimidin-2-one is present in an amount from 1 to 1500 mg per unit dosage form.

**26.** A method according to claim **20** wherein each (1S, 4R)-cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-yl]-2-cyclopentene-1-methanol and (2R, cis)-4-amino-1-(2-hydroxymethyl-1,3-oxathiolan-5-yl)-(1H)-pyrimidin-2-one is present in an amount from 5 to 1000 mg per unit dosage form.

**27.** A method according to claim **20** wherein the combination is administered simultaneously.

**28.** A method according to claim **20** wherein the combination is administered sequentially.

**29.** A method according to claim **20** wherein the combination is administered as a single combined formulation.

**30.** A method according to claim **20** in which said animal is a human.

**31.** A patient pack comprising at least one active ingredient selected from (1S, 4R)-cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-yl]-2-cyclopentene-1-methanol, zidovudine, and (2R, cis)-4-amino-1-(2-hydroxymethyl-1,3-oxathiolan-5-yl)-(1H)-pyrimidin-2-one and an information insert containing directions on the use of all three active ingredients together in combination.

**32.** A method for the treatment or prevention of the symptoms or effects of an HIV infection in an infected animal which comprises treating said animal with a therapeutically effective amount of a combination comprising (1S, 4R)-cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-yl]-2-cyclopentene-1-methanol, zidovudine, and (2R, cis)-4-amino-1-(2-hydroxymethyl-1,3-oxathiolan-5-yl)-(1H)-pyrimidin-2-one.

**33.** A method according to claim **32** wherein each (1S, 4R)-cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-yl]-2-cyclopentene-1-methanol, zidovudine, and (2R, cis)-4-amino-1-(2-hydroxymethyl-1,3-oxathiolan-5-yl)-(1H)-pyrimidin-2-one are present in an amount from 1 to 1500 mg per unit dosage form.

**34.** A method according to claim **32** wherein each (1S, 4R)-cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-yl]-2-cyclopentene-1-methanol, zidovudine, and (2R, cis)-4-amino-1-(2-hydroxymethyl-1,3-oxathiolan-5-yl)-(1H)-pyrimidin-2-one is present in an amount from 5 to 1000 mg per unit dosage form.

**35.** A method according to claim **32** wherein the (1S, 4R)-cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-yl]-2-cyclopentene-1-methanol is the succinate salt.

**36.** A method according to claim **32** wherein the combination is administered simultaneously.

**37.** A method according to claim **32** wherein the combination is administered sequentially.

**38.** A method according to claim **32** wherein the combination is administered as a single combined formulation.

**39.** A method according to claim **32** in which said animal is a human.

**40.** A method according to claim **32** wherein the (1S, 4R)-cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-yl]-2-cyclopentene-1-methanol is the succinate salt.

Copy provided by USPTO from the PIRS Image Database on 04/17/2012

US 6,417,191 B1

15

41. A pharmaceutical formulation comprising (1S, 4R)-cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-yl]-2-cyclopentene-1-methanol, zidovudine, and (2R, cis)-4-amino-1-(2-hydroxymethyl-1,3-oxathiolan-5-yl)-(1H)-pyrimidin-2-one in association with one or more pharmaceutically acceptable carriers therefor.

42. A pharmaceutical formulation according to claim 41 wherein the (1S, 4R)-cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-yl]-2-cyclopentene-1-methanol is the succinate salt.

43. A formulation according to claim 41 in unit dosage form.

44. A formulation according to claim 43 in the form of a tablet or capsule.

45. A pharmaceutical formulation comprising (1S, 4R)-cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-yl]-2-cyclopentene-1-methanol, zidovudine, and (2R, cis)-4-amino-1-(2-hydroxymethyl-1,3-oxathiolan-5-yl)-(1H)-pyrimidin-2-one in a ratio of 1 to 20:1 to 20:1 to 10 by weight, in association with one or more pharmaceutically acceptable carriers therefor.

16

46. A formulation according to claim 45 in unit dosage form.

47. A formulation according to claim 46 in the form of a tablet or capsule.

48. A pharmaceutical formulation comprising (1S, 4R)-cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-yl]-2-cyclopentene-1-methanol or a physiologically functional derivative thereof and (2R, cis)-4-amino-1-(2-hydroxymethyl-1,3-oxathiolan-5-yl)-(1H)-pyrimidin-2-one or a physiologically functional derivative thereof in association with one or more pharmaceutically acceptable carriers therefor.

49. A pharmaceutical formulation according to claim 48 wherein the physiologically functional derivative of (1S, 4R)-cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-yl]-2-cyclopentene-1-methanol is the succinate salt.

50. A formulation according to claim 48 in unit dosage form.

51. A formulation according to claim 50 in the form of a tablet or capsule.

\* \* \* \* \*

Copy provided by USPTO from the PIRS Image Database on 04/17/2012

ViiV_EZTZ_0778217

UNITED STATES PATENT AND TRADEMARK OFFICE
## CERTIFICATE OF CORRECTION

PATENT NO.        : 6,417,191 B1                                    Page 1 of 1
APPLICATION NO. : 08/930225
DATED             : July 9, 2002
INVENTOR(S)       : Barry et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Claim 2 (Column 12, Line 49) should read as follows:

--in a ratio of 1 to 20:1 to 20:1 to 10 by weight.--

Signed and Sealed this

Thirty-first Day of July, 2007

JON W. DUDAS
*Director of the United States Patent and Trademark Office*

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.        : 6,417,191 B1                    Page 1 of 1
APPLICATION NO.   : 08/930225
DATED             : July 9, 2002
INVENTOR(S)       : Barry et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is
hereby corrected as shown below:

On the Title page:

Item (73) ASSIGNEE should read as follows:

--(73) Assignee: SmithKline Beecham Corporation, Philadelphia, PA (US)--

In the Claims:

Claim 2 (Column 12, Line 49) should read as follows:

--in a ratio of 1 to 20:1 to 20:1 to 10 by weight.--

Signed and Sealed this

Twenty-first Day of August, 2007

JON W. DUDAS
*Director of the United States Patent and Trademark Office*

𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰
𝔣𝔬𝔯 𝔱𝔥𝔢 𝔉𝔢𝔡𝔢𝔯𝔞𝔩 𝔆𝔦𝔯𝔠𝔲𝔦𝔱

VIIV HEALTHCARE CO., ET AL. V. LUPIN LIMITED, 2014-1303

## CERTIFICATE OF SERVICE

I, Rose Olvera Olejniczak, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by RAKOCZY MOLINO MAZZOCHI SIWIK LLP, Attorneys for Defendants-Appellants to print this document.  I am an employee of Counsel Press.

On **June 6, 2014**, Counsel for Defendants-Appellants has authorized me to electronically file the foregoing **Brief of Defendants-Appellants Lupin Limited and Lupin Pharmaceuticals, Inc.** with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to any of the following counsel registered as CM/ECF users:

John C. O'Quinn
William H. Burgess
F. Christopher Mizzo

KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C.  20005

*Attorneys for
Plaintiffs-Cross-Appellants
ViiV Healthcare UK Ltd. and
ViiV Healthcare Co.*

Ira J. Levy
Annemarie Hassett
Henry C. Dinger
David M. Hashmall
William M. Jay
Joshua A. Whitehill

GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018

*Attorneys for Defendants-Appellant
Teva Pharmaceuticals USA, Inc.*

Upon acceptance by the Court of the e-filed document, six paper copies will be filed with the Court, via Federal Express, within the time provided in the Court's rules.

June 6, 2014                                          /s/ Rose Olvera Olejniczak
                                                         Counsel Press

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B).  This brief contains 13,730 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Fed. Cir. R. 32(b).  Microsoft Word 2010 was used to calculate the word count.

2.      The brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6).  This brief has been prepared in a proportionally-spaced typeface using Microsoft Word 2010 in 14-point Times New Roman type style.

/s/Deanne M. Mazzochi
Deanne M. Mazzochi