**14-1303, -1304, -1315**

_____

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

_____

## VIIV HEALTHCARE CO. and VIIV HEALTHCARE UK LTD.

*Plaintiffs-Cross-Appellants,*

v.

## LUPIN LTD., LUPIN PHARMACEUTICALS, INC., and TEVA PHARMACEUTICALS USA, INC.,

*Defendants-Appellants.*

_____

Appeal from the United States District Court for the District of Delaware
in consolidated case no. 11-cv-576, Judge Richard G. Andrews

_____

### BRIEF OF DEFENDANT-APPELLANT
### TEVA PHARMACEUTICALS USA, INC.

_____

IRA J. LEVY
DAVID M. HASHMALL
ANNEMARIE HASSETT
JOSHUA A. WHITEHILL
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, NY  10018
(212) 813-8800

HENRY C. DINGER
GOODWIN PROCTER LLP
Exchange Place, 53 State Street
Boston, MA  02109
(617) 571-1000

WILLIAM M. JAY
GOODWIN PROCTER LLP
901 New York Avenue, NW
Washington, DC  20001
(202) 346-4444

*Counsel for Defendant-Appellant*
*Teva Pharmaceuticals USA, Inc.*

June 6, 2014

## CERTIFICATE OF INTEREST

I, Ira J. Levy, Counsel for Defendant-Appellant Teva Pharmaceuticals USA, Inc., certify that:

1.    The full name of the party that I represent is Teva Pharmaceuticals USA, Inc.

2.    The real party in interest is the same as the party I represent.

3.    The parent corporations and the publicly held companies that currently own 10% or more of the stock of the party that I represent are:

> Orvet UK Unlimited, Teva Pharmaceutical Holdings Coöperatieve U.A., Ivax LLC (f/k/a IVAX Corporation), Teva Pharmaceuticals Europe, B.V., and Teva Pharmaceutical Industries Ltd.; Teva Pharmaceutical Industries Ltd. is the only publicly traded company that owns 10% or more of Teva Pharmaceuticals USA, Inc.

4.    The names of all law firms and their partners or associates who appeared for Teva Pharmaceuticals USA, Inc. in the lower tribunal, or who are expected to appear for Teva Pharmaceuticals USA, Inc. in this Court are:

> GOODWIN PROCTER LLP
>
> | | |
> |---|---|
> | Ira J. Levy, Esq. | Joshua A. Whitehill, Esq. |
> | David M. Hashmall, Esq. | Natasha E. Daughtrey, Esq. |
> | Annemarie Hassett, Esq. | Eric H. Yecies, Esq. |
> | Henry C. Dinger, Esq. | Gregory T. Sandidge, Esq. |
> | William M. Jay, Esq. | Rivka Jungreis, Esq. |
> | Elaine H. Blais, Esq. | Lauren M. Nowierski, Esq. |
>
> POTTER ANDERSON & CORROON LLP
> Richard L. Horwitz, Esq.
> David E. Moore, Esq.

Dated:  June 6, 2014                          /s/  Ira J. Levy
                                                             Ira J. Levy

i

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST .................................................................................i

TABLE OF AUTHORITIES .................................................................................v

TABLE OF ABBREVIATIONS ...........................................................................ix

STATEMENT OF RELATED CASES ...................................................................1

JURISDICTIONAL STATEMENT .......................................................................1

STATEMENT OF ISSUES ...................................................................................2

STATEMENT OF THE CASE................................................................................4

I.    State of the Art.........................................................................................4

    A.    The First-Generation NRTIs ........................................................4

        1.    First-Generation NRTIs Were Effective but Highly Toxic ...................................................................................5

        2.    Monotherapy and Non-Adherence to Treatment Protocols Induced Drug-Resistance.............................................6

        3.    Clinicians Confirmed the Superiority of Combination Therapy ...............................................................8

    B.    Second-Generation NRTIs Were Comparably Potent but Significantly Less Toxic.........................................................9

        1.    3TC Was an Obvious Candidate for Combination Therapy .................................................................................10

        2.    Abacavir Was an Obvious Candidate for Combination Therapy ...........................................................12

        3.    The POSA Was Motivated to Combine 3TC and Abacavir ...................................................................................13

II.    The Patent-in-Suit........................................................................................15

III.    Procedural History .....................................................................................18

SUMMARY OF ARGUMENT ............................................................................20

ARGUMENT ........................................................................................................25

I.    Teva Does Not Infringe the Asserted Claims Under the District Court's Post-Trial Construction of "Abacavir"...........................................25

A.  Teva's Infringement Stipulation Was Contingent on the District Court's Markman Opinion Claim Construction.....................26

B.  The District Court Issued a New Claim Construction Post-Trial ..........................................................................28

II.  The Claims Require "Synergistic" Combinations ........................31

A.  Standard of Review and Governing Principles ...................31

B.  The Asserted Claims Are Limited to "Synergistic Combinations"..............................................................31

III.  Claims 26, 27, 29 And 30 Are Obvious ......................................35

A.  Standard of Review and Governing Principles ...................36

B.  The District Court Legally Erred by Requiring Teva to Prove that the POSA Would Have Expected 3TC/Abacavir to Match the "Sustained Clinical Efficacy" of AZT/3TC.....................................................................38

C.  Under the Correct Legal Standard, the Claims-in-Suit Are Obvious ...................................................................41

1.  It Was Obvious to Combine Abacavir and 3TC with a Reasonable Expectation of Therapeutic Effectiveness ...............................................................42

2.  It Was Obvious to Replace AZT in AZT/3TC with Abacavir with a Reasonable Expectation of Therapeutic Effectiveness .......................................45

3.  The Prior Art as a Whole Did Not Teach Away from Abacavir/3TC ..............................................47

4.  The District Court Improperly Struck Dr. Parniak's Trial Testimony that It Was Obvious to Substitute 3TC for ddC in Abacavir/ddC....................................54

a.  Standard of Review and Governing Principles ................................................55

b.  Dr. Parniak's Testimony Did Not Violate Rule 26 ...............................................56

5.  No Secondary Considerations Support Non-Obviousness .......................................................58

iii

a.      Commercial Success Does Not Favor Non-Obviousness ...................................................58

b.      "Failure of Others" and "Long-Felt-but-Unsolved Need" Do Not Support Non-Obviousness ...................................................59

c.      The District Court Clearly Erred in Finding that the Evidence Established Unexpected Clinical Efficacy ...........................................61

CONCLUSION ......................................................................63

STATEMENT PURSUANT TO FED. R. APP. P. 28(i).......................................64

ADDENDUM

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

C<span>ASES</span>

*Allergan, Inc. v. Sandoz Inc.*,
   726 F.3d 1286 (Fed. Cir. 2013) .......................................36, 41, 44, 47

*Bayer Schering Pharma AG v. Barr Labs., Inc.*,
   575 F.3d 1341 (Fed. Cir. 2009) .........................................................37

*Braxton v. United States*,
   500 U.S. 344 (1991)..........................................................................26

*Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.*,
   334 F.3d 1294 (Fed. Cir. 2003) .........................................................27

*Cephalon, Inc. v. Watson Pharm., Inc.*,
   707 F.3d 1330 (Fed. Cir. 2013) .........................................................59

*Conoco, Inc. v. Energy & Envtl. Int'l, L.C.*,
   460 F.3d 1349 (Fed. Cir. 2006) .........................................................28

*Consolidated Rail Corp. v. Portlight, Inc.*,
   188 F.3d 93 (3d Cir. 1999) ................................................................30

*Fuji Photo Film Co., Ltd. v. Jazz Photo Corp.*,
   394 F.3d 1368 (Fed. Cir. 2005) .........................................................26

*Galderma Labs., L.P. v. Tolmar, Inc.*,
   737 F.3d 731 (Fed. Cir. 2013) .....................................................58, 62

*Gaus v. Conair Corp.*,
   363 F.3d 1284 (Fed. Cir. 2004) .........................................................32

*Hoffman-La Roche Inc. v. Apotex Inc.*,
   2014 WL 1394948 (Fed. Cir. Apr. 11, 2014) ....................................37

*In re Baxter Travenol Labs*,
   952 F.2d 388 (Fed. Cir. 1991) ...........................................................62

*In re Fielder*,
   471 F.2d 640 (C.C.P.A. 1973) ...........................................................61

v

*In re Grasselli*,
713 F.2d 731 (Fed. Cir. 1983) ........................................................... 62

*In re Kubin*,
561 F.3d 1351 (Fed. Cir. 2009) ......................................................... 37

*In re Paoli R.R. Yard PCB Litig.*,
35 F.3d 717 (3d Cir. 1994) ................................................................ 57

*Innova/Pure Water, Inc. v. Safari Filtration Sys., Inc.*,
381 F.3d 1111 (Fed. Cir. 2004) ......................................................... 29

*Inventio AG v. Thyssenkrupp Elevator Americas Corp.*,
2014 WL 129799 (D. Del. Jan. 14, 2014) .......................................... 28

*Johns Hopkins Univ. v. CellPro, Inc.*,
152 F.3d 1342 (Fed. Cir. 1998) ................................................... 21, 24

*Kearns v. Chrysler Corp.*,
32 F.3d 1541 (Fed Cir. 1994) ........................................................... 26

*KSR Int'l Co. v. Teleflex Inc.*,
550 U.S. 398 (2007) .......................................................................... 37

*Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp.*,
744 F.3d 1272 (Fed. Cir. 2014) (en banc) ........................................ 31

*Merck & Co. v. Teva Pharm. USA, Inc.*,
395 F.3d 1364 (Fed. Cir. 2005) ................................................... 58, 60

*Meyer Intellectual Props. Ltd. v. Bodum, Inc.*,
690 F.3d 1354 (Fed. Cir. 2012) ................................................... 55, 56

*Novatek, Inc. v. Sollami Co.*,
2014 WL 1229547 (Fed. Cir. Mar. 26, 2014) ............................... 33, 34

*Novo Nordisk A/S v. Caraco Pharm. Labs., Ltd.*,
719 F.3d 1346 (Fed. Cir. 2013) ......................................................... 36

*Nystrom v. TREX Co.*,
424 F.3d 1136 (Fed. Cir. 2005) ......................................................... 29

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
521 F.3d 1351 (Fed. Cir. 2008) ...........................................29

*Pfizer, Inc. v. Apotex, Inc.*,
480 F.3d 1348 (Fed. Cir. 2007) ........................37, 41, 61, 63

*PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*,
491 F.3d 1342 (Fed. Cir. 2007) ...........................................53

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (en banc) ..........................31

*Praxair, Inc. v. ATMI, Inc.*,
543 F.3d 1306 (Fed. Cir. 2008) ...........................................33

*Pressure Prods. Med. Supplies, Inc. v. Greatbatch Ltd.*,
599 F.3d 1308 (Fed. Cir. 2010) ...........................................28

*Quinn v. Consolidated Freightways Corp. of Del.*,
283 F.3d 572 (3d Cir. 2002) .................................55, 56, 57

*Republic of Phil. v. Westinghouse Elec. Corp.*,
43 F.3d 65 (3d Cir. 1994) ....................................................55

*Saffran v. Johnson & Johnson*,
712 F.3d 549 (Fed. Cir. 2013) .............................................34

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*,
242 F.3d 1337 (Fed. Cir. 2001) ......................................31, 32

*Storage Tech. Corp. v. Cisco Sys., Inc.*,
329 F.3d 823 (Fed. Cir. 2003) ........................................39, 40

*Tokai Corp. v. Easton Enters., Inc.*,
632 F.3d 1358 (Fed. Cir. 2011) ...........................................44

*USX Corp. v. Penn Cent. Corp.*,
130 F.3d 562 (3d Cir. 1997) ................................................30

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
503 F.3d 1295 (Fed. Cir. 2007) ...........................................33

*Waldorf v. Shuta*,
  142 F.3d 601 (3d Cir. 1998) ........................................................26, 27

*Washington Hosp. v. White*,
  889 F.2d 1294 (3d Cir. 1989) .............................................................26

*Wi-LAN, Inc. v. Kilpatrick Townsend & Stockton LLP*,
  684 F.3d 1364 (Fed. Cir. 2012) .........................................................26

*Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC*,
  683 F.3d 1356 (Fed. Cir. 2012) ...................................................38, 45

*ZF Meritor, LLC v. Eaton Corp.*,
  696 F.3d 254 (3d Cir. 2012) ...............................................................56

## STATUTES

28 U.S.C. § 1295(a)(1) ..............................................................................1

28 U.S.C. § 1331 ......................................................................................1

28 U.S.C. § 1338(a) .................................................................................1

35 U.S.C. § 103 ......................................................................................36

35 U.S.C. § 112 ......................................................................................64

## RULES

Fed. R. App. P. 28(i) ..............................................................................64

Fed. R. Civ. P. 26(a)(2)(B)(i) ................................................................55

Fed. R. Civ. P. 37(c)(1) .........................................................................55

## OTHER AUTHORITIES

Restatement (Second) of Contracts § 152 ..............................................30

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| '191 patent | United States Patent No. 6,417,191 (issued July 9, 2002) |
| '394 patent | United States Patent No. 5,034,394 (issued July 23, 1991) |
| '500 patent | United States Patent No. 5,089,500 (issued Feb. 18, 1992) |
| 3TC | Lamivudine |
| 3TC/d4T | Dual combination of 3TC and d4T |
| 3TC/ddC | Dual combination of 3TC and ddC |
| 3TC/ddI | Dual combination of 3TC and ddI |
| A | Adenosine |
| Abacavir or 1592U89 or (1S,4R)-cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-yl]-2-cyclopentene-1-methanol | Abacavir |
| Abacavir/3TC | Dual combination of abacavir and 3TC |
| Abacavir/AZT/3TC | Triple combination of abacavir, AZT, and 3TC |
| Abacavir/ddC | Dual combination of abacavir and ddC |
| AIDS | Acquired immunodeficiency syndrome |
| AIDS Alert 1995 | *AZT Studies Reinforce Benefits of Combination: New Anti-HIV Drug, 3TC, Yields Exciting Results*, AIDS ALERT (Jan. 1995), 11-12 |
| ANDA | Abbreviated New Drug Application |
| AZT | Zidovudine |
| AZT/3TC | Dual combination of AZT and 3TC |
| AZT/ddC | Dual combination of AZT and ddC |
| AZT/ddI | Dual combination of AZT and ddI |
| C | Cytidine |
| Coates 1992 | Coates et al., *(-)-2'-Deoxy-3'-Thiacytidine Is a Potent, Highly Selective Inhibitor of Human Immunodeficiency Virus Type 1 and Type 2 Replication In Vitro*, ANTIMICROBIAL AGENTS & CHEMOTHERAPY (1992), 36(4):733-739 |
| d4T | Stavudine |

| | |
|---|---|
| Daluge 1994 | Daluge et al., *1592U89 Succinate – A Novel Carbocyclic Nucleoside Analog with Potent Selective Anti-HIV Activity*, ABSTRACTS OF THE 34TH ICAAC (1994), 7, Abstract I6 |
| ddC | Zalcitabine |
| ddI | Didanosine |
| ddI/ddC | Dual combination of ddI and ddC |
| Defendants | Teva and Lupin, collectively |
| DeNoon 1995 | DeNoon, *3TC/AZT Combination Trial Results Called "Breath of Fresh Air,"* AIDS WEEKLY (Feb. 20, 1995), 3-5 |
| DNA | Deoxyribonucleic acid |
| Du 1992 | Du et al., *In Vitro Toxicity of 3'-Azido-3'-Deoxythymidine, Carbovir and 2',3'-Didehydro-2',3'-Dideoxythymidine to Human and Murine Haematopietic Progenitor Cells,* BRIT. J. HAEMATOLOGY (1992), 80(4):437-445 |
| FDA | United States Food and Drug Administration |
| G | Guanosine |
| Gao 1992 | Gao et al., *Generation of Nucleoside-Resistant Variants for HIV-1 by In Vitro Selection in the Presence of AZT or DDI But Not by Combinations*, LEUKEMIA (1992), 6 Suppl 3:192S-195S |
| Gao 1994 | Gao et al., *Generation of Multiple Drug Resistance by Sequential In Vitro Passage of the Human Immunodeficiency Virus Type I*, ARCH. VIROL. (1994) 136:111-122 |
| Hammer | Hammer et al., *Issues in Combination Antiretroviral Therapy: A Review*, J. ACQUIRED IMUMUNE DEFICIENCY SYNDROMES (1994), 7(Suppl. 2):S24- |
| Hart 1992 | Hart et al., *Effects of (-)-2'-Deoxy-3'-Thiacytidine (3TC) 5'-Triphosphate on Human Immunodeficiency Virus Reverse Transcriptase and Mammalian DNA Polymerases Alpha, Beta, and Gamma,* ANTIMICROBIAL AGENTS & CHEMOTHERAPY (1992), 36(8):1688-1694 |
| HIV | Human immunodeficiency virus |
| ICAAC | Interscience Conference on Antimicrobial Agents and Chemotherapy |
| LTX1490 | Caliendo & Hirsch, *Combination Therapy for Infection Due to Human Immunodeficiency Virus Type 1*, CLINICAL INFECTIOUS DISEASES (1994), 18(4):516-24 |

| Lupin | Defendants/Appellants Lupin Ltd. and Lupin Pharmaceuticals, Inc., collectively |
|---|---|
| New AIDS Therapies 1994 | *New AIDS Therapies at ICAAC*, SCRIP No. 1988 (Oct. 25, 1994), 26 |
| NNRTI | Non-nucleoside reverse transcriptase inhibitor |
| NRTI | Nucleoside reverse transcriptase inhibitor |
| PI | Protease inhibitor |
| POSA | Person of ordinary skill in the art |
| PTX365 | Kavlick & Mitsuya, *Anti-HIV Drug Test Systems: Significance and Limitations*, in ANTI-AIDS DRUGS DEVELOPMENT: CHALLENGES, STRATEGIES AND PROSPECTS 185 (1995) |
| PTX696 | Johnson, *Nucleoside Reverse Transcriptase Inhibitors and Resistance of Human Immunodeficiency Virus Type 1*, J. INFECTIOUS DISEASES (Mar. 1995), 171(Suppl.2):S140-49 |
| RNA | Ribonucleic acid |
| RT | HIV's reverse transcriptase enzyme |
| Schinazi 1995 | Schinazi, *A Brighter Future for Nucleoside Antiviral Agents*, INT'L ANTIVIRAL NEWS (Mar. 1, 1995), 3(3):45-46 |
| T | Thymidine |
| Teva | Defendant/Appellant Teva Pharmaceuticals USA, Inc. |
| Tisdale 1994 | Tisdale et al., *Anti-HIV Activity of (1S, 4R)-4-(2-amino-6-(cyclopropylamino)-9H-purin-9-yl]-2-cyclopentene-1-methanol(1592U89)*, ABSTRACTS OF THE 34TH ICAAC (1994), 92, Abstract I82 |
| USPTO | United States Patent and Trademark Office |
| ViiV | Plaintiffs/Appellees ViiV Healthcare Co. and ViiV Healthcare UK Ltd., collectively |

## STATEMENT OF RELATED CASES

Teva, Lupin, and ViiV each appealed from the District Court's January 27, 2014 Judgment.  Those appeals, Nos. 14-1303, -1304, and -1315, respectively, have been consolidated.  This Court's decision in this appeal may directly affect the following case:  *ViiV Healthcare UK Ltd. v. Lupin Ltd.*, No. 14-cv-00369 (D. Del., filed Mar. 21, 2014).

## JURISDICTIONAL STATEMENT

The U.S. District Court for the District of Delaware had jurisdiction under 28 U.S.C. §§ 1331 and 1338(a) because ViiV asserted patent infringement claims. On January 27, 2014, the District Court entered Judgment for ViiV against Teva. Teva timely filed its notice of appeal on February 19, 2014.  This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

## STATEMENT OF ISSUES

1. Did the District Court err in binding Teva to an infringement stipulation expressly conditioned on a claim construction that the District Court ultimately rejected?

2. Did the District Court err in not construing the asserted claims as limited to "synergistic combinations," where the specification described synergism of the claimed combinations as a key feature of the invention, not merely a preferred embodiment?

3. Did the District Court err in rejecting Teva's obviousness defense where it:

   (a)    required proof that a POSA would reasonably expect the combination of abacavir and 3TC to cause "sustained clinical efficacy" comparable to that of the AZT/3TC combination, even though the claims, as construed, require only that the abacavir/3TC combination be "therapeutically effective" against the symptoms or effects of an HIV infection, a lesser standard;

   (b)    correctly found that at the relevant time (i) using dual NRTI combinations was the preferred approach to treating HIV infection; (ii) researchers sought the best balance of high potency and low toxicity in choosing a regimen; (iii) NRTIs were the only class of compounds that was FDA-approved to treat HIV infection and had

2

more clinical successes than any other class; (iv) abacavir and 3TC were among a small number of NRTIs under clinical development known to be highly potent, synergistic in combination with other NRTIs, and far less toxic than predecessor NRTIs; and (v) a better-tolerated, less-toxic alternative to AZT was needed to treat patients who would not or could not tolerate AZT;

(c)    improperly disregarded undisputed evidence that abacavir and 3TC were the only members of the NRTI class that were under active clinical evaluation for use in combination therapies;

(d)    erroneously concluded that secondary considerations supported non-obviousness even though no product embodying the claims as construed was ever sold and the therapeutic effectiveness of abacavir in combination with 3TC was not unexpected; and

(e)    erroneously struck testimony of Teva's expert concerning the combinations of references disclosed in his expert reports?

## STATEMENT OF THE CASE

This is a patent infringement action under the Hatch-Waxman Act.  Teva seeks FDA approval to market a generic equivalent of Epzicom®, a combination of abacavir sulfate and 3TC to treat HIV infection.  A1760.  Teva appeals from a judgment that its product would infringe claims 26, 27, 29 and 30 of the '191 patent and that Teva did not prove those claims obvious as of the priority date (March 30, 1995).

## I.    State of the Art

HIV is a retrovirus that destroys the human immune system and causes AIDS by infecting and killing CD4$^+$ immune cells.  A471-72, A479-82.  By the early 1980s, AIDS was a worldwide epidemic with no cure or treatment.  A23-24; A464-65, A471-75; A1353; A3993-95.  Researchers identified HIV as the cause of AIDS in 1983, which spurred research into drugs to combat the virus and prolong patients' lives.  *Id*.  Abacavir and 3TC belong to a class of anti-HIV agents known as NRTIs; NRTIs were the first effective anti-HIV agents and the first to receive FDA-approval.  A23-24; A464-65, A471-76.

### A.    The First-Generation NRTIs

NRTIs treat HIV infection by suppressing HIV's ability to replicate.  A24-25; A486-87.  After HIV infects a cell, it hijacks the host cell's natural reproductive machinery to make new HIV particles, which then infect other cells.

A23-24; A238; A479-82.  HIV's RT enzyme makes new virus by constructing viral DNA chains using the four nucleoside building blocks (A, T, G, or C) found in the infected cell, from which chains of DNA are constructed.  A24-25; A486-87; A624-26.  The viral DNA chain incorporates nucleosides that are complementary to those on the chain: A to T, and G to C.  A24; A486; A623-31.  When an NRTI is present (*e.g*, abacavir, a G-analog), RT incorporates it into the growing DNA chain instead of the corresponding natural nucleoside (*e.g.*, G), thereby blocking RT from building a complete DNA chain and thus inhibiting HIV replication.  A24-25; A486; A631-33.

### 1.    First-Generation NRTIs Were Effective but Highly Toxic

In 1987, the FDA approved the NRTI AZT to treat HIV/AIDS patients.  A30; A461.  AZT (a T-analog) was the first drug shown to effectively treat HIV infection by increasing $CD4^+$ cell counts, lowering the amount of virus ("viral load"), and delaying disease progression and death.  A25; A101 (1:22-30); A4156; A4169; A4222; A488; A652.  Over the next several years, FDA approved three other NRTIs:  ddI (an A-analog), ddC (a C-analog) and d4T (a T-analog).  A28, A31; A493-96; A3689-3718.  Initially, NRTIs were administered alone ("monotherapy").  A25-26.

While effective, AZT and the other first-generation NRTIs had harsh side-effects.  A25, A30-31; A488-89, A495-96; A639-40; A1538; A4120; A4133;

A4186-87.  As Teva's expert clinician, Dr. Zingman, explained:  "AZT was a very

debilitating drug…  It often caused significant nausea, vomiting, diarrhea,

abdominal pain[,] … anemia requiring blood transfusions[,] headache, fatigue, and

rash[.] … [I]t was a struggle to convince people to take AZT or to stay on AZT."

A488-89 (327:23-328:20).[1]  AZT's toxicity led many patients to stop taking it, and

the rampant non-adherence to treatment protocols and intolerance to the side-

effects allowed their HIV to rebound and led to treatment failure over time.  A489,

A504; A4186.  This created a need for less-toxic alternatives to AZT.  A30-31;

A532; A639-40; A1538; A4120; A4133; 4186-87.

### 2.    Monotherapy and Non-Adherence to Treatment Protocols Induced Drug-Resistance

When HIV replicates, it randomly mutates.  A1173.  HIV mutants that can

replicate in the presence of a previously effective antiviral drug have "resistance"

to the drug.  A520-21.  Over time, the resistant virus will predominate, and the

drug will lose effectiveness.  A4157.

The pattern of mutations that develops in the presence of a particular drug—

the drug's "resistance profile"—is typically determined using *in vitro* passage

---

[1] The other first-generation NRTIs caused, *e.g.*, severe pancreatitis and peripheral neuropathy.  A495-96; A3694-704, A3713-17; A4120.

studies.[2]  A679-80.  When two drugs' resistance profiles overlap (*i.e.*, individually

trigger the same HIV mutation), treating a patient with one drug *may* cause the

virus to become resistant to both drugs—a phenomenon known as "cross-

resistance."  A521; A971-72, A978-79.  But a drug's *in vitro* resistance profile can

differ from its profile *in vivo*, and combination-drug therapy can result in different

resistance patterns than single-drug therapy.  A3734; A4005.  Whether the

mutations in a drug's resistance profile cause a *clinically significant* degree of

resistance to that drug has to be tested *clinically*.  A701-03, A733, A795-97; A978-

79 ("[R]esistance is not a black or white thing…  The degree of resistance is very

important in determining issues such as cross-resistance."); A4110.

　　Because the first-generation NRTIs lacked the potency to suppress viral

replication completely when administered alone, resistance to them developed over

time and diminished their ability to treat HIV infection.  A639-40; A3996-97.

Noncompliance with treatment protocols due to drug side-effects also led to

treatment failure and induced drug-resistance.  A101 (1:59-65); A488-89.  While

they actively sought less-toxic alternatives, clinicians kept prescribing NRTIs

_____

[2] Such studies are designed to push HIV to develop drug-resistance by allowing an
HIV-infected cell-line to replicate in the presence of suboptimal amounts of test
compound(s) to see what mutations arise over time.  A668-70, A679-70, A698,
A700-01, A795-97; A4169-72; A4157-58; A4373.

despite their side-effects because NRTIs were the best available tools to extend the lives of those suffering from this fatal disease.  A488-89; A4029.

### 3.    Clinicians Confirmed the Superiority of Combination Therapy

One promising strategy in the early 1990s involved combining two NRTIs. The POSA[3] reasoned that NRTI combinations would increase potency, suppress HIV replication better than monotherapy, delay the emergence of resistance, and reduce side-effects by, for example, reducing individual drug dosages.  A485, 496-97; A639-41; A1502, 1505-06; A3996-97; A4005-06; A4111; A4182.

In combination, NRTIs typically had additive or synergistic antiviral activity *in vitro*.[4]  The POSA understood that combining NRTIs that were analogs of different nucleoside bases could achieve synergy because the prior art taught that such NRTIs did not compete for sites of incorporation on the growing DNA strand; even ViiV's expert conceded that this was known in the prior art.  A1543-44 (Ho:

---

[3] The POSA to whom the '191 patent is directed would have an M.D. or PhD in virology or a related field in the biological sciences with experience in antiretroviral therapies.  A23.

[4] Abacavir (G-analog) was reported to combine synergistically with AZT (T-analog), ddC (C-analog) and ddI (A-analog).  A518-21; A715-16; A4183; A4372-73 (I6, I82).  Carbovir (G-analog), abacavir's predecessor, was also reported as synergistic with AZT and ddC.  A659-66; A4327-28; A4152, A4155.  3TC (C-analog) was reported as synergistic with AZT and additive-to-synergistic with ddI.  A651-59; A3742; A3751, A3755-56; A3765-66; A4236-37, A4241-42.  AZT was additionally reported as synergistic with ddC, ddI and FTC (C-analog).  A3765-66.

1394:10-1395:13); *see also* A494-95; A627-35, 656-66; A1401.[5]  Research in

1992-94 showed that combining NRTI analogs of different bases (AZT/ddC,

AZT/ddI, ddI/ddC) could delay development of drug-resistance.  A4168-72;

A4156-67; A666-85.

By 1992, clinicians commonly prescribed AZT/ddI and AZT/ddC, and

researchers investigated other dual NRTI combinations.  A1510-13; A4182.  NRTI

combinations generally demonstrated better efficacy than monotherapies by

increased $CD4^+$ cell counts, decreased viral loads, and reduced patient mortality.

*See, e.g.*, A3998-4000; A4082-84 (PB0260); A3735-36; A4116.  By March 1995,

combination therapy was an established strategy and generally the preferred

approach.  A25-27; A4008-09; A4182.

### B.    Second-Generation NRTIs Were Comparably Potent but Significantly Less Toxic

In the early 1990s, HIV researchers sought to improve HIV treatment by

developing more potent and less toxic inhibitors of HIV replication.  A4120;

---

[5] The District Court clearly erred in rejecting this "complementary base" theory for
lack of evidence, A36-37, because supporting evidence was in the record, *see, e.g.*,
A1543-44 (Ho: 1394:10-1395:13), which it overlooked.  Further, it erroneously
found that some complementary NRTI combinations "displayed antagonistic
qualities," A38, which was improperly based on an inventor's lab notebook, not
prior art.  A1067-69.  All the complementary NRTI combinations in the prior art
exhibited at least additive (often synergistic) effects.  *See supra*, n.4.

A4133; A4186-87; A540, 577-79; A692-96, A711-13.  NRTIs remained the key

drug agents of interest.  *Id.*

### 1.    3TC Was an Obvious Candidate for Combination Therapy

The prior art identified one new agent, 3TC (a C-analog), as the first "non-

toxic" NRTI with high antiviral potency.  A4280; *see* A496, A506-08, A535,

A540; A692-96, A711-13; A4125 ("The potency of 3TC, in combination with its

lack of demonstrable toxicity in vitro, makes 3TC an excellent candidate for the

treatment of AIDS and HIV infection[.]"); A31 ("3TC's potency was similar to

AZT's, yet it was much less toxic…. 3TC was also much less toxic than ddC,

another FDA-approved NRTI, despite the structural similarities between those two

drugs.").  Teva's expert clinician explained without contradiction that "by March

of 1995, it was very clear that 3TC was in many ways the most remarkable

nucleoside analog that we had ever seen.  There were virtually no extra side effects

from using 3TC.  It was a game changer."  A496 (335:14-22).

3TC was initially developed for both monotherapy and combination therapy.

A4193; A4224-25; A493-94, A503-06, A510-13.  As monotherapy, 3TC selected

for drug-resistant HIV strains having the M184V mutation, which significantly

reduced 3TC's effectiveness over time.  A572-74.  But in combination therapy,

3TC was better than any prior NRTI.  By early 1995, numerous studies reported

that, when combined with AZT, 3TC reduced viral loads and increased CD4$^+$ cell

10

counts, and that those effects were sustained for nearly a year.  *See* A4116-17; A4118; A4128-31; A4280; A4375.

Although some speculated that the enhanced effectiveness of the AZT/3TC combination was partly due to 3TC's selection for the M184V mutation, which might theoretically "resensitize" HIV to AZT, that hypothesis was unproven and could not entirely explain the enhanced potency of AZT/3TC.  A4129 ("[T]he efficacy of 3TC apparently goes beyond its ability to prolong the efficacy of AZT."); A584, A588-89.  Dr. Zingman explained at trial:  "[I]f 3TC was simply working as a rejuvenator of AZT, then we would have expected that the combination would have been no better than AZT alone[.]  …  The combination was much better than just a theoretical possibility about resensitization of AZT, and others said the same thing."  A574-75 (425:2-426:2).  3TC's impressive clinical effectiveness and lack of toxicity drove researchers to combine 3TC with other NRTIs, including those for which no resensitization effect had been hypothesized.  Schinazi 1995 reported that "[o]n the basis of th[e] strong consensus" that 3TC was potent in combination and less toxic, 3TC was combined with other NRTIs (*e.g.*, 3TC/d4T).  A4280; *see also* A4129 ("Some people still think it's worth trying 3TC with ddC or ddI.").

11

### 2.    Abacavir Was an Obvious Candidate for Combination Therapy

Abacavir ("1592U89") (a G-analog) also attracted considerable interest by March 1995. A32-33. In October 1994, Wellcome[6] researchers at the 34th ICAAC disclosed highly favorable preclinical results with abacavir, A4183; 4367-73, which was significantly less toxic than AZT, yet comparably potent. A4183; A4373 (I82); *see* A32-33; A532; A729-30, A786-88. Like AZT, abacavir penetrated the brain and central nervous system, which was important for treating HIV/AIDS-linked central nervous system conditions. A4372 (I6); A4373 (I88); *see* A33; A101 (1:36-42); A515, A518-20; A705; A4352 (2:65-68). Abacavir had good oral bioavailability and was safe in laboratory animals at anticipated therapeutic doses. A4372 (I6); A4373 (I86, I88); *see* A32-33, A53; A513-14, A518-20, A522-24.

The Wellcome researchers further disclosed that abacavir showed "promise as a safe and efficacious treatment for HIV infection," A4372 (I6), was "an attractive candidate for clinical evaluation," *id*. and A4373 (I88), and was "an important candidate for further development as an anti-HIV drug for combination therapy" due to its "cross-resistance profile and the relative slow emergence of

---

[6] Wellcome, Burroughs Wellcome, Glaxo, Glaxo Wellcome, and GlaxoSmithKline are ViiV predecessors-in-interest. A1126; A1336-39; A3463-64.

resistance, together with the synergy" it exhibited with other NRTIs.  A4373 (I82);

*see* A32-33; A518-21, A524-25; A698, A700, A715-16; A982-83.  Of the many

topics presented at ICAAC that year, abacavir was one of just five to be reported in

a prior art industry publication, which disclosed that abacavir had entered phase-1

human clinical trials, the first step toward obtaining FDA-approval.  A4183; *see*

A32; A4173-74.[7]

### 3.    The POSA Was Motivated to Combine 3TC and Abacavir

ViiV's expert conceded that "there will always be some patients who may be

intolerable to AZT" and that "obviously if a patient cannot tolerate AZT, that

would motivate [the POSA] to look for other drug combinations that don't include

AZT."  A1538 (Ho: 1389:1-11).  The POSA was strongly motivated to combine

3TC with other NRTIs in the search for better-tolerated alternatives to AZT.

A532; A639-40; A30-31("Researchers looked to alternatives for AZT in order to

skirt the drug's resistance and toxicity issues.").  As Dr. Zingman testified without

contradiction, "[W]e ha[d] one great drug, 3TC.  …  We needed a second better

drug and so that's where [abacavir] comes in."  A589-90 (440:23-441:1).  Dr.

Zingman explained that "in comparison to AZT[,]" "abacavir appeared to be better

tolerated and just as potent," A532 (371:16-20), and the District Court found "the

---

[7] Abacavir was first disclosed in Burroughs Wellcome's prior art '394 and '500
patents.  A4333-49; A4350-66; *see* A513-16; A647-51; A1564.

evidence show[ed] that abacavir would have been a ripe candidate for researching new combination therapies," A33, as the prior art showed. A4373 (I82).

Abacavir was the most attractive candidate to combine with 3TC, especially for the many patients unable or unwilling to tolerate AZT. A488-89, A532.[8] Although the POSA may also have considered drugs from other classes (NNRTIs and PIs) as candidates for further research in March 1995, the POSA would have tried the dual NRTI combination abacavir/3TC because NRTIs were the only drugs either FDA-approved or clinically available through the FDA's early-access program, A484-85, 488, A490-94; A4425-28, there had been "more clinical successes with [NRTIs] than with any other class of compounds," A4280, NRTI combination therapy was already in use, and a few NRTIs were known to be potent and less toxic. A540; A711-13. ViiV's expert conceded that in March 1995, abacavir and 3TC were the only two experimental NRTIs under clinical investigation for NRTI combination therapy. A1518-19 (Ho: 1369:19-1370:13). Thus, the POSA was strongly motivated to use abacavir/3TC with a reasonable

---

[8] Carbovir, a closely related analog of abacavir, was specifically recommended in the prior art as an "alternative to AZT" due to carbovir's comparable potency and far lower toxicity. A32; A707-10; A4133. Abacavir was recognized as an analog of carbovir because both compounds metabolized into the same antivirally active form in the body, carbovir-triphosphate, albeit via different routes. A31-32; A663-64, A710-11, A735; A1522-23; A4373 (I84). Abacavir offered better bioavailability and lower toxicity than carbovir. A32; A513-14; A748-49; A1524-25; A4372 (I6); A4373 (I86, I88).

expectation that they would form "a combination that works better and is better tolerated."  A601 (452:17-23); *see* A536-40; A1518-19.

The potential for resistance to develop over time with abacavir/3TC was not so substantial as to overcome its benefits.  Although *in vitro* resistance passage studies showed that HIV grown in the presence of either 3TC or abacavir developed the M184V mutation, the M184V mutants exhibited only low-level resistance to abacavir *in vitro* (<2–5-fold).  A520-21; A702-03; A4373.  Such low-level *in vitro* resistance was not expected to be clinically significant.  A3926 ("partial resistance (5-fold)"), A3928 ("low-level (<5-fold) resistance"); A4301 ("fivefold or less … should not be indicative of isolation of resistance virus"); A520-21; A698-705, A733, A793, 795-97; A975, A978-79.  ViiV's predecessor reported in 1994 that although cross-resistance developed when abacavir was combined with either ddI or ddC *in vitro*, abacavir was still "an important candidate for further development as an anti-HIV drug for combination therapy" in view of "the relatively slow emergence of resistance, together with the synergy with AZT, ddI or ddC."  A4373 (I82); *see* A520-22; A982-83.

## II.    The Patent-in-Suit

The '191 patent, "Synergistic Combinations of Zidovudine, 1592U89 and 3TC," issued on July 9, 2002, claiming priority to March 30, 1995.  A99.  All 51

claims are directed to combinations of abacavir/3TC or abacavir/AZT/3TC.  A106-08.

Asserted claims 26, 27, 29 and 30 all depend from independent claim 20, which claims a method of treating or preventing the symptoms or effects of an HIV infection in an infected animal by administering a therapeutically effective amount of a combination of abacavir and 3TC.  A107.  The asserted dependent claims add limitations relating to dosage and administration.  *Id*.  ViiV agreed that the obviousness of all asserted claims turned on whether the claimed combination was obvious to a POSA.  A1709-11.[9]  The specification identifies AZT, abacavir, and 3TC as known effective anti-HIV agents.  A101 (1:22-65).

The specification repeatedly identifies the synergism of the combinations as a key feature of the expressly claimed invention:  "It is a feature of this invention that the use of this drug combinations [sic] will provide synergistic antiviral effects[.]"  A101 (2:7-15)  The patent states that when any two compounds selected from abacavir, 3TC and AZT "are combined *a synergistic effect* is also found."  A103 (5:38-54) (emphasis added).  But such combinations do not *always* result in synergy:  "[T]he compounds of the combination may be administered

---

[9] Teva presented unrebutted evidence that these additional limitations were taught and rendered obvious by the prior art.  A537-42; A736-39; A4173-74; A4184-99; A4220-44; A4250-66; A4333-49.

simultaneously, either in the same or different pharmaceutical formulation or sequentially," but "[i]f there is sequential administration, the delay in administering the second and third active ingredient should not be such as to lose the benefit of a *synergistic therapeutic effect of the combination* of the active ingredients." A102 (3:59-65) (emphasis added). The patent identifies specific ratios over which "[t]he *synergistic effects of the combination … are seen.*" *Id.* (4:17-25) (emphasis added).

During prosecution, the inventors emphasized the synergism of the claimed combinations to overcome the USPTO examiner's rejection of the claims as obvious. The examiner objected that abacavir, 3TC and AZT were all "taught by the prior art to be useful for the same purpose, in order to form a composition which is to be used for the very same purpose." A1890-93; A1899-1904; A1915-21; A1923-29. In response, the applicants argued repeatedly that the combinations of the claimed methods were synergistic. A1895-97; A1907-10; A1956-57. The examiner relented only after the applicants submitted a declaration by an inventor claiming that the triple combination of abacavir/AZT/3TC exhibited unexpected *in vitro* synergism.[10] A1931-33, 54; A1959-60.

---

[10] The declaration was silent about the abacavir/3TC dual combination and about *in vivo* synergism. A1931-33, 54.

### III. Procedural History

ViiV sued Teva for infringing the patent on August 5, 2011.  A1757-63.

The District Court consolidated the case for pretrial purposes with ViiV's co-

pending case against Lupin.  A1764-65.

During claim construction, Defendants proposed a construction of

"combination" limited to *synergistic* combinations of abacavir, 3TC, and/or AZT.

A1766-823.[11]  Lupin also sought construction of the claim term "therapeutically

effective amount" to require a synergistically enhanced clinical efficacy.  A1826-

30.  The District Court rejected these proposed constructions.  A85-94.[12]

Thereafter, Teva and ViiV entered into a Stipulation providing that Teva's

proposed ANDA product containing abacavir as abacavir sulfate infringed claims

20, 26, 27, 29, 48, and 51.  A80-82.  Teva rejected ViiV's request for an

unconditional stipulation, A3667-68, A3671-82, A4434-36, and the Stipulation

was expressly limited to how "***those claims were construed by the Court on***

***November 16, 2012***, to the extent that those claims are valid and enforceable."

A81 (emphasis added).

---

[11] ViiV proposed that the plain and ordinary meaning was "therapeutic combination."  A1776, 1805-06, 1826-29; A1961-63, A1987-88, A1993, A2000-02, A2062, A2117-19.

[12] *ViiV Healthcare UK Ltd. v. Lupin Ltd.*, 904 F. Supp. 2d 379 (D. Del. 2012).

The District Court consolidated the Teva and Lupin cases for a bench trial held June 24-28, 2013.  A2151-54.  ViiV asserted claims 26, 27, 29, and 30 against Teva and Lupin, and other claims against Lupin only.  A1641.  After trial, ViiV moved to strike portions of the trial testimony of Teva's expert biochemical virologist, Dr. Parniak, alleging that it exceeded the scope of his expert reports. A4402-06, 4409-12.

In its Trial Opinion,[13] the District Court:

> (1)    construed the claim term "(1S,4R)-cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-yl]-2-cyclopentene-1-methanol" (*i.e.*, abacavir) to encompass only the free-base form of abacavir and not the salt form abacavir sulfate.  A8-21;
>
> (2)    held that Lupin could not infringe any of the claims (including 26, 27, 29 and 30) because Lupin's product contains "abacavir as abacavir sulfate."  *Id*.;
>
> (3)    granted ViiV's motion to strike portions of Dr. Parniak's testimony under Fed. R. Civ. P. 26.  A48-49; and
>
> (4)    concluded that Defendants had not proven by clear and convincing evidence that the asserted claims were invalid. A68-76.

Teva moved for judgment of non-infringement arguing that Teva's generic product contained "abacavir as abacavir sulfate," as the Stipulation between Teva and ViiV expressly recognized, A80-81, and Teva's stipulation of infringement no longer

---

[13] *ViiV Healthcare UK Ltd. v. Lupin Ltd.*, _ F. Supp. 2d _, 2013 WL 6665207 (D. Del. Dec. 17, 2013).

applied because the District Court had modified its prior claim construction for the

term abacavir.  A4434-42.  The District Court denied Teva's request, A4, and

entered judgment for ViiV.  A1-2.

## SUMMARY OF ARGUMENT

### Teva Does Not Infringe Because Its Generic Product Does Not Contain Abacavir Free-Base and Teva's Stipulation of Infringement by Its Terms Is Inapplicable

Teva does not infringe the asserted claims of the '191 patent under the

District Court's post-trial construction of the claim term for abacavir.  In deciding

an issue raised by Lupin at trial, the District Court construed the claim term for the

compound abacavir to refer only to free-base abacavir and not to abacavir sulfate,

the salt form.  A9.  Applying that construction, the District Court held that Lupin's

product, which contains abacavir sulfate, did not infringe claim 26, 27, 29 or 30.

*Id*.

Teva's product also contains only abacavir sulfate.  A80-81.  The District

Court refused to apply its post-trial construction to Teva, relying on Teva's pretrial

stipulation that the Teva product containing "abacavir as abacavir sulfate"

infringed.  A4.  The Court erred because the stipulation was expressly limited to

the asserted claims "as [they] were construed by the Court on November 16,

2012."  A81.  That condition protected Teva in the event that further claim

construction during or after trial "change[d] the rules of the game" and opened up

20

new non-infringement defenses. *Johns Hopkins Univ. v. CellPro, Inc.*, 152 F.3d 1342, 1357 (Fed. Cir. 1998). That is precisely what happened here. The District Court had not construed the claim term for abacavir (which appears in claims 26, 27, 29 and 30), or defined the term's plain meaning to exclude abacavir sulfate until after the Stipulation. This Court should reverse and direct the entry of judgment for Teva.

### The District Court's Construction of the Claim Term "Combination" Erroneously Encompassed Non-Synergistic Combinations

The District Court erred in claim construction by failing to recognize that the inventors clearly and repeatedly limited the "combinations" of the claimed methods to combinations exhibiting synergism. The patent and the prosecution history make clear that the inventors disavowed non-synergistic combinations. The inventors emphasized in the patent that "synergistic antiviral effects" are the defining "feature of this invention." A101 (2:10-15). The patent instructed that the claimed drug combinations be formulated and administered to ensure a synergistic effect. A102-03 (3:59-65, 4:17-25, 5:38-54). And applicants repeatedly invoked the synergism of the claimed drug combinations to overcome multiple obviousness rejections. A1895-97; A1907-10; A1931-33; A1956-57. Thus, this Court should construe claims 26, 27, 29 and 30 to encompass only synergistic combinations of abacavir and 3TC, and void Teva's conditional infringement stipulation.

21

Because ViiV failed to prove that the combination in Teva's product is synergistic, this Court should reverse and direct entry of judgment for Teva.

### Teva Clearly and Convincingly Proved that Claims 26, 27, 29 and 30 Are Obvious

The District Court committed legal error in rejecting the obviousness defense because the Court asked the wrong question. Instead of analyzing whether a POSA reasonably expected abacavir/3TC to treat the symptoms or effects of an HIV infection, as the patent claimed, the District Court focused on whether a POSA reasonably expected abacavir/3TC to provide the "sustained clinical efficacy" of AZT/3TC. A35, A40-41, A55-56, A69-70, A72. But the claims contain no such limitation. The District Court applied a standard that was inconsistent with the plain and ordinary meaning of the claim terms "treatment" and "therapeutically effective." The right question is whether in March 1995 a POSA would have reasonably expected abacavir/3TC to treat the symptoms or effects of HIV infection, particularly for patients who would not or could not take AZT. On this record, the answer to this question is clearly "yes."

Applying the wrong legal framework caused other errors. The District Court viewed the prior art as an "extensive history of failures," deeming all prior art HIV therapies other than AZT/3TC "failures" and not "effective" because they did not demonstrate "sustained clinical efficacy." A29, A55-56, A69-70. The record, however, is that the prior art FDA-approved therapies—all NRTIs, like abacavir

22

and 3TC—treated the symptoms or effects of HIV infection and were therapeutically effective for a period of time.

Additionally, because the District Court was focused only on the "sustained clinical efficacy" of AZT/3TC, it discounted the indisputable need acknowledged in the prior art for a combination to use with patients who were unable or unwilling to take AZT. This led the Court below to conclude erroneously that a POSA would not replace AZT with abacavir in a dual NRTI combination with 3TC. A69-70. But even ViiV's expert admitted that a POSA was motivated to make combinations without AZT for AZT-intolerant patients. A1538. In March 1995, a POSA would have reasonably expected 3TC/abacavir to treat the symptoms or effects of HIV infections in such patients and be therapeutically effective for some period of time.

Had the District Court asked the right question, its own findings clearly and convincingly showed that these claims are obvious. It found that NRTIs were the only FDA-approved class of anti-HIV agents and that dual NRTI combination therapy was well established, A25-29, and that 3TC and abacavir satisfied the POSA's desire for a dual NRTI combination having high potency and reduced toxicity. A30-33, A43. The Court further found that (i) a POSA was motivated to prescribe less toxic alternatives to AZT for patients who could not or would not take AZT, and (ii) abacavir was comparably potent yet significantly less toxic than

23

AZT, penetrated the central nervous system well like AZT, and successfully

avoided the bioavailability and toxicity problems of the closely related prior art

compound carbovir, an NRTI which the prior art said "could be considered an

alternative to AZT."  A29-32, A53; A4133, A704-10.  On this record, abacavir was

an obvious alternative to AZT for combination with 3TC.  A532, A590-91, A596-

97, A605.

At a minimum, the abacavir/3TC combination was obvious to try.  A POSA

would have preferred to build upon the clinical success of the FDA-approved

NRTI class over other "less known classes," none of which had FDA-approval.

A29.  3TC was the obvious starting point for a new NRTI combination, having

already demonstrated remarkable safety and tolerability, as well as impressive

potency in combination with AZT.  A4280; A540, A589-91.  Based on that

information, researchers had immediately commenced trials of other 3TC-based

combinations, including other dual NRTI therapies.  *Id*.  The District Court

recognized that abacavir was more attractive for treatment than most prior NRTIs.

A32-33, A49.  According to ViiV's expert, 3TC and abacavir were the only NRTIs

that were under clinical evaluation for combination therapy at the relevant time.

A1518-19 (Ho: 1369:19-1370:13).  While a POSA also might have considered

other treatment options, 3TC and abacavir were among the most attractive, if not

the most attractive, candidates for use in combination therapy and, thus, obvious to try.

Its erroneous focus on "sustained results" also tainted the District Court's assessment of the purported "unexpected" clinical efficacy, long-felt-but-unsolved need, and failure of others. A54-56. The District Court also clearly erred in finding that the commercial success of Trizivir® and Epzicom® tablets favored non-obviousness because those products contain abacavir sulfate and therefore lack nexus with the asserted claims, which only cover abacavir free-base, as the Court determined after trial. A58-63.

## ARGUMENT

### I.    Teva Does Not Infringe the Asserted Claims Under the District Court's Post-Trial Construction of "Abacavir"

In its Trial Opinion, the District Court found that products containing "abacavir as abacavir sulfate" do not infringe the asserted claims of the patent. Specifically, the Court held that the asserted claims "do not encompass the salt form of abacavir." A9. Under that ruling, Teva, like Lupin, is entitled to a judgment of non-infringement because Teva's product indisputably contains only abacavir sulfate, not free-base. A80-81; A1759 (¶13); A2175, A2178 (¶25); A2183, A2185 (¶¶10-11).

The District Court did not apply its claim construction to Teva because Teva had "stipulated to infringement" before trial. A4. Under its plain language,

however, the Stipulation was inapplicable because the claim construction changed

after the Stipulation was made.

### A. Teva's Infringement Stipulation Was Contingent on the District Court's Markman Opinion Claim Construction

"An interpretation of the parties' pretrial stipulation, much like contract

interpretation, is a legal issue that this court reviews de novo." *Fuji Photo Film*

*Co., Ltd. v. Jazz Photo Corp.*, 394 F.3d 1368, 1373 (Fed. Cir. 2005); *see also*

*Braxton v. United States*, 500 U.S. 344, 350 (1991) (same).  As with contract

interpretation, the court's inquiry begins with "the 'four corners' of the agreement

itself." *Washington Hosp. v. White*, 889 F.2d 1294, 1300 (3d Cir. 1989); *see also*

*Kearns v. Chrysler Corp.*, 32 F.3d 1541, 1545 (Fed Cir. 1994) (similar).[14]  "[T]he

circumstances surrounding the formation of the [s]tipulation [also] may explain its

meaning." *Waldorf v. Shuta*, 142 F.3d 601, 612 (3d Cir. 1998) (internal quotation

marks omitted).  "[L]imiting language or the intent to limit the agreement is ... an

important factor in considering the effect of a stipulation." *Id.* at 617.

The Stipulation recites that Teva's ANDA "for a proposed 600 mg of

abacavir as abacavir sulfate plus 300 mg of lamivudine generic tablet" would

---

[14] Because the interpretation of a stipulation is not an issue "unique to patent law," this Court "applies the law of the regional circuit." *Wi-LAN, Inc. v. Kilpatrick Townsend & Stockton LLP*, 684 F.3d 1364, 1368 (Fed. Cir. 2012).  There is no apparent difference between the laws of this Circuit and the Third Circuit concerning the interpretation of pretrial stipulations.

"actively induce the infringement and contribute to the literal infringement of Claims 20, 26, 27, 29 and 30 of the '191 patent, *as those claims were construed by the Court on November 16, 2012*," and only "to the extent those claims are valid and enforceable." A80-81 (emphasis added). Teva thus made a limited "stipulation of the factual component of the infringement question," *Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.*, 334 F.3d 1294, 1298 (Fed. Cir. 2003), conditioned on the claims being valid and enforceable as construed in the *Markman* Opinion.[15] If any of those preconditions is removed, then Teva's concession ceases to apply.

The "circumstances surrounding the formation of the stipulation" demonstrate that this condition was a deliberate choice. *Waldorf*, 142 F.3d at 612 (internal quotation marks omitted). Teva rejected ViiV's original proposal for an unconditional stipulation of infringement, A3667-68, A3671-82, and the parties adopted the conditional language at issue here. A80-81. In interpreting the Stipulation, this Court must give effect to its "limiting language." *Waldorf,* 142 F.3d at 617.

---

[15] The Stipulation's express qualifications contrast markedly with the unequivocal concessions of infringement that take infringement completely "off the table." *See, e.g.*, A4446-49 (Stipulation and Order, *Alcon Research, Ltd. v. Barr Labs., Inc.*, No. 09-318-RGA, D.I. 243, ¶ 1 (D. Del. Nov. 4, 2011)).

**B.     The District Court Issued a New Claim Construction Post-Trial**

The District Court plainly engaged in further claim construction when it ruled after trial that the claim term for abacavir applied only to abacavir free-base and not abacavir sulfate.  "[A] district court may engage in claim construction during various phases of litigation, not just in a *Markman* order." *Conoco, Inc. v. Energy & Envtl. Int'l, L.C.,* 460 F.3d 1349, 1359 (Fed. Cir. 2006).  After issuing a *Markman* opinion, district courts may "supplement[]," revisit[]," or "alter[]" their interpretation of the claim terms as their "understanding of the technology evolves." *Pressure Prods. Med. Supplies, Inc. v. Greatbatch Ltd.*, 599 F.3d 1308, 1316 (Fed. Cir. 2010); *see also Inventio AG v. Thyssenkrupp Elevator Americas Corp.*, No. 08-874-RGA, 2014 WL 129799, at *2 (D. Del. Jan. 14, 2014) (A4378-83).  That happened here.

Following its *Markman* Opinion (and Teva's Stipulation), the District Court continued to entertain arguments about claim construction.  Lupin argued that the meaning of the claim term for the chemical formulation of abacavir is abacavir free-base.  A2244.  Lupin and ViiV both framed that argument in claim construction terms.  A1643 (ViiV: 1494:3-21); A1706 (Lupin: 1557:10-20); A3535, A3545-47; A3560, A3568-72; A3652, A3656-57.

After trial, the District Court adopted Lupin's argument that abacavir is limited to free-base abacavir, and that "[c]laims 26, 27, 29, [and] 30 ... [of the '191

28

patent] do not encompass the salt form of abacavir." A9. Such a determination of what a claim "encompasses" is the very definition of claim construction. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008) (requiring district court to determine "the scope that should be encompassed by t[he] claim language" as part of claim construction). Moreover, the District Court repeatedly referred to how a POSA would understand the claim term, as in claim construction. A10, A12. *See Innova/Pure Water, Inc. v. Safari Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004). The District Court invoked the doctrine of claim differentiation, A13-14, A20, a well-established "principle of claim construction." *See Nystrom v. TREX Co.*, 424 F.3d 1136, 1143 (Fed. Cir. 2005).

The new construction departed from the *Markman* Opinion, which did not distinguish between the sulfate and free-base forms of abacavir. A83-97. Indeed, the parties did not address the distinction until after that Opinion. In its claim construction briefing, ViiV proposed the term be given its "ordinary and plain meaning," without further explanation. A1770. And the language of the Stipulation—which described Teva's product as having "a proposed 600 mg of abacavir *as abacavir sulfate* plus 300 mg of lamivudine generic tablet," A80-81 (emphasis added)—demonstrates that neither party believed that the Court's *Markman* Opinion had construed the term to encompass only free-base abacavir.

29

Because Teva obviously would not and did not stipulate that its generic product containing abacavir sulfate would infringe patent claims construed to exclude abacavir sulfate, the Stipulation by its terms does not apply.  Nor would ViiV have stipulated to a construction of abacavir that placed its own commercial product Epzicom®—which also contains abacavir only in its sulfate form, A3804-3806, A3817—outside these patent claims.  Because the parties were mistaken that the plain and ordinary meaning of the term "abacavir" encompasses abacavir sulfate, it was a mutual mistake regarding a basic assumption of the Stipulation that had a material effect on the bargain they struck, rendering the Stipulation voidable by Teva.  *See* Restatement (Second) of Contracts § 152; *see also Consolidated Rail Corp. v. Portlight, Inc.*, 188 F.3d 93, 97 (3d Cir. 1999) (a "mutual mistake relat[ing] … to a material fact" existed  and "the mutual mistake doctrine is applicable" where neither party to a settlement recognized that a limitation of liability agreement applied); *USX Corp. v. Penn Cent. Corp.*, 130 F.3d 562, 566 (3d Cir. 1997) (recognizing that stipulations are governed by general contract principles).

Accordingly, this Court should reverse the judgment of infringement and direct entry of judgment for Teva.

## II.    The Claims Require "Synergistic" Combinations

### A.    Standard of Review and Governing Principles

Claim construction is reviewed *de novo*, without deference to district court findings. *Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp.*, 744 F.3d 1272, 1276-77 (Fed. Cir. 2014) (en banc).[16]  A claim must be read "in the context of the entire patent, including the specification." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc).  "Where the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question." *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001).

### B.    The Asserted Claims Are Limited to "Synergistic Combinations"

Both the patent and its file history reflect a clear and unmistakable limitation of the claimed methods to synergistic drug combinations.  Indeed, the entire basis for the patent was the inventors' purported discovery that the claimed combinations exhibit "synergistic antiviral effects."  The patent, entitled

---

[16]    Even if the Supreme Court ultimately determines that some deference is due to a district court's findings underlying claim construction (*see Teva Pharmaceuticals USA, Inc. v. Sandoz Inc.* case (U.S.S.Ct.13-854)), this District Court construction does not depend on disputed issues of historical fact.

"Synergistic Combinations of Zidovudine, 1592U89 and 3TC," repeatedly stresses that the claimed combinations exhibit a "synergistic effect," notes that the utility of the claimed combinations flows from their "synergistic antiviral effects," and disapproves of NRTI combinations that are "antagonistic or [merely] additive." A101-03 (2:4-15, 3:59-65, 4:17-25, 5:38-54). Those statements clearly manifest an intent to limit the claimed methods to "synergistic combinations." *See Gaus v. Conair Corp.*, 363 F.3d 1284, 1291 (Fed. Cir. 2004) (construing claims to exclude a particular feature, necessitated by the specification's criticisms of prior art devices having the feature and assertion that the claimed invention avoids the criticized problem); *SciMed*, 242 F.3d at 1340-45 (limiting claims to catheters with coaxial lumens where the specification emphasized coaxial lumens as a feature of the invention and criticized catheters using other lumens).

"Synergistic combinations" are not simply preferred embodiments of the patent. The patent describes "synergistic antiviral effects" as a "feature of this invention," A101 (2:10-15), and warns that if administered sequentially, the component compounds should be administered close enough in time so as to maintain the synergism of the combination. A102 (3:59-65) ("[T]he delay … should not be such as to lose the benefit of a synergistic therapeutic effect of the combination of the active ingredients."). This instruction makes it clear that the combinations are not *inherently* synergistic, and that the component compounds do

not constitute a "combination" *unless* they are combined in such a way that makes them synergistic. That is, only those combinations that exhibit synergism fall within the scope of the claimed invention.

The District Court discounted this instruction because it uses the phrase "should not" instead of "must not." A91. But in context, that statement directs using combinations in a manner that preserves synergistic effects; it is *not optional*. *See* A102 (3:59-65). Non-synergistic combinations are not just discouraged; they are excluded from the claimed methods. Synergism is thus a limiting "feature of the invention as a whole, and not merely a preferred embodiment." *See Novatek, Inc. v. Sollami Co.*, No. 13-1389, 2014 WL 1229547, at *8 (Fed. Cir. Mar. 26, 2014) (A4384-401) (construing claims to require "removability" because removability was "a feature of the invention as a whole, and not merely a preferred embodiment of the invention"); *Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1324 (Fed. Cir. 2008) ("The claims of the patent must be read in light of the specification's consistent emphasis on [a] fundamental feature of the invention."); *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007) ("When a patent ... describes the features of the 'present invention' as a whole, this description limits the scope of the invention.").

The inventors' express reliance on synergism to overcome a rejection during prosecution also shows that the claims require synergism. The examiner

33

repeatedly rejected the claims as obvious over prior art that disclosed using abacavir, 3TC, and AZT in treating HIV infection.  A1890-93; A1899-904; A1912-13; A1915-21; A1923-29.  The inventors essentially conceded that the combinations would predictably treat HIV infection, but responded that administering the claimed combinations was novel and non-obvious *because* the "compounds were found to be synergistic."  A1895-97; A1907-10; A1956-57. Ultimately, the examiner allowed the claims based on inventor Ms. St. Clair's declaration that the claimed triple combination was inventive *because* it is synergistic.  A1931-33; A1959-60; *see* A93; A1540-42.  Because the patentability of the claimed methods turned on applicants' assertion of synergism of the combinations, the claims—properly construed—require "synergistic combinations."  *See Novatek*, 2014 WL 1229547, at *8 (construing claims to require the unclaimed feature of "removability" where "patentee remained cognizant of [that] key feature throughout the prosecution"); *Saffran v. Johnson & Johnson*, 712 F.3d 549, 559-60 (Fed. Cir. 2013) (construing term as limited by definition used by patentee during prosecution to traverse rejections over prior art).

The District Court committed legal error by failing to hold the inventors to their word that their invention required synergistic combinations.  As no evidence at trial showed that Teva's product is synergistic, and ViiV itself describes the

34

same combination as "additive,"[17] this Court should construe the claims to require synergistic combinations, void the Stipulation in light of the changed claim construction, reverse the judgment of infringement, and direct entry of judgment for Teva.

## III.    Claims 26, 27, 29 And 30 Are Obvious

The District Court correctly evaluated many aspects of the prior art but ultimately reached the wrong conclusion about obviousness because its legal analysis was fundamentally flawed.  Instead of focusing on whether the evidence clearly and convincingly proved that in March 1995, the POSA would have reasonably expected abacavir/3TC to treat HIV infection, the District Court required proof that the POSA would have expected abacavir/3TC to match or surpass the "sustained clinical efficacy" observed with AZT/3TC.  But the claims require only that the abacavir/3TC combination effectively treat the symptoms or effects of HIV infection, not that it perform better than AZT/3TC.  The District Court erred as a matter of law by holding that the obviousness defense requires proof of a greater degree of therapeutic effectiveness than the claims themselves require.  This legal error infected all aspects of the District Court's obviousness analysis.

_____

[17] ViiV's label for Trizivir® states that abacavir/3TC is "additive."  A3844-47, 3867-68.

Its error led the District Court to misconstrue *Novo Nordisk A/S v. Caraco Pharm. Labs., Ltd.*, 719 F.3d 1346 (Fed. Cir. 2013), where this Court affirmed the district court's conclusion that a claim directed to combining two prior art compounds for the very purpose for which they were known in the art to be effective was obvious.  The District Court attempted to distinguish that case by concluding that, here, it would have been a "much larger leap of faith to predict that monotherapy failures w[ould] turn the corner to effectiveness when used together." A71-72.  But that runs counter to clear and convincing evidence that dual NRTI combination therapy was well-established, the art touted abacavir and 3TC as prime candidates for combination therapies, and dual NRTI combinations were therapeutically effective against HIV infection.  The District Court was clearly wrong that combining abacavir and 3TC as an HIV treatment would have taken a great leap of faith.

### A.    Standard of Review and Governing Principles

"The determination of obviousness under 35 U.S.C. § 103 is a legal conclusion based on underlying facts."  *Allergan, Inc. v. Sandoz Inc.*, 726 F.3d 1286, 1290 (Fed. Cir. 2013).  "After a bench trial, [the Court] review[s] the district court's factual findings for clear error and its conclusions of law *de novo*."  *Id*. (quotation mark omitted).

36

A claimed invention is invalid for obviousness when a POSA would have been motivated to combine prior art teachings to achieve the claimed result with a reasonable expectation of success. *See Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1361 (Fed. Cir. 2007). Motivation to combine references need not be "found explicitly in the prior art references sought to be combined, but rather 'may be found in any number of sources, including common knowledge, the prior art as a whole, or the nature of the problem itself.'" *Id.* at 1362. Obviousness requires "only a reasonable expectation of success, not a guarantee" that the claimed invention will work. *Pfizer*, 480 F.3d at 1364; *see also Hoffman-La Roche Inc. v. Apotex Inc.*, 2014 WL 1394948, at *5 (Fed. Cir. Apr. 11, 2014).

A claimed invention can be proven obvious when it was "obvious to try":

> When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp. If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense.

*KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007). A claim directed to a combination of prior art elements is obvious to try where one would be motivated to select the components from a finite and easily traversed number of options and the result of combining them was reasonably predictable. *See Bayer Schering Pharma AG v. Barr Labs., Inc.*, 575 F.3d 1341, 1347, 1350 (Fed. Cir. 2009); *In re*

*Kubin*, 561 F.3d 1351, 1361 (Fed. Cir. 2009).  Even when a large number of

compounds are known as possible solutions to a given problem, where a POSA

would focus on a small number of preferred compounds, the resulting invention is

obvious.  *See Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC*, 683 F.3d 1356,

1364-65 (Fed. Cir. 2012).

### B. The District Court Legally Erred by Requiring Teva to Prove that the POSA Would Have Expected 3TC/Abacavir to Match the "Sustained Clinical Efficacy" of AZT/3TC

The asserted claims all depend from claim 20, which requires "treating said

animal with a *therapeutically effective amount of a combination* comprising…"  At

ViiV's urging, the District Court adopted the plain and ordinary meaning for the

term "therapeutically effective amount," *i.e.*, "an amount that will *treat or prevent*

*symptoms or effects of an HIV infection in an infected animal*."  A87, A94.  Thus,

the asserted claims required Teva to prove only that a POSA would have combined

abacavir and 3TC with a reasonable expectation that the combination would treat

or prevent HIV symptoms or effects.

But at trial the District Court insisted on proof that a POSA would

reasonably expect that abacavir/3TC would not only treat HIV infection, but would

provide "sustained clinical efficacy" as good as or better than AZT/3TC's.  A34-

35, A40-41, A55-56, A69-72.  The District Court did so even though nothing in the

claim terms "treating," "therapeutically effective," or any other element in these

claims, or in the patent specification, supports such a limitation.[18]  The District

Court erred as a matter of law by applying a standard for obviousness that was

more demanding than what the claims require.  *See Storage Tech. Corp. v. Cisco*

*Sys., Inc.*, 329 F.3d 823, 834 (Fed. Cir. 2003) (vacating judgment where the district

court misapplied its claim construction in assessing non-infringement).

Setting the standard for therapeutic effect higher than the claims themselves

require also tainted the District Court's view of the prior art.  The District Court

dismissed all prior art therapies other than AZT/3TC as "failures" that were not

"effective" and did not "work" because they "failed to provide sustained results."

A 55-56, A69.  But the patent does not teach that all prior therapies were failures,

nor would the POSA view all prior art therapies as "failures."  On the contrary, in

March 1995, the enormity of the AIDS epidemic motivated the POSA to develop

drug therapies that promised therapeutic effectiveness by suppressing HIV viral

replication, increasing $CD4^+$ cell counts, delaying the onset of drug-resistance, and

improving the length and quality of patients' lives, even incrementally.  A101

---

[18] This is distinct from Teva's claim construction position that the claims require synergism.  While the patent makes clear that synergistic antiviral *activity* is an essential element of the claimed combination (*see supra*), synergy is a matter of greater than expected potency (*e.g.*, 1+1=3), which is typically tested *in vitro*.  By contrast, therapeutic efficacy is a clinical observation.  The claims require synergistic combinations, but do not expressly require a longer *duration* of therapeutic effectiveness or greater *delay* in the development of drug-resistant virus compared to any other combination.

(1:22-2:7); A488, A497, A532, A577-78 (327:14-22, 336:7-18, 428:14-429:23, 371:4-20).

The '191 patent makes clear the Court's error. It states that monotherapies worked to treat HIV infection, A101 (1:22-30),[19] even though they became "less effective" after "prolonged treatment" due to the emergence of resistance or toxicity. *Id.* (1:31-35, 59-64). ViiV admitted that even "single anti-HIV agents ... have a therapeutic effect." A1826. In March 1995, monotherapy was regarded as an effective treatment for at least some patients, although the POSA knew that NRTI combination therapies offered increased benefits. A3998-4000; A4084 (PB0260); A3734-36; A4116-17; A532-33; A685-88. The POSA was looking to extend life, and its quality, by building on prior successes with "incremental improvement in the already established dual nucleoside approach." A577-78. The District Court was clearly wrong in viewing the prior art as an "extensive history of failures" and AZT/3TC as the *only* effective treatment.

The District Court further erred as a matter of law by deeming whatever unpredictability existed in the field of NRTI combination therapy to be "incompatible" with a finding of obviousness. A69. Although not wholly

---

[19] The prior art similarly recognized monotherapies as "effective" to treat HIV infection. *See, e.g.*, A3735 ("The effectiveness of monotherapy with AZT and ddI in treating HIV-1 infection, their different toxicities, and their in vitro synergy against HIV-1 have led to studies of combination therapy.").

predictable, the field had developed a rationale for NRTI combinations that clearly

suggested the combination of abacavir/3TC.  A536-37, A560-62, A589-91; A657,

A677, A781.[20]  This Court forbids "equating unpredictability to patentability" and

has stressed that "obviousness cannot be avoided simply by a showing of some

degree of unpredictability in the art so long as there was a reasonable probability of

success."  *Pfizer*, 480 F.3d at 1364 (Fed. Cir. 2007); *see also Allergan*, 726 F.3d at

1292 (Fed. Cir. 2013).

Because it perceived AZT/3TC as "the sole success story," A69, the District

Court incorrectly deemed "sustained clinical efficacy" comparable to AZT/3TC as

the *only* effective treatment.  The evidence, however, is clear and convincing that

in March 1995, the POSA reasonably would have expected abacavir/3TC to treat

HIV infection as claims 26, 27, 29 and 30 assert.

### C.    Under the Correct Legal Standard, the Claims-in-Suit Are Obvious

The question the District Court should have addressed is whether the prior

art motivated the POSA to use abacavir/3TC with a reasonable expectation that the

combination would treat HIV infection.  The evidence clearly and convincingly

---

[20] Ms. St. Clair testified that the known potencies of the compounds gave the
inventors their rationale to combine them.  A1034-35.

established that the answer is yes, even absent the erroneously excluded testimony of Dr. Parniak.

### 1.    It Was Obvious to Combine Abacavir and 3TC with a Reasonable Expectation of Therapeutic Effectiveness

The District Court expressly found that in March 1995, combination therapy was an established treatment strategy that was "thought to offer better treatment opportunities" than monotherapies.  A25-27, A43.  Indeed, the prior art taught that AZT/ddC was "*superior* to" and "*more effective* than monotherapy with either agent"; AZT/ddI was "*superior* to [AZT-]monotherapy" "with *higher and more sustained increases* in CD4+ cell counts"; and "combination therapy had a *greater suppressive effect* on viral load than [monotherapy]."  A3998-4000 (emphases added); PTX440 at Abstract PB0260); *see also* A3734-36.  AZT/ddC "had better effect," *reducing deaths* substantially.  A4084 (PB0260) (32% of the AZT-monotherapy patient group died during the study, versus only 11% in the AZT/ddC group).  "[P]atients taking AZT/ddC or AZT/ddI received *greater survival benefit* than [monotherapies]."  A4116.

The District Court also expressly found that in choosing drugs for combination, "clinicians sought to obtain the best balance of high potency and low toxicity."  A43.  Under that framework, abacavir and 3TC were prime candidates for combination with one another.  "[A]bacavir and 3TC were 'second generation NRTIs,' less toxic than AZT, … were understood to be potent inhibitors of HIV,

and both had been shown to have synergy with other NRTIs." A49.  Moreover, although by March 1995, the combination of AZT/3TC offered "the most potent and longest lasting effect of any antiretroviral strategy yet tested in clinical trials[,]" A31, "[r]esearchers looked to alternatives for AZT in order to skirt the drug's resistance and toxicity issues."  A30-31.  Even ViiV's expert agreed that "obviously if a patient cannot tolerate AZT, that would motivate [a POSA] to look for other drug combinations that don't include AZT."  A1538 (Ho: 1389:1-11).

The District Court's findings demonstrate that abacavir was an obvious alternative to AZT for several reasons.  "[T]he evidence show[ed] that abacavir would have been a ripe candidate for researching new combination therapies" because abacavir:

- "was comparably potent to AZT" (A33),

- "had lower toxicity than AZT" (*id*.),

- "penetrated the central nervous system [like AZT], which is a desirable feature for an anti-HIV medication" (*id.*),

- "was synergistic with other compounds" and "reported to have in vitro synergistic activity with AZT, ddI, and ddC" (*id.*),

- "was an attractive candidate for clinical evaluation" (*id.*),

- "was an important candidate for further development as an anti-HIV drug for combination therapy, due to its cross resistance profile and relatively slow emergence of resistance" (*id.*),

- "was known to offer sufficient oral bioavailability and to be non-toxic in laboratory animals" (A32),

- "is an analog of another then experimental anti-HIV drug, carbovir," which "was reported to be a potent inhibitor of HIV and to have synergistic activity with AZT … and ddC[,]" and which "was discussed in the prior art as a potential alternative to AZT" (A31-32),

- "was successfully designed to avoid the toxicity problems of carbovir, and was understood to be a less toxic compound" (A53),

- "had progressed to clinical trials, which would increase confidence that abacavir was safer than carbovir" (*id.*), and

- "stood out among the [hundreds of] topics covered at the [October 1994 ICAAC] conference" (A32).

These findings would have been more than sufficient to sustain a ruling of obviousness had the District Court not erroneously required proof that a POSA would have predicted the abacavir/3TC combination to provide sustained results comparable to AZT/3TC. *See Allergan,* 726 F.3d at 1291-93 (drug combination obvious where the prior art taught each drug component for treating the same indication and provided motivation to use them in combination therapy); *Tokai Corp. v. Easton Enters., Inc.*, 632 F.3d 1358, 1371 (Fed. Cir. 2011) ("A strong case of *prima facie* obviousness[] ... cannot be overcome by a far weaker showing of objective indicia of nonobviousness."). As explained below, the secondary considerations of non-obviousness do not undermine this conclusion.

### 2.    It Was Obvious to Replace AZT in AZT/3TC with Abacavir with a Reasonable Expectation of Therapeutic Effectiveness

The evidence was equally clear that the POSA would have recognized the advantages of replacing AZT with abacavir in the AZT/3TC combination.  In March 1995, the prior art pointed to 3TC as a starting point for developing a new combination therapy to treat HIV infection, which would have particular value in treating patients who could not or would not tolerate AZT.  A489, 496-97, 532, A540, A589-91; A1538; A4129; A4280.  There were only a small number of attractive options for the second drug, and abacavir was clearly one of them.  *See Wrigley*, 683 F.3d at 1364-65 (finding combination obvious-to-try where the claimed components were among a few preferred candidates and there were thus "a finite number of identified, predictable solutions").  The District Court's findings support this conclusion.  A32-33.

Further, abacavir belonged to the only FDA-approved class of anti-HIV drugs, was one of the most important new compounds within that class, and exhibited a unique balance of high potency and low toxicity that was well-known to the POSA.  *Id.*  And abacavir was one of only two NRTIs in clinical trials in the relevant timeframe for use as part of an NRTI combination therapy; the other was 3TC.  A1518-19 (Ho: 1369:19-1370:13); *see also* A32-33; A4183; A4177-78 (#8).

The prior art speculated that the sustained efficacy of the AZT/3TC combination resulted from mutations induced by 3TC that rendered otherwise

45

AZT-resistant HIV once again responsive to AZT.  A586-89.  But the

resensitization hypothesis would not have deterred a POSA from combining

abacavir and 3TC.  A590-91.  The prior art taught that 3TC was effective in its

own right and its lower toxicity made it a very attractive candidate for combination

with NRTIs other than AZT.  A496-99, A540, A556; A4280.  The prior art further

recognized that the resensitization hypothesis could not entirely explain the clinical

success of AZT/3TC.  DeNoon 1995 observed that "the efficacy of 3TC apparently

goes beyond its ability to prolong the efficacy of AZT."  A4129; *see* A574-75,

A584, A586-89.  The AZT/3TC results directly motivated the POSA to investigate

other 3TC-containing NRTI combinations that were not expected to have a

resensitization effect, such as 3TC/d4T, 3TC/ddI, and 3TC/ddC.[21]  A4280; A4129;

*see* A590-91.

    The District Court's view that an NRTI combination had to match or exceed

the sustained clinical efficacy of AZT/3TC led it to ignore the prior art that

motivated a POSA to make combinations that would skirt AZT's toxicity issue and

in particular to substitute abacavir for AZT in AZT/ 3TC.  In March 1995,

scientists attempting to prolong the lives of HIV/AIDS patients were motivated to

use a drug combination with AZT-intolerant patients that promised effective

---

[21] The prior art suggested those combination even though 3TC's resistance profile
overlapped to some extent with each of d4T, ddI and ddC.  A4111.

treatment with fewer debilitating side-effects than AZT/3TC, even if such a combination might not provide effective treatment for as long as AZT/3TC. A3998-4000; A3734-36; A4089 (PB0260); A4116; A485, A489, A532, A577-78. It was undisputed in the record that substituting abacavir for AZT in AZT/3TC would reduce side-effects and patient compliance problems for AZT-intolerant patients.  A30-31; A1538.

### 3.   The Prior Art as a Whole Did Not Teach Away from Abacavir/3TC

The District Court also asked the wrong question in framing its teaching-away analysis.  Instead of focusing on whether the art as a whole taught abacavir/3TC *would not inhibit* HIV replication, which is all the claims require, A18 (combinations 'inhibit[] replication of the HIV virus), the District Court focused primarily on two factors—cross resistance and resensitization, an untested theory for the success of AZT/3TC—and ignored evidence of other factors that strongly favored abacavir/3TC.  A44, A47-48.  Even if the factors it focused on might be read to teach away from the claimed invention, the District Court erred because it "did not find that the prior art *as a whole* taught away from the invention."  *Allergan*, 726 F.3d at 1293 (emphasis added).

Cross-resistance was only one of many factors that a POSA considered in selecting drugs to combine.  A43-44; A605-06.  The other factors—*e.g.*, maximized potency, minimized toxicity, favorable pharmacokinetics, good

penetration into the central nervous system—all strongly favored the abacavir/3TC combination, and potency and toxicity were the "central" issues for drug developers.[22]  A31, A33, A43-44.  The District Court recognized that "researchers pursued potential solutions in the face of teachings" about potential cross-resistance, A48, but it erroneously dismissed that as a POSA deliberately ignoring teachings in the art, A43, rather than correctly viewing it as a POSA reaching a considered balance of the relevant factors.

First, the District Court gave cross-resistance undue emphasis.  The prior art taught that, when passaged alone *in vitro*, abacavir and 3TC each selected first for the M184V mutation,  A4373 (I82); A3929.  The evidence was clear, however, that "resistance is not a black or white thing[,]" and that "[t]he degree of resistance is very important in determining issues such as cross-resistance."  A978-79.  The record establishes that the M184V mutation caused only "minimal," "partial" or "low-level" *in vitro* resistance to abacavir (<2–5-fold), meaning that the likelihood of that mutation being clinically significant was low.  A4373 (I82); A3926, 3928;

---

[22] Although PTX365 indicates that cross-resistance is an "increasingly important issue," as the District Court notes, PTX365 is not prior art.  A43-44; A4037-39. Moreover, PTX365 identified potency and toxicity as the two ***central issues***," and lists the potential for cross-resistance among a "variety" of non-central factors to consider.  A4506.

A520-21; A698-705, A793; A4301 ("[A] fivefold or less increased $EC_{50}$ should not be indicative of isolation of resistant virus[.]").

That concerns about cross-resistance would not discourage investigation into abacavir/3TC was also demonstrated by undisputed evidence that the prior art taught that combinations with overlapping resistance profiles nevertheless made effective, synergistic combination therapies.  A4373 (I82) (even though abacavir was "cross-resistant to ddI and ddC (3- to 6-fold increase in $IC_{50}$)," abacavir/ddI and abacavir/ddC made favorable, synergistic combination therapies); A520-22.

Second, the District Court was wrong that PTX696 and Dr. Zingman's testimony supported its conclusion that the cross-resistance profiles of abacavir and 3TC would discourage their use as a combination therapy.  A46-47.[23]  PTX696 demonstrated that *in vitro* resistance did not necessarily correlate with clinical failure, A4110 ("*[t]he clinical significance of the detection of didanosine resistance* **in vitro** *remains unclear*"),[24] not that *in vitro* "resistance between two-fold and eight-fold resulted in treatment failure."  A46-47.  And Dr. Zingman testified that *cross-resistance would not have been considered a significant problem for abacavir/3TC* because the enhanced potency of the combination could

---

[23]  The District Court inexplicably relied on testimony by Dr. Laurence, who was not offered as and expressly disavowed being an expert in resistance.  A906-08.

[24]  *See also* A4106 ("The clinical significance of in vitro drug resistance to [AZT] has been difficult to determine.").

overcome resistance, which lacked clinical significance until, over time, HIV developed a number of mutations to abacavir.  A521-22, A569, A589-90, A593-97.

Third, the District Court erroneously discounted the undisputed evidence that "researchers … pursue[d] the ddI and 3TC cross-resistant combination."  A45-46.  Its assertion that the degree of cross-resistance between 3TC and abacavir (which had three overlapping mutations, A46) was more extensive than between ddI and 3TC, A47, A54, is directly contradicted by the record.  The resistance profiles of 3TC/ddI and 3TC/ddC, like that of abacavir/3TC, all overlapped at three mutations:  M184V, K65R and T75V.  A4111 (Table 1).[25]  Because cross-resistance did not discourage researchers from pursuing the 3TC/ddI combination—and it indisputably did not, A47 and A1512 (Ho: 1363:14-18)—

_____

[25] The District Court's discussion of the Hammer reference exemplifies its failure to appreciate that the prior art *as a whole* did not teach away from combining abacavir and 3TC because of cross-resistance.  A42-43.  Contradicting the District Court's assertion that Hammer "does not suggest that any principles of combination had been thoroughly established," *id.*, the reference actually stated: "Many approaches to combination therapy are being tried clinically.  Such approaches are based on ***the principle that decreasing viral burden in HIV disease is a fundamentally sound approach***, and that combination regimens promise a greater likelihood of reducing viral burden compared with current monotherapy."  A4005-06 (emphasis added); *see also* A4111 ("[T]he overall goal of [combination] regimens remains the optimal suppression of HIV-replication to limit the emergence of viral resistance.").

there was no good reason why a similar pattern of cross-resistance would discourage the abacavir/3TC combination.

Fourth, the District Court also effectively ignored the significance of Gao 1992 (TTX108) and 1994 (TTX107). A41 (addressing TTX108 but omitting any mention of TTX107). Those studies demonstrated that simultaneous passaging of NRTI combinations could delay or even prevent the development of resistance *in vitro*, and Dr. Parniak's testimony to that effect went unrebutted at trial. A666-685. Gao 1992 taught that resistance developed over time to AZT and ddI monotherapies but not to AZT/ddI. A4168-72; A666-79. Gao 1994 went even further. Using the data from Gao 1994, Dr. Parniak explained that they passaged AZT, ddI, ddC, AZT/ddI, AZT/ddC, and the completely cross-resistant combination of ddI/ddC,[26] and found that while HIV developed resistance over time to the monotherapies, the NRTI combinations completely suppressed viral replication and prevented HIV from developing resistance for the duration of the study. A4156-67; A679-85. This unchallenged evidence contradicted the District Court's conclusion that it was unknown whether potency could trump cross-

---

[26] The POSA understood that ddC and ddI had extensively overlapping cross-resistance profiles, both selecting for the M184V, K65R, L74V, and V75T mutations. A4110-11.

resistance.  A41; *see also* A497, A589-90, 596-97; A731-32; A948-50; A3997.[27,28]

Had the District Court properly assessed Dr. Parniak's *undisputed* testimony that

resistance did not emerge in the presence of the fully cross-resistant ddI/ddC,[29] the

Court could not have reached the conclusions it did.[30]  On this record, there was no

reasonable basis to conclude that the prior art as a whole discouraged the

abacavir/3TC combination.

---

[27] The District Court also relied on LTX1490 at pages 518-19 as supposedly showing that "it was later known that the combinations of AZT/ddI and AZT/ddC[] ... did nothing to delay resistance clinically."  A41.  But LTX1490 (submitted for publication before Gao 1994 published) only said that those combination did not "prevent" resistance, not that those combinations did not *delay* resistance.  A3734-35; *see* A4004 ("Combination therapy does not appear to prevent the emergence of resistance, ***but may delay it***; patterns of resistance seen with combination therapy differ from those seen with monotherapy.") (emphasis added).  Indeed, LTX1490 discloses that many patients on AZT/ddC "were significantly less likely to develop progressive disease or die than those receiving AZT," A3734-35, and that AZT/ddI resulted in "increases in CD4 cell counts … [that] were greater than those in the group receiving AZT monotherapy" and "fewer opportunistic infections" than monotherapies.  A3735-36.

[28] The District Court's emphasis on cross-resistance as discouraging the POSA from considering abacavir/3TC is not supported by the patent, which even ViiV's expert Dr. Ho agreed makes no mention of cross-resistance as an issue to be overcome in the art; the patent suggests that the combined potency of the combinations could overcome or delay any resistance, A101; A1494-1500 (1345:9-1347:3, 1349:10-1351:7), which is what the art in March 1995 taught.

[29] This testimony was not subject to ViiV's motion to strike.

[30] Although clinicians avoided using the ddI/ddC combination in their patients, it was not because of the compounds' overlapping cross-resistance profiles.  Rather, they avoided concurrent administration of ddI and ddC because of their overlapping toxicities.  A3998, A4000.

Finally, the District Court unduly focused on the resensitization theory, concluding that the POSA would be deterred from replacing AZT in AZT/3TC with abacavir because the abacavir/3TC combination might not benefit from the possible "resensitization" effect of 3TC on AZT.  A49-50, A69-70.  It treated this unproven hypothesis as overriding other reasons a POSA would have for replacing AZT in AZT/3TC.  A40-42, A49-50.  In so doing, the District Court relied largely on ViiV's expert's testimony that resensitization deterred a POSA from removing AZT from AZT/3TC, A49-50, even though that testimony (*e.g.*, A1293) "cannot be reconciled with ... the prior art references themselves."  *PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1361-62 (Fed. Cir. 2007).

Resensitization was a competing theory that encouraged the use of AZT/3TC, but it *did not teach a POSA not to use abacavir/3TC* with patients who were AZT-intolerant, nor did it diminish the undisputed motivation of a POSA "to look for other drug combinations that that don't include AZT" for patients who would not or could not tolerate it.  A1538 (Ho: 1389:1-11).  The District Court clearly erred by discounting the indisputable need for combinations that excluded AZT and finding that the resensitization theory weighed against obviousness.

### 4.    The District Court Improperly Struck Dr. Parniak's Trial Testimony that It Was Obvious to Substitute 3TC for ddC in Abacavir/ddC

ViiV objected and the District Court struck Dr. Parniak's testimony on his two alternative theories of obviousness.  A717-42; A4402-12.  The Court adopted ViiV's argument that at trial Dr. Parniak had relied on combinations of references not disclosed in his expert reports and, citing just a single paragraph of a 130-page report, it criticized Dr. Parniak for testifying concerning Du 1992, Daluge 1994, Coates 1992, and Hart 1992, when his expert report combined AIDS Alert 1995, Du 1992, and Daluge 1994 on the one hand, and New AIDS Therapies 1994[31] and Hart 1992 on the other.  A48-49.

The District Court erroneously focused on the report captions and not its substance, which shows that Dr. Parniak's analysis was not so limited.  Section XIV.A.1. of the Parniak Report, "Claim 20 is Obvious," has two subsections: a, "AIDS Alert 1995 (Reporting on Katlama 1995 and Staszewski 1995), Du 1992, and Daluge 1994," (¶¶ 367-80); and b, "New AIDS Therapies 1994 and Hart 1992," (¶¶ 381-87).  A3601-05, 3621-26.  New AIDS Therapies 1994 is cited in subsection a (¶¶ 372-75) and Daluge 1994 is cited in subsection b (¶¶ 381, 382).  Nor was Dr. Parniak's reliance on Coates 1992 improper.  Coates 1992 is cited

---

[31]  Dr. Parniak relied on New AIDS Therapies 1994, not "New AIDS Therapies 1992" as cited in Trial Opinion.

together with Hart 1992 in subsection b (¶¶ 383, 385) as an alternative to Hart

1992 in combination with New AIDS Therapies 1994.

### a.    Standard of Review and Governing Principles

This Court reviews district court evidentiary rulings under the law of the

relevant regional circuit. *Meyer Intellectual Props. Ltd. v. Bodum, Inc.*, 690 F.3d

1354, 1371 (Fed. Cir. 2012).  In the Third Circuit, a district court's exclusion of

evidence is reviewed for abuse of discretion. *Quinn v. Consolidated Freightways

Corp. of Del.*, 283 F.3d 572, 576 (3d Cir. 2002).  A district court "necessarily

abuse[d] its discretion if it based its ruling on an erroneous view of the law or on a

clearly erroneous assessment of the evidence." *Republic of Phil. v. Westinghouse

Elec. Corp.*, 43 F.3d 65, 75 (3d Cir. 1994) (internal quotation marks omitted).

Rule 26 requires an expert to disclose a report that contains "a complete

statement of all opinions the witness will express and the basis and reasons for

them," Fed. R. Civ. P. 26(a)(2)(B)(i), so opposing parties have a "reasonable

opportunity to prepare for effective cross examination and perhaps arrange for

expert testimony from other witnesses." *Id.*, advisory committee's note (1993

Amendments).  An expert may not testify to subject matter beyond the scope of the

report unless the failure to include that information in the report "was substantially

justified or is harmless."  Fed. R. Civ. P. 37(c)(1).

"The exclusion of critical evidence is an 'extreme sanction,' not normally to be imposed absent a showing of willful deception or 'flagrant disregard' of a court order by the proponent of the evidence." *Quinn*, 283 F.3d at 576.  In evaluating whether a district court abused its discretion, the Third Circuit considers "the importance of excluded testimony" and the following four factors:  (1) prejudice or surprise to the movant; (2) the movant's ability to cure the prejudice, (3) whether waiver of discovery deadlines could mitigate disruption of the case, and (4) bad faith or willfulness in failing to comply with the district court's order.  *Id*. at 577.  "The importance of the evidence is often the most significant factor." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 298 (3d Cir. 2012).

### b.    Dr. Parniak's Testimony Did Not Violate Rule 26

There was no improper mixing and matching of references at trial.  Dr. Parniak did not fail to disclose his opinions or their bases in his report, as his report clearly shows.  *See Meyer*, 690 F.3d at 1373.  It contains a detailed discussion of both theories of obviousness, A3621-26 (¶¶ 368-387), and of each of the prior art references underlying his opinions, A3606-20.  His report did not present both analyses of obviousness as mutually exclusive.  The cross-referencing of prior art between subsections a and b reflects that these are complementary approaches, both of which the POSA would have considered at the time.  His discussion of

them together in his direct examination was not a new undisclosed opinion.  A724-42.

ViiV had no genuine basis for surprise or prejudice.  *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 792 (3d Cir. 1994).  ViiV had ample notice of both obviousness theories in the expert report, and ViiV had fully examined Dr. Parniak on that report at deposition.

The District Court abused its discretion in striking this testimony.  *Quinn*, 283 F.3d at 576-79.  The stricken opinion proved the motivation for the POSA to replace ddC with 3TC in the known synergistic abacavir/ddC combination, a combination which ViiV's predecessor recommended in the prior art even though those compounds were viewed as cross-resistant and lacked a resensitization effect.  A4183, A4372-73 (I6, I82).  This evidence countered the District Court's conclusions that concerns about cross-resistance and maintaining the resensitization effect would have led the POSA not to consider abacavir/3TC.

In sum, the District Court arbitrarily disregarded Dr. Parniak's opinions on obviousness which directly undermined its erroneous conclusion that a POSA would not consider abacavir/3TC.  This Court should remedy that abuse of discretion by reversing the District Court's determination of non-obviousness and remanding for reconsideration in view of Dr. Parniak's full testimony at trial.

### 5. No Secondary Considerations Support Non-Obviousness

The District Court correctly found that ViiV's evidence of industry praise and *in vitro* synergism did not demonstrate non-obviousness and that the evidence of skepticism was an "insignificant factor." A56-63. It erred, however, in finding that other secondary considerations favored non-obviousness.

### a. Commercial Success Does Not Favor Non-Obviousness

The District Court correctly concluded that the blocking patent rights of ViiV's predecessor Burroughs Wellcome diminished the weight of Epzicom®'s commercial success. A67-68; A1559-67.[32] But the District Court erred as a matter of law in giving *any* consideration to that product's commercial success, A66-69, A71, because Epzicom® lacks a nexus with the asserted claims.

Claims 26, 27, 29 and 30 do not cover Epzicom® because, like Teva's product, it contains abacavir sulfate, not abacavir free-base. A3804-07, A3817.

---

[32] Burroughs Wellcome owned two patents that covered the abacavir compound and its use in the treatment of HIV infection. A4333-49; A4350-66; *see also* A514-517; A647-51, A706-07. Those patents "legally barred [others] from commercially testing the [prior art's] ideas" to use abacavir as an "important candidate for further development as an anti-HIV drug for combination therapy." A4373 (I82). *Merck & Co. v. Teva Pharm. USA, Inc.*, 395 F.3d 1364, 1377 (Fed. Cir. 2005). On this basis alone, the District Court should have dismissed Epzicom®'s commercial success as a factor supporting non-obviousness. *Id.* at 1376; *see also Galderma Labs., L.P. v. Tolmar, Inc.*, 737 F.3d 731, 740 (Fed. Cir. 2013) ("Where market entry by others was precluded due to blocking patents, the inference of non-obviousness of the asserted claims, from evidence of commercial success, is weak.") (internal quotation marks omitted).

Nothing in the record demonstrates a nexus between these claims and Epzicom®, certainly not Dr. Ho's *ipse dixit*, cited by the District Court, that Trizivir® is "covered by the asserted claims of the '191 patent." A66. *See, e.g., Cephalon, Inc. v. Watson Pharm., Inc.,* 707 F.3d 1330, 1338 (Fed. Cir. 2013) (unsupported *ipse dixit* of an expert "carries little weight"). On this record, this Court should give no weight to commercial success.

>           **b.**    **"Failure of Others" and "Long-Felt-but-Unsolved
>                      Need" Do Not Support Non-Obviousness**

The District Court's conclusion that "failure of others" and "long-felt-but-unsolved need" evidence non-obviousness was tainted by the legal error, discussed above, that "therapeutic effectiveness" requires an ability to suppress HIV at least as well and for as long as AZT/3TC without developing resistance. A54-56. That is not what the patent claims. All that is required to meet the "therapeutic effectiveness" element of the claims-in-suit is the ability to treat the symptoms of HIV infection. At the time, many compounds and combinations provided such therapeutic effectiveness, and the POSA could reasonably anticipate that many other compounds and combinations, including abacavir/3TC, would be therapeutically effective. To be sure, there may have been a need for additional products like AZT/3TC that would delay the development of resistant strains of HIV longer than existing therapies. But the patent on its face does not *claim* either to have "solved" *that* need or to have succeeded where others had failed. All the

patent *claims* is a therapeutically effective method of treating HIV infection with combinations of prior art NRTIs.  Others had *not* failed to develop such methods and the need for such methods had *not* proven insoluble.

Moreover, evidence of long-felt-but-unsolved need and failure of others has little or no probative value here because patents held by ViiV's predecessor blocked others from developing the claimed methods.  Despite unambiguous recognition in the prior art of the "importan[ce]" of abacavir for combination therapy, A4373 (I82), no one besides Burroughs Wellcome could take advantage of that disclosure and use abacavir to devise more effective combination therapies because Burroughs Wellcome controlled the abacavir patents.  A4333-49; A4350-66.  *See Merck*, 395 F.3d at 1376-77.

Although *Merck* involved commercial success, its rationale equally applies to evidence of long-felt-but-unsolved need.  "[T]he law presumes an idea would successfully have been brought to market sooner, in response to market forces, had the idea been obvious to persons skilled in the art."  *Id.* at 1376.  But "[t]hat rationale has no force … because others were legally barred from commercially testing the [prior art's] ideas" and "could not put [its] ideas to practice."  *Id*. at 1376-77.

The same reasoning applies to long-felt-but-unmet-need.  The rationale for that secondary consideration is that the "[e]xistence of [a] defect creates a demand

for its correction, and it is reasonable to infer that the defect would not persist were the solution 'obvious.'" *In re Fielder*, 471 F.2d 640, 644 (C.C.P.A. 1973). A blocking patent prevents others from developing the "solution," even if it is "obvious." Burroughs Wellcome received its patent on abacavir in July 1991, when combination therapy was just underway. A4333. Thus, during the relevant period, no one outside of Burroughs Wellcome could develop abacavir. Only the '191 patent's inventors had ready access to abacavir for clinical development of its use in combination therapy. *See* A1036-37 (St.Clair: 887:8-888:2).

<blockquote>

**c.    The District Court Clearly Erred in Finding that the Evidence Established Unexpected Clinical Efficacy**

</blockquote>

The District Court erred in concluding that the evidence established "unexpected clinical efficacy" for abacavir/3TC. It determined that unexpected clinical efficacy only required "show[ing] that the claimed combinations are safe and effective agents at providing sustained anti-HIV therapy." A56. But the District Court never required ViiV to show, nor did ViiV show, that abacavir/3TC was unexpectedly superior to the closest prior art. *Pfizer*, 480 F.3d at 1370-71 (holding that district court erred by relying on the fact that the claimed invention "work[ed]" where the purported closest prior art also "worked" for its intended purpose).

ViiV presented evidence that "the abacavir/3TC combination outperformed AZT/3TC in children" in the PENTA5 study, A55, but no evidence established that

AZT/3TC was the closest prior art in adults or children, or that the results with abacavir/3TC were "different in kind and not merely in degree from the results of the prior art," whether in adults or children." *Galderma*, 737 F.3d at 739. The PENTA5 study reported that "*abacavir-containing* regimens are more effective than [AZT]/[3TC] in children with HIV-1 who have not previously been treated." A3901 (emphasis added)[33]. While abacavir/3TC showed somewhat better results than abacavir/AZT (another prior art combination) in that study, the researchers did not conclude that the difference was significant. A3900-01. Rather, they attributed part of the success of abacavir/3TC to a better-tasting and easier to take formulation, concluding that the resulting "[g]ood adherence could have contributed to the effectiveness of this combination." A3901.[34]

---

[33] There was no evidence that the clinical success of abacavir/3TC was due to a favorable interaction between abacavir and 3TC, rather than to a latent property of the prior art compound abacavir. *See In re Baxter Travenol Labs*, 952 F.2d 388, 392 (Fed. Cir. 1991) ("Mere recognition of latent properties in the prior art does not render nonobvious an otherwise known invention.").

[34] Additionally, there was no evidence that abacavir/3TC performed comparatively well in adults, and, contrary to the District Court's finding, A56 n.33, the unchallenged evidence showed that results can vary considerably between pediatric and adult studies. A3886-87 ("Differences in available formulations, variable pharmacokinetics and robustness of dosing recommendations, as well as reliance on caregivers to give medications may all lead to differing relative efficacy in adults and children both short and long term."). The PENTA5 results therefore are entitled to little probative force because they were not commensurate in scope with the asserted claims, which cover more than just pediatric treatment, as well as a far broader range of dosages. *See In re Grasselli*, 713 F.2d 731, 743 (Fed. Cir. 1983)

(*continued next page*)

The record shows that the efficacy of abacavir/3TC was *not* unexpected. The superiority of abacavir over AZT was predicted by the prior art, which taught that abacavir was comparable in potency and other qualities, yet far less toxic than AZT. The District Court's error in finding unexpected clinical efficacy for abacavir/3TC is a direct consequence of its erroneous requirement that a POSA expect the sustained clinical efficacy of AZT/3TC and its undue emphasis on resensitization and cross-resistance over other factors. *See Pfizer*, 480 F.3d at 1371 ("[T]o properly evaluate whether a superior property was unexpected, the court should have considered what properties were expected."). It was hardly surprising that the two most promising second-generation NRTIs achieved a favorable result.

## CONCLUSION

For the foregoing reasons, this Court should reverse the District Court's judgment that Defendants did not prove that claims 26, 27, 29 and 30 of the '191 patent are invalid, and that Teva infringes those claims, and direct entry of judgment that those claims are invalid and not infringed. In the alternative, the Court should reverse the District Court's November 16, 2012 *Markman* Opinion and remand for further proceedings.

---

(holding that experimental results for sodium-containing catalysts were insufficient to overcome *prima facie* obviousness where the claims' scope encompassed alkali metals generally).

## STATEMENT PURSUANT TO FED. R. APP. P. 28(i)

Teva joins the following sections of Lupin's brief:

- IV.B, B.2, B.3, B.3b, B.3c, B.4, B.5, B.8, B.10, B.11;

- VI.A.1.c (all), A.1.e, A.1.f, A.3, A.3.b.i, A.4.d; and

- VI.B (all).

Based on the facts and law described in those parts of Sections IV.B and VI.A, and the reasons set forth above, claims 26, 27, 29 and 30 are invalid for obviousness.

Based on the facts and law described in those parts of Sections IV.B and VI.B, and the facts adduced by Teva at trial, A1399-1400, claims 26, 27, 29 and 30 are invalid under 35 U.S.C. § 112.

Respectfully submitted,

Dated: June 6, 2014

/s/ Ira J. Levy
Ira J. Levy
David M. Hashmall
Annemarie Hassett
Joshua A. Whitehill
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
Tel: (212) 813-8800

Henry C. Dinger
GOODWIN PROCTER LLP
Exchange Place, 53 State Street
Boston, MA  02109
Tel:  (617) 571-1000

William M. Jay
GOODWIN PROCTER LLP
901 New York Avenue, NW
Washington, DC  20001
Tel:  (202) 346-4444

***Counsel for Defendant-Appellant
Teva Pharmaceuticals USA, Inc.***

# ADDENDUM

## TABLE OF CONTENTS

**Pages**

Judgment, filed Jan. 24, 2014 ........................................................... A1-2

Memorandum Supporting Judgment, filed Jan. 24, 2014................................... A3-5

Trial Opinion, filed Dec. 17, 2013.................................................... A6-79

Stipulation and Order, filed Feb. 8, 2013 ....................................... A80-82

*Markman* Opinion, filed Nov. 16, 2012........................................... A83-97

Patent-in-Suit:  U.S. Patent No. 6,417,191 B1 ............................................ A98-110

*Inventio AG v. Thyssenkrupp Elevator Americas Corp.*,
    No. 08-874-RGA, 2014 WL 129799 (D. Del. Jan. 14, 2014) ................. A4378-83

*Novatek, Inc. v. Sollami Co.*,
    No. 13-1389, 2014 WL 1229547 (Fed. Cir. Mar. 26, 2014) ................. A4384-401

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

VIIV HEALTHCARE UK LTD. AND VIIV :
HEALTHCARE CO., :
                          :
        Plaintiffs, :
        v. :        C.A. 11-576-RGA (CONSOLIDATED)
                          :
LUPIN LTD. AND LUPIN :
PHARMACEUTICALS, INC., :
TEVA PHARMACEUTICALS, INC., :
                          :
        Defendants. :

## JUDGMENT

For the reasons stated in the Court's December 17, 2013 Trial Opinion (D.I. 257), IT IS

HEREBY ORDERED AND ADJUDGED ON THIS 24th day of January, 2014, that:

1.  ViiV Healthcare UK Ltd. and ViiV Healthcare Co. have standing and are proper

plaintiffs in these consolidated cases.

2.  Claims 4, 26, 27, 29, 30, 34, 36, 38, 39, and 47 of U.S. Patent No. 6,417,191

Patent ("the '191 patent") are not invalid for obviousness under 35 U.S.C. § 103 or for lack of

utility under 35 U.S.C. § 112, nor are claims 4, 26, 27, 29, 34, 36, 38, or 47 invalid for lack of

enablement under 35 U.S.C. § 112.

3.  Teva[1] infringes claims 26, 27, 29, and 30 of the '191 patent. Teva's filing of

ANDA No. 079-246 was an act of infringement of those claims, and Teva's commercial

manufacture, use, sale, offer for sale, or importation of its ANDA product would infringe, induce

infringement, and/or contribute to infringement of those claims. Pursuant to 35 U.S.C.

§ 271(e)(4)(A), the effective date of any approval by the FDA of Teva's ANDA No. 079-246

shall be a date which is not earlier than the expiration of the '191 patent, including any

---

[1] Teva Pharmaceuticals USA, Inc.

1

exclusivities or patent term extensions.

    4.  Lupin[2] does not infringe claims 4, 26, 27, 29, 30, 34, 36, 38, 39, or 47 of the '191 patent, either literally or under the doctrine of equivalents, and Lupin's commercial manufacture, use, sale, offer for sale or importation of its ANDA No. 202-912 product would not infringe, induce infringement, and/or contribute to infringement of those claims, either literally or under the doctrine of equivalents.

    5.  The only pending motion (D.I. 187 at 5) is denied.

    6.  The deadline for filing any motion/petition for attorney fees and costs, together with any bill of costs, is hereby stayed until 30 days after: (a) the issuance of any mandate from any appeal taken in this matter; or (b) the date after which the deadline for filing a notice of appeal in this matter has expired, whichever is later.

_____
UNITED STATES DISTRICT JUDGE

---

[2] Lupin Ltd. and Lupin Pharmaceuticals, Inc.

2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

VIIV HEALTHCARE UK LTD. AND VIIV    :
HEALTHCARE CO.,                      :
                                     :
        Plaintiffs,                  :
                                     :
    v.                               :    C.A. 11-576-RGA (CONSOLIDATED)
                                     :
LUPIN LTD. AND LUPIN                 :
PHARMACEUTICALS, INC.,               :
TEVA PHARMACEUTICALS, INC.,          :
                                     :
        Defendants.                  :

## MEMORANDUM

The Court issued an opinion on December 17, 2013. (D.I. 257). The Court requested the parties agree to a form of final judgment. The parties were unable to do so. This Memorandum is to explain its resolution of the issues the parties disputed in their letters. (D.I. 262, 265, 267, 268).

**ViiV v. Lupin:** 1. This is an ANDA case. Plaintiffs have not waived any right to a jury trial, as this case only concerned issues to which Plaintiffs had no right to a jury trial. 2. I am only going to enter judgment on claims that were actually tried. Lupin wants judgments of non-infringement on four claims that were included in the pretrial order; it does not want judgments of validity on them, however. (D.I. 267-1 at ¶¶3 & 5). The Court always encourages the parties to streamline the trial. While it would be better to do the streamlining before the pretrial conference, fine-tuning between the pretrial conference and the trial still serves a useful purpose, which the Court does not want to discourage. Both parties understood the four claims were no longer asserted. As a practical matter, the Court does not understand the point of the dispute,

1

since it is not arguable that the Plaintiff can assert those four claims (or any other claims in the patent) against Lupin either in this case or some other case involving the ANDA products.  3. The Court does not understand Lupin's position in regard to the third disputed issue.  Lupin won on infringement.  Lupin lost on invalidity.  The judgment's language ought to, and does, reflect that.

**ViiV v. Teva**:  1. Teva stipulated to infringement under the Court's claim construction. The case between ViiV and Teva only concerned validity of the patent's asserted claims.  Teva cannot back out of its stipulation simply because it would like to pursue an argument that Lupin successfully pursued on Lupin's facts (which may or may not be Teva's facts).[1]  The Court did not change anything in its earlier claim construction.  To the extent it offered further claim construction in the ViiV v. Lupin dispute, it was done in the context of an issue being litigated between ViiV and Lupin, and not between ViiV and Teva.  2. Teva also questions the Court's commercial success analysis.  Assuming for the sake of argument that ViiV's two products are not the commercial embodiments of the asserted claims, such a finding would result in the conclusion that ViiV had not shown commercial success, as opposed to the Court's finding in the Opinion: "The Court finds that the commercial success of Epzicom and Trizivir is indicia of nonobviousness, although not as strong of an indication as would exist in the absence of the patent rights that Burroughs Wellcome held." (D.I. 257 at 63).  In my opinion, even if Teva were right, I would still conclude that the totality of the analysis would lead to the conclusion that the Defendants had not shown by clear and convincing evidence that the inventions were obvious.

---

[1] The facts relating to Teva's proposed product were not at issue in the trial, and thus the Court cannot opine on them.

The Court will thus enter ViiV's proposed form of judgment, slightly modified.

_Richard G. Andrews_
United States District Judge
1|2-4|14

3

A00005

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

VIIV HEALTHCARE UK LTD. AND VIIV :
HEALTHCARE CO.,                  :
                                 :
            Plaintiffs,          :
       v.                        :      C.A. 11-576-RGA (CONSOLIDATED)
                                 :
LUPIN LTD. AND LUPIN             :
PHARMACEUTICALS, INC.,           :
TEVA PHARMACEUTICALS, INC.,      :
                                 :
            Defendants.          :

## TRIAL OPINION

Brian E. Farnan, Esq., Wilmington, Delaware; F. Christopher Mizzo, Esq., Washington, D.C.; Gregg F. LoCascio, Esq., Washington, D.C.; Charles A. Fernandez, Esq., Washington, D.C.; Tiffany P. Cunningham, Esq., Chicago Illinois; Craig T. Murray, Esq., Washington, D.C.; Attorneys for Plaintiffs ViiV Healthcare UK Limited and ViiV Healthcare Co.

John C. Phillips, Jr., Esq., Wilmington, Delaware; Deanne M. Mazzochi, Esq., Chicago, Illinois.; Paul J. Molino, Esq., Chicago, Illinois; Neil A. Benchell, Esq., Chicago, Illinois; Rachel P. Waldron, Chicago, Illinois; Matthew T. Lord, Esq., Chicago, Illinois; Attorneys for Defendants Lupin Ltd. and Lupin Pharmaceuticals, Inc.

Richard L. Horwitz, Esq., Wilmington, Delaware; Ira J. Levy, Esq., New York, New York; Annemarie Hassett, Esq., New York, New York; Gregory T. Sandidge, Esq., New York, New York; Attorneys for Defendant Teva Pharmaceuticals USA, Inc.

December 17 2013
Wilmington, Delaware

1

ANDREWS, UNITED STATES DISTRICT JUDGE:

Plaintiffs ViiV Healthcare UK Ltd. and ViiV Healthcare Co. (collectively "ViiV") assert

U.S. Patent No. 6,417,191 ("the `191 Patent") against Defendants Teva Pharmaceuticals, Inc.

("Teva"), Lupin Ltd., and Lupin Pharmaceuticals, Inc. (collectively "Lupin"). The `191 Patent

(JX 1) is titled "Synergistic Combinations of Zidovudine, 1592U89 and 3TC." [1](D.I.178, Ex. 1 ¶

7). The patent issued on July 9, 2002, and expires on March 28, 2016. (*Id.* ¶¶ 7, 9). The named

inventors are David Walter Barry and Martha Heider St. Clair. *Id.* ¶ 8. The patent claims recite

formulations and methods of treating HIV infection, using (a) the "triple combination" of

abacavir, zidovudine, and 3TC; or (b) the "double combination" of abacavir and 3TC. (JX 1

cols. 12-16).

ViiV holds NDA No. 21-205 for Trizivir, an oral tablet dosage form, which the FDA

approved in November 2000 as an HIV drug. (D.I. 178, Ex. 1 ¶¶ 13-15). Trizivir contains the

"triple combination" of abacavir, 3TC, and AZT. ViiV also holds NDA No. 21-652 for an oral

tablet dosage form for Epzicom, which the FDA approved in August 2004 as an HIV drug. (*Id.*

¶ 20). Epzicom contains the "double combination" of abacavir and 3TC. The FDA's Orange

Book lists ViiV's `191 Patent in connection with both products. (*Id.* ¶¶ 16, 23). ViiV's case

against Teva and Lupin arises out the Defendants' ANDA filings with the FDA. Teva seeks

FDA approval to market a generic version of Epzicom, while Lupin seeks FDA approval for a

generic version of Trizivir. (*Id.* ¶ 17).

Defendants assert that the `191 Patent is invalid as obvious. Lupin individually asserts

that the `191 Patent is invalid due to lack of enablement and utility, and also asserts that its

proposed generic product does not infringe the `191 Patent. The Court held a four and a half day

---

[1] Zidovudine is also referred to as "AZT." "1592U89" is also referred to as "abacavir" or "ABC." "3TC" is also referred to as "lamivudine." The terms are used interchangeably throughout the opinion.

2

bench trial on June 24, 25, 26, 27, and 28.[2]  Defendants failed to prove any of their invalidity

defenses by clear and convincing evidence, while ViiV failed to prove that Lupin's generic drug

product infringes the asserted claims of the `191 Patent.

## I.    INFRINGEMENT

ViiV asserts that Lupin's generic product would infringe claims 4, 26, 27, 29, 30, 34, 36,

38, 39, and 47 of the `191 Patent.  Claim 47 is a formulation claim, while the remaining claims

recite methods of treatment.  All claims encompass abacavir and 3TC, while certain claims add

AZT as the third drug in the combination.  There is no dispute that Lupin's ANDA product will

contain AZT and 3TC.  The infringement dispute hinges on the abacavir limitation, and whether

Lupin's ANDA product's use of abacavir sulfate puts the product outside the scope of the

asserted claims.  Lupin argues that it does not infringe any of the claims because (1) the asserted

claims do not encompass the sulfate form of abacavir; (2) the method claims are only directed to

treating the "opportunistic conditions" associated with HIV rather than the HIV infection itself;

and (3) there is no evidence that Lupin would induce and contribute to the infringement of the

method claims.  ViiV disagrees, arguing that (1) abacavir is contained by the abacavir sulfate in

Lupin's generic product; (2) the method claims are aimed at the treatment of the underlying HIV

infection; and (3) Lupin clearly intends to infringe the method claims by inducing and

contributing to use by clinicians and patients of the claimed combinations.

(A) FINDINGS OF FACT

1.    Independent claim 45 recites the chemical compounds of AZT, 3TC, and pure
abacavir, also referred to as abacavir free base.  `191 Patent, claim 45.

2.    Claim 46 depends from claim 45, reciting the formulation of claim 45 in a unit
dosage form.  `191 Patent, claim 46.

---

[2] (Transcripts available at D.I. 192, 193, 194, 195, and 196).

3

3.  Claim 47 depends from claim 46, reciting the formulation of claim 46 in the form of a tablet capsule. `191 Patent, claim 47.

4.  Claim 47 is asserted against Lupin.

5.  Lupin's proposed ANDA product contains abacavir sulfate, also referred to as the salt form of abacavir, 3TC, and AZT. (*See, e.g.*, PTX 135 at 1; PTX 136 at 15; PTX 137 at 44).

6.  Abacavir sulfate is formed via a chemical reaction between abacavir free base and sulfuric acid. (Tr. at 215-17, 228, Dr. Langer).

7.  Abacavir sulfate has different molecular bonds and a different molecular weight from free base abacavir. (Tr. at 215-17, 228, Dr. Langer).

8.  Abacavir sulfate is a distinct chemical compound from free base abacavir. (Tr. at 254-56, Dr. Arnold).

9.  The `191 Patent does not define claim 47 to encompass abacavir sulfate, and thus Lupin's generic product does not literally infringe claim 47.

10. There is no evidence that abacavir sulfate and free base abacavir are functional equivalents, as abacavir sulfate has superior stability and handling properties. (Tr. at 220, Dr. Langer; Tr. at 254-55, Dr. Arnold).

11. Claims 4, 26, 27, 29, 30, 34, 36, 38, and 39 of the `191 Patent encompass treatment of the underlying HIV infection rather than merely treatment of the opportunistic infections associated with AIDS. `191 Col. 1:09-20.

12. Claim 4 does not encompass any "physiologically functional derivative" of abacavir, and thus Lupin's generic product does not literally infringe that claim. *See* `191 Patent, claim 1-4.

13. Claims 26, 27, 29, 30, 34, 36, 38, and 39 do not encompass the salt form of abacavir, and thus Lupin's generic product does not literally infringe those claims. *See* `191 Patent, claims 26, 27, 29, 30, 34, 36, 38, and 39.

14. Lupin's generic product does not infringe claims 4, 26, 27, 29, 30, 34, 36, 38, and 39 under the doctrine of equivalents.

(B)  LEGAL DISCUSSION AND CONCLUSIONS OF LAW

   *(i) Literal infringement of claim 47*

4

ViiV first argues that Lupin's generic product will directly infringe claim 47 of the `191

Patent, which is a formulation claim. ViiV has the burden to prove infringement by a

preponderance of the evidence. *Golden Blount, Inc. v. Robert H. Peterson Co.*, 438 F.3d 1354,

1363 (Fed. Cir. 2006). Claim 47 depends from claim 46, which depends from claim 45. Those

three claims follow:

> 45. A pharmaceutical formulation comprising (1S, 4R)-cis-4-[2-amino-6-
> (cyclopropylamino)-9H-purin-9-yl]-2-cyclopentene-1-methanol, zidovudine, and
> (2R, cis)-4-amino-1-(2-hydroxymethyl-1,3-oxathiolan-5-yl)-(1H)-pyrimidin-2-
> one in a ratio of 1 to 20:1 to 20:1 to 10 by weight, in association with one or more
> pharmaceutically acceptable carriers therefor.
>
> 46. A formulation according to claim 45 in a unit dosage form.
>
> 47. A formulation according to claim 46 in the form of a tablet capsule.

ViiV asserts that independent claim 45 recites abacavir, AZT, and 3TC, and Lupin's generic

tablet capsule product will infringe dependent claim 47, which claims a tablet capsule unit

dosage form. In support, ViiV points to Lupin's ANDA, which states that Lupin's generic drug

product will contain abacavir, AZT, and 3TC as the active ingredients. In response, Lupin

argues that claim 47 is limited to the chemical formulation of "abacavir free base," *i.e.*, pure

abacavir. Lupin argues that its generic product does not contain "abacavir free base," but rather

uses "abacavir sulfate," or a salt form of abacavir. According to Lupin, the salt form of abacavir

has a chemical structure that differs from pure abacavir, and the salt form's chemical structure is

not encompassed by claim 47. ViiV replies that this is a distinction without a difference, as

abacavir sulfate invariably contains abacavir.

ViiV is correct when it says that Lupin's ANDA, in certain places, explicitly states that

abacavir, AZT, and 3TC are the ingredients of the generic product. (*See, e.g.*, PTX 152 at

LUPIN(TRIZ) 012340; *id.* at 012373). Lupin's 30(b)(6) witnesses also stated as much: "Our

5

product is abacavir, lamivudine and zidovudine tablets."[3]  (Tr. at 150-151, Mr. Dahibate).  Dr.

Langer, ViiV's expert on infringement, further testified that "abacavir is in abacavir

sulfate…Lupin's ANDA says that."  (Tr. at 189).  Lupin's ANDA further states that "each film-

coated tablet contains the active ingredients 300 mg of abacavir as abacavir sulfate."  (PTX 154

at LUPIN(TRIZ) 000102).  Dr. Arnold, Lupin's expert, acknowledged that Lupin's product

"eventually provides abacavir.  That is the active ingredient.  Otherwise, the product wouldn't

work."  (Tr. 280).

These statements in isolation would suggest that Lupin's proposed generic drug contains

the identical chemical compound recited in independent claim 45 and is thus encompassed by

asserted dependent claim 47.  The sum total of the evidence, however, shows otherwise.  Lupin's

ANDA product will use abacavir in a salt form, i.e., abacavir sulfate, not abacavir in its free base

or pure form.  Each ANDA section proffered by ViiV identifies the active ingredient as

"abacavir sulfate."  (*See, e.g.*, PTX 135 at 1; PTX 136 at 15; PTX 137 at 44).  The proposed

ANDA labeling expressly defines the active ingredient as the sulfate or salt form.  (PTX 152 at

12355).  Although ViiV argues that abacavir is "in" abacavir sulfate, the sulfate form comes into

being only after a reaction between abacavir free base and sulfuric acid in isopropyl alcohol, and

the resulting salt product has a changed molecular weight and forms new molecular bonds.  (Tr.

at 215-17, 228, Dr. Langer).  As the salt form is only produced after a chemical reaction, it is

chemically distinct from abacavir free base or pure abacavir.  (Tr. at 254-56, Dr. Arnold).  It thus

does not contain abacavir free base as recited in claim 45.  As to the 30(b)(6) testimony, Mr.

Dahibate also testified to the cover letter for the ANDA, which recites abacavir sulfate,

lamivudine, and zidovudine tablets.  (Tr. at 152-53).  There is no question that Lupin's proposed

---

[3] *See also* tr. at 164, Mr. Raghavan ("Yes. [Lupin's generic product] provides lamivudine, zidovudine and abacavir.")).

6

tablet must use the sulfate form of abacavir, and not abacavir free base, if it is to be consistent with the ANDA submitted to the FDA. (*See* PTX 152 at 5) (generic drug contains "300 mg of abacavir as abacavir sulfate"). A 30(b)(6) witness's testimony does not alter the directions provided in the ANDA document, and any generic product must be consistent with the content of the relevant ANDA.

ViiV argues that Lupin's planned use of abacavir sulfate in combination with AZT and 3TC nevertheless infringes claim 47, as the tablet capsule eventually provides abacavir when it is administered to a patient. ViiV relies on *Merck & Co., Inc. v. Teva Pharmaceuticals USA, Inc.*, 347 F.3d 1367, 1371 (Fed. Cir. 2003) to argue that even if the sulfate form is chemically distinct from abacavir free-base, claim 45 would be understood by a person skilled in the art as encompassing the salt form. In *Merck & Co.*, the Federal Circuit upheld the district court's finding that the salt form of an acid drug compound infringed the sole claim of the patent, which was a method claim, even though that claim recited only the acid form and not the salt form. *Id.* at 1372. The Federal Circuit stated the following:

> The evidence of all the qualified witnesses was that persons in this field would understand that the acid is the active agent and that the acid is administered when it is in the form of the salt. There was no evidence that the claimed method of treatment is not achieved by the acid salt. The record shows that Teva and Zenith, as well as Merck, label their products with the "free acid equivalent."

*Id.* at 1371. The chemical distinction between an acid and a salt was thus discounted, as pharmacologists skilled in the art would have understood the claimed method of treatment to encompass the salt. *Id.* at 1371-72. ViiV argues that similarly, the Court should conclude that the sulfate of abacavir falls within the scope of abacavir in the free base form. In support, ViiV points to the specification's statement that "therapeutic use" included "salts of [abacavir]," and that "all salts, whether or not derived from a physically acceptable acid or base, are within the

7

scope of the present invention." `191 Col. 3:25-27. ViiV also directs attention to dependent claim 35, which states the following: "a method according to claim 32, wherein the [abacavir] is the succinate salt," suggesting that the abacavir chemical is intended to include the salt form.

Lupin argues that *Merck & Co.* is not on point. First, Lupin notes that the claim at issue in that case recited methods of treatment, whereas claim 47 is a chemical formulation claim. Lupin argues that because it was a method claim in *Merck & Co.*, rather than a formulation claim, the district court was able to apply a special lexicography to define the acid compound as including salts, as the district court relied on the "biology" section of that patent's specification that was more relevant to the method of treatment, while ignoring the "chemical" section. *Merck & Co. v. Teva Pharms. USA, Inc.*, 228 F. Supp. 2d 480, 489 (D. Del. 2002). Lupin argues that the district court noted that this was only proper because a method claim was at issue, and the district court would not have done so if the claim "were still a composition claim," since, in that context, the chemistry section "would be highly instructive." *Id.* The Federal Circuit's affirmation of the district court's opinion was similarly dependent on the claim's form as a method claim. *See Merck & Co.*, 347 F.3d at 1372. Further, Lupin argues that construing the only claim of the patent at issue in *Merck & Co.* as excluding the salt form would have rendered salt form embodiments described in the specification completely excluded from the patent. Here, in contrast, there are unasserted claims specifically directed at "physiological functional derivatives," meaning that the salt embodiments described in the `191 Patent would not be excluded by Lupin's construction, and also suggesting that when the inventors intended to claim derivatives, they did so explicitly, and thus the derivatives should not be read as encompassed by the method claims.

The Court agrees with Lupin that the present facts are distinguishable from *Merck & Co.*

8

*Merck & Co.* dealt with a method claim that recited a "method of treatment" that "consists of

administering to a patient in need thereof an effective amount of [the drug compound]." *Id.* at

1370. The Federal Circuit relied on the fact that "[t]he evidence of all the qualified witnesses

was that persons in this field would understand that the acid is the active agent and that the acid

is administered when it is in the form of the salt." *Id.* at 1371. The claim in that case

encompassed therapeutic treatments, and there were multiple statements in the specification

suggesting that the method of treatment included the salt form. Claim 47 is not a method claim

reciting the administration of a drug to a patient for a certain therapy. It is solely a formulation

claim, unconcerned with the ultimate effects of the drug compound in the body. Further, there

are unasserted claims of the `191 Patent explicitly reciting "physiological functional derivatives"

of the drugs, which would include the salt form. Thus, the patentee differentiated between the

pure (or free base) form of abacavir and the salt form in the claims themselves, undermining the

argument that the salt form is intrinsically encompassed by the free base or pure form. The

Court's ruling does not exclude salt forms altogether from the scope of the patent, as there are

unasserted claims that encompass derivatives. If salts and derivatives of abacavir were intended

to be encompassed by the chemical compound as recited, then there would have been no need for

the patentee to claim derivatives and salts of abacavir separately.

As to ViiV's claim differentiation argument, ViiV correctly states that claim 35 narrows

the "1S-methanol" [abacavir] element of claim 32 to "the succinate salt." As Lupin notes,

however, the inventors were inconsistent in their use of dependent claims. Claim 32 claims in

part "1S-Methanol" [abacavir]. It does not claim a physiologically functional derivative thereof.

Claim 35 depends from claim 32, and narrows the claim to where the "1S-Methanol" [abacavir]

is the "succinate salt," implying that the "succinate salt" is claimed by "1S-methanol" [abacavir].

9

Claim 48 recites the "1S-methanol" [abacavir] element with "or a physiologically functional derivative thereof." Then, dependent claim 49 narrows claim 48 to where the "physiologically functional derivative of '1S-Methanol' [Abacavir]" is the "succinate salt." In one case, the succinate salt is a limitation on "1S-methanol" [abacavir] and the other time it is a limitation on the derivative of "1S-methanol" [abacavir]. The patentee excludes the "1S-methanol" limitation, instead only reciting the "derivative" limitation narrowed to the "succinate salt." The "succinate salt" claims are inconsistent. The patentee cannot benefit from inconsistent claims drafting.[4]

For these reasons, the Lupin generic ANDA product does not literally infringe claim 47 of the '191 Patent.

### (ii) Infringement of claim 47 under doctrine of equivalents

ViiV next argues that Lupin's generic ANDA product infringes under the doctrine of equivalents. The primary inquiry in applying the doctrine of equivalents is whether "the differences between the claimed invention and the accused device are . . . 'insubstantial.'" *nCUBE Corp. v. SeaChange Int'l, Inc.*, 313 F. Supp. 2d 361, 376 (D. Del. 2004), *aff'd*, 436 F.3d 1317 (Fed. Cir. 2006). A salt form of a drug has properties distinct from the pure or free base form, as the entire purpose behind using the salt form is the form's superior stability and handling properties. (Tr. at 220, Dr. Langer; Tr. at 254-55, Dr. Arnold). This suggests that the salt and the free base forms are not equivalent, and no evidence was provided otherwise. Further, as discussed, there are unasserted claims that explicitly recite "physiologically functional derivatives" of abacavir. ViiV chose not to assert those claims against Lupin, instead asserting a claim that does not contain that limitation. It would be improper to recapture scope

---

[4] As Lupin notes, (D.I. 210 at 12), the claims drafting belies that any particular care went into it. For example, claim 40 is a duplicate of claim 35.

that is absent in the asserted claim, yet present in unasserted claims, under the doctrine of

equivalents. *See Abbott Laboratories v. Sandoz, Inc.*, 566 F.3d 1282, 1297 (Fed. Cir. 2009).

(iii) Literal infringement of method claims 4, 26, 27, 29, 30, 34, 36, 38, and 39

ViiV also asserts method claims 4, 26, 27, 29, 30, 34, 36, 38, and 39 of the `191 Patent,

all reciting methods "for the treatment or prevention of the symptoms or effects of an HIV

infection in an infected animal which comprises treating said animal with a therapeutically

effective amount of" a combination of abacavir, 3TC, and optionally AZT. ViiV asserts theories

of indirect infringement, arguing that Lupin's ANDA shows it would induce and/or contribute to

acts of direct infringement of the method claims by doctors and patients.

To induce infringement, the defendant must intend to cause the acts that constitute the

direct infringement, *DSU Medical Corp. v. JMS Co.*, 471 F.3d 1293, 1305 (Fed. Cir. 2006), and

must know that the induced acts constitute infringement. *Global-Tech Appliances, Inc. v. SEB

S.A.*, 131 S. Ct. 2060, 2068-71 (2011). To be held liable for contributory infringement, ViiV

must show that Lupin will sell its generic product knowing that it will be used in an infringing

manner. *Netgear, Inc. v. Ruckus Wireless, Inc.*, 852 F. Supp. 2d 470, 476 (D. Del. 2012).

Claims 34, 35, 38, and 39 are nearly identical to claims 26, 27, 29, and 30, except that claims 26,

27, 29, and 30 recite methods of treatment using a combination "comprising" ABC and 3TC,

thus permitting (but not requiring) AZT. Those claims are recited below:

| Double combination claims (26, 27, 29, 30) | Triple Combination Claim (34, 36, 38, 39) |
|---|---|
| **20.** A method for the treatment or prevention of the symptoms or effects of an HIV infection in an infected animal which comprises treating said animal with a therapeutically effective amount of a | **32.** A method for the treatment or prevention of the symptoms or effects of an HIV infection in an infected animal which comprises treating said animal with a therapeutically effective amount of a |

11

| combination comprising [abacavir] and [3TC]. | combination comprising [abacavir], zidovudine, and [3TC] |
|---|---|
| **26.** A method according to claim **20** wherein each [abacavir] and [3TC] is present in an amount from 5 to 1000 mg per unit dosage form. | **34.** A method according to claim **32** wherein each [abacavir], zidovudine, and [3TC] is present in an amount from 5 to 1000 mg per unit dosage form. |
| **27.** A method according to claim **20** wherein the combination is administered simultaneously. | **36.** A method according to claim **32** wherein the combination is administered simultaneously. |
| **29.** A method according to claim **20** wherein the combination is administered as a single combined formulation. | **38.** A method according to claim **32** wherein the combination is administered as a single combined formulation. |
| **30.** A method according to claim **20** in which said animal is a human. | **39.** A method according to claim **32** in which said animal is a human. |

All of the asserted method claims (or the independent claims from which they derive) recite the following limitation: "the treatment or prevention of the symptoms or effects of an HIV infection." The parties dispute whether treatment or prevention of the HIV infection itself falls within the scope of "symptoms or effects." Lupin argues that the plain meaning of "symptoms or effects" of HIV is limited to opportunistic infections or conditions and not to the HIV infection itself. Because its generic drug product is intended to treat HIV infection, not the symptoms or effects of an infection, Lupin argues it does not indirectly infringe the claims. ViiV disagrees, arguing that Lupin's generic product is aimed at halting replication of HIV, which is an effect of infection, and it therefore infringes that limitation. The Court construed the "symptoms or effects" term according to its plain and ordinary meaning, but did not specify what this plain and ordinary meaning was, or whether that meaning excluded treatment of the HIV infection itself. (D.I. 126 at 2, 3).

12

Lupin argues that construing "symptoms or effects" to include the HIV infection itself would simply remove the term from the claim in the following manner:

> 32. A method for the treatment or prevention ~~of the symptoms or effects~~ of an HIV infection in an infected animal. . . .

The Court does not agree. The '191 Patent is aimed at treatments designed to halt viral replication. (Tr. at 81-82, Dr. Blick). The first paragraph of substance in the specification states, "The present invention relates to therapeutic combinations of [the drug compounds] which have anti-HIV activity. The present invention is also concerned with pharmaceutical compositions containing said combinations and their use in the treatment of HIV infections including infections with HIV mutants bearing resistance to nucleoside and/or non-nucleoside inhibitors." '191 Col. 1:09-20. The specification makes clear that the combinations are designed to treat an HIV infection by inhibiting replication of the HIV virus. There is nothing wrong with construing the "symptoms or effects" claim language to encompass such treatment, especially when those terms are read in light of the specification. "Symptoms" and "effects" are not equivalent. While "symptoms" might be understood to have the restrictive scope argued by Lupin, "effects" is a broader term. One "effect" of an HIV infection is the nonstop viral replication resulting in a spread of infection throughout the cells of the body. There is no dispute that Lupin's ANDA product is intended to halt such progression of the disease. (*See* PTX 152 at LUPIN(TRIZ) 12337). It is thus a method for the treatment of the effects of an HIV infection.

The claim language also concerns the "prevention" of symptoms of an HIV infection. One way to prevent the opportunistic conditions (which Lupin argues is what is meant by "symptoms or effects of an HIV infection") associated with AIDS is to treat the underlying infection. Finally, although it is true that "[a] claim construction that gives meaning to all terms of the claim is preferred over one that does not do so," *Merck & Co. v. Teva Pharms. USA, Inc.,*

13

395 F.3d 1364, 1372 (Fed. Cir. 2005), that is a mere preference. It would be better to allow for some redundancy than to adopt a construction that is inconsistent with the invention. Thus, Lupin's generic ANDA product meets the "method for the treatment or prevention of the symptoms or effects of an HIV infection" limitation.

The Court will next consider claim 4 separately from the other method claims. Claim 4 depends from claim 2, which depends from claim 1. Those three claims follow:

> 1. A method for the treatment or prevention of the symptoms or effects of an HIV infection in an infected animal which comprises treating said animal with a therapeutically effective amount of a combination comprising [abacavir] or a physiologically functional derivative thereof, [AZT] or a physiologically functional derivative thereof, and [3TC] or a physiologically functional derivative thereof.

> 2. A method according to claim 1 wherein [abacavir] or a physiologically functional derivative thereof, [AZT] or a physiologically function derivative thereof, and [3TC] or a physiologically functional derivative thereof are present in a ratio of 1 to 20:1 to 20:1 to 10 by weight.

> 4. A method according to claim 2 wherein [abacavir], [AZT] and [3TC] are present in a ratio of 1 to 3:1 to 3:1 to 2 by weight.

The parties dispute whether the "physiologically functional derivative thereof" limitation of claims 1 and 2 is encompassed or excluded by asserted claim 4.[5] ViiV argues that dependent claim 4 encompasses that limitation, and thus that Lupin's generic product infringes the claim. Lupin disagrees, arguing that claim 4 has been narrowed to exclude the "physiologically functional derivative" limitation. Dependent claim 2 contains "physiologically functional derivative thereof" limitations for all drug compounds, but asserted dependent claim 4 does not. This would suggest that claim 4 does not encompass derivatives. Claim 13, which is also dependent from claim 1, and like claim 4, adds additional weight ratio limitations, follows:

> 13. A method according to claim 1 wherein [abacavir] or a physiologically functional derivative thereof, [AZT] or a physiologically functional derivative

---

[5] The Court construed "physiologically functional derivative thereof" as including "[a]ny physiologically acceptable salt[.]" (D.I. 126, p. 3). This means that abacavir sulfate would fall within the scope of the term.

thereof, and [3TC] or a physiologically functional derivative thereof are present in
a ratio of 1 to 10:1 to 10:1 to 5 by weight.

Claim 13 explicitly recites the derivative limitation, while asserted claim 4 does not. It would

follow that claim 4 does not encompass the derivative limitation. The only conclusion that can

be drawn from comparing asserted claim 4 with claims 2 and 13 is that claim 4 has been

narrowed to exclude salt derivatives of abacavir, which would exclude Lupin's accused generic

product. Lupin's generic product does not literally infringe claim 4.

As to the bulk of the method claims, ViiV argues that the reasons for finding non-

infringement of formulation claim 47 do not extend to finding non-infringement of method

claims 26, 27, 29, 30, 34, 36, 38, and 39. ViiV argues that the method claims are concerned with

treatment, and the generic product ultimately treats the patient with abacavir. This gives rise to

another discussion of *Merck & Co.*, 347 F.3d at 1367. On the surface, it would appear that

because the asserted claims at issue are method claims, the situation becomes analogous to

*Merck & Co.* This does make *Merck & Co.* a closer fit than it was with formulation claim 47.

There are, however, still key differences between the singular method claim of *Merck & Co.* and

the asserted method claims of the `191 Patent. In *Merck & Co.*, there was only a single asserted

claim and the specification suggested that the salt form was understood as falling within the

scope of that claim. *Id.* at 1371-72. Here, by contrast, there are unasserted claims that

manifestly recite derivatives of abacavir that would include the salt forms. It would not seem

true to the patentee's intentions of claim drafting for the Court to redefine and broaden the

asserted claims as implicitly encompassing scope, where the patentee felt it necessary to

explicitly claim that scope elsewhere. This is the most important distinction with *Merck & Co.*,

as in that case, there was only a single method claim at issue, and construing that claim to

include the salt form would not vitiate limitations in unasserted claims. Further, in *Merck & Co.*,

there was evidence that the lexicography of the patent defined the acid form of the drug as encompassing the salt form. *Id.* at 1372. Here, there is no suggestion in the patent that the chemical formula for pure or free base abacavir was specially defined to include the salt form. The inventors' explicit recitation of separate "physiologically functional derivative thereof" limitations in unasserted claims suggests they understood them to be different. Finally, Dr. Arnold persuasively explained how the salt form is chemically distinct from the pure or free base form of abacavir, and that the salt form offers superior functionality, and thus the Court cannot find that persons skilled in the art would have understood the pure or free base form of abacavir to be the same thing as, or to encompass, the salt form. (Tr. at 254-57). For these reasons, the instant case is distinguishable from *Merck & Co.*, and Lupin's generic product does not literally infringe the asserted method claims of the `191 Patent.

> *(iv) Infringement of method claims 4, 26, 27, 29, 30, 34, 36, 38, and 39 under the doctrine of equivalents*

For similar reasons as to why the generic product does not infringe the formulation claim under the doctrine of equivalents, Lupin's generic product does not infringe the method claims under the doctrine of equivalents. Where the patentee explicitly claims certain subject matter in unasserted claims, that subject matter should not be transported into the asserted claims via the doctrine of equivalents. This, however, is what ViiV seeks here, as many unasserted claims contain the "physiologically functional derivative thereof" limitations, which would encompass the salt form of abacavir, yet the asserted claims do not. For this reason, Lupin's generic product does not infringe the method claims of the `191 Patent under the doctrine of equivalents.

## II.     OBVIOUSNESS

To determine obviousness, the Court must decide whether the subject matter of the claimed invention would have been obvious at the time the invention was made to a person of

16

ordinary skill in the art to which the subject matter of the invention pertains.  35 U.S.C. § 103(a).

"Obviousness is a question of law with several underlying factual inquiries: (1) the scope and

content of the prior art; (2) the differences between the prior art and the claims at issue; (3) the

level of ordinary skill in the field of the invention; and (4) objective considerations such as

commercial success, long felt but unsolved need, and the failure of others." *Transocean*

*Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1347 (Fed. Cir.

2012).  Defendants have the burden of proving the obviousness of the claims by clear and

convincing evidence.  *Id.*

Defendants argue that the claimed combinations, abacavir and 3TC, and abacavir, 3TC,

and AZT, were obvious in light of the prior art.  Where a skilled artisan merely pursues known

options from a finite number of identified, predictable solutions, the resulting invention is

obvious under § 103.  *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent*

*Litig.*, 676 F.3d 1063, 1070 (Fed. Cir. 2012).  "Where, however, a defendant urges an

obviousness finding by 'merely throw[ing] metaphorical darts at a board' in hopes of arriving at

a successful result, but 'the prior art gave either no indication of which parameters were critical

or no direction as to which of many possible choices is likely to be successful,' courts should

reject 'hindsight claims of obviousness.'"  *Id.* at 1070-71.

Teva asserts that the combination of abacavir and 3TC was obvious both because (i) a

person skilled in the art ("POSA") would have been motivated to combine complementary and

potent NRTIs to hit HIV early and hard, with a reasonable expectation that such a combination

would suppress HIV reproduction and delay or prevent the development of resistant strains of the

virus, and (ii) a POSA would have been particularly motivated to replace AZT in the AZT/3TC

combination with abacavir, as abacavir was an NRTI, yet it avoided the toxicity problems

17

**A00022**

associated with AZT while still complementing 3TC. Lupin argues that a POSA would have
been motivated to build upon the success of AZT/3TC by adding a third potent and low toxicity
drug to the therapeutic regimen. ViiV disagrees, arguing that combination therapy was
unpredictable, the sizeable universe of potentially useful drugs was inconsistent with an
obviousness finding, problems of cross-resistance overrode considerations of potency and would
have discouraged a POSA from combining abacavir and 3TC, and it made no sense to alter
AZT/3TC by substituting abacavir for AZT, as AZT/3TC was the only known combination that
worked.

> (A) FINDINGS OF FACT

>> (i) *Level of ordinary skill in the art.*

The parties agreed that their definitions of a person skilled in the art are essentially the
same. (Tr. at 1583). A person skilled in the art would have a medical degree or a PhD in
virology or a related field in the biological sciences with experience in retroviral therapies. (Tr.
at 79, Dr. Langer; Tr. at 309, Dr. Zingman).

>> (ii) *Scope and content of the prior art.*

>>> (a) Background

The application leading to the `191 Patent was filed on March 28, 1996, and claims
priority from two Great Britain applications filed on March 30, 1995, and claims inventions
conceived in mid-1994. (JX 1, p.30). Human Immunodeficiency Virus ("HIV") was first
reported in 1983, and was discovered to be the cause of Acquired Immune Deficiency Syndrome
("AIDS") in 1994. (Tr. at 1219-21, Dr. Ho). As a virus, HIV does its damage through
replication. HIV (1) fuses and enters a cell; (2) converts viral RNA to DNA by reverse
transcription; (3) integrates the new DNA into the host cell's nucleus; (4) uses the new DNA to

create copies of viral RNA and enzymes; (5) packages the new RNA and enzymes into virions;
(6) buds from the cell; (7) cleaving, or cutting, the enzymes into their final form.  (Tr. at 987-88,
Dr. Larder; Tr. at 1278-79, Dr. Ho).  AIDS, which is the final stage of HIV infection, is
diagnosed where immune cells (CD4 T cells) fall below a certain level, and the patient is
vulnerable to deadly opportunistic infections.  (Tr. at 84, Dr. Blick).  The AIDS epidemic was a
public health crisis in the 1980s and 1990s, having left approximately 300,000 Americans dead.
(PTX 258).

In 1995, the state of the art in HIV treatment was one of both failure and advancement,
with drug researchers and doctors eager to identify effective therapies to halt the progression of
the disease.  (Tr. at 313-15, Dr. Zingman; Tr. at 1218-21, Dr. Ho).  Nucleoside reverse
transcriptase inhibitors ("NRTIs") were the first type of drugs developed for the treatment of
HIV.  (Tr. at 317, Dr. Zingman; Tr. at 1233-34, Dr. Ho).  In order to incorporate itself into the
nucleus of a host cell and induce replication, HIV must build a complete DNA chain from its
RNA after entering the host cell.  (Tr. at 1234-35, Dr. Ho).  This is known as the reverse
transcription process, and is mediated by an enzyme called reverse transcriptase.[6]  (Tr. at 317,
Dr. Zingman; Tr. at 1234, Dr. Ho).  The DNA chain is made from four protein building blocks,
which are known as deoxycytidine, deoxyguanine, deoxythymidine, and deoxyadenosine.  (Tr. at
476, Dr. Parniak).  They are generally referred to as the C, G, T, and A building blocks or bases.
(Tr. at 476, Dr. Parniak).[7]  NRTIs function as analogs of these building blocks.  (Tr. at 477, Dr.
Parniak).  An NRTI will trick the reverse transcriptase enzyme into incorporating the drug into a
growing viral chain.  (Tr. at 1234, Dr. Ho).  The NRTI then prevents further blocks from being

---

[6] It is "reverse" transcription because generally, DNA produces RNA, not vice versa.
[7] Each building block only binds with its pair: T binds with A, and C binds with G.  (Tr. at 478, Dr. Parniak).

19

attached to the chain, thus acting as a "chain terminator" and halting replication. (Tr. at 482, Dr. Parniak).

AZT, the first FDA-approved anti-HIV drug, is an NRTI analog to the "T" DNA building block. (Tr. at 136, Dr. Blick; Tr. at 1220, Dr. Ho). AZT was known to be effective at decreasing mortality as a monotherapy, but for only a relatively short period of time. (Tr. at 327, Dr. Zingman). AZT also had the drawback of producing severe side effects due to its toxicity, causing patient compliance difficulties. (Tr. at 328, Dr. Zingman). Toxicity occurred because NRTIs may disrupt normal human DNA processes in a similar manner as to how they disrupt viral DNA. (Tr. at 328, Dr. Zingman). Other NRTIs were developed and used in treatment, but no drug provided sustained effectiveness when prescribed as monotherapy. (TTX 153; Tr. at 313-15, Dr. Zingman; Tr. at 1218-21, 1236-37, Dr. Ho). HIV replicates itself at a rapid pace, creating over one billion copies daily. (Tr. at 320, Dr. Zingman). The replication process is error-prone, allowing for millions of mutated variants created daily in an infected person. (PTX 353 at 126). HIV's ability to mutate rapidly causes the virus to become resistant to monotherapy in a matter of months. (Tr. at 982-83, 993, Dr. Larder; Tr. at 1237, Dr. Ho; Tr. at 445-46, Dr. Zingman; Tr. at 816, Dr. Arnold). Persons skilled in the art sought to solve the problem of treatment failure due to resistance. (Tr. at 991-93, 995-97, 1023-24, Dr. Larder; Tr. at 816, Dr. Arnold).

> (b) Was combination therapy established as a treatment strategy as of March 1995?

The `191 Patent sought to solve the problem of viral resistance to monotherapy via NRTI combination therapy. `191 Col. 1:16-21. The claims of the patent recite two-drug and three-drug combinations, those combinations being abacavir and 3TC, and abacavir, 3TC, and AZT. *See* `191 Patent, claims 1-51. The effective filing date is March 30, 1995. The degree to which

20

combination therapy was accepted in the field of anti-HIV drug treatment as of March 1995 is

relevant to the obviousness of the `191 Patent. *Novo Nordisk A/S v. Caraco Pharm.*

*Laboratories, Ltd.*, 719 F.3d 1346, 1351 (Fed. Cir. 2013). Defendants argue that by March 1995,

combination therapy had clearly begun to demonstrate its superiority to monotherapy. ViiV

disagrees, arguing that there was still pervasive uncertainty in the field, and combination therapy

was far from established.

    The Court generally agrees with Defendants that combination therapy was emerging as

superior to monotherapy in the field of HIV treatment, with the caveat that the field was still in

the midst of considerable uncertainty. As early as June 1993, over a year and a half before the

effective filing date, the *Journal of Commerce* reported on the Ninth International Conference on

AIDS in Berlin. (TTX 153). The publication stated that "most AIDS cases now are treated with

a combination of drugs because researchers believe this might be a better technique." (*Id.*). The

failures of monotherapy were recognized: "The most critical point . . . is that no currently

available monotherapy (use of one drug) will provide as long-lasting benefit as we would all

desire." (*Id.*). The Hammer article from *Journal of Acquired Immune Deficiency Syndromes*

reported that a "majority of panelists," *i.e.*, clinicians, would "recommend initial combination

antiretroviral therapy" for a variety of patient types.[8] The Caliendo reference from *AIDS*

*Commentary* also described the failure of AZT monotherapy (referring to its benefits as

"transient") and the suspected superiority of combination therapy. (LTX 1490 at 516). The

FDA had approved the ddC and AZT combination, and doctors independently prescribed AZT

plus ddI. (LTX 1318; TTX 17; Tr. at 315; Tr. at 1361-62, Dr. Ho).

---

[8] These patient types were "treatment-naïve patients who are symptomatic and for treatment-naïve persons who are asymptomatic with less than 200 $CD4^+$ cells/mm.$^3$ They would recommend combination therapy for patients who have had previous antiretroviral therapy and who are stable with <300 $CD4^+$ cells/mm$^3$ or who are progressing." (PTX 344 at S37).

All of these references strongly suggest that the field had been moving toward combination therapy prior to the effective filing date of the `191 Patent. This could be derived even without taking into account the results of the 3TC and AZT trials, presented at the 2nd National Conference on Human Retroviruses and Related Infections, held January 29 to February 2, 1995 in Washington D.C. (TTX 71). *AIDS Weekly* reported these results: "The combination of lamivudine (3TC) and zidovudine (AZT) has the most potent and longest lasting effect of any retroviral strategy yet tested in clinical trials, according to the result of four Phase II trials conducted in Europe and in North America." (*Id.*). This reference explicitly supports the premise that certain types of combination therapy were recognized as the best available treatment.

In arguing that combination therapy was not established, ViiV does cite a trial stating that monotherapy had "the best benefit for patients," but that trial came before the 3TC/AZT announcement and only touched upon the AZT and ddI combination. (PTX 440 at PB0261). It further is a single study of a single combination, which does not alter the fact that combination therapy was generally being pursued in the field. ViiV also cites the *The Medical Letter* in opposition, as that reference does state that monotherapy was the recognized preferential treatment, but even that reference suggested the suspected superiority of combinational therapy over monotherapy: "Concurrent use of two or more drugs may prove to be more effective than monotherapy." (PTX 251 at 87, 88, 90 n.1). Thus, the evidence is clear and convincing that combination therapy was generally thought to offer better treatment opportunities by March 1995.

(c) Universe of potential anti-HIV drugs for combination.

22

**A00027**

The size of the universe of potential drugs that a person skilled in the art would encounter when seeking an effective combination is relevant to the obviousness analysis. *See In re Kubin*, 561 F.3d 1351, 1361 (Fed. Cir. 2009). The more potentialities, the less likely that a particular combination is obvious. *Id.* Where options are fewer, indicia of obviousness increases. *Id.* Defendants argue that a person skilled in the art would look toward a small group of promising NRTIs for potential combinations, as NRTIs were the most effective and best understood class of drugs. ViiV disagrees, arguing that the universe was much larger than Defendants state, and that it certainly included drugs in classes other than NRTIs.

The Court finds that this factor weighs slightly against a finding of obviousness. It is true that good reasons existed to explore the NRTI category for combination research. As of the filing date, all four FDA-approved anti-HIV medications (AZT, ddI, ddC, and d4T) were NRTIs. (Tr. at 317-18, 321-24, Dr. Zingman; Tr. at 486, Dr. Parniak). The AZT and 3TC combination consisted of two NRTIs and was the first HIV therapy to offer lasting clinical benefits. (TTX 17, TTX 71; Tr. at 1381-82, 1391 Dr. Ho). Although evidence suggested that a particular mutational relationship between those two drugs gave rise to the combination's benefits (*see id.*), it would follow that persons skilled in the art would attempt to build on the success garnered from combinations in the NRTI class. At least one reference did show a special focus on NRTIs, with one researcher stating, "In the last year, there have been more clinical successes with [NRTIs] than with any other class of compounds." (TTX 224 at 45). "A powerful platform for drug discovery, in particular [NRTIs], may well set the stage for modifying the predestined pathogenesis of HIV-1." (*Id.* at 46).

All of this being said, however, the Court agrees with ViiV that a person of ordinary skill in the art would not completely limit herself to NRTIs in considering drug combinations. ViiV

23

rightly points out that, as of the time of filing, at least 28 drugs were in human clinical trials.

(TTX 24; PTX 358; PTX 466; TTX 196; PTX 280; PTX 255; PTX 396; PTX 362; PTX 254;

PTX 399; PTX 418; PTX 334; PTX 449; PTX 462; PTX 269; Tr. at 1231, Dr. Ho). Of these 28

drugs, thirteen were not NRTIs: eight were protease inhibitors ("PIs") and five were non-

nucleoside reverse transcriptase inhibitors ("NNRTIs").[9] (Tr. at 1231-36). NNRTIs were

thought to have the potential for less toxicity compared with the other drug classes, making them

desirable research targets, especially considering the NRTI toxicity issue. (Tr. at 606, Dr.

Parniak; PTX 491 at 103-04). PIs were identified as a "potent new class of drugs[.]" (PTX 251

at 88). Defendants argue, and Dr. Parniak testified, that problems with bioavailability and

manufacturing would have discouraged research with PIs, but it was reported that, despite these

difficulties, "there [was] still merit in pursuing the protease inhibitors[.]" (TTX 224 at 46). Dr.

Parniak admitted that PIs were available for experimentation, and that he would consider

combining NNRTIs and PIs. (Tr. at 604, 428).[10] Defendants' other experts made similar

admissions. (Tr. at 428-29, Dr. Zingman; Tr. at 821-22, Dr. Arnold). Thus, the experts

essentially agree that a person skilled in the art would not limit herself to NRTIs. As Lupin

stated in its brief, "[s]cientists were eager for new drugs." (D.I. 202, p. 7). It makes sense for

drug developers to pursue combinations in both the known and the less known classes, especially

in what were still perilously uncertain days for HIV patients. Further, a patent application of one

---

[9] NNRTIs, like NRTIs, focus on disrupting the reverse transcriptase step of HIV replication. Unlike NRTIs, NNRTIs do not mimic nucleosides and interfere with the growing DNA chain. They instead bind directly to the reverse transcriptase enzyme. (Tr. at 1233-35, Dr. Ho). PIs inhibit the "cleavage" step of viral replication by interfering with the protease enzyme. (Tr. at 1235-36, Dr. Ho).
[10] The fact that eight PIs were in clinical testing further undermines Dr. Parniak's position that the difficulty of manufacturing PIs would discourage clinical research for that class.

24

of ViiV's experts, Dr. Larder, specifically teaches that NRTIs could be combined with NNRTIs and PIs. [11]  (*See* TTX 204).  PIs and NNRTIs were on the table for combination therapy.

(d) Predictability of combination therapy?

The next inquiry into the scope of the prior art is the predictability of combination therapy.  Defendants further argue that persons skilled in the art were armed with specific rationales that would lead them to the claimed combinations.  Specifically, the AZT and 3TC combination's success would steer drug researchers to incrementally improve upon that combination to achieve predictable results.  Teva argues that the AZT and 3TC combination would lead a person skilled in the art to combine abacavir and 3TC, as abacavir and 3TC would offer similar potency to the AZT/3TC combination, but with less toxicity.  Lupin argues that the AZT/3TC combination would lead a person skilled in the art to improve the potency of that combination by adding abacavir.  ViiV disagrees, arguing that the field was generally unpredictable, AZT and 3TC was the only known effective combination, but that effectiveness was due to a unique mutational interplay between the drugs.  ViiV further argues that issues of cross-resistance would discourage combining abacavir and 3TC.

AZT, the first anti-HIV drug sanctioned by the FDA, had been approved for monotherapy since 1987.  (Tr. at 1220, Dr. Ho).  AZT was a potent inhibitor of HIV, but it produced toxic side effects severe enough to cause some patients to refuse it.  (Tr. at 327-28, Dr. Zingman; TTX 56 at 736-37; TTX 78; TTX 202).  Moreover, despite AZT's initial potency, the benefits of AZT monotherapy were short-lived.  (*Id.*; Tr. at 1220, Dr. Ho).  After a few months, the therapeutic benefit was lost due to the rapid emergence of a drug-resistant virus, resulting in treatment failure and patient death.  (Tr. at 1220, 1237, Dr. Ho; PTX 128).  Researchers looked to

---

[11] This supports Dr. Ho's testimony the PIs and NNRTIs began to show "safety and pharmokinetics data," and "efficacy results" before March 1995.  Tr. at 1290.

alternatives for AZT in order to skirt the drug's resistance and toxicity issues.[12] 3TC's potency was similar to AZT's, yet it was much less toxic. (Tr. at 335, 345-47, 374, Dr. Zingman; TTX 56; TTX 224).[13] Like AZT, however, 3TC's initial therapeutic effectiveness as a monotherapy quickly waned. (Tr. at 423-24, Dr. Zingman). 3TC gave rise to resistance and was not effective as a monotherapy. (Tr. at 423, Dr. Zingman; Tr. at 1220, Dr. Ho). Three other NRTIs, ddI, ddC, and d4T, all failed as monotherapies due to the emergence of resistance in the virus. (Tr. at 1220, Dr. Ho).

All parties agree that the AZT and 3TC combination was a momentous development in the field. Results from the corresponding trials were described as a "breath of fresh air," and the combination was said to offer "the most potent and longest lasting effect of any antiretroviral strategy yet tested in clinical trials." (TTX 71 at 2; Tr. at 339, Dr. Zingman). AZT and 3TC effectively delayed the emergence of resistant strains of HIV, even though neither drug did so individually. (Id.; TTX 224; TTX 300; Tr. at 337-39). The efficacy of the 3TC and AZT combination was thought to depend upon a mutation in the M184 reverse transcriptase gene that made the virus resistant to 3TC, but overrode mutations conferring AZT resistance, thus resensitizing previously AZT-resistant HIV to the antiviral effects of AZT. (TTX 71 at 3).[14]

Defendants argue that good reasons existed to focus on abacavir as a low toxic and potent candidate for combination therapy. ViiV disagrees, arguing that there was no reason to focus on abacavir among the myriad of available compounds. Abacavir is an analog of another then experimental anti-HIV drug known as carbovir. Both drugs metabolize to the same antiviral

---

[12] "Drug resistance and bone marrow toxicity point to a need for new chemotherapeutic agents with high antiviral potency and low myelotoxicity for use as alternatives to, or in combination with, AZT." (TTX 78 at 437).
[13] 3TC was also much less toxic than ddC, another FDA-approved NRTI, despite the structural similarities between those two drugs. (TTX 224 at 45).
[14] "Researchers 'speculate' that 3TC may increase AZT's effectiveness by delaying viral resistance to the drug." (TTX 17 at 12).

26

form in the body, carbovir triphosphate, albeit via different routes. (TTX 265, Abstract I84; Tr. at 515, 586, Dr. Parniak; Tr. at 1373-74, Dr. Ho). Both are "G" analogs. (*Id.*). Carbovir was reported to be a potent inhibitor of HIV and to have synergistic *in vitro* activity with AZT (a "T" analog) and ddC (a "C" analog). (PTX 438 at 967; TTX 93 at 2-3; TTX 228 at 90-92). Carbovir was discussed in the prior art as a potential alternative to AZT. (Tr. at 558-61, 586, Dr. Parniak; TTX 78 at 437). ViiV argues that carbovir's poor oral bioavailability and reported toxicity in dogs caused drug developers to abandon it, and they likewise would have looked away from carbovir's analog, abacavir. It is true that carbovir had poor bioavailability, and in one reference, was reported to cause toxicity in dogs. (PTX 438 at 967; Tr. at 515-17, 599, Dr. Parniak; TTX 93; TTX 228). However, this did not apply to abacavir, because abacavir was known to offer sufficient oral bioavailability and to be non-toxic in laboratory animals. (TTX 265 at I6, I86, I88; Tr. at 352-53, Dr. Zingman; Tr. at 1375-76). Dr. Ho testified that carbovir's toxicity report would be a "red flag" to researchers investigating abacavir, but he also admitted that a researcher would understand that toxicity issues would be resolved were a drug in phase 1 trials. (Tr. at 1294, 1377-78). As of October 1994, abacavir was in Phase I human clinical trials. (TTX 196; TTX 116 at § 8). Carbovir's toxicity would not have been imputed to abacavir.

ViiV argues that a person skilled in the art had no reason to focus on abacavir in particular. ViiV points out that the first abacavir data was not published until October 1994 at the "ICAAC" conference, and that abacavir was only described in five out of more than a thousand abstracts presented at that conference. (Tr. at 442-43, Dr. Zingman; TTX 265). One publication reciting the major points of the conference, however, specifically highlighted "Wellcome's 1592UB9," *i.e.*, abacavir. (TTX 196). This suggests that abacavir stood out among the topics covered at the conference. ViiV also argues that abacavir's potency was in

27

doubt, as one study showed that abacavir was 50 to 100 times less potent than AZT. (TTX 265 at I82). The weight of the scientific literature, however, shows that abacavir was comparably potent to AZT. (TTX 78; TTX 265 at I82; TTX 258 at 2:65-68, Tr. at 511-17, 559-61, 581, Dr. Parniak). Abacavir also had lower toxicity than AZT, was synergistic with other compounds, and penetrated the central nervous system, which is a desirable feature for an anti-HIV medication. (*Id.*). Abacavir was reported to have *in vitro* synergistic activity with AZT, ddI, and ddC. (TTX 265 at I6). Abacavir was reported to be "an attractive candidate for clinical evaluation." (TTX 265 at I6, I88). It was also "an important candidate for further development as an anti-HIV drug for combination therapy," due to its "cross-resistance profile and the relatively slow emergence of resistance." (TTX 265 at I82). Thus, the evidence shows that abacavir would have been a ripe candidate for researching new combination therapies.

Defendants argue that because the AZT and 3TC combination was the best known combination, and abacavir was known as a particularly strong candidate for future combinations, the claimed combinations bringing those drugs together were obvious. ViiV argues that the fact that all combinations other than AZT and 3TC had failed showed the extreme unpredictability of the field. Defendants point to other allegedly successful combinations to show that it was not an unpredictable field. Defendants rely on the `191 Patent's specification to show that AZT was known to combine well with other compounds. The specification states, "The combination of [AZT] with either ddC or ddI has shown promising results in HIV infected patients[.]" `191 Col. 1:66-67. ViiV points out that the studies relied on in the specification for this statement were outdated by March 30, 1995, and that it was understood that those combinations were in fact not

28

effective. Defendants counter that admissions in the specification regarding the prior art are

binding on the patentee.[15]

The Court accepts the statement that AZT plus ddI or ddC were regarded as "promising."

That is not the same thing as saying they were effective. Defendants themselves, however, cite

references that contain statements indicating that those combinations were not effective long-

term. It would not make sense for the Court to allow Defendants to rely on those references

where they support the obviousness case, but to pretend that certain statements unfavorable to

the obviousness analysis do not exist. *AIDS Weekly* from February 1995, a Teva exhibit that

Defendants rely on to show the success of AZT and 3TC, also discusses the AZT/ddC Phase II

trial. (TTX 71 at 5). That trial showed that therapeutic benefits of AZT/ddC were not sustained

at 24 weeks. (*Id.*). The Hammer reference, which is both a ViiV and Lupin exhibit, is relied on

by Defendants to show the general acceptance of combination therapy and to support the theory

that potency was understood to lessen the problem of resistance. (LTX 1324; PTX 344; D.I. 205

at 15). That reference also explains that no combination therapy, including AZT/ddC and

AZT/ddI, had been shown "beneficial in delaying *clinical* disease progression or in improving

survival." (*Id.* at S28) (italics in original). As to whether Hammer supports Defendants' position

that potency was understood to be the most important factor, Dr. Hammer did state, "Perhaps it

is better to hit as hard as you can as early as you can," and the general consensus was that

combination therapy should be started earlier rather than later in treatment. (*Id.* at S36). There is

nothing in Hammer, however, that suggests that combination therapy was predictably effective.

---

[15] The cases that hold that an admission in the specification is binding on the patentee typically involve a situation where the patentee attempts to deny the existence of something in the prior art. *See, e.g., PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1362 (Fed. Cir. 2007), a case where expert testimony was given that stem cells had not yet been proven to exist in umbilical cord blood by the asserted patent's filing date, despite the statement in the specification that stem cells were concentrated in cord blood at a much higher level than in adult blood. *Id.* at 1361-62. In contrast, the '191 Patent's specification only states that AZT plus ddC or ddI garnered "promising results," which is far from a definite statement as to the ultimate effectiveness of those combinations.

It in fact suggests strongly otherwise, as there was not even any proof of "clear-cut clinical benefits" of combination therapy. (*Id.* at S36). Doctors "could not recommend one combination over another based on current data." (*Id.* at S34). Defendants' own physician expert admitted that he regarded antiretroviral therapy to be "quite confusing" in 1995. (Tr. at 762, Dr. Laurence).

Defendants also rely on results from the "Thompson" study that indicated that AZT plus ddC or ddI afforded greater survival benefit than did starting on AZT and then switching to ddC or ddI. (*Id.*). According to Defendants, these results, juxtaposed with what was known about AZT/3TC, suggest the obviousness of the claimed combinations. Defendants, however, admit that no definitive conclusions could be drawn from this study, as it was a retrospective (or "look-back") study rather than a prospective study, and that prospective studies were much better.[16] (Tr. at 747, 48). Later prospective studies showed that AZT and ddI provided no better results than monotherapy, or, in the case of AZT and ddC, produced worse results. (Tr. at 1246, Dr. Ho; PTX 420; PTX 440 at Abstract PB0261; Tr. at 633, Dr. Parniak; PTX 268 at PB0266; PTX 344).[17] It was also known that AZT combined with ddC showed signs of increased incidence of serious toxicity in patients in advanced stages of the disease. (PTX 432 at 4253; Tr. at 1246-47, Dr. Ho). Other combinations, including AZT and interferon, and AZT and nevirapine, did not display good results. (PTX 315 at 059B; PTX 344 at 0012152-53).

The AZT and 3TC combination was the only therapy known to provide prolonged viral load reduction and increase in CD4 count as of the priority date. (TTX at 17; TTX at 71; TTX 224). No other combination was recognized as providing sustained therapeutic effects. As one

---

[16] Dr. Ho elaborated on the weaknesses of retrospective studies. (Tr. at 1242-43).
[17] Defendants argue that AZT/ddI combination was superior to monotherapy. The weight of the evidence, however, is against that proposition.

30

reference stated, that combination was a "breath of fresh air" to the field, *i.e.*, it provided

something sorely lacking. (TTX at 71). The high degree of failure suggests that combination

therapy could not be considered a predictable field.

Defendants argue that the claimed combinations are obvious in part because each of

abacavir, 3TC, and AZT is an analog to a different DNA building block (the C, G, and T bases,

respectively). These blocks are essential to the reverse transcription process and thus HIV's

ability to replicate. Because each drug would inhibit replication at different sites of the growing

viral DNA chain, they would not compete with one another to effectuate their anti-HIV activity.

Defendants argue that the combination of differing analogs was understood to provide

synergistic (or at least additive) effects. Defendants argue that persons skilled in the art knew of

the beneficial nature of combining NRTIs operating on different sites of the DNA chain, and

would thus be motivated to combine the claimed combinations with a reasonable expectation of

success. ViiV disagrees, arguing that Defendants provide no evidence that persons skilled in the

art were aware of the beneficial nature of the specific drug interactions at play.

In support of this position, Defendants rely on the testimony of their experts. Dr.

Zingman testified, "By March of 1995, we already had pretty good evidence that it would be

helpful to have complementary nucleoside reverse transcriptase inhibitors, and that would be one

way to put them together as a combination." (Tr. at 326). "[W]e started to get information about

potential antagonism between the cytosine analogs, so we started to get information that it wasn't

a good idea to use two T drugs, for example[.]" (Tr. at 334). He testified as to an expectation

for success: "[T]he potential to join abacavir and 3TC because one was a G analog and one was

a C analog and that you'd expect they would work well together." (Tr. at 376). Dr. Zingman

continued that "combination therapy targeting different DNA bases was already established as a

treatment option for people with HIV infection." (Tr. at 379). Dr. Parniak echoed Dr.

Zingman's opinion, testifying in great detail as to how the strands of DNA are made in the

reverse transcription process, and how the component drugs work to terminate the DNA chain,

and explaining the expected benefit derived from combinations where the analogs do not

compete for the same site on the DNA chain. (Tr. at 477, 482-86, 516).

Aside from expert testimony, however, Defendants do not provide a single reference to

support the premise that combining analogs of different bases was known to provide a more

potent combination. It is true that certain combinations having different bases (at least AZT and

3TC) were reported as offering significant clinical benefits. Defendants, however, do not cite a

single reference or publication reporting that the therapeutic benefits of combination therapy

could be explained by the drugs affecting different bases of the DNA chain. Nor did

Defendants' experts rely on any references in support. Dr. Zingman testified that "we had pretty

good evidence" that combining NRTIs with complementary bases was known to be effective, yet

he never actually identified that evidence. Likewise, Dr. Parniak testified that it was known that

certain combinations having two NRTIs with different bases provided additive to synergistic

inhibition of HIV replication, but he never provided any studies or publications suggesting this

was the case. In fact, his deposition testimony was that he could not identify any references that

taught to combine compounds with different bases.[18] There is no reference in the record

showing that such a sophisticated understanding of combination therapy existed as of March

1995.

---

[18] "Q. And but my question focused on whether there was a general statement in the literature before March 30, 1995 that taught to combine combinations of compounds of different bases and said that they would lead to additive to synergistic effects? Can you identify any such references for me?

A. Off the top of my head, no, I cannot. I would have to conduct an extensive literature review."

Tr. at 612-13.

Lupin cites Schinazi 1995 for the field's supposed recognition that NRTIs with the same mechanism of action should not be combined, but that reference in no way refers to the benefits of combining NRTIs with different analog bases. It is instead concerned with the discovery that structurally similar NRTIs may differ significantly in regard to levels of toxicity.[19] Lupin also cites *AIDS Weekly 1995* for the proposition that researchers realized that if the success of the 3TC and AZT combination was "due to specific interactions, it may lead to rational strategies for combination therapy instead of random choices from a wide array of drugs." (TTX 71 at 2). This article, however, specified the M184V mutation selected by 3TC and the consequential resensitization of the virus to AZT as the reason for the 3TC and AZT combination's success. (*Id.* at 3). Thus, the specific interactions from which scientists might learn rational strategies for combination involved mutational interplay, not interactions derived from differing DNA bases. If the benefit of offering combinations with different DNA bases were truly known in the art prior to the filing date, one would imagine some reference, somewhere, would have said so, and been presented during the trial.

ViiV also rightly points out that researchers did combine NRTIs targeting the same nucleoside bases, including 3TC and ddC, up until shortly before the filing date, and some NRTI combinations with analogs of different bases failed to show any benefit over monotherapy or even displayed antagonistic qualities. (TTX 71 at 4, 5; Tr. at 920, Ms. St. Clair; PTX at 178). These failures provide further reason to doubt that combining analogs of different bases was a known method of increasing potency, although it is Defendants' failure to provide any references

---

[19] "We are realizing that nucleosides are the only approved antiretroviral drugs and that they are not all the same. For example, although structurally related to ddC, 3TC does not cause peripheral neuropathy even at high doses, thus destroying the fallacy that there is no 'non-toxic nucleoside' for retroviral therapy." (TTX 224 at 5).

33

**A00038**

in support that is the most important factor in reaching the conclusion that the Defendants have
not proved that it was a known method.

Defendants cite testimony from Dr. Ho in an attempt to show that he agreed with their
position that combining analogs with different DNA bases was an established treatment strategy
as of the filing date. The Court does not agree with this interpretation of the testimony.
Although Dr. Ho testified that one might avoid using the same nucleoside analog based on the
same building block, he also testified that combining different analogs was just a theory. (Tr. at
1252). "In terms of what might work, in my opinion this is unpredictable, what may turn out to
be synergistic, antagonistic, or additive. Until one does the experiment, it's not --- the outcome
is not known." (*Id.*). At best, it has been established that one might avoid combining drugs that
work on the same base, but there is no proof that a person skilled in the art had any expectation
that combining drugs of different bases would offer additive or synergistic potency.

(e) Teaching away and cross-resistance

The parties debate the significance of cross-resistance. ViiV argues that the art taught
away from using abacavir in a combination with 3TC because those two drugs share overlapping
cross-resistance profiles. ViiV also argues it would make no sense to remove AZT from the
AZT and 3TC combination, because that combination was understood to work due to specific
mutational interplays. Defendants disagree, arguing that cross-resistance was not a factor where
highly potent combinations were concerned, and that in any event the cross-resistance between
abacavir and 3TC was not significant. As to the particular combinations, Teva argues that it
would be obvious to remove AZT from the AZT/3TC combination and replace it with abacavir,
as abacavir offered similar potency to AZT with lower toxicity. For its part, Lupin argues that it

34

**A00039**

would be obvious to combine 3TC, abacavir, and a low dose of AZT, as persons skilled in the art knew this would provide an extremely potent therapy with an acceptable degree of toxicity.

There is no dispute that drug resistance was the reason behind the failure of NRTI monotherapy. (*See, e.g.*, PTX 128). "The development and clinical use of selective inhibitors to treat human immunodeficiency virus (HIV) infection have been marred by the ability of the virus to become drug resistant []." (*Id.*). HIV's ability to replicate up to one billion times per day, combined with its propensity to err in the transcription process, allow for millions of viral variants or mutations each day. (Tr. at 789, 803, 816, Dr. Arnold; Tr. at 1219-20, Dr. Ho). In other words, NRTI monotherapy selected for HIV mutations that resulted in resistance to the drug. (Tr. at 368-69, Dr. Zingman; Tr. at 490-91, Dr. Parniak). Monotherapy provided temporary benefits until the resistant variants emerged, causing the therapy to lose effectiveness. (PTX 128). This occurred with all NRTI monotherapies, including AZT and 3TC individually, without regard to their individual potency. (Tr. at 789, 803, 816, Dr. Arnold).

The hope in the field was that combination therapy would succeed where monotherapy failed. At the time of filing, there was only one combination known to provide sustained therapeutic benefits for HIV-infected persons: AZT and 3TC. The success of this combination was a breakthrough in the art, coming a few months prior to March 1995. (TTX 17; TTX 71). Although the pharmaceutical and viral interactions were not entirely understood,[20] the prevailing thought behind the combination's success was 3TC's selection of the M184V mutation, which appeared to restore the effectiveness of AZT in an AZT-resistant person. (Tr. at 796, 823, Dr. Arnold; Tr. at 1004, Dr. Ho; Tr. at 1003-04, Dr. Larder; TTX 71). In other words, it was

---

[20] "Researchers speculate that 3TC may increase AZT's effectiveness by delaying viral resistance to the drug." (TTX 17 at 12).

suspected that the mutations selected for by 3TC and AZT interacted with one another to make a

previously resistant infection treatable. This is what allowed the combination to provide

sustained therapy where other treatments failed.

Defendants point out that the mutational interplay was unproven, but it was by far the

best explanation given for the combination's success in the prior art.[21] As the AZT and 3TC

combination was a turning point in the field of HIV therapy, it would seem a POSA seeking to

mimic its success would invariably put stock into the only known explanation for that success.

The explanation hinged on the resistance profiles of the individual compounds of the

combination, which would make cross-resistance highly significant. That is not to say that

Defendants are incorrect when they assert that potency was a fundamental principle of

compound selection.[22] There was the hope that potent combinations would delay the emergence

of a resistant virus. The fact that potency was essential to therapy, however, is not inconsistent

with a strong desire to avoid cross-resistant combinations, as drug resistance might undermine

potency altogether. (Tr. at 1018-19, Dr. Larder). Defendants also cite TTX 108. It shows that

when using certain potent combinations *in vitro*, "no resistant variants emerged." (TTX 108 at

195S). Defendants thus argue that it was known that potency could trump resistance. There is

no evidence, however, that those combinations had overlapping cross-resistance profiles, and

they thus do not speak to the issue. Further, it was later known that the combinations of AZT/ddI

and AZT/ddC, which showed very strong potency *in vitro*, did nothing to delay resistance

clinically. (LTX at 1490 at 518-19). Defendants argue that research was conducted on

---

[21] Teva notes that TTX 71 stated that "the efficacy of 3TC apparently goes beyond its ability to prolong the efficacy of AZT," but that exhibit clearly singles out the mutational interplay as the main suspected reason behind the combination's success.

[22] It seems obvious even to a layperson that a more potent drug is superior to a less potent drug for treatment of a disease, all else being equal.

36

combinations that included both ddI and 3TC, drugs with known overlapping cross-resistance profiles. (LTX 1518 at 953-54). This research was conducted prior to the announcement of the AZT and 3TC trials, which everyone agrees was a monumental occurrence in the field, and the Court sees it as a strongly indicating the importance of accounting for cross-resistance.

Defendants also rely on the testimony of Dr. Laurence, who stated, "You want to target it early on in infection with the most potent combination you have, so that you don't have to worry about resistance or cross-resistance . . . [h]it it hard and hit it early." (Tr. at 672-73, 678). There was, however, little evidence that hitting the infection hard and early with combination therapy made cross-resistance a non-issue. Defendants point to the Hammer reference for the proposition that "the overriding goal of researchers by March 1995 was . . . to hit HIV 'hard' and 'early.'" Although clinicians in the reference discuss the need to use maximum dosages, and tentatively suggest that combination therapy might best be used right away, rather than in later stages of infection, the tone and tenor of the article does not inspire confidence. (*See* PTX 344 at S36). To the contrary, the reference highlights the uncertainty in combination therapy, stating, "many issues complicate[d] the evaluation of combination therapy for HIV." (*Id.* at S25). A "clear-cut clinical benefit" demonstrating combination therapy's superiority to monotherapy had yet to be proven.[23] (*Id.* at S36). Clinicians did not understand why some studies showed promise, while other studies disappointed.[24] One lingering question was "[w]hat will the impact of combination therapy be on the emergence of resistance and cross-resistance?" (*Id.* at S25). The Hammer reference thus does not suggest that any principles of combination therapy had

---

[23] This reference was circulated prior to the publication of the AZT/3TC combination results.
[24] "Salvage studies, such as ACTG 116B/117, have seemed promising in terms of continuing the antiviral effect by switching therapy. Yet the results of ACTG 155 were disappointing. Why did the salvage studies work and ACTG 155 not work?" (*Id.*).

37

been thoroughly established, and in no way suggests that potency resolved issues of cross-resistance.

ViiV also cites three references teaching that cross-resistance was to be avoided in selecting compounds for combination. (TTX 225 at 172; PTX 365; PTX 434). Defendants dispute the interpretation of these references as containing statements teaching against combining drugs with overlapping profiles of cross-resistance. (*See id.*). Defendants argue that TTX 225 emphasizes toxicity concerns, not cross-resistance, as it states, "if synergistic toxicity is not a problem, then these should be combined with drugs that impact acute infection." (TTX 225 at 172). That same paragraph, however, flatly stated that "drugs should not be cross-resistant." (*Id.*; Tr. at 1009, Dr. Larder). It thus clearly teaches against combining cross-resistant drugs.

Defendants also argue that the second reference, PTX 365, stresses potency and selectivity, and lists cross-resistance toward the end of its teachings, thus suggesting that factor is less important. That reference lists various factors as important when combining drugs, including "the stage of HIV replication at which the agent works," "the pharmokinetic profile," "penetration into the central nervous system," and "the likely toxicity profile" before noting that "[a]nother increasingly important issue is the potential for inducing resistance and the likelihood of cross-reactive resistance with other agents." (PTX 365 at 202). The order factors are listed, however, is not determinative of their value. Further, the recognition that choosing drugs for combination is a complicated endeavor that requires the weighing of many factors does not suggest that cross-resistance is a minor factor. There is no dispute that clinicians sought to obtain the best balance of high potency and low toxicity. The question is the significance of cross-resistance's potential to undermine therapeutic value in choosing compounds to combine. This reference's acknowledgment that cross-resistance is an "increasingly important issue"

38

speaks for itself. Finally, the third reference, PTX 434, states that knowledge of 3TC's selection

for the M184V mutation would "permit effective patient monitoring for the development of

resistance to these drugs and to design rational drug combinations." (PTX 434 at 880). As

Defendants point out, PTX 434 discusses the importance of maximizing antiviral effects while

minimizing toxicity. (*Id.*) It also straightforwardly pairs the rationality of combining drugs with

knowledge of resistance. (*Id.*). Even the most potent combination, AZT and 3TC, which were

not cross-resistant, still rapidly selected for the M184V mutation. (PTX 363 at LB33; Tr. at

1003, 1018-19, Dr. Larder).

The weight of the prior art most strongly suggests that concerns of cross-resistance would

be a discouraging factor, even for combinations displaying significant potency and limited

toxicity. HIV's ability to mutate quickly gave rise to the difficulties in identifying an effective

treatment. It was recognized that "the enormous potential of HIV-1 for the development of drug

resistance cannot be denied." (TTX 224 at 45). Drug resistance was the root cause of the failure

of both monotherapy and combination therapies prior to the AZT and 3TC combination, and the

best understanding of why that combination worked was attributed to how it selected for

mutations, *i.e.*, its resistance profile. (Dr. Larder, Tr. at 1018-19, 1029). Drugs with issues of

cross-resistance retained the potential to undermine even the most potent combinations. Thus,

resistance profiles would be a critically important factor in forming combinations,

notwithstanding the fact that toxicity and potency were also vitally important.

Cross-resistance might discourage a person skilled in the art from pursuing a particular

combination, but would it discourage the specific combination of 3TC and abacavir? Defendants

argue that it would not, as the cross-resistance between those two drugs was minimal, and there

were strong countervailing reasons to combine those drugs. ViiV argues that the cross-resistance

39

between 3TC and abacavir was known and significant, and persons skilled in the art would have accordingly avoided that combination.

3TC and abacavir both select for the M184V mutation, a mutation that can cause resistance to HIV.[25] (Tr. at 1016-18, Dr. Larder). Abacavir's selection of the M184V mutation caused increases of resistance at levels between two and five-fold. (TTX 265 at 182; Tr. at 552-54, Dr. Parniak). Defendants argue that resistance at those levels is not significant, while ViiV argues that it would be discouraging. Dr. Parniak testified that two-fold resistance was not significant, and five-fold resistance was "borderline at best." (Tr. at 553-54). Defendants point out that this is consistent with a 1998 article by Dr. Larder that defined "resistance" as greater than five-fold, and "high-level resistance" as greater than ten-fold. (LTX 1341; Tr. at 1348). In 1993, Dr. Larder also described five-fold resistance as low resistance. (PTX 128 at 5653, 5655). Despite abacavir's cross-resistance with ddI and ddC in the range of a three-to-six fold increase, abacavir was declared "an important candidate for further development as an anti-HIV drug for combination therapy," due to a lack of cross-resistance with AZT, its synergy with ddI, ddC, and AZT, and the slow emergence of resistance. (TTX 265 at 182; Tr. at 358-60, Dr. Zingman; Tr. at 444-45, 551-55, Dr. Parniak). AZT, ddI, and 3TC were combined and evaluated as having "superior activity" *in vitro*. (LTX 1484 at 268; Tr. at 701, Dr. Laurence; Tr. at 809-10, 833, Dr. Arnold). They were also combined and used in clinical trials that suggested therapeutic intervention at an earlier stage of HIV infection. (LTX 1484 at 265, 268; Tr. at 702-04, Dr.

---

[25] Although the M184V mutation causes a degree of resistance to both 3TC and abacavir, it ironically reverses resistance to AZT.

A00045

Laurence).  This was despite the fact that ddI and 3TC have cross-resistance to some of the same

mutations as abacavir and 3TC.[26]  (LTX at 1484 at 265, 268; Tr. at 1041, Dr. Larder).

In response, ViiV first notes that abacavir did not only select for the M184V mutation, it

also selected for secondary L74V and K65R mutations, which also conferred resistance to 3TC.

(TTX 265 at I82; Tr. at 1016-17, Dr. Larder).  Defendants' own expert, Dr. Zingman, described

the resistance conferred by these latter two mutations as "significant."  (Tr. at 360).  Dr.

Laurence, another expert of Defendants, testified that abacavir and 3TC would have appeared to

be cross-resistant on their face, and that combination therapy was confusing in general.  (Tr. at

763-64).  Although the Tisdale reference (TTX 265 at I82) described the emergence of the

M184V mutation to abacavir as slow, both Drs. Larder and Arnold testified that the four

passages required for abacavir to select the M184V mutation was quick.  (Tr. at 1015-16; Tr. at

820).  There is a reference suggesting that levels of resistance between two and six were not

insignificant, as resistance at similar levels affected the clinical use of ddI.[27]  (Tr. at 1269-70,

1275-76, Dr. Ho).  Dr. Ho testified that although it is true that researchers did pursue the ddI and

3TC cross-resistant combination, only 3TC and abacavir had completely overlapping resistance

profiles.  (Tr. at 1297-98, 1365-66, Dr. Ho).

Abacavir was declared an important candidate for combination therapy due to its general

cross-resistance profile and its synergy with other NRTIs in the Tisdale abstract.  It thus was a

good candidate for combination therapy generally.  The cross-resistance profile, however, also

---

[26] Dr. Arnold referred to the St. Clair abstract in his testimony on this subject, which was outside the scope of his
expert report, and thus cannot be considered here.

[27] PTX 696 notes that ddI was shown to confer resistance in patients who received long-term therapy, while also
noting that "[i]t has been difficult to detect more than a 2 to 8 fold difference in [ddI] susceptibility…which is in
contrast to the high-level [AZT] resistance (e.g., 100-fold changes from the baseline seen after prolonged [AZT]
therapy[.]" (PTX 696 at S144; Tr. at 1269-70).  "The clinical significance of the detection of [ddI] resistance in
vitro remain[ed] unclear."  (Id.).

41

gave reasons to look in directions other than combining abacavir with 3TC. Although a fold

increase of between two and five was not considered extremely high, it would at a minimum

factor into the consideration, especially in conjunction with the knowledge that other drugs (ddI

in particular) displaying resistance between two-fold and eight-fold resulted in treatment failure.

As to the Dr. Larder publications relied on by Defendants, one was published in 1998 and thus is

not relevant here, as it is fair to believe that much was learned about M184V cross-resistance

three years after AZT/3TC and the claimed combinations entered the public sphere. The other

publication, from 1993, characterized ddC's five-fold resistance as "partial resistance," and

resistance at levels of less than five-fold resistance as "low-level."[28]   (PTX 128 at 5653, 5655).

The countervailing evidence, however, that the overall cross-resistance profile was expected to

be capable of interfering with anti-HIV therapy is persuasive, especially the testimony of

Defendants' own witnesses, Dr. Zingman and Dr. Laurence.

      The existence of research into the ddI and 3TC cross-resistant combinations tends to

show that cross-resistance would not always conclusively rule out research on a particular

combination. That being said, Defendants did not counter the evidence showing that the degree

of cross-resistance between 3TC and abacavir was more extensive than between ddI and 3TC. It

is also important to view all of the testimony in light of the treatment situation during the early to

mid-90s. Drug researchers and physicians acted in the midst of a public health crisis, and they

did not have a strong understanding as to what would work and why. The situation was

desperate, and with doctors scrambling for solutions, they might not be inclined to rule out any

---

[28] ViiV argues that Defendants' failure to cross-examine Dr. Larder on his own publications that allegedly undermine his testimony justifies an inference that Dr. Larder's answers would have explained away any inconsistencies. I do not find that any choice not to ask a witness a question justifies an inference that the unasked question would have been answered unfavorably to the party who did not ask the question. Defendants, however, do not appear to use the reference to specifically impeach Dr. Larder's testimony, for had they, they would have violated Fed. R. Evid. 613(b) for failing to give him the chance to explain or deny the statement. They instead use it as one prior art publication supporting their position that the resistance conferred by abacavir was not significant.

particular combination absent experimental evidence indicating that it should not be pursued. The fact that in certain instances researchers pursued potential solutions in the face of teachings suggesting that the solution might not work is not surprising in this context. That does not change the fact that those teachings existed, and would have been informative for those seeking to combine drug compounds. The cross-resistance between abacavir and 3TC is a significant difference with the prior art AZT and 3TC combination. In the end, the cross-resistance profiles of abacavir and 3TC provided a reason for researchers to look in another direction than a combination of those drugs.

*(iii) The claimed combinations in comparison with the prior art.*

The Court will next address the specific claimed combinations and the differences and similarities between those combinations and the prior art.

(a) The double combination: abacavir and 3TC.

Teva argues that, because abacavir showed synergy in combination with ddC, 3TC was a logical replacement for ddC, as ddC and 3TC had identical mechanisms of action, yet 3TC had a superior therapeutic window and toxicity profile. Teva argues that persons skilled in the art would have known that replacing ddC with 3TC would have led to predictable therapeutic benefits, because both ddC and 3TC are "C" analogs, and thus work on a different base than abacavir. It has already been shown, however, that no references in the prior art support the position that drug researchers understood this phenomenon. There is thus no justification for the premise that drug researchers would expect another "C" analog to combine well with abacavir. Further undermining Teva's position is the fact that, to reach this conclusion, Teva chiefly relies on Dr. Parniak's discussion of Du 1992 (TTX 78), Daluge 1994 (TTX 265), Coates 1992 (TTX 56), and Hart 1992 (TTX 124). (Tr. at 581-82, 587; D.I. 205 at p. 10). This combination,

43

however, was not disclosed in his expert report as one of the specific combinations that he relied

upon to form the foundation of his obviousness opinion. In his report, Dr. Parniak defined the

following two groups of references as each separately supporting his obviousness opinion: (1)

AIDS Alert 1995 (TTX 17), Du 1992 (TTX 78), and Daluge 1994 (TTX 265) and (2) New AIDS

Therapy 1992 (TTX 196) and Hart 1992 (TTX 124). (*See* D.I. 211, Exh. A, *Dr. Parniak's Expert*

*Report* at ¶ 353). The Court was clear that witnesses were to testify only to combinations

specifically identified in their expert reports as supporting their opinions.[29] Dr. Parniak thus was

not permitted to mix and match between his identified groups as he did in his testimony, where

he relied on Hart 1992 (from the second group) in combination with Daluge 1994 and Du 1992

(from the first group). Further, he explicitly relied on Coates 1992 (TTX 56) in forming his

opinion, which does not appear in either of the two groups. (Tr. at 636). For this reason, Dr.

Parniak's testimony on this point will not be considered by the Court.[30]

Teva also argues that a person skilled in the art would seek to improve upon the

AZT/3TC combination by removing AZT and replacing it with abacavir. It is true that abacavir

and 3TC were "second generation NRTIs," less toxic than AZT, a first generation NRTI. (TTX

265 at IG, I82; TTX 56). It is also true that abacavir and 3TC were understood to be potent

inhibitors of HIV, and both had been shown to have synergy with other NRTIs. (TTX 196; TTX

202). Despite all of this, to remove AZT from the AZT/3TC combination and replace it with

abacavir would be inconsistent with the best understanding of why that combination worked.

Although the pharmaceutical and viral interactions were not entirely understood, the prevailing

thought behind the combination's success was 3TC's selection of the M184V mutation, which

---

[29] "If I find something in [the expert report] saying, here are 27 references. It's some combination of these that makes it obvious. Well, if that's what the report says, that's not good enough." (D.I. 188, p. 46 ll. 11-15).
[30] Dr. Parniak's testimony on this point was thus in violation of Fed. R. Civ. P. 26. ViiV timely objected. (*See* Tr. at 569-592) The Court now grants ViiV's motion to strike (D.I. 211) this testimony.

appeared to restore the effectiveness of AZT in an AZT-resistant person. (Tr. at 796, 823, Dr.

Arnold; Tr. at 1004, Dr. Ho; Tr. at 1003-04, Dr. Larder; TTX 71). Removing AZT would be

contrary to the understanding of why that combination worked, and no good reason was given

why a person skilled in the art would abandon that advantageous property. (Tr. at 1003, Dr.

Larder; Tr. at 1251, Dr. Ho). Teva argues that this was just a theory, but the evidence shows that

it was the best available explanation for why AZT/3TC worked where all other combinations

failed.[31] Teva also points out that resensitization did not entirely explain the efficacy of the

combination, but resensitization indisputably was understood to be the most significant factor. It

is not disputed that 3TC and abacavir did not have a similar mutational interplay, and would not

be expected to restore sensitivity to a resistant virus. There also is the issue of cross-resistance,

which the Court already noted was a deterrent to combining abacavir and 3TC. For these

reasons, the AZT/3TC prior art would not provide motivation for a person skilled in the art to

remove AZT from the combination, and to replace it with abacavir to form the double

combination.

(b) The triple combination: abacavir, 3TC, and AZT.

Lupin argues that the prior art logically led drug researchers to pursue the triple

combination of abacavir, 3TC, and AZT. Lupin points out that abacavir and 3TC selected for the

same mutations, and thus both would resensitize an AZT-resistant virus to AZT, making them

ideal to pair with AZT. (Tr. at 764; TTX 265 at 182). Lupin further asserts that abacavir was

known to show *in vitro* synergy with AZT. (LTX 1324 at S36; TTX 265 at I6, 182; Tr. at 802,

---

[31] Although the references indicate that scientific certainty had not been arrived regarding why the combination worked, there are multiple references explicitly tying the mutational interplay to AZT/3TC's success. Contrasted with Defendants' theory that differing analog bases would offer predictable potency and synergy, which has no supportive publications, the mutational interplay explanation is on solid ground. All of this suggests that the mutational interplay would inform persons skilled in the art when designing combinations after AZT/3TC's publicized success.

45

Dr. Arnold; Tr. at 1379-81, Dr. Ho).  Lupin also relies heavily on a patent application of Dr. Larder, one of ViiV's experts.  That application suggested combining AZT with two additional compounds, each from one of the following categories: (1) a "mutation-inducing HIV-RT inhibitor," to gain the benefit of resensitization, and (2) "other therapeutic agents."  (TTX 204 at 1-2, 7; Tr. at 1379-81).  3TC is listed in the first category as one possible "mutation-inducing HIV-RT inhibitor," and carbovir is listed in the second category as one of the "other therapeutic agents."  (Tr. at 778, Dr. Laurence; TTX 204 at 7).  According to Lupin, the application thus specifically discloses AZT, 3TC, and carbovir.  As abacavir was a carbovir analog understood to have superior bioavailability and toxicity profiles, Lupin argues a person skilled in the art would accordingly replace carbovir with abacavir in the three drug combination suggested by the Larder application, making the claimed combination obvious.

ViiV, however, rightly points out that a complete reading of the Larder application gives rise to a large number of potential combinations having many different potential benefits and challenges.  While 3TC is one potential "mutation-inducing HIV-RT inhibitor" to be combined with AZT, there are also eight other drugs listed in that "inhibitor" category.  (TTX 204 at 4-5).  One is the NRTI known as FCT, and the seven others are NNRTIs.  (TTX 204 at 2, 4-5; Tr. at 801-02, Dr. Arnold; Tr. at 750-53, Dr. Laurence).[32]  The NNRTIs induce a different resensitizing mutation than 3TC (at "position 181" rather than "position 184").  (TTX 204 at 19).  The application next contains the vague suggestion to add "other therapeutic agents" to "AZT and/or the mutation-inducing HIV-RT inhibitor."  The "other therapeutic agents" category is exemplified by (but not limited to) a laundry list of drug classes and compounds, including protease inhibitors, interferons, and the NRTIs of ddI, 3TC (appearing again) and carbovir.  (Id.

---

[32] The NNRTIs induced a different mutation than 3TC did (M181V rather than M184V) to resensitize the virus to AZT.  (Id.).  Thus, their use, unlike 3TC's use, with abacavir would not result in duplicative resensitization.

46

at 7). The variety of compounds in the "other therapeutic agents" category, spanning multiple classes, would leave a person skilled in the art with virtually no guidance as to which path to choose.

Although one extractable combination from the instructions is AZT, 3TC, and carbovir, there is nothing in the application that would lead a drug researcher to that specific combination to the exclusion of any other. Even combining teachings in the application with the knowledge that AZT/3TC had been proven to be the best combination, it does not follow that carbovir should be added as the third drug where those two drugs are used. It would make little sense to pluck carbovir out from the list of "other therapeutic agents" where 3TC was used as the mutation inducing inhibitor, as there were a litany of options on the list that did not share cross-resistant profiles with 3TC. In contrast, carbovir would be more predictably combined where one of the NNRTIs was used as the mutation inducing inhibitor, as overlapping resistance profiles would be avoided. The Larder application is thus not as strong a suggestion in the direction of the claimed triple combination as proffered by Lupin.

ViiV further argues that the concerns of toxicity would have taught away from the triple combination. Specifically, carbovir and AZT had been shown to display "synergistic toxicity," and thus a person skilled in the art would not seek to combine abacavir (the carbovir analog) with AZT. (PTX 451 at 146; TTX 225 at 172). NRTIs were generally expected to be toxic, as they may interfere with normal DNA processes in a similar manner as to how they inhibit the viral reverse transcription. (Tr. at 1290-91, Dr. Ho; TTX 224 at 33). Toxicity could not necessarily be predicted based on *in vitro* study or even *in vivo* animal experimentation, as ddI did not show serious toxicity when studied *in vitro* or in dogs, yet when given to humans, serious side effects emerged, including potentially lethal pancreatitis. (PTX 365 at 3949). Certain

47

combinations also resulted in highly toxic outcomes. For example, the combination of AZT and

ddC caused "considerably more adverse reactions" due to toxicity than AZT or ddI

monotherapies. (PTX 268 at PB0266; Tr. at 634, Dr. Parniak). That combination was also

reported to cause "increased incidence of serious toxicity in patients with advanced disease."

(PTX 432 at 4253; Tr. at 1246-47, Dr. Ho). Dr. Zingman agreed that "it was a difficult decision

to know whether or not to give [patients] two toxic drugs or only one…" (Tr. at 421-22). The

experts agreed that synergistic toxicity was to be avoided. (Tr. at 709, Dr. Laurence; Tr. at 1294-

95, Dr. Ho; Tr. at 581, Dr. Parniak).

     All of this suggests that new types of NRTI therapies retained the potential for

unexpected toxicity. That potential increased the unpredictability in the field, which undercuts

the argument that any particular combination would be obvious. And it is true that AZT and

carbovir produced synergistic toxicity. (PTX 451 at 146; TTX 225 at 172). As discussed above,

however, abacavir was successfully designed to avoid the toxicity problems of carbovir, and was

understood to be a less toxic compound. (TTX 265 at I84). Further, unlike carbovir, abacavir

had been progressed to clinical trials, which would increase the confidence that abacavir was

safer than carbovir. (Tr. at 1374-77, Dr. Ho). Thus, concerns of abacavir's toxicity would not be

the same as they were for carbovir, and the Court does not believe that carbovir's toxic synergy

with AZT would be imputed to abacavir.

     Lupin also argues that a person skilled in the art would be motivated to improve upon the

existing AZT/3TC/ddI combination by replacing ddI with abacavir. Lupin points out that prior

to March 1995, doctors had already prescribed the triple combination of AZT, 3TC, and ddI.

(Tr. at 1364, Dr. Ho). Lupin posits that abacavir was a solid candidate to replace ddI in the

combination, as abacavir was known to be less toxic than the very toxic ddI, yet offered greater

48

**A00053**

potency. (Tr. at 334, 362-63, Dr. Zingman; Tr. at 715, Dr. Laurence). Abacavir was structurally similar to ddI, and both selected for the M184V and L74V mutations. (Tr. at 795, Dr. Arnold; Tr. at 1041, Dr. Larder; TTX 265 at I82). Lupin heavily relies on the fact that abacavir targets the same DNA base as ddI. As discussed already, the differing analog base strategy was not shown to be established in the prior art. Thus it would not provide a motivation to make the triple combination. Lupin further does not point to any success garnered from the AZT/3TC/ddI combination that would inspire imitation. Only two abstracts discuss this combination. (LTX 1484 at 265, 268). One is a description of ongoing clinical trials that does not disclose any results. (*Id.* at 265). The second is an *in vitro* study of AZT/ddI/3TC, describing it as "the most consistent triple drug combination," but the study does not state which other combinations were less consistent. (*Id.* at 268). A single *in vitro* study claiming some degree of undefined success is not persuasive evidence of obviousness. And, as discussed, the complete cross-resistance between abacavir and 3TC provided some degree of discouragement for their combination.

### (iv) Secondary considerations

The Court will consider any secondary considerations indicative of nonobviousness. "A court is required to consider secondary considerations, or objective indicia of nonobviousness, before reaching an obviousness determination, as a 'check against hindsight bias.'" *INVISTA N. Am. S.a.r.l. v. M & G USA Corp.*, 2013 WL 3196817, *7 (D. Del. June 25, 2013). ViiV argues the secondary considerations of failures of others, long felt but unresolved needs and unexpected clinical efficacy, industry praise, skepticism, unexpected synergism, and commercial success as indicia of nonobviousness.

### (a) Failures of others, unmet but long felt needs, and unexpected clinical efficacy

**A00054**

ViiV asserts that both the claimed combinations satisfied long felt, but unresolved needs

in the marketplace for anti-HIV medicine.  Defendants disagree, arguing that ViiV failed to show

that the claimed combinations were superior to AZT/3TC.

Dr. Ho testified that studies showed that the abacavir/3TC combination outperformed

AZT/3TC in children, and this would be surprising, because AZT/3TC was known as the gold

standard of HIV treatment in March 1995.  (PTX 113; PTX 122 at 738; Tr. at 1303-04, Dr. Ho).

The fact that the abacavir/3TC would eliminate the resensitization benefit of AZT/3TC, yet still

offered clinical efficacy, would be surprising.  Dr. Ho also testified that abacavir/3TC/AZT

outperformed AZT/3TC even with the M184V mutation present, and this would be surprising.

(Tr. at 1307-08, Dr. Ho; PTX 257).  The triple combination was also non-inferior (or

comparable) to AZT/3TC plus a protease inhibitor in two separate studies.  (Tr. at 1307-08, Dr.

Ho; PTX 390; PTX 477).  ViiV argues this would be surprising in light of the overlapping

resistance profiles of abacavir and 3TC.

"In the pharmaceutical industry, the failure of others to develop a safe and effective drug

often supports the nonobviousness of a drug that finally achieves success." *Bristol-Myers Squibb*

*Co. v. Teva Pharmaceuticals USA, Inc.*, 923 F. Supp. 2d 602, 680 (D. Del. 2013) (citation

omitted).  The long-felt and unmet need inquiry is judged at the time of the filing date of the

patent.  *Id.* at 683.  It is clear that the art of HIV treatment was littered with failures as of March

30, 1995.  Only a single combination, AZT/3TC, had shown any sustained effectiveness against

the virus.  Despite this promising showing, that combination was still in an experimental stage,

not yet FDA approved, and there was no certainty that its benefits would be sustainable in the

face of a vexing disease.  The question is whether the announcement of AZT/3TC's impressive

clinical results a few months prior to the filing date erases the extensive history of failures in the

art. The Court does not believe that it does. Monumental efforts were being put forth in the

early to mid-90s to solve the HIV public health crisis. When put to the test, nearly all of those

efforts were proven to be failures. Those failures are indicia of nonobviousness in comparison

with the success of the claimed combinations.

As to the actual evidence of success proffered by ViiV, it is sufficient to show that the

claimed combinations are safe and effective agents at providing sustained anti-HIV therapy.[33]

The success of the double combination is particularly surprising, as that combination lacked the

AZT/3TC resensitization dynamic. The success of the triple combination is also surprising, as

that combination added a third potentially toxic drug to the existing AZT/3TC combination,

while having an overlapping cross-resistance profile with 3TC. Defendants argue that ViiV has

not shown that the claimed combinations were superior to AZT/3TC, but the Court does not view

that as necessary, considering that at the time of filing, the country was still in the midst of a

public health crisis, and the need for more than a single effective therapy was apparent. For

these reasons, the success of the claimed combinations in the midst of many failures is indicia of

nonobviousness.

(b) Industry Praise

ViiV argues that the claimed combinations received industry praise, a factor which may

support nonobviousness. ViiV points to the testimony of Dr. Blick, who stated that the claimed

combinations gained praise for their efficacy and durability. (Tr. at 104-09). ViiV points out

that they have been prescribed often, and that Trizivir was chosen to launch a highly active

antiretroviral therapy ("HAART") in China. (Tr. at 1143-45, Dr. Grabowski; Tr. at 1308-09,

---

[33] Defendants argue that the studies cited by ViiV should be discounted, as they only show effectiveness for treatment in children, but do not explain why that effectiveness would not be correlated with effective treatment generally.

1311-12, Dr. Ho).  ViiV also asserts that the single combined formulation of abacavir/3TC is

currently a "preferred" regimen, in four out of six guidelines.  (PTX 467; 633; PTX 637; PTX

636).  Similarly, ViiV asserts that the triple combination was recommended as an alternative

regimen for many years by two guidelines, and was the only triple combination to be so

recommended.  (PTX 487; PTX 515; PTX 532).

    None of this is sufficient to create indicia of nonobviousness.  ViiV has not provided any

evidence of praise from other drug researchers or competitors.  The testimony of Dr. Blick is

unsupported by any evidence, and the fact that a drug compound is recommended by treatment

guidelines or is prescribed often is more appropriately considered in the context of commercial

success.  All of this falls well short of showing true industry praise.  *See Bayer Healthcare*

*Pharmaceuticals, Inc. v. Watson Pharmaceuticals, Inc.*, 713 F.3d 1369, 1377 (Fed. Cir. 2013)

(holding journal citations referencing efficacy studies not sufficient to show industry praise).

                        (c) Skepticism

    ViiV argues that it has provided evidence of skepticism of others that the claimed

inventions would work.  ViiV points to two supposed instances of skepticism.  The first is a

February 1995 communication by Dr. Tisdale, a colleague of the inventors, who warned that

abacavir and 3TC "clearly show some cross-resistance" and "stress[ed] that the cros[s]-resistance

profile is a problem with this combination."  (PTX 12 at 0745208).  The second is a 2002 study,

where the authors stated that, prior to the study, they were concerned that the combination might

not be effective due to abacavir and 3TC's selection for the M184V mutation.  (PTX 122 at 738-

39).

    Defendants argue that the Tisdale statement is irrelevant, as it was an untestified to

hearsay statement that was not published.  The Court agrees that it is not relevant, but not for

52

**A00057**

precisely these reasons. The Court is not aware of any cases where skepticism was recognized as indicia of nonobviousness when that skepticism was made by personnel internal to the company responsible for the invention. Skepticism should only be recognized as indicia of nonobviousness if it is displayed by those outside the company, as it seems conducive to the inventive process for coworkers to play the devil's advocate, that is, to probe for weaknesses and test the merits of ongoing research. Such internal dialogue has no probative value. Further, skepticism expressed in a private communication is likely less considered and less self-scrutinized than statements of skepticism intended to be published to the scientific community. For these reasons, Dr. Tisdale's statement is not indicia of nonobviousness.

As to the 2002 study, Defendants argue it is irrelevant for being published subsequent to the filing date. The Federal Circuit has stated, however, that evidence responding to attacks on validity may be obtained after the filing date of the patent. *Knoll Pharm. Co., Inc. v. Teva Pharmaceuticals USA, Inc.*, 367 F.3d 1381, 1385 (Fed. Cir. 2004). "Relevant secondary considerations often are not manifest even until well after the issuance of a patent." *Genetics Inst., LLC v. Novartis Vaccines & Diagnostics, Inc.*, 655 F.3d 1291, 1307 (Fed. Cir. 2011). This would seem to be especially true in the context of a skepticism inquiry, as it is often in the inventor's interest to maintain the secrecy of her invention as long as possible, and knowledge of the invention might only enter the public sphere (and thus become ripe for skepticism) due to an event naturally occurring after the filing date, such as the application's publication. The Court agrees with ViiV that the statement, that the risk of cross-resistance was still a concern so many years after the filing date, is relevant skepticism indicating nonobviousness. It is, however, only a single statement, and therefore is an insignificant factor in the final weighing of the evidence.

(d) Unexpected synergism

53

### (i) Was synergism expected?

Defendants argue that the synergism of the claimed combinations was to be expected, as abacavir, 3TC, and AZT all operate as analogs of different DNA bases, and all of the clearly synergistic combinations in the prior art also involved NRTIs of different analog bases. As discussed *supra*, however, the only evidence that synergism was positively understood to result from these types of combinations is unsupported expert testimony. It is beyond doubt that experts were aware of the nature of NRTIs as analogs of a particular DNA base, and it is also true that experts were aware of combinations producing synergy. There is no evidence, however, that the field put two and two together to deduce that synergism was actually caused by (or even correlated with) combinations assembled from different analogs. There is little doubt that, were such a relationship established in the field, it would have been reported in some study, publication, or textbook in the prior art.

The only support Defendants can point to is Dr. Ho's testimony that drug researchers would avoid using nucleoside analogs based on the same DNA building block. Knowing it is best to avoid combining drugs based on the same block out of an apparent desire to avoid antagonism is not equivalent to reasonably predicting that combining drugs based on different blocks will result in synergism. For these reasons, Defendants do not show that "POSAs understood that complementary NRTIs exhibited synergistic effects[.]" (D.I. 205 at 28).

### (ii) Synergy evidence

The next question is whether ViiV factually proved the synergistic effects of the claimed double and triple combinations. The parties dispute the trustworthiness of the data relied upon by ViiV's synergism expert, Dr. Greco, for his opinion that synergy was shown for both combinations. Dr. Greco received the data from Mr. Hazen, the Glaxo employee who conducted

54

**A00059**

the experiments. (Tr. at 1098-99, Dr. Greco). Mr. Hazen admitted that the data sets were affected by control problems. (Tr. at 1072-72). Nevertheless, Dr. Greco relied on the data for his model, finding the drug combinations synergistic. (Tr. at 1088-90, 1107-08, 1108-09; PTX 567; PTX 569; PTX 576; PTX 579).

Defendants argue that problems with the controls of Mr. Hazen's experiment make Professor Greco's opinion unreliable. The problem involved the wells of uninfected and untreated human cells. (Tr. at 1072-74, Mr. Hazen). As the control group, the uninfected cells were intended to provide the theoretical upper bound for the measurement of living human cells in comparison with the infected cells. (Tr. at 1452, Prof. Makuch). The results of the test, however, showed that wells of infected cells plus AZT actually had a higher number of living cells than the control group, counterintuitively suggesting that HIV infection increased rather than decreased human cell production. (Tr. at 1452-53, Prof. Makuch). Professor Makuch, Defendants' expert, testified that it was much more difficult to measure the effect of the drugs absent the control group for comparison. (Tr. at 1454-55). He also noted that certain wells containing lesser dosages of the drug resulted in greater suppression of replication than wells with greater dosages, when the opposite would be expected. (Tr. at 1454).

ViiV argues that issues with the control group do not necessarily imply issues with the infected cells. Dr. Greco testified that he was able to rely on the infected cells treated with drugs at high concentrations in place of the control because they characterized the "upper asymptote very, very well." (Tr. at 1102-03). Mr. Hazen found the data was reliable because the infected cells were treated differently than the uninfected cells, and the calculations from the infected cells produced a smooth, S-shaped curve. (Tr. at 1058-60).

55

**A00060**

Professor Makuch explained that Dr. Greco's attempt to salvage the validity of the experiment was problematic because ignoring the control group violated the original design of the experiment, which included the control group to provide a baseline for data comparison. (Tr. at 1455). He also explained that problems with the control group put the values of all wells in the experiment in doubt. (Tr. at 1455-56). Professor Makuch opined that the proper way to remedy the problem was to replicate the experiment to provide a check on the data obtained, rather than to ignore the control group. (Tr. at 1456). Professor Makuch also testified that wells at columns five through nine were concerning. (Tr. at 1457). Those columns represented serial dilutions of the drug with other variables constant, yet had a flat dose response, *i.e.*, the values did not vary despite differences in drug potency. (Tr. at 1457). He further noted that even if Hazen's experiment had been conducted perfectly, it was only a single experiment, and further experimentation should have been performed to assess validity and account for variability. (Tr. at 1457).

The Court credits Prof. Makuch's testimony. The control group was there for a reason, and simply ignoring it is not consistent with the original intent of the experiment. Further, anomalies in the control group not only required the removal of the baseline, but also place a degree of doubt into the data accumulated from the infected wells, even if they were "treated differently" than the uninfected cells. That doubt is enlarged by counterintuitive findings that certain wells with lesser drug concentration showed greater viral replication than wells with greater drug concentration. One of these problems in isolation might not necessarily undermine Dr. Greco's conclusions relying on the Hazen data, but in combination they are troubling enough so that I cannot conclude his opinion is based on reliable data. I therefore do not credit it.

56

The Hazen data is not the only source of alleged synergy proffered by ViiV. ViiV also

provided testimony from Martha St. Clair, one of the `191 Patent's inventors. Defendants argue

that this evidence is also not reliable. Ms. St. Clair testified that she generated results showing

synergy, relying on her lab notebooks. (Tr. at 918-920, 934-35, 959; PTX 12; PTX 13). She

also admitted that she did not include one set of data indicating antagonism, as that set involved a

very high concentration of 3TC, and drugs at high levels sometimes do not behave in an

appropriate fashion. (Tr. at 961-63). Defendants argue that Ms. St. Clair's exclusion of results

indicating antagonism proves she cherry-picked from data sets. The Court does not agree that

Ms. St. Clair's exclusion of a single data set showing antagonism from the totality of her results

renders those results untrustworthy. If Defendants put forth evidence that the claimed

combinations were in fact antagonistic, rather than "not synergistic," the exclusion of those

results might put the St. Clair data into serious question. There does not seem to be a genuine

dispute, however, that the drug combinations are not antagonistic.[34] It is thus reasonable to

conclude that the data excluded by Ms. St. Clair was in fact not reflective of the actual drug

activity. The only other criticism Defendants have of the St. Clair data is that two points of data

were slightly misplotted. (Tr. at 956-61, Ms. St. Clair). Ms. St. Clair, however, testified that

even with accurate plotting of those two points, the data still showed synergy, and that testimony

was not discredited. Ms. St. Clair also testified as to the synergy of the two drug combination

disclosed in the Daluge 1997 article that she co-authored, but that article only contains an

isobologram, without the underlying data points, so it is less persuasive evidence. (PTX 296; Tr.

at 936-39). Nevertheless, the St. Clair data is thus sufficient for a showing of the *in vitro*

synergy of the claimed combinations.

---

[34] If Lupin and Teva actually believed the claimed combinations resulted in antagonism, they would likely not seek
to bring generic forms of those drugs to market.

Defendants do point to some evidence suggesting that the claimed combinations did not show synergy. Mr. Hazen authored a report to his supervisors, which was forwarded to the FDA, suggesting that the ABC and 3TC combination was additive rather than synergistic. (TTX 61 at 0046905; Tr. at 1079, Mr. Hazen). Dr. Tisdale also stated that ABC and 3TC was an additive combination in an internal communication to Ms. St. Clair, while allowing that abacavir, 3TC, and AZT showed some synergy. (PTX 12 at 745208; Tr. at 968-70, Ms. St. Clair). Defendants, however, point to no actual data supporting any argument that the combinations were merely additive. Absent such a showing, the Court will rely on Ms. St. Clair's testimony and her lab notebooks as accurate.

That being said, the only evidence proffered by ViiV related to *in vitro* synergy. The fact that the claimed combinations show synergism *in vitro* is not enough to prove unexpected results. In fact, many combinations had been shown to be synergistic *in vitro*, as explained throughout the opinion (*E.g., supra*, pg. 26, 27), and ViiV repeatedly criticized those results as not sufficient to conclude that combination therapy would provide clinical results. A showing of synergy *in vitro*, without correlative *in vivo* success, is not enough. Although ViiV has shown unexpected clinical efficacy as explained above, the evidence of synergism *in vitro* is not evidence of unexpected results.

(e) Commercial success

The parties dispute whether Epzicom and Trizivir, the commercial embodiments of the `191 Patent, have been proven to be commercial successes. "Commercial success is relevant because the law presumes an idea would successfully have been brought to market sooner, in response to market forces, had the idea been obvious to persons skilled in the art." *Merck & Co., Inc. v. Teva Pharmaceuticals USA, Inc.*, 395 F.3d 1364, 1376 (Fed. Cir. 2005). "Thus, the law

58

deems evidence of (1) commercial success, and (2) some causal relation or 'nexus' between an invention and commercial success of a product embodying that invention, probative of whether an invention was non-obvious." *Id.*

The Court must first define the relevant market. ViiV argues that the relevant market is limited to drug products in the NRTI class. Defendants argue that the relevant market is all classes of anti-HIV drugs. Dr. Grabowski, ViiV's expert, testified that the market is limited to NRTIs, rather than the anti-HIV drug market as a whole, because that is consistent with how the drugs are prescribed for treatment. (Tr. at 1146). Specifically, Epzicom and Trizivir are prescribed as the "backbone" of HAART therapy, and are then combined with another drug from a different class, either a PI or an NNRTI. (Tr. at 1146-47). According to Dr. Grabowski, drugs from other classes complement NRTIs and do not take sales away from NRTIs; and the focus for the commercial success analysis should thus center on the market for the NRTI "backbone" of HAART therapy. (Tr. at 1146-47). Mr. McSorley, Defendants' expert on obviousness, disagreed, pointing out that ViiV's internal documents defined the market as including products in other drug classes, including PIs. (Tr. at 1420; LTX 1224). Defendants further argue that because patients can take more than one NRTI at a time, and also because NRTIs themselves can be complementary to each other, it makes no sense to define the NRTI market as separate from other drug classes. (D.I. 221 at 30).

The Court agrees with ViiV that the relevant market for Epzicom and Trizivir is the NRTI market. Dr. Grabowski's testimony as to how Epzicom's and Trizivir's use in treatment drives sales and determines the market is persuasive. There are two general components of HAART therapy: (1) an NRTI "backbone" matched with (2) a drug of another class.[35] It would

---

[35] ViiV's evidence of what HAART therapy consists of is unchallenged by Defendants. Defendants further do not put forth evidence that a different type of HIV therapy drives the market.

make no sense for a doctor to consider prescribing a PI or an NNRTI for the "backbone" of

HAART therapy, as the "backbone" itself must be comprised of NRTIs. The realities of

treatment thus dictate that PIs and NNRTIs generally do not compete with NRTIs for sales.

While ViiV's internal "launchplan" showed an intention for the commercial embodiments to

compete with all anti-HIV drug classes, Mr. McSorley's contention that ViiV's launchplan

determines the market is not persuasive. ViiV's internal aspirations for market dominance are

not evidence of how the drugs are prescribed in practice, and are thus less probative when

determining the relevant market.

Defendants further argue that it illogical to say that because NRTIs are complementary to

other classes of drugs, they are in a different market from those drugs, where the evidence shows

that NRTIs themselves can be complementary to each other. It is true that NRTIs in one sense

may be described as complementary to one another, *i.e.*, the much discussed AZT and 3TC

combination. They complement one another, however, in performing the same anti-HIV

function, *i.e.*, acting as chain terminating nucleosides. The other anti-HIV drug classes attack

viral replication in a fundamentally distinct way. For example, a PI disrupts replication by

selectively inhibiting the protease enzyme, which interferes with the virus's cleaving process.

The mechanism is completely different, and this explains why doctors prescribe NRTIs and PIs

together as "complementary" drugs, and would not consider one as a substitute for another, even

if NRTIs can also be labeled as "complementary" to each other in a different sense. The market

for Epzicom and Trizivir is the NRTI market.

The next question is whether Epzicom and Trizivir garnered a substantial quantity of the

NRTI market. Over 2.5 million prescriptions have been filled for both drugs since their

introduction to the market. (PTX 77; Tr. at 1145). The two drugs were rapidly accepted in the

60

market place, with Epzicom garnering over 200,000 prescriptions in its first year, and Trizivir

garnering almost 400,000 prescriptions by year three on the market. (Tr. at 1143-44). Dollar

sales of Epzicom and Trizivir are over $3 billion each, with the cumulative profitability of both

drugs over $1.6 and $1.56 billion, respectively. (PTX 76; PTX 78; PTX 83). To argue that they

are not commercial successes, Defendants point to the fact that other NRTI products such as

Truvada and Combivir have outperformed Epzicom and Trizivir. The fact that a commercial

embodiment is not the most popular product on the market, however, does not dictate that the

embodiment is not a commercial success. Although Trizivir and Epzicom did not capture the

greatest share of the market, they are solidly in the top half of NRTIs through their sales history.

(PTX 76; PTX 78; PTX 83). Epzicom has consistently outperformed the majority of other

NRTIs on the market, and Trizivir did as well during the peak years of its life-cycle. Their

market shares are sufficient to find them reasonably successful compared with the competition.

ViiV must not only show that Trizivir and Epzicom are successful drugs, but that there is

a close nexus between that success and the claims of the `191 Patent. *Transocean*, 699 F.3d at

1350. If the success was due to factors other than the benefits intrinsic to the invention, such as

marketing or, relevant here, the existence of blocking patents, the nexus may not exist. *See Teva*,

395 F.3d at 1364. There is little dispute that Trizivir and Epzicom are the commercial

embodiments of the `191 Patent's claims.[36] Trizivir and Epzicom were "tier two formularies" 76

and 77 percent of the time, meaning that they are designated "preferred drugs" by insurers.[37]

The designations supports the finding that the products are successful due to their therapeutic

qualities. (Tr. at 1162, Dr. Grabowski).

---

[36] Lupin says there was no testimony that Trizivir contains abacavir free base. (D.I. 221, p. 17). Dr. Ho did testify that Trizivir was "covered by the asserted claims of the `191 patent." (Tr. 1324).

[37] Tier 1 drugs are generally reserved for generic drugs. (Tr. at 1160, Dr. Grabowski). Third tier drugs are non-preferred and have higher co-pays than preferred drugs. (Tr. at 1160, Dr. Grabowski).

Key to the nexus question is whether the commercial success was due to the beneficial characteristics of the invention, or can be attributed to the existence of blocking patents.[38] Defendants main argument is that the existence of "blocking patents," owned or controlled by the same patentee, prevented competitors from developing the invention earlier in response to "market forces," citing *Teva*, 395 F.3d at 1376-77. The claimed combinations were developed by Burroughs Wellcome, who also invented AZT and abacavir individually and held patents for those two drugs. (Tr. at 1165, Dr. Grabowski). The rights to commercialize 3TC were licensed to Glaxo from a company known as Biochemical Pharma. (Tr. at 1414-15, Mr. McSorely). Glaxo entered into a letter of intent with Burroughs Wellcome, licensing some of the 3TC patent rights in March 1994. (Tr. at 1414-15, Mr. McSorely).

Mr. McSorley's opinion that the patents effectively halted any other company from pursuing the claimed combinations relied on the fact that "other researchers would not have been able to conduct such research to begin with because of the patents[.]" (Tr. at 1418). It is true that Burroughs Wellcome had the right to exclude others from working on all three drug compounds as of the effective filing date. Burroughs Wellcome only had the right of exclusivity for a short period of time, however. The rights to market 3TC were gained in March 1994, and Martha St. Clair performed her tests showing the synergism of the double and triple combinations in June 1994. This is not a situation where a patentee was able to "block" others from attempting to make the claimed inventions for many years- they were formulated a matter of months into Burroughs Wellcome's exclusivity period. It is also not disputed that researchers frequently shared compounds with other companies in the HIV field to help create new HIV therapies. (Tr. at 881-83, Ms. St. Clair; Tr. at 1164-66, Dr. Grabowski; Tr. at 1198, Dr. Hausman). Although

---

[38] There is no evidence that marketing or promotion drove the sales of either drug. (Tr. at 1162-64, Dr. Grabowski).

Burroughs Wellcome had exclusive rights to use all three compounds as of the effective filing date, it had only obtained the right to 3TC a relatively short time prior. Thus, the inference that the commercial success was due to "blocking patents" is lessened.

Thus, this is not a situation where the commercial success of the drugs can be completely attributed to blocking patents. The Court finds that the commercial success of Epzicom and Trizivir is indicia of nonobviousness, although not as strong of an indication as would exist in the absence of the patent rights that Burroughs Wellcome held.

### (B) LEGAL DISCUSSION AND CONCLUSIONS OF LAW

Section 103 bars patentability unless "the improvement is more than the predictable use of prior art elements according to their established functions." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 401 (2007). A patent claim is obvious "if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art." 35 U.S.C. § 103(a). To prove a case of obviousness, Defendants must show that a person skilled in the art would be motivated to combine the claimed combinations with a reasonable expectation of success. *Allergan, Inc. v. Sandoz Inc.*, 726 F.3d 1286, 1291 (Fed. Cir. 2013). Evidence of obviousness, especially when that evidence is proffered in support of an "obvious-to-try" theory, is insufficient unless it indicates that the possible options skilled artisans would have encountered were "finite," "small," or "easily traversed," and that skilled artisans would have had a reason to select the route that produced the claimed invention. *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1072 (Fed. Cir. 2012). Obviousness must be proven by clear and convincing evidence. *Id.* at 1078.

63

Defendants did not meet their burden. There was very little about anti-HIV therapy that could be described as predictable as of March 1995, and the history of failure in the field offered persons skilled in the art little reason to expect that any particular combination would work. Concerns of toxicity, potency, cross-resistance profiles, HIV's ability to mutate swiftly, a large universe of potential compounds and drug classes, and rapidly dying patients in the midst of a public health crisis made assembling an effective drug combination extremely challenging. In the months preceding the filing of the `191 Patent, the state of the art was extremely fluid. News of disheartening setbacks were followed by important advances in what was a fast moving field. Monotherapy options had been exhausted, and although the field generally accepted the premise that combination therapy was the future of HIV treatment, no clear cut clinical benefit had been shown prior to the reports of AZT/3TC's success in December 1994. These results were exciting precisely because of the pervasive failure encountered in the field, as years of testing antiviral agents either alone or in combination showed that while the drugs would initially reduce a patient's viral load, it would return to baseline levels after six months of treatment. The promise of AZT/3TC in no way erased the reality that combining anti-HIV drugs was a highly uncertain endeavor, and there was little expectation that any particular combination would work.

Defendants argue that AZT/3TC provided a reference point that made the claimed combinations of the `191 Patent obvious, but as Defendants point out, the molecular mechanisms underlying why the AZT/3TC combination was successful were not entirely understood. This observation cuts against finding the claimed combinations obvious, as the less understanding that exists in a field, the less the likelihood that any particular new therapy in that field is obvious. A finding of obviousness seems incompatible in a field where (1) almost all therapies failed to provide sustained results and (2) the sole success story was not completely understood. The

64

reality that combination therapy was still quite confusing for persons skilled in the art is

confirmed by the words of the February 1995 issue of *AIDS Weekly*, which stated that AZT/3TC

"*may* lead to rational strategies for combination therapy *instead* of random choices from a wide

array of drugs." (TTX 71 at 2) (italics added).  Researchers felt their efforts in combination

therapy were beset by "random choices from a wide array of drugs." The hope was that "rational

strategies" were forthcoming, but the field was not quite there yet.  This was the state of the art

less than six weeks prior to the effective filing date of the `191 Patent, and months after Martha

St. Clair did her first testing and compiled results of the claimed combinations.

    The state of the art as described in the *Aids Weekly* report is inconsistent with the law

underlying Defendants' "obvious to try" theory.  The "obvious to try" standard follows:

> When there is a design need and there are a finite number of identified, predictable
> solutions, a person of ordinary skill has good reason to pursue the known options
> within his or her technical grasp. If this leads to the anticipated success, it is likely
> the product not of innovation but of ordinary skill and common sense.

*KSR*, 550 U.S. at 421.  Where researchers have to resort to a wide array of options and are

required to select drugs randomly, it cannot be said that "a finite number of identified,

predictable solutions" existed.  Defendants' "differing DNA bases" theory cannot serve to

narrow the options or to make the efficacy of the claimed combinations predictable, as it was not

supported in the art.  Abacavir's status as a strong candidate for combination therapy does not

convert the combination selection process into a reasonably predictable endeavor.  Further, the

argument that the AZT/3TC combination made the double combination obvious is contradicted

by the then-existing best explanation for the AZT/3TC combination's success, *i.e.*, the special

mutational interplay resensitizing the virus to AZT.  As to the claimed triple combination, while

it retained the special AZT/3TC dynamic, no three-drug NRTI combination had shown sustained

clinical efficacy as of the filing date.  In that sense, the abacavir, 3TC, and AZT was a first of its

kind combination. The inherent risk of toxicity associated with adding a third NRTI to AZT/3TC lowered the expectation that the three drug combination would be successful, even considering the fact that abacavir and 3TC were second generation NRTIs associated with less toxicity than first generation NRTIs. The overlapping drug profiles of abacavir and 3TC also taught away from their combination. The secondary considerations also suggest that nonobviousness of the claimed combinations. Both Epzicom and Trizivir must be regarded as commercial successes, and both succeeded in providing clinically effective treatment in a field where many others had failed, despite monumental efforts to succeed. All of these considerations results in the conclusion that the Defendants have not proved the obviousness of the claimed inventions by clear and convincing evidence.

*Novo Nordisk A/S v. Caraco Pharm. Laboratories, Ltd.*, 719 F.3d 1346 (Fed. Cir. 2013), cited by Defendants, is not persuasive otherwise. In *Novo Nordisk*, the Federal Circuit upheld the district court's finding that a two-drug combination treatment for Type II diabetes was obvious. *Id.* at 1351. The combined drugs were metformin, a well-known and successful drug used to improve insulin sensitivity, and repaglinide, a new sulfonylurea-class insulin secretagogue that worked to stimulate insulin release from pancreatic beta cells. *Id.* at 1349. It was not disputed that it was well-known in the art that two drugs having different mechanisms for attacking diabetes were more effective than one, and drugs were often tested in combination therapy after demonstrating effectiveness in monotherapy. *Id.* at 1351. Combinations of insulin sensitizers and insulin secretagogues were common at the time, and the patentee's failure to prove that the synergy shown was unexpected doomed the claims as obvious. *Id.* at 1349, 1355.

There are some superficial similarities between *Novo Nordisk* and the case at hand. Both involve combination therapies and a failure to show unexpected synergistic effects. The

66

**A00071**

commonality ends there. In *Novo Nordisk*, the patentee's showing of synergistic effects was not

surprising, as the district court found that the combined drug classes had been used together for

more than 30 years. *Novo Nordisk A/S v. Caraco Pharm. Laboratories, Ltd.*, 775 F. Supp. 2d

985, 1003 (E.D. Mich. 2011). The drug classes had a well-known history of being used together

for beneficial results. *See Novo Nordisk*, 719 F.3d at 1355. That history went a long way to

make combining metformin and repaglinide a predictable endeavor. *See id.* The first effective

HIV combination therapy, in contrast, was only announced a few months before the `191

Patent's filing date. The degree of understanding in the field of the *Novo Nordisk* combination

was literally a generation ahead of the understanding in the anti-HIV field. Further, although

ViiV did not establish unexpected synergy, ViiV did show unexpected clinical efficacy, and any

sustained clinical efficacy was seen as a breakthrough as of March 1995. Another significant

difference is that the drugs in *Novo Nordisk* were known to be generally effective individually

for diabetes treatment, whereas the NRTIs of the claimed combinations all failed to treat HIV

infection as monotherapy. It takes less of a leap of faith to conclude that drugs that provide

effective treatment individually would work well in tandem, especially where they have different

mechanisms of action, as the drugs of *Novo Nordisk* do. It takes a much larger leap to predict

that monotherapy failures will turn the corner to effectiveness when used together. Finally, there

is no indication that the field of diabetes treatment was littered with the challenges facing

persons skilled in the art seeking to treat HIV, and there apparently were no other secondary

considerations suggesting nonobviousness in *Novo Nordisk*. For these reasons, *Novo Nordisk*

does not compel the Court to find the claimed combinations obvious.

Defendants have not proven the obviousness of any of the claims of the `191 Patent by

clear and convincing evidence.

## III.    ENABLEMENT

A patent's specification must enable the claimed invention. *In re Cortright*, 165 F.3d

1353, 1356 (Fed. Cir. 1999).  For a patent claim to be enabled, "The specification shall contain a

written description of the invention, and of the manner and process of making and using it, in

such full, clear, concise, and exact terms as to enable any person skilled in the art to which it

pertains, or with which it is most nearly connected, to make and use the same . . . ."  35 U.S.C. §

112.  Furthermore, "[t]he scope of enablement . . . is that which is disclosed in the specification

plus the scope of what would be known to one of ordinary skill in the art without undue

experimentation." *Nat'l Recovery Technologies, Inc. v. Magnetic Separation Sys., Inc.*, 166 F.3d

1190, 1196 (Fed. Cir. 1999).

Defendant Lupin argues that the method claims are invalid as they encompass inoperable

embodiments.  Specifically, Lupin contends that as the full scope of the method claim recites "an

infected animal" and as the specification only enables the method claims for humans the claims

cannot be enabled.[39]   (D.I. 202 at 33-34).  ViiV responds that the claims are in fact limited to

"infected animals" which "is much narrower than 'all animals'" and thus the claims "do not

include any inoperative embodiments."  (D.I. 212 at 57).

(A) FINDINGS OF FACT

The only animals that are able to contract HIV are humans and "potentially

chimpanzees."  (Tr. 731).

(B) LEGAL DISCUSSION AND CONCLUSIONS OF LAW

Whether a patent claim is enabled is a question of law based upon the underlying facts of

the case.  *Wyeth & Cordis Corp. v. Abbott Labs.*, 720 F.3d 1380, 1384 (Fed. Cir. 2013).  Here,

---

[39] Lupin does not contest dependent claims 30 and 39 of the `191 Patent on these grounds as the claims are limited
to treating humans. (D.I. 202 at 33).

68

the burden of proof must be carried by the Defendants, and must be proven by clear and

convincing evidence. *Cephalon, Inc. v. Watson Pharm., Inc.*, 707 F.3d 1330, 1336 (Fed. Cir.

2013). "Claims are not enabled when, at the effective filing date of the patent, one of ordinary

skill in the art could not practice their full scope without undue experimentation." *Id.*

Here, the patent explicitly refers to an infected animal, not simply an animal. `161 Col.

12: 32-35.[40] Thus, while Lupin's arguments may have had some appeal if the patent claims did

not limit the term animal, here the patent claims explicitly limit themselves to animals that are

infected. Lupin claims that the `161 patent's specification defines the term "infected animal" to

include "any mammal and humans." (D.I. 221 at 32). The Court disagrees. The Court finds that

the while the patent discusses that, "The components of the combination which may be referred

to as active ingredients may be administered for therapy to an animal e.g. a mammal including a

human in a conventional manner," `161 Col. 5: 4-7, this section does not act to define the term

"infected animal" only that the components can be administered to an animal. Therefore, as

Lupin's contentions rely upon the assumption that the patent must enable the treatment of at least

all mammals, not simply infected animals, Lupin has failed to bring forth sufficient evidence to

prove that the `161 Patent is not sufficiently enabled for a POSA to utilize the patent without

undue experimentation.

## IV.    UTILITY

Patents may only be issued for inventions that are "useful to some extent and in certain

applications . . . ." *Stiftung v. Renishaw PLC*, 945 F.2d 1173, 1180 (Fed. Cir. 1991). However,

"[a]n invention need not be the best or the only way to accomplish a certain result, and it need

---

[40] Claim 1of the `161 patent, which is representative, states in part "A method for the treatment or prevention of the symptoms or effects of an HIV infection in an infected animal which comprises treating said animal with a therapeutically effective amount of a combination comprising . . . ." `161 Col. 12: 32-35.

only be useful to some extent and in certain applications. . . . The fact that an invention has only

limited utility and is only operable in certain applications is not grounds for finding lack of

utility." *Id.* (internal brackets, citations, and quotation marks omitted).

Here, Lupin argues that because the patentee "provide[d] no human or animal data

regarding the three-drug combination's safety, efficacy, toxicity, etc.," the patent specification

discloses no "credible utility." (D.I. 202 at 31-32). In turn, the Plaintiff argues that "credible

utility" was disclosed as "a POSA would believe that the claimed combinations would have

'therapeutic utility'" considering that the `191 Patent describes the claimed combinations and

"the `191 Patent includes *in vitro* data on the ability of abacavir, 3TC, and AZT alone and in

combination to inhibit HIV replication at 'trough' drug concentrations determined from human

clinical studies." (D.I. 212 at 53-54).

For a Court to find that a patent claim is not useful, "the claimed device must be totally

incapable of achieving a useful result." *Brooktree Corp. v. Advanced Micro Devices, Inc.*, 977

F.2d 1555, 1571 (Fed. Cir. 1992). This is ultimately a question of fact. *Id.* While the parties

discuss *in vitro* versus *in vivo* studies, "Testing for the full safety and effectiveness . . . is more

properly left to the Food and Drug Administration (FDA). Title 35 does not demand that such

human testing occur within the confines of Patent and Trademark Office . . . proceedings." *Scott

v. Finney*, 34 F.3d 1058, 1063 (Fed. Cir. 1994).

Utility is proven where there is evidence of the patent claim's commercial success.

*Raytheon Co. v. Roper Corp.*, 724 F.2d 951, 959 (Fed. Cir. 1983); *see also Temco Elec. Motor

Co. v. Apco Mfg. Co.*, 275 U.S. 319, 328 (1928) (finding that commercial success demonstrated

that the patent claim was useful). As in *Raytheon*, the Court's finding *supra* that the "inventions

set forth in the claims . . . have on their merits been met with commercial success," 724 F.2d

951, 959 (Fed. Cir. 1983), further supports the Court's finding that the `191 patent is not invalid for lack of utility.

Additionally, "Usefulness in patent law, and in particular in the context of pharmaceutical inventions, necessarily includes the expectation of further research and development. The stage at which an invention in this field becomes useful is well before it is ready to be administered to humans." *In re Brana*, 51 F.3d 1560, 1568 (Fed. Cir. 1995). Here, the `191 Patent specification itself includes *in vitro* data on the ability of abacavir, 3TC, and AZT to inhibit HIV replication. `161 Col. 11:65 - 12:25. As was discussed by Martha St. Clair, the assays were conducted in MT-4 cells, which allowed for a robust assay. (Tr. at 901). The presence of this assay in the patent, in combination with the knowledge of a POSA, is sufficient to establish a "credible" utility for the `191 Patent. Lupin's argument that because the patent did not include *in vivo* test results the patent lacked utility, is unpersuasive and runs counter to the Federal Circuit's holding in *In re Brana*.

The Court finds that Lupin has not shown by clear and convincing evidence that any of the claims of the `191 Patent are invalid due to a failure to show utility.

## V.   STANDING

Standing in a patent infringement suit is governed by Federal Circuit case law. *Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1337 (Fed. Cir. 2007). Whether a party has standing is based upon "whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." *Id.* at 1339 (quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975)). The Federal Circuit has determined that there are three types of plaintiffs that may be encountered when determining whether there is standing: "those that can sue in their own name; those that can sue as long as the patent owner is

71

joined in the suit; and those that cannot even participate as a party to an infringement suit." *Id.*

"When a party holds all rights or all substantial rights, it alone has standing to sue for

infringement . . . ," and would thus fall under the first category. *Id.* at 1340. "Parties that hold

the exclusionary rights are often identified as exclusive licensees, because the grant of an

exclusive license to make, use, or sell the patented invention carries with it the right to prevent

others from practicing the invention. However, these exclusionary rights 'must be enforced

through or in the name of the owner of the patent,' and the patentee who transferred these

exclusionary interests is usually joined to satisfy prudential standing concerns." *Id.* (footnote

omitted). Finally, "[t]he third category of plaintiffs includes those that hold less than all

substantial rights to the patent and lack exclusionary rights under the patent statutes to meet the

injury in fact requirement." *Id.*

    Here, the Defendants contend that while ViiV UK "was the sole owner of the `191 Patent

at the time suit was filed and has standing to sue on that basis," ViiV Co. "lacks standing and

must be dismissed . . . ." (D.I. 208 at 9). Specifically, the Defendants argue that the Cost

Sharing Agreement ("the Agreement") between ViiV Co. and ViiV UK is not sufficient to grant

ViiV Co. an exclusive license. The Plaintiffs rebut by arguing that the aforementioned

agreement is sufficient to create an exclusive license. The Court agrees.

    The Court finds that the Agreement between ViiV Co. and ViiV UK granted ViiV Co. an

exclusive license. Here the Agreement is subject to Pennsylvania law. (D.I. 206-1 at 63). In

Pennsylvania,

> [t]he law of contracts requires contractual terms that are clear and unambiguous to
> be given effect without reference to matters outside the contract. Further, a contract
> must be construed as a whole and the parties' intentions must be ascertained from
> the entire instrument; effect must be given to each part of a contract. A contract is
> deemed "ambiguous if it is reasonably susceptible of different constructions and
> capable of being understood in more than one sense. Therefore, a contract will be

72

deemed unambiguous if reasonable persons could not differ as to the contract's
interpretation.

*Purdy v. Purdy*, 715 A.2d 473, 475 (Pa. Super. Ct. 1998) (internal citations and quotation marks

omitted).

Two sections of the agreement are relevant to the determination of whether there is an

exclusive license: (1) "Rights of Parties in ViiV Cost Shared Intangibles" and (2) "Definitions."

First, the section entitled "Rights of Parties in ViiV Cost Shared Intangibles" states in part:

> Each Party or its designated Affiliates shall be entitled to exclusive ownership
> including the exclusive right to exploit within their respective geographic markets
> of all items of ViiV Cost Shared Intangibles developed pursuant to this Agreement,
> regardless of which Party owns legal title to the ViiV Cost Shared Intangibles. The
> geographic market of ViiV Co and its Affiliates shall be the United States, and that
> of ViiV Ltd and its Affiliates shall be the rest of the world.

(D.I. 206-1 at 59).  Second, the Definition section of the same Agreement, states in part:

> "ViiV Cost Shared Intangibles" shall mean any patents, patent applications, new
> drug applications, product license applications, inventions, formulae,
> specifications, protocols, processes, designs, patterns, trade secrets, know-how, . .
> . that relate to ViiV Cost Shared Products (a) that are generated, developed, or first
> reduced to practice by or on behalf of, either or both of the Parties or their Affiliates
> pursuant to this Agreement, or (b) that relate to ViiV Cost Shared Products and are
> acquired by transfer by, or on behalf of, either or both of the Parties, but only if
> such acquisition results in substantial direct benefits to both Parties.

(D.I. 206-1 at 55 (emphasis removed)).  The Court finds that it is clear from the four corners of

the Agreement that the `161 patent is a "ViiV Cost Shared Intangible" and thus is subject to the

"Rights of Parties" clause of the Agreement.  The `161 patent meets part (b) of the definition of

"ViiV Cost Shared Intangibles."  First, the patent was "acquired by transfer by, or on behalf of,

either of the parties."[41] And second, the acquisition resulted in "substantial direct benefits to both

Parties" as required by the Agreement.  While the Defendants claim that there has not been a

showing that both ViiV UK and ViiV Co. received a substantial direct benefit, the Court

---

[41] The `161 patent was acquired in April 2011, after the Agreement was signed.  (D.I. 208 at 12).

73

disagrees.  Epzicom and Trizivir, the commercial embodiments of the `191 Patent, have a

cumulative profitability of over 1.5 billion and 1.56 billion dollars respectively.  (*See* the Court's

findings *supra*).  Furthermore, as ViiV Co. is a wholly-owned subsidiary of ViiV UK, (D.I. 206-

1 at 47-48), its profits provide substantial direct benefits to ViiV UK.  These two facts alone are

sufficient to find that there is a "substantial direct benefit" to both ViiV UK and ViiV Co.[42]

 For all these reasons, the Court finds that ViiV Co. has standing.

## VI. CONCLUSION

 The Plaintiffs have failed to prove that Lupin's generic product infringes the `191 Patent.

The Defendants have not proven by clear and convincing evidence that any of the asserted

claims of the `161 Patent are invalid.

 The Plaintiffs should submit an agreed upon form of final judgment within two weeks.

---

[42] The Court finds that even if the contract was ambiguous as written, Mr. William Collier's unrebutted declaration that ViiV UK owned the `191 patent and that ViiV Co. was the exclusive licensee, provides an alternative basis for ViiV Co. to have standing in this case.  (D.I. 222-3 at 5, 6).

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| VIIV HEALTHCARE UK LTD. and VIIV HEALTHCARE CO., | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C. A. No. 11-cv-00576-RGA |
| | ) | |
| LUPIN LTD. and LUPIN PHARMACEUTICALS, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| VIIV HEALTHCARE UK LTD. and VIIV HEALTHCARE CO., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | C. A. No. 11-cv-00688-RGA |
| v. | ) | |
| | ) | |
| TEVA PHARMACEUTICALS USA, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## STIPULATION AND ORDER

Plaintiffs ViiV Healthcare UK Ltd. and ViiV Healthcare Co. (collectively "ViiV"), and Defendant Teva Pharmaceuticals USA, Inc. ("Teva"), by and through their respective counsel, have agreed to the following stipulation regarding infringement, subject to the approval of the Court:

WHEREAS, this is a Hatch-Waxman pharmaceutical patent case filed in the United States District Court for the District of Delaware, C.A. No. 11-cv-00688-RGA, alleging infringement of U.S. Patent No. 6,417,191 (the "'191 patent"), and arising out of the filing of Teva's Abbreviated New Drug Application ("ANDA") No. 079246 with the U.S. Food and Drug

Administration ("FDA") for a proposed 600 mg of abacavir as abacavir sulfate plus 300 mg of lamivudine generic tablet.

It is hereby STIPULATED and ORDERED that:

1.    If Teva commercially makes, uses, offers for sale or sells within the United States, or commercially imports into the United States the proposed generic product defined by ANDA No. 079246, then Teva would literally infringe Claims 48 and 51 of the '191 patent, as those claims were construed by the Court on November 16, 2012, to the extent that those claims are valid and enforceable.[1]

2.    If Teva commercially sells the proposed generic product defined by ANDA No. 079246 in the United States for use in the treatment of HIV infection, Teva would actively induce the literal infringement and contribute to the literal infringement of Claims 20, 26, 27, 29, and 30 of the '191 patent, as those claims were construed by the Court on November 16, 2012, to the extent that those claims are valid and enforceable.

3.    This Stipulation And Order is without prejudice to any party's right to assert or rebut any defense or counterclaim that Claims 20, 26, 27, 29, 30, 48, and 51 of the '191 patent are invalid.

4.    This Stipulation And Order is without prejudice to any party's right to appeal the November 16, 2012 claim construction opinion, D.I. 55 in C.A. No. 11-cv-00688-RGA.

---

[1]  Teva has not alleged that any of the asserted claims are unenforceable and the deadline for amending pleadings has passed.  Amended Scheduling Order, D.I. 53 in C.A. No. 11-cv-00576-RGA.  ViiV reserves all rights to address any such allegation to the extent one might be made by Teva in the future.  Teva reserves all rights under this stipulation in the event that the claims of the '191 patent are held unenforceable in any U.S. federal court action.

**SO AGREED AND STIPULATED:**

| | |
|---|---|
| /s/ Brian E. Farnan | /s/ David E. Moore |
| Joseph J. Farnan, Jr. (Bar No. 100245) | Richard L. Horwitz (Bar No. 2246) |
| Brian E. Farnan (Bar No. 4089) | David E. Moore (Bar No. 3983) |
| FARNAN LLP | POTTER ANDERSON & CORROON LLP |
| 919 North Market Street | Hercules Plaza |
| 12th Floor | 1313 N. Market Street |
| Wilmington, DE 19899-1347 | P.O. Box 951 |
| (302) 770-0300 | Wilmington, DE 199801 |
| bfarnan@farnanlaw.com | (302) 984-6027 |
| | rhorwitz@potteranderson.com |
| F. Christopher Mizzo | dmoore@potteranderson.com |
| Charles A. Fernández | |
| Craig T. Murray | Ira J. Levy |
| KIRKLAND & ELLIS LLP | Annemarie Hassett |
| 655 15th Street, N.W. | Gregory T. Sandidge |
| Washington, DC. 20005 | Rivka Jungreis |
| (202) 879-5000 | Joshua A. Whitehill |
| chris.mizzo@kirkland.com | Natasha E. Daughtrey |
| charles.fernandez@kirkland.com | GOODWIN PROCTER LLP |
| criag.murray@kirkland.com | The New York Times Building |
| | 620 Eighth Avenue |
| Tiffany P. Cunningham | New York, NY 10018 |
| KIRKLAND & ELLIS LLP | (212) 813-8800 |
| 300 North LaSalle | ilevy@goodwinprocter.com |
| Chicago, IL 60654 | ahassett@goodwinprocter.com |
| (312) 862-2000 | gsandidge@goodwinprocter.com |
| tiffany.cunningham@kirkland.com | rjungreis@goodwinprocter.com |
| | jwhitehill@goodwinprocter.com |
| *Attorneys for Plaintiffs ViiV Healthcare UK* | ndaughtrey@goodwinprocter.com |
| *Ltd. and ViiV Healthcare Co.* | |
| | *Attorneys for Defendant Teva* |
| | *Pharmaceuticals USA, Inc* |

So ORDERED this __8th__ day of __Feb__. 2013.

_Richard G Andrews_

UNITED STATES DISTRICT JUDGE

3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| VIIV HEALTHCARE UK LTD. AND VIIV HEALTHCARE CO., | : | |
| | : | |
| Plaintiffs, | : | |
| v. | : | C.A. 11-576-RGA |
| | : | |
| LUPIN LTD. AND LUPIN PHARMACEUTICALS, INC., | : | |
| | : | |
| Defendants. | : | |
| | : | |
| VIIV HEALTHCARE UK LTD. AND VIIV HEALTHCARE CO., | : | |
| | : | |
| Plaintiffs, | : | |
| v. | : | C.A. 11-688-RGA |
| | : | |
| TEVA PHARMACEUTICALS USA, INC., | : | |
| | : | |
| Defendant. | : | |

Brian E. Farnan, Esq., Wilmington, Delaware; F. Christopher Mizzo, Esq. (argued), Washington, D.C.; Tiffany P. Cunningham, Esq. (argued), Chicago Illinois; Attorneys for Plaintiffs Viiv Healthcare UK Limited and and Viiv Pharmaceutical.

John C. Phillips, Jr., Esq., Wilmington, Delaware; Paul J. Molino, Esq. (argued), Chicago, Illinois; Deanne M. Mazzochi, Esq. (argued), Chicago, Illinois; Attorneys for Defendants Lupin Ltd. and Lupin Pharmaceuticals, Inc.

David E. Moore, Esq., Wilmington, Delaware; Ira J. Levy, Esq. (argued), New York, New York; Eric H. Yecies, Esq. (argued), New York, New York; Attorneys for Defendant Teva Pharmaceuticals USA, Inc.

November 16, 2012
Wilmington, Delaware

1

**A00083**

ANDREWS, UNITED STATES DISTRICT JUDGE:

This is a claim construction opinion.  Plaintiffs Viiv Healthcare UK Ltd. and Viiv

Healthcare Co. assert U.S. Patent No. 6,417,191 ("'191 Patent") against Defendants Lupin Ltd.,

Lupin Pharmaceuticals, Inc., and Teva Pharmaceuticals, USA, Inc.[1]  The '191 Patent relates to

therapeutic combinations of anti-HIV drug compounds.

## I.   Agreed Upon Term

The parties have agreed to the construction of the term "simultaneously" as follows:

| Undisputed Claim Term | Agreed Upon Construction |
|---|---|
| "simultaneously"<br><br>(claims 8, 21, 27, 36) | at the same time, either in the same or separate pharmaceutical formulations |

## II.   Disputed Terms

This brings the Court to the disputed terms.  The disputed terms "animal,"

"physiologically functional derivative," and "symptoms or effects of an HIV infection" are

construed as follows:

| Disputed Claim Term | Court's Construction |
|---|---|
| "animal" (claims 1, 11, 20, 24, 30, 32, 39) | Plain and ordinary meaning. |

---

[1] Viiv filed suit against the Lupin entities and Teva separately.  The claim construction briefing and hearing were conducted jointly for purposes of efficiency.

A00084

| | |
|---|---|
| "physiologically functional derivative" (claims 1, 2, 13, 15, 48, 51) | Any physiologically acceptable salt, ether, ester, salt of such ester of 1592U89, zidovudine or 3TC; or solvates of any thereof and their physiologically functional derivatives; or any other compound which upon administration to the recipient, is capable of providing (directly or indirectly) such a compound or an antivirally active metabolite or residue thereof. |
| "symptoms or effects of an HIV infection" (claims 1, 20, 32) | Plain and ordinary meaning. |

The remaining terms present more complicated issues of claim construction and merit

written explanation.

A. "Synergism"

| Disputed Claim Term/Phrase from Patent-in-Suit | ViiV's Proposed Construction | Lupin's Proposed Construction | Teva's Proposed Construction |
|---|---|---|---|
| "(1S, 4R)-cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-y1]-2-cyclopentene-1-methanol or a physiologically functional derivative thereof and (2R, cis)-4-amino-1-(2-hydroxymethyl-1,3-oxathiolan-5-yl)-(1H)-pyrimidin-2-one or a physiologically functional derivative thereof"<br><br>(claim 48) | Plain and ordinary meaning.  If the Court wishes to further construe the term, its plain and ordinary meaning is a combination of (1S, 4R)-cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-y1]-2-cyclopentene-1-methanol or a physiologically functional and (2R, cis)-4-amino-1-(2-hydroxymethyl-1,3-oxathiolan-5-yl)-(1H)-pyrimidin-2-one or physiologically functional derivative. | [Lupin takes no position on this term.] | Synergistic combination of (1S, 4R)- cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-yl]- 2-cyclopentene-1-methanol or a physiologically functional derivative thereof and (2R, cis)-4-amino-1-(2-hydroxymethyl-1,3-oxathiolan-5-yl)-(1H)-pyrimidin-2-one or a physiologically functional derivative thereof |

3

| Disputed Claim Term/Phrase from Patent-in-Suit | ViiV's Proposed Construction | Lupin's Proposed Construction | Teva's Proposed Construction |
|---|---|---|---|
| "combination" (claims 1, 8, 10, 20, 21, 23, 27, 29, 32, 36, 38) | Plain and ordinary meaning.  If the Court wishes to further construe the term, its plain and ordinary meaning is combination. | Synergistic combination. | Synergistic combination |
| **Disputed Claim Term/Phrase from Patent-in-Suit** | **ViiV's Proposed Construction** | **Lupin's Proposed Construction** | **Teva's Proposed Construction** |
| "pharmaceutical formulation" /"formulation" (claims 10, 16, 23, 29, 38, 48, 51) | Plain and ordinary meaning.  If the Court wishes to further construe the term, its plain and ordinary meaning is a combination of one or more active ingredients with one or more pharmaceutically acceptable carriers or excipients and optionally other therapeutic agents. | Synergistic pharmaceutical formulation / Synergistic formulation. | Teva does not seek construction of this claim term and therefore does not proffer a construction. |
| **Disputed Claim Term/Phrase from Patent-in-Suit** | **ViiV's Proposed Construction** | **Lupin's Proposed Construction** | **Teva's Proposed Construction** |
| "combination" (claims 1, 8, 10, 20, 21, 23, 27, 29, 32, 36, 38) | Plain and ordinary meaning.  If the Court wishes to further construe the term, its plain and ordinary meaning is combination. | Synergistic combination. | Synergistic combination |
| **Disputed Claim Term/Phrase from Patent-in-Suit** | **ViiV's Proposed Construction** | **Lupin's Proposed Construction** | **Teva's Proposed Construction** |
| "pharmaceutical formulation" /"formulation" (claims 10, 16, 23, 29, | Plain and ordinary meaning.  If the Court wishes to further construe the term, its | Synergistic pharmaceutical formulation / Synergistic | Teva does not seek construction of this claim term and therefore does not |

| 38, 48, 51) | plain and ordinary meaning is a combination of one or more active ingredients with one or more pharmaceutically acceptable carriers or excipients and optionally other therapeutic agents. | formulation. | proffer a construction. |
|---|---|---|---|
| **Disputed Claim Term/Phrase from Patent-in-Suit** | **ViiV's Proposed Construction** | **Lupin's Proposed Construction** | **Teva's Proposed Construction** |
| "therapeutically effective amount"<br><br>(claims 1, 20, 32) | Plain and ordinary meaning.  If the Court wishes to further construe the term, its plain and ordinary meaning is an amount that will treat or prevent symptoms or effects of an HIV infection in an infected animal. | Amount sufficient to cause a synergistic response. | Teva does not seek construction of this claim term and therefore does not proffer a construction. |

The construction of all of these terms hinges upon the same dispute: whether the "synergism" achieved by the drug combination functions to limit the '191 Patent's claims. Synergism is not mentioned within any of the claims.  Defendants, however, argue that the specification and prosecution history demonstrate that synergism is an essential element of the claimed drug combination.  They argue that the patentee disavowed non-synergistic combinations and the claims should be construed accordingly.  Viiv argues that the synergistic activity is not an element of the drug combination itself, but is an unexpected effect or result of

5

the drug combination's administration, which was emphasized in order to overcome repeated rejections for obviousness.

Claim terms should generally be given their ordinary and customary meaning. *ICU Med., Inc. v. Alaris Med. Sys., Inc.*, 558 F.3d 1368, 1374 (Fed. Cir. 2009). That meaning is determined by how a person of ordinary skill in the art in question would understand the terms at the time of the invention. *Id.* In determining this meaning, the claims must be read in view of the specification, of which they are a part. *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1340 (Fed. Cir. 2001). "Where the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question." *Id.* at 1341. "The patentee may demonstrate intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." *Id.* "Mere criticism of a particular embodiment encompassed in the plain meaning of a claim term is not sufficient to rise to the level of clear disavowal. . . . It is likewise not enough that [all of the embodiments] contain a particular limitation." *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1366 (Fed. Cir. 2012). Any disclaimer must be clear and unmistakable. *Id.* at 1366-67.

Defendants begin their disavowal argument with reliance on the specification. Defendants point to the title of the '191 Patent itself, which emphasizes the synergistic aspect of the invention: "Synergistic Combinations of Zidovudine, 1592U89, and 3TC." Defendants then refer to description that explains the synergistic anti-viral activity achieved by the invention:

6

> Unexpectedly, it has now been found that by combining 1592U89, zidovudine and 3TC a synergistic anti-HIV effect is achieved. The result is surprising since all three drugs act upon the same molecule, HIV Reverse Transcript use. It is a feature of this invention that the use of this drug combinations [sic] will provide synergistic antiviral effects, more complete viral suppression over a longer period, limit the emergence of drug resistant HIV mutants and allow better management of drug-related [toxicity].

Patent '191, ll. 2:08-15. Defendants particularly emphasize the language describing "synergistic antiviral effects" as a "feature of the invention." Defendants argue that this statement speaks to the scope of the invention itself as requiring synergism and the claims should be limited accordingly.

Defendants next cite another passage from the specification: "If there is sequential administration, the delay in administering the second and third active ingredients should not be such as to lose the benefit of a synergistic therapeutic effect of the combination of the active ingredients." *Id.* at 3:62-65. Defendants argue that these directions explicitly mandate a particular method of administration to ensure that the synergistic drug activity is not lost. Defendants also point to the description of specific drug ratios aimed at ensuring synergism.[2] According to Defendants, these are additional pieces of evidence that synergism is an essential part of the invention and that non-synergistic drug combinations have been disclaimed by the patentee.

The Court does not find that the specification evinces "manifest statements of exclusion or restriction" giving rise to clear and unmistakable disclaimer. Disclaimer of claim scope most

---

[2] The ratios are explained as follows:

> The synergistic effects of the combination of 1592U89, zidovudine and 3TC (or, alternatively to 3TC, FTC), or a physiologically functional derivative of any thereof are seen over a ratio, for example, of 1 to 20:1 to 20:1 to 10 (by weight), preferably 1 to 10:1 to 10:1 to 5 (by weight), particularly 1 to 3:1 to 3:1 to 2 (by weight)[.] Conveniently each compound will be employed in the combination in an amount at which it exhibits antiviral activity when used alone.

*Id.* at 4:17-25.

7

typically occurs through a patentee's differentiation of prior art. Here, at no point does the patentee criticize a prior art for lacking synergism and then distinguish the drug combination for its synergistic aspect. To the contrary, the patentee differentiates her invention by emphasizing the novelty of combining the drugs in the first place.[3] Further, when the specification explains what the "present invention" consists of, it describes the drug combination.[4] Synergism or synergistic effects are only discussed insofar as they constitute unexpected results. The description of "synergistic anti-viral effects" as a "feature of the invention" does not give rise to disavowal of non-synergism. The discussion just preceding this description makes clear that this synergism feature came along "unexpectedly" and that the "result [was] surprising."[5] This confirms the nature of synergism as an incident of the claimed drug combination, but not as a component or property of the combination itself.[6]

Despite Defendants' arguments, the specification's detailing of preferred drug combination ratios for the delivery of synergy is not persuasive evidence of disclaimer.

---

[3] The specification describes the prior art in relation to the present invention as follows:

> To date the treatment of HIV infection has relied to a large extent upon monotherapy with nucleoside reverse transcriptase inhibitors such as zidovudine, didanosine (ddI), zalcitabine (ddC) and stavudine (D4T). However, these drugs eventually become less effective due either to the emergence of HIV resistant mutants [or] because of toxicity. Thus, new therapies are needed.

> The combination of zidovudine with either ddC or ddI has shown promising results in HIV infected patients[.]

*Id.* at 1:59-67.

[4] For example, the specification states, "[T]he present invention provides a combination comprising 1592U89 or a physiologically functional derivative thereof, zidovudine or a physiologically functional derivative thereof and 3TC (or, alternatively to 3TC, FTC) or a physiologically functional derivative thereof." *Id.* at 2:18-23.

[5] "Unexpectedly, it has now been found that by combining 1592U89, zidovudine and 3TC a synergistic anti-HIV effect is achieved. This result is surprising since all three drugs act upon the same molecule, HIV Reverse Transcript use." *Id.* at 2:7-9.

[6] It makes sense for the patentee to have emphasized these unexpected results, as the '191 Patent's application was repeatedly rejected for obviousness. (D.I. 67, Exhs. 37-41).

8

Dependent claims 2-4 claim these same ratios. These claims are dependent to claim 1, which does not mention any ratio. The rule of claim differentiation suggests that claim 1 should be read more broadly than its dependent claims 2-4 and is thus not limited to the described ratios. It therefore follows that the effects of these ratios are not limiting on the independent claim. Finally, the specification's advice that the combination "should" be taken within a certain time period is not strong enough language to justify finding a "clear and unmistakable" disclaimer. Moreover, even in this context, synergism is described as an effect of the combination rather than a property of the combination itself. In addition, the claims describe numerous distinct methods of administration, and they are not limited to sequential administration, thus undermining the argument that the statements should limit every claim. For all these reasons, the Court holds that specification disclaimer does not render "synergism" as a limit on claim scope.

Defendants also argue for prosecution disclaimer. "[A] patentee may limit the meaning of a claim term by making a clear and unmistakable disavowal of scope during prosecution." *Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1374 (Fed. Cir. 2008). This may occur where an applicant clearly characterizes an invention in order to overcome rejections based on prior art. *Id.* Prosecution disclaimer is not found where the file history is ambiguous. *Id.* at 1375.

Defendants argue that the patentee's responses to the PTO Examiner's rejections disclaimed non-synergistic drug combinations. The '191 Patent application was rejected numerous times for obviousness. (D.I. 67, Exhs. 37-41). The rejections were predicated on the rationale that "[i]t is generally considered prima facie obvious to combine two compounds each of which is taught by the prior art to be useful for the same purpose, in order to form a composition which is to be used for the very same purpose." (*See, e.g.*, D.I. 67, Exh. 41 at 2-3).

9

In response to these rejections, the patentee emphasized the originality of combining the drug

compounds and the unexpected results of the combination. The patentee stated the following

within a November 19, 1998 response:

> Nothing in the references suggests that HIV infections can be successfully treated with
> [the triple drug combination]. Figure 1 of the instant specification demonstrated that no
> measurable HIV-1 mediated cytopathic effect remained upon treatment of HIV-1 infected
> MT4 cells with all three compounds. Furthermore, these compounds were found to be
> synergistic[.]

(D.I. 67, Exh. 26 at 2). Despite this response, the application was again rejected for obviousness.

Within the next response, dated September 14, 1999, the patentee again attempted to change the

examiner's mind, referencing proof of the drug combination's synergistic effects:

> The Examiner contends that Applicants fail to illustrate the presence of unexpected
> benefits. On the contrary, the specification at page 2 states the combinations of the
> present invention are synergistic and data provided in Figure 1 indicates the excellent
> anti-HIV effect of the combinations of the present invention.

(D.I. 67, Exh. 2 at 2). The patentee further explained why the synergism of the combination was

to be unexpected and that it rendered the drug combination non-obvious and patentable:

> [D]rugs having the same mode of action would be expected to be antagonistic.
> The drugs of the instant application are all inhibitors of HIV reverse transcriptase
> and therefore, would be expected to be antagonistic or at best additive. This is not
> the case, as illustrated in the specification and in the Daluge article. In summary,
> the demonstration of synergy between [the combined drugs] is an unexpected
> effect.

(*Id.* at 3). Despite the patentee's insistence, the Examiner again rejected the application as

obvious. Only after the patentee filed a March 14, 2001 response with the affidavit of Inventor

Martha Heider St. Clair attached was the Examiner persuaded. This response again insisted that

"the combination is synergistic." (D.I. 67, Exh. 42 at 2). It also explained that this result was

surprising and unexpected, as "[i]t would not be obvious to one skilled in the art to combine

10

three drugs that have the same viral mechanism of action to achieve a synergistic effect." (*Id.*).
The attached St. Clair affidavit stated the following:

> 8.      The results of this experiment indicate that the triple combination of
> zidovudine, 3TC and 1592U89 was synergistic in suppression of viral replication
> in lymphocytes *in vitro*.
>
> 9.      The synergistic effects of zidovudine, 3TC and 1592U89 was unexpected
> because zidovudine, 3TC and 1592U89 are all nucleoside reverse transcriptase
> inhibitors, and therefore, act upon the same viral target in cells.  Because of the
> same mechanism of action of zidovudine, 3TC and 1592U89 it would not be
> obvious to one skilled in the art that combining these three agents would result in
> the synergistic effect described above.

(D.I. 67, Exh. 3 at ¶¶ 8-9).  In response to this filing, the Examiner finally allowed the

application, agreeing that "it would not be obvious for the skilled artisan to employ the claimed

compounds concomitantly and expect the therapeutic effect herein claimed." (D.I. 67, Exh. 30 at

2).  The Examiner specifically cited paragraphs eight and nine of the St. Clair affidavit as support

for overcoming the rejections for obviousness.  (*Id.*).

Defendants argue that this file history makes clear that the applicants only intended to

claim synergistic combinations of the drug compounds and disavowed all non-synergistic

combinations.  Classic prosecution disclaimer occurs when an applicant escapes rejection for

anticipation through narrowing statements to the examiner differentiating the application from

the prior art.  The claimant then attempts to "recapture" the disclaimed scope by submitting a

final patent application with claims covering the scope of the prior art that was previously

distinguished.  This is not what occurred here.  The '191 application was never rejected as

anticipated by prior art, as the Examiner agreed that nothing in the prior art disclosed the

combined use of the drug compounds.[7]  It was thus not necessary for the patentee to narrow

---

[7] "That the prior art failed to employ one, or another prior art antiviral compound concomitantly in the prior art
medicament composition fails to reduce the prior art's obviation power."  (D.I. 67, Exh. 38 at 2).

11

claim scope in order to defeat the Examiner's rejections. Instead, the patentee was required to prove that it would not be obvious to administer a combination of drugs known to be individually effective against the HIV virus for that same effective purpose. The patentee eventually proved the nonobvious nature of the invention by successfully arguing that the combined use of the drug compounds would not be expected to be as effective as proven. This was because the drug compounds have the same "mode of action" in fighting the HIV virus, and typically drugs with the same mode of action have antagonistic rather than synergistic therapeutic effects. These arguments were accepted by the Examiner. They should not be considered clear and unmistakable disclaimer, because they did not require the claims to be narrowed, distinguished, or amended. Had the patentee proved the existence of synergistic effects (and thus non-obviousness) via responses that altered the chemical or physical characteristics of the drug combination itself, those responses would arguably limit the scope of the claims, as the invention itself would have been re-characterized. Instead, the properties of the drug combination never needed to be altered or narrowed in order to prove the existence of synergism, as synergism was maintained as an intended result from the beginning of the application process. Statements during prosecution that purely concern the intended results of the administration of drug compounds do not limit the patent's claims. *See Bristol-Myers Squibb Co. v. Ben Venue Laboratories, Inc.*, 246 F.3d 1368, 1375 (Fed. Cir. 2001). For these reasons, Defendants have failed to show clear and unmistakable disclaimer of non-synergistic combinations.

The Court thus adopts the plain and ordinary meaning for each term in this group.

12

**A00094**

2.    **"A single combined formulation"**

The Court next construes "a single combined formulation." The parties' proposed

constructions are as follow:

| Disputed Claim Term/Phrase | Viiv's Proposed Construction | Lupin's Proposed Construction | Teva's Proposed Construction |
|---|---|---|---|
| "a single combined formulation"<br><br>(claims 10, 23, 29, 38) | Plain and ordinary meaning. If the Court wishes to further construe the term, its plain and ordinary meaning is one formulation. | A dosage form wherein the 1592U89, zidovudine and 3TC are mixed together in the same admixture. (Claims 10 and 23).<br><br>A dosage form wherein the 1592U89 and 3TC are mixed together in the same admixture. (Claims 29 and 38). | No position, as none of the claims asserted against Teva contain this term. |

"A single combined formulation" is used within claims 10, 23, 29, and 38 of the '191

Patent. The claim construction dispute hinges on whether the word "combined" within this

phrase requires the drug compounds to be mixed together within the same admixture. Viiv

argues that "combined" only requires that the individual drug compounds be contained within

one formulation and places no restrictions on how the drugs are physically composed within that

formulation. "A single combined formulation" is thus arguably due its plain and ordinary

meaning. In the alternative, Viiv offers "one formulation." Lupin argues that Viiv's

construction fails to give "combined" any meaning. Lupin points to claim 6, which claims a

"unit dosage form." According to Lupin, a "unit dosage form" already claims Viiv's

13

construction, i.e., a single formulation of the drug compounds with no restriction on how the drugs are physically composed within the formulation. Lupin argues that the presence of the word "combined" within the phrase "single combined formulation" necessarily makes the scope of that phrase narrower than "unit dosage form." Lupin concludes that "combined" can only be construed faithfully with the specification if it requires the drug compounds to be uniformly mixed in the same admixture.

I do not agree with Lupin. It is not the case that the word "combined" within "a single combined formulation" makes that phrase narrower than "unit dosage form." The specification states, "The formulations may be presented in unit-dose or multi-dose sealed containers, for example, ampoules and vials[.]" '191 Patent, ll. 7:27-29. This indicates that a single formulation is not equivalent to a "unit-dosage form," as a single formulation may encompass both "unit-dose" and "multi-dose" containers. The fact that a "single formulation" is not equivalent to a "unit dosage form" defeats the inference that a "single combined formulation" must be more narrowly construed than "unit dosage form." This undermines Lupin's argument that "combined" necessarily gives rise to the admixture limitation. Further consideration of the claims reveals that "combined" simply requires that the drug compounds are contained within a single pharmaceutical formulation, regardless of admixture. Claim 1 broadly covers the administration of the claimed combination and places no limits on the methods of administration. This means that drugs that can be administered at the same or separate times, whether in separate formulations (one compound per formulation) or combined formulations (at least two compounds combined in the same formulation). Various dependent claims then narrow the scope of the "methods" of "administ[ration]" of the claimed "combination." Dependent claim 21 refers to methods "wherein the combination is administered simultaneously," dependent claim 22

14

refers to methods "wherein the combination is administered sequentially," and dependent claim

23 refers to methods with a "single combined formulation." Claim 21's use of "simultaneously"

would cover the scenario where the drug combination is taken all at once, but not necessarily in

the same pill. Claim 22's use of "sequentially" would cover the scenario where pills are given

over a period of time as opposed to all at once. Finally, claim 23's use of "single combined

formulation" would cover the scenario where all the drugs are administered within a single pill.

Thus, it is not accurate to say that "combined" restricts the claim to require admixing, when its

most naturally reading in comparison with the other claims merely requires that the drugs are

administered in one formulation. For these reasons, the Court adopts Viiv's proposal and

construes "a single combined formulation" according to its plain and ordinary meaning.

A00097



THE UNITED STATES OF AMERICA

TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office

April 30, 2012

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM
THE RECORDS OF THIS OFFICE OF:

U.S. PATENT: *6,417,191*
ISSUE DATE: *July 09, 2002*

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

P. R. GRANT
Certifying Officer

**JX 1**

Civil Action No.:
11-576-RGA

ViiV_EZTZ_0778207

US006417191B1

(12) **United States Patent**
    Barry et al.

(10) Patent No.:     US 6,417,191 B1
(45) Date of Patent:     *Jul. 9, 2002

(54) **SYNERGISTIC COMBINATIONS OF ZIDOVUDINE, 1592U89 AND 3TC**

(75) Inventors: **David Walter Barry**, Chapel Hill; **Martha Heider St. Clair**, Rougemont, both of NC (US)

(73) Assignee: **GlaxoSmithKline**, Research Triangle Park, NC (US)

(*) Notice: This patent issued on a continued prosecution application filed under 37 CFR 1.53(d), and is subject to the twenty year patent term provisions of 35 U.S.C. 154(a)(2).

Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **08/930,225**

(22) PCT Filed: **Mar. 28, 1996**

(86) PCT No.: **PCT/EP96/01352**
    § 371 (c)(1),
    (2), (4) Date: **Sep. 30, 1997**

(87) PCT Pub. No.: **WO96/30025**
    PCT Pub. Date: **Oct. 3, 1996**

(30)    **Foreign Application Priority Data**

Mar. 30, 1995    (GB) ............................................. 9506489
Mar. 30, 1995    (GB) ............................................. 9506490

(51) Int. Cl.⁷ ..................... **A61K 31/505; A61K 31/70; A61K 31/52**

(52) U.S. Cl. .................... **514/274; 514/50; 514/261**

(58) Field of Search ......................... 514/50, 274, 261

(56)    **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 4,724,232 | A * | 2/1988 | Rideout et al. ................ | 514/50 |
| 5,047,407 | A | 9/1991 | Belleau et al. ................ | 514/274 |
| 5,122,517 | A | 6/1992 | Vince et al. ................ | 514/50 |
| 5,234,913 | A | 8/1993 | Furman et al. ................ | 574/49 |
| 5,539,116 | A | 7/1996 | Liotta et al. ................ | 544/317 |
| 5,627,186 | A | 5/1997 | Cameron et al. ................ | 574/274 |
| 5,723,490 | A | 3/1998 | Tung ................ | 514/478 |
| 5,756,478 | A | 5/1998 | Cheng et al. ................ | 514/45 |
| 5,859,021 | A | 1/1999 | Cameron ................ | 514/274 |
| 6,180,639 | B1 | 1/2001 | Coates ................ | 514/274 |

FOREIGN PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| EP | A0 513 917 | 11/1992 | | |
| WO | WO 91/17159 | * 11/1991 | ......... | A61K/31/505 |
| WO | A92 15309 | 9/1992 | | |
| WO | A93 23021 | 11/1993 | | |
| WO | 96/06844 | 3/1996 | | |

| | | |
|---|---|---|
| WO | 97/49410 | 12/1997 |
| WO | 97/49411 | 12/1997 |

OTHER PUBLICATIONS

Daluge, S.M. et al., "1592U89, a Novel Carbocyclic Nucleoside Analog with Potent, Selective Anti–Human Immunodeficiency Virus Activity", vol. 41, No. 5, pp. 1082–1093, 1997.

Staszewski, S. et al, "Preliminary Long–Term Open–Label Data From Patients Using Abacavir (1592) Containing Antiretroviral Treatment Regimens," 5ᵗʰ Conference on Retroviruses and Opportunistic Infections, Feb. 1–5, 1998, #658.

Tisdale, M., et al., "Rapid In–Vitro Selection of Human Immunodeficiency Virus Type 1 Resistant to 3'Thiacytidine Inhibitors Due to a Mutation in the YMDD Region of Reverse Transcriptase", *Proc Natl Acad Sci USA*, vol. 90 (12). 1993, pp. 5653–5656.

Mathez D., et al., "Infectious Amplification of Wild–Type Human Immunodeficiency Virus From Patients' Lymphocytes and Modulation by Reverse Transcriptase Inhibitors In–Vitro", *Antimicrob Agents Chemother*, vol. 37 (10). 1993, pp. 2206–2211.

"New AIDS therapies at ICAAC;Triple therapy Fusion toxins Wellcomes's 1592U89 Protease inhibitor prodrugs", *Scrip World Pharmaceutical News*, No. 1969, Oct. 25, 1994.

Tisdale, M., et al., "Anti–HIV activity of (1S,4R)–4[2–amino–6–(cyclopropylamino)–9H–purin–9–yl]–2–cyclopentene–1–methanol(159U89)", *Program Abstr Intersci Conf Antimicrob Agents Chemother*, Oct. 4–7, 1994, P92.

Daluge, SM, et al., "1592U89 succinate —a novel carbocyclic nucleoside analogue with potent, selective anti–HIV activity", *Program Abstr Intersci Conf Antimicrob Agents Chemother*, Oct. 4–7, 1994, P7.

Hoong et al J org cham, vol. 57, pp. 5563–65, 1992.*
Scrip word Pham Neus, #1969, Oct. 25, 1994.*

* cited by examiner

*Primary Examiner*—Russell Travers
(74) *Attorney, Agent, or Firm*—Karen L. Prus

(57)    **ABSTRACT**

The present invention relates to therapeutic combinations of (1S,4R)–cis-4-[2–amino–6–(cyclopropylamino)–9H–purin-9-yl)–2-cyclopentene-1-methanol (1592U89), 3'-azido-3'-deoxythymidine (zidovudine) and (2R,cis)-4-amino-1-[1-(2-hydroxymethyl)-1,3-oxathiolan-5-yl)-(1H)-pyrimidin-2-one (3TC) (or, alternatively to 3TC, (2R,cis)-4-amino-5-fluoro-1-(2-hydroxymethyl)-1,3-oxathiolan-5-yl)-(1H)-pyrimidin-2-one (FTC)) which have anti-HIV activity. The present invention is also concerned with pharmaceutical compositions containing said combinations and their use in the treatment of HIV infections including infections with HIV mutants bearing resistance to nucleoside and/or non-nucleoside inhibitors.

**51 Claims, 1 Drawing Sheet**

*Copy provided by USPTO from the PIRS Image Database on 04/17/2012*

**U.S. Patent**               Jul. 9, 2002          **US 6,417,191 B1**



10 x TCID50 HIV 3B
Zidovudine, 3TC, and 1592U89 Added at Trough Plasma Levels

| Point | Combination used |
|-------|------------------|
| 1 | zidovudine |
| 2 | 3TC |
| 3 | zidovudine and 3TC |
| 4 | zidovudine and 3TC and 1592U89 |

*Fig. 1*

Copy provided by USPTO from the PIRS Image Database on 04/17/2012

ViiV_EZTZ_0778209

A00100

US 6,417,191 B1

<table>
<tr><td>1</td><td>2</td></tr>
</table>

**SYNERGISTIC COMBINATIONS OF ZIDOVUDINE, 1592U89 AND 3TC**

This application is filed pursuant to 35 U.S.C. §371 as a United States National Phase Application of International Application No. PCT/EP96/01352 filed Mar. 28, 1996 which claims priority from GB9506490.3 filed Mar. 30, 1995 and GB9506489.5 filed Mar. 30, 1995.

The present invention relates to therapeutic combinations of (1S,4R)-cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-yl]-2-cyclopentene-1-methanol (1592U89), 3'-azido-3'-deoxythymidine (zidovudine) and (2R,cis)-4-amino-1-(2-hydroxymethyl-1,3-oxathiolan-5-yl)-(1H)-pyrimidin-2-one (3TC) (or, alternatively to 3TC, (2R,cis)-4-amino-5-fluoro-1-(2-hydroxymethyl-1,3-oxathiolan-5-yl)-(1H)-pyrimidin-2-one (FTC)) which have anti-HIV activity. The present invention is also concerned with pharmaceutical compositions containing said combinations and their use in the treatment of HIV infections including infections with HIV mutants bearing resistance to nucleoside and/or non-nucleoside inhibitors.

Zidovudine is now well established as an important and useful chemotherapeutic agent for the treatment and/or prophylaxis of HIV-infections including related clinical conditions such. as AIDS, AIDS-related complex (ARC), AIDS dementia complex (ADC) and also for the treatment of patients who have an asymptomatic HIV infection or who are anti-HIV antibody-positive. Treatment with zidovudine prolongs the disease-free interval in asymptomatic patients infected with HIV and delays death in symptomatic patients.

Following the widespread clinical use of zidovudine in the treatment of such infections and conditions. It has been observed that in certain instances following prolonged treatment, the virus may develop a certain level of resistance to zidovudine and therefore a loss of sensitivity to the drug.

The therapeutic agent 1592U89 (European Specification EPO434450) is a promising anti-HIV chemotherapeutic candidate (International Conference on Antiviral Research Apr. 23rd 1995) showing potent activity against HIV, low cytotoxicity and excellent penetration into the brain, which is important for the treatment of AIDS and HIV linked central nervous system conditions such as ADC.

Nucleoside analogues containing an oxathiolane residue in place of the sugar residue, for example, nucleosides described in European Patent Specification No. 382526 particularly 4-amino-1-(2-hydroxymethyl-1,3-oxathiolan-5-yl)-(1H)-pyrimidin-2-one(BCH-189) have been found to have anti-HIV activity. BCH-189 is a racemic mixture and although the enantiomers are equipotent against HIV the (−)-enantiomer has considerably lower cytotoxicity than the (+)-enantiomer. The (−)-enantiomer has the chemical name (2R,cis)-4-amino-1-(2-hydroxymethyl-1,3-oxathiolan-5-yl)-(1H)-pyrimidin-2-one, now known as 3TC or lamivudine.

An alternative oxathiolane nucleoside analogue is described in International Specification Number WO92/14743 (2R,cis)-4-amino-5-fluoro-1-(2-hydroxymethyl-1,3 oxathiolan-5-yl)-(1H)-pyrimidine-2-one, commonly referred to as FTC or 524W91.

To date the treatment of HIV infection has relied to a large extent upon monotherapy with nucleoside reverse transcriptase inhibitors such as zidovudine, didanosine (ddI), zalcitabine (ddC) and stavudine (D4T). However, these drugs eventually become less effective due either to the emergence of HIV resistant mutantsor becauseof toxicity. Thus, new therapies are needed.

The combination of zidovudine with either ddC or ddI has shown promising results in HIV infected patients (New

Eng. J. Med. 1992, 329(9) 581–587, and Program Abstract 1993 9R International Conference on AIDS, abstract US-B25–1). The combination of zidovudine and 3TC has also been studied and reported. However, it should be noted that these results are surprising because drugs with the same site of action are frequently antagonistic or additive (Rev Infect Dis 1982, 4, 255–260). Unexpectedly, It has now been found that by combining 1592U89, zidovudine and 3TC a synergistic anti-HIV effect is achieved. The result is surprising since all three drugs act upon the same molecule, HIV Reverse Transcript use. It is a feature of this invention that the use of this drug combinations will provide synergistic antiviral effects, more complete viral suppression, viral suppression over a longer period, limit the emergence of drug resistant HIV mutants and allow better management of drug-rel ated toxicitie dt

As an alternative to 3TC the compound FTC may be used.

Thus, a ccording to one aspect, the present invention provides a combination comprising 1592U89 or a physiologically functional derivative thereof, zidovudine or a physiologically functional derivative thereof and 3TC (or, alternatively to 3TC, FTC) or a physiologically functional derivative thereof.

It will be appreciated that zidovudine may exist in the keto or enol tautomeric form and the use of either tautomeric form is within the scope of this invention. 3TC and 1592U89 will normally be provided substantially free of the corresponding enantiomer, that is to say no more than about 5% w/w of the corresponding enantiomer, preferably no more than about 2% w/w, in particular less than 1% w/w will be present.

As used herein, the term "physiologically functional derivative" includes any physiologically acceptable salt, ether, ester, salt of such ester of 1592U89, zidovudine or 3TC; or solvates of any thereof and their physiologically functional derivatives; or any other compound which upon administration to the recipient, is capable of providing (directly or indirectly) such a compound or an antivirally active metabolite or residue thereof.

Preferred esters in accordance with the invention are independently selected from the following group: (1) carboxylic acid esters in which the non-carbonyl moiety of the carboxylic acid portion of the ester grouping is selected from straight or branched chain alkyl (for example, methyl, n-propyl, t-butyl, or n-butyl), cycloalkyl, alkoxyalkyl (for example, methoxymethyl), aralkyl (for example, benzyl), aryloxyalkyl (for example, phenoxymethyl), aryl (for example, phenyl optionally substituted by, for example, halogen, $C_{1-4}$ alkyl, or $C_{1-4}$ alkoxy), or amino; (2) sulphonate esters, such as alkyl- or aralkylsulphonyl (for example, methanesulphonyl); (3) amino acid esters (for example, L-valyl or L-isoleucyl); and (4) phosphonate esters In such esters, unless otherwise specified, any alkyl moiety present advantageously contains from 1 to 18 carbon atoms, particularly from 1 to 6 carbon atoms, more particularly from 1 to 4 carbon atoms. Any cycloalkyl moiety present in such esters advantageously contains from 3 to 6 carbon atoms. Any aryl moiety present in such esters advantageously comprises a phenyl group. Any reference to any of the above compounds also includes a reference to a physiologically acceptable salt thereof.

Particularly preferred esters are the mono-, di-, and tri-phosphate esters of zidovudine, 3TC (which may be optionally blocked) or FTC or any other compound which upon administration to a human subject is capable of providing (directly or indirectly) said mono-, di, or triphosphate ester.

Copy provided by USPTO from the PIRS Image Database on 04/17/2012

ViiV_EZTZ_0778210

**A00101**

3

4

A preferred derivative of 1592U89 is the tri-phosphate ester of (–) carbovir.

Examples of physiologically acceptable salts of 1592U89, zidovudine or 3TC and their physiologically acceptable derivatives include salts derived from an appropriate base, such as an alkali metal (for example, sodium), an alkaline earth (for example, magnesium), ammonium and $NX_4^+$ (wherein X is $C_{1-4}$ alkyl). Physiologically acceptable salts of an hydrogen atom or an amino group include salts of organic carboxylic acids such as acetic, lactic, tartaric, malic, isethionic, lactobionic and succinic acids, organic sulphonic acids, such as methanesulphonic, ethanesulphonic, benzenesulphonic and p-toluenesulphonic acids and inorganic acids, such as hydrochloric, sulphuric, phosphoric and sulphamic acids. Physiologically acceptable salts of a compound of an hydroxy group include the anion of said compound in combination with a suitable cation such as $Na^+$, $NH_4^+$ and $NX_4^+$ (wherein X is a $C_{1-4}$ alkyl group).

For therapeutic use, salts of 1592U89, zidovudine and 3TC will be physiologically acceptable, i.e. they will be salts derived from a physiologically acceptable acid or base. However, salts of acids or bases which are not physiologically acceptable may also find use, for example, in the preparation or purification of a physiologically acceptable compound. All salts, whether or not derived form a physiologically acceptable acid or base, are within the scope of the present invention.

A preferred salt of 1592U89 is the succinate salt.

Combinations of 1592U89 or a physiologically functional derivative thereof, zidovudine or a physiologically functional derivative thereof and 3TC or a physiologically functional derivative thereof may hereinafter be referred to as combinations according to the invention.

The present invention further provides combinations according to the invention for use in therapy, particularly in the treatment and/or prophylaxis of an HIV infection including infections with HIV mutants bearing resistance to nucleoside inhibitors, particularly zidovudine, 3TC, FTC, ddI, ddC or D4T or combinations thereof and non-nucleoside inhibitors such as Nevirapine (BI-RG-587), Loviride (α-APA) and Delavuridine (BHAP). Furthermore, the combinations according to the invention are especially useful for the treatment of AIDS and related clinical conditions such as AIDS related complex (ARC), progressive generalised lymphadenopathy (PGL), Kaposi's sarcoma, thrombocytopenic purpura, AIDS-related neurological conditions such as AIDS dementia complex, multiple sclerosis or tropical paraparesis, and also anti-HIV antibody-positive and HIV-positive conditions, including such conditions in asymptomatic patients.

According to another aspect, the present invention provides a method for the treatment or prevention of the symptoms or effects of an HIV infection in an infected animal, for example, a mammal including a human, which comprises treating said animal with a therapeutically effective amount of a combination of 1592U89, zidovudine and 3TC for, alternatively to 3TC, FTC) or a physiologically functional derivative of any thereof.

It will be appreciated that the compounds of the combination may be administered simultaneously, either in the same or different pharmaceutical formulation or sequentially. If there is sequential administration, the delay in administering the second and third active ingredient should not be such as to lose the benefit of a synergistic therapeutic effect of the combination of the active ingredients. It will also be understood that 1592U89, zidovudine and 3TC (or, alternatively to 3TC, FTC), or the physiologically functional

derivatives of any thereof, whether presented simultaneously or sequentially, may be administered individually or in multiples or in any combination thereof. 1592U89, zidovudine and 3TC (or, alternatively to 3TC, FTC), are preferably administered simultaneously or sequentially in separate pharmaceutical formulations, most preferably simultaneously.

The present invention also provides the use of 1592U89 in the manufacture of a medicament for administration simultaneously or sequentially with zidovudine and 3TC (or, alternatively to 3TC, FTC), respectively for the treatment and/or prophylaxis of HIV infections and associated clinical conditions hereinbefore described. It will be appreciated that 1592U89, zidovudine or 3TC (or, alternatively to 3TC, FTC), or any combination thereof may be used in the manufacture of the above medicament.

The synergistic effects of the combination of 1592U89, zidovudine and 3TC (or, alternatively to 3TC, FTC), or a physiologically functional derivative of any thereof are seen over a ratio, for example, of 1 to 20:1 to 20:1 to 10 (by weight), preferably 1 to 10:1 to 10:1 to 5 (by weight), particularly 1 to 3:1 to 3:1 to 2 (by weight) Conveniently each compound will be employed in the combination in an amount at which it exhibits antiviral activity when used alone.

The amount of a combination of 1592U89, zidovudine and 3TC (or, alternatively to 3TC, FTC), required to be effective as an anti-HIV agent will, of course, vary and is ultimately at the discretion of the medical practitioner. The factors to be considered include the route of administration and nature of the formulation, the animal's body weight, age and general condition and the nature and severity of the disease to be treated.

In general a suitable dose of 1592U89 for administration to a human for treatment of an HIV infection will be in the range of 0.1 to 100 mg per kilogram body weight of the recipient per day, preferably in the range of 0.5 to 50 mg per kilogram body weight per day and most preferably in the range 7 to 30 mg per kilogram body weight per day.

In general a suitable dose of zidovudine will be in the range of 3 to 120 mg per kilogram body weight of the recipient per day, preferably in the range of 6 to 90 mg per kilogram body weight per day and most preferably in the range 10 to 30 mg per kilogram body weight per day.

For 3TC a suitable daily dose will be in the range of from about 0.1 to about 120 mg per kilogram body weight of the recipient per day, preferably in the range of 0.5 to 75 mg per kilogram body weight per day, most preferably in the range of 1 to 40 mg per kilogram body weight per day, such as 5 to 10 mg per kilogram body weight per day.

For FTC a suitable daily dose will be in the range of from about 0.1 to about 120 mg per kilogram body weight of the recipient per day, preferably in the range of 0.5 to 75 mg per kilogram body weight per day, most preferably in the range of 1 to 40 mg per kilogram body weight per day, such as 5 to 10 mg per kilogram body weight per day.

Unless otherwise indicated all weights of active ingredients are calculated in terms of the drug per se. In the case of a physiologically functional derivative of 1592U89, zidovudine, 3TC (or, alternatively to 3TC, FTC), (or, alternatively to 3TC, FTC), or a solvate of any thereof the figures would be increased proportionately. The desired dose is preferably presented as two, three, four, five, six or more sub-doses administered at appropriate intervals throughout the day. These sub-doses may be administered in unit dosage forms, for example, containing from 1 to 1500 mg, preferably from 5 to 1000 mg, most preferably from 10 to 700 mg

Copy provided by USPTO from the PIRS Image Database on 04/17/2012

ViiV_EZTZ_0778211

US 6,417,191 B1

5

of active ingredient per unit dosage form. Alternatively, if the condition of the recipient so requires, the dose may be administered as a continuous infusion.

The components of the combination which may be referred to as active ingredients may be administered for therapy to an animal e.g. a mammal including a human in a conventional manner.

While it is possible for the active ingredients of the combination to be administered as the raw chemical it is preferable to present them as a pharmaceutical formulation. Pharmaceutical formulations according to the present invention comprise a combination according to the invention together with one or more pharmaceutically acceptable carriers or excipients and optionally other therapeutic agents. The carrier(s) must be acceptable in the sense of being compatible with the other ingredients of the formula and not deleterious to the recipient thereof. When the individual components of the combination are administered separately they are generally each presented as a pharmaceutical formulation. The references hereinafter to formulations refer unless otherwise stated to formulations containing either the combination or a component thereof.

A combination of 1592U89, zidovudine and 3TC (or, alternatively to 3TC, FTC), or a physiologically functional derivative of any thereof may conveniently be presented as a pharmaceutical formulation in a unitary dosage form. A convenient unitary dosage formulation contains the active ingredients in amounts of from 50 mg to 3 g each, for example, 100 mg to 2 g.

It is also possible to combine any two of the active ingredients in a unitary dosage form for simultaneous or sequential administration with the thirdactive ingredient, for example, a typical unitary dosage may contain 50 mg to 3 g each of zidovudine and 3TC, preferably 100 mg to 2 g each of zidovudine and 3TC or 50 mg to 3 g each of zidovudine and 1592U8983, preferably 100 mg to 2 g each of zidovudine and 1592U8983.

As a further feature of the present invention presented is a unitary dosage form comprising at least two active ingredients selected from zidovudine, 1592U89 and 3TC (or, alternatively to 3TC, FTC) or physiologically functional derivatives of any thereof and a pharmaceutically acceptable carrier therefore.

It will be appreciated that the administration of two active compounds selected from zidovudine, 159U89 and 3TC (or, alternatively to 3TC, FTC), is an essential part of the invention, preferably as a prelude to the remaining third active ingredient being administered. The combinations of 1592U89 and zidovudine, 1592UB9 and 3TC, and 1592U89 and FTC are prefered, in particular the combination of 1592U89 and zidovudine.

In addition we have found that when the compounds described above are combined a synergistic effect is also found.

As yet a further feature of the present invention presented is a combination comprising two compounds selected from zidovudine, 1592U89 and 3TC (or, alternatively to 3TC, FTC) provided that the two compounds are not zidovudine and 3TC. Preferably the combination is administered simultaneously or sequentially with the third remaining compound.

More commonly these days pharmaceutical formulations are prescribed in "patient packs" containing the whole course of treatment in a single package, usually a blister pack. Patient packs have an advantage over traditional prescriptions, where a pharmacists divides a patients supply of a pharmaceutical from a bulk supply, in that the

6

patient always has access to the package insert contained in the patient pack, normally missing in traditional prescriptions. The inclusion of a package insert has been shown to improve patient compliance with the physicians instructions.

It will be understood that the administration of the combination of the invention by means of a single patient pack, or patients packs of each formulation, within a package insert directing the patient to the correct use of the invention is a desirable additional feature of this invention.

According to a further aspect of the invention provided is a patient pack comprising of at least one active ingredient 1592U89, zidovudine, 3TC or FTC of the combination of the invention and an information insert containing directions on the use of the combination of the invention.

According to another aspect the invention provides a triple pack comprising in association for separate administration 1592U89 or a physiologically functional derivative thereof, zidovudine or a physiologically functional derivative thereof and 3TC or a physiologically functional derivative thereof.

Formulations include those suitable for oral, rectal, nasal, topical (including transdermal, buccal and sublingual), vaginal or parenteral (including subcutaneous, intramuscular, intravenous and intradermal) administration. The formulations may conveniently be presented in unit dosage form and may be prepared by any methods well known in the art of pharmacy. Such methods represent a further feature of the present invention and include the step of bringing into association the active ingredients with the carrier which constitutes one or more accessory ingredients. In general, the formulations are prepared by uniformly and intimately bringing into association the active ingredients with liquid carriers or finely divided solid carriers or both, and if necessary shaping the product.

Formulations of the present invention suitable for oral administration may be presented as discrete units such as capsules, caplets, cachets or tablets each containing a predetermined amount of the active ingredients; as a powder or granules; as a solution or a suspension in an aqueous or non-aqueous liquid; or as an oil-in-water liquid emulsion or a water-in-oil liquid emulsion. The active ingredient may also be presented as a bolus, electuary or paste.

A tablet may be made by compression or molding, optionally with one or more accessory ingredients. Compressed tablets may be prepared by compressing in a suitable machine the active ingredients in a free-flowing form such as a powder or granules, optionally mixed with a binder (e.g. povidone, gelatin, hydroxypropylmethyl cellulose), lubricant, inert diluent, preservative, disintegrant (e.g. sodium starch glycollate, cross-linked povidone, cross-linked sodium carboxymethyl cellulose) surface-active or dispersing agent. Molded tablets may be made by molding a mixture of the powdered compound moistened with an inert liquid diluent in a suitable machine. The tablets may optionally be coated or scored and may be formulated so as to provide slow or controlled release of the active ingredients therein using, for example, hydroxypropylmethyl cellulose in varying proportions to provide the desired release profile. Tablets may optionally be provided with an enteric coating, to provide release in parts of the gut other than the stomach.

Formulations suitable for topical administration in the mouth include lozenges comprising the active ingredients in a flavored base, usually sucrose and acacia or tragacanth; pastilles comprising the active ingredient in an inert basis such as gelatin and glycerin, or sucrose and acacia; and mouthwashes comprising the active ingredient in a suitable

Copy provided by USPTO from the PIRS Image Database on 04/17/2012

ViiV_EZTZ_0778212

US 6,417,191 B1

7

liquid carrier. Formulations for rectal administration may be presented as a suppository with a suitable base comprising, for example, cocoa butter or a salicylate.

Topical administration may also be by means of a transdermal iontophoretic device.

Formulations suitable for vaginal administration may be presented as pessaries, tampons, creams, gels, pastes, foams or spray formulations containing in addition to the active ingredient such carriers as are known in the art to be appropriate.

Pharmaceutical formulations suitable for rectal administration wherein the carrier is a solid are most preferably presented as unit dose suppositories. Suitable carriers include cocoa butter and other materials commonly used in the art. The suppositories may be conveniently formed by admixture of the active combination with the softened or melted carrier(s) followed by chilling and shaping in moulds.

Formulations suitable for parenteral administration include aqueous and nonaqueous isotonic sterile injection solutions which may contain anti-oxidants, buffers, bacteriostats and solutes which render the formulation isotonic with the blood of the intended recipient; and aqueous and nonaqueous sterile suspensions which may include suspending agents and thickening agents; and liposomes or other microparticulate systems which are designed to target the compound to blood components or one or more organs. The formulations may be presented in unit-dose or multi-dose sealed containers, for example, ampoules and vials, and may be stored in a freeze-dried (lyophilized) condition requiring only the addition of the sterile liquid carrier, for example water for injection, immediately prior to use. Extemporaneous injection solutions and suspensions may be prepared from sterile powders, granules and tablets of the kind previously described.

Preferred unit dosage formulations are those containing a daily dose or daily subdose of the active ingredients, as hereinbefore recited, or an appropriate fraction thereof.

It should be understood that in addition to the ingredients particularly mentioned above the formulations of this invention may include other agents conventional in the art having regard to the type of formulation in question, for example, those suitable for oral administration may include such further agents as sweeteners, thickeners and flavoring agents.

The compounds of the combination of the present invention may be obtained in a conventional manner. Zidovudine can be prepared, for example, as described in U.S. Pat. No. 4,724,232, incorporated herein by reference. Zidovudine can also be obtained from Aldrich Chemical Co., Milwaukee, Wis. 53233, USA.

1592U89 may be prepared by the method described in European Specification EP0434450 or PCT application PCT/GB/4500225, which are incorporated herein by reference.

Methods for the preparation of 3TC are described in International Patent Application No. WO91/17159, incorporated herein by reference.

Methods for the preparation of FTC are described in International Patent Application No. WO92/14743 incorporated herein by reference.

The following examples are intended for illustration only and are not intended to limit the scope of the invention in any way. "Active ingredient" denotes 1592U89, zidovudine, 3TC (or, alternatively to 3TC, FTC), or multiples thereof or a physiologically functional derivative of any of the aforementioned compounds.

8

EXAMPLE 1

Tablet Formulation

The following formulations A, B and C are prepared by wet granulation of the ingredients with a solution of povidone, followed by addition of magnesium stearate and compression.

|  | mg/tablet |
|---|---|
| **Formulation A** | |
| Active Ingredient | 250 |
| Lactose B.P. | 210 |
| Povidone B.P. | 15 |
| Sodium Starch Glycollate | 20 |
| Magnesium Stearate | 5 |
|  | 500 |
| **Formulation B** | |
| Active Ingredient | 250 |
| Lactose B.P. | 150 |
| Avicel PH 101 | 60 |
| Povidone B.P. | 15 |
| Sodium Starch Glycollate | 20 |
| Magnesium Stearate | 5 |
|  | 500 |
| **Formulation C** | |
| Active Ingredient | 250 |
| Lactose B.P. | 200 |
| Starch | 50 |
| Povidone | 5 |
| Magnesium Stearate | 4 |
|  | 359 |

The following formulations, D and E, are prepared by direct compression of the admixed ingredients. The lactose in formulation E is of the direct compression type (Dairy Crest—"Zeparox").

|  | mg/tablet |
|---|---|
| **Formulation D** | |
| Active Ingredient | 250 |
| Pregelatinized Starch NF15 | 150 |
|  | 400 |
| **Formulation E** | |
| Active Ingredient | 250 |
| Lactose B.P. | 150 |
| Avicel | 100 |
|  | 500 |

Formulation F (Controlled Release Formulation)

The formulation is prepared by wet granulation of the ingredients with a solution of povidone followed by the addition of magnesium stearate and compression.

Copy provided by USPTO from the PIRS Image Database on 04/17/2012

ViiV_EZTZ_0778213

A00104

US 6,417,191 B1

| 9 | 10 |

|  | mg/tablet |
|---|---|
| Active Ingredient | 500 |
| Hydroxypropylmethylcellulose (Methocel K4M Premium) | 112 |
| Lactose B.P. | 53 |
| Povidone B.P. | 28 |
| Magnesium Stearate | 7 |
|  | 700 |

Drug release takes place over a period of about 6–8 hours and is complete after 12 hours.

### EXAMPLE 2

Capsule Formulations

Formulation A

A capsule formulation is prepared by admixing the ingredients of formulation D in Example 1 above and filling into a two-part hard gelatin capsule. Formulation B (infra) is prepared in a similar manner.

|  | mg/capsule |
|---|---|
| Formulation B |  |
| Active Ingredient | 250 |
| Lactose B.P. | 143 |
| Sodium Starch Glycollate | 25 |
| Magnesium Stearate | 2 |
|  | 420 |
| Formulation C |  |
| Active Ingredient | 250 |
| Macrogel 4000 B.P. | 350 |
|  | 600 |

Capsules of formulation C are prepared by melting the Macrogel 4000 B.P., dispersing the active ingredient in the melt and filling the melt into a two-part hard gelatin capsule.

| Formulation D | mg/capsule |
|---|---|
| Active Ingredient | 250 |
| Lecithin | 100 |
| Arachis Oil | 100 |
|  | 450 |

Capsules of formulation D are prepared by dispersing the active ingredient in the lecithin and arachis oil and filling the dispersion into soft, elastic gelatin capsules.

Formulation E (Controlled Release Capsule)

The following controlled release capsule formulation is prepared by extruding ingredients a, b, and c using an extruder, followed by spheronization of the extrudate and drying. The dried pellets are then coated with release-controlling membrane (d) and filled into a two-piece, hard gelatin capsule.

|  | mg/capsule |
|---|---|
| (a) Active Ingredient | 250 |
| (b) Microcrystalline Cellulose | 125 |
| (c) Lactose B.P. | 125 |
| (d) Ethyl Cellulose | 13 |
|  | 513 |

### EXAMPLE 3

Injectable Formulation

| Formulation A | mg |
|---|---|
| Active Ingredient | 200 |
| Hydrochloric Acid Solution 0.1 M or Sodium Hydroxide Solution 0.1 M q.s. to pH | 4.0 to 7.0 |
| Sterile water q.s. to | 10 ml |

The active ingredient is dissolved in most of the water (35°–40° C.) and the pH adjusted to between 4.0 and 7.0 with the hydrochloric acid or the sodium hydroxide as appropriate. The batch is then made up to volume with the water and filtered through a sterile micropore filter into a sterile 10 ml amber glass vial (type 1) and sealed with sterile closures and overseals.

| Formulation B |  |
|---|---|
| Active Ingredient | 125 mg |
| Sterile, Pyrogen-free, pH 7 Phosphate Buffer, q.a. to | 25 ml |

### EXAMPLE 4

Intramuscular Injection

| Active Ingredient | 200 mg |
|---|---|
| Benzyl Alcohol | 0.10 g |
| Glycofurol 75 | 1.45 g |
| Water for injection q.s. to | 3.00 ml |

The active ingredient is dissolved in the glycofurol. The benzyl alcohol is then added and dissolved, and water added to 3 ml. The mixture is then filtered through a sterile micropore filter and sealed in sterile 3 ml amber glass vials (type 1).

### EXAMPLE 5

| Syrup |  |
|---|---|
| Active Ingredient | 250 mg |
| Sorbitol Solution | 1.50 g |
| Glycerol | 2.00 g |
| Sodium Benzoate | 0.005 g |
| Flavor, Peach 17.42.3169 | 0.0125 ml |
| Purified Water q.s. to | 5.00 ml |

US 6,417,191 B1

**11**

The active ingredient is dissolved in a mixture of the glycerol and most of the purified water. An aqueous solution of the sodium benzoate is then added to the solution, followed by addition of the sorbital solution and finally the flavor. The volume is made up with purified water and mixed well.

### EXAMPLE 6

Suppository

|  | mg/capsule suppository |
| --- | --- |
| Active Ingredient | 250 |
| Hard Fat, B.P. (Witepsol H15 - Dynamit Nobel) | 1770 |
|  | 2020 |

One-fifth of the Witepsol H15 is melted in a steam-jacketed pan at 45° C. maximum. The active ingredient is sifted through a 200 $\mu$M sieve and added to the molten base with mixing, using a Silverson fitted with a cutting head, until a smooth dispersion is achieved. Maintaining the mixture at 45° C., the remaining Witepsol H15 is added to the suspension and stirred to ensure a homogenous mix. The entire suspension is passed through a 250 $\mu$m stainless steel screen and, with continuous stirring, is allowed to cool to 40° C. At a temperature of 38° C. to 40° C., 2.02 g of the mixture is filled into suitable, 2 ml plastic molds. The suppositories are allowed to cool to room temperature.

### EXAMPLE 7

Pessaries

|  | mg/pessary |
| --- | --- |
| Active Ingredient | 250 |
| Anhydrate Dextrose | 380 |
| Potato Starch | 363 |
| Magnesium Stearate | 7 |
|  | 1000 |

The above ingredients are mixed directly and pessaries prepared by direct compression of the resulting mixture.

### Biological Test Results

#### Peak and Trough Plasma Levels

The peak and trough values in micromolar concentrations used in this study came from clinically determined peak and trough plasma levels. These values were meant to reflect actual peak and trough plasma levels achieved in patients when using therapeutic doses of each drug as a single agent

| Drug | Peak Level (uM) | Trough Level (uM) |
| --- | --- | --- |
| zidovudine | 5 | 0.4 |
| 3TC | 9 | 0.7 |
| 1592U89 | 3.5 | 0.1 |
| FTC | 10 | 0.5 |

#### Antiviral Activity Alone or in Combination

Anti-HIV assay. The human T-cell lymphotropic virus type 1-transformed cell line MT4 was grown and infected

**12**

with HIV-1 strain 3B or strain MN (Advanced Biotechnologies Inc., Columbia, Md.) at 10 times the amount necessary to cause a 50% reduction of MT4 cell growth ($10 \times TCID_{50}$, $2 \times 10^4$ plaque forming units/cell), unless otherwise indicated. Mock-infected cells were also prepared. Following 1 hour incubation, the cells were pipetted onto 96well dishes at $1 \times 10^4$ cells/well. The wells contained various concentrations of zidovudine, and peak or trough plasma levels of 3TC (or, alternatively to 3TC, FTC), and 1592U8983 as indicated in table 1. The infected T-lymphoblastoid cells were incubated for 5 days to allow for HIV-1 mediated growth inhibition. Plates were then treated with 28 $\mu$l of 5% Nonidet P-40 (Sigma) in phosphate-buffered saline (PBS) and 60 $\mu$l samples were transferred to filter-bottomed, 96-well plates (Idexx Corp.). Plates were placed in an automated assay instrument (Idexx Screen Machine) which added propidium iodide to each well, performed a series of washes, and determined the resulting fluorescence (H). Fluorescence has been shown to correlate directly with cell number, allowing for the quantitation of HIV-1 mediated cytopathic effect (CPE). Uninfected cells were determined to have 0% CPE and infected untreated cells were determined to have 100% CPE. Percent inhibition of HIV-1 induced CPE and $IC_{95}$s (95% inhibitory concentration) were determined.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 shows graphically the results of the combination of zidovudine, 3TC and 1592U89 against zidovudine and 3TC alone and in combination.

What is claimed is:

1. A method for the treatment or prevention of the symptoms or effects of an HIV infection in an infected animal which comprises treating said animal with a therapeutically effective amount of a combination comprising (1S, 4R)-cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-yl]-2-cyclopentene-1-methanol or a physiologically functional derivative thereof, zidovudine or a physiologically functional derivative thereof, and (2R, cis)-4-amino-1-(2-hydroxymethyl-1,3-oxathiolan-5-yl)-(1H)-pyrimidin-2-one or a physiologically functional derivative thereof.

2. A method according to claim 1 wherein (1S, 4R)-cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-yl]-2-cyclopentene-1-methanol or a physiologically functional derivative thereof, zidovudine or a physiologically functional derivative thereof, and (2R,cis)-4-amino-1-(2-hydroxymethyl-1,3-oxathiolan-5-yl)-(1H)-pyrimidin-2-one or a physiologically functional derivative thereof are present in a ratio of 1 to 20:1 to 20:1 to 22 by weight.

3. A method according to claim 2 wherein (1S, 4R)-cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-yl]-2-cyclopentene-1-methanol, zidovudine, and (2R, cis)-4-amino-1-(2-hydroxymethyl-1,3-oxathiolan-5-yl)-(1H)-pyrimidin-2-one are present in a ratio of 1 to 10:1 to 10:1 to 5 by weight.

4. A method according to claim 2 wherein (1S, 4R)-cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-yl]-2-cyclopentene-1-methanol, zidovudine, and (2R, cis)-4-amino-1-(2-hydroxymethyl-1,3-oxathiolan-5-yl)-(1H)-pyrimidin-2-one are present in a ratio of 1 to 3:1 to 3:1 to 2 by weight.

5. A method according to claim 2 wherein each (1S, 4R)-cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-yl]-2-cyclopentene-1-methanol, zidovudine and (2R, cis)-4-amino-1-(2-hydroxymethyl-1,3-oxathiolan-5-yl)-(1H)-pyrimidin-2-one is present in an amount from 1 to 1500 mg per unit dosage form.

Copy provided by USPTO from the PIRS Image Database on 04/17/2012

ViiV_EZTZ_0778215

US 6,417,191 B1

13

6. A method according to claim 2 wherein each (1S, 4R)-cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-yl]-2-cyclopentene-1-methanol, zidovudine, and (2R, cis)-4-amino-1-(2-hydroxymethyl-1,3-oxathiolan-5-yl)-(1H)-pyrimidin-2-one is present in an amount from 5 to 1000 mg per unit dosage form.

7. A method according to claim 2 wherein the (1S, 4R)-cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-yl]-2-cyclopentene-1-methanol is the succinate salt.

8. A method according to claim 2 wherein the combination is administered simultaneously.

9. A method according to claim 2 wherein the combination is administered sequentially.

10. A method according to claim 2 wherein the combination is administered as a single combined formulation.

11. A method according to claim 2 in which said animal is a human.

12. A method according to claim 1 wherein the physiologically functional derivative of (1S, 4R)-cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-yl]-2-cyclopentene-1-methanol is the succinate salt.

13. A method according to claim 1 wherein (1S, 4R)-cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-yl]-3-2-cyclopentene-1-methanol or a physiologically functional derivative thereof, zidovudine or a physiologically function derivative thereof, and (2R,cis)-4-amino-1-(2-hydroxymethyl-1,3-oxathiolan-5-yl)-(1H)-pyrimidin-2-one or a physiologically functional derivative thereof are present in a ratio of 1 to 10:1 to 10:1 to 5 by weight.

14. A method according to claim 1 wherein each (1S, 4R)-cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-yl]-2-cyclopentene-1-methanol or a physiologically functional derivative thereof, zidovudine or a physiologically function derivative thereof, and (2R,cis)-4-amino-1-(2-hydroxymethyl-1,3-oxathiolan-5-yl)-(1H)-pyrimidin-2-one or a physiologically functional derivative thereof is present in an amount from 1 to 1500 mg per unit dosage form.

15. A method according to claim 1 wherein each (1S, 4R)-cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-yl]-2-cyclopentene-1-methanol or a physiologically functional derivative thereof, zidovudine or a physiologically function derivative thereof, and (2R,cis)-4-amino-1-(2-hydroxymethyl-1,3-oxathiolan-5-yl)-(1H)-pyrimidin-2-one or a physiologically functional derivative thereof is present in an amount from 5 to 1000 mg per unit dosage form.

16. A pharmaceutical formulation comprising (1S, 4R)-cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-yl]-2-cyclopentene-1-methanol or a physiologically functional derivative thereof, zidovudine or a physiologically functional derivative thereof, and (2R,cis)-4-amino-1-(2-hydroxymethyl-1,3-oxathiolan-5-yl)-(1H)-pyrimidin-2-one or a physiologically functional derivative thereof in association with one or more pharmaceutically acceptable carriers therefor.

17. A formulation according to claim 16 in unit dosage.

18. A formulation according to claim 17 in the form of a tablet or capsule.

19. A pharmaceutical formulation according to claim 16 wherein the physiologically functional derivative of (1S, 4R)-cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-yl]-2-cyclopentene-1-methanol is the succinate salt.

20. A method for the treatment or prevention of the symptoms or effects of an HIV infection in an infected animal which comprises treating said animal with a therapeutically effective amount of a combination comprising (1S, 4R)-cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-yl]-2-cyclopentene-1-methanol and (2R,cis)-4-amino-1-(2-hydroxymethyl-1,3-oxathiolan-5-yl)-(1H)-pyrimidin-2-one.

14

21. A method according to claim 1 wherein the combination is administered simultaneously.

22. A method according to claim 1 wherein the combination is administered sequentially.

23. A method according to claim 1 wherein the combination is administered as a single combined formulation.

24. A method according to claim 1 in which said animal is a human.

25. A method according to claim 20 wherein each (1S, 4R)-cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-yl]-2-cyclopentene-1-methanol and (2R, cis)-4-amino-1-(2-hydroxymethyl-1,3-oxathiolan-5-yl)-(1H)-pyrimidin-2-one is present in an amount from 1 to 1500 mg per unit dosage form.

26. A method according to claim 20 wherein each (1S, 4R)-cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-yl]-2-cyclopentene-1-methanol and (2R, cis)-4-amino-1-(2-hydroxymethyl-1,3-oxathiolan-5-yl)-(1H)-pyrimidin-2-one is present in an amount from 5 to 1000 mg per unit dosage form.

27. A method according to claim 20 wherein the combination is administered simultaneously.

28. A method according to claim 20 wherein the combination is administered sequentially.

29. A method according to claim 20 wherein the combination is administered as a single combined formulation.

30. A method according to claim 20 in which said animal is a human.

31. A patient pack comprising at least one active ingredient selected from (1S, 4R)-cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-yl]-2-cyclopentene-1-methanol, zidovudine, and (2R, cis)-4-amino-1-(2-hydroxymethyl-1,3-oxathiolan-5-yl)-(1H)-pyrimidin-2-one and an information insert containing directions on the use of all three active ingredients together in combination.

32. A method for the treatment or prevention of the symptoms or effects of an HIV infection in an infected animal which comprises treating said animal with a therapeutically effective amount of a combination comprising (1S, 4R)-cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-yl]-2-cyclopentene-1-methanol, zidovudine, and (2R, cis)-4-amino-1-(2-hydroxymethyl-1,3-oxathiolan-5-yl)-(1H)-pyrimidin-2-one.

33. A method according to claim 32 wherein each (1S, 4R)-cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-yl]-2-cyclopentene-1-methanol, zidovudine, and (2R, cis)-4-amino-1-(2-hydroxymethyl-1,3-oxathiolan-5-yl)-(1H)-pyrimidin-2-one are present in an amount from 1 to 1500 mg per unit dosage form.

34. A method according to claim 32 wherein each (1S, 4R)-cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-yl]-2-cyclopentene-1-methanol, zidovudine, and (2R, cis)-4-amino-1-(2-hydroxymethyl-1,3-oxathiolan-5-yl)-(1H)-pyrimidin-2-one is present in an amount from 5 to 1000 mg per unit dosage form.

35. A method according to claim 32 wherein the (1S, 4R)-cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-yl]-2-cyclopentene-1-methanol is the succinate salt.

36. A method according to claim 32 wherein the combination is administered simultaneously.

37. A method according to claim 32 wherein the combination is administered sequentially.

38. A method according to claim 32 wherein the combination is administered as a single combined formulation.

39. A method according to claim 32 in which said animal is a human.

40. A method according to claim 32 wherein the (1S, 4R)-cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-yl]-2-cyclopentene-1-methanol is the succinate salt.

Copy provided by USPTO from the PIRS Image Database on 04/17/2012

US 6,417,191 B1

15

41. A pharmaceutical formulation comprising (1S, 4R)-cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-yl]-2-cyclopentene-1-methanol, zidovudine, and (2R, cis)-4-amino-1-(2-hydroxymethyl-1,3-oxathiolan-5-yl)-(1H)-pyrimidin-2-one in association with one or more pharmaceutically acceptable carriers therefor.

42. A pharmaceutical formulation according to claim 41 wherein the (1S, 4R)-cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-yl]-2-cyclopentene-1-methanol is the succinate salt.

43. A formulation according to claim 41 in unit dosage form.

44. A formulation according to claim 43 in the form of a tablet or capsule.

45. A pharmaceutical formulation comprising (1S, 4R)-cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-yl]-2-cyclopentene-1-methanol, zidovudine, and (2R, cis)-4-amino-1-(2-hydroxymethyl-1,3-oxathiolan-5-yl)-(1H)-pyrimidin-2-one in a ratio of 1 to 20:1 to 20:1 to 10 by weight, in association with one or more pharmaceutically acceptable carriers therefor.

16

46. A formulation according to claim 45 in unit dosage form.

47. A formulation according to claim 46 in the form of a tablet or capsule.

48. A pharmaceutical formulation comprising (1S, 4R)-cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-yl]-2-cyclopentene-1-methanol or a physiologically functional derivative thereof and (2R, cis)-4-amino-1-(2-hydroxymethyl-1,3-oxathiolan-5-yl)-(1H)-pyrimidin-2-one or a physiologically functional derivative thereof in association with one or more pharmaceutically acceptable carriers therefor.

49. A pharmaceutical formulation according to claim 48 wherein the physiologically functional derivative of (1S, 4R)-cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-yl]-2-cyclopentene-1-methanol is the succinate salt.

50. A formulation according to claim 48 in unit dosage form.

51. A formulation according to claim 50 in the form of a tablet or capsule.

* * * * *

Copy provided by USPTO from the PIRS Image Database on 04/17/2012

ViiV_EZTZ_0778217

A00108

UNITED STATES PATENT AND TRADEMARK OFFICE
## CERTIFICATE OF CORRECTION

PATENT NO.          : 6,417,191 B1                                Page 1 of 1
APPLICATION NO. : 08/930225
DATED               : July 9, 2002
INVENTOR(S)      : Barry et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is
hereby corrected as shown below:

Claim 2 (Column 12, Line 49) should read as follows:

--in a ratio of 1 to 20:1 to 20:1 to 10 by weight.--

Signed and Sealed this

Thirty-first Day of July, 2007

JON W. DUDAS
*Director of the United States Patent and Trademark Office*

Copy provided by USPTO from the PIRS Image Database on 04/17/2012

ViiV_EZTZ_0778218

A00109

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.          : 6,417,191 B1                                    Page 1 of  1
APPLICATION NO. : 08/930225
DATED                  : July 9, 2002
INVENTOR(S)       : Barry et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is
hereby corrected as shown below:

On the Title page:

Item (73) ASSIGNEE should read as follows:

  --(73) Assignee: SmithKline Beecham Corporation, Philadelphia, PA (US)--

In the Claims:

Claim 2 (Column 12, Line 49) should read as follows:

  --in a ratio of 1 to 20:1 to 20:1 to 10 by weight.--

Signed and Sealed this

Twenty-first Day of August, 2007

JON W. DUDAS
*Director of the United States Patent and Trademark Office*

Copy provided by USPTO from the PIRS Image Database on 04/17/2012

ViiV_EZTZ_0778219



Page 1

Not Reported in F.Supp.2d, 2014 WL 129799 (D.Del.), 2014 Markman 129799
**(Cite as: 2014 WL 129799 (D.Del.))**

**H**

United States District Court, D. Delaware.
**Inventio** AG, Plaintiff,
v.
**ThyssenKrupp** Elevator Americas Corporation,
**ThyssenKrupp** Elevator Corporation, and
**ThyssenKrupp** Elevator Manufacturing Incorporated, Defendants.

Civil Action No. 08–874–RGA
January 14, 2014

**Patents 291 328(2)**

291 Patents
    291XIII Decisions on the Validity, Construction, and Infringement of Particular Patents
        291k328 Patents Enumerated
            291k328(2) k. Original utility. Most Cited Cases
    US Patent 6,892,861, US Patent 6,935,465. Construed.

Michael Flynn, Esq., Morris, Nichols, Arsht & Tunnell LLP, Wilmington, DE; Pierre R. Yanney, Esq., Stroock & Stroock & Lavan LLP, New York, NY, Attorneys for the Plaintiff.

James M. Lennon, Esq., Young Conaway Stargatt & Taylor, Wilmington, DE; David E. Schmit, Esq., Frost Brown Todd LLC, Cincinnati, OH, Attorneys for the Defendants.

MEMORANDUM OPINION
ANDREWS, UNITED STATES DISTRICT JUDGE:
**\*1** Pending before this Court is the issue of claim construction of various disputed terms found in U.S. Patents Nos. 6,935,465 and 6,892,861.

**I. BACKGROUND**
    The Court *sua sponte* ordered the parties on November 18, 2013 to reargue various claim terms as a result of the Court becoming more familiar with the technology at issue in this case. The Court previously construed the claim terms on June 14, 2010. (D.I.135). Much of the arguments presented to the Court simply rehash the previous arguments, and therefore will not be redundantly addressed in this opinion.

    On November 21, 2008, Inventio AG ("Plaintiff") filed this patent infringement action. (D.I.1). The Defendants are ThyssenKrupp Elevator Corporation, ThyssenKrupp Elevator Americas Corporation, and ThyssenKrupp Elevator Manufacturing Incorporated ("Defendants"). The Patent-in-suits are U.S. Patents Nos. 6,935,465 and 6,892,861 ("the '465 Patent " and "the '861 Patent " respectively).

    The Court has considered the Parties' letters. (D.I. 500 and 501).

**II. LEGAL STANDARD**
    "It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.,* 415 F.3d 1303, 1312 (Fed.Cir.2005) (en banc) (internal quotation marks omitted). " '[T]here is no magic formula or catechism for conducting claim construction.' Instead, the court is free to attach the appropriate weight to appropriate sources 'in light of the statutes and policies that inform patent law.' " *SoftView LLC v. Apple Inc.,* 2013 WL 4758195 (D.Del. Sept. 4, 2013) (quoting *Phillips,* 415 F.3d at 1324). When construing patent claims, a matter of law, a court considers the literal language of the claim, the patent specification, and the prosecution history. *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 977–80 (Fed.Cir.1995) (en banc), *aff'd,* 517 U.S. 370 (1996). Of these sources, "the specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Phillips,* 415 F.3d at 1315 (internal quotations and citations

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 2

Not Reported in F.Supp.2d, 2014 WL 129799 (D.Del.), 2014 Markman 129799
**(Cite as: 2014 WL 129799 (D.Del.))**

omitted).

Furthermore, "the words of a claim are generally given their ordinary and customary meaning ... [which is] the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips,* 415 F.3d at 1312–13 (internal citations and quotation marks omitted). "[T]he ordinary meaning of a claim term is its meaning to [an] ordinary artisan after reading the entire patent." *Id.* at 1321 (internal quotation marks omitted). "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314 (internal citations omitted).

**\*2** A court may consider extrinsic evidence, which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises," in order to assist the court in understanding the underlying technology, the meaning of terms to one skilled in the art and how the invention works. *Id.* at 1317–19 (internal quotation marks and citations omitted). However, extrinsic evidence is less reliable and less useful in claim construction than the patent and its prosecution history. *Id.*

"A claim construction is persuasive, not because it follows a certain rule, but because it defines terms in the context of the whole patent." *Renishaw PLC v. Marposs Societa' per Azioni,* 158 F.3d 1243, 1250 (Fed.Cir.1998). It follows that "a claim interpretation that would exclude the inventor's device is rarely the correct interpretation." *Osram GmbH v. Int'l Trade Comm'n,* 505 F.3d 1351, 1358 (Fed.Cir.2007) (internal quotation marks and citation omitted).

Finally, the Court is allowed to construe claims "during various phases of litigation" and not solely following a *Markman* Hearing. *Conoco, Inc. v. En-*

*ergy & Envtl. Int'l, L.C.,* 460 F.3d 1349, 1359 (Fed.Cir.2006). The Federal Circuit has held that a district court "may engage in rolling claim construction, in which the court revisits and alters its interpretation of the claim terms as its understanding of the technology evolves." *Id.* (internal quotation marks omitted).

## III. CONSTRUCTION OF DISPUTED TERMS

A. *"elevator control"*

1. *Plaintiff's proposed construction* : "an existing device that controls the operation of an elevator before modernization, and is reused (with or without modifications) during modernization"

2. *Defendants' proposed construction:* "an unmodified device that controls the operation of the elevator and was already in place prior to the modernization process"

3. *Court's Construction* : " an existing device that controls the operation of an elevator before modernization, and is reused (with or without modifications) during modernization"

The Defendants argue that the "elevator control" should be construed consistently with the patent specification, prosecution history, and the Plaintiff's admissions, which all indicate that the phrase means the " 'existing' elevator control that was in place prior to modernization." (D.I. 501 at 7). The Defendants contend that by focusing on the word "existing" during the prosecution of the patent, "it has by implication surrendered protection for installations that do not re-use the existing elevator controls." *Id.* at 8.

The Plaintiff argues that "[n]othing in the specification or the claims requires that the 'elevator control' be 'unmodified.' Rather, the specification and the claims simply state that the 'elevator control' is the existing elevator control in place prior to modernization, as opposed to the new elevator control that will be installed in the modernization." (D.I. 500–1 at 1 (emphasis omitted)). The Plaintiff

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 3

Not Reported in F.Supp.2d, 2014 WL 129799 (D.Del.), 2014 Markman 129799
**(Cite as: 2014 WL 129799 (D.Del.))**

further contends that the specification uniformly refers to the elevator control as the existing elevator control, not an unmodified elevator control. *Id.* at 2

The Court is persuaded by Plaintiff's arguments. Not only do the Patents' claims not require that the elevator control be unmodified, but also the Patents' specifications do not require an unmodified elevator control. Furthermore, the Court is not convinced that Inventio has made any disclaimer that the term "existing" means "unmodified." Finally, it is apparent to the Court that the extent to which an elevator control may be modified, so as to remain the "existing" elevator control unit, is a question of fact for the jury.

B. *"at least one of [A] and [B]"*
    **\*3** 1. *Plaintiff's construction:* "[A] or [B]"

2. *Defendants' construction:* "having the capability of performing both [A] and [B]"

3. *Court's construction:* "[A], [B], or [A] and [B]" [FN1]

> **FN1.** The Court's construction should be applied equally to the following disputed phrases:
>
> "floor terminal ... operative for at least one of input of destination call reports and recognition of identification codes of passengers"
>
> "floor terminal ... for at least one of the input destination call reports and for recognition of identification codes of users."
>
> "computing unit ... for at least one of evaluating the destination call reports and association of destination floors with recognized ones of the identification codes"

The Defendants argue that the phrase requires the presence of both "a and b" as per the Federal Circuit's holding in *Superguide Corp. v. DirecTV Entm't, Inc.,* 358 F.3d 870 (Fed.Cir.2004). The Defendants argue that the Federal Circuit "found that the ordinary meaning of the phrase 'at least one of [A], [B], [C], and [D]' 'connotes a conjunctive list' because '[t]he phrase 'at least one of' precedes a series of categories of criteria, and the patentee used the term 'and' to separate the categories of criteria.' " (D.I. 501 at 18 (brackets in original)). The Defendants further argue that this construction is not inconsistent the Patents' specification. *Id.* at 20. Finally, the Defendants argue that the "clearest proof of the conjunctive interpretation" derives from the prosecution history, in which the Plaintiff "specifically amended the claim to eliminate the alternative language ... and replaced that alternative language with the conjunctive requirement...." *Id.* at 26.

The Plaintiff argues that "the specification expressly states that the floor terminals have 'at least [A] ... or at least [B]," which "plainly and unambiguously shows that Inventio understood ... that there is no requirement that [the invention] have both." (D.I. 500-1 at 5 (emphasis omitted)). The Plaintiff supports this argument by pointing out that every embodiment in the specification is phrased disjunctively. *Id.* Furthermore, the Plaintiff contends that the prosecution history supports its proposed construction. The Plaintiff argues that the amendment did not surrender any claim scope but instead was only a "formalistic amendment, made to overcome the Examiner's formalistic objection to the 'alternative' word 'or.' " *Id.* at 12. The Court agrees.

Here, every embodiment of the claim in the specification uses only one of [A] or [B], not both [A] and [B]. Furthermore, it is evident from the prosecution history that the claim language was changed to overcome a formalistic objection made by the examiner. (D.I. 422–2 at 31.) Counsel for the Defendants discussed at the recent summary judgment hearing that it had been the previous practice of the Patent and Trademark Office to reject some

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

Not Reported in F.Supp.2d, 2014 WL 129799 (D.Del.), 2014 Markman 129799
**(Cite as: 2014 WL 129799 (D.Del.))**

claims that included the word "or." (D.I. 492 at 41). The Court asked Defense Counsel, "Everybody seems to be agreed that back in the mid 2000[s], or whenever exactly ... these patents were being considered, patent examiners, for no apparent reason, did not like the word [']or,['] right?" *Id.* To which the Defendants' attorney stated, "Some didn't, that's correct." [FN2] *Id.* Furthermore, it is evident to the Court that the plain meaning of the disputed phrase means the presence of [A], [B], or [A] and [B].

> FN2. It is noteworthy that a recent Patent Trial and Appeal Board ("PTAB") decision in *Ex Parte John Nicholas Gross* further supports this contention. 2013 WL 6907805 (Patent Tr. & App. Bd., Dec. 31, 2013). In *Gross,* the PTAB determined that the phrase "and/or" means "having element A alone, element B alone, or elements A and B taken together." *Id.* The PTAB further stated in a footnote, "Should there be further prosecution, we note that the preferred verbiage to claim 'at least' clauses of elements A and B would be 'at least one of A and B' and not 'at least one of A and/ or B.' *Id.* This indicates that the phrase, "at least one of A and B" also means, "having element A alone, element B alone, or elements A and B taken together." *Id.* While a PTAB decision is not binding, the PTAB's decision helps the Court understand the context in which the examiner's objections and the patentee's responses were made.

**\*4** The Court disagrees with the Defendants' interpretation of *SuperGuide.* In *SuperGuide,* every disclosed embodiment of the invention contained each element of the "at least one of" clause. *Super-Guide Corp. v. DirecTV Enterprises, Inc.,* 358 F.3d 870, 887 (Fed.Cir.2004). Additionally, the Federal Circuit found that a figure in the specification explicitly indicated that each element of the "at least one of" clause must be present in the invention. *Id.* This is vastly dissimilar from the facts of this case, as discussed above.

C. *"interrupting at least one existing car call transmitter line between at least one car call transmitter and the elevator control"*

1. *Plaintiff's construction:* "causing the elevator control to operate based on input from the modernizing device instead of based on input from the car call transmitter"

2. *Defendants' construction* : "the act of physically detaching at least one wire connecting the car call transmitters to the elevator control during the installation of the modernizing device"

3. *Court's construction:* " causing the elevator control to operate based on input from the modernizing device instead of based on input from the car call transmitter"

The Defendants argue that phrase should be construed consistent with the car call transmitter line being physically disconnected as the "interrupting step [ is] part of the procedure for mechanically installing and connecting up the new modernizing device equipment." (D.I. 501 at 44 (internal quotation marks omitted)). The Defendants direct the Court's attention to the specification, which describes the interrupting procedure "as part of the preparatory acts of removing and adding equipment during modernization of the elevator installation." *Id.* at 45.

The Plaintiff argues that "nowhere does the specification indicate that the existing car call buttons must be physically disconnected from the elevator control. Rather, the entire focus of the specification is on changing the operative input from which the elevator control takes its instructions." (D.I. 500–1 at 15 (internal emphasis removed)). The Court agrees. The patent claims and specification do not discuss a specific method for interrupting the car call transmitter line and it would be inappropriate to construe the phrase to incorporate a method that would impose a limitation on the claim not found in the claim language itself. Therefore it remains a question of fact as to whether the method utilized by the Defendants interrupts the signal.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 5

Not Reported in F.Supp.2d, 2014 WL 129799 (D.Del.), 2014 Markman 129799
**(Cite as: 2014 WL 129799 (D.Del.))**

D. *"interrupting at least one existing electrical floor call transmitter line between at least one floor call transmitter and the elevator control"*

1. *Plaintiff's construction:* "causing the elevator control to stop operating based on an input from at least one floor call transmitter"

2. *Defendants' construction :* "the act of physically detaching at least one wire connecting the car call transmitters to the elevator control during the installation of the modernizing device"

3. *Court's construction :* " causing the elevator control to operate based on input from the modernizing device instead of based on input from the car call transmitter"

The issue here is the same issue that the Court discussed in Section C above, [FN3] and therefore the Court adopts its prior findings here.

> [FN3]. The Defendants discuss the contested terms at issue in section C, D, and E together. (D.I. 501 at 42–50).

E. *"the elevator control being disconnected from the hall call transmitters and the car call transmitters of the elevator installation."*
**\*5** 1. *Plaintiff's construction:* "the elevator control ceases operating based on input from the car call transmitters of the elevator installation"

2. *Defendants' construction:* "during modernization, there are no longer any wires connecting the floor call transmitters and car call transmitters to the existing elevator control"

3. *Court's construction :* " the elevator control ceases operating based on input from the car call transmitters of the elevator installation"

The issue here is the same issue that the Court discussed in Section C above, and therefore the Court adopts its prior findings here.

F. *"modernized"* and *"modernizing"*
1. *Plaintiff's construction :* "exchanging components of an elevator installation for newer components"

2. *Defendants' construction :* "a more or less complete exchange of components in an elevator installation"

3. *Court's construction :* " a more or less complete exchange of components in an elevator installation"

The Defendants argue that the Plaintiff expressly defined the terms as "a more or less complete exchange of components in an elevator installation...." (D.I. 501 at 51). The Defendants cite as evidence the Inventio Patents, which state:

> If after such a length of time a general overhaul of the elevator installation is needed, the components of the elevator installation are often old in terms of technology, which obliges a more or less complete exchange of components. Such an exchange of components of an elevator installation is termed a "modernization" in the follow- ing.

'861 Patent, col 1:10–16.

The Plaintiff contends that Inventio intended the term "to have its standard meaning in the industry—i.e., any exchange of old components for new components." (D.I. 500–1 at 18 (emphasis omitted)). Inventio states, "It is black letter law that a claim term must be given its standard, ordinary meaning in the relevant field of art, unless it is unequivocally clear from the specification that the patentee intended a different meaning." *Id.* at 19 (emphasis omitted). Inventio then cites as evidence multiple extrinsic sources, including the ASME A17.1 standard, the *Vertical Transportation Handbook,* and various other patents. *Id.*

The Court is unpersuaded by the Plaintiff's arguments. The inventor of the Patents at issue specifically defined the term "modernize" in the second paragraph of the patent as being a "more or less complete exchange of components." '861 Pat-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 6

Not Reported in F.Supp.2d, 2014 WL 129799 (D.Del.), 2014 Markman 129799
**(Cite as: 2014 WL 129799 (D.Del.))**

ent, col 1:10–16. As the patentee may act as its own lexicographer, and did so here, the Court will adopt the patentee's own claim definition as found in the patents.

G. *"elevator installation"*

This term was brought to the Court's attention by the Defendants; however, it appears that the parties did not confer and agree to present this term to the Court for resolution. Therefore the Court provides no further opinion regarding the construction of this term.

**IV. CONCLUSION**

Within three days the parties should submit a proposed agreed form of order consistent with the Court's original *Markman* Opinion (D.I.135), as modified by this opinion, suitable for submission to the jury. The parties should make any necessary supplementation of their expert reports by the close of business on January 22, 2014. The parties then have until the close of business on January 25, 2014 to reply to any amended expert report. The parties are also to file simultaneous letters to the court on January 22, 2014 indicating how the pending Motion for Summary Judgment of Non–Infringement (D.I.396) is affected, if at all, by this opinion.

D.Del., 2014
Inventio AG v. ThyssenKrupp Elevator Americas Corporation
Not Reported in F.Supp.2d, 2014 WL 129799 (D.Del.), 2014 Markman 129799

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

--- Fed.Appx. ----, 2014 WL 1229547 (C.A.Fed. (Utah))
**(Cite as: 2014 WL 1229547 (C.A.Fed. (Utah)))**

**H**

Only the Westlaw citation is currently available.This case was not selected for publication in the Federal Reporter.

Not for Publication in West's Federal Reporter. See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007. See also Federal Circuit Rule 32.1 and Federal Circuit Local Rule 32.1. (Find CTAF Rule 32.1)

United States Court of Appeals,
Federal Circuit.
NOVATEK, INC., Plaintiff–Appellee,
v.
The SOLLAMI COMPANY, Defendant–Appellant.

No. 2013–1389.
March 26, 2014.

**Background:** In patent infringement action involving patents directed to cutter bits, bit holders, and bit blocks used in road milling, mining, and trenching operations, the United States District Court for the District of Utah, David Nuffer, J., 2013 WL 1831995, entered summary judgment of non-infringement. Patentee appealed.

**Holding:** The Court of Appeals, Wallach, Circuit Judge, held that accused device did not infringe patents.

Affirmed.

Moore, Circuit Judge, filed dissenting opinion.

West Headnotes

**[1] Patents 291 ⚙⟳101(2)**

291 Patents
    291IV Applications and Proceedings Thereon
        291k101 Claims
            291k101(2) k. Construction in general.

Most Cited Cases

Term "bit," in patents directed to cutter bits, bit holders, and bit blocks used in road milling, mining, and trenching operations, meant an object comprising a hardened tip and a shank mountable in and removable from a bore through the front portion of a bit holder.

**[2] Patents 291 ⚙⟳101(2)**

291 Patents
    291IV Applications and Proceedings Thereon
        291k101 Claims
            291k101(2) k. Construction in general.

Most Cited Cases

Term "bit holder," in patents directed to cutter bits, bit holders, and bit blocks used in road milling, mining, and trenching operations, meant an object in which a removable bit is mounted in a bore in the front portion thereof.

**[3] Patents 291 ⚙⟳101(2)**

291 Patents
    291IV Applications and Proceedings Thereon
        291k101 Claims
            291k101(2) k. Construction in general.

Most Cited Cases

Term "shank," in patents directed to cutter bits, bit holders, and bit blocks used in road milling, mining, and trenching operations, meant elongate cylindrical object.

**[4] Patents 291 ⚙⟳235(2)**

291 Patents
    291XII Infringement
        291XII(A) What Constitutes Infringement
            291k233 Patents for Machines or Manufactures
                291k235 Identity of Principle or Mode of Operation
                    291k235(2) k. Particular patents or devices. Most Cited Cases

Accused device did not have bit including a

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- Fed.Appx. ----, 2014 WL 1229547 (C.A.Fed. (Utah))
**(Cite as: 2014 WL 1229547 (C.A.Fed. (Utah)))**

shank, bit mountable in a bore, or bit that was removable from the bit holder, and thus did not infringe patents directed to cutter bits, bit holders, and bit blocks used in road milling, mining, and trenching operations.

**Patents 291 ⬤⟩328(2)**

291 Patents
     291XIII Decisions on the Validity, Construction, and Infringement of Particular Patents
         291k328 Patents Enumerated
             291k328(2) k. Original utility. Most Cited Cases
6,371,567, 7,883,155. Construed and Ruled Not Infringed.

Appeal from the United States District Court for the District of Utah in Nos. 11–CV–0180 and 11–CV–1112, Judge David Nuffer.Philip W. Townsend, III, of Provo, UT, argued for plaintiff-appellee.

Jeffrey T. Morris, Morris, Jobe, & Cook, LLC, of Pittsburgh, PA, argued for defendant-appellant.

Before NEWMAN, MOORE, and WALLACH, Circuit Judges.

WALLACH, Circuit Judge.

**\*1** In this patent case, Sollami Company ("Sollami") alleged Novatek, Inc. ("Novatek") infringed U.S. Patent Nos. 7,883,155 ("the '155 patent") and 6,371,567 ("the '567 patent"). Particularly, in February 2011, Novatek instituted this declaratory judgment action at the U.S. District Court for the District of Utah on issues of invalidity and non-infringement of the '155 patent. On July 13, 2011, Sollami filed suit against Novatek in the Southern District of Illinois for infringement of the '567 patent. This latter suit was transferred to the District of Utah, and the two cases were consolidated in February 2012. After claim construction, the district court found non-infringement in favor of Novatek. This court affirms.

BACKGROUND

The technology at issue involves equipment and machinery used in road milling, mining, and trenching operations. Specifically, the patents are directed to cutter bits, bit holders, and bit blocks used in the above-mentioned operations. The patents purport to provide a better means for allowing the removal of a bit from a bit holder or a bit block, "especially when the bit becomes worn and in need of replacement." *E.g.,* '567 patent col. 1 ll. 36–37, 43–44. The figure below is illustrative:

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- Fed.Appx. ----, 2014 WL 1229547 (C.A.Fed. (Utah))
(Cite as: 2014 WL 1229547 (C.A.Fed. (Utah)))



'155 patent at [57]. A bit 16 and a spacer 17, together with a bit holder 18, and a bit block 20 comprise the claimed invention. The bit 16 includes a hardened tip 21 which resides in a pocket in the front face 22 of a frustoconical forward portion 23 of the bit 16. *Id.* col. 2 l. 65–col. 3 l. 1. "At the rear of the frustoconical portion (23) is a cylindrical front portion base 24." *Id.* col. 3 ll. 1–2. "Aft of the cylindrical base 24, the tip narrows to a cylindrical shank 25, which, [in certain embodiments], includes a C-shaped retainer 26 there around and a cylindrical shank portion base 27 defining the rear end of the bit 16." *Id.* col. 3 ll. 7–10.

The '567 patent was issued on April 16, 2002, and the '155 patent was issued on February 8, 2011. The two patents' specifications are not identical but are nonetheless substantially similar. Claims 1 to 9 of the '567 patent and claims 1 to 4 of the '155 patent are the asserted claims in this case. Claim 1 of the '155 patent is representative:

1. In an assembly for use in road milling, trenching and mining equipment including a bit, bit holder and a bit block, said bit being mountable in a first bore through said bit holder and said bit holder being mountable in a second bore through said bit block, said bit holder and bit block, in combination, comprising:

a single piece bit holder structure including,

a bit holder front portion and a generally cylindrical bit holder shank portion extending axially rearwardly from said front portion defining an annular sidewall, an elongate slot radially through said sidewall extending axially from said distal end of said shank and terminating between said distal end and said front portion defining a C-shape portion of said shank, an outer surface of said C-shape portion providing interference with said second bore on said bit block sufficient to maintain said bit holder on said bit block during use.

**\*2** '155 patent col. 7 l. 14–col. 8. l. 8. Claim 1 of the '567 patent differs slightly, and recites:

1. A bit holder for use in road milling, trenching and mining equipment as part of an assembly including a bit, said bit holder and a bit block, said bit being mountable in a first bore through said bit holder and said bit holder being mountable in a second bore through said bit block, said bit holder comprising:

a bit receiving front portion terminating at an

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- Fed.Appx. ----, 2014 WL 1229547 (C.A.Fed. (Utah))
**(Cite as: 2014 WL 1229547 (C.A.Fed. (Utah)))**

annular flange for engaging a face of said bit block, a shank portion extending axially rearwardly from said annular flange, said shank portion including a declining taper from adjacent said annular flange to adjacent a distal end thereof, said declining taper providing an interference fit between said bit holder and said bit block,

said shank portion including an axial bore centrally therethrough, and

means on said shank portion for providing increased resilience for an outer surface of said declining taper to increase the usable interference fit between said declining taper and said second bore on said bit block by at least about four times a standard interference fit therebetween as said

shank portion is fully mounted on said second bore.

'567 patent col. 8 ll. 11–33.

Like Sollami, Novatek manufactures a bit assembly used in road milling, mining, and trenching operations ("accused device"). Its assembly consists of a bit with a polycrystalline diamond ("PCD") coated tip that is brazed to a carbide bolster, which is then brazed to a steel body. Novatek provides the following depiction of its accused device:



Appellee's Br. 12; J.A. 332.

The district court issued its claim construction order on December 4, 2012, and Novatek moved for summary judgment of non-infringement thereafter on December 21, 2012. On April 30, 2013, the motion was granted and judgment was entered.[FN1]

Sollami timely appealed. This court has jurisdiction under 28 U.S.C. § 1295(a)(1) (2012).

## DISCUSSION

Sollami makes the following arguments on appeal: (1) that the district court erred in construing "bit," "bit holder," and "shank" as recited in the asserted claims; and (2) that the district court erred in

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- Fed.Appx. ----, 2014 WL 1229547 (C.A.Fed. (Utah))
**(Cite as: 2014 WL 1229547 (C.A.Fed. (Utah)))**

finding that the accused device does not have a "bit" as the district court construed the term. The issues presented therefore pertain to the district court's claim construction and its grant of Novatek's motion for summary judgment of non-infringement.

A. The District Court Correctly Construed "Bit," "Bit Holder," and "Shank"

This court reviews a district court's claim construction de novo. Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp., No.2012–1014, 2014 WL 667499, at *1, *16 (Fed.Cir. Feb.21, 2014) (en banc). To ascertain the scope and meaning of the asserted claims, courts look to the words of the claims themselves, the specification, the prosecution history, and, if necessary, any relevant extrinsic evidence. Phillips v. AWH Corp., 415 F.3d 1303, 1315–17 (Fed.Cir.2005) (en banc).

**\*3** Relevant to this appeal, the district court construed, among other terms, "bit," "bit holder," and "shank." Novatek, Inc. v. Sollami Co., No. 2:11–cv–00180, 2013 WL 1831995, at *3 (D.Utah Apr.30, 2013). Sollami contends that certain terms interpreted by the district court, including the term "bit," appear only in the preambles of the asserted claims. Sollami argues "bit" is not a required structural element of the asserted claims because the preambles are not limitations on the claims. The district court concluded that the preambles serve as limitations.

"A claim's preamble may limit the claim when the claim drafter uses the preamble to define the subject matter of the claim." August Tech. Corp. v. Camtek, Ltd., 655 F.3d 1278, 1284 (Fed.Cir.2011). On one hand, a preamble is generally construed to be limiting if it " 'recites essential structure or steps, or if it is necessary to give life, meaning, and vitality to the claim.' " NTP, Inc. v. Research In Motion, Ltd., 418 F.3d 1282, 1305 (Fed.Cir.2005) (quoting Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc., 289 F.3d 801, 808 (Fed.Cir.2002)). For example, limitations in the body of the claim that rely upon and derive antecedent basis from the preamble may render the preamble a necessary

component of the claimed invention; and therefore, a limitation on the claims. Id. at 1306. Also, where the specification underscores structure or steps recited in the preamble as important, the preamble may operate as a claim limitation. Catalina Mktg., 289 F.3d at 808. Further, "clear reliance on the preamble during prosecution to distinguish the claimed invention from prior art transforms the preamble into a claim limitation because such reliance indicates use of the preamble to define, in part, the claimed invention." Id. at 808–09.

On the other hand, when a patentee "defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention, the preamble is not a claim limitation." Rowe v. Dror, 112 F.3d 473, 478 (Fed.Cir.1997); see Pitney Bowes, Inc. v. Hewlett–Packard Co., 182 F.3d 1298, 1305 (Fed.Cir.1999) (explaining the preamble is not limiting if "the body of the claim fully and intrinsically sets forth the complete invention, including all of its limitations, and the preamble offers no distinct definition of any of the claimed invention's limitations, but rather merely states, for example, the purpose or intended use of the invention"). Whether a preamble is treated as a limitation is determined by the facts of each case and upon an understanding of what the inventors actually invented and intended to encompass by the claims. Catalina Mktg., 289 F.3d at 808.

Here, as the district court concluded, the preambles of the asserted claims recite essential elements of the invention pertaining to, among other things, the bit, the bit holder, and the bit block in addition to the mounting relationship among these elements that make up the claimed bit assembly. For example, the preamble of claim 1 of the '567 patent recites a "bit holder" that is a "part of an assembly including a bit, said bit holder and a bit block," where the "bit" is "mountable in a first bore through said bit holder and said bit holder being mountable in a second bore through said bit block." The preamble of claim 1 of the '155 patent recites

--- Fed.Appx. ----, 2014 WL 1229547 (C.A.Fed. (Utah))
**(Cite as: 2014 WL 1229547 (C.A.Fed. (Utah)))**

substantially the same. Particularly, it too refers to "an assembly" that includes "a bit, bit holder and a bit block." The body of claim 1 of the '567 patent does not recite the complete invention, but refers back to the features of the bit assembly stated in the preamble, so that these references in the body of the claim derive their antecedent bases from the preamble. '567 patent col. 8 ll. 11–33 ("bit holder, "bit block," and "second bore" finding antecedent bases in the preamble).

**\*4** The patents' specifications support this reading of the preambles. In particular, the specifications identify the recited structural elements in the patents' preambles as "the invention." The '567 patent for instance provides:

> Referring to FIGS. 1–2, a bit mounting assembly, generally indicated at 20, constructed in accordance with the present invention, includes a bit, generally indicated at 21, which is mounted on a bit holder, generally indicated at 22, which, in turn, is secured on a bit block, generally indicated at 23.

'567 patent col. 2 ll. 49–54; *see also* '155 patent col. 2 ll. 59–64 ("[A] bit, bit holder and bit block assembly, generally indicated at 15, constructed in accordance with the present invention, includes a bit, generally indicated at 16 and a spacer, generally indicated at 17, together with a bit holder, generally indicated at 18 and a bit block, generally indicated at 20."). In addition, the purported improvement over prior art is stated as a "more efficient means for allowing the removal of a bit from a bit holder or a bit block." '567 patent col. 1 ll. 43–44. These statements in the specification underscore structural elements recited in the preamble, *e.g.,* "bit," as pertinent to the invention claimed. *Proveris Scientific Corp. v. Innovasystems, Inc.,* 739 F.3d 1367, 1373 (Fed.Cir.2014) ("[T]he preamble [provides for] the only reference in any independent claim to the inventive concept ... [and][t]his fact alone is likely sufficient to support a conclusion that the preamble is limiting."); *Deere & Co. v. Bush Hog, LLC,* 703 F.3d 1349, 1358 (Fed.Cir.2012) (holding that the

preamble phrase "rotary cutter deck" was a limitation where the specification referred to "the present invention" as "a rotary cutter deck"); *Poly–Am., LP v. GSE Lining Tech., Inc.,* 383 F.3d 1303, 1310 (Fed.Cir.2004) (construing preamble as limiting where it disclosed a "fundamental characteristic of the claimed invention") (internal quotation marks and citation omitted).

The inventor's statements made during prosecution of the '155 patent also highlight the relevance of the structural elements recited in the preambles. For instance, the inventor stated in a declaration that: "The present application is a bit holder that is stiffer and therefore holds the bit in the proper position for heavy operating conditions.... A combination of the [cited prior art references] would cause the holder to rotate. In the industry, bits rotate, not holders." J.A. 253. In distinguishing prior art, the inventor stated that:

> The [prior art] reference has a wider notch at the rearward potion and a narrower width at the front face [than the bit holder of the claimed invention]. The present application is the reverse. This difference is material because the narrower rearward portion prevents the clogging of the notch and aids in removal of the bit.

J.A. 254. Thus, the inventor during prosecution of the '155 patent relied on structural elements recited in the preamble to distinguish the claimed invention from the prior art.

**\*5** Accordingly, the preambles of the asserted claims are not merely limited to stating the purpose or intended use of the invention of the '567 and '155 patents, but rather contain essential structural elements that are highlighted in the specification and which were relied upon during prosecution. Although Sollami argues that the essence of its invention is directed to a "bit holder" as opposed to a "bit," the intrinsic evidence does not support Sollami's contention. Indeed, in addition to the structural elements of the claimed bit assembly, the invention focuses on the mounting relationship

--- Fed.Appx. ----, 2014 WL 1229547 (C.A.Fed. (Utah))
**(Cite as: 2014 WL 1229547 (C.A.Fed. (Utah)))**

among the bit, bit holder, and bit block. *E.g.,* '155 patent col. 4 ll. 7–9 ("Referring to FIG. 2, the mounting relation between the bit block 20, bit holder 18, spacer 17 and bit 16 is shown in cross section."). It is apparent that the "claim drafter [chose] to use both the preamble and the body to define the subject matter of the claimed invention." *Eaton Corp. v. Rockwell Int'l Corp.,* 323 F.3d 1332, 1339 (Fed.Cir.2003) (internal quotation marks and citation omitted). Therefore, the district court did not err in concluding that the recited structural elements in the preambles serve as limitations that give "life, meaning, and vitality to the claims" as a whole. *Novatek,* 2013 WL 1831995, at *3.

[1][2] Even if "bit" is construed as a structural limitation, Sollami avers that the district court erred by requiring a bit with a shank and by requiring removability of the bit from the bit holder. The district court construed "bit" as "an object comprising a hardened tip and a shank mountable in and removable from a bore through the front portion of a bit holder," and "bit holder" as "[a]n object in which a removable bit is mounted in a bore in the front portion thereof." *Novatek,* 2013 WL 1831995, at *3. The court's constructions were correct.

Claim 1 of the '567 patent provides that the "bit [is] mountable in a first bore through said bit holder and said bit holder [is] mountable in a second bore through said bit block." '567 patent col. 8 ll. 13–15. Inherent in this claim language is that a portion of the bit is "in" a first bore, and similarly, a portion of the bit holder is "in" a second bore. That portion of the bit holder that is "in" the second bore is recited expressly as the "shank portion." *Id.* col. 8 ll. 18–32. Although the claim language does not denote a label for the portion of the bit that is "in" the first bore, like the district court, this court holds that portion of the bit and the bit holder's shank portion "cannot be ... entirely different" and construes both the bit and the bit holder to include a shank. *Novatek,* 2013 WL 1831995, at *5. The patentee adheres to this definition when describing his invention throughout the patent. *See Boss Control,*

*Inc. v. Bombardier Inc.,* 410 F.3d 1372, 1377 (Fed.Cir.2005) (quoting *Astrazeneca AB v. Mut. Pharm. Co.,* 384 F.3d 1333, 1340 (Fed.Cir.2004)) ("[W]hile it is of course improper to limit the claims to the particular preferred embodiments described in the specification, the patentee's choice of preferred embodiments can shed light on the intended scope of the claims.").

**\*6** In the "Background of the Invention" section, the patentee without qualification sets out that "bits include a tip and a shank ." '567 patent col. 1 ll. 21–22; '155 patent col. 1 ll. 28–30 ("The bits utilized include a tip and a shank."). Elaborating on the "tip" and "shank," the patentee recites:

> The shank is received and may axially rotate in a bit holder which is secured onto a bit block that, in turn, is mounted on the drum. Each of the bits has a hardened tip, preferably made of tungsten carbide or such other hardened material that acts to remove a portion of the surface it contacts.

'567 patent col. 1 ll. 22–26.

Additionally, every figure in the patents depicting a bit includes a shank. ' 567 patent Figs. 1, 2, 7, 8; '155 patent Figs. 1, 13. Specifically, the ' 567 patent provides: "Referring to FIG. 2, the bit, generally indicated at 21, includes a forward end 24, and a shank 25 or rear end thereof." '567 patent col. 2 ll. 57–59; '155 patent col. 3 ll. 9–10 ("[A] cylindrical shank portion base 27 defining the rear end of the bit."). Further consistent with the claim language that allows for the bit and bit holder to include a shank, the embodiments provide that "shank 25 [of the bit] fits within bore 40" of the bit holder the length of which "is determined partly by the length of the shank 25 on bit 21," '567 patent col. 3 ll. 31–34, and that "[b]ore 49 [that runs through the bit block] is sized to receive the cylindrical shank 35 of the bit holder 22," *id.* col. 3 ll. 45–46.

The intrinsic evidence therefore supports what is inherent in the claim language—the portion of the bit that is "in" the first bore, as recited in the as-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- Fed.Appx. ----, 2014 WL 1229547 (C.A.Fed. (Utah))
**(Cite as: 2014 WL 1229547 (C.A.Fed. (Utah)))**

serted claims, is the "shank." In particular, the patents disclose a symbiotic relationship between the shank and bore, an interdependence where the existence of a bore necessitates the need for a shank to practice the invention as claimed. *See* Response to Office Action, U.S. Patent App. No. 11/509,349, at 9 (Oct. 21, 2009) ("[B]its used in road milling equipment have shanks that may slightly vary but would approximate 3/4 to 7/8 inch in diameter. Applicant is presently designing bit holders for trenching equipment wherein the bit shanks approximate 1–1/2 inches in diameter. Mining equipment would utilize bits having larger shanks. Therefore, the exact numbers given for the bit holder bores and outer bit holder dimensions would vary depending upon the application...."). FN2 Accordingly, the patentee's consistent usage and treatment of a limitation (here, "shank") demonstrates the bit includes a shank. *See, e.g., Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.,* 488 F.3d 982, 990 (Fed.Cir.2007) (construing the claim term "look ahead distance" to include a time limitation because "time is inherent in the calculation of 'look ahead distance,' " as shown by the specification); *Network Commerce, Inc. v. Microsoft Corp.,* 422 F.3d 1353, 1360 (Fed.Cir.2005) (limiting the term "download component" to a component capable of performing certain functions, based on the consistent usage in the specification).

**\*7** That the "bit" was construed as being "removable" from the "bit holder" was also not error. The district court reasoned that "if [the bit is] going to be mountable, it has to be removable." J.A. 308. Sollami argues that "removable" is not recited in the claim language, and thus, cannot be a limitation.

The "removable" requirement is fully supported by the specification, which is " 'the single best guide to the meaning of a disputed term.' " *Phillips,* 415 F.3d at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed.Cir.1996) ). Every relevant embodiment disclosed in the '567 and ' 155 patents refers to the removability of the

bit from the bit holder. Indeed, the purpose of the invention is to provide a means for "quick removal" of the bit from the bit holder and/or the bit holder from the bit block during road milling, mining, and trenching. *See, e.g.,* '567 patent col. 1 ll. 54–57 ("[A]n object of the present invention, generally stated, is to provide an improved means for quickly mounting and/or removing a bit holder from its associated bit block.").

In the "Background of the Invention" section, the '567 patent explains that "a need has developed for providing ease of removability of bits in their bit holders, especially when the bit becomes worn and in need of replacement," and that "[i]t would be desirable to provide a more efficient means for allowing the removal of a bit from a bit holder or a bit block." *Id.* col. 1 ll. 36–44. Throughout the specifications of both patents, the bit is described in no other way than allowing for removability:

> If the bit 21 should break at reduced diameter portion 29 adjacent the bottom flanged portion 28, a rod, punch, etc. (not shown) may be inserted into the bottom of the bore to push the shank [of the bit] out of the holder.

> *Id.* col. 3 ll. 34–38;

The notches 32a–32d, constructed in accordance with the present invention, allow for the quick removal of the bit 21 from the bit holder 22 by applying a force having a substantial axial component thereto to the bottom side of the bit flange 28. In the preferred embodiments there may be two, three or four notches or indents 32a-d (FIG. 2, 32–d not shown) on the bit holder 22 positioned at 120 degree or 90 degree intervals, respectively, around the circumference thereof. Each notch may be straight vertically or slightly wider at surface 31 and narrows as the notch descends toward flange 33. While the use of the punch 55 on one notch is usually sufficient to remove the bit, the punch may be utilized sequentially in differing notches to balance the axial force, if necessary, to move the bit 21 out of the bit holder 22.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

*--- Fed.Appx. ----, 2014 WL 1229547 (C.A.Fed. (Utah))*
**(Cite as: 2014 WL 1229547 (C.A.Fed. (Utah)))**

*Id.* col. 3 l. 63–col. 4 l. 10;

Referring to FIGS. 7 and 8, the bit 21 and the second embodiments of the bit holder 60 and bit block 61 are shown in assembled condition with the exception of the modification in the bit block 61 to provide a slot 85 positioned in the outer portion of bit block 61 to more easily allow the insertion of tools in the rear of the bit block 61 to drive the bit 21 from the bit holder 60.

**\*8** *Id.* col. 5 ll. 35–41;

As with the first embodiment of the present invention, the notch 65 in the front tapered portion of the bit holder 60 allows a chisel (not shown) or other such device to apply force on the back side of the bottom flanged portion 28 of bit 21 to drive the bit out of the bit holder.

*Id.* col. 5 ll. 49–53;

A plurality of notches 37–37 (one shown) adjacent the front face 35 of the bit holder, provide an access area to the cylindrical base 24 of the tip 16 into which a prying tool may be positioned to force out the base 24 of the bit 16 when the bit shank 25 and spacer 17 are mounted in the bore 36 of the bit holder 18.

'155 patent col. 3 ll. 25–30.

As shown most clearly in FIG. 2, the semicylindrical indent 33 in the spacer 17 provides for the insertion of a tool through the backside of bore 36 which will accommodate punching out the spacer 17 and the bit 16 from the back of the assembly.

*Id.* col. 4 ll. 32–46.

With this embodiment, the bit 16 (not shown) would be driven out of the bit holder 60 for replacement by inserting a rod to tool (not shown) in the bottom of bore 63 of the bit holder (shown most clearly in FIG. 3)....

*Id.* col. 5 ll. 15–19;

The bulbous frustoconical portion 73 extends rearwardly beyond the cylindrical nose and includes a pair of notches 74, 75 therein that provide tool access to the back of a bit for easing removal of the bit from the bit holder.

*Id.* col. 5 ll. 44–48. It is apparent that removability of the bit from the bit holder is a feature of the invention as a whole, and not merely a preferred embodiment of the invention. *See Regents of Univ. of Minn. v. AGA Med. Corp.,* 717 F.3d 929, 936 (Fed.Cir.2013) (quoting *Verizon Servs. Corp. v. Vonage Holdings Corp.,* 503 F.3d 1295, 1308 (Fed.Cir.2007)) ("When a patent thus describes the features of the 'present invention' as a whole, this description limits the scope of the invention."); *Decisioning.com, Inc. v. Federated Dept. Stores, Inc.,* 527 F.3d 1300, 1309 (Fed.Cir.2008) ("The remote interface is a component of the invention itself, and the inventor's use of 'kiosk' in that manner does not merely describe a preferred embodiment of the invention. Rather, it describes the invention itself.").

In addition, the prosecution history of the '155 patent supports the district court's construction requiring removability of bits from bit holders. In explaining the purpose behind the wall thickness of a prior art bit assembly, the patentee declared that it was "to quickly remove the bit" and further specified that "[a]s many as 320 bits may be removed and replaced in a day." J.A. 253. The patentee also explained as "material" the bit assembly design of the '155 patent that "aids in removal of the bit." J.A. 254. These statements show the patentee remained cognizant of a key feature throughout the prosecution of the '155 patent-removability of the bit.

Thus, the patentee's references to "bit" consistently require that it is removable from the bit holder. *Bell Atl. Network Servs. ., Inc. v. Covad Comm'ns Grp., Inc.,* 262 F.3d 1258, 1271 (Fed.Cir.2001) (quoting *Vitronics Corp.,* 90 F.3d at 1582) ("[W]hen a patentee uses a claim term throughout the entire patent specification, in a manner consistent with only a single meaning, he has defined that term 'by implication.' "). Accordingly, the district court did not err in construing the bit to be removable from the bit holder.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- Fed.Appx. ----, 2014 WL 1229547 (C.A.Fed. (Utah))
**(Cite as: 2014 WL 1229547 (C.A.Fed. (Utah)))**

**\*9** [3] Finally, Sollami argues that the district court erred in requiring the "shank" to be an "elongate cylindrical object" because the claim language does not provide for a particular shape of "shank." As discussed above, claim 1 of the '567 patent requires the bit's and bit holder's shank portions to be "in" bores that run through the bit holder and bit block. The ordinary meaning of "bore" is defined as "a hole made or enlarged by boring" and/or "the inside diameter of a hole, tube, or hollow cylindrical object or device, such as a bushing or bearing, engine cylinder, or barrel of a gun." *Random House Unabridged Dictionary* 242 (2d ed.2001); *see also Merriam–Webster Dictionary,* http://www.merriam-webster.com/dictionary/bore (last visited Mar. 21, 2014) ("Bore" defined as "a usually cylindrical hole made by or as if by boring" or "the long usually cylindrical hollow part of something (as a tube or gun barrel)."). A shank portion that fits in a "hole" that runs through the bit holder (and bit block) must be elongated and cylindrical. The claim language also provides that a shank extends axially from an annular (shape of a ring) flange. '567 patent col. 8 ll. 19–21 (describing the bit holder's shank). Although Sollami contends that the "shank" can be of any shape, a structure that extends away from an annular flange must impart a shape that is generally cylindrical and no other.

The specification supports this plain meaning. To begin, every figure and description of "shank" and "shank portion" illustrates a cylindrical structure. As an example, a portion of the '567 patent's specification reads:

Flange 66 is annular in that a bore 71 runs axially through the bit holder in a more straight forward hollow cylindrical manner than the bore 40 which extends through the bit holder 22 of the first embodiment. The leading edge of bore 71 includes a countersink 72 adjacent to the flat annular leading surface 62 of the bit holder to receive a similarly shaped shank portion 25 on the bit 21 shown in FIG. 2.

*Id.* col. 4 ll. 45–51. Consequently, a "hollow cylindrical" bore receives "a similarly shaped shank portion" of the bit.

Likewise, "[t]he shank is received and may axially rotate in a bit holder which is secured into a bit block that, in turn, is mounted on the drum." *Id.* col. 1 ll. 21–23. In order for a shank to axially rotate and to extend away from an annular flange, the "shank" must take on a cylindrical shape. While this latter example is in reference to the shank portion of the bit holder, it is nevertheless depictive of the disclosed shape of the bit's shank portions. Indeed, these and other examples disclosed in the patents show that the claimed bore and shank portions are of similar cylindrical shape. *E.g., id.* col. 7 ll. 1–34 (disclosing cylindrical "drive pins" that fit into the bores of the bit holder and bit block). The prosecution history similarly highlights the structurally complementary relationship between the shank and bore. *See* Response to Office Action, U.S. Patent App. No. 11/509,349, at 8 (Oct. 21, 2009) (The Patent Office states a "standard interference-press fit" is indefinite. While it is true there are no present standards for hollow slotted shanks fitting in complementary bores ... there are standards for interference fits for solid cylinders fitting into bores."); *see also* Response to Office Action, U.S. Patent App. No. 11/509,349, at 20 (Aug. 6, 2007) ("[M]echanical engineering handbooks ... include charts disclosing what dimensions heretofore known interference fits are for various diameters of solid cylinders. These are the [interference] fits that applicant refers to."). Accordingly, the district court's construction of "shank" as an "elongate cylindrical object" was correct.[FN3]

*B. The District Court Did Not Err in Granting Novatek's Motion for Summary Judgment of Non-infringement*

**\*10** Summary judgment decisions are reviewed under regional circuit law. *SkinMedica, Inc. v. Histogen Inc.,* 727 F.3d 1187, 1194 (Fed.Cir.2013). The Tenth Circuit reviews the grant of summary judgment *de novo. Robert v. Bd. of Cnty. Comm'rs,*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

691 F.3d 1211, 1216 (10th Cir.2012). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). At the summary judgment stage, we credit all of the nonmovant's evidence and draw all justifiable inferences in her favor. *Brilliant Instruments, Inc. v. GuideTech, LLC,* 707 F.3d 1342, 1344 (Fed.Cir.2013) (internal quotation marks and citations omitted).

[4] Based on its construction of "bit," the district court found that Novatek was entitled to judgment as a matter of law because there were no genuine disputes as to any material fact that Novatek's accused device did not have a bit including a shank. The district court additionally found that the accused device did not include a bit mountable in a bore. Lastly, the district court found that the accused device did not have a bit that is removable from the bit holder.

"To prove infringement, the patentee must show that an accused product embodies all limitations of the claim either literally or by the doctrine of equivalents." *Cephalon, Inc. v. Watson Pharms., Inc.,* 707 F.3d 1330, 1340 (Fed.Cir.2013). "If any claim limitation is absent from the accused product, there is no literal infringement as a matter of law." *Id.* Where a defendant seeks summary judgment of non-infringement, "nothing more is required than the filing of a ... motion stating that the patentee had no evidence of infringement and pointing to the specific ways in which accused [products] did not meet the claim limitations." *Exigent Tech. v. Atrana Solutions, Inc.,* 442 F.3d 1301, 1309 (Fed.Cir.2006). The burden of production then shifts to the patentee to "identify genuine issues that preclude summary judgment ." *Optivus Tech., Inc. v. Ion Beam Applications S.A.,* 469 F.3d 978, 990 (Fed.Cir.2006).

Novatek's accused devices do not meet all the structural limitations of the asserted claims. First, the district court found that "the carbide bolster of the Novatek devices is not an elongate cylindrical object and is therefore not a 'shank.' " *Novatek,* 2013 WL 1831995, at *5. An illustration of the PCD tip and carbide bolster is depicted below:



Appellee's Br. 13; Appellant's Reply Br. 19; J.A. 334; *see also* J.A. 416. Sollami argues that the device "exhibits a cylindrical protrusion at its distal end which serves to anchor or secure the subassembly into the bore in the front end of the tool holder/steel body." Appellant's Reply Br. 18. According to Sollami, a trier of fact could reasonably conclude that the cylindrical protrusion at the distal end is an elongated cylindrical shank. We find Sollami's contention persuasive. Whether the protrusion at the bottom portion of the carbide bolster is sufficiently "elongate" and "cylindrical" are disputed. To the extent the district court's decision was based on Novatek's lack of a "shank" or an "elongate cylindrical object," it was error.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- Fed.Appx. ----, 2014 WL 1229547 (C.A.Fed. (Utah))
**(Cite as: 2014 WL 1229547 (C.A.Fed. (Utah)))**

**\*11** The district court nonetheless found no genuine dispute as to whether Novatek's accused device met the bit "mountable in a bore" limitation of the asserted claims. In particular, the district court determined that "even if the carbide bolster comprises a shank, the carbide bolster nevertheless is not mountable in a bore." *Novatek,* 2013 WL 1831995, at \*5. Although Sollami disputes the district court's determination that Novatek's device does not include a "bit mountable in a bore," its arguments turn on issues of claim construction—whether the shank portion of the bit and the corresponding bore are cylindrical and whether the shank portion fits in a bore. Because the district court correctly interpreted "shank" to be cylindrical (and in turn, the bore to be cylindrical), many of Sollami's arguments as to whether Novatek's device has a "bit mountable in a bore" cannot stand.

With respect to any remaining argument on this point, the following illustrations of Novatek's accused device are instructive:




Appellee's Br. 15; J.A. 337; *see also* J.A. 416. As shown in these illustrations, the accused devices do not feature a bit "in" a bore that runs through the bit holder. Sollami's contention that the "concave opening in the front portion of the steel body/bit holder" constitutes a "complex geometry through hole" is unconvincing. Appellant's Reply Br. 19–20 (quotation marks and citation omitted). The claim language requires a bore that runs through the bit holder, and the shank is required to be "in" this bore. As the district court found, however, it is undisputed that the carbide bolster is brazed directly to the top of the steel body and no corresponding shank portion is in a bore. *Novatek,* 2013 WL 1831995, at \*5. Accordingly, there is no genuine dispute as to whether Novatek's carbide bolster mounts in the bore of the steel body; Novatek's carbide bolster lacks a bore in which a shank is mounted as the asserted claims require.

The district court was also correct in finding that the accused device's PCD tip with its carbide bolster is not "removable" from the steel body, and therefore, fails to meet the "removable" construction of the "bit" limitation. *Novatek,* 2013 WL 1831995, at \*6. The district court considered "the brazed attachment to be analogous to a rivet or laminate, which are 'meant to remain permanent [and] unremovable unless one is bent on breaking the permanent structure apart,' as opposed to a screw, for example, which is 'meant to be unscrewed [or] removed.' " *Id.* (quoting *K2 Corp. v. Salomon S.A.,* 191 F.3d 1356, 1365 (Fed.Cir.1999)). The accused device's brazed attachment of the carbide bolster to the steel body is shown below:

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- Fed.Appx. ----, 2014 WL 1229547 (C.A.Fed. (Utah))
**(Cite as: 2014 WL 1229547 (C.A.Fed. (Utah)))**



Appellee's Br. 18; J.A. 339; *see also* J.A. 415.

It is undisputed that Novatek's carbide bolster is brazed to a steel body. Sollami argues that the carbide bolster is nevertheless "removable" from the steel body, requiring merely the application of heat to dissolve the brazed joint; a process Sollami characterizes as non-destructive and having no adverse effects to the components. Therefore, despite the need to melt the braze joint, Sollami contends that it does not render the PCD tip/carbide bolster subassembly not "removable." These contentions are unpersuasive.

**\*12** Sollami's own expert declaration in the record shows the difficulty of removing the accused product's carbide bolster from the steel body. In particular, Sollami's expert depicts a process that includes using induction heat to melt the braze, removing and replacing the carbide bolster, and using induction heat to braze the new carbide bolster onto the steel body. J.A. 417–18. Although the accused device's carbide bolster is removable, it cannot be said to be "removable" as the term is intended in the patents at issue.

Distinguishing from prior art, the '567 patent states: "It would be desirable to provide a more *efficient means for allowing the removal* of a bit from a bit holder or a bit block." '567 patent col. 1 ll. 42–44 (emphasis added). Also, referring to an embodiment as depicted in Figure 1, the specification recites: "The notches 32a–32d, constructed in accordance with the present invention, allow for the *quick removal* of the bit 21 from the bit holder 22

by applying a force having a substantial axial component thereto the bottom side of the bit flange 28." *Id.* col. 4 ll. 64–67 (emphasis added). Further, "providing *ease of removability* of bits in their bit holders" is described as a "need" that the patent addresses. *Id.* col. 1 ll. 36–37 (emphasis added). "Quick removal" providing "ease of removability" is depicted by embodiments disclosing, *e.g.,* "drive pins" that push bits out of bit holders and bit holders out of bit blocks, *id.* col. 7 ll. 1–34, and the use of "interference fit," as opposed to utilizing retaining nuts or clips for the purpose of keeping the bit assembly together and the components in place, *id.* col. 1 ll. 62–64, col. 5 ll. 53–55. The process of heating and melting the brazed joint of Novatek's device to render it removable is not the type of removability the patents contemplate.

*K2 Corp. v. Salomon S.A.* is instructive. There, this court recognized that while claim terms such as "permanently" can be interpreted to require infinite duration in the metaphysical sense, "claim construction is firmly anchored in reality by the understanding of those of ordinary skill in the art." *K2 Corp.,* 191 F.3d at 1365. We accordingly held that a rivet or a laminate was sufficiently permanent because it "is meant to remain permanent, unremovable unless one is bent on breaking the permanent structure apart." *Id.; see High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.,* 49 F.3d 1551, 1555 (Fed.Cir.1995) (finding the "rotatably coupled" limitation in the asserted claim was not met by the accused product where the accused product had to be altered—by loosening the set screws—in order for it to rotate).

Here, adopting Sollami's position would detract from "removable" as a skilled artisan would interpret "bit" based on the patents' disclosures. Anything with adequate force can be "removable," but such unbounded interpretation of the term flounders on the shoals of reality. No reasonable jury would find "removable" as construed by the district court to read on Novatek's accused device. Accordingly, the district court was correct to find that there are no genuine disputes whether Novatek's accused device includes a bit that is removable.

CONCLUSION

**\*13** Based on the foregoing, the district court's claim construction of "bit," "bit holder," and "shank" and its summary judgment of non-infringement are affirmed. Novatek's accused device does not meet the "bit" limitation of the asserted claims.

**AFFIRMED.**

MOORE, Circuit Judge, dissenting.

I respectfully dissent from the majority's decision to affirm the district court's judgment of non-infringement. Because the district court erred in its claim construction, I would reverse and remand.

I. IS "BIT," USED ONLY IN THE PREAMBLE, A
STRUCTURAL LIMITATION?

I disagree with the majority that "bit" limits the claims of U.S. Patent No. 6,371,567 ('567 patent). It is correct that the terms "bit holder" and "bit block," which first appear in the preamble of the '567 patent, are claim limitations. The body of the claim itself expressly recites these structures. However, the fact that one structure recited in the preamble is a limitation by virtue of providing antecedent basis for a later reference does not convert the entire preamble into a limitation. The bit is a structure distinct from the bit holder or bit block. The bit itself appears only in the preamble in a statement of intended use. It does not appear in the body of any claim in the patent. And the invention claimed in the '567 patent is structurally complete without the bit. Claim 1 is to a bit holder, and the

elements in the body of the claim define the structure of the bit holder and the manner in which the bit holder interacts with the bit block. But claim 1 does not require the presence of a bit. It never mentions the bit itself or even delineates how it fits into the claimed bit holder. There is no doubt that the bit is part of the assembly disclosed in the '567 patent for use in road milling, trenching, and mining. Neither the assembly nor the bit, however, is claimed in the '567 patent. The patentee directed the '567 patent claims solely to the bit holder and its interaction with the bit block.

I find nothing in the specification to indicate that the bit is necessary to give life, meaning, and vitality to the claimed bit holder and block. *See* Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc., 289 F.3d 801, 808 (Fed.Cir.2002). The title of the '567 patent is "Bit Holders and Bit Blocks," not "bits." '567 patent, at [54]. The abstract discusses "[a]n improved bit holder with its mating bit block," but again does not mention a "bit" as a separate structural entity. *Id. at* [57]. Finally, the face of the '567 patent displays Figures 3 and 9, which do not depict a bit. The specification describes Figures 3–8 as "a second embodiment of the bit holder and bit block constructed in accordance with the present invention," *id.* col. 4 ll. 11–13, and Figures 9–10 as "a third embodiment of the bit holder of the present invention," *id.* col. 5 ll. 56–57. Although Figures 1 and 2, which presumably refer to the first embodiment, depict bits, the bits are not described as a part of the "present invention." I thus conclude the word "bit," used only in the preamble, is not a limitation of the '567 patent claims. Because the district court's decision that the '567 patent is not infringed was based on its erroneous conclusion that "bit" is a claim limitation, I would reverse its grant of summary judgment of noninfringement as to the '567 patent.

**\*14** With regard to U.S. Patent No. 7,883,155 ('155 patent), I agree with the majority that the preamble term "bit" limits the scope of the claims, but not for the reasons that the majority provides. The '

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case: 14-1303    Document: 41    Page: 209    Filed: 06/06/2014

--- Fed.Appx. ----, 2014 WL 1229547 (C.A.Fed. (Utah))
**(Cite as: 2014 WL 1229547 (C.A.Fed. (Utah)))**

155 patent, in contrast to the '567 patent, is directed not to bit holders and blocks that are a *part of an assembly*," but rather to the "assemblies" or "bit assemblies" themselves. *See* '155 patent, at [54], [57]; claims 1–4; *cf.* '567 patent claim 1 (emphasis added). I read the "assembly" in the preamble of claim 1 of the '155 patent as a claim limitation that delineates the structural elements of the claim. Each dependent claim of the '155 patent expressly recites "[t]he assembly as defined in claim 1 ...." '155 patent claims 2–4. Were the word "assembly" not a limitation of claim 1, the claims that depend from it would lack a proper antecedent basis for the "[t]he assembly as defined in claim 1." *See, e.g., Rapoport v. Dement,* 254 F.3d 1053, 1059 (Fed.Cir.2001). Moreover, the dependent claims of the '155 patent expressly add a further limitation to "the assembly," not to the bit holder (as the ' 567 patent does).

The specification confirms this conclusion. It indicates that the assembly is the present invention. *See* '155 patent col. 4 ll. 64–65 ("the assembly 15 of the present invention"); col. 5 l. 3 ("the bit assembly of the invention"); col. 2 ll. 59–61 ("Referring to FIG. 1, a bit, bit holder and bit block assembly, generally indicated at 15, constructed in accordance with the present invention, includes a bit ..."). I would thus conclude that the "assembly" recited in the preamble is a limitation of the '155 patent claims. And claim 1 expressly defines the assembly as "including a bit, bit holder, and bit block." For these reasons, I conclude that bit is a structural limitation of the claims of the '155 patent.

## II. WHAT IS THE PROPER CONSTRUCTION OF "BIT"?

Although I agree that the term "bit" in the preamble of claim 1 of the '155 patent is a limitation, I would still reverse the grant of summary judgment of noninfringement with respect to this patent. The district court's construction of "bit" is in error. The district court, and now the majority, improperly read three limitations into the bit—that the bit is removable, that the bit includes a shank that is cylin-

drical, and that the bit is mounted in a cylindrical bore.

### A. "Removable" bit

The plain and ordinary meaning of "bit" does not require removability. A "bit" is simply an object comprising a tip and a shank. That is the plain meaning and the definition expressly given by the patentee. *See* '155 patent col. 1 l. 27 ("The bits utilized include a tip and a shank."). A bit can be brazed onto its holder. *See* Maj. Op. at 22–23. This lack of removability makes it no less a bit.

We only deviate from the plain and ordinary meaning in instances of lexicography or disavowal. *Thorner v. Sony Computer Entm't Am. LLC,* 669 F.3d 1362, 1365 (Fed.Cir.2012). The majority points to the same definition discussed above: "[t]he bits utilized include a tip and a shank." *See* Maj. Op. at 12. There is not, nor does the majority point to, any other lexicography on this term. The majority concludes that the claimed bits ought to be limited to removable bits because "[t]he removability requirement is fully supported by the specification." *Id.* at 14. With due respect, that is not the standard we apply. If it were, every limitation in the preferred embodiments would be read into the claims.

**\*15** There have been cases from this court that conclude that a claim is limited by a statement in the specification when the patentee has indicated clearly and unmistakably that he intended to so limit his claims—i.e., disclaimer cases. For example, we found disclaimer when the specification indicated that for "successful manufacture" a particular step was "require [d]." *Andersen Corp. v. Fiber Composites, LLC,* 474 F.3d 1361, 1367 (Fed.Cir.2007) ("Those statements are not descriptions of particular embodiments, but are characterizations directed to the invention as a whole."). We found disclaimer when the specification indicated that the invention operated by "pushing (as opposed to pulling) forces," and then characterized the "pushing forces" as "an important feature of the present invention." *SafeTCare Mfg., Inc. v.*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- Fed.Appx. ----, 2014 WL 1229547 (C.A.Fed. (Utah))
**(Cite as: 2014 WL 1229547 (C.A.Fed. (Utah)))**

*TeleMade, Inc.,* 497 F.3d 1262, 1269–70 (Fed.Cir.2007). We found disclaimer when the patent repeatedly disparaged an embodiment as "antiquated," having "inherent inadequacies," and then went on to detail the "deficiencies [that] make it difficult" to use. *Chicago Bd. Options Exch., Inc. v. Int'l Sec Exch., LLC,* 677 F.3d 1361, 1372 (Fed.Cir.2012) ("[T]he specification goes well beyond expressing the patentee's preference ... and its repeated derogatory statements about [a particular embodiment] reasonably may be viewed as a disavowal."). We have also held that disclaimer applies when the patentee makes statements such as "the present invention includes ..." or "the present invention is ..." or "all embodiments of the present invention are...." *See Regents of Univ. of Minn. v. AGA Med. Corp.,* 717 F.3d 929, 936 (Fed.Cir.2013); *Honeywell Int'l, Inc. v. ITT Indus., Inc.,* 452 F.3d 1312, 1316–19 (Fed.Cir.2006); *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.,* 242 F.3d 1337, 1343–44 (Fed.Cir.2001). There is no such disclaimer here.

Nowhere does the '155 patent describe removability of the bit as a feature of the "present invention" or a feature "essential" to the invention. In fact, the '155 patent is almost completely devoid of any statement about removability of the bit. The Background of the Invention section discusses four objects of the present invention: (1) improved means for removing *a bit holder* from its bit block; (2) a more efficient assembly that requires less power; (3) providing multiple means for retaining a bit holder in a bit block; and (4) providing a tool that allows easy removal of the *bit holder* from the bit block. *See* '155 patent col. 2 ll. 1–20. To the extent that removability is discussed at all, it is the removability of the bit holder from the bit block, *not* the removability of the bit from its bit holder. There are only two mentions of removability of the bit from the bit holder in the entire patent. The first is where the patent discusses, not the prosecution, but rather a single piece of prior art: "U.S. Patent 5,374,111 discloses [a tool] ... to help remove a bit from the bit block. It would be desirable to provide a more efficient means and multiple means for allowing the removal of a *bit holder* from the *bit block.*" *Id.* col. 1 ll. 56–61. Clearly, this statement does not limit the claimed invention to removable bits. It explains that the present invention focuses on removal of bit holders from bit blocks. The only other mention of removability of a bit is in the third discussed embodiment: "Referring to Figures 7, 8, and 9, a third embodiment of a bit holder is shown.... [The bit holder] includes a pair of notches 74, 75 therein that provide tool access to the back of a bit for easing removal of the bit from the bit holder." *Id.* col. 5 ll. 40–48. The fact that the design of the bit holder in this one embodiment facilitates removal does not morph removability into a requirement. Additionally, there are five embodiments in the patent, and none of the others require, show, or even mention removability of the bit. The majority's claim that every relevant embodiment disclosed refers to the removability of the bit from the bit holder is inaccurate.

**\*16** To be sure, removability of *the bit holder from the bit block* is an important aspect of the present invention and is mentioned more than a dozen times in the patent. But this is entirely different from removability of *the bit from the bit holder,* which is mentioned only once in conjunction with one of five embodiments. The fact that my watch must be removable from my arm doesn't mean the hands on the watch need to be removable from the watch. There is nothing in this patent which suggests that removability of the bit is important, much less a critical or essential part of the claimed invention.

Finally, to the extent that the majority finds disclaimer in the prosecution history, I do not agree. *None* of the multiple office actions or responses ever discusses removable bits. There was, however, a declaration filed by the inventor during the prosecution of the '155 patent that mentions removable bits. The PTO rejected claims as obvious over Beebe in combination with O'Neill or Topka. The declaration states that in Beebe (the prior art

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- Fed.Appx. ----, 2014 WL 1229547 (C.A.Fed. (Utah))
**(Cite as: 2014 WL 1229547 (C.A.Fed. (Utah)))**

reference), the sleeve has a "wall material thickness of between 0.040 and 0.045. The reason [for] this wall thickness is to be able to quickly remove the bit. As many as 320 bits may be removed and re-placed a day." J.A. 253. The patentee criticizes this design because the thin walls would "shear under even a moderate load." *Id.* The patentee further ex-plains that "the present application is a bit holder that is stiffer [due to thickness] and therefore holds the bit in the proper position for heavy operating." *Id.* None of this supports the idea that the present invention is limited to a holder with removable bits. The declaration does, however, go on to distinguish the Warren reference because Warren's bit holder "has a wider notch at the rearward portion and a narrower width at the front face. The present ap-plication is the reverse. This difference is material because the narrower rearward portion prevents the clogging of the notch and aids in removal of the bit." J.A. 254. This is not a clear and unmistakable disclaimer of any bit that is not removable. The fact that the present design of the bit holder might per-mit or aid in removability of bits does not require that the bits be removable. This is a statement that would support the notion that the inventor contem-plated removable bits, but it is a far cry from re-quiring removable bits.

It is *not* an object of the invention of the '155 patent to provide removable bits. Removability of the bits is only mentioned in one of the five dis-closed embodiments. It is not described as import-ant, essential, required, or "the present invention." None of the descriptions of the other embodiments and none of the figures of the other embodiments even hint at removable bits. Respectfully, this pat-ent is directed to bit holders that are removable from bit blocks. The bit, however, does not have to be removable from the bit holder. I would find for the patentee, and not read the removability limita-tion into the claim.

### B. "Mountable in a Bore"
**\*17** I agree with the majority that the bit must be "mountable in a bore," but not because this is

somehow inherent in the word "bit." The claims contain a limitation that the bit is "mountable in a first bore through said bit holder." '155 patent claim 1. This limitation requires that the bit be mountable in a bore.

The majority notes, but does not appear to ad-opt, the district court's reasoning that if a bit is "mountable" it has to be "removable." *See* J.A. 308 ("[T]he only reason really on this one that I adopted the removability is because I think if it's going to be mountable, it has to be removable.") Mounting is about attachment, not removal. When one mounts a bit to a bore, one attaches it or fixes it to the bore. A bit that is brazed onto its bore is still mounted in the bore. Likewise, a diamond is mounted in its set-ting. Removability is not a condition that necessar-ily follows from mounting.

### C. "Cylindrical" shank and bore
The majority also errs in its construction of the "shank" portion of the bit as an "elongate cylindric-al object." There is nothing inherent in the word "shank" that requires a cylindrical shape as opposed to, for example, the frustoconical shape of the ac-cused structures' carbide bolster (which, the pat-entee argues, is its shank). The plain and ordinary meaning of shank is "[t]hat part of an instrument, tool, or other thing, which connects the acting part with a handle or other part." J.A. 437. It is true that *one* disclosed embodiment—the discussion of Fig-ure 1 of the '155 patent—has a bit with a cylindrical shank. The only time the shank of the bit is ever de-scribed at all is in the following sentence of the pat-ent: "Aft of the cylindrical base 24, the tip narrows to a *cylindrical shank 25,* which, in this embod-iment, includes a C-shaped retainer 26 there around and a cylindrical shank portion base 27 defining the rear end of the bit." '155 patent col. 3 ll. 7–10 (emphasis added). That is the only time in the entire patent that the shape of the shank of the bit is ever mentioned. Given that shanks in general can have any shape, this one sentence does not clearly limit the claimed bit to a bit with a cylindrical shank. There is nothing in this discussion that even sug-

--- Fed.Appx. ----, 2014 WL 1229547 (C.A.Fed. (Utah))
**(Cite as: 2014 WL 1229547 (C.A.Fed. (Utah)))**

gests that the cylindrical shape is important, essential, useful, advantageous, or necessary to the invention.

To be clear, there are other portions of the patent that discuss the cylindrical shank of the *bit holder.* In fact, claim 1 itself covers a "generally cylindrical bit holder shank." *Id.* claim 1. This is *not* the shank of the bit, nor does the bit shank mate with the bit holder shank such that one would expect them to be similarly shaped. They are completely separate parts.

The majority's requirement that the shank be cylindrical is intertwined with its conclusion that the bore be cylindrical. Maj. Op. at 18; *see Novatek, Inc. v. Sollami Co.,* No. 2:11–cv–00180, 2013 WL 1831995, at *5 (D.Utah Apr.30, 2013) ("Because the shank ... [is] 'in the bore,' and because the shank is cylindrical, the bore must also be cylindrical."). Again there is no language anywhere that suggests that the cylindrical shape given to the disclosed embodiment is important, "the present invention," or an essential feature. If the plain and ordinary meaning of bore required a cylindrical shape, then there would be no need for the patent to refer to a "cylindrical bore," as it does at one place in the patent. '155 patent col. 3 l. 64. The very dictionaries relied upon by the majority indicate only that bores are "usually cylindrical." In short, bores are not required to be cylindrical.

**\*18** To the extent "bit" is a claim limitation, it is to be given its plain and ordinary meaning, which does not require removability or a cylindrical shank and bore. There is nothing in the record to indicate that the patentee intended to deviate from the plain and ordinary meaning by defining the word "bit," disavowing its scope, or even suggesting that these three features are critical to the claimed invention. The majority improperly deprives the patentee of the breadth of the claims by reading limitations from particular embodiments in the specification into its construction of "bit." I would reverse the summary judgment of noninfringement and remand

for a jury trial on the disputed issues of fact.

FN1. Although the district court's judgment does not discuss Novatek's invalidity counterclaims, "[the judgment] is clear that the district court intended to dispose of all the claims before it." *Locell v. Chandler,* 303 F.3d 1039, 1049 (9th Cir.2002); *Petty v. Manpower, Inc.,* 591 F.2d 615, 617 (10th Cir.1979) ("What is of importance is the district court's intent in issuing its order dismissal of the complaint alone or actual dismissal of plaintiff's entire action?").

FN2. The '155 patent's prosecution history, *e.g.,* office action responses, referenced in this opinion are publicly available at Patent Application Information Retrieval, USPTO, http://portal.uspto.gov/pair/ PublicPair (last visited Mar. 21, 2014).

FN3. Novatek raises alternative claim construction and non-infringement contentions. Appellee's Br. 20 ("The 'Bit' must be rotatable."). Because we affirm the district court's claim constructions and affirm the district court's finding of non-infringement, this court need not consider Novatek's alternative bases for affirmance.

C.A.Fed. (Utah),2014.
Novatek, Inc. v. Sollami Co.
--- Fed.Appx. ----, 2014 WL 1229547 (C.A.Fed. (Utah))

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

# CERTIFICATE OF SERVICE

I hereby certify that on June 6, 2014, I caused the foregoing document to be electronically filed with the Clerk of Court using CM/ECF, which will send notification of such filing to counsel of record, and caused to be served true and correct copies on the following counsel in the manner indicated:

<u>VIA ELECTRONIC MAIL</u>

John C. O'Quinn, Esq. (john.oquinn@kirkland.com)
William H. Burgess, Esq. (william.burgess@kirkland.com)
F. Christopher Mizzo, Esq. (chris.mizzo@kirkland.com)
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C.  20005
***Attorneys for Plaintiffs-Cross-Appellants***
***ViiV Healthcare UK Ltd. and ViiV Healthcare Co.***

<u>VIA ELECTRONIC MAIL</u>

William A. Rakoczy, Esq. (wrakoczy@rmmslegal.com)
Deanne M. Mazzochi, Esq. (dmazzochi@rmmslegal.com)
Paul J. Molino, Esq. (paul@rmmslegal.com)
Rachel Waldron, Esq. (rwaldron@rmmslegal.com)
Patrick C. Kilgore, Esq. (pkilgore@rmmslegal.com)
RAKOCZY MOLINO MAZZOCHI SIWIK LLP
6 W. Hubbard Street, Suite 500
Chicago, IL  60654
***Attorneys for Defendants-Appellants***
***Lupin Ltd. and Lupin Pharmaceuticals, Inc.***

Dated:  June 6, 2014                    /s/  Ira J. Levy
                                        Ira J. Levy
                                        ilevy@goodwinprocter.com

### CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).

    __X__ The brief contains <u>13,952</u> words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), or

    _____ The brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

    __X__ The brief has been prepared in a proportionally spaced typeface using <u>MS Word</u> in a <u>14</u> point <u>Times New Roman</u> font or

    _____ The brief has been prepared in a monospaced typeface using _____ in a _____ characters per inch _____ font.

Dated: June 6, 2014                    /s/  Ira J. Levy
                                        Ira J. Levy
                                        **_Counsel for Defendant-Appellant_**
                                        **_Teva Pharmaceuticals USA, Inc._**