Nos. 14-1303, 14-1304, and 14-1315 (consolidated)

# United States Court of Appeals for the Federal Circuit

VIIV HEALTHCARE CO. AND VIIV HEALTHCARE UK, LTD.,

*Plaintiffs-Cross-Appellants,*

v.

LUPIN LTD., LUPIN PHARMACEUTICALS,
AND TEVA PHARMACEUTICALS USA, INC.,

*Defendants-Appellants.*

Appeals from the U.S. District Court for the District of Delaware,
Judge Richard G. Andrews, Nos. 11-CV-576, 11-CV-688 (consolidated)

## OPENING AND RESPONSE BRIEF OF CROSS-APPELLANTS VIIV HEALTHCARE CO. AND VIIV HEALTHCARE UK, LTD. (Non-Confidential Version)

F. Christopher Mizzo
John C. O'Quinn
William H. Burgess
Craig T. Murray
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C.  20005
(202) 879-5000
*Counsel for Cross-Appellants*

September 4, 2014

# CERTIFICATE OF INTEREST

Counsel for Plaintiffs-Cross-Appellants ViiV Healthcare UK Limited and ViiV Healthcare Company certify the following:

1.  **The full name of every party represented by me is:**
    ViiV Healthcare UK Limited and ViiV Healthcare Company

2.  **The name of the real party in interest is:** N/A.

3.  **All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by me are:**

    ViiV Healthcare Company and ViiV Healthcare UK Limited are wholly-owned by ViiV Healthcare Limited. ViiV Healthcare Company and ViiV Healthcare UK Limited are ultimately wholly-owned by GlaxoSmithKline plc, Pfizer Inc. and Shionogi Limited.

    GlaxoSmithKline plc has no parent corporation and the Bank of New York Mellon, a publicly-traded company listed on the New York Stock Exchange, holds 10% or more of the stock of GlaxoSmithKline plc. Pfizer plc has no parent corporation and no publicly-held company owns 10% or more of its stock. Shionogi Limited is 100% owned by Shionogi & Co. Ltd., a publicly traded company listed on the Tokyo stock exchange. No publicly-held company owns 10% or more of the stock of Shionogi & Co., Ltd.

4.  **The names of all law firms and the partners or associates that appeared for the party now represented by me in the trial court or are expected to appear in this Court are:**

Kirkland & Ellis LLP: F. Christopher Mizzo, John C. O'Quinn, Gregg F. LoCascio, P.C., William H. Burgess, Charles A. Fernández, Craig T. Murray, Tiffany P. Cunningham,* Hugham Chan*

Farnan LLP: Joseph J. Farnan, Jr., Brian E. Farnan

---

* Formerly of Kirkland & Ellis LLP

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES ....................................................xi

ABBREVIATIONS...........................................................................xii

JURISDICTIONAL STATEMENT ..................................................... 1

PRELIMINARY STATEMENT ........................................................ 1

STATEMENT OF THE ISSUES ........................................................ 5

STATEMENT OF THE CASE ........................................................... 5

I.    Background ............................................................................ 5

    A.    HIV/AIDS Virus and Epidemic ............................................ 6

    B.    HIV Drug Development ........................................................ 6

        1.    Available Compounds .................................................... 7

        2.    Toxicity in Anti-HIV Compounds............................... 11

        3.    Monotherapy and Drug Resistance............................. 12

        4.    Combination Therapy and Cross-Resistance .............. 13

    C.    St. Clair and Barry's Inventions ....................................... 16

    D.    Development of Trizivir and Epzicom................................ 18

II.   Proceedings Below ............................................................... 19

    A.    Pretrial Proceedings............................................................ 19

    B.    Trial ................................................................................... 21

    C.    Post-Trial Proceedings....................................................... 23

SUMMARY OF THE ARGUMENT ................................................ 25

STANDARD OF REVIEW.............................................................. 27

ARGUMENT .................................................................................. 28

I.    The District Court Correctly Declined to Add a "Synergy"
    Limitation to the Claims....................................................... 28

    A.    The Written Description Does Not Disavow Claim
        Scope ................................................................................. 29

    B.    The Prosecution History Does Not Disavow Claim
        Scope ................................................................................. 32

i

II.    Lupin and Teva Did Not Prove Their Obviousness Defenses
       By Clear and Convincing Evidence ................................................ 33

       A.    The District Court Applied the Correct Legal Standard ...... 34

       B.    Based On The Evidence, The District Court Properly
             Concluded That The Claims Were Not "Obvious to Try" ..... 41

             1.    In March 1995, HIV Drug Development Was
                   Highly Unpredictable, With No Particular Reason
                   to Select the Patented Combinations From the
                   Many Thousands Possible ............................................ 42

             2.    All Combinations But One Failed to Demonstrate
                   Any Improvement Over Monotherapy Before
                   March 1995 ................................................................... 46

             3.    Targeting Different Nucleoside Bases Did Not
                   Predict Success ............................................................ 49

       C.    The District Court Properly Weighed the Evidence and
             Found that the Prior Art Taught Away from the
             Claimed Combinations ........................................................... 51

             1.    Because of Cross-Resistance, the Prior Art
                   Taught Away from Combining Abacavir and 3TC,
                   With or Without AZT .................................................... 54

                   a.    Arguments About "Potency" Do Not Explain
                         Away Cross-Resistance ...................................... 55

                   b.    Varying Degrees of Resistance To Abacavir
                         Do Not Explain Away Cross-Resistance ............ 59

                   c.    Lupin's "Resensitizing" Argument Does Not
                         Explain Away Cross-Resistance ......................... 60

                   d.    Teva Did Not Show that A POSA Would
                         Have Been Motivated to Remove AZT From
                         the Only Combination That Worked .................. 61

             2.    Because of Toxicity, the Prior Art Taught Away
                   from Combining NRTIs ................................................ 63

                   a.    NRTIs Were Known to Be Toxic,
                         Particularly In Combination .............................. 64

       b.    Other Triple-Drug Combinations Reinforced The Teaching Away From Combining Multiple NRTIs ..................................................... 66

  D.   District Court Properly Considered Evidence of Secondary Considerations ..................................... 68

  E.   The District Court Was Well Within Its Discretion Not to Consider a Portion of Expert Testimony That Exceeded Pretrial Disclosures ................................ 70

III.  Lupin Did Not Prove its Enablement-Utility Defense by Clear and Convincing Evidence ....................................... 72

IV.  The District Court Properly Rejected Teva's Post-Trial Attempt To Rescind or Avoid its Infringement Stipulation .......... 76

  A.   Factual Stipulations are Binding and Conclusive ............... 77

  B.   The District Court's Post-Trial Resolution of Lupin's Non-Infringement Defense Does Not Entitle Teva to Rescind its Pretrial Stipulation ............................ 77

  C.   Allowing Teva to Rescind its Stipulation Would Be Unfairly Prejudicial to ViiV ...................................... 80

V.  Cross-Appeal:  The Court Should Reverse the Judgment that Lupin Does Not Infringe .................................................. 82

  A.   Lupin's Product Literally Contains the Claimed Abacavir ....................................................................... 83

  B.   Lupin's Product Necessarily "Treats" Patients "with a therapeutically effective amount" of the Claimed Abacavir, and Lupin Thus Infringes at Least the Method Claims ............................................................. 85

  C.   At a Minimum, Lupin Infringes Under the Doctrine of Equivalents ................................................................. 88

  D.   The Court Should Remand For Determination of Remedy ........................................................................ 90

CONCLUSION ....................................................................... 91

**CONFIDENTIAL MATERIAL OMITTED**

The three redacted images at pp. 86-87 are from portions of Lupin's ANDA, which were admitted under seal at trial for the reasons stated on the record, A321:17-323:7, and not fully reproduced in the Court's publicly-available Trial Opinion.  A6-79.

# TABLE OF AUTHORITIES

## Cases

*Abbott Labs. v Andrx Pharms., Inc.*, 473 F.3d 1196 (Fed. Cir. 2007) .... 80

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
  694 F.3d 1312 (Fed. Cir. 2012) ............................................................. 70

*AIA Eng'g Ltd. v. Magotteaux Int'l S/A*,
  657 F.3d 1264 (Fed. Cir. 2011) ....................................................... 29, 32

*Alcon Research, Ltd. v. Apotex Inc.*,
  687 F.3d 1362 (Fed. Cir. 2012) ....................................................... 53, 84

*Allergan, Inc. v. Apotex Inc.*, 754 F.3d 952 (Fed. Cir. 2014) .................. 37

*Allergan, Inc. v. Sandoz Inc.*, 726 F.3d 1286 (Fed. Cir. 2013) ............... 65

*Anderson v. Bessemer City*, 470 U.S. 564 (1985) .............................. 27, 53

*Apple Computer, Inc. v. Articulate Sys., Inc.*,
  234 F.3d 14 (Fed. Cir. 2000) .................................................................. 28

*Application of Merchant*, 575 F.2d 865 (CCPA 1978) ............................ 32

*ArcelorMittal France v. AK Steel Corp.*,
  700 F.3d 1314 (Fed. Cir. 2012) .............................................................. 33

*Belden Techs., Inc. v. Superior Essex Commc'ns*,
  802 F.Supp.2d 555 (D. Del. 2011) ......................................................... 71

*Bradford-White Corp. v. Ernst & Whinney*,
  872 F.2d 1153 (3d Cir. 1989) ................................................................. 82

*Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*,
  246 F.3d 1368 (Fed. Cir. 2001) ....................................................... 29, 30

*Brooktree Corp. v. Advanced Micro Devices, Inc.*,
  977 F.2d 1555 (Fed. Cir. 1992) .............................................................. 73

*Callicrate v. Wadsworth Mfg., Inc.*, 427 F.3d 1361 (Fed. Cir. 2005) ...... 90

*Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*,
   381 F.3d 1371 (Fed. Cir. 2004) .................................................... 33

*Christian Legal Soc'y v. Martinez*,
   130 S.Ct. 2971 (2010) .............................................. 77, 78, 80, 82

*Daiichi Sankyo Co. v. Matrix Labs., Ltd.*,
   619 F.3d 1346 (Fed. Cir. 2010) .................................................. 48

*DePuy Spine Inc. v. Medtronic Sofamor Danek, Inc.*,
   567 F.3d 1314 (Fed. Cir. 2009) .............................................. 51, 52

*Edwards Lifesci. AG v. CoreValve, Inc.*,
   699 F.3d 1305 (Fed. Cir. 2012) .................................................. 74

*Eisai Co. v. Dr. Reddy's Labs., Ltd.*,
   533 F.3d 1353 (Fed. Cir. 2008) .............................................. 42, 62

*Eli Lilly & Co. v. Actavis Elizabeth LLC*,
   435 F.App'x 917 (Fed. Cir. 2011) ............................................ 73, 75

*Envirotech Corp. v. Al George, Inc.*, 730 F.2d 753 (Fed. Cir. 1984) ........ 73

*Forest Labs., Inc v. Ivax Pharms., Inc.*,
   501 F.3d 1263 (Fed. Cir. 2007) .................................................. 58

*Fujitsu Ltd. v. Belkin Int'l*, No. 10-CV-3972,
   2012 WL 4497966 (N.D. Cal. Sept. 28, 2012) .............................. 77

*Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321 (Fed. Cir. 2010) ................ 79

*Gaus v. Conair Corp.*, 363 F.3d 1284 (Fed. Cir. 2004) ........................ 31

*Graham v. John Deere Co.*, 383 U.S. 1 (1966) ................................ 34, 41

*Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*,
   339 U.S. 605 (1950) ................................................................ 89

*Hearing Components, Inc. v. Shure, Inc.*, No. 07-CV-104,
    2009 WL 593836 (E.D. Tex. 2009),
    *aff'd*, 600 F.3d 1357 (Fed. Cir. 2010) ..................................... 71

*In re '318 Patent Infringement Litig.*,
    583 F.3d 1317 (Fed. Cir. 2009) ..................................... 75, 76

*In re Brana*, 51 F.3d 1560 (Fed. Cir. 1995) ............................... 74, 75, 76

*In re Cortright*, 165 F.3d 1353 (Fed. Cir. 1999) ............................... 73, 75

*In re Cyclobenzaprine Hydrochloride Extended-Release Capsule
    Patent Litig.*, 676 F.3d 1063 (Fed. Cir. 2012) ......................... 33, 34, 36

*In re Fenn*, 639 F.2d 762 (CCPA 1981) ..................................... 69

*Innogenetics, N.V. v. Abbott Labs.*,
    512 F.3d 1363 (Fed. Cir. 2008) ..................................... 35, 70

*Insta-Foam Prods., Inc. v. Universal Foam Sys., Inc.*,
    906 F.2d 698 (Fed. Cir. 1990) ..................................... 89

*Institut Pasteur v. Focarino*, 738 F.3d 1337 (Fed. Cir. 2013) ..... 36, 38, 65

*InTouch Techs., Inc. v. VGO Commc'ns, Inc.*,
    751 F.3d 1327 (Fed. Cir. 2014) ..................................... 28, 35

*Johnson & Johnson Assocs. Inc. v. R.E. Serv. Co.*,
    285 F.3d 1046 (Fed. Cir. 2002) (en banc) ....................... 89, 90

*Johnson v. Manhattan Ry. Co.*, 289 U.S. 479 (1933) ........................... 80

*KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398 (2007) ........................... 41, 42

*Leo Pharm. Prods. v. Rea*, 726 F.3d 1346 (Fed. Cir. 2013) ......... 38, 42, 49

*Lighting Ballast Control LLC v. Phillips Elecs. N. Am. Corp.*,
    744 F.3d 1272 (Fed. Cir. 2014) (en banc) ............................... 28

*Merck & Co. v. Teva Pharms. USA, Inc.*,
    347 F.3d 1367 (Fed. Cir. 2003) ..................................... 87

*Merck & Co. v. Teva Pharms. USA, Inc.*,
    395 F.3d 1364 (Fed. Cir. 2005) ............................................................ 53

*Moore USA, Inc. v. Standard Register Co.*,
    229 F.3d 1091 (Fed. Cir. 2000) ............................................................ 31

*Novo Nordisk A/S v. Caraco Pharm. Labs., Ltd.*,
    719 F.3d 1346 (Fed. Cir. 2013) ............................................................ 44

*Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*,
    520 F.3d 1358 (Fed. Cir. 2008) ............................................................ 41

*Otsuka Pharm. Co. v. Sandoz, Inc.*,
    678 F.3d 1280 (Fed. Cir. 2012) .................................... 27, 34, 35, 48, 68

*Pozen Inc. v. Par Pharm., Inc.*, 696 F.3d 1151 (Fed. Cir. 2012) ............ 42

*PPG Indus. v. Guardian Indus.*, 75 F.3d 1558 (Fed. Cir. 1996) ............. 75

*Preemption Devices, Inc. v. Minn. Mining & Mfg. Co.*,
    732 F.2d 903 (Fed. Cir. 1984) .............................................................. 31

*Rasmusson v. SmithKline Beecham Corp.*,
    413 F.3d 1318 (Fed. Cir. 2005) ............................................................ 75

*Ring & Pinion Serv. v. ARB Corp.*, 743 F.3d 831 (Fed. Cir. 2014) ......... 77

*Rodriguez v. Señor Frog's de la Isla*, 642 F.3d 28 (1st Cir. 2011) .......... 77

*Sage Prods., Inc. v. Devon Indus., Inc.*,
    126 F.3d 1420 (Fed. Cir. 1997) ............................................................ 41

*Sanofi-Aventis Deutschland GmbH v. Glenmark Pharms. Inc.*,
    748 F.3d 1354 (Fed. Cir. 2014) .................................................. 42, 44, 53

*Schering Corp. v. Geneva Pharms., Inc.*,
    339 F.3d 1373 (Fed. Cir. 2003) ............................................................ 86

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*,
    242 F.3d 1337 (Fed. Cir. 2001) ............................................................ 31

*Scott v. Finney*, 34 F.3d 1058 (Fed. Cir. 1994) ........................................ 74

*Shear v. NRA*, 606 F.2d 1251, (D.C. Cir. 1979).................................... 79

*Siemens Med. Solutions USA, Inc. v. Saint-Gobain Ceramics*
   *& Plastics, Inc.*, 637 F.3d 1269 (Fed. Cir. 2011)............................ 28, 70

*Singh v. Brake*, 317 F.3d 1334 (Fed. Cir. 2003) ............................... 28, 75

*SmithKline Beecham Corp. v. Apotex Corp.*,
   439 F.3d 1312 (Fed. Cir. 2006) ............................................. 10

*Sunovion Pharms., Inc. v. Teva Pharms USA, Inc.*,
   731 F.3d 1271 (Fed. Cir. 2013) ...................................... 28, 77

*Takeda Chem. Indus. v. Alphapharm Pty.*,
   492 F.3d 1350 (Fed. Cir. 2007) ............................................. 68

*Thorner v. Sony Comp. Entm't Am. LLC*,
   669 F.3d 1362 (Fed. Cir. 2012) ............................... 28, 29, 31

*TriMed, Inc. v. Stryker Corp.*, 608 F.3d 1333 (Fed. Cir. 2010) .............. 37

*United States v. Adams*, 383 U.S. 39 (1966).......................................... 45

*United States v. Bill Harbert Int'l Constr., Inc.*,
   608 F.3d 871 (D.C. Cir. 2010) ............................................. 77

*W.L. Gore & Assocs. v. Garlock, Inc.*, 721 F.2d 1540 (Fed. Cir. 1983) ... 44

*Warner-Jenkinson Co. v. Hilton-Davis Chem. Co.*,
   520 U.S. 17 (1997)........................................................ 88

*Yamanouchi Pharm. Co. v. Danbury Pharmacal, Inc.*,
   231 F.3d 1339 (Fed. Cir. 2000) ............................................. 36

## Statutes

28 U.S.C. §1295(a)(1) ................................................................ 1

28 U.S.C. §1338.................................................................... 1

35 U.S.C. §112(a) ..................................................................... 73

## Other Authorities

27 *Williston on Contracts* §70:4 (4th ed.)................................. 79

MPEP §2164.02........................................................................ 74

*Restatement 2d of Contracts* §151, cmt. a (1981) .................... 79

## STATEMENT OF RELATED CASES

No other appeal in or from the same civil action in the trial court has previously been before this or any other appellate court. The decision in this appeal may affect the following two pending matters: *ViiV Healthcare UK Ltd. v. Lupin Ltd.*, No. 14-CV-369 (D. Del., complaint filed Mar. 21, 2014), and *Apotex Corp. v. ViiV Healthcare UK Ltd.*, No. IPR2014-00876 (P.T.A.B., petition filed June 2, 2014).

# ABBREVIATIONS

| | |
|---|---|
| **ABC** | Abacavir, also referred to in the record as "1592U89" |
| **ANDA** | Abbreviated New Drug Application |
| **AZT** | Zidovudine |
| **HAART** | Highly Active Antiretroviral Therapy |
| **HIV** | Human Immunodeficiency Virus |
| **Lupin** | Defendants-Appellants Lupin Ltd. and Lupin Pharmaceuticals, Inc. |
| **Lupin-Br.** | Lupin's Opening Brief, filed June 6, 2014 |
| **NDA** | New Drug Application |
| **NIH** | National Institutes of Health |
| **NRTI** | Nucleoside Reverse Transcriptase Inhibitor |
| **NNRTI** | Non-Nucleoside Reverse Transcriptase Inhibitor |
| **PI** | Protease Inhibitor |
| **POSA** | Person of Ordinary Skill in the Art |
| **Teva** | Defendant-Appellant Teva Pharmaceuticals USA, Inc. |
| **Teva-Br.** | Teva's Opening Brief, filed June 6, 2014 |
| **ViiV** | Plaintiffs-Cross-Appellants ViiV Healthcare UK Ltd. and ViiV Healthcare Co. |
| **'191 patent** | The patent-in-suit, U.S. Patent No. 6,417,191 |
| **3TC** | Lamivudine |

<u>**Note:**</u> All quoted emphasis is added, and internal quotation marks are omitted, unless otherwise indicated. Gray-highlighted image borders at pp. 86-87 denote confidential information.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. §1338, and entered final judgment January 27, 2014. Appellants appealed on February 21; ViiV timely cross-appealed on February 24. This cross-appeal only concerns Lupin. This Court has jurisdiction under 28 U.S.C. §1295(a)(1).

## PRELIMINARY STATEMENT

ViiV's '191 patent describes and claims two lifesaving anti-HIV combination drugs that Martha St. Clair and David Barry invented in the mid-1990s in the middle of a massive public health crisis. Undisputed trial evidence showed that both combinations succeeded where numerous others failed—and where the components eventually failed if administered individually. St. Clair and Barry were on the front lines of HIV/AIDS research, and previously discovered the anti-HIV activity of individual compounds. Their inventions here were isolated successes, born of experience with the still-nascent component drugs and insight to look past conventional wisdom. To this day, the patented drugs are widely prescribed and sold, and continue to save countless lives.

Appellants' attempt to make the discovery of these combinations seem inevitable depends on revisionist history and classic hindsight rea-

soning that the district court properly rejected. In March 1995, there were literally *thousands* of potential combinations just of the hundreds of drugs with known anti-HIV activity, never mind others. And, as the district court found, combination therapy was unpredictable, requiring costly and time-consuming trial-and-error.

On appeal, Appellants offer a laundry list of (often inconsistent) theories for why a person of ordinary skill would, in their view, inevitably have narrowed the vast universe of possibilities to a small subset that conveniently includes the claimed drugs. Appellants ignore entire classes of anti-HIV drugs that were considered more promising, ignore the persistent teaching in the literature (of a still-nascent art) to avoid combinations of cross-resistant drugs, and ignore teachings about toxicity that would have led most researchers away from the combinations St. Clair and Barry discovered. As the district court concluded, far from being obvious, "[c]oncerns of toxicity, potency, cross-resistance profiles, HIV's ability to mutate swiftly, a large universe of potential compounds and drug classes, and rapidly dying patients … made assembling an effective drug combination extremely challenging." A69.

Recognizing that they cannot prevail given the district court's factual findings, Appellants seek to move the goalposts, arguing for the first time that the district court applied too rigid a standard in assessing the motivation of a skilled artisan. Appellants' argument ignores factual findings, conflates motivation to improve over the state of the art with claim scope, and is ultimately waived. Having argued below that a person of ordinary skill in the art would have been motivated to improve on prior art, Appellants cannot now argue no improvement was necessary.

Appellants present a scattered litany of other equally meritless arguments. Teva asks the Court to revisit claim construction and to import as claim limitations what the intrinsic evidence disclosed as advantages. Lupin insists—by advocating an approach that would surely invalidate most pharmaceutical patents—that if the claimed inventions are not obvious, they must not be enabled.

That leaves infringement. Teva stipulated to infringement, and that should be the end of the matter. But Teva now seeks to escape its stipulation based on Lupin's defense, though Teva was fully aware of that defense when it stipulated. Supreme Court precedent forecloses Teva's arguments.

As to Lupin, even though (a) Lupin told the FDA its product would contain abacavir, (b) its product releases abacavir into the bloodstream, and (c) Lupin's expert conceded Lupin's product would not work if it did not provide abacavir, Lupin insisted at trial that its product does not meet the abacavir claim limitation. Instead, Lupin argued—and the court accepted—that Lupin's product has abacavir sulfate, while the asserted claims are limited to abacavir free base. Lupin's literal infringement argument depends on reading dependent claims more broadly than claims they depend from, and ignoring metabolization of abacavir sulfate. Lupin's doctrine-of-equivalents argument requires novel application of "recapture" doctrine to unasserted claims, as opposed to disclosed-but-unclaimed subject matter. Lupin's theories cannot withstand scrutiny. The Court should affirm the judgment except for the finding of non-infringement by Lupin.

## STATEMENT OF THE ISSUES

1. Whether the district court correctly declined to add a "synergy" limitation to certain patent claims.

2. Whether the district court permissibly ruled, based on the trial evidence, that Appellants failed to prove their obviousness defenses by clear and convincing evidence

3. Whether the district court permissibly ruled, based on the trial evidence, that Lupin failed to prove its enablement-utility defense by clear and convincing evidence.

4. Whether the district court properly rejected Teva's post-trial attempt to rescind or avoid its pretrial infringement stipulation.

5. Whether the district court erroneously ruled that Lupin does not infringe literally or equivalently.

## STATEMENT OF THE CASE

## I.    Background

ViiV holds the NDAs for branded drugs Trizivir and Epzicom. Trizivir treats HIV with a combination of three drugs: abacavir ("ABC"), lamivudine ("3TC"), and zidovudine ("AZT"). Epzicom uses two: abacavir and lamivudine.



*ViiV Demonstrative*

Inventors St. Clair and Barry discovered those combinations in 1994. ViiV's '191 patent—which has a March 1995 effective filing date—describes and claims formulations and methods of HIV treatment with those combinations.  A98-110.

### A.    HIV/AIDS Virus and Epidemic

The HIV virus was identified in the early 1980s, and confirmed as the cause of AIDS in 1984.  A1368.  In 1987, approximately 10 million people worldwide were infected.  A1369.  By 1995, HIV had killed more than 300,000 Americans.  A24.  All agree, and witnesses consistently testified, the HIV/AIDS epidemic was a major public health crisis in the 1980s and 1990s.  A24; A69; A5835-38; A4997; A5032.

### B.    HIV Drug Development

HIV drug development in 1995 focused on finding compounds that inhibit HIV's replication by targeting different steps of the replication pro-

cess.  A5860; A1143. HIV replicates billions of times per day in the human

body by the following steps:  **(a)** fusing and entering a cell; **(b)** converting

viral RNA to DNA by reverse transcription; **(c)** integrating new DNA into

the cell's nucleus; **(d)** using the new DNA to create thousands of copies of

viral RNA and enzymes; **(e)** packaging viral RNA and enzymes into viri-

ons[2]; **(f)** budding from the cell; and **(g)** maturation.  A23-24; A1136-37;

A1427-28; A5861.  The new virions then attack other cells by the same

process.



*Teva and ViiV Demonstratives*

### 1.    Available Compounds

In 1995, known anti-HIV compounds fell into several classes, includ-

ing the following:

---

[2] A "virion" is a single virus particle.

- **Nucleoside reverse transcriptase inhibitors ("NRTIs")** target reverse transcription (step (b) above) by mimicking natural nucleosides in the DNA chain. NRTIs are incorporated into the viral DNA chain and prevent further transcription. A24-25.

- **Non-nucleoside reverse transcriptase inhibitors ("NNRTIs")** also target reverse transcription, by binding to the reverse-transcriptase enzyme. A29n.9.

- **Integrase inhibitors** target the integrase enzyme (step (c)). A5876.

- **Protease inhibitors ("PIs")** inhibit cleavage by the protease enzyme (step (g)). A29n.9.

A1382-85. Other classes targeted other steps, *e.g.,* **transcription inhibitors** (step (e)), **translation inhibitors** (e), **budding inhibitors** (f), and **glycosylation inhibitors** (g). A5861. By 1995, hundreds of compounds had been shown in laboratories ("*in vitro*")[3]—and dozens in humans ("*in vivo*")—to inhibit HIV replication. A1373; A1142; A1144; A751-52.

---

[3] One 1995 reference recites 120 compounds, A5860-99; other evidence recites hundreds. *See, e.g.*, A970 ("thousands of NRTIs" synthesized; "hundreds … had shown anti[-]HIV activity").

As researchers, doctors, and patients searched urgently for solutions to a public health crisis, researchers developed new compounds and shared proprietary compounds, A1313-15; A1338-40; A1322; A1347-48; A1030-32. Some desperate patients ordered not-yet-FDA-approved compounds from chemical supply companies and ingested the raw chemicals. A904.

By 1995, at least twenty-nine anti-HIV compounds were in human clinical trials, including six NRTIs, five NNRTIs, and eight PIs:

|    | NRTI | NNRTI | PI | Other |
|----|------|-------|-----|-------|
| 1 | 3TC | Nevirapine | Saquinavir | Bucast |
| 2 | FTC | Loviride | MK-639 (indinavir) | Vesnarione |
| 3 | Abacavir | R18893 | ABT-538 (ritonavir) | Alpha Trichosanthin |
| 4 | 935U83 | Delavirdine | AG-1343 (nelfinavir) | GEM 91 |
| 5 | AZDU | Ateviridine | U-103,017 | Panavir |
| 6 | 2'-F-ara-ddC | | DMP-450 | Todoxin |
| 7 | | | VX-478 | Curdlan Sulfate |
| 8 | | | KNI-272 | Interferons |
| 9 | | | | ALX40-4C |
| 10 | | | | GSPH-1 |

TTX-116, PTX-296, PTX-358, LTX-1901, PTX-382, LTX-1899, LTX-1808, PTX-255, LTX-1861, LTX-1798, LTX-1810, LTX-1874, LTX-1896, LTX-1903, LTX-1906, LTX-1806

*ViiV Demonstrative*

*See* A29 (citing A6760-62; A4010-36; A4089-90; A4183; A5843-45; A5824-25; A5922-24; A5821-23; A5821-23; A5925-27; A5928-30; A5900-02; A5946-48; A5955; A5839-41; A1380:12-20).

Abacavir, AZT, and 3TC—components of the patented combinations—are NRTIs. Zidovudine ("AZT") became the first FDA-approved drug for HIV treatment in 1987. A397:3-14. AZT was originally an anti-cancer compound, and St. Clair was one of five to discover AZT's anti-HIV

activity in 1984. A1035:4-24. The FDA approved three additional NRTIs for HIV before 1995: ddI, ddC, and d4T. A493:5-10.

St. Clair was the first to test abacavir ("ABC") against HIV in 1989. A1036:8-17. In 1995, abacavir had just begun initial human clinical trials. A1404-06. "Animal toxicity studies ha[d] not been reliable predictors of the principal toxicities of" NRTIs. A6139. It was thus not expected that abacavir would have "low toxicity" or be less toxic than AZT, as Teva claims. Teva-Br. 45-47. Nor, contrary to Lupin's suggestion, Lupin-Br. 14, were there toxicity comparisons between ddI and abacavir.[4] By March 1995, no public human trial results existed for abacavir, A1406, no doctors

---

[4] Appellants' briefs repeatedly misstate the record. *Compare* Teva-Br. 45 (abacavir was "one of only two NRTIs in clinical trials"), *with* A4014 (AZDU); A5846 (935U83); A496 (d4T); A4019-20 (2'-F-ara-ddC); A5939 (FTC); *compare* Lupin-Br. 33 (citing A851-53 for proposition that physicians prescribed AZT/3TC/ddI "without awaiting clinical trial results"), *with* A851-53 (referring to clinical trial as shown at A3729). Lupin frequently mischaracterizes the court's analysis by recasting observations on specific pieces of evidence into statements of rigid legal standards. Where, for example, the court observed that a study was "not definitive" before discussing "better" studies, A35, or that key portions of expert testimony had no documentary support, A39, it did not thereby require "definitive" studies or written motivation as prerequisites to an obviousness defense. Lupin-Br. 28; 35-37. Teva's footnote arguments are full of misstatements, but regardless are waived. *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006).

ViiV does not concede, by not specifically addressing, every misstatement in Appellants' briefs.

could or did prescribe abacavir, and the only publications were five ab-stracts—*out of thousands*—at an October 1994 conference.  A1404-05; A4367-73.  Abacavir was not FDA-approved until 1998.

By 1995, lamivudine ("3TC") was another unapproved drug in clini-cal trials.  A294-95; A5814.  St. Clair had done some of the earliest exper-iments and published research with 3TC.  A1036:1-7; A4073-74 (referred to as "(-)-BCH-189").

By 1995, researchers viewed PIs and NNRTIs as more promising. A1439.  Those classes showed strong potency, safety, pharmacokinetics, and efficacy in humans.  *Id.*; A910; A970; A5842; A29.  Compared to NRTIs, PIs were more potent, more were in clinical development, and only PIs could prevent already-infected cells from creating HIV virions.  A1384-85; A29n.9.

## 2.    Toxicity in Anti-HIV Compounds

A major drawback of NRTIs is varying degrees of toxicity.  NRTIs in-terfere with normal DNA synthesis of healthy cells in much the same way they interfere with HIV replication.  NRTI toxicity leads to painful, poten-tially lethal, symptoms such as lactic acidosis, lypodystrophy, peripheral neuropathy, pancreatitis, severe anemia and renal- and cardio-toxicity.

A5813-14; A4056; A5936; A495-96; A4066.  By March 1995, 3TC was the only NRTI that had not shown "demonstrable toxicity".  Teva-Br 10.  A medical committee suggested "discontinuing *all* nucleoside therapy [NRTIs]" in late-stage patients because of toxicity, A5937.  Toxicity also led to noncompliance—some terminally-ill patients would not take their NRTI medications because of excruciating side effects.  A489:13-20; A495:9-496:4.

NNRTIs, however, were the least toxic drugs.  NNRTIs target only viral enzymes and thus inhibit HIV replication without inhibiting normal DNA synthesis.  A29 n.9; A5870 ("Nonsubstrate analogs"); A755; A6141-42.  PIs had similarly shown low toxicity in humans, A1439, and did not increase toxicity when combined with AZT.  A4001.

### 3.    Monotherapy and Drug Resistance

Another major drawback of NRTIs is resistance.  For each NRTI, certain mutations (variations in HIV's genetic code) generate a resistant reverse transcriptase enzyme that does not incorporate the NRTI into the viral DNA chain.  HIV replicates billions of times per day in an infected person.  A481; A1431; A5914-17.  Each possible mutation is produced at least once per day in an infected person, including drug-resistant muta-

tions that appear before a patient ever receives treatment. A1432; A1146; A1172-73. Thus, when a patient receives a single drug ("monotherapy"), the drug inhibits non-resistant virions. However, through a process resembling natural selection, resistant virions replicate and predominate, and the treatment ultimately fails—usually within months. A1144-46.



Viral resistance was the principal cause of drug failure in 1995. A25; A40. Testifying experts agreed that the motivation in the art in 1995 was to improve on monotherapy failures by seeking longer-lasting HIV therapies that overcame resistance. A40; A497-98; A572; A1142-43; A4111.

### 4.    Combination Therapy and Cross-Resistance

Some doctors and researchers experimented with multiple drugs ("combination therapy")—including multiple NRTIs and drugs from other classes—in hopes of overcoming resistance. A40. The point of combination therapy is to inhibit HIV replication better, and longer, than monotherapy.

A497; A639-40.  With NRTIs, the theory was that a combination of drugs would inhibit replication of virions resistant to just one, making it harder for the virus to simultaneously overcome both drugs.  A1146-47; A1432-34. But that theory only worked if the NRTIs each selected for *different* resistance mutations.  A35; A53; A4420.

Cross-resistance is when the *same* mutation makes a virus resistant to multiple drugs.  A1192.  Thus, administering both drugs in combination allows the same resistant virions (in red below) to replicate, leading to the same treatment failure as either drug alone.  A1148.



Administering two cross-resistant NRTIs adds a toxic drug without any marginal benefit.  Worse, some NRTIs are *synergistically* toxic in combination.  A1444.

Before March 1995, the only successful combination in clinical trials was AZT/3TC. A1385-86. That success was—witnesses consistently testified—a "breath of fresh air." A4128; A31; A499-500. AZT and 3TC were successful in combination because their "resistance profiles" were the opposite of cross-resistant: the same mutation that resists 3TC *reverses* resistance to AZT (or "resensitizes" HIV to AZT). A40; A945; A1152; A1400. The AZT/3TC trial results were announced in late 1994 and early 1995— after the '191 patent inventors conceived, and a few months before the priority applications were filed. A4128.

Where AZT/3TC succeeded, other combinations of NRTIs failed. A5936 (AZT/ddC); A1395-96 (same); A5931 (AZT/ddI). They failed to delay viral resistance, A1149, and were more toxic than monotherapy. A783. AZT/ddC's failure in particular "caused a great deal of disappointment in the field" and "helped to darken that period for AIDS patients." A1395-96.

The recognized phenomenon of cross-resistance among NRTIs led doctors and researchers to experiment with combinations of drugs from different classes. A1435-36. As the district court found, "PIs and NNRTIs were on the table for combination therapy," A30, and "combination therapy was emerging as superior to monotherapy in the field of HIV treatment,

15

with the caveat that the field was still in the midst of considerable uncertainty." A26; A50; A1442.

## C.    St. Clair and Barry's Inventions

In March 1995, 280,000 three-drug combinations and 7,000 two-drug combinations were possible based solely on the 120 drugs one reference listed as having *in vitro* anti-HIV activity. A1402. 3,000 three-drug combinations and 300 two-drug combinations were possible based on just 29 drugs in clinical trials. *Id.* A POSA considering combinations understood that relative resistance profiles tended to explain (a) AZT/3TC's success, (b) the failure of every other NRTI combination, and (c) the desire of doctors and researchers to look away from NRTI-only combinations to treat HIV patients. A41-42. No cross-resistant combination had proven better than monotherapy in humans.

Abacavir and 3TC were thus not appealing candidates for combinations. Abacavir and 3TC are cross-resistant three times over: they select for the same *three* mutations ("M184V," "L74V," and "K65R"). A767-68; A913; A1164; A1418.

16

| | Abacavir [1] | Lamivudine |
|---|---|---|
| M184V | 2 – 5 fold | 1000 fold [2] |
| L74V | 10 fold* | 10 fold [3] |
| K65R | | 20 fold [4] |

1 – PTX-469 (Tisdale 1994)    * In presence of M184V

*ViiV Demonstrative*[5]

St. Clair and Barry, however, had the experience and insight to look beyond conventional wisdom and experiment with the two combinations that led to Trizivir and Epzicom. As noted, St. Clair personally discovered AZT's anti-HIV activity in 1984, helped identify abacavir's in 1989, and worked extensively with 3TC. She and Barry began looking at combinations in the early 1990s, considering hundreds of compounds from all drug classes. A1027:16-1028:20. The experiments were complicated, time-consuming, and unpredictable. A1050-52. They tested hundreds of combinations, including the claimed combinations, in 1994. A1032; A1039-40. Despite warnings about cross-resistance, St. Clair and Barry persisted, and their experiments revealed unexpected synergistic anti-HIV activity in the claimed combinations. A1067:16-1068:1; A1083:16-1084:11; A1108:8-12; A5143; A5343; A1449:2-20; A5535.

---

[5] Five "fold" resistance means five times the drug quantity is needed to inhibit the same amount of HIV replication.

St. Clair and Barry's inventions are described and claimed in the '191 patent, A98-110, which was filed in 1996 and claims priority to two March 30, 1995, British applications. A99. The claims recite methods and formulations for treating HIV with the "double" combination of ABC/3TC, and "triple" combination of ABC/3TC/AZT. A106-08.

## D.    Development of Trizivir and Epzicom

ViiV's predecessor-in-interest GlaxoSmithKline invested in the clinical trials and NDAs to commercialize St. Clair and Barry's inventions as Trizivir and Epzicom. A3768-70; A5826-34; A4064-72; A5949-54; A4091-103; A3895-902; A5119-24; A3886-94. Trizivir is a single-pill formulation of the ABC/3TC/AZT triple combination, and Epzicom is a single-pill with the ABC/3TC double-combination. A1095. Trizivir launched in the United States in 2000, and Epzicom in 2004. A993-94; A5641-42. The market rapidly accepted both drugs, A1297-98, and both have been commercially successful and prolonged patients' lives. The NIH and similar organizations highly recommended Trizivir and Epzicom. A5956-71; A6329-44; A6496; A6357, A6170; A6286; A6002, A1465-66. *Each* has been prescribed millions of times, and generated more than $3 billion in sales. A994; A1292; A1294.

To this day, though the science has advanced, and competing drugs have arisen, Trizivir and Epzicom remain widely prescribed and the best or only option for some patients. A264-69. Epzicom remains one of only two recommended double-NRTI-combination HIV drugs. A1464; A6357.

## II. Proceedings Below

### A. Pretrial Proceedings

In separate actions, later consolidated, ViiV sued Lupin and Teva for infringement arising out of their respective ANDAs. A1764-65; A2151-54. Lupin's ANDA sought FDA approval for a generic version of Trizivir, and Teva's for generic Epzicom. The FDA's Orange Book lists ViiV's '191 patent for both drugs, and both ANDAs sought approval before the patent expires.

On November 16, 2012, after briefing, *see* A1766-69, and a hearing, the district court issued its claim construction order. A83-97 (904 F.Supp.2d 379). Relevant to ViiV's cross-appeal, the court construed "physiologically functional derivative" as follows:

> Any physiologically acceptable salt, ether, ester, salt of such ester of 1592U89, zidovudine or 3TC; or solvates of any thereof and their physiologically functional derivatives; or any other compound which upon administration to the recipient, is capable of providing (directly or indirectly) such a compound or an antivirally active metabolite or residue thereof.

19

A85.

Relevant to Teva's appeal, the court rejected Teva's arguments for reading a "synergy" limitation into the claims. A85-94. The court noted that "[s]ynergism is not mentioned within any of the claims," A87, and the written description referred to synergy only as an advantage or intended result. A87-94.

The following month, ViiV's expert submitted a report detailing Teva's infringement. *See* A4556-57 (¶1.a). Faced with that report and the *Markman* order rejecting its "synergy" arguments, Teva conceded infringement, and submitted no rebuttal infringement report. In February 2013, Teva and ViiV instead filed a stipulation, which the court approved, stating that Teva infringes claims 20, 26-27, 29-30, 48, and 51, "as those claims were construed by the Court on November 16, 2012, to the extent that those claims are valid and enforceable." A80-82. The stipulation thus preserved Teva's right to dispute validity, and to appeal the *Markman* order rejecting Teva's proposed "synergy" limitation. A81 (¶¶3-4).

Following Teva's stipulation, and before trial, ViiV dropped three claims, asserting only claims 26-27, and 29-30 against Teva, and Teva

dropped invalidity defenses other than obviousness. A5116; A5118; A4529:14-4530:7; A198:18-24.

ViiV asserted formulation claim 47 and method claims 4, 26-27, 29-30, 34, 36, and 38-39 against Lupin. A176. Lupin disputed infringement, and asserted the claims were obvious, and that certain claims were invalid under §112. A216.

Throughout proceedings below, the parties and the court repeatedly confirmed that while Lupin disputed infringement by its generic Trizivir, Teva did not dispute infringement by its generic Epzicom. *See, e.g.*, A198:18-24; A4564; A4624-25; A4727-29.

## B.    Trial

The court held a bench trial in June 2013. The first day concerned ViiV's infringement claims against Lupin. The asserted claims recite abacavir by its chemical nomenclature "(1S,4R)-cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-yl]-2-cyclopentene-1-methanol." A108; A348-49. That chemical is found in ViiV's Trizivir and Lupin's generic product in its salt form as abacavir sulfate. A348; A390. Lupin's ANDA states that each tablet "contains the active ingredient[] 300 milligrams *of abacavir* as abacavir sulfate." A5812; A5781; A430. ViiV's evidence in-

cluded Lupin's ANDA (which details the composition, labeling, and manufacturing process of Lupin's product), A321, testimony from Lupin employees, *e.g.*, A310; A324-25, and testimony from ViiV's expert Dr. Langer. A343-402. Lupin argued that the abacavir sulfate in Lupin's product is not the abacavir claimed in the patent.

The remainder of trial concerned invalidity defenses, primarily obviousness. Lupin's and Teva's principal obviousness arguments both took the only successful prior art combination (AZT/3TC) as a starting point, but went in different directions.

Lupin contended that a POSA would have been motivated to augment AZT/3TC with abacavir to arrive at the patented triple combination. A30. Under Lupin's theory, a POSA would have added to the only successful combination a drug that would (a) increase the combination's toxicity and (b) be cross-resistant with one of the other two components.

Teva contended that a POSA would have been motivated to replace AZT with abacavir to arrive at the patented double combination. A30. Under Teva's theory, a POSA would have taken the only successful combination, and replaced AZT (uniquely non-cross-resistant with 3TC) with abacavir (cross-resistant three times over with 3TC).

Over five days of trial, the district court received more than 150 exhibits and heard testimony from twelve experts, including researchers and physicians. ViiV's experts included Drs. David Ho and Brendan Larder. Ho was on the front lines of research and clinical efforts to combat HIV, was one of the first few to isolate the HIV virus, and received *Time* Magazine's Man of the Year recognition in 1996 for pioneering work against AIDS. A1355-58; A1363. Larder was the first to publish regarding drug resistance to AZT, and 3TC resensitizing HIV to AZT, and spent his career researching HIV resistance. A1125-1130; A1133-34. St. Clair testified about her inventive process, and portions of her laboratory notebooks were in evidence. *See, e.g.* A1039-43.

## C.    Post-Trial Proceedings

In December 2013, after receiving briefing, the court issued findings of fact and conclusions of law. A6-79 (2013 WL 6665207).

First, the court ruled Lupin did not infringe. A8-21. The court accepted Lupin's argument that asserted claims did not literally cover the abacavir sulfate in Lupin's ANDA, A9, and found no infringement under the doctrine of equivalents. A15-16, A21.

23

Second, the court ruled Lupin and Teva did not prove their invalidity defenses by clear and convincing evidence.  A21-72 (obviousness); A73-76 (§112).  The court's 50-page discussion of obviousness reviewed the evidence and concluded, factually, that "[t]here was very little about anti-HIV therapy that could be described as predictable as of March 1995, and the history of failure in the field offered … little reason to expect that any particular combination would work."  A69.  "Concerns of toxicity, potency, cross-resistance profiles, HIV's ability to mutate swiftly, a large universe of potential compounds and drug classes, and rapidly dying patients in the midst of a public health crisis," the court found, "made assembling an effective drug combination extremely challenging." *Id*.

At the court's direction, A79, ViiV drafted a final judgment.  A5093; A5101-08.  In response, Teva tried to retract its pretrial infringement stipulation.  A5093-94; A5109-12; A4.  Despite having known of Lupin's non-infringement defense, and never having indicated it would claim any benefit if Lupin's defense succeeded, Teva asserted that it was not bound to its stipulation.  A5093-94; A5109-12; A4.  Though the trial included no evidence regarding Teva's generic product because of Teva's stipulation, Teva asked the court to enter *judgment of non-infringement* in its favor.  A4444.

Lupin raised objections, not renewed here.  The court overruled both Appellants' objections, A3-4, and entered judgment.  A1-2.  Lupin and Teva appealed.  ViiV cross-appealed as to Lupin's infringement.

## SUMMARY OF THE ARGUMENT

I.    The district court correctly held that references to "synergy" in the written description and prosecution history referred to advantages or results, not a limitation to be read into each claim.  Teva fails to show unambiguous disavowal of claim scope.

II.    The district court applied the correct legal standard, and properly concluded that Appellants did not meet their burden to prove obviousness by clear and convincing evidence.  The evidence showed that combination therapy was unpredictable and that the only successful NRTI combination (AZT/3TC) worked because the two components had a unique complementary relationship whereby HIV mutants that resisted one component were uniquely sensitive to the other.  Lupin's theory was that a POSA would have been motivated to add a toxic drug that had the opposite relationship (cross-resistance) with 3TC.  Teva's theory was that a POSA would have been motivated to split apart the one successful combination and replace a complementary relationship with cross-resistance.  Both

theories presupposed picking ABC and 3TC out of *hundreds* of drugs and *thousands* of potential combinations, where the prior art strongly taught against the claimed combination and nothing suggested them.  The district court carefully weighed evidence, assessed credibility, and properly concluded that Appellants failed to meet their burden.

III.    The district court correctly found that ViiV disclosed a credible utility.  Lupin's contrary arguments misstate the record and conflate the criteria for nonobviousness with enablement.  This Court has explained the differences and rejected the dichotomy Lupin posits, where pharmaceutical patent applications without clinical data must be either obvious or non-enabled.  ViiV's patent, like most, is neither.

IV.    Teva stipulated to infringement before trial, reserving only the right to argue on appeal for the addition of a "synergy" limitation to the claims.  Under Supreme Court precedent, Teva's stipulation is binding, and Teva's post-trial regret is no reason for rescinding its pretrial stipulation.

V.    The judgment that Lupin does not infringe should be reversed. The court's literal infringement ruling is based on a clear misreading of the claims.  Even accepting that reading, Lupin infringes the method

26

claims because abacavir sulfate undisputedly metabolizes into "abacavir free base" upon ingestion, thus "treating" patients with "abacavir free base." At a minimum, Lupin infringes under the doctrine of equivalents. The judgment regarding equivalents rests on two erroneous arguments from Lupin: (1) that non-equivalence may be found by reference to characteristics ("stability and handling properties") that are not part of the function, way, or result of the claimed active ingredient, and (2) that a product cannot infringe equivalently if it is within the literal scope of an *un*asserted claim. The latter is directly contrary to *Graver Tank* and would require patentees to assert their broadest claims in every case or forgo the doctrine of equivalents.

## STANDARD OF REVIEW

Following a bench trial, factual findings are reviewed for clear error, and legal conclusions are reviewed *de novo*. *Otsuka Pharm. Co. v. Sandoz, Inc.*, 678 F.3d 1280, 1290 (Fed. Cir. 2012). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. Bessemer City*, 470 U.S. 564, 573-74 (1985) (reversing appellate court's reversal of bench trial rulings). Nonobviousness and enablement are legal conclusions based on underlying facts.

27

*InTouch Techs., Inc. v. VGO Commc'ns, Inc.*, 751 F.3d 1327, 1347 (Fed. Cir. 2014); *Singh v. Brake*, 317 F.3d 1334, 1345 (Fed. Cir. 2003). Infringement is a factual question. *Sunovion Pharms., Inc. v. Teva Pharms USA, Inc.*, 731 F.3d 1271, 1275 (Fed. Cir. 2013). Evidentiary rulings are reviewed for abuse of discretion. *Siemens Med. Solutions USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*, 637 F.3d 1269, 1284 (Fed. Cir. 2011).

## ARGUMENT

## I. The District Court Correctly Declined to Add a "Synergy" Limitation to the Claims

Claim construction is reviewed *de novo*,[6] *Lighting Ballast Control LLC v. Phillips Elecs. N. Am. Corp.*, 744 F.3d 1272, 1276 (Fed. Cir. 2014) (en banc), "begin[ning] with and carefully consider[ing] the trial court's work." *Apple Computer, Inc. v. Articulate Sys., Inc.*, 234 F.3d 14, 20 (Fed. Cir. 2000). Claims define the patent right, and courts "do not read limitations from the specification into claims [or] redefine words." *Thorner v. Sony Comp. Entm't Am. LLC*, 669 F.3d 1362, 1366-67 (Fed. Cir. 2012). Rather, claim terms take their ordinary meaning, in context of the intrinsic

---

[6] That standard is under consideration at the Supreme Court. *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, No. 13-854 (argument scheduled Oct. 15, 2014).

evidence, except in instances of (1) lexicography, or (2) unambiguous disavowal of claim scope in the written description or prosecution history. *Id.* at 1367. Neither exception applies here.

As the district court noted, "[s]ynergism is not mentioned within any of the claims." A87. Teva does not dispute that, nor does it invoke the lexicography exception. Rather, Teva asserts that the patentee disavowed claim scope.

The "unambiguous disavowal" standard is "exacting," *Thorner*, 669 F.3d at 1366, and rarely (if ever) met by statements about an invention's advantages or intended results. *See Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368, 1375 (Fed. Cir. 2001); *AIA Eng'g Ltd. v. Magotteaux Int'l S/A*, 657 F.3d 1264, 1277 (Fed. Cir. 2011). The district court properly concluded that references to "synergy" described advantages or results, and did not unambiguously disavow claim scope. A85-94. Teva fails to demonstrate error in that ruling. Teva-Br. §I.

## A.    The Written Description Does Not Disavow Claim Scope

Where the patent refers to "the present invention," it does not mention synergy. A90 & n.4. Rather, it describes methods and formulations using the patented combinations. *Id.* Similarly, references to "essential

29

part[s] of the invention" refer to the component drugs in combination, not to "synergy." A103(5:44-48).

To be sure, the written description explains that the combinations can produce synergistic *results*, and that synergy was an "unexpected" "benefit" or "feature." *See, e.g.*, A101(2:7-9) ("Unexpectedly [in ABC/3TC/AZT] a synergistic anti-HIV effect is achieved."); A103(5:44-54) (ABC/3TC produced synergistic results). The specification provides examples of synergistic ratios of active ingredients, A102(4:17-25), but the independent claims are not limited to those ratios. A91.

The passage Teva principally relies on merely confirms the district court's ruling. The patent states that the component drugs "*should*" be administered simultaneously or close in time so as not "to lose the *benefit* of a synergistic therapeutic effect of the combination." A102(3:59-65). Teva argues that "should" means "must," and that the intended "benefit" must be imported into all claims as a limitation. Teva-Br. 33. Precedent holds, however, that statements in the written description of intended results or advantages should *not* be read into the claims. *Bristol-Myers*, 246 F.3d at 1375 ("the statement of the intended result of administering those amounts does not change those amounts or otherwise limit the claim.");

*Preemption Devices, Inc. v. Minn. Mining & Mfg. Co.*, 732 F.2d 903, 907 (Fed. Cir. 1984) ("[A]dvantages … do not properly belong in claims.").

Teva's reliance on the title and preferred embodiment are likewise unavailing—titles and preferred embodiments are not claim limitations. *See Moore USA, Inc. v. Standard Register Co.*, 229 F.3d 1091, 1111 (Fed. Cir. 2000) ("[T]he bar on importing limitations from the written description into claims applies no less forcefully to a title."); *Thorner*, 669 F.3d at 1366-67 (similar).

Finally, Teva cites cases where other patentees distinguished prior art combinations by disavowing claim scope. *See SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337 (Fed. Cir. 2001); *Gaus v. Conair Corp.*, 363 F.3d 1284 (Fed. Cir. 2004). Here, however, the patentee did *not* criticize prior art "for lacking synergism and then distinguish the drug combination for its synergistic aspect." A89-90.

The district court correctly evaluated the references to synergy: they "confirm[] the nature of synergism as an incident of the claimed drug combination, but not as a component or property of the combination itself." A90.

31

## B.    The Prosecution History Does Not Disavow Claim Scope

In prosecution, the patentee submitted data and argument regarding synergy to rebut an allegation of *prima facie* obviousness.  Contrary to Teva's argument, Teva-Br. 34, the patentee argued that synergistic results were unexpected—*not* that the *claims* were narrower than the PTO believed because of an unwritten "synergy" limitation.  *See* A1908-09 ("surprising and unexpected results of the combinations of the present invention."); A1957.

The examiner recognized as much in the Notice of Allowability, remarking that synergy was an "unexpected benefit[]." A1960.  This Court has consistently held, on strikingly similar facts, that statements in prosecution regarding unexpected benefits or "intended results" do not limit claims.  *AIA*, 657 F.3d at 1277 (patentee's prosecution statements that "unexpected synergy is the result of this solid solution" did not define or limit "solid solution" claim term (emphasis omitted)); *Application of Merchant*, 575 F.2d 865, 869 (CCPA 1978) ("We are aware of no law requiring that unexpected results relied upon for patentability be recited in the claims.").  The statements here are no different, and the district court's ruling should be affirmed.

\*     \*     \*

Finally, Teva grossly overreaches by demanding "entry of judgment for Teva." Teva-Br. 35. Were Teva's "synergy" argument correct—and it is not—that would lead, at most, to a remand, where ViiV would demonstrate that Teva infringes under a revised construction. *See generally Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 381 F.3d 1371, 1382-83 (Fed. Cir. 2004); *ArcelorMittal France v. AK Steel Corp.*, 700 F.3d 1314, 1322 (Fed. Cir. 2012).

## II. Lupin and Teva Did Not Prove Their Obviousness Defenses By Clear and Convincing Evidence

"Generally, a party seeking to invalidate a patent as obvious must demonstrate by clear and convincing evidence that a skilled artisan would have had reason to combine the teaching of the prior art references to achieve the claimed invention, and … would have had a reasonable expectation of success from doing so." *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1068-69 (Fed. Cir. 2012). Obviousness is a question of law, based on underlying facts regarding: (1) the scope and content of the prior art; (2) the differences between the prior art and the claims; (3) the level of ordinary skill in the art; and (4) objective evidence of nonobviousness. *See Graham v. John Deere Co.*,

383 U.S. 1, 17-18 (1966). The district court considered the evidence of each and found Appellants could not meet the exacting standard for obviousness. Appellants' case for obviousness is based on classic hindsight reasoning with the patented invention serving as the roadmap. *See Cyclobenzaprine*, 676 F.3d at 1073 ("retrac[ing] the inventor's steps" is "hindsight"); *Otsuka*, 687 F.3d at 1296 ("The inventor's own path itself never leads to a conclusion of obviousness; that is hindsight."). On appeal, Appellants largely reargue their view of the facts, distort the trial record, and ultimately fail to demonstrate error.

## A.    The District Court Applied the Correct Legal Standard

Lupin and Teva assert that the district court applied the obviousness standard too rigidly. Teva-Br. §III.B; Lupin-Br. §VI.A.1.a-c. That argument depends on hindsight, is inconsistent with the law and facts, and is waived. The parties generally agreed that a POSA would have been motivated only to search for HIV treatments that performed better than then-existing monotherapies. Appellants' cannot backtrack on appeal.

As an initial matter, Appellants' argument begins and ends with hindsight. Appellants start *with the claimed combinations*, and say it would be obvious to a POSA that the combinations would have some effect

(even if not an improvement over the state of the art). *E.g.*, Teva-Br. 38. That is itself error and reason enough to reject the argument. *Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1374 n.3 (Fed. Cir. 2008) (improper "to allow hindsight reconstruction of references to reach the claimed invention without any explanation as to how or why the references would be combined to produce the claimed invention."); *InTouch*, 751 F.3d at 1348-49; *Otsuka*, 687 F.3d at 1296.

But the question is not whether a POSA, if presented with the claimed combinations, would have expected that they would have some effect (however fleeting). The question is what would have *motivated* a POSA, in March 1995, to pick the claimed combinations in the first place. Appellants fault the district court for discussing whether a POSA would have expected in March 1995 that the claimed combinations would improve upon monotherapy or the AZT/3TC combination (which itself had only showed initial promise months before the critical date). Teva-Br. 35; Lupin-Br. 38. Because the claims do not require any particular *degree* of therapeutic effect, Appellants argue, the proper inquiry is whether a POSA would have expected the patented combinations to have *any* therapeutic effect (however small), regardless of whether the claimed combinations

35

improved on, or were less successful than monotherapy.  Since "AZT, 3TC, and [abacavir] were each known to inhibit HIV replication," Lupin-Br. 26, it necessarily follows (so their argument goes) that any combination of those drugs would be expected to have some effect and, thus, is obvious. That approach is wrong on the law and the facts.

The proponent of an obviousness defense must demonstrate "that a skilled artisan would have had reason to combine the teachings of the prior art references to achieve the claimed invention, *and* … would have had a reasonable expectation of success from doing so." *Cyclobenzaprine*, 676 F.3d at 1068-69.  The inquiry, thus, *begins* with the motivation—*i.e.*, whether a POSA "would have had reason to combine the teaching of the prior art references" in the first place.  *Id.*  In turn, "the expectation-of-success analysis *must match the highly desired goal*" that motivates a POSA, not whatever degree of performance is explicit in the claims, and not some "different goal that may be a less challenging but also less worthwhile pursuit."  *Institut Pasteur v. Focarino*, 738 F.3d 1337, 1346 (Fed. Cir. 2013); *see also Yamanouchi Pharm. Co. v. Danbury Pharmacal, Inc.*, 231 F.3d 1339, 1345 (Fed. Cir. 2000).

Beginning with the "highly desired goal," the question is whether that goal would have led a POSA to make and reasonably expect success from *the claimed invention*, as opposed to something narrower or broader. *See Allergan, Inc. v. Apotex Inc.*, 754 F.3d 952, 962 (Fed. Cir. 2014). To be sure, the question is not the patentee's subjective motivation or avowed purpose, but a POSA's objective motivation—which is a question of fact. *TriMed, Inc. v. Stryker Corp.*, 608 F.3d 1333, 1341 (Fed. Cir. 2010). The district court was not clearly erroneous in finding as a factual matter that the goal was to improve on monotherapy, and was thus correct to ask whether *that goal* would have led one to select the patented combinations here and expect success. Indeed, *the whole point of combination therapy was to improve on monotherapy*, which eventually failed due to resistance. A40 ("The hope in the field was that combination therapy would succeed where monotherapy failed."); A31 ("all" NRTI monotherapies failed due to resistance); A44; A1142-43; A1146-47; A1386-87; A1432-34. The district court found that nothing would have motivated a POSA to combine the particular compounds at issue, but instead, "[r]esearchers felt their efforts in combination therapy were beset by 'random choices from a wide array of drugs.'" A70. Some combinations "provided no better results than mono-

37

therapy," and some "produced worse results." A35; *see generally* §II.B, *infra*. Moreover, what little guidance existed taught away from experimenting with the claimed combinations. A44-47; A71; *see generally* §II.C*, infra*. It was thus not clear error for the district court to conclude that there was not clear and convincing evidence that a POSA in 1995, motivated to improve on the state of the art, would have selected and experimented with the patented combinations. *See Leo Pharm. Prods. v. Rea*, 726 F.3d 1346, 1357 (Fed. Cir. 2013) ("no indication in the prior art which of these possible formulations would be the most promising to try."); *Institut Pasteur*, 738 F.3d at 1345 (Teaching away "counts significantly against finding a motivation to take the claimed steps with a reasonable expectation of success.").

In addition to being wrong, Appellants' argument is waived. Appellants argued below only that a POSA would have sought treatments in 1995 that improved over the state of the art. *Infra* pp.39-40. Appellants never suggested that a POSA was motivated to pursue combinations of minimal effect, even if not an improvement over the state of the art. Appellants' current argument was not considered by the district court because it was not made. That alone is reason enough to reject it.

Where Appellants now complain about the district court's references to "sustained clinical efficacy" and prior art "failures" to achieve that goal, the district court was simply analyzing the evidentiary support for Appellants' obviousness arguments, as presented at trial.

It was undisputed at trial that a POSA would have been motivated to improve upon the failures of monotherapy. A24-25. The parties disputed the relative promise and predictability of combination therapy, A25-27, but not the reason for pursuing combinations in the first place. All parties' experts consistently described monotherapy "*failure*" due to drug resistance, A594-95; A941; A951; A965; A1132, and the district court correctly noted "[p]ersons skilled in the art sought to solve the problem of treatment failure due to resistance." A25 (citing expert testimony); A497; A572; A1142; A4111 ("The ultimate test of combined therapy regimens that include [NRTIs] will be whether they provide more complete virus suppression and prolongation of therapeutic benefits[.]"); A4117 (goal of "*sustained* suppression of virus"). Lupin's post-trial brief made that point explicitly, A4996 ("NRTI monotherapy was a *failure* due to toxicity and loss of efficacy due to resistance."), citing the face of the patent. A101(1:59-65) ("Thus, new therapies are needed"); *see also* A25 (citing *id.*(1:16-21)).

Similarly, the district court properly considered whether a POSA would have expected the claimed combinations to improve upon AZT/3TC, because that is what both Appellants argued: that a POSA would have started with the AZT/3TC combination, been "motivated to improve" upon it, and been guided by that motivation to arrive at the patented combinations. Lupin argued that a POSA would add abacavir to arrive at the triple combination, and Teva argued that a POSA would replace AZT with abacavir to arrive at the double combination. A5041-42 ("*motivated to improve* the successful AZT/3TC combination"); A5039; A5006; A5009; A5010; A5072-73 ("By March 1995, one of ordinary skill would focus on the NRTI drug class *to improve or augment the existing AZT/3TC combination.*"); A22-23; A30 (describing arguments); *see also supra* p. 22. Accordingly, and appropriately, the district court considered those arguments, and found that the evidentiary support fell short of clear and convincing.

Appellants cannot argue that the district court erred by analyzing obviousness in light of the very motivations Appellants argued below, and have waived the argument that the district court should have found a POSA would have been motivated by something different. *Sage Prods.,*

*Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1426 (Fed. Cir. 1997) ("[T]his court does not 'review' that which was not presented to the district court.").

## B.  Based On The Evidence, The District Court Properly Concluded That The Claims Were Not "Obvious to Try"

Nearly all inventions are combinations of preexisting elements. *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 418-19 (2007).  A combination is only "obvious to try" where "there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions[, and] this leads to the anticipated success." *Id* at 421.  Such a scenario "*might* show" obviousness. *Id. KSR*'s discussion of obvious-to-try "posits a situation with a finite, and in the context of the art, small or easily traversed, number of options," *Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 520 F.3d 1358, 1364 (Fed. Cir. 2008).  The content and predictability of prior art are fact-intensive inquiries, *Graham*, 383 U.S. at 17-18, and the district court held, based on the trial evidence, that the obvious-to-try situation *KSR* posited did not describe anti-HIV therapy in 1995.  The prior art options were neither finite nor predictable. *Statement of Case* §§I.B.1, I.B.4, *supra*.  Appellants' contrary arguments distort the record and disregard the district court's findings, which were not clearly erroneous.

### 1. In March 1995, HIV Drug Development Was Highly Unpredictable, With No Particular Reason to Select the Patented Combinations From the Many Thousands Possible

Compared to the mechanical pedal assembly in *KSR*, pharmaceutical inventions are generally less predictable and rarely obvious-to-try. *See, e.g.*, *Eisai Co. v. Dr. Reddy's Labs., Ltd.*, 533 F.3d 1353, 1359 (Fed. Cir. 2008) (In "chemical arts … *KSR*'s focus on these 'identified, predictable solutions' may present a difficult hurdle because potential solutions are less likely to be genuinely predictable"); *Sanofi-Aventis Deutschland GmbH v. Glenmark Pharms. Inc.*, 748 F.3d 1354, 1360 (Fed. Cir. 2014) (rejecting obvious-to-try argument); *Pozen Inc. v. Par Pharm., Inc.*, 696 F.3d 1151, 1165-66 (Fed. Cir. 2012) (same)*; Leo*, 726 F.3d at 1356 (same). This case illustrates vividly why that is so.

In 1995, hundreds of compounds in numerous classes had known anti-HIV activity, leading to hundreds of thousands of potential combinations. *Statement of Case* §§I.B.1, I.C, *supra*; A28-30; A1402:5-24. Even focusing solely on 29 drugs in human clinical trials (of which most were *not* even NRTIs), more than *300* two-drug combinations and *3,000* three-drug combinations were possible. *Id.* Appellants' experts conceded that POSAs would have considered the broad universe of available compounds,

including non-FDA-approved compounds, and many believed NNRTIs and PIs to be more potent and less toxic than NRTIs. A752-53; A970-71; *Statement of Case* §I.B.1, *supra*. Further, ViiV presented evidence, which the district court credited, that "a person skilled in the art would not limit herself to NRTIs," and that due to numerous advantages over NRTIs, including the absence of cross-resistance, A28-29, "PIs and NNRTIs were on the table for combination therapy." A30.

Beyond the sheer number of potential combinations, testing each one was time consuming, difficult, and unpredictable. A1050:22-1052:9; A1032:13-1033:12. "[M]any issues complicate[d] the evaluation of combination therapy for HIV," A3997; A1388:4-14, including the number of available compounds, more potential combinations than could possibly be tested, and scant ability to predict how a combination would perform. A1030:15-18 (too many combinations); *see also Statement of Case* §I.C, *supra* (failed combinations). Further underscoring the unpredictability of combination therapy is the tension between Teva's and Lupin's obviousness theories. Teva argued that a POSA would be strongly motivated to replace AZT in AZT/3TC because AZT had "debilitating" toxicity that was an "undisputed problem." A5032; A5041. Lupin disagreed, arguing AZT

was part of the "gold standard," which a POSA would want to build upon, not tear down.  A5010.

This Court has rejected the "premise that if a combination of classes of components is already known, all selections within such classes are obvious to try, as a matter of law," *Sanofi*, 748 F.3d at 1358.  Rather, each case turns on its facts.  *Novo Nordisk A/S v. Caraco Pharm. Labs., Ltd.*, 719 F.3d 1346 (Fed. Cir. 2013)—which Appellants relied on heavily below—found obviousness under vastly different facts, as the district court observed.  A71-72.  Combination therapy to treat diabetes with the precise two classes of drugs combined in *Novo* had been ongoing for *more than 30 years*, and was far more predictable than HIV therapy in 1995.  A72.

Ultimately, it was St. Clair's unique experience—having worked extensively with each component drug and and conducted hundreds of combination experiments—that gave her and Dr. Barry the insight to go against conventional wisdom and discover the unique, life-saving combinations of abacavir/3TC, and abacavir/3TC/AZT.  *See Statement of Case* §§I.B.1, I.C, *supra*.  A POSA, lacked that experience, and would have heeded warnings in the art, and avoided those combinations.  *See W.L. Gore & Assocs. v. Garlock, Inc.*, 721 F.2d 1540, 1552 (Fed. Cir. 1983)

44

("[P]roceed[ing] contrary to the accepted wisdom of the prior art … is strong evidence of nonobviousness." (citing *United States v. Adams*, 383 U.S. 39, 52 (1966)); §II.C, *infra*.

The district court was entitled to credit the record evidence and conclude that "[t]here was very little about anti-HIV therapy that could be described as predictable as of March 1995, and the history of failure in the field offered persons skilled in the art little reason to expect that any particular combination would work." A69; *see also* A30-39 (reviewing evidence); A35 (Lupin expert agreed combinations were "quite confusing").

Appellants largely ignore the district court's findings on appeal. Teva fails to mention PIs and NNRTIs at all. Lupin gives those classes passing mention, dismissing them on the ground that NNRTIs and PIs were not FDA-approved by March 1995. The same was true, however, of abacavir and 3TC. A1404-06; A5814. Indeed, in March 1995, the majority of anti-HIV drugs in clinical trials were not NRTIs. A1380. Appellants' contentions for narrowing the hundreds of available compounds to the two in the patent depend on hindsight and fail to demonstrate error in the district court's analysis.

## 2. All Combinations But One Failed to Demonstrate Any Improvement Over Monotherapy Before March 1995

Appellants' obvious-to-try argument also misrepresents the state of the art. As of March 1995, only one combination—AZT/3TC—had shown any benefit over monotherapy in humans. A55; A35; *Statement of Case* §I.B.4, *supra*. Others showed "promise" *in vitro* but failed *in vivo* to show improvement over monotherapy, and some were worse than monotherapy. A55; A1395-96. Based on the trial record, the district court thus explained that prior art combinations were "not effective long-term" in treating patients. A34-35; A42-43 (similar). The "art of HIV treatment was littered with failures as of March 30, 1995," A55, and the "breakthrough" exception of AZT/3TC, A40, did not "erase[] the extensive history of failures." A55.

Those findings are not clearly erroneous. Contrary to Lupin's argument, *Graham* does not hold that every prior art "success supersedes any supposed prior art failures." Lupin-Br. 30. Some prior art explains previous failures and shows a path forward; some does not. In *Graham*, the prior-art Livingstone patent had already solved the mechanical sealing problem the inventor addressed, 383 U.S. at 31-32, 36, and "rendered apparent" the "exceedingly small and quite non-technical mechanical

46

differences" between the patent and other prior art. *Id.* at 36. Here, how-ever, AZT/3TC had no similar effect. The parties did not dispute that a POSA might try to build on the success of AZT/3TC, but the district court properly credited evidence (a) AZT/3TC's success taught away from com-bining cross-resistant NRTIs, §II.C.1, *infra,* and (b) other experiments with dual-NRTI combinations *failed*, causing "disappointment in the field," "help[ing] to darken that period for AIDS patients," A1395-96, and further teaching away from the claimed combinations. *See also Statement of Case* §I.B, *supra.*

Lupin nonetheless declares that "the art had picked a path: all-NRTI combinations," Lupin-Br. 17, relying on a 1993 patent application by Dr. Larder. *Id.* at 17, 37. But as the district court found, Larder focuses almost entirely on combining one or two NRTIs with an *NNRTI* and, if an-ything, teaches away from the claimed combinations. A50-52. Larder taught to *avoid cross-resistance* by considering drugs that would resensi-tize one another. A52; A1153.

The single Larder paragraph Lupin relies on states that AZT "and/or the mutation-inducing HIV-RT inhibitor" can be combined with "other therapeutic agents." A4253. As the district court noted, these "other ther-

47

apeutic agents" are a "laundry list of drug classes and compounds, including protease inhibitors, interferons, and the NRTIs of ddI, 3TC (appearing again) and carbovir," and many others. A51. Thus, rather than rendering all HIV combination therapy obvious, Larder "gives rise to a large number of potential combinations having many different potential benefits and challenges," while offering "virtually no guidance as to which path to choose." A51-52. The Larder application certainly does not "pick … all-NRTI combinations." Lupin-Br. 17. While "one *extractable* combination" was AZT/3TC/carbovir, nothing led a POSA to that combination, A52, and it is only hindsight that leads Lupin to "extrapolate[]" on appeal. Lupin-Br. 40. Larder taught the importance of avoiding drug resistance, A4247-48, and "especially preferred" combining AZT with a *non-NRTI*, and/or "a 184 mutation"-inducing NRTI, "such as lamivudine or FTC," A4251, thus teaching away from cross-resistance, A1153, and "drown[ing] out" any cross-resistant combinations that Lupin now extrapolates from its disclosure. *Daiichi Sankyo Co. v. Matrix Labs., Ltd.*, 619 F.3d 1346, 1354-55 (Fed. Cir. 2010); *see also Otsuka*, 678 F.3d at 1293-94 ("explicit[] … clear teaching controls over the far more nebulous disclosure" of a "laundry list" of other options).

The Court did not merely find that the patented triple combination "was not defined as the best," Lupin-Br. 39, but rather that nothing about Larder actually pointed a POSA to that combination. A52. Where, as here, the prior art gives "no indication … which of these possible [combinations] would be the most promising to try," the patented combinations are not obvious-to-try. *Leo*, 726 F.3d at 1357.

### 3. Targeting Different Nucleoside Bases Did Not Predict Success

Attempting to fill the evidentiary gap, Appellants presupposed that a POSA would have ignored compounds other than NRTIs, and argued from that supposition that a POSA would have further narrowed the possible combinations by focusing on those where each component is an NRTI that mimics a different nucleoside base in the DNA chain (either "A," "C," "G, or "T")—which includes the combination of abacavir, 3TC, and AZT. A5039; A5010-11. Despite the volumes of scientific literature produced below, Appellants offered no evidence for that theory other than their experts' conclusory testimony. The district court, thus, acknowledged Appellants' testimony, but appropriately gave it little weight. A39; A59.

Lupin argues that the court thereby contravened *KSR* and required Lupin to show an explicit, printed, motivation to combine. Lupin-Br. 35-

37. Not so. The court merely considered the lack of documentary support in weighing the experts' testimony and credibility. Neither *KSR* nor any other authority requires blind acceptance of unsubstantiated testimony. The court was plainly entitled to give that testimony little weight, particularly in the face of strong contrary evidence.

Defense expert Parniak, for example, admitted that using drugs of different bases does not reveal how the drugs will work in combination. A760:23-761:4. Further, several combinations of NRTIs that happened to target different bases *failed* to demonstrate any benefit over monotherapy. AZT("T")/ddI("A") and AZT("T")/ddC("C") both failed in clinical tests, and some combinations were *antagonistic*. A38; A1069:12-22 (abacavir ("G") and d4T ("T") antagonistic in combination); A5302 (same). Far from searching for combinations targeting different bases, some researchers looked for combinations targeting the *same* bases. *See* A4129-31 (3TC ("C" analogue) with ddC ("C")).

Finally, as noted, the "prevailing thought" behind AZT/3TC's success had nothing to do with the bases the components targeted, but with the unusual complementary interplay between mutations. A40-41. Dr. Ho's testimony was not to the contrary. Lupin-Br. 36. Ho rejected Appellants'

"alphabet soup" theory, A1401:14-18, and did not "admit" that the Rideout

reference disclosed Appellants' theory.  A39; A1448.  The district court

watched all of the testimony and was entitled to consider which was credi-

ble and which was the product of litigation-driven hindsight.

### C.    The District Court Properly Weighed the Evidence and Found that the Prior Art Taught Away from the Claimed Combinations

Not only was there "very little about anti-HIV therapy that could be

described as predictable as of March 1995," and "little reason to expect

that any particular combination would work," A69, but the prior art

strongly taught away from the patented combinations.  Prior art refer-

ences teach away when they "discourage" a POSA from following the path

the inventors took.  *DePuy Spine Inc. v. Medtronic Sofamor Danek, Inc.*,

567 F.3d 1314, 1326-27 (Fed. Cir. 2009).  "An inference of nonobviousness

is especially strong where," as here, "the prior art's teachings undermine

the very reason proffered as to why a person of ordinary skill would have

combined the known elements."  *Id.* at 1326.  In this case, the district court

weighed the parties' competing evidence regarding the strength, sub-

stance, and relative importance of considerations such as cross-resistance,

toxicity, and potency, and concluded that the prior art as a whole strongly taught away. *See, e.g.*, A39-48.

On appeal, Teva and Lupin attempt to resurrect an argument they disclaimed below. In a joint post-trial filing, both insisted they "never suggested that a prior art indication of 'complete inoperability' was a prerequisite to teaching away." A5092n.1. Now, however, both argue that the appropriate inquiry is "whether the art as a whole taught [ABC/3TC/AZT] *would not work* to inhibit HIV replication." Lupin-Br. 42; *see* Teva-Br. 47. That theory is waived and meritless. *See DePuy*, 567 F.3d at 1326 (prior art supports non-obviousness if it indicates "the invention would not have worked for its intended purpose *or otherwise* taught away from the invention").

Lupin argues that the district court failed to limit its analysis to problems explicitly solved in the patent's specification. Lupin-Br. §VI.A.1.c.ii. But the specification explicitly states that the triple combination may provide "viral suppression over a longer period" and "better management of drug-related toxicities." A101(2:11-15). Lupin does not dispute the truth of that, and the trial record corroborated that the combinations in fact provided sustained efficacy and overcame cross-resistance concerns.

A55-56. "Patentability may consider *all* of the characteristics possessed by the claimed invention, *whenever* those characteristics become manifest." *Sanofi-Aventis*, 748 F.3d at 1360. Lupin's cited cases lacked similar evidence and are otherwise distinguishable. *Alcon Research, Ltd. v. Apotex Inc.*, 687 F.3d 1362, 1369 (Fed. Cir. 2012) (prior art disclosed claimed compound and expressed no concerns regarding alleged toxicity); *Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1373-74 (Fed. Cir. 2005) (prior art disclosed claimed compound for same claimed use at nearly the same dose).

Appellants otherwise simply ask this Court to reweigh the trial evidence. Teva-Br. §III.C.3; Lupin-Br. §VI.A.1.d-h. Teva argues that other than cross-resistance, "other factors" such as toxicity and potency "all strongly favored the abacavir/3TC combination," Teva-Br. 47-48, and faults the district court for purportedly giving some evidence "undue emphasis" and "erroneously discount[ing]" or "effectively ignor[ing]" Teva's preferred evidence, Teva-Br. 48, 50-52; *see also* Lupin-Br. §VI.A.1.d-h. The district court was entitled to weigh Appellants' evidence as it did, and to credit contrary evidence. Appellants distort the record and fail to demonstrate clear error. *Anderson*, 470 U.S. at 573-74.

### 1. Because of Cross-Resistance, the Prior Art Taught Away from Combining Abacavir and 3TC, With or Without AZT

As the evidence showed, and Appellants and their experts confirmed, the main reason to resort to combination therapy is that monotherapy led to drug resistance. *Statement of Case* §I.B.3-4, *supra.* That *same* consideration counseled strongly *against* combining cross-resistant drugs. *Id.* Thus, *all* Appellants' primary invalidity experts agreed, a POSA would regard cross-resistance as an important factor in designing drug combinations. A595:7-9 (Zingman: POSA knew to "try to avoid drug resistance"); A768:19-770:12 (Parniak); A914:18-915:8 (Laurence); A978:18-22 (Arnold). Numerous prior art publications corroborated that testimony, and explicitly counseled to avoid cross-resistant combinations. A43-44 (citing A4303 ("Three criteria should be used to select the right clinical combination," one being that "the drugs *should not be cross-resistant.*"); A4056 ("the "likelihood of cross-reactive resistance with other agents" was an "increasingly important issue" to consider."); A5944; *see also* A1416:4-13; A143:22-1438:23.

Abacavir and 3TC, both sides' experts testified, were known to be *cross-resistant three times over*. A1164:11-1166:20 (Larder); A1418:3-22

(Ho); A701:9-13 (Parniak); A767:17-768:5 (Parniak); A972:21-24 (Arnold); A979:8-11 (Arnold); A973:8-13 (Arnold); A913:1-21 (Laurence); A520:24-521:22 (Zingman); *see also* A4373 (abst. I82). Thus, given undisputed evidence that a POSA considered it important to avoid cross-resistance, and knew that abacavir and 3TC were cross-resistant for three mutations, the district court had ample support to conclude that "[t]he weight of the prior art most strongly suggests that concerns of cross-resistance would be a discouraging factor, even for combinations displaying significant potency and limited toxicity." A44. Appellants' complaints that the court did not weigh other evidence more heavily provide no basis for overturning the judgment.

### a.    Arguments About "Potency" Do Not Explain Away Cross-Resistance

Appellants continue to argue that "potency" considerations trumped cross-resistance. Lupin-Br. 42-44; Teva-Br. 51. Teva argues that a POSA was motivated to combine ABC/3TC based on their individual properties, Teva-Br. 42-45, without regard for their performance in combination. The district court properly gave that theory little weight, as it had little basis in the evidence and failed to undermine the importance of cross-resistance. Not only was the Appellants' "potency" evidence weak, it was refuted.

Teva contends that the district court "effectively ignored" two references (TTX 107 and TTX 108) that "went unrebutted at trial" and showed that combinations could prevent the development of resistance *in vitro*. Teva 51-52. On the contrary, the district court credited contrary evidence. It was known that the tested combinations did ***not*** prevent resistance when used in humans. A41; A1149:9-1150:14; A03734-35; A893:18-895:10; *see also* A4110 ("Drug resistance with currently available agents is probably unavoidable"). Teva's expert admitted "there were *no* publications that would suggest" using cross-resistant drugs to delay the emergence of drug resistance, A768:6-13, and Teva admitted that, at best, potency would only "diminish[]" cross-resistance. A5044.

Further, evidence showed that synergistic potency should *not* be a "main criterion for using drug combinations." A4303. That is because a POSA knew in 1995 that even with a potent combination, resistance mutations would emerge quickly. A1167:18-1168:20; A1436:1-17; *see also* A878:5-6 (Lupin expert Laurence: "if we haven't wiped it out everywhere, we wiped it out nowhere"). Potency only gets one so far. The HIV virus replicates billions of times *per day*, generating every possible mutation of the HIV genome at least once a day. A1431:16-1432:14; A1436:1-17;

A481:18-22. By 1995, a POSA knew that before treatment the patient would already have virus variants resistant to drugs. A1144:19-1146:18. Thus, the main criteria for combinations were avoidance of (a) overlapping toxicities, (b) cross-resistance, and (c) antagonism. A4303. That makes sense: drug resistance ultimately *undermines* potency as resistant virions propagate. *See* A1178:14-1179:2; A43-44. Appellants never addressed that issue.

A POSA would also have been aware that no known combination actually inhibited all replication or even significantly delayed resistance in humans. A1167:18-1168:20; A3738. AZT/ddI and AZT/ddC each failed to delay resistance. A1149:9-1150:14; A3734-35; A893:18-895:10. Potency is fleeting in face of drug resistance. The most potent combination at the time, AZT/3TC, which was *not* cross-resistant, *still allowed M184V* to rapidly emerge. A5921 (abst.LB33); A762:17-763:14; A764:11-765:22; A1152:1-17; A1167:18-1168:11 1018:18-1019:11.[7] That finding alone, reported in January 1995, A5921; A4118, demonstrates that the district court was not clearly erroneous in rejecting Appellants' unsupported

---

[7] The combination delayed resistance to AZT, not both drugs as Teva alleges. Teva-Br. 8.

theory that "hitting hard and early" with a *cross-resistant* combination would prevent emergence of drug resistance.

Even assuming a POSA would have focused on potency, Appellants never explain why a POSA would have ignored cross-resistance. Researchers had *hundreds* of available compounds, including dozens more advanced and more potent than abacavir. PIs and NNRTIs in particular (which, again, Appellants ignore) had shown a "great deal of potency in patients." A1443:13-17; *see also* A909:20-23. Combinations of potent, non-cross-resistant drugs were available, and preferred by the field. *See, e.g.*, A1434-36 (2 NRTIs and a PI); *Forest Labs., Inc v. Ivax Pharms., Inc.*, 501 F.3d 1263, 1267, 1269 (Fed. Cir. 2007) (affirming non-obviousness where a POSA "would generally have been motivated to develop new compounds rather than undertake the difficult and unpredictable task" the inventor undertook).

Against the weight of the evidence showing cross-resistant combinations were highly disfavored, Appellants point to *one* arguably cross-resistant combination, AZT/3TC/ddI, reported before March 1995. Teva-Br. 49-50; Lupin-Br. 44. Unlike abacavir and 3TC, however, ddI and 3TC did not share the same primary mutation. A47; A1514:21-1515:4.

Appellants did not dispute that fact below. Teva has thus waived the factual argument it makes for the first time here that 3TC plus ddI also "overlapped at three mutations." Teva-Br. 50 (citing A4111). Replacing ddI with abacavir would lead to a "[c]omplete overlap in terms of resistance," something unheard of in 1995. A1446:7-1447:4.

### b.  Varying Degrees of Resistance To Abacavir Do Not Explain Away Cross-Resistance

Teva faults the district court for giving cross resistance "undue emphasis" in light of evidence that resistance to abacavir *with respect to the M184V mutation* varied by degrees. Teva-Br. 48-50. As an initial matter, that ignores that a POSA had hundreds of compounds to consider, and no reason to focus on a cross-resistant one—Teva's argument depends on hindsight. Teva also ignores that abacavir and 3TC both selected for two *additional* mutations (L74V and K65R) which, Teva's own expert acknowledged, undeniably caused "significant resistance to abacavir." A520:24-521:22. Finally, Teva asks this Court to reweigh evidence. The record reflected that even the 2-5 fold resistance to abacavir caused by M184V, which Teva derides as "low," Teva-Br. 48, was significant. A1418:23-1419:18; A1424:22-1425:7; A947-48 (would cause "problems in clinical efficacy"); A1187-88; A4110. Teva asserts that abacavir "slow[ly]" selected for

resistance in vitro, Teva-Br. 12-13, but as the district court noted, A46, ViiV's and Lupin's experts agreed that the emergence of M184V in four "passages" is actually "quite quick." A1164:11-1165:15; A969:9-18.

### c.    Lupin's "Resensitizing" Argument Does Not Explain Away Cross-Resistance

With respect to the triple combination, the district court found that "the complete cross-resistance between abacavir and 3TC provided some degree of discouragement" for combining them with AZT, A54, and "gave reasons to look in directions other than combining abacavir with 3TC." A46-47.   Lupin disputes those findings, Lupin-Br. 43-44, but fails to demonstrate clear error.

Lupin contends that cross-resistance would not have discouraged a POSA from the patented triple combination because abacavir would induce mutations that would *further* sensitize the virus to AZT.  Lupin-Br. 43-44. Tellingly, Lupin's expert did not take that position, A952 (combine AZT with "abacavir *or* 3TC"); A958 (combine AZT with ABC), and Lupin cites no evidence indicating that a POSA would expect the addition of abacavir to AZT/3TC to provide additional sensitization to AZT, as opposed to merely cross-resistance with 3TC.  *See* A1443; A1447.

Even assuming that a POSA would have looked for a second "resensitizing agent" to add to AZT/3TC, no evidence at trial suggested that a POSA would have looked to abacavir, as opposed to the numerous other compounds that resensitized HIV to AZT but were *not* cross-resistant with 3TC.  *See, e.g.*, A51 n.32; A4248-51; A899:13-902:12; A950:21-951:3. Again, Lupin's arguments are supported only by hindsight.

### d. Teva Did Not Show that A POSA Would Have Been Motivated to Remove AZT From the Only Combination That Worked

Teva contends that a POSA would have replaced AZT with abacavir in the prior art combination of AZT/3TC, in part because, in Teva's view, all factors other than cross-resistance "favored" that course.  Teva-Br. 47-48.  Teva is wrong for the reasons above, and further fails to explain the contradiction between its arguments that (a) a POSA would have started with AZT/3TC in the first place, and (b) a POSA would have split apart the only combination that showed benefits over NRTI monotherapy by March 1995.

All parties agreed, and witnesses consistently testified, that AZT/3TC was a "breath of fresh air", A31, or a "turning point in the field of HIV therapy."  A41; A4128; A499:3-24.  The prevailing thought behind the

61

success of that combination was that the two drugs were essentially the opposite of cross-resistant.  A40; A945; A1152; A1400.  Teva derides that explanation as an "unproven hypothesis," but where experts for both sides testified otherwise, A945:7-17; A972:7-15; A1152:1-17; A1153:11-15; A1400:14-24; A910:3-911:11, and the prior art explicitly stated otherwise, A4129; A4375; A4247-48, it was not clear error for the district court to hold otherwise.  A41 (resensitization "by far the best explanation given for the combination's success").

Teva starts with the idea that a POSA "would have recognized the advantages of replacing AZT with abacavir in the AZT/3TC combination." Teva-Br. 45; *see also* A22-23; A30.  Teva never showed, however, why one would expect to see "advantages" by taking away the very reason for that combination's success (the resensitization between AZT and 3TC) and re-placing it with the opposite (cross-resistance between ABC and 3TC).  This Court rejected a similar argument in *Eisai*.  533 F.3d at 1358 ("The record … shows no discernible reason for a skilled artisan to begin with lansoprazole only to drop the very feature … that gave this advantageous property.")  As the district court found here, there was "no good reason" to make this change.  A50; *also* A1442.  And even were a researcher so moti-

vated, there were non-cross-resistant NRTIs available. A4014 (AZDU related to AZT, but less toxic and "an attractive alternative."); A5857 (935U83 less toxic than AZT; "lack[ed] cross-resistance with other anti-HIV agents").

### 2. Because of Toxicity, the Prior Art Taught Away from Combining NRTIs

The toxicity of NRTIs—both alone and in combination—was well-established in March 1995. *Statement of Case* §I.B.2, *supra*. Beyond cross-resistance, toxicity presented another reason that a POSA would not be motivated to focus on NRTI combinations to the exclusion of numerous other possibilities. Teva does not dispute the importance of toxicity—indeed, it emphasizes AZT's toxicity to rationalize why one might want to replace it in the AZT/3TC combination. Teva-Br. 45. Lupin addresses toxicity in passing, Lupin-Br. §VI.A.1.e, and appears to rely on the prior art triple combination of AZT/3TC/ddI to challenge the judgment. *See, e.g.*, Lupin-Br. 13, 20, 23, 26-27, 33, 38. The district court did not err in weighing evidence of toxicity and concluding "synergistic toxicity was to be avoided." A53. Given the "unpredictability in the field," there is no reason a POSA would be motivated to explore "any particular combination," and

every reason to pursue the numerous possible combinations that included non-toxic compounds.  *Id.*

### a.    NRTIs Were Known to Be Toxic, Particularly In Combination

The evidence showed "NRTIs were generally expected to be toxic." A52; *see also Statement of Case* §I.B.2, *supra*.  A 1995 article Appellants relied on notes that clinical evaluation of many "antiviral nucleosides [NRTIs]" were "abandoned in the late 1980s, *merely because they were nucleosides*."  A4280.

Moreover, the toxicity of NRTIs was both *unpredictable* in humans, and potentially *synergistic* in combination.  ddI, for example, did not show severe toxicity *in vitro* or in dogs, A4056, but caused painful and potentially lethal side effects when given to humans.  *Id.*  Increased toxicity was already seen with dual-NRTI combinations, such as AZT/ddC. A53.  Dr. Zingman even admitted that it was "a difficult decision to know whether or not to give [patients] two toxic drugs or only one…."  *Id.*  Indeed, the prior art showed that the toxic side effects of AZT and carbovir (which metabolizes to the same compound as abacavir) were synergistic in combination.  A4087.  That "synergistic toxicity," A4303, both sides'

experts acknowledged, taught away from combining abacavir, 3TC, and AZT. A858:13-21; A1443:2-1444:8; A730:6-13; *cf.* A1439:15-1440:5.[8]

The potential for increased NRTI toxicity "undercuts the argument that any particular combination would be obvious." A53; *Institut Pasteur*, 738 F.3d at 1346 (Board erred by disregarding toxicity teaching). Lupin cites no case holding that reliance on "generalized toxicity risks applicable to all drugs … reflects reversible error." Lupin-Br. 34. To the contrary, the unpredictability here, combined with the fact that hundreds of non-toxic alternatives were available, demonstrates why a POSA would not be motivated to explore the claimed combinations. *Allergan, Inc. v. Sandoz Inc.*, 726 F.3d 1286 (Fed. Cir. 2013), is not to the contrary. On *Allergan*'s facts, the prior art as a whole taught only "some degree of unpredictability," and thus did not teach away from the claimed invention. *Id.* at 1292. Here, however, the court's findings go much further and must be considered in light of the teaching that abacavir and 3TC were cross-resistant.

---

[8] The district court observed that abacavir was "understood to be a less toxic compound" than carbovir, A53, but it does not follow that a POSA would consider a combination with abacavir over other non-toxic compounds.

Taken as a whole, only hindsight supports focusing on the claimed combinations.

### b.    Other Triple-Drug Combinations Reinforced The Teaching Away From Combining Multiple NRTIs

Again using hindsight, Lupin focuses on the AZT/3TC/ddI combination as a supposed "starting point[]" for a POSA, arguing that it overcomes toxicity concerns. Lupin-Br. 13. But as the district court found, there was no "success from the AZT/3TC/ddI combination that would 'inspire imitation,'" A54, much less reason for a POSA to substitute ddI with abacavir. A53-54.

*First*, this was the *only* prior art triple-NRTI combination Lupin identifies, belying Lupin's claim that "the art had picked a path: all-NRTI combinations." Lupin-Br. 17. Tellingly, the patented ABC/3TC/AZT is the *only* triple-NRTI combination ever recommended in the NIH's or World Health Organizations' HIV treatment guidelines. A1466; *see also* A6170; A6286; A6002. As described above and as Lupin does not rebut, the art reflected a preference for adding a drug from a different class, namely protease inhibitors or NNRTIs, which were less toxic. The art taught that "combination regimens will likely include both RT [reverse transcriptase]

66

inhibitors … and HIV-1 protease inhibitors" as only the latter affects chronically-infected cells. A4110. The Schinazi reference Lupin cites, Lupin-Br. 12, states that the AZT/3TC results caused researchers to add "protease inhibitors in combination with AZT/3TC", *not* a third NRTI. A4280. By the priority date, clinical trial results favored drugs *outside* the NRTI class. A884; A4001; A4004; A4183. The patented triple-NRTI combination here, by contrast, "was a first of its kind." A70-71.

*Second*, AZT/3TC/ddI was disclosed just two months before the patent's effective filing date, A3727; A40, in just two conference abstracts. A3729 (abst. 265 & 268). Abstract #268 is by the '191 patent's inventors and reports on an *in vitro* assay without specifying what other combinations were tested. A54. Abstract #265 describes a single clinical trial but "does not disclose any results." *Id*. Lupin's refrain that physicians prescribed AZT/3TC/ddI "without awaiting clinical trial results" is misleading as the cited testimony refers to that very clinical trial. Lupin-Br. 33 (citing A851-53 (discussing "Lewis", which is Abstract #265) and A3729 (Abstract #265)).

Without data to suggest that AZT/3TC/ddI overcame well-known toxicity or cross-resistance concerns, the "negative properties" of this

alleged "closest prior art" would have directed one of ordinary skill away from that combination. *Takeda Chem. Indus. v. Alphapharm Pty.*, 492 F.3d 1350, 1359 (Fed. Cir. 2007); *Otsuka*, 678 F.3d at 1292 ("adverse effects" impact whether a POSA "would have selected" a compound); A1446 ("[I]f you ask someone to recall back to that period, would they have started with AZT, 3TC, ddI?  The answer is clearly no, except through the—what we call the retrospective scope.").

### D.    District Court Properly Considered Evidence of Secondary Considerations

ViiV presented evidence of secondary considerations such as commercial success, industry praise, and skepticism of others. A54-68.  While Appellants argue that the district court erred in giving any weight to ViiV's secondary considerations evidence, the court viewed that evidence with a skeptical eye and gave it little weight in the obviousness analysis. *See* A4; A54-68.

For instance, the court did not rely on ViiV's evidence of industry praise, A56, or unexpected results, A63, and treated ViiV's evidence of skepticism as an "insignificant factor in the final weighing of the evidence." A58.  The court found commercial success relevant, but later confirmed that it was not dispositive.  A4.  Given the low weight the district

court gave those factors, secondary considerations cannot be the basis for a claim of clear error. If anything, the district court undervalued some of that evidence. For example, Trizivir and Epzicom are successful drugs, still widely prescribed and recommended today, ten years after launch. A266-269; A1290-94; A1452-53; A1456-1458; A1460-66.

Appellants contend the court did not compare the claims to the closest prior art. Lupin-Br. 52; Teva-Br. 61-62. But regardless of which was the "closest," the claimed combinations proved better than AZT/3TC, the best of its time. A55; *In re Fenn*, 639 F.2d 762, 765 (CCPA 1981) ("indirect comparison" to closest prior art supported non-obviousness); *see also* A6002 (recommending ABC/3TC/AZT, not AZT/3TC/ddI).

The evidence—including unrebutted testimony of widespread sharing of proprietary compounds—soundly refuted Teva's "blocking patents" argument, Teva-Br. 60. *See* A66-68. Teva's criticism of the court's consideration of evidence of "failure of others," "long-felt need," and "unexpected clinical efficacy," Teva-Br. 59-63, otherwise duplicates its criticisms of the court's weighing of evidence of predictability and motivation, and are meritless for the reasons described above. §§II.A-C, *supra*.

## E.    The District Court Was Well Within Its Discretion Not to Consider a Portion of Expert Testimony That Exceeded Pretrial Disclosures

The district court specifically warned the parties before trial not to present expert testimony about prior art combinations not previously disclosed. A49 & n.29. The district court did not abuse its discretion by disregarding testimony that violated that order and the Federal Rules. *Id.* Teva fails to demonstrate an abuse of discretion, Teva-Br. 54-57, and does not even mention the court's order.

Federal Rule 26(a)(2)(B)(i) requires testifying experts to disclose "a complete statement of all opinions [they] will express and the basis and reasons for them" before trial, and Rule 37(c)(1) provides that experts may not offer previously undisclosed opinions, bases, or reasons at trial. *See Siemens*, 637 F.3d at 1286-87. Those rules require obviousness experts to specify prior art references and reasons for combining them, rather than reciting a mass of prior art and the conclusion that the claims are obvious. *Innogenetics*, 512 F.3d at 1373; *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1327 (Fed. Cir. 2012). Where a report merely stockpiles references to be mixed and matched at trial later on, the patentee is deprived of notice and opportunity for rebuttal and cross-

70

examination. *Hearing Components, Inc. v. Shure, Inc.*, No. 07-CV-104, 2009 WL 593836, at *4 (E.D. Tex. 2009), *aff'd*, 600 F.3d 1357 (Fed. Cir. 2010); *Belden Techs., Inc. v. Superior Essex Commc'ns*, 802 F.Supp.2d 555, 566 & nn.7-8 (D. Del. 2011).

Consistent with those principles, and without objection, the district court ordered before trial that experts could not testify at trial to combinations not disclosed in their reports. A49 & n.29; A4493-95; A4984-85. Part of Parniak's testimony violated that order. His reports identify more than *100* prior art references, mostly as "background," and identified two specific prior-art combinations that he alleged rendered the asserted claims obvious. Parniak's trial testimony, however, attempted to merge the two combinations, and to add references newly plucked from the mass of "background" citations. A726-27.

After trial, consistent with its earlier order, the district court sustained ViiV's objection and disregarded the offending portion of Parniak's testimony. A48-49. Teva does not point to any place in Parniak's report disclosing the specific combinations he testified about at trial. Instead, Teva argues that the report was cleverly worded to permit *post hoc* shuffling of references ("cross-referencing," in Teva's words) at trial. Teva-Br.

54-56. Teva's reading is strained, and largely unexplained, and the district court was well within its discretion to forbid Parniak from creating new combinations of prior art references at trial.

In any event, Parniak's testimony does not have the significance Teva asserts. Parniak never testified that a POSA would start with abacavir/ddC, and the evidence regarding that combination consisted of one sentence in two abstracts. A4372 (abst.I6); A4373 (abst.I82). Substituting 3TC for ddC would also run into the same cross-resistance issues as the rest of Teva's arguments. A4420; A4302. Parniak's testimony would not have changed the judgment.

## III. Lupin Did Not Prove its Enablement-Utility Defense by Clear and Convincing Evidence

Although Lupin's brief refers to "the '191 patent," Lupin-Br. §VI.B, its enablement-utility defense applies only to method-of-treatment claims, and not formulation claim 47. Lupin-Br. 63 (purporting to distinguish a case on that ground). Regardless, the district court's ruling, A74-76, should be affirmed. Lupin misstates the law and the record and attempts to set up a false dichotomy where a pharmaceutical invention is either not enabled or obvious.

The enablement clause of 35 U.S.C. §112(a) "incorporates … the requirement of 35 U.S.C. §101 that the specification disclose as a matter of fact a practical utility for the invention." *In re Cortright*, 165 F.3d 1353, 1356 (Fed. Cir. 1999). That requirement typically weeds out patents in such fraud-prone areas as "perpetual motion," "cold fusion," or "once notoriously intractable areas such as cures for baldness or cancer." *Eli Lilly & Co. v. Actavis Elizabeth LLC*, 435 F.App'x 917, 924 (Fed. Cir. 2011). Utility is a low bar for a patentee, requiring that the invention not "be *totally incapable* of achieving a useful result." *Brooktree Corp. v. Advanced Micro Devices, Inc.*, 977 F.2d 1555, 1571 (Fed. Cir. 1992); *Envirotech Corp. v. Al George, Inc.*, 730 F.2d 753, 762 (Fed. Cir. 1984) ("the defense of non-utility cannot be sustained without proof of total incapacity").

ViiV's patent easily meets that standard. The patent describes a "credible utility" for the claimed combinations, A101(1:16-21) (useful for treating HIV infections); A101(2:10-15) ("more complete viral suppression" and "limit[ing] the emergence of drug resistant HIV mutants"), and Lupin's experts never testified otherwise. Indeed, *unlike prior art*, the patent includes *in vitro* data on the ability of abacavir, 3TC, and AZT alone and in

combination to inhibit HIV replication at "trough" drug concentrations from human clinical studies. A106(11:65-12:25); A1050:3-8 (St. Clair testimony). Based on that disclosure, a POSA would understand that the claimed combinations would have "therapeutic utility." A781:7-19; A1550:8-13.

Lupin argues that the patent would not "give the skilled artisan comfort," Lupin-Br. 62, but cites nothing in support. Lupin also mischaracterizes ViiV's expert's testimony. *Id.* In explaining nonobviousness, Dr. Ho testified that human data would "*prove*" the combinations "*actually* had utility *and* worked in humans," A1490:4-12, not that only human data would enable the combinations. This Court has specifically held that human clinical data is not required to enable pharmaceutical inventions. *Edwards Lifesci. AG v. CoreValve, Inc.*, 699 F.3d 1305, 1309-10 (Fed. Cir. 2012) (citing MPEP §2164.02; *In re Brana*, 51 F.3d 1560, 1566 (Fed. Cir. 1995); *Scott v. Finney*, 34 F.3d 1058, 1063 (Fed. Cir. 1994)). That is, in part, because pharmaceutical inventions "necessarily include[] the expectation of further research and development. The state at which an invention in this field becomes useful is well before it is ready to be administered to humans." *Brana*, 51 F.3d at 1568; *see also Cortright*, 165

F.3d at 1360 (method lacking "clinical evidence" still satisfied utility requirement).

Indeed, this Court has specifically rejected attempts to conflate obviousness and enablement in the manner Lupin does, cautioning against "confus[ing] the criteria for proving obviousness with those for demonstrating that a disclosure is nonenabling," and noting that teaching away and unexpected results are "not the primary questions bearing on enablement." *Singh*, 317 F.3d at 1346; *see also PPG Indus. v. Guardian Indus.*, 75 F.3d 1558, 1563-65 (Fed. Cir. 1996); *Brana*, 51 F.3d at 1567.

Lupin's reliance on *Rasmusson v. SmithKline Beecham Corp.*, 413 F.3d 1318 (Fed. Cir. 2005) and *In re '318 Patent Infringement Litigation*, 583 F.3d 1317 (Fed. Cir. 2009) ("*Janssen*") is misplaced. Lupin-Br. 64-65. *Rasmusson* was an interference case where the question was which applicant conceived and reduced to practice first. In that context, *Rasmusson* required additional evidence from the party trying to show an earlier priority date. 413 F.3d at 1324. This Court has specifically distinguished *Rasmusson* on that basis. *Eli Lilly*, 435 F.App'x at 925. Outside the interference context, however, applicants "may provide data obtained either before *or after* the patent application was filed." *Id.*; *see also Brana*, 51 F.3d

at 1567 n.19 (post-filing evidence substantiated utility). ViiV did so here, documenting the clinical efficacy of the claimed combinations. A3773; A3768-70; A248:10-252:16.

The *Janssen* patent claimed methods of treating Alzheimer's, but the specification "was only just over one page" and disclosed neither "*in vitro* test results nor animal test results … to treat Alzheimer's-like conditions." 583 F.3d at 1321, 1325. The inventor did not provide *any* information indicating even *potential* "to treat Alzheimer's-like conditions," *id.* at 1325, nor any test results during prosecution, *id.* at 1322, and testified that when he filed the application, he had no expectation whether the class of agents "would ever work." *Id.* at 1327. *Janssen* bears no resemblance to this case and does not support Lupin.

## IV. The District Court Properly Rejected Teva's Post-Trial Attempt To Rescind or Avoid its Infringement Stipulation

Before trial, Teva stipulated to infringement, knowing of Lupin's noninfringement defense. During and after trial, Teva reaffirmed its stipulation and remained silent while Lupin presented its defense. After Lupin's defense succeeded, Teva sought to retract its stipulation and claim a benefit for itself. ViiV's cross-appeal, *infra* §V, explains that Lupin's defense should *not* have succeeded. If the Court agrees, Teva's arguments

regarding its stipulation are moot. Teva's arguments are also without merit. *See* A4.

## A. Factual Stipulations are Binding and Conclusive

Infringement is a question of fact, *Sunovion*, 731 F.3d at 1275, and under Supreme Court precedent factual stipulations are "*binding and conclusive*," *Christian Legal Soc'y v. Martinez*, 130 S.Ct. 2971, 2983 (2010) ("*CLS*"), as "formal concessions that have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact." *Id.* Consistent with *CLS* —which ViiV cited below and Teva ignores—courts hold parties strictly to their factual stipulations, *Rodriguez v. Señor Frog's de la Isla*, 642 F.3d 28, 35 (1st Cir. 2011); *United States v. Bill Harbert Int'l Constr., Inc.*, 608 F.3d 871, 889 (D.C. Cir. 2010), including stipulations of patent infringement. *Ring & Pinion Serv. v. ARB Corp.*, 743 F.3d 831, 836 (Fed. Cir. 2014); *Fujitsu Ltd. v. Belkin Int'l*, No. 10-CV-3972, 2012 WL 4497966, at *12 (N.D. Cal. Sept. 28, 2012).

## B. The District Court's Post-Trial Resolution of Lupin's Non-Infringement Defense Does Not Entitle Teva to Rescind its Pretrial Stipulation

Teva argues that it was entitled to rescind its pretrial stipulation because the district court purportedly altered the claim construction it issued in November 2012. That argument fails for several reasons.

*First*, Teva's stipulation preserved its right to appeal the district court's November 2012 *Markman* order—nothing more. That stipulation, entered when Teva knew that Lupin disputed infringement, concedes infringement of seven claims "of the '191 patent, as those claims were construed by the Court on November 16, 2012, to the extent those claims are valid and enforceable." A81. No plausible reading gives Teva the right to dispute infringement after trial on the basis of arguments it never made, or claim terms the court did not construe in November 2012. Rather, by its terms, the stipulation preserved Teva's right to renew arguments it made in the pretrial *Markman* proceedings (which Teva has done, *see* §I, *supra*), and otherwise removed Teva's infringement from further dispute. *See CLS*, 130 S.Ct. at 2983.

*Second*, the district court did not alter its November 2012 claim construction. As Teva admits, the November 2012 order "did not distinguish between the sulfate and free-base forms of abacavir," as the parties had not asked the district court to construe that term. Teva-Br. 29; *id.* at 21 ("had not construed the claim term for abacavir"). Later orders addressing that distinction could thus not have "departed from the *Markman* Opinion." *Id.* at 29; A4 ("The Court did not change anything in its earlier claim

construction"); *cf. Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1337 (Fed. Cir. 2010) (district court "did not amend its construction" when it "simply looked to additional elements of the claim").

*Third*, Teva's "mutual mistake" argument is waived and meritless. Teva did not argue "mutual mistake" below, and the law is clear that a party's erroneous prediction about the future is not a "mistake" within the meaning of contract law. *See generally* 27 *Williston on Contracts* §70:4 (4th ed.); *Shear v. NRA*, 606 F.2d 1251, 1260 (D.C. Cir. 1979); *Restatement 2d of Contracts* §151, cmt. a (1981). Rather, this is a simple instance of one party's regret about its decision in light of subsequent events. Teva stipulated that under the Court's November 2012 claim construction, it infringed. Lupin went to trial with the opposite position—that under the November 2012 claim construction, it did *not* infringe. Teva's speculation about the parties' possible silent motivations for stipulating is irrelevant, and Teva's apparent surprise at the result of the trial is no basis for rescinding the stipulation.

*Finally*, as the district court found, regardless of how its post-trial order is characterized, consolidation of Teva's and Lupin's cases did not expand Teva's rights. A4 ("To the extent [the court] offered further claim

construction in the ViiV v. Lupin dispute, it was done in the context of an issue being litigated between ViiV and Lupin, and not between ViiV and Teva."). Had the cases been tried separately, it is beyond question that Teva could not have claimed the benefit of Lupin's defense. Consolidation does not change that analysis. Consolidation is is "a matter of convenience and economy in administration, but does not merge the suits into a single cause, or change the rights of the parties, or make those who are parties in one suit parties in another." *Johnson v. Manhattan Ry. Co.*, 289 U.S. 479, 496-97 (1933); *cf. Abbott Labs. v Andrx Pharms., Inc.*, 473 F.3d 1196, 1198-1201 (Fed. Cir. 2007).

## C. Allowing Teva to Rescind its Stipulation Would Be Unfairly Prejudicial to ViiV

*CLS* and the stipulation's terms foreclose Teva's argument. Further, it would be fundamentally unfair to ViiV to permit Teva to rescind its stipulation.

In reliance on Teva's stipulation, the parties narrowed their claims and defenses for trial. Teva's ANDA was not in the trial record, because Teva's infringement was no longer disputed. *CLS*, 130 S.Ct. at 2983. Before and during trial, as Lupin's non-infringement defense unfolded, the parties repeatedly confirmed that only Lupin disputed infringement:

- **The jointly-filed pretrial order**, reiterated Teva's infringement stipulation, A4567-68(¶16), while reciting the specific basis for Lupin's noninfringement defense, A4624 (Lupin's product "will use abacavir sulfate, not abacavir free base"); *see also* A4625; A4727 ("Lupin only" contested "infringement").

- **At the pretrial conference,** all confirmed that only Lupin contested infringement A4473:3-8 (Court: "infringement only relates to one of two defendants"); A4487:16-21 (only Lupin should brief noninfringement).

- **At trial**, only Lupin's infringement was disputed. Teva's opening statement confirmed that it was "moving forward on a single defense … the claims … are invalid because they're obvious," A198:18-24, and the court sustained an objection when ViiV began to ask Lupin's non-infringement expert about the fact that Teva conceded infringement. A447:9-19.

- **In post-trial briefing**, after Lupin's defense was fully aired, Teva gave no indication that it would claim any benefit if that defense succeeded, though it joined certain of Lupin's invalidity arguments. A5054-55.

There is no basis in law or logic for Teva's contention that it was entitled to lie in wait for 10 months and object to entry of judgment after trial. "Litigants … are entitled to have [their] case tried upon the assumption that facts, stipulated into the record, were established." *CLS*, 130 S.Ct. at 2983; *see also Bradford-White Corp. v. Ernst & Whinney*, 872 F.2d 1153, 1161 (3d Cir. 1989) ("grossly unfair to allow a plaintiff to go to the expense of trying a case only to be met by a new defense after trial.").

Finally, Teva overreaches by demanding "entry of judgment for Teva" if its argument succeeds. Teva-Br. 30. At most the remedy would be a remand, and ViiV would be entitled to pursue additional discovery and revisit its decision to drop claims in light of Teva's stipulation—including 48 and 51, to which Teva stipulated, A81; A19n.5. Teva's argument is meritless, however, and the infringement judgment should be affirmed.

## V.    <u>Cross-Appeal</u>: The Court Should Reverse the Judgment that Lupin Does Not Infringe

ViiV's cross-appeal concerns only Lupin. ViiV respectfully submits that the district court erred in crediting Lupin's noninfringement arguments. The facts regarding Lupin's generic product are undisputed. All agree—and testimony and evidence showed—Lupin's product contains abacavir in the form of abacavir sulfate. At Lupin's urging, however, the dis-

82

trict court held that Lupin's product would not contain the claimed "(1S,4R)-cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-yl]-2-cyclopentene-1-methanol," literally or equivalently. Lupin's defense cannot withstand scrutiny.

## A. Lupin's Product Literally Contains the Claimed Abacavir

ViiV asserted formulation claim 47 and method claims 4, 26-27, 29-30, 34, 36, and 38-39 against Lupin. All recite "(1S,4R)-cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-yl]-2-cyclopentene-1-methanol"—*i.e.*, abacavir. The district court's conclusion that that term does not literally include salts such as the abacavir sulfate in Lupin's product (and ViiV's Trizivir) rests on two demonstrable errors.

*First*, the court stated there is "*no suggestion in the patent* that the chemical formula for pure or free base abacavir was specially defined to include the salt form." A21. The written description, however, provides that "*[a]ll salts … are are within the scope of the present invention.*" A102(3:25-27). Likewise, the prosecution history demonstrates that the patentees used "1592U89" (abacavir, *see* A99(abstract)) and "abacavir sulfate" interchangeably. The patentees' submission at A3773 refers to Fischl and Staszewski abstracts as "report[ing]" on use of "1592U89," and

"summariz[ing] results of clinical trials with combinations *of the present invention*." Both abstracts concern the use of Ziagen (the brand name for abacavir sulfate). A3768; A3770.

*Second*, the district court erroneously read a dependent claim as broader than an independent claim. Yet, it is "axiomatic that a dependent claim cannot be broader than the claim from which it depends" and an independent claim "must cover at least" the dependent claim. *Alcon*, 687 F.3d at 1367. Claims 35 and 32 necessarily confirm that "(1S,4R)-cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-yl]-2-cyclopentene-1-methanol" is a broad term that includes salts. Claim 32 recites a method using a combination including "(1S,4R)-cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-yl]-2-cyclopentene-1-methanol." A107(14:34-41). Claim 35 recites "a method according to claim 32 *wherein the* (1S,4R)-cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-yl]-2-cyclopentene-1-methanol *is the succinate salt*." A107(14:54-56).

The court acknowledged that "claim 35 narrows the '1S,methanol' [abacavir] element of claim 32 to 'the succinate salt,'" A14, yet held, incongruously, that the asserted claims—which include that same "'1S,methanol' [abacavir] element"—do not cover "salt form[s] of abacavir."

A9. The court sought to explain that inconsistency by suggesting that the dependent claims are "inconsistent" because some add the limitation "wherein the "(1S,4R)-cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-yl]-2-cyclopentene-1-methanol" is a particular salt, while others add the limitation "wherein the physiologically functional derivative" is a particular salt.[9] But both terms are broad and include salts. The district court erred in finding no infringement.

## B. Lupin's Product Necessarily "Treats" Patients "with a therapeutically effective amount" of the Claimed Abacavir, and Lupin Thus Infringes at Least the Method Claims

Even accepting "(1S,4R)-cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-yl]-2-cyclopentene-1-methanol" as limited to abacavir "free base," undisputed evidence establishes that Lupin infringes at least the method claims. Each method claim (4, 26-27, 29-30, 34, 36, and 38-39) recites "treatment" or "treating," "with a therapeutically effective amount of a combination comprising 1S,4R)-cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-yl]-2-cyclopentene-1-methanol…."

---

[9] The court construed "physiological functional derivative" to include salts. A19n.5 (citing A85).

There is no dispute that, when a patient ingests a pill, the abacavir sulfate is metabolized to the free base form of abacavir. That is explicit in Lupin's ANDA, and Lupin's expert Arnold confirmed it. A441:13-19 (Lupin's tablet "eventually provides abacavir. That is the active ingredient. Otherwise, the product wouldn't work."). This Court has "recognized that a person may infringe a claim to a metabolite if the person ingests a compound that metabolizes to form the metabolite." *Schering Corp. v. Geneva Pharms., Inc.*, 339 F.3d 1373, 1380 (Fed. Cir. 2003). That is precisely what happens here, and Lupin represented as much to the FDA to obtain approval. Were there any doubt that Lupin's product—like ViiV's Trizivir—treats with "abacavir," Lupin's ANDA resolves it. It repeatedly recites that the "tablet *contains* the *active ingredient* 300mg of *abacavir* as abacavir sulfate" (highlighting added):



A5812 (comparison to reference product)

**Confidential Material Omitted**

A5799 (Medication Guide)

A5645 (proposed indications and usage)

*See also* A5809; A5661; A5675; A5685; A5747-49; A5763; A5766; A5806;

A311:21-312:3; A325:17-20; A326:10-12.   That makes sense—a POSA

would understand "abacavir is in abacavir sulfate." A350:14-22.  In *Merck*

*& Co. v. Teva Pharmaceuticals USA, Inc.*, this Court rejected an argument

similar to Lupin's:

> The evidence of all the qualified witnesses was that persons in
> this field would understand that the acid is the active agent
> and that the acid *is administered when it is in the form of the*
> *salt.*  There was no evidence that the claimed method of treat-
> ment is not achieved by the acid salt.

347 F.3d 1367, 1371 (Fed. Cir. 2003).  So too here.  The judgment of nonin-

fringement must be reversed at least for the method claims.

87

**Confidential Material Omitted**

### C.    At a Minimum, Lupin Infringes Under the Doctrine of Equivalents

A product or process infringes under the doctrine of equivalents where it contains "elements identical or equivalent to each claimed element of the patented invention." *Warner-Jenkinson Co. v. Hilton-Davis Chem. Co.*, 520 U.S. 17, 40 (1997).  ViiV's expert Langer explained how Lupin infringes literally and equivalently.  Langer explained that even if "(1S,4R)-cis-4-[2-amino-6-(cyclopropylamino)-9H-purin-9-yl]-2-cyclopentene-1-methanol" does not literally cover abacavir sulfate, the differences are insubstantial.  Both treat HIV symptoms in the same way by delivering the same active ingredient to inhibit HIV's reverse transcription in the same way.  A351:15-352:6.

Langer's equivalents analysis was unrebutted.  Lupin's expert Arnold admitted he did not analyze infringement under the doctrine of equivalents.  A448:18-24.  Lupin convinced the court, however, to find noninfringement based on two dispositive legal errors.

*First,* the court relied on functions unrelated to the invention.  The court's brief discussion of equivalents relies on the fact that the salt form of a drug has "superior stability and handling properties." A15.  Stability and handling properties, however, are unrelated to the function, way, or

88

result of the claimed abacavir active ingredient.  A351:15-352:6.  The Supreme Court has admonished that equivalence "does not require complete identity for *every purpose and in every respect.*"  *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 609 (1950).  Rather, the focus is the element's purpose in the patent.  *Id.*  "It is the limitations and functions of the invention described in the claims, not the elements or functions of the accused device, which establish the reference point for the doctrine of equivalents analysis."  *Insta-Foam Prods., Inc. v. Universal Foam Sys., Inc.*, 906 F.2d 698, 702 (Fed. Cir. 1990).  Under *Graver Tank* and its progeny, reliance on stability and handling properties was erroneous.

*Second*, the district court held the doctrine of equivalents is inapplicable because of its view that other *unasserted* claims *literally* covered abacavir free base.  A15-16 ("[I]t would be improper to recapture scope that is absent in the asserted claim, yet present in unasserted claims, under the doctrine of equivalents.").  That proposition is inconsistent with *Graver Tank*, and would turn claim differentiation on its head.  The *Graver Tank* patent had broad claims covering "metallic silicates" and narrower claims covering "alkaline earth metals."  *Johnson & Johnson Assocs. Inc. v. R.E. Serv. Co.*, 285 F.3d 1046, 1053 (Fed. Cir. 2002) (en banc) (discussing *Grav-*

*er Tank*).  The accused manganese silicate literally infringed the broader claims but not the narrower claims.  *Id.*  The Supreme Court nonetheless held that the accused product infringed the narrower claims under the doctrine of equivalents—which it could not have done if the district court's analysis here were correct.  *Id.*  This Court has not applied "recapture" doctrine to limit the scope of equivalents by reference to unasserted claims, as opposed to disclosed but unclaimed subject matter.  Any such holding would be contrary to *Graver Tank* and would nonsensically imply that any patentee who fails to assert the broadest independent claims in any particular case forfeits most recourse to the doctrine of equivalents.  At a minimum, the doctrine-of-equivalents ruling must be reversed.

## D.    The Court Should Remand For Determination of Remedy

The remaining claim elements are readily met by Lupin's product, and largely undisputed.  As Lupin launched its generic product in December 2013, this Court should reverse the judgment of noninfringement and remand for a determination of ViiV's remedies.  *See Callicrate v. Wadsworth Mfg., Inc.*, 427 F.3d 1361, 1375 (Fed. Cir. 2005).

## CONCLUSION

The Court should *affirm* the judgment that Teva infringes and the claims are not invalid, and *reverse* the judgment that Lupin does not infringe.

September 4, 2014                    Respectfully submitted,

/s/ F. Christopher Mizzo
_____

F. Christopher Mizzo
John C. O'Quinn
William H. Burgess
Craig T. Murray
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C.  20005
(202) 879-5000
*Counsel for Cross-Appellants*

## **CERTIFICATE OF SERVICE**

On September 4, 2014, the Confidential and Non-Confidential versions of this brief were submitted to the Court through the CM/ECF system. As to the Non-Confidential version, all parties are represented by CM/ECF users and will be served by the CM/ECF system.

As to the Confidential version, two copies were served via Federal Express Overnight Delivery on the following counsel for Defendants-Appellants, and a courtesy copy by e-mail, on September 4, 2014.

Ira J. Levy
GOODWIN PROCTER LLP
N.Y. Times Bldg., 620 Eighth Ave.
New York NY 10018
ilevy@goodwinprocter.com

*Principal Attorney for Teva
Pharmaceuticals USA, Inc.*

William A. Rakoczy
RAKOCZY MOLINO MAZZOCHI
  SIWIK LLP
6 W. Hubbard Street
Chicago IL 60654
wrakoczy@rmmslegal.com

*Principal Attorney for Lupin Ltd.
and Lupin Pharmaceuticals, Inc.*

/s/ William H. Burgess

## **CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION**

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 28.1(e)(2). According to the word processing system used to prepare it, the brief contains 16,484 words.

/s/ William H. Burgess